Liza M. Walsh
Marc D. Haefner
Christopher J. Borchert
CONNELL FOLEY LLP
One Newark Center
1085 Raymond Blvd., 19th Floor
Newark, New Jersey 07102
(973) 757-1100

Peter D. Vogl
Lisa T. Simpson
Mary Beth Myles
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York 10019-6142
(212) 506-5000

*Attorneys for Plaintiff*
*KARS 4 KIDS INC.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| KARS 4 KIDS INC., | : | Civil Action No. 14-7770 (PGS/LHG) |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
|  | : | **BRIEF IN SUPPORT OF MOTION TO** |
| v. | : | **ENFORCE SETTLEMENT OR, IN** |
|  | : | **THE ALTERNATIVE, REOPEN THE** |
| AMERICA CAN!, | : | **MATTER** |
|  | : |  |
| Defendant. | : | Return Date: January 19, 2016 |
|  | : |  |

# TABLE OF CONTENTS

I.   Introduction ................................................................................................... 1

II.  Factual and Procedural History ...................................................................... 5

III. Legal Standard ............................................................................................. 10

IV.  Argument ..................................................................................................... 12

   A.   The Settlement Terms Should Be Enforced............................................. 12

     1.   The Court May Reopen This Action For The Purpose Of Enforcing The Settlement Terms ........................................................................................................... 13

     2.   The Settlement Terms Constitute An Enforceable Contract.......................................... 13

       a.   The Settlement Terms Contain All Essential Terms In a Sufficiently Definite Manner and The Parties Manifested Their Intent to Be Bound ....................................... 14

     3.   Telephone Donations Are A Material Term ............................................... 15

       (1)   The Parties Had A Meeting Of The Minds As To Telephone Donations......... 16

       b.   Even If Telephone Donations Were Not Explicitly Incorporated In The Settlement Terms, None Of The Other Material Terms Would Prohibit Telephone Donations ........ 19

       c.   The Settlement Agreement Does Not Include The Provision Requiring The Transfer Of The Cars Domain Name ............................................................................... 21

       (1)   The Transfer Of The Cars Domain Name Is Not An Essential Term.............. 22

    (2)   The Parties Were Not In Agreement As To The Transfer Of The Cars Domain Name 23

   B.   Alternatively, The Action Should Be Reopened For Good Cause To Allow The Parties To Litigate The Case On The Merits ...................................................................... 23

V.   Conclusion ................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Tacconelli's Pizzeria*,
LLC, No. 10-1901, 2013 U.S. Dist. LEXIS 12204 (D.N.J. Jan. 30, 2013) .............................7

*Alexander v. N.J. DOT*,
No. 11-3348 (PGS), 2013 U.S. Dist. LEXIS (D.N.J. Aug. 26, 2014) ....................................17

*Berg Agency v. Sleepworld-Willingboro, Inc.*,
136 N.J. Super. 369, 346 A.2d 419 (App. Div. 1975) .............................................4, 10, 13, 21

*Building Materials Corp. of America, d/b/a GAF Materials Corp. v. Certainteed
Corp. and Air Vent, Inc.*
273 F. Supp. 2d 552 (D.N.J. 2003) ........................................................................................11

*In re Cendant Corp. Secs. Litig.*,
*569 F. Supp. 2d 440 (D.N.J. 2008)* .......................................................................................21

*Dept't Pub. Advocate v. N.J. Bd. Of Pub. Utilities*,
206 N.J. Super. 523, 503 A.2d 331 (App. Div. 1985) ............................................................11

*Excelsior Ins. Co. v. Pennsbury Pain Center*,
975 F. Supp. 342 (D.N.J. 1996) ...................................................................................10, 11, 13

*Flexco Microwave, Inc. v. MegaPhase LLC*,
Civ. No. 04-1339 (TJB), 2009 U.S. Dist. LEXIS 55943 (D.N.J. March 6,
2009) .......................................................................................................................................18

*Forte Sports, Inc. v. Toy Airplane Gliders of Am., Inc.*,
371 F. Supp. 2d 648 (E.D. Pa. 2004) .....................................................................................10

*Hagrish v. Olson*,
254 N.J. Super. 133, 603 A.2d 108 (App. Div. 1992) ............................................................11

*Honeywell v. Bubb*,
130 N.J. Super 130, 325 A.2d 832 (N.J. Super. Ct. App. Div. 1974).....................................11

*JM Agency, Inc. v. NAS Fin. Servs., Inc.*,
No. A-5898-05TS, 2007 N.J. Super. Unpub. LEXIS 1548, at *9 (N.J. Super.
Ct. App. Div. Aug. 3, 2007)....................................................................................................10

*Karl's Sales & Serv., Inc. v. Gimbel Bros.*,
249 N.J. Super. 487, 592 A.2d 647 (App. Div.), *certify. denied*, 127 N.J. 548,
606 A.2d 362 (1991) ...............................................................................................................21

*Lederman v. Prudential Life Ins. Co. of Am., Inc.*,
    188 N.J. 324, 907 A.2d 1013 (2006) ................................................................... 11

*North Am. Lacrosse League LLC v. Jennings*,
    2012 U.S. Dist. LEXIS 159002, Civ. No. 12-167 (D.N.J. Oct. 12, 2012) ............................. 23

*Nye v. Ingersoll Rand Co.*,
    783 F. Supp. 2d 751 (D.N.J. 2011) .................................................................... 20

*Pascarella v. Bruck*,
    190 N.J. Super. 118, 462 A.2d 186 (App. Div. 1983) .............................. 10, 11, 13

*Sanofi-Aventis U.S. LLC v. Sandoz, Inc.*,
    No. 07-2762 (JAP), 2009 U.S. Dist. LEXIS 91923 (D.N.J. Oct. 2, 2009) .............................. 12

*Sawka v. Healtheast, Inc.*,
    989 F.2d 138 (3d Cir. 1993) ...................................................................... 10, 13

*United States v. Lightman*,
    988 F. Supp. 448 (D.N.J. 1997) .................................................................... 10

*United States v. Zoebisch*,
    Civ. No. 09-cv-05207, 2013 U.S. Dist. LEXIS 150074 (D.N.J. Oct. 18, 2013) .................. 13

*United States v. Zoebisch*,
    405 Fed. App'x 493 (Fed. Cir. 2010) ................................................................ 13

**Other Authorities**

Local Civil Rule 41.1(b) .................................................................................. 10

*Restatement 2d, Contracts* §131, comment g ................................................................ 10

# I.  INTRODUCTION

Plaintiff Kars 4 Kids, Inc. ("K4K") and Defendant America Can! ("America Can") have reached a settlement of this litigation.  The parties voluntarily entered into a settlement agreement after many months of negotiations, culminating in a settlement conference before the Honorable Lois H. Goodman, U.S.M.J., on July 28, 2015 (the "July Settlement Conference"). (Declaration of Peter D. Vogl ("Vogl Decl.") ¶¶ 5, 7-25.)  The purpose of the settlement agreement was to settle this dispute by eliminating the likelihood that consumers would be confused between the two charities.  To that end, the parties agreed upon a geographic split whereby K4K may advertise, market, or promote its marks in any national advertising and in any other advertising, marketing, or promotion not specifically directed at residents of Texas. Conversely, America Can may advertise, market, or promote its mark in Texas, but may not engage in national advertising of its mark.  The parties reached an agreement as to all material terms, save the payment term, during extensive negotiations leading up to the July Settlement Conference.  These material terms of the settlement were agreed upon after months of telephone conferences and email exchanges between counsel and were memorialized in drafts of a proposed term sheet prior to the July Settlement Conference.  The term sheet specifically set forth the following:

- America Can may use the CARS FOR KIDS Mark in Texas only and not engage in any national advertising using the CARS FOR KIDS Mark.  America Can may not use "kars" as part of any domain name or keyword advertising.  America Can may not bid on any car donation search terms directed at Internet users surfing from locations outside Texas.

- K4K may engage in national advertising and any advertising not specifically directed at Texas, so long as national advertising highlights the "k" in "kars." K4K otherwise may bid on "cars for kids" as a search term outside of Texas and may use "cars for kids" descriptively, so long as "cars for kids" does not appear in any consumer facing material.  K4K may not use "America Can" as part of any domain name.  K4K may not bid on "America Can," "Can Academy," "Dallas Can," "Texas Can," or any other geographic terms relating to Texas, as a search term.

- America Can may not accept Internet donations originating from outside Texas, while K4K may not accept Internet donations originating from inside Texas.

- America Can may accept all unsolicited telephone donations including from outside Texas, and K4K may also accept all unsolicited telephone donations including from inside Texas.

- The parties will negotiate an appropriate enforcement mechanism against third parties.

- America Can will consent to K4K's application for and registration of any trademarks containing the word "kars" with a "k."

- The parties grant each other a right of first refusal to purchase any trademark rights.

- Consistent with the settlement of the district court action, the parties also agree to dismiss the cancellation and opposition proceedings before the Trademark Trial and Appeal Board.

(*Id.* at ¶ 18; Ex. H.)

The payment term was the only material term negotiated at the July Settlement Conference.  (*Id.* at ¶ 25)  K4K agreed to pay $3.1 million in consideration for the aforementioned terms.  (*Id.*)  The terms set forth above (as in the term sheet), together with the payment terms agreed upon at the July Settlement Conference, constitute all of the material terms of the agreement (hereinafter, the "Settlement Terms").[1]  (Vogl Decl. ¶¶ 18, 44; Ex. H.)

The issue before this Court is whether America Can should be held to the language it proposed when it stated that "K4K can accept donations via the telephone from the State of Texas."  (*See id.* at ¶ 18; Ex. H)  Inexplicably, America Can is now taking the position that the provision and the language it drafted were never agreed upon by the parties as part of the settlement.  America Can is refusing to finalize a settlement agreement that includes the very language it proposed and that K4K relied upon and accepted as a term that was material to its offer of $3.1 million.

It is clear that the disputed provision is an essential term of the settlement agreement to which the parties each voluntarily assented.  As K4K sets forth in more detail below, after America Can proposed the provision regarding telephone donations, the parties exchanged two additional drafts of the term sheet (one sent from each party on July 16, 2015), and counsel had at least three additional conversations (on July 16, 21, and 22, 2015) in furtherance of settlement prior to the July Settlement Conference.  (*Id.* at ¶¶ 17-20, 22; Exs. F, H.)  Not once in any of these communications preceding the July Settlement Conference did America Can ever repudiate the language it drafted regarding telephone donations or indicate any lack of certainty regarding the now-disputed provision.  (*See id.* at ¶¶ 19-20, 22.)  In fact, America Can did nothing but

---

[1] Subsequent to the July Settlement Conference, the parties agreed to certain other terms to which K4K remains prepared to agree should be included in any final settlement.  (*See id.* at ¶ 39; Ex. Q.)

*confirm* the inclusion of telephone donations in the period between the date America Can drafted the provision and the July Settlement Conference.  (*Id.* at ¶ 16; Ex. F.)  America Can cannot escape its obligations because it has decided in hindsight that it no longer views telephone donations as beneficial.

Additionally, America Can is attempting to include other terms that were never included in the term sheet or agreed upon by the parties.[2]  America Can should not be permitted to add new material terms after settlement has been reached by the parties.  America Can is claiming that the parties agreed to transfer ownership of certain domain names to one another.  Specifically, America Can alleges that K4K agreed to transfer ownership of the domain name www.carsforkids.com (the "Cars Domain Name") to America Can, while America Can allegedly agreed to transfer ownership of all domain names containing the word "kar" to K4K (for example, www.kar4kids.org).  While K4K understood that it could not use "cars for kids" as a trademark or as a domain name to the extent such use would be contrary to the Settlement Terms, just as America Can could not use "kars 4 kids" as a trademark or as a domain name to the extent such use would be contrary to the Settlement Terms, the Settlement Terms only prohibited the parties from advertising, marketing, or promoting in connection with the marks.  Nothing in the settlement agreement required either party to transfer ownership of any domain names.  Importantly, America Can did not list the transfer of domain names as a desired provision in any of the drafts of the term sheet, nor did America Can raise it at the July Settlement Conference.  (*See id.* at ¶¶15, 17-20, 22-23; Exs. D, F, and H.)  America Can may not

---

[2] Both sides did propose additional non-material provisions, several of which were not agreed upon by the parties as of the date of this filing.  K4K believes the parties would have been able to resolve these differences but for the parties' disagreement as to the material terms raised in this motion.  An otherwise enforceable agreement is no less binding where non-material details remained to be fleshed-out in a formal settlement document.  *See Berg Agency v. Sleepworld-Willingboro, Inc.*, 136 N.J. Super. 369, 373-74 (App. Div. 1975).

now argue that a term which was not agreed upon by the parties should be construed to be part of a binding settlement agreement.

Pursuant to this Court's Dismissal Order and Local Civil Rule 41.1(b), K4K respectfully requests that the Court enforce the Settlement Terms.  Because the parties entered into a binding settlement, this Court has the power to reopen the action for the purpose of enforcing the Settlement Terms.  Alternatively, should the Court find no meeting of the minds as to material terms of the agreement, K4K respectfully requests that the Court vacate the July 30 Dismissal Order and reopen this action to be litigated on the merits before this Court.

## II.  <u>FACTUAL AND PROCEDURAL HISTORY</u>

The subject of this action is a dispute between K4K and America Can regarding their rights to their trademarks—K4K's marks, KARS 4 KIDS and 1-877-KARS-4-KIDS (the "KARS 4 KIDS Marks"), and America Can's mark, CARS FOR KIDS.  The parties have been engaged in settlement discussions since mid-2014, when K4K brought a Notice of Opposition against America Can's application for CARS FOR KIDS before the Trademark Trial and Appeal Board.[3] (Vogl Decl. ¶ 4.)  Initial attempts to resolve the Opposition proceeding were unsuccessful and K4K decided to initiate this action against America Can to enforce its trademark rights.  (*Id.* at ¶ 5.)

Shortly after filing this case, the Court encouraged the parties to engage in a voluntary discovery period wherein the parties would exchange information and evidence related to the parties' respective claims to trademark rights throughout the United States.  (*Id.* at ¶ 7.)  The parties exchanged substantial records documenting donations, as well as evidence of marketing,

_____

[3] These proceedings have been stayed pending the resolution of this litigation.  (*Id.* at ¶ 6.)

advertising, and the parties' respective alleged first use dates of their marks in jurisdictions throughout the United States.  (*Id.* at ¶ 8.)

The parties exchanged four iterations of the Term Sheet (on June 29, July 6, and twice on July 16, 2015) and engaged in at least five telephone conferences (on July 1, 3, 19, 20, and 22, 2015) between counsel to discuss the terms as drafted in the Term Sheet prior to the July Settlement Conference.  (*Id.* at ¶¶ 10-15, 17-20, 22-23.)  As a result of these extensive negotiations, the parties were able to agree upon all of the material terms as set forth in pages one and two herein, with the exception of the amount and terms of payment.

During the settlement negotiations preceding the July Settlement Conference, America Can proposed language whereby, notwithstanding the other provisions of the term sheet, "K4K can accept donations via the telephone from the State of Texas" and "[America Can] can accept donations via the telephone from outside the State of Texas."  (*Id.* at ¶ 15; Ex. D)  As counsel for both parties agreed, telephone donations should be treated differently from online donations.  (*Id.* at ¶¶ 12-14.)

Although America Can and K4K continued to revise the term sheet, at no point did either party delete, remove, or materially alter the provision regarding telephone donations.  (*See id.* at ¶¶ 15, 17, 18; Exs. D, F, and H.)  In fact, counsel for America Can confirmed that the telephone donations provision was indeed part of the deal in an email dated July 16, 2015, when counsel for America Can, Mr. Jonathan Pressment, wrote to counsel for K4K, Mr. Peter Vogl, "Your client [K4K] will have national advertising that will certainly be heard in Texas and will undoubtedly have residual donations from Texas (*by phone would still be permitted*)." (*Id.* at ¶ 18; Ex. G (emphasis added).)

6

Although the Term Sheet also contained an express provision prohibiting K4K from using "America Can" and America Can from using "kars" as part of any domain name, the Term Sheet never included a provision requiring the parties to transfer ownership of the Cars Domain Name or any other domain names to one another.  (*See id.* at ¶¶ 10, 15, 17, 18; Exs. B, D, F, and H.)

In a telephonic conference with Judge Goodman, counsel for the parties indicated that the parties were in agreement as to the material terms, but not as to the payment amount to be paid in consideration for those terms.  (*Id.* at ¶ 23.)  America Can's last offer was $3.995 million, while K4K's last offer was $3 million.  (*Id.*)  Judge Goodman instructed the parties to decide by July 27, 2015 if they would meet in the middle and accept a payment of $3.5 million payable over a period of three years.  (*Id.*)  When the parties did not agree, Judge Goodman scheduled an additional in-person settlement conference for July 28, 2015.

At the conclusion of the July Settlement Conference, the parties agreed as to the remaining material term—settlement payment amount and payment schedule.  (*Id.* at ¶ 25.)  At no point during the July Settlement Conference did America Can and K4K renegotiate any of the agreed upon terms of the term sheet, nor did the parties agree upon the transfer of domain names. (*Id.*)  After the conclusion of the July Settlement Conference, this Court issued a Dismissal Order on July 30, 2015 (D.I. 42) whereby the action was dismissed with prejudice, but the parties could move to reopen the action for good cause within 60 days.[4]

Following the July Settlement Conference, K4K prepared a draft of the settlement agreement, incorporating the provisions of the term sheet, as well as the payment terms negotiated at the July Settlement Conference, which it sent to America Can on September 11,

_____

[4] The parties sought and were granted two extensions of time through November 13, 2015 to finalize the settlement or move to reopen the action.  (D.I. 43, 44, 45, and 46.)

2015.  (*Id.* at ¶ 26; Ex. I.)  The September 11 draft settlement agreement included the term permitting unsolicited telephone donations.  (*See id.*)

On September 30, 2015, counsel for America Can provided a revised draft of the settlement agreement which consisted of a clean document and a mark-up of K4K's September 11 draft.  (*Id.* at ¶ 27; Ex. J.)  In the September 30 draft, for the first time, America Can expressed it was not agreeing to telephone donations by deleting the previously agreed upon language permitting telephone donations.  America Can also inserted various other provisions not agreed upon by the parties, including the transfer of the Cars Domain Name.

America Can's changes were contrary to the Settlement Terms.  Counsel for K4K therefore prepared another revised draft of the settlement agreement, reinserting the telephone donations provision, and counsel for both parties held a telephone conference on November 6, 2015 to discuss K4K's revisions.  (*Id.* at ¶¶ 29-30; Ex. L)  During that call, Mr. Pressment expressly agreed to accept telephone donations, but requested that the parties add language to clarify the original intent of the parties to permit only unsolicited telephone donations.  (*Id.* at ¶30.)  In other words, no "cold calling" would be permitted.  (*Id.*)  K4K consented and provided a revised draft reflecting the requested language.  (*Id.* at ¶ 31; Ex. M.)

Despite agreeing to the provision regarding telephone donations again on November 6, 2015, America Can once again retracted its consent and maintained that the telephone donations provision was not a part of the settlement agreement.  On November 12, 2015, America Can submitted a letter to the Court (D.I. 47), in which it sought a dismissal of this action without prejudice in order to permit America Can to litigate the same case in the Northern District of Texas.  (Vogl Decl. at ¶ 32.)  America Can took the position that should K4K not agree to the

8

material changes made by America Can to the settlement agreement, America Can would seek to force K4K to defend itself in new litigation in Texas.

After the parties submitted letters advising the Court of the parties' failure to conclude a settlement (D.I. 47, 48, 49), Judge Goodman conducted a telephonic conference with counsel for America Can and K4K on November 17, 2015, where she granted the parties a few additional days to resolve their differences and ordered the parties to submit letters setting forth their final positions by November 24, 2015.  (D.I. 50.)  After exchanging several additional draft settlement agreements and engaging in further conversations, the parties were able to resolve other non-material provisions, but remained in disagreement as to the telephone donations provision and the provision requiring the transfer of the domain names.  (Vogl Decl. ¶¶ 33-40; Exs. N-R.)

The parties submitted letters on November 24, 2015, as instructed by Judge Goodman, advising the Court that the parties were unable to conclude a settlement agreement and setting forth requests to move for appropriate relief.  (*Id.* at ¶ 41.)  K4K sought leave to file a motion to enforce the settlement agreement, or, in the alternative, to reopen the action for good cause for litigation on the merits.  America Can similarly sought permission to move to enforce the settlement; however, in the event the Court did not agree with its position, rather than seeking to return to litigation before this Court, America Can suggested it will seek the extraordinary remedy of the Court vacating its Dismissal Order to dismiss the action again without prejudice to allow America Can to litigate the same matter in Texas.  On December 3, 2015, the Court granted the parties' requests and instructed K4K and America Can to file motions to enforce the settlement agreement.  (D.I. 52.)

### III. LEGAL STANDARD

Under Local Rule 41.1(b), an action dismissed as settled may be reopened for good cause.  Where a Court has manifested an intent to retain jurisdiction, a district court has jurisdiction to reopen litigation for the purpose of enforcing a settlement agreement.  *See Forte Sports, Inc. v. Toy Airplane Gliders of Am., Inc.*, 371 F. Supp. 2d 648, 651 (E.D. Pa. 2004); *see also Sawka v. Healtheast, Inc.*, 989 F.2d 138, 141-42 (3d Cir. 1993).

It is well settled that settlement agreements are binding contracts enforceable by courts.  *See Pascarella v. Bruck*, 190 N.J. Super. 118, 124-25 (App. Div. 1983).  State law governs the interpretation of settlement agreements.  *Excelsior Ins. Co. v. Pennsbury Pain Center*, 975 F. Supp. 342, 348-49 (D.N.J. 1996).  Thus, this Court should look to New Jersey law to interpret the agreement between the parties.  *See id.*

Under New Jersey law, the terms of a settlement agreement need not be in writing, as oral settlement agreements are binding.  *See Pascarella*, 190 N.J. Super. at 124.  An oral agreement to settle need not include all possible provisions, so long as the parties were of one mind as to the essential, or material, terms of the agreement.  *United States v. Lightman*, 988 F. Supp. 448, 459 (D.N.J. 1997).  Courts should consider the context of a term and the "subsequent conduct of the parties" to determine if a term is essential.  *JM Agency, Inc. v. NAS Fin. Servs., Inc.*, No. A-5898-05TS, 2007 N.J. Super. Unpub. LEXIS 1548, at *9 (App. Div. Aug. 3, 2007), citing *Restatement 2d, Contracts* §131, comment g.  The parties are free to negotiate and resolve non-essential terms after the creation of the contract, while any remaining disputed non-essential terms should be decided by operation of law.  *Berg Agency v. Sleepworld-Willingboro, Inc.*, 136 N.J. Super. 369, 376 (App. Div. 1975).

Under New Jersey contract law, a contract, and thus a binding agreement, is formed where the parties intended to make an offer and acceptance of "sufficiently definite essential terms." *Excelsior Ins. Co.*, 975 F. Supp. at 349.  "A contracting party is bound by the apparent intention he or she outwardly manifests to the other party." *Hagrish v. Olson*, 254 N.J. Super. 133, 138 (App. Div. 1992).  To determine whether parties reached a settlement and to identify essential terms, courts typically look to factors such as the language of any writings, the conduct of the parties, and the objective reasonableness of the alleged agreement.  *See Lederman v. Prudential Life Ins. Co. of Am., Inc.*, 188 N.J. 324, 339-40 (2006) (noting that courts interpreting a contract should consider "the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain…").  Courts are not required to discern subjective intent, but rather look to the objective intent as evidenced through the circumstances surrounding the contract.  *Building Materials Corp. of America, d/b/a GAF Materials Corp. v. Certainteed Corp. and Air Vent, Inc.*, 273 F. Supp. 2d 552, 553 (D.N.J. 2003).

Courts will ordinarily enforce settlement agreements unless there is evidence of fraud or other circumstances sufficient to warrant releasing a contracting party from its obligations.  *See Honeywell v. Bubb*, 130 N.J. Super 130, 136 (App. Div. 1974); *Pascarella*, 190 N.J. Super. at 125.  Courts will enforce settlements without reviewing the adequacy of the consideration. *Honeywell*, 130 N.J. Super. at 136.  Strong public policy dictates that settlement agreements should be enforced wherever possible—in fact, New Jersey courts are instructed to "strain" to preserve settlement agreements.  *Dept't Pub. Advocate v. N.J. Bd. Of Pub. Utilities*, 206 N.J. Super. 523, 528 (App. Div. 1985); *Pascarella*, 190 M.J. Super. at 125.  A party may not repudiate a contract due to a change of heart after reaching a settlement.  *See id.* at 126 (noting

that "[i]f later reflection were the test of the validity of such an agreement, few contracts of settlement would stand.").

## IV.  ARGUMENT

America Can should not be permitted to escape from its obligation to abide by the settlement agreement reached, nor should it be permitted to subsequently alter the material terms of the settlement agreement.  K4K respectfully requests that this Court reopen the action for the purpose of enforcing the settlement, as the parties unequivocally reached an agreement of the Settlement Terms during months of negotiations and exchanging multiple iterations of the term sheet, culminating in the July Settlement Conference.  Alternatively, should the Court find there was not a meeting of the minds on all of the material terms, this Court may reopen the action to allow the parties to litigate the case on the merits.

### A.        The Settlement Terms Should Be Enforced

Pursuant to this Court's July 30 Dismissal Order, the action could be reopened upon a showing of good cause within sixty days.  (D.I. 42.)  The Court specifically retained jurisdiction for the purposes of enforcing the settlement agreement between the parties.  (*See id.*)  Good cause exists, because the parties had a meeting of the minds as to the material terms of the settlement and knowingly and voluntarily entered into an agreement.  In *Sanofi-Aventis U.S. LLC v. Sandoz, Inc.*, the Court found that the parties had reached a settlement where the parties had expressed an intent to settle and where they "set forth the essential terms of their deal" in a term sheet, while working on "finer details of their agreement."  No. 07-2762 (JAP), 2009 U.S. Dist.

LEXIS 91923, at *2 (D.N.J. Oct. 2, 2009).[5]  The Settlement Terms are therefore a binding

contract that the Court has the power to enforce.

**1.    The Court May Reopen This Action For The Purpose Of
Enforcing The Settlement Terms**

If the Court finds that the parties had a meeting of the minds as to all essential elements

of a settlement, the Settlement Terms are an enforceable contract, and the Court has the power to

reopen the action for the purpose of enforcing it.  *See Sawka*, 989 F.2d at 141-42; *Pascarella,*

*190 N.J. Super.* at 125.  Because this Court specifically indicated an intent to retain jurisdiction

to enforce the settlement, good cause should be found to reopen the action for the purpose of

enforcing the settlement.  *See United States v. Zoebisch*, Civ. No. 09-cv-05207 (RMB/KMW),

2013 U.S. Dist. LEXIS 150074, at *10 (D.N.J. Oct. 18, 2013) (finding good cause to reopen

litigation to enforce a settlement agreement and noting that a finding of "good cause is further

supported by [the Court's] clear intention to retain jurisdiction with respect to the Settlement

Agreement.").  K4K therefore respectfully requests that the Court reopen the action for the

limited purpose of enforcing the Settlement Terms.

**2.    The Settlement Terms Constitute An Enforceable Contract**

The parties entered into a settlement agreement voluntarily and knowingly after extensive

negotiations where each party was represented by counsel.  Both parties have continuously

expressed a desire to resolve their disputes amicably.  The Settlement Terms are binding.

"[P]arties may effectively bind themselves by an informal memorandum where they agree upon

the essential terms of the contract and intend to be bound by the memorandum, even though they

contemplate the execution of a more formal document."  *Berg Agency*, 136 N.J. Super. at 373-

---

[5] The Court found an enforceable settlement agreement and issued a Consent Judgment, which
was vacated at 405 Fed. App'x 493 (Fed. Cir. 2010).

13

74.  The oral agreement to settle was binding under New Jersey law, so long as the material terms were sufficiently definite.  *See Excelsior Ins. Co.*, 975 F. Supp. at 349.  The prohibitions against the parties' uses of their marks in the other's geographic territories, the payment terms, and the dismissal of the proceedings before the Trademark Trial and Appeal Board were all sufficiently definite.  Moreover, the heavily negotiated terms agreed upon in the term sheet were memorialized in writing and provide additional clarification as to the material terms.  The July 16 term sheet sent from Mr. Pressment to Mr. Vogl is clear and sufficiently definite as to all material terms, save payment, which was resolved at the July Settlement Conference.  America Can and K4K bound themselves to the Settlement Terms.  The Settlement Terms therefore constitute a binding contract.

> **a.**     **The Settlement Terms Contain All Essential Terms In a Sufficiently Definite Manner and The Parties Manifested Their Intent to Be Bound**

Prior to the July Settlement Conference, the parties agreed to a settlement in principle. As the parties represented during their call with Judge Goodman on July 24, 2015, the parties believed they were in agreement as to the essential terms of the settlement, but were unable to resolve the settlement payment terms.  (*Id.* at ¶ 23.)  At the time of the call, the parties had participated in a settlement conference before Judge Goodman on June 23, 2015, exchanged four iterations of the term sheet and engaged in numerous telephone calls.  (*Id.* at ¶¶ 9-20, 22; Exs. B, D, F, and H.)  Contrary to America Can's position, the parties were not negotiating from a clean slate at the July Settlement Conference.  Rather, the parties were in agreement on key terms, but were unable to bridge the gap between America Can's last proposal of $3.995 million and K4K's last offer of $3 million.  The remaining material terms were clear and sufficiently definite as expressed in the term sheet.

14

The purpose of the July Settlement Conference was to facilitate agreement between the parties on a settlement dollar figure and an appropriate payment schedule.  K4K and America Can did not renegotiate any of the terms discussed by counsel and previously agreed upon and memorialized in the term sheet.  (*Id.* at ¶ 25.)  The July Settlement Conference resulted in the parties agreeing on the final remaining material term—a specific settlement figure, $3.1 million, according to a specific payment schedule.  (*Id.*)

America Can's contention that the agreed upon terms of the term sheet ceased to be relevant once the parties agreed to continue settlement discussion before Judge Goodman is contrary to all of the facts.  America Can's position as to the transfer of the domain names also completely belies its claim that the settlement consists only of the terms specifically discussed at the July Settlement Conference.  America Can claims on one hand that telephone donations are not a part of the agreement, because while they were listed in a Term Sheet exchanged prior to the July Settlement Conference, the term sheet became an irrelevancy at the July Settlement Conference.  On the other hand, America Can contends the domain name transfer was part of the agreement, even though it was not even discussed at the July Settlement Conference.  If America Can wants to argue that a provision drafted by America Can and explicitly agreed upon by the parties is not binding, it cannot maintain at the same time that a disputed term never memorialized in any writing, nor agreed upon or even discussed at the July Settlement Conference, should be construed to be part of the settlement agreement.  Therefore, the essential terms consist of the Settlement Terms, that is, those agreed upon in the term sheet along with the $3.1 million payment agreed upon at the July Settlement Conference.  (*Id.* at ¶¶ 18, 44; Ex. H.)

### 3.     <u>Telephone Donations Are A Material Term</u>

The telephone donations provision is an essential term of the settlement agreement and it is clear that both parties intended that the term be part of the agreement.  Mr. Pressment

specifically pointed out that telephone donations were valuable to America Can during a telephone conference with Mr. Vogl.  (*Id.* at ¶¶ 12-13.)  In fact, Mr. Pressment conveyed a story to highlight America Can's desire to include a provision permitting telephone donations.  (*Id.* at ¶ 13.)  Mr. Pressment indicated that he believed the parties should not be prohibited from accepting donations where the donor has a specific charity in mind.  (*Id.*)  Mr. Pressment provided the example of the relative of an America Can executive currently residing outside of Texas.  (*Id.*)  As Mr. Pressment expressed, it would be illogical to reach an agreement whereby a prospective donor suffering no confusion as to the source of his client's CARS FOR KIDS Mark would be unable to make a donation to his charity of choice.  (*Id.*)  As Mr. Vogl pointed out during that conversation, telephone donors should be permitted to donate to their chosen charity by telephone without risk of any likelihood of confusion.  (*Id.*)  It is therefore clear that telephone donations were material to both parties and that both parties agreed that America Can and K4K would each be able to accept telephone donations, regardless of the location of the vehicle or the donor, because confusion was not likely under those circumstances.[6]  (*Id.*)

### (1)    The Parties Had A Meeting Of The Minds As To Telephone Donations

The provision regarding telephone donations was proposed by America Can and expressly accepted by K4K.  At no point during any of the discussions between counsel prior to or at the July Settlement Conference did counsel for America Can ever express a position inconsistent with the inclusion of telephone donations as stated in the term sheet.  In fact, counsel

---

[6] Contrary to America Can's position, K4K suggests that confusion is *less* likely due to the fact that K4K uses the jingle 1-877-KARS-4-KIDS, and expressed that opinion to Mr. Pressment during conversations between counsel.  (*Id.* at ¶ 12.)  The parties' marks differ primarily in the fact that K4K spells its mark with a "k" and the number "4."  (*Id.*)  In order for a donor to dial the 1-877-KARS-4-KIDS number to make a donation, he or she would need to deliberately dial a "5" for "k" as opposed to a "2" for "c."

for America Can confirmed in an email dated July 16, 2015 that donations "by phone would still be permitted." (*Id.* at ¶ 18; Ex. G.)

Where an attorney has at least apparent authority to accept a deal, courts may bind a party to the terms agreed upon. *See Abbott v. Tacconelli's Pizzeria,* LLC, No. 10-1901 (JBS/AMD), 2013 U.S. Dist. LEXIS 12204, at *17 (D.N.J. Jan. 30, 2013) (noting that an attorney may settle a lawsuit based on apparent authority); *see also Alexander v. N.J. DOT*, No. 11-3348 (PGS), 2013 U.S. Dist. LEXIS, at *16-17 (D.N.J. Aug. 26, 2014) (finding that an attorney attending a settlement conference has apparent authority to settle the litigation). Mr. Pressment's communications with Mr. Vogl clearly evidenced America Can's intention to be bound by the term. Mr. Pressment at least had apparent authority to make the offer to include telephone donations with no geographic restrictions when he included it in the term sheet. Mr. Pressment also had at least apparent authority when he failed to delete the provision through multiple iterations of the term sheet and expressly consented over the phone. Mr. Pressment's July 16, 2015 email also conveys clear intent and authority to agree upon the provision regarding telephone donations. In fact, the email also demonstrates that the inclusion of the term was assumed and non-controversial.

America Can's conduct supports K4K's position that the parties agreed and understood that the term sheet was to be incorporated in the settlement agreement. Several other items included in the term sheet were also not explicitly discussed during the July Settlement Conference, but America Can has never expressed any question that those terms were part of the deal. For example, the term sheet included a mutual grant of a right of first refusal to each party, an enforcement mechanism against third parties, and specific restrictions on keyword advertising. (*Id.* at ¶ 18; Ex. H.) K4K incorporated each of these items from the term sheet into

17

the September 11, 2015 draft settlement agreement.  (*See id.* at ¶ 26; Ex. I.)  Other than minor

changes to the provisions, America Can never objected to these provisions or argued that they

were unauthorized additions to the agreement by K4K.  Rather, America Can accepted them

because they understood those terms to be a part of the agreement—an understanding created by

the existence of the term sheet.

      The permissibility of unsolicited telephone donations is also consistent with the parties'

intent as expressed throughout the settlement negotiations.  During communications between

counsel, the parties discussed ways to enable each party to receive donations from each other's

respective geographic territories where no confusion was present.  (*Id.* at ¶ 14.)  Although such

an arrangement proved unworkable for other donation methods (for example, donations

completed over the Internet), the parties were able to agree that confusion was not present, or at

was at least highly unlikely, in the case of telephone donations.  (*Id.*)  Permitting unsolicited

telephone donations is consistent with the parties' goal of eliminating any likelihood of

confusion by stopping the active solicitation and use of the parties' marks in the other's

respective territory.

      America Can's acceptance of telephone donations is further supported by the fact that it

made other revisions to the term sheet but left the telephone donations provision intact.  The term

sheet which America Can attempts to characterize as "riddled with edits" actually evidences an

intent by America Can to be bound by any terms not rejected.  Where America Can opposed

language provided by K4K, America Can crossed out those provisions.  (*See id.* at ¶ 18; Ex. H.)

The fact that America Can did not cross out the language regarding telephone donations—

language America Can drafted itself—indicated that it had agreed to that term.  *See Flexco*

*Microwave, Inc. v. MegaPhase LLC*, Civ. No. 04-1339 (TJB), 2009 U.S. Dist. LEXIS 55943, at

*10-11 (D.N.J. March 6, 2009) (enforcing settlement interpreted to include a specific clause where a draft agreement showed the defendant had crossed out other terms).

It is apparent that America Can had a change of heart at some point after the July Settlement Conference, well after there was a meeting of the minds as to the material terms of settlement.   America Can's change of heart does not justify altering the material terms as set forth in the Settlement Terms.

**b.   Even If Telephone Donations Were Not Explicitly Incorporated In The Settlement Terms, None Of The Other Material Terms Would Prohibit Telephone Donations**

During discussions between counsel, the parties agreed that telephone donations would be permissible, irrespective of the location of the donor or the vehicle, so long as the provision was reciprocal and provided that neither party would engage in unsolicited calls, or "cold calling."  (*Id*. at ¶¶ 12, 13, 30.)  The settlement agreement centers on an agreement by each side not to advertise, market, promote, or solicit its respective marks in the other's geographic territory (although the parties have always agreed that K4K would still be able to engage in national advertising, marketing, and promotion).  K4K agreed that it would not use the KARS 4 KIDS Marks in "consumer facing" material specifically directed at residents of Texas—again emphasizing active solicitation using the marks.  (*See, e.g., id.* at ¶ 39; Ex. Q.)  None of these provisions would prohibit K4K from accepting unsolicited telephone donations from residents of Texas.  Similarly, nothing in the material terms of the settlement agreement would prohibit America Can from accepting unsolicited telephone donations from residents outside of Texas.

Rather, the provision regarding telephone donations merely grants each party the right to *receive* donations by telephone.  Specifically, a prospective donor picks up the telephone and

calls either America Can or K4K to make a donation.  Telephone donations are not inconsistent with any of the other Settlement Terms.

If America Can had intended for K4K to cease *accepting* donations from Texas, as opposed to restricting K4K's use of its KARS 4 KIDS Marks in Texas, America Can could have easily negotiated that point prior to the July Settlement Conference.  Indeed, the parties did agree they would be restricted from accepting online donations where the vehicle was located outside of their geographic territories.  (*Id.* at ¶ 38; Ex. Q.)  The fact that the term sheet incorporated restrictive language for Internet donations (language drafted by America Can), but not telephone donations (again, drafted by America Can) indicates that the parties intended that Internet donations and telephone donations would be treated differently.[7]

Thus, it is clear that Internet donations were the only instance where the parties intended to restrict donations based on the location of the vehicle.  This result is consistent with the intent and purpose of the Settlement Terms.  The parties' proactive use of their respective marks is the issue at stake—not the parties' rights to do business by accepting unsolicited telephone donations.

> (a)     The Meaning of the Settlement Terms Are Clear and Unambiguous

Where the language of a contract is clear and unambiguous, courts should interpret the language according to its clear meaning and not look to extrinsic evidence to alter that clear meaning.  *Nye v. Ingersoll Rand Co.*, 783 F. Supp. 2d 751, 761 (D.N.J. 2011).  Courts may not

---

[7] The parties agreed that Internet donations should be treated differently, because it is impossible for the parties to restrict the natural search results of a search engine.  (*Id.* at ¶ 14.)  Thus, a potential donor could search for "cars for kids" and reach the K4K website.  (*Id.*)  Since the parties could not completely foreclose the possibility that there was no confusion when individuals placed donations online, they agreed the parties should restrict the ability of individuals from placing donations based on the location of the vehicle.  (*Id.*)

redraft unambiguous contractual provisions.  *See In re Cendant Corp. Secs. Litig.*, 569 F. Supp. 2d 440, 443 (D.N.J. 2008).  Here, the language of the term sheet is clear—"[America Can] can accept donations via the telephone from outside of the State of Texas" and "K4K can accept donations via the telephone from the State of Texas."  (*Id.* at ¶ 18; Ex. H.)

In his letter to the Court, Mr. Pressment maintained that the telephone donations provision was, at most, intended to convey a narrow exception for prior donors.  If America Can had intended to include any such limitation, it would have done so when *it drafted* the language for the term sheet.  Clearly, the most obvious and unambiguous manner to express such an intent would have been to carve out an exception for prior donors.  The language drafted does not do so.  Because the language is clear and unambiguous, it would be improper for the Court to consider any extraneous evidence submitted by America Can to qualify, limit, or redefine the language of the term sheet.  "The polestar of contract construction is to discover the intention of the parties as revealed by the language used by them."  *Karl's Sales & Serv., Inc. v. Gimbel Bros.*, 249 N.J. Super. 487, 492 (App. Div.), *certif. denied*, 127 N.J. 548 (1991).  The clear meaning of the provision indicates that America Can had every intention of permitting the parties to accept telephone donations with no restrictions.  Thus, the Court should interpret the provision without restriction according to its clear and unambiguous meaning—"K4K can accept donations via the telephone from the State of Texas."  (*Id.* at ¶ 18; Ex. H.)

       **c.**      **The Settlement Agreement Does Not Include The Provision Requiring The Transfer Of The Cars Domain Name**

In America Can's letter to the Court, America Can claims that the transfer of domain names was an essential term to the settlement agreement.  The transfer and ownership of the Cars Domain Name was not an essential term, was never included in the term sheet, and was never

agreed upon by the parties at the July Settlement Conference.  Because there was no meeting of the minds as to the domain names, the provision cannot be enforced.

**(1)** **The Transfer Of The Cars Domain Name Is Not An Essential Term**

The transfer of the Cars Domain Name was not an essential term of the settlement agreement and the parties did not have a meeting of the minds regarding such a transfer.  As such, the provision is not part of the agreement, but the Settlement Terms remain an enforceable contract.  "[A] contract is no less a contract because some preferable clauses may be omitted either deliberately or by neglect."  *Berg Agency*, 136 N.J. Super. at 377.  K4K agreed not to use "cars" and America Can agreed not to use "kars" as part of a trademark, but did not reach an agreement that either party would transfer ownership of any domain names.  America Can did not expressly include the transfer of the Cars Domain Name as one of the material terms set forth in the term sheet, nor could K4K be expected to have known that America Can viewed the term as material where America Can never added it to the term sheet or otherwise made the settlement agreement contingent upon K4K's agreement to transfer ownership of the Cars Domain Name.

Consistent with the agreement reached between the parties, K4K has agreed to cease all use of the Cars Domain Name in connection with its KARS 4 KIDS Marks in the United States.  The Settlement Terms make clear that K4K could not use "cars for kids" in a manner inconsistent with the terms of the agreement, including use as a domain name, but none of the material terms of the settlement require the transfer of ownership of the Cars Domain Name to America Can.  Similarly, the Settlement Terms only require America Can to cease use of any "kar" domains, but do not require America Can to transfer ownership to K4K.

Moreover, the Cars Domain Name had been owned and controlled by other entities for over a decade after America Can claimed it last held it.  (*Id.* at ¶ 42; Ex. S.)  Counsel for

America Can acknowledged that America Can allowed the Cars Domain Name registration to lapse and it was purchased by a third party that K4K discovered was *operating under the name "Cars For Kids"* (now defunct) before it ultimately was acquired by K4K. (*Id.*) America Can cannot claim that the transfer of ownership of a domain name it has not held for at least over a decade is an essential element of the agreement that must be enforced.

**(2)**     **The Parties Were Not In Agreement As To The Transfer Of The Cars Domain Name**

The Cars Domain Name was never listed as one of the essential terms in any iteration of the term sheet, nor was it discussed during the July Settlement Conference. If America Can believed transfer of the domain names to be a material term, it should have included such a provision in the term sheet. At a minimum, the failure to include the Cars Domain Name in the term sheet suggests that the parties had not reached agreement and that there was no meeting of the minds as to the inclusion of such a term. *See North Am. Lacrosse League LLC v. Jennings*, 2012 U.S. Dist. LEXIS 159002, Civ. No. 12-167 (D.N.J. Oct. 12, 2012) (recommending that the Court refuse to enforce an enforcement provision where it was not an essential term to the settlement agreement and not negotiated by the parties). If the transfer of domain names was material to America Can, it was incumbent on America Can to convey as much in the term sheet. Thus, because the provision requiring the transfer of domain names is not material and was not agreed upon by the parties, the settlement agreement is enforceable, but the domain name transfer provision is not required.

**B.**     **Alternatively, The Action Should Be Reopened For Good Cause To Allow The Parties To Litigate The Case On The Merits**

K4K submits that there is an enforceable contract containing all essential terms; however, if the Court finds that there was not a complete integration of all essential terms, good cause

23

exists to reopen the matter.  For the reasons explained above, telephone donations were an essential term to the agreement.  K4K understood the telephone donations provision to be included when it agreed to the payment of $3.1 million.  As this term was included in the term sheet, K4K's belief was objectively reasonable.  If the Court finds that the parties did not have a meeting of the minds as to the telephone donations, however, the failure to include and agree upon an essential term constitutes good cause to reopen the action.  This result was clearly contemplated by the Court when it expressly provided a mechanism in its Dismissal Order by which the parties could reopen the matter for good cause.

To the extent that America Can argues and the Court concurs that the transfer of the Cars Domain Name (or any other issues still in dispute) were essential terms, K4K submits that there was no meeting of the minds.  Good cause therefore exists to reopen the action.  K4K understood the agreement to consist only of the Settlement Terms.  If the Court finds there was no meeting of the minds as to any of the Settlement Terms, the agreement should fail as a result of a misunderstanding.

America Can's lawsuit filed in Texas constitutes an attempt to clean the slate and renegotiate a better deal for America Can.  If the Court does not reopen the matter to enforce the Settlement Terms or to enable the litigation to proceed in the District of New Jersey, America Can may attempt to proceed in pursuing a nearly identical lawsuit in Texas.  Such a result would be unjust.  Whether the Court enforces the Settlement Terms or reopens the action for litigation on the merits, this Court remains the proper forum to hear the claims at issue.

## V.  CONCLUSION

For the reasons explained above, the parties entered into an enforceable settlement agreement as set out in the Settlement Terms.  The transfer of domain names was not among the

agreed upon terms, and America Can should not be permitted to modify the material terms of the agreement or escape from its obligations.  America Can's failure to finalize a settlement agreement that includes the Settlement Terms and attempts to incorporate additional terms to which K4K never agreed, is inconsistent with the parties' intent at the time of the settlement and constitutes good cause for the Court to reopen the action for the purpose of enforcing the Settlement Terms.

Alternatively, if the Court finds that there was no meeting of the parties' minds as to the permissibility of telephone donations or other terms this Court deems to be essential, the failure to reach an agreement as to any essential term based on the parties' misunderstanding or mutual mistake constitutes good cause to reopen the action to permit the parties to proceed with litigation before this Court.

DATED:  December 23, 2015    Respectfully submitted,

                **CONNELL FOLEY**

                By: *s/Liza M. Walsh*
                Liza M. Walsh
                Marc D. Haefner
                Christopher J. Borchert
                One Newark Center
                1085 Raymond Blvd., 19th Floor
                Newark, New Jersey 07102

                Peter D. Vogl
                Lisa T. Simpson
                Mary Beth Myles
                ORRICK, HERRINGTON & SUTCLIFFE
                51 West 52nd Street
                New York, New York 10019-6142

                *Attorneys for Plaintiff KARS 4 KIDS INC.*