**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| KARS 4 KIDS INC., | Civil Action No. 14-7770 (PGS/LHG) |
| Plaintiff, | **DECLARATION OF BRIGGS M. WRIGHT IN SUPPORT OF PLAINTIFF KARS 4 KIDS INC.'S MOTION _IN LIMINE_ NO. 1 TO EXCLUDE THE ENTIRETY OF BRYCE R. COOK'S OPINIONS** |
| v. |  |
| AMERICA CAN!, | |
| Defendant. | _**Redacted Version**_ |

I declare as follows:

1.      I am an attorney with the law firm of Orrick, Herrington & Sutcliffe LLP, and counsel of record for Plaintiff Kars 4 Kids Inc. ("Kars 4 Kids").  I make this declaration of my own personal knowledge and, if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of the opening expert report of Defendant America Can!'s ("America Can") damages expert witness Bryce R. Cook, dated January 16, 2018.

3.      Attached hereto as **Exhibit 2** is a true and correct copy of the reply expert report of America Can's damages expert witness Bryce R. Cook, dated March 1, 2018.

4.      Attached hereto as **Exhibit 3** is a true and correct copy of excerpts from the transcript of the deposition of America Can's damages expert witness Bryce R. Cook, dated March 15, 2018.

I hereby declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed in New York, NY on February 14th, 2019.

/s/

Briggs M. Wright

# EXHIBIT 1



**Kars 4 Kids Inc.**

v.

**America Can!**

United States District Court, District of New Jersey
Case No. 3:14-cv-07770-PGS-LHG

January 16, 2018

**Expert Report of**
**Bryce R. Cook**

**Highly Confidential – Outside Attorneys Only**

Navigant Consulting, Inc.
201 East Washington Street, Suite 1700
Phoenix, Arizona 85004-2245
602.257.0075
www.navigant.com



**EXPERT REPORT**

# Contents

I.   Introduction ......................................................................................................... 1

II.  Background........................................................................................................... 1

    A.   America Can! Cars for Kids ............................................................................ 1

    B.   Kars 4 Kids ................................................................................................... 5

III.  Damages / Monetary Remedy ............................................................................ 8

    A.   K4K's Profits ................................................................................................. 8

    B.   Actual Damages............................................................................................ 9

Attachment A – Documents Considered

Attachment B – Résumé of Bryce R. Cook



## I.   Introduction

Navigant Consulting was retained by counsel for America Can! to determine the damages or monetary remedy resulting from the infringement of the "Cars for Kids" trademark by Kars for Kids Inc. ("K4K").

In developing my opinions, I have reviewed the pleadings filed in this matter, documents produced by the Plaintiff, and documents obtained in the course of performing my research and analysis. A list of the documents I considered is included in Attachment A.

The opinions and analyses presented in this report are based on currently available information. If new information becomes available that is relevant to my analysis or opinions, I may supplement this report. If this matter proceeds to trial, selected pages of the documents and information considered may be used as exhibits. In addition, I may prepare graphical or illustrative exhibits based on the contents of this report, the documents and information considered, and on my analysis of the documents and information.

I am a Director with Navigant, a specialized independent consulting firm that employs over 5,000 professionals and has over 60 offices worldwide. The firm's consultants include accounting, finance, engineering and information technology professionals experienced in the analysis of business operations, business valuation, financial and accounting matters, and economic damages. I have a Bachelor of Science Degree in Business Management with a concentration in finance and a Master's Degree in Business Administration. I am also a Certified Management Accountant and a member of the National Association of Certified Valuation Analysts.

I am experienced in financial, economic, damage and accounting matters related to the scope of work on this matter. I have consulted and testified on numerous engagements involving the analysis of economic damage claims, including matters involving trademark infringement and valuation of intellectual assets. My résumé is included as Attachment B and includes a list of the cases in which I have provided expert testimony. My billing rate on this matter is $445 per hour.

## II.   Background

### A.   America Can! Cars for Kids

America Can! is a not-for-profit Texas corporation formed in 1988 that operates Dallas Can! Academy and various other charter schools in Texas. Dallas Can!, was formed in 1985 to aid adjudicated juveniles and later expanded to serve at-risk youth through various educational and training programs. In 1996 Dallas Can! opened its first charter school in Dallas and subsequently expanded to open additional charter schools throughout Texas and in other states.[1]

---

[1] America Can! 2009 audited financial statements, Note 1; also, https://www.texanscan.org/about-our-story/

Highly Confidential – Outside Attorneys Only



EXPERT REPORT

Beginning in 1989, America Can! took steps to promote its automobile and watercraft resale program and boost its charitable fundraising activities through use of the assumed names Cars for Kids and Kars for Kids. Since at least 1989, America Can! has continuously and consistently used its Cars For Kids Mark (the "Mark") in interstate commerce and in connection with its charitable fund raising services.[2] America Can! Cars for Kids ("CFK") was formed in 1992 as the fundraising arm of the charter-holding organization, owning and operating the car donation and auction program that America Can! started in 1989.[3]

CFK accepts donations in every state but the majority of its donations and sales have been in Texas. CFK's vehicle donations peaked in 2004 and have generally trended downward since then, as shown in the following chart.[4]



As shown above, CFK's donations declined sharply in 2005, partially rebounded in 2006 through 2009, then declined sharply again in 2010 where they remained at low levels for the next five years until experiencing a strong uptick in growth in 2016. The 2010 decline and depressed donation levels reflect, in part, the effects of the recession and increased value of used cars.[5] However, as will be shown in the following section, K4K's market entry and growth in each of

---

[2] Answer and Counterclaim, p. 17.
[3] America Can! Cars for Kids 2016 audited financial statements, Note 1; http://www.americacan.org/aboutus.asp; Answer and Counterclaim, p. 17.
[4] Source: "CFK Sales 2004 – 2017.xls" and "Old Database Records.xls." 2017 estimated by applying previous 3-year Jan-Aug units as a percent of total (62.6%) to Jan-Aug 2017 units.
[5] https://www.thoughtco.com/used-car-sales-figures-3308387 "Over the three calendar years from 2009 to 2012, used car sales would jump more than 14%. The recession hadn't quite ended for a good portion of that time but people turned to used cars instead of buying new cars because of the better values, better vehicles, and strong certified pre-owned programs."

Highly Confidential – Outside Attorneys Only



EXPERT REPORT

CFK's markets, along with its high advertising spend, likely had an effect on CFK's donations and inability to return to previous levels.

CFK's decline in donations was more pronounced in states outside of Texas, as illustrated in the following chart.[6]



As shown above, after the sharp one-year decline in 2005, Texas donations began increasing through 2009. Out-of-state donations – reflected in the gap between the Texas and Total lines and in the "All other" line – were also growing in these early years, and at a faster rate than Texas through 2007. However, out-of-state donations started declining in 2008, and after the 2010 drop almost disappeared entirely. After peaking above the 4,000-unit level in 2007, CFK's nationwide out-of-state donations declined to a level of only several hundred units, a fraction of its pre-2010 levels, and have not rebounded. As described in the next section, this decline corresponds with K4K's growth in the same non-Texas markets.

America Can! has expended significant resources in marketing and advertising to promote its CARS FOR KIDS Mark and the underlying automobile and watercraft donation program including, but not limited to, print and broadcast advertising, billboards, door hangings, and other publicity methods.[7] The following table summarizes the advertising and promotion expense CFK has expended from 2008 through 2014.

---

[6] Source: "CFK Sales 2004 – 2017.xls" and "Old Database Records.xls." 2017 estimated by applying previous 3-year Jan-Aug units as a percent of total (62.6%) to Jan-Aug 2017 units.
[7] Answer and Counterclaim, p. 17.

Highly Confidential – Outside Attorneys Only



| Table 1 – America Can! Advertising expense[8] | |
|---|---|
| 2008 | $  4,292,981 |
| 2009 | 3,136,594 |
| 2010 | 2,667,363 |
| 2011 | 3,568,832 |
| 2012 | 3,246,242 |
| 2013 | 2,761,304 |
| 2014 | 2,301,967 |
| **Total** | **$ 21,975,283** |

For its Texas vehicle donation program, CFK handles vehicle intake, title work, inspection, mechanical repair (if needed) and the auction process. For donations outside of Texas, CFK outsources these activities to Copart. CFK's annual auction and sales revenue from its vehicle donation operation have generally been in the range of $8 million to $10 million, as shown in the chart below.[9]



CFK's auction and sales revenue did not decline to the same degree as donation units in 2010 and following years because CFK realized a much lower auction/sales price on donated vehicles outside of Texas than on vehicles within Texas.[10] Therefore, with the loss of out-of-state donations, its average auction/sales price per vehicle increased, thereby providing some offset to the donations lost during that period.

---

[8] Source: America Can! Form 990's
[9] Source: "CFK Sales 2004 – 2017.xls" and "Old Database Records.xls." 2017 estimated by applying previous 3-year Jan-Aug sales as a percent of total (62.6%) to Jan-Aug 2017 sales.
[10] Some of the lower price is due to the $129 fee Copart deducts for handling the intake and auction activities; however, this fee only accounts for about half the difference.

Highly Confidential – Outside Attorneys Only



| EXPERT REPORT |
| --- |

## B.   Kars 4 Kids

K4K is a national organization dedicated to addressing the educational, material, emotional and spiritual needs of disadvantaged Jewish children and their families. K4K is a registered national, 501(c)(3), non-profit organization, which was established in 2000.[11]

K4K claims to have begun using the KARS 4 KIDS marks "since at least 1998" but did not obtain a trademark registration until much later. It was unsuccessful in registering the KARS 4 KIDS mark but was able register 1-877-KARS-4-KIDS in April 2012.[12] In addition, K4K claims to have offered a website located at www.kars4kids.com since 2002.[13] In or about August of 2003, America Can! learned of K4K's use of the phrase "Kars 4 Kids" in connection with its automobile donation program through an advertisement that appeared in the Dallas Morning News. Because K4K's use of the phrase "Kars 4 Kids" was phonetically identical to America Can!'s CARS FOR KIDS Mark and because both entities appeared to be operating similar automobile donation programs aimed at the same channels of commerce, America Can! sent a Cease and Desist Letter to K4K in August 2003.[14]

America Can! believes that K4K ceased using the "Kars 4 Kids" phrase in America Can!'s home state of Texas following the Cease and Desist Letter; however, K4K has continued to use the phrase in its advertising outside of Texas. As shown in the following table, K4K appears to have significantly outspent CFK in advertising in every year since at least 2008.

| Table 2 – Comparison of Advertising Expense[15] | | |
| --- | --- | --- |
| | **K4K** | **CFK** |
| 2004 | | N/A |
| 2005 | | N/A |
| 2006 | | N/A |
| 2007 | | N/A |
| 2008 | | $   4,292,981 |
| 2009 | | 3,136,594 |
| 2010 | | 2,667,363 |
| 2011 | | 3,568,832 |
| 2012 | | 3,246,242 |
| 2013 | | 2,761,304 |
| 2014 | | 2,301,967 |
| **2008-2014 Total** | | **$ 21,975,283** |
| **All years** | | **$ 21,975,283** |

---

[11] https://www.kars4kids.org/joy.php; JOY audited 2010 financial statement, Note 1; 2013 Form 990 for JOY.
[12] Complaint, p. 4; Answer and Counterclaim, pp. 19-20
[13] Per the Internet Archive Wayback Machine, October 2002 is the earliest capture of kars4kids.org.
[14] Answer and Counterclaim, pp. 18-19.
[15] Sources: K4K0085313.xls, America Can! Form 990's

Highly Confidential – Outside Attorneys Only



Even though CFK began using the Mark first and preceded K4K in most states (based on when an organization first reported donations), after K4K entered each market, it soon surpassed CFK in donations by a large margin, with the exception of CFK's home state of Texas, as shown in the following table.

| | | Entry Year[17] | | Year K4K[18] | 2004 Donations | |
|---|---|---|---|---|---|---|
| State | First in Market | CFK | K4K | Surpassed CFK | CFK | K4K |
| NJ | CFK | 1997 | | | 179 | |
| MD | CFK | 1996 | | | 96 | |
| NY | CFK | 1996 | | | 216 | |
| PA | CFK | 1995 | | | 70 | |
| CT | CFK | 1997 | | | 56 | |
| OH | CFK | 1996 | | | 36 | |
| MA | CFK | 1998 | | | 103 | |
| CA | CFK | 1995 | | | 648 | |
| IL | CFK | 1996 | | | 199 | |
| FL | CFK | 1996 | | | 92 | |
| VA | CFK | 1996 | | | 64 | |
| WA | CFK | 1998 | | | 81 | |
| WI | CFK | 1997 | | | 56 | |
| MI | CFK | 1995 | | | 101 | |
| MN | CFK | 1996 | | | 83 | |
| GA | CFK | 1996 | | | 88 | |
| IN | CFK | 1997 | | | 26 | |
| AZ | CFK | 1995 | | | 30 | |
| NC | CFK | 2002 | | | 40 | |
| CO | CFK | 1997 | | | 18 | |
| OR | CFK | 1996 | | | 35 | |
| MO | CFK | 1995 | | | 34 | |
| NH | CFK | 2001 | | | 18 | |
| UT | CFK | 2002 | | | 24 | |
| NV | CFK | 2001 | | | 9 | |
| TN | CFK | 1997 | | | 40 | |
| DE | CFK | 1997 | | | 7 | |
| ME | CFK | 1997 | | | 5 | |
| DC | CFK | 1999 | | | 8 | |
| KY | CFK | 1997 | | | 10 | |
| SC | CFK | 1997 | | | 8 | |
| KS | CFK | 1996 | | | 18 | |

Table 3 – Analysis of Market Entry[16]

[16] Sources: CFK Data - CFK Sales 2004 – 2017.xls and Old Database Records.xls. K4K Data – K4K0000089.xls, K4K0000090.xls, and K4K0000095.xls.
[17] Based on month and year donations were first reported in each party's donations database files. Earliest available data for CFK is 1995 and for K4K is 1999.
[18] Based on cumulative donations received since first year in a given market.

Highly Confidential – Outside Attorneys Only



EXPERT REPORT

| | | Table 3 – Analysis of Market Entry[16] | | | | |
| State | First in Market | Entry Year[17] | | Year K4K[18] Surpassed CFK | 2004 Donations | |
| | | CFK | K4K | | CFK | K4K |
| IA | CFK | 1997 | | | 12 | |
| AL | CFK | 1998 | | | 18 | |
| LA | CFK | 1995 | | | 16 | |
| NM | CFK | 1998 | | | 6 | |
| NE | CFK | 1996 | | | 7 | |
| MS | CFK | 1996 | | | 10 | |
| AR | CFK | 1996 | | | 8 | |
| MT | CFK | 1997 | | | 2 | |
| OK | CFK | 1996 | | | 35 | |
| TX | CFK | 1995 | | | 14,812 | |
| RI | **K4K** | 2003 | | | 14 | |
| VT | **K4K** | 2003 | | | 3 | |
| WV | **K4K** | 2004 | | | 6 | |
| ID | **K4K** | 2004 | | | 5 | |
| HI | **K4K** | 2003 | | | 14 | |
| WY | **K4K** | 1995 | | | 1 | |
| ND | **K4K** | 2002 | | | 0 | |
| AK | **K4K** | 2004 | | | 1 | |
| SD | **K4K** | 2004 | | | 2 | |

As shown above, CFK preceded K4K in all but nine states; yet K4K overtook CFK's donations in most states by 2003 or 2004. The following chart shows each organization's total donations over time.[19]



[19] Chart source: K4K0089669.xls and KFK Form 990's. Full-year 2015 and 2016 K4K donation data was not available; therefore, the number of units in those years was estimated based on the reported Form 990 non-cash donation revenue divided by 2014 average revenue per vehicle.

7

Highly Confidential – Outside Attorneys Only



K4K's donations followed a similar pattern as CFK with a peak in 2009 followed by declining donations in 2010 through 2012, which indicates the recession and used-car market had a similar effect on both companies. However, K4K's donations recovered much more quickly than CFK's, which did not experience an increase until 2016. CFK's slower recovery and inability to regain its past level of donations appears to be due to K4K's comparatively high advertising spend and significant donation growth in each location it entered.

Given the similarity of each organization's mission and car donation program – vehicle donations to benefit underprivileged kids; advertising via internet, radio and print; solicitation of donations in all 50 states – there is likely to be consumer confusion based on the similarity of the marks used by each organization. Indeed, I found evidence of consumer confusion in many of the donor comments contained in various K4K documents, including the K4K donations database, two instances of which are as follows:[20]

- "Confused with Cars for Kids."
- "Was picked up by Copart for Cars for Kids, not us."

## III.  Damages / Monetary Remedy

Under the Lanham Act, recovery for trademark infringement may include:

> (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount.[21]

### A.  K4K's Profits

As a 501(c)(3) non-profit entity, K4K is required to file annual statements (form 990) of income and expense with the IRS. From K4K's annual form 990's, I was able to obtain the revenue it earned from its vehicle donation operation over the last ten years. I compared the Form 990 revenue amounts to the auction sales revenue from the K4K database and to the revenue reported in the JOY For Our Youth 2010 audited financial statement (the only audited statement available).

Note 1 to this audited financial statement includes the following explanations regarding donations and revenue: "Donations of used cars, which account for substantially all of the organizations' revenue, are valued at the net proceeds of subsequent sales of such vehicles. The value of other

---

[20] Source: K4K0000090.xls. See also, 04_K4K0527662_image through 60_K4K0532002_image.
[21] 15 U.S. Code § 1117 - Recovery for violation of rights

Highly Confidential – Outside Attorneys Only



EXPERT REPORT

donated goods and services are not reflected in the financial statements… The organizations' primary source of revenue is derived from donations of used vehicles, which are sold at auction by independent car dealers." This note indicates that (1) substantially all of the revenue relates to its car donation program, and (2) reported revenue is net of the fees K4K pays the independent dealers who auction the cars and therefore reflects "net proceeds" to K4K. These results are summarized below.

| Table 4 – K4K Revenue from Vehicle Donations | | | |
|---|---|---|---|
| Year | Form 990 | Database | Audited |
| 2008 | $ 23,003,060 | | |
| 2009 | 24,653,912 | | |
| 2010 | 29,130,893 | | $ 29,130,893 |
| 2011 | 29,976,125 | | |
| 2012 | 26,964,821 | | |
| 2013 | 28,229,162 | | |
| 2014 | 34,756,266 | | |
| 2015 | 39,071,455 | | |
| 2016 | 44,383,024 | | |
| 2017[22] | 48,007,066 | | |
| Total | $ 328,175,784 | | |

Based on the above summary of revenue, America Can!'s claim for K4K's profits on sales made using the infringing mark total **$328,175,784**.

## B.  Actual Damages

America Can! believes that K4K's confusingly similar Mark has caused confusion in the marketplace and resulted in CFK losing donations. At this time, I am not able to determine the amount of lost donations attributable to K4K's infringement. However, there are other methods that have been accepted as measures of damages that may be useful to the trier of fact.

### Reasonable Royalty

One such method is the royalty that K4K would have had to pay if CFK had agreed to license the Mark. However, given that both organizations compete directly for the same donations in the same markets, CFK would be unwilling to license the Mark for anything less than the incremental profit it earns on its donations. Nevertheless, in a hypothetical negotiation, as is used in determining reasonable royalties in patent matters, the assumption is that the parties would reach an agreement as opposed to the defendant infringing or leaving the market altogether. In this matter neither party has licensed its trademarks, and I have not found any reasonably-comparable

---

[22] 2017 revenue estimated by applying latest 5-year (2011-2016) CAGR (8.2%) to 2016 revenue

Highly Confidential – Outside Attorneys Only



| EXPERT REPORT |
| --- |

third-party license agreements. Therefore, the best approach for determining a reasonable royalty would be to determine a split of K4K's incremental profit on infringing donations based on a Georgia-Pacific-type analysis. However, because K4K has not produced detailed information on its expenses, I am unable to perform the analysis to determine incremental profit. Assuming K4K produces sufficiently detailed expense information in its rebuttal report, I may be able to use that information to assess incremental profit and a reasonable royalty.

***Corrective Advertising***

As shown in Table 2 above, K4K has spent over $75 million in advertising that wrongfully used the Mark from 2004 through 2014 (the last full year available). One measure of damages could include the cost of corrective advertising America Can! would have to do to counter the $75 million in advertising K4K has done. At this time, I do not have an estimate of what amount of corrective advertising would be necessary to correct the confusion that has resulted in the marketplace; however, the trier of fact may find the total advertising spend useful as a starting point for addressing this method.

Bryce R. Cook

Highly Confidential – Outside Attorneys Only

**Attachment A**

CAN-00000355_Highly Confidential-Outside Counsel Only (2)-C3
CAN-00000001_Highly Confidential-Outside Counsel Only (4)-C3
CAN-00000002_Highly Confidential-Outside Counsel Only (3)-C3
Old Database Records
2017 to Current Donation Sales
Form 990-2000-America CAN
Form 990-2001-America CAN
Form 990-2002-America CAN
Form 990-2010-America CAN
Form 990-2012-America Can
Form 990-2013-Cars for Kids
52729548_1_AMC00526842 - Financials for Board
CAN Audited Financials FY 2014
Financial Audit 2015
Cars for Kids Final 2016 Report
America Can! Financial Audit 2013
America CAN Financial Audit 2012
America CAN Financial Audit 2011
America CAN Financial Audit 2010
America CAN Financial Audit 2009
CFK Sales 2004 - 2017
Form 990-2014-America Can
Form 990-2013-America Can
Form 990-2011-America CAN
Form 990-2008-America CAN
CAN I990 - FY2015
Form 990-2007-America CAN
Form 990-2006-America CAN
Form 990-2005-America CAN
Form 990-2004-America CAN
CAN I990 - FY2012
CAN I990 - FY2010
CAN I990 - FY2009
AC response to K4K Settlement ltr  to Judge
Aug 2003 Cease Desist Ltr
Joy for our Youth Financials
K4K -- Esti (Financials)
K4K - Joy for our Youth
K4K - Settlement talks
K4K - TV income & expenses
K4K Settlement Ltr  to Judge

oorah_2010_irs_990
oorah_2008_irs_990
oorah_2005_irs_990
oorah_2004_irs_990
oorah_2002_irs_990
k4k 990 2008-1
k4k 990 2002
k4k 990 2003
k4k 990 2004
k4k 990 2005
k4k 990 2006
k4k 990 2007
1_K4K0135992_image (JOY audited 2010 FS)
k4k Clearing House Enterprise
Joy For Our Youth
Esti Landu
oorah_2015_irs_990
oorah_2014_irs_990
oorah_2013_irs_990
oorah_2012_irs_990
oorah_2011_irs_990
oorah_2009_irs_990
oorah_2007_irs_990
oorah_2006_irs_990
oorah_2003_irs_990
k4k_990_2013
k4k 990 2008
k4k 990 2015
k4k 990 2016
k4k 990 2014
k4k 990 2013
k4k 990 2012
k4k 990 2011
k4k 990 2010
k4k 990 2009

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| K4K0000089 | K4K0044384 | K4K0084573 | K4K0087617 | K4K0110692 | K4K0141109 | K4K0531663 | K4K0556985 |
| K4K0000090 | K4K0044385 | K4K0084574 | K4K0087649 | K4K0110791 | K4K0526353 | K4K0532168 | K4K0556986 |
| K4K0000091 | K4K0047045 | K4K0085273 | K4K0088116 | K4K0110892 | K4K0526408 | K4K0532265 | K4K0556987 |
| K4K0000092 | K4K0052337 | K4K0085274 | K4K0088265 | K4K0111126 | K4K0526497 | K4K0532267 | K4K0556988 |
| K4K0000093 | K4K0052364 | K4K0085311 | K4K0088666 | K4K0111206 | K4K0526499 | K4K0532268 | K4K0557784 |
| K4K0000094 | K4K0052423 | K4K0085313 | K4K0088724 | K4K0111208 | K4K0526500 | K4K0532360 | K4K0557793 |
| K4K0000095 | K4K0052831 | K4K0085342 | K4K0088901 | K4K0111217 | K4K0526758 | K4K0532996 | K4K0557800 |
| K4K0000096 | K4K0053927 | K4K0085858 | K4K0089283 | K4K0112137 | K4K0526936 | K4K0533799 | K4K0558244 |
| K4K0000122 | K4K0054401 | K4K0085859 | K4K0089328 | K4K0113029 | K4K0527342 | K4K0533832 | K4K0559588 |
| K4K0000152 | K4K0054613 | K4K0085860 | K4K0089583 | K4K0113030 | K4K0527343 | K4K0533882 | K4K0561521 |
| K4K0000277 | K4K0055054 | K4K0085861 | K4K0089594 | K4K0113031 | K4K0527344 | K4K0534156 | |
| K4K0000979 | K4K0060375 | K4K0085862 | K4K0089597 | K4K0113032 | K4K0527345 | K4K0534168 | |
| K4K0000980 | K4K0060385 | K4K0085863 | K4K0089625 | K4K0113033 | K4K0527346 | K4K0534172 | |
| K4K0020066 | K4K0060415 | K4K0085932 | K4K0089656 | K4K0113177 | K4K0527347 | K4K0534527 | |
| K4K0020158 | K4K0060416 | K4K0086101 | K4K0089659 | K4K0113210 | K4K0527348 | K4K0534530 | |
| K4K0023276 | K4K0061022 | K4K0086102 | K4K0089669 | K4K0113291 | K4K0527349 | K4K0534697 | |
| K4K0036936 | K4K0061144 | K4K0086103 | K4K0089670 | K4K0113419 | K4K0527350 | K4K0534960 | |
| K4K0037035 | K4K0061152 | K4K0086105 | K4K0089832 | K4K0113463 | K4K0527351 | K4K0536613 | |
| K4K0037158 | K4K0061224 | K4K0086112 | K4K0089912 | K4K0113497 | K4K0527352 | K4K0536615 | |
| K4K0037492 | K4K0061495 | K4K0086123 | K4K0089914 | K4K0113985 | K4K0527353 | K4K0536624 | |
| K4K0037582 | K4K0061506 | K4K0086127 | K4K0089943 | K4K0113987 | K4K0527624 | K4K0551945 | |
| K4K0038054 | K4K0061532 | K4K0086128 | K4K0089944 | K4K0136664 | K4K0527771 | K4K0551947 | |
| K4K0038080 | K4K0062236 | K4K0086129 | K4K0089975 | K4K0136787 | K4K0527786 | K4K0554647 | |
| K4K0038085 | K4K0062259 | K4K0086142 | K4K0089976 | K4K0136788 | K4K0528406 | K4K0554942 | |
| K4K0038088 | K4K0062634 | K4K0086143 | K4K0089977 | K4K0136789 | K4K0528408 | K4K0555117 | |
| K4K0038135 | K4K0062662 | K4K0086144 | K4K0090044 | K4K0136790 | K4K0528446 | K4K0555118 | |
| K4K0038136 | K4K0064003 | K4K0086174 | K4K0090096 | K4K0136791 | K4K0529181.DBF | K4K0555999 | |
| K4K0038137 | K4K0068117 | K4K0086185 | K4K0091770 | K4K0136792 | K4K0529215 | K4K0556051 | |
| K4K0038138 | K4K0068118 | K4K0086281 | K4K0093453 | K4K0136797 | K4K0529884 | K4K0556052 | |
| K4K0038139 | K4K0068119 | K4K0086331 | K4K0094817 | K4K0136955 | K4K0530722 | K4K0556054 | |
| K4K0038140 | K4K0068120 | K4K0086333 | K4K0094906 | K4K0138532 | K4K0530723 | K4K0556101 | |
| K4K0038141 | K4K0068121 | K4K0086362 | K4K0095920 | K4K0138534 | K4K0530724 | K4K0556102 | |
| K4K0038245 | K4K0068122 | K4K0086365 | K4K0108571 | K4K0138543 | K4K0530725 | K4K0556385 | |
| K4K0038260 | K4K0079646 | K4K0086379 | K4K0108614 | K4K0138545 | K4K0530756 | K4K0556979 | |
| K4K0038261 | K4K0083316 | K4K0086403 | K4K0109198 | K4K0138979 | K4K0530768 | K4K0556980 | |
| K4K0038303 | K4K0083338 | K4K0087015 | K4K0109202 | K4K0139743 | K4K0530833 | K4K0556981 | |
| K4K0038304 | K4K0083352 | K4K0087017 | K4K0109788 | K4K0140809 | K4K0530834 | K4K0556982 | |
| K4K0038305 | K4K0083395 | K4K0087445 | K4K0109790 | K4K0141094 | K4K0530932 | K4K0556983 | |
| K4K0041831 | K4K0084196 | K4K0087592 | K4K0109814 | K4K0141107 | K4K0530999 | K4K0556984 | |



| | | | | | | |
|---|---|---|---|---|---|---|
| K4K0038053 | K4K0083394 | K4K0085341 | K4K0089658 | K4K0111211 | K4K0527768 | K4K0536619 |
| K4K0041830 | K4K0084195 | K4K0085856 | K4K0089668 | K4K0111212 | K4K0527770 | K4K0536621 |
| K4K0044383 | K4K0084572 | K4K0085931 | K4K0089831 | K4K0111214 | K4K0527781 | K4K0536623 |
| K4K0047042 | K4K0084575 | K4K0086098 | K4K0089911 | K4K0111216 | K4K0528405 | K4K0551944 |
| K4K0052335 | K4K0084576 | K4K0086104 | K4K0089913 | K4K0112136 | K4K0528407 | K4K0551946 |
| K4K0052363 | K4K0084577 | K4K0086106 | K4K0089937 | K4K0113028 | K4K0529180 | K4K0554646 |
| K4K0052422 | K4K0084578 | K4K0086122 | K4K0089972 | K4K0113176 | K4K0529214 | K4K0554941 |
| K4K0052830 | K4K0084579 | K4K0086124 | K4K0089978 | K4K0113209 | K4K0529882 | K4K0555116 |
| K4K0053926 | K4K0084580 | K4K0086130 | K4K0090042 | K4K0113285 | K4K0530721 | K4K0555998 |
| K4K0054400 | K4K0084581 | K4K0086140 | K4K0090095 | K4K0113286 | K4K0530753 | K4K0556045 |
| K4K0054609 | K4K0084582 | K4K0086172 | K4K0091768 | K4K0113287 | K4K0530765 | K4K0556047 |
| K4K0055051 | K4K0084583 | K4K0086184 | K4K0093447 | K4K0113418 | K4K0530826 | K4K0556048 |
| K4K0060365 | K4K0084584 | K4K0086279 | K4K0093448 | K4K0113462 | K4K0530845 | K4K0556049 |
| K4K0060376 | K4K0084585 | K4K0086330 | K4K0093449 | K4K0113464 | K4K0530931 | K4K0556050 |
| K4K0060414 | K4K0084586 | K4K0086332 | K4K0094816 | K4K0113465 | K4K0530998 | K4K0556053 |
| K4K0061021 | K4K0084587 | K4K0086361 | K4K0094905 | K4K0113984 | K4K0531662 | K4K0556095 |
| K4K0061143 | K4K0084588 | K4K0086364 | K4K0095919 | K4K0113986 | K4K0532167 | K4K0556097 |
| K4K0061151 | K4K0084589 | K4K0086378 | K4K0108566 | K4K0136663 | K4K0532264 | K4K0556098 |
| K4K0061222 | K4K0084590 | K4K0086402 | K4K0108567 | K4K0136785 | K4K0532266 | K4K0556099 |
| K4K0061486 | K4K0084591 | K4K0087014 | K4K0108608 | K4K0136795 | K4K0532357 | K4K0556100 |
| K4K0061489 | K4K0084592 | K4K0087016 | K4K0108609 | K4K0136954 | K4K0532995 | K4K0556384 |
| K4K0061492 | K4K0084593 | K4K0087444 | K4K0108610 | K4K0138530 | K4K0533798 | K4K0556978 |
| K4K0061497 | K4K0084594 | K4K0087591 | K4K0109195 | K4K0138531 | K4K0533831 | K4K0557783 |
| K4K0061500 | K4K0084595 | K4K0087616 | K4K0109197 | K4K0138533 | K4K0533874 | K4K0557792 |
| K4K0061503 | K4K0084596 | K4K0087648 | K4K0109199 | K4K0138535 | K4K0534147 | K4K0557799 |
| K4K0061524 | K4K0084597 | K4K0088115 | K4K0109201 | K4K0138537 | K4K0534167 | K4K0558243 |
| K4K0061526 | K4K0084598 | K4K0088264 | K4K0109787 | K4K0138538 | K4K0534169 | K4K0561152 |
| K4K0061529 | K4K0084599 | K4K0088664 | K4K0109789 | K4K0138540 | K4K0534173 | |
| K4K0062234 | K4K0084600 | K4K0088667 | K4K0109813 | K4K0138542 | K4K0534526 | |
| K4K0062258 | K4K0084601 | K4K0088706 | K4K0110685 | K4K0138544 | K4K0534529 | |
| K4K0062633 | K4K0084602 | K4K0088709 | K4K0110689 | K4K0138978 | K4K0534696 | |
| K4K0062660 | K4K0084603 | K4K0088900 | K4K0110691 | K4K0139742 | K4K0534954 | |
| K4K0064000 | K4K0084604 | K4K0089281 | K4K0110790 | K4K0140808 | K4K0534961 | |
| K4K0064004 | K4K0084605 | K4K0089326 | K4K0110891 | K4K0140810 | K4K0534963 | |
| K4K0068116 | K4K0084606 | K4K0089582 | K4K0141093 | K4K0141093 | K4K0536611 | |
| K4K0079645 | K4K0084607 | K4K0089592 | K4K0111204 | K4K0141106 | K4K0536612 | |
| K4K0083315 | K4K0085272 | K4K0089595 | K4K0111205 | K4K0141108 | K4K0536614 | |
| K4K0083336 | K4K0085310 | K4K0089624 | K4K0111207 | K4K0527623 | K4K0536616 | |
| K4K0083351 | K4K0085312 | K4K0089655 | K4K0111209 | K4K0527764 | K4K0536618 | |



K4K0085756
K4K0090017
K4K0109162
K4K0113205
K4K0113372
K4K0136508
K4K0138384
K4K0527705
K4K0533111
K4K0533112
K4K0533113
K4K0533114
K4K0533115
K4K0533116
K4K0533117
K4K0551395.dat
K4K0551397.dat



| | | |
|---|---|---|
| K4K0000109 | K4K0135587 | K4K0533110 |
| K4K0000391 | K4K0135588 | K4K0551392 |
| K4K0001498 | K4K0135589 | K4K0551393 |
| K4K0041884 | K4K0135590 | K4K0551396 |
| K4K0052462 | K4K0135591 | K4K0551836 |
| K4K0052463 | K4K0135592 | K4K0551837 |
| K4K0052607 | K4K0135593 | K4K0551838 |
| K4K0052608 | K4K0136050 | K4K0551841 |
| K4K0054174 | K4K0136174 | K4K0551845 |
| K4K0054175 | K4K0136178 | K4K0551850 |
| K4K0054177 | K4K0136507 | K4K0551863 |
| K4K0054179 | K4K0136731 | K4K0551867 |
| K4K0066798 | K4K0136732 | K4K0551876 |
| K4K0066799 | K4K0136733 | K4K0551884 |
| K4K0085309 | K4K0136768 | K4K0552520 |
| K4K0085755 | K4K0136774 | K4K0552521 |
| K4K0086211 | K4K0136777 | K4K0552527 |
| K4K0086212 | K4K0136779 | K4K0552528 |
| K4K0087553 | K4K0138379 | K4K0552836 |
| K4K0087576 | K4K0138385 | K4K0552837 |
| K4K0089936 | K4K0138386 | K4K0552838 |
| K4K0090016 | K4K0138387 | K4K0552839 |
| K4K0090250 | K4K0138389 | K4K0552842 |
| K4K0090922 | K4K0138390 | K4K0552843 |
| K4K0091352 | K4K0138392 | K4K0553868 |
| K4K0092002 | K4K0138393 | K4K0553869 |
| K4K0092004 | K4K0140217 | |
| K4K0092019 | K4K0140916 | |
| K4K0092021 | K4K0527328 | |
| K4K0093424 | K4K0527337 | |
| K4K0093779 | K4K0527704 | |
| K4K0094211 | K4K0529639 | |
| K4K0094258 | K4K0529640 | |
| K4K0094294 | K4K0529644 | |
| K4K0095454 | K4K0530268 | |
| K4K0109161 | K4K0530271 | |
| K4K0113204 | K4K0530272 | |
| K4K0113371 | K4K0530273 | |
| K4K0135585 | K4K0531504 | |

28454510_1_2014 KAR 4 KIDS v. AMERICA CAN! COMPLAINT AND COVER SHEET-C1 - Copy

28454510_1_2014 KAR 4 KIDS v. AMERICA CAN! COMPLAINT AND COVER SHEET-C1

28926676_1_2015 0205 ANSWER to Complaint , COUNTERCLAIM against All Plai...-C1

29224969_1_2015 0302 ANSWER to Counterclaim by KARS 4 KIDS (#26)-C1

51292213_1_2017 1006 CONSENT ORDER (#99)-C1



**Attachment B**

Bryce R. Cook

# Bryce R. Cook

Bryce R. Cook
Director

**Navigant Consulting**
The Collier Center: Suite 1700
201 E. Washington St.
Phoenix, AZ  85004-2245
Tel:  602.528.8061 (direct)
Fax:  602.254.6163
bcook@navigantconsulting.com

**Professional History**
- Navigant Consulting, Inc. – Present
- Tucker Alan Inc. – 1994 to 2004
- Peterson Consulting Limited Partnership – 1987-1994
- Economic Analysis Corporation – 1986-1987

**Education**
- Master of Business Administration, with a concentration in finance and economics, Arizona State University
- Bachelor of Science degree in Business Management, Brigham Young University
- Certified Management Accountant

**Professional Associations**
- Institute of Management Accountants
- National Association of Certified Valuation Analysts
- Licensing Executives Society
- State Bar of Arizona, Intellectual Property Section

## Current Position

Bryce is a Director with Navigant Consulting, Inc. As part of Navigant's Litigation and Investigations practice, Bryce consults on business matters involving complex financial, accounting and economic issues, particularly as they relate to economic damages or financial investigations.  Bryce is a Certified Management Accountant and a member of the National Association of Certified Valuation Analysts.

## Professional Experience

Bryce has extensive experience in matters involving computation of economic damages, including breach of contract, infringement of intellectual property rights, professional malpractice, fraud and other causes of action.  He has performed damage analyses that involve lost profits, increased costs, diminution of business value and deepening insolvency, among others.  He has consulted in a variety of industries including:

- Financial institutions
- Healthcare/pharmaceutical
- Retail
- Utilities
- Real estate and construction
- Insurance
- Computers
- Automobile
- Restaurant and fast food
- Agricultural
- Oil and gas

Bryce has given expert testimony on damages in federal and state courts and in arbitration.  He has lectured to the Arizona State Bar on damages issues and has made presentations on damages to law firms and at professional society conferences.



**Attachment B**

## Bryce R. Cook

## Selected Experience

### Financial Analysis and Commercial Damages

Performed analyses of economic damages and other special-purpose financial investigations of companies in a variety of industries.  Damages were based on such causes of action as breach of contract, dealer termination, professional malpractice, lender liability and deepening insolvency, to name a few.   Case examples include:

» Evaluated numerous auditor malpractice claims brought by trustees, investors, government agencies and other third parties.  Performed forensic analysis to determine the causes of a company's failure or reasons for the decline in value of its securities.  Analyzed the company's investments and transactions over time to determine what would have been avoided given the plaintiff's liability scenario.

» Evaluated a real estate developer's lost profit claim stemming from the filing of a lis pendens on one of his properties.  Analyzed property values and economic indicators affecting Arizona real estate over the relevant time period.  Modeled cash flow projections and performed sensitivity analysis under varying marketing and economic scenarios to determine the most likely disposition of his property holdings.

» Determined consequential damages to high-tech manufacturing company stemming from insurance company's failure to pay on a claim.  Damages included lost profits and lost cost savings due to inability to take advantage of business opportunities.

» Reconstructed the capital accounts of a dissolved physicians practice to determine the ending capital owed to/by the various partners based on a review and analysis of five years worth of transactions records, accounting data and tax records. This analysis included determining the relative value of services provided, real estate contributed, and other resources contributed or used that flowed through the partnership over this time period.

### Valuation

Performed business valuations for purposes of damage claims, solvency analyses and transaction disputes.  Valuations have included public and privately held companies, franchises, trademarks and loan portfolios.  Case examples include:

» Valued a sub-prime mortgage wholesaler whose general partner terminated the partnership.  Entailed analyzing the company's past performance, management skill, and industry norms.  Performed projections of loan production volume, origination points and fees, sales premiums, and general and administrative expenses.

» Valued the trademark of a restaurant chain that was licensed to operators in Arizona and California.  Analyzed factors that affected the ability of the mark to generate income, including recognition and reputation, historical financial performance, legal status, licensee characteristics and economic/industry conditions.



**Attachment B**

» Performed a valuation estimate of the lease price of a lithotripsy facility operated by a physician's group. The lease structure included compensation for both equipment and services provided by the physicians. Work involved researching comparable companies, fee and cost structures, revenue per patient and contractual agreements with hospitals.

» Performed stock valuation of a closely held manufacturing firm being sued by a minority shareholder wanting to liquidate his interest. Determined discounts for lack of marketability and lack of control.

**Intellectual Property**

Performed damage analyses stemming from infringement of intellectual property rights. This work has included determining lost profits, reasonable royalty, accounting of profits and deductible costs, and the cost of corrective advertising. Case examples include:

» Analyzed a company's damage claim stemming from the alleged misappropriation of its trade secrets and proprietary technology relating to a medical waste destruction process. In assessing the value of the trade secrets, performed research on the industry and commercial viability of the technology. Evaluated the company's past transactions involving the technology and determined a reasonable royalty assuming a hypothetical licensing negotiation between the parties.

» Calculated a reasonable royalty and the economic harm sustained by a patentee whose patent was infringed by a tool manufacturer and distributor. Analyzed various factors relevant to determining a reasonable royalty in this matter, including the bargaining positions and economic expectations of both parties prior to the infringement.

» Performed an analysis of a trademark infringer's accounting records to determine its costs associated with manufacturing and selling counterfeit branded motorcycles. Evaluated infringer's own analysis of costs and identified inconsistencies and errors.

» Analyzed the lost profits of an international tour operator due to a competitor's trademark infringement and false advertising. Performed a detailed analysis of economic, industry and company-specific factors to determine to what extent, if any, these factors contributed to the decline in the infringed company's profits. Conducted extensive interviews of travel agents to determine the likelihood of consumer confusion in the industry and the effect of the advertising claims on consumers.

**Healthcare**

Performed various analyses of healthcare provider financial operations, rate structures, profitability and costs of providing services. Have performed work on behalf of state agencies, hospitals and physicians. Case examples include:

» Performed a variety of consulting projects for the State of California, Department of Corrections, relating to inmate healthcare. One project entailed analyzing a provider hospital's cost structure, profitability and financial condition in a rate dispute. In another project, computed statistics from health-care budgeting and expenditure data and compared results with other state departments of corrections.



**Attachment B**

<div style="background:#58595b;color:#fff;padding:4px;">Bryce R. Cook</div>

» Analyzed the financial operations and patient volume of a laser eye clinic to determine the costs and profits associated with treating the former patients of a large, national laser eye surgery company that went bankrupt.  Analyzed the accounting records of a related, surviving clinic to determine the ownership of accounts and moneys owed between the two entities.

» Analyzed adequacy of Medicaid reimbursements to health-care providers in a lawsuit against the state of Oregon.  Conducted review of providers' costs and constructed a computer model to analyze variables affecting reimbursement formula.

» Prepared a Boren Amendment "findings" report and analysis to determine adequacy of Medicaid reimbursement of hospital costs in the state of Illinois.  Required significant statistical and quantitative analysis of hospital costs.

» Reviewed lost profit claim of the operator of a planned medical clinic in a lender liability lawsuit.  Created a financial model to generate alternative business scenarios based on claimant's historical financial record operating similar ventures.


**Testimony History**

*American Tech Services, Inc. v. Raytheon Service Company, et al.*
U.S. District Court, Phoenix, AZ
- Deposition: January 1997
- Trial: May 1997

*Lamb Architects & Associates, Inc. v. Wingate Inns L.P.*
American Arbitration Association, Phoenix, AZ
- Deposition: September 1997
- Arbitration: September 1997

*H-D Michigan, Inc. (Harley Davidson) v. Bikers Dream, Inc., et al.*
U.S. District Court, Los Angeles, CA, 1998
- Declaration: April 1998

*Process Construction, Inc. v. The Tartaric Manufacturing Corporation, et al.*
Superior Court of California, Stanislaus County
- Deposition: May 1999
- Deposition: August 1999

*Robert Smith v. Casa Grande/I-10 Land Partners Joint Venture II, et al.*
Superior Court of Arizona, Maricopa County
- Declaration: September 1999
- Deposition: July 2001
- Trial: October 2001

*Leasco, Inc., Debtor v. Santo Domingo & Company, Inc., et al.*
U.S. Bankruptcy Court, Phoenix, AZ
- Deposition: May 2004
- Trial: June 2004



**Attachment B**

## Bryce R. Cook

*Next Phase Enterprises v. Action Performance Companies*
Superior Court of Arizona, Maricopa County
- Deposition: July 2007

*Snikpoh Investments LP v. Inilex, Inc., et al.*
American Arbitration Association, Phoenix, AZ
- Deposition: August 2007

*Eurofresh/Travelers v. Town of Snowflake, Arizona, et al.*
Superior Court of Arizona, Navajo County
- Deposition: October 2007
- Trial:  February 2010

*Certain Underwriters at Lloyd's, London v. Delta Diversified Enterprises, Inc.*
Superior Court of Arizona, Maricopa County
- Deposition: August 2008

*Pipeline Data, Inc. adv. L60, Incorporated*
Superior Court of Arizona, Maricopa County
- Deposition: February 2009

*Richard Kawar v. JP Morgan Chase Bank N.A.*
U.S. District Court, Phoenix, AZ
- Deposition: February 2009

*Griffin v. Griffin*
Superior Court of Arizona, Maricopa County
- Deposition: April 2009
- Trial: December 2009

*Taser International, Inc. v. Stinger Systems, Inc.*
U.S. District Court, Phoenix, AZ
- Deposition: July 2009

*Archetype Associates, Inc. v. The Frank Lloyd Wright Foundation, et al.*
U.S. District Court, Phoenix, AZ
- Deposition: September 2009

*Bachmann v. BBK Tobacco & Foods, Inc.*
American Arbitration Association, Phoenix, AZ
- Arbitration: January 2010

*The Braun Corporation v. Vantage Mobility International, LLC*
U.S. District Court, Northern District of Indiana
- Deposition: January 2010

*Dunn v. Western Neurosurgery, Ltd.*
American Arbitration Association, Tucson, AZ
- Arbitration: February 2010



**Attachment B**

*Medicis Pharmaceutical Corporation v. Acella Pharmaceuticals, LLC*
U.S. District Court, District of Arizona
- Deposition: June 2011

*RB Insurance Group, LLC v. Sterling Life Insurance Company*
Arbitration, Phoenix, AZ
- Deposition: October 2011
- Arbitration: October 2011

*Nikolic v. Pepperidge Farm, Inc.*
Superior Court of Arizona, Maricopa County
- Deposition: August 2012
- Trial: January 2013

*Syntrix BioSystems, Inc. v. Illumina, Inc.*
U.S. District Court, Western District of Washington
- Deposition: December 2012
- Trial: March 2013

*Everett Laboratories, Inc. v. Acella Pharmaceuticals, LLC*
U.S. District Court, District of New Jersey
- Deposition: August 2013
- Deposition: August 2013
- Preliminary injunction hearing: August 2013

*Full Tilt, LLC v. Tilted Kilt Franchise Operating, LLC*
American Arbitration Association, Phoenix, AZ
- Deposition: August 2013
- Arbitration: September 2013

*AA & Saba Consultants, Inc. v. TASER International, Inc.*
Superior Court of Arizona, Maricopa County
- Trial: February 2014

*Barnet, et al. v. Medical Management Resources Group, LLC, et al.*
Superior Court of Arizona, Maricopa County
- Deposition: March 2014

*Bonsall v. Ryley, Carlock & Applewhite*
Superior Court of Arizona, Maricopa County
- Deposition: May 2014

*Rowpar Pharmaceuticals, Inc. v. Lornamead Brands, Inc..*
U.S. District Court, District of Arizona
- Deposition: July 2014

*BNC National Bank, et al. v. HUB International, et al.*
Superior Court of Arizona, Maricopa County
- Deposition: August 2014
- Trial: April-May 2015



**Attachment B**

*Rural/Metro Corporation adv. American Medical Response, LLC*
Arizona Office of Administrative Hearings
- Hearing: September 2014

*Stone Creek, Inc. v. Omnia Italian Design, Inc. et al.*
U.S. District Court, District of Arizona
- Deposition: April 2015
- Trial: October 2015

*Irish Restaurant and Pub Company, et al. v. Concast, Inc., et al.*
U.S. Bankruptcy Court, District of Arizona
- Deposition: May 2015

*AZ Sourcing Land Holding, LLC v. AZ Sourcing, LLC, et al.*
Private Arbitration - Phoenix, Arizona
- Deposition: September 2015
- Arbitration: October 2015

*Cardiovascular Consultants, LTD, v. Lee M. Ugol, et al.*
Superior Court of Arizona, Maricopa County
- Deposition: December 2015

*Paramount Petroleum Corporation v. International Surfacing Systems, et al.*
Superior Court of California, County of Sacramento
- Deposition: March 2016

*Polylast Systems, LLC v. Equiflex, et al.*
Superior Court of Arizona, Maricopa County
- Deposition: July 2016

*Bank of the West v. TriSports.com, et al.*
Superior Court of Arizona, Pima County
- Deposition: December 2016
- Trial: May 2017

*Hurry, et al. v. Financial Industry Regulatory Authority, et al.*
U.S. District Court, District of Arizona
- Deposition: February 28, 2017

*Zoetis LLC v. Roadrunner Pharmacy, Inc.*
U.S. District Court, District of New Jersey
- Deposition: April 2017

*Schires (Goldwater Institute) v. City of Peoria, et al.*
Superior Court of Arizona, Maricopa County
- Deposition: September 2017

# EXHIBIT 2



**Kars 4 Kids Inc.**

v.

**America Can!**

United States District Court, District of New Jersey
Case No. 3:14-cv-07770-PGS-LHG

March 1, 2018

**Expert Report of**
**Bryce R. Cook**

**Highly Confidential – Outside Attorneys Only**

Navigant Consulting, Inc.
201 East Washington Street, Suite 1700
Phoenix, Arizona 85004-2245
602.257.0075
www.navigant.com



# Contents

I.   Introduction ........................................................................................................................ 1

II.  Analysis of Mr. Hall's Report ............................................................................................ 1

    A.   Substantiation of "Defendant's Profits" Remedy ........................................................ 1

    B.   Support for "First to Market Analysis" .........................................................................11

    C.   Impact of K4K on America Can's Sales.......................................................................12

    D.   Mischaracterization and/or Misunderstanding of Liability Assumption and Marketplace Confusion....................................................................................................................17

Attachment A – Documents Considered

Attachment B – Market Share Analysis

Attachment C – Market Share Analysis with Wheels for Wishes



# I.  Introduction

Navigant Consulting was retained by counsel for America Can! to determine the damages or monetary remedy resulting from the infringement of the "Cars for Kids" trademark by Kars 4 Kids Inc. ("K4K"), as presented in my January 16, 2018 expert report. In this current report, I am responding to the rebuttal report of David Hall, dated February 15, 2018.

In developing my opinions, I have reviewed the pleadings filed in this matter, documents produced by the Plaintiff, and documents obtained in the course of performing my research and analysis. A list of the documents I considered is included in Attachment A.

The opinions and analyses presented in this report are based on currently available information. If new information becomes available that is relevant to my analysis or opinions, I may supplement this report. If this matter proceeds to trial, selected pages of the documents and information considered may be used as exhibits. In addition, I may prepare graphical or illustrative exhibits based on the contents of this report, the documents and information considered, and on my analysis of the documents and information.

See my previous expert report for my qualifications and prior expert testimony.

# II.  Analysis of Mr. Hall's Report

## A.  Substantiation of "Defendant's Profits" Remedy

Mr. Hall claims that my accounting of K4K's profits is inaccurate and unreliable, yet he uses the same source and numbers I relied on in performing his "apportionment of Kars 4 Kids' vehicle donation revenue less expenses." In an attempt to discredit my accounting of Defendant's Profits, he makes a number of argumentative, invective-based claims, none of which invalidate my analysis but which instead serve to further substantiate the monetary remedy America Can is seeking. His rebuttal claims are addressed below.

**Semantic Argument over use of the Term "Profits"**

Mr. Hall makes a novel legal defense in response to my accounting of K4K's profits, claiming that it is misleading and inaccurate because "Kars 4 Kids is a non-profit entity and as such, does not earn 'profits on sales.'" He also claims that "because Kars 4 Kids is a non-profit entity, there are no profits to apportion."[1] Based on this semantic argument, all non-profit entities would be immune from liability under Lanham Act claims for "Defendant's Profits" (the term used in 15 U.S. Code § 1117) because, according to Mr. Hall, a nonprofit entity "does not earn profits on sales."

---

[1] Hall report, ¶¶17, 18, 30.

Highly Confidential – Outside Attorneys Only



However, assuming Congress's use of the term "profits" in the Lanham Act was meant to describe financial gain (i.e., revenues less expenses)[2] and not intended to exclude infringing nonprofit organizations from liability, there is nothing inaccurate or misleading about my use of the term or my quantification of K4K's revenues as required under the Lanham Act.[3] Indeed, Mr. Hall used my numbers as the starting point in his own "apportionment of Kars 4 Kids' vehicle donation revenue less expenses."[4] In addition, my accounting was in no way misleading since it explicitly stated the source and basis for the amount claimed ("summary of revenue")[5] and met the trademark registrant's burden of "proving defendant's sales only" under the Lanham Act. Mr. Hall's claiming that my statement was misleading is a gross mischaracterization, if not outright dishonest, or demonstrates lack of experience and understanding of trademark matters.

**Diversion of Donations from America Can to K4K**

Mr. Hall claims that I have not adequately demonstrated that vehicle donations were diverted from America Can to K4K and takes issue with my opinion that "K4K's market entry and growth in each of CFK's markets, along with its high advertising spend, likely had an effect on CFK's donations and inability to return to previous levels."[6] In criticizing this opinion, he appears to be unaware that the Third Circuit used similar language in addressing the second factor in the *Banjo Buddies* case, which he cites. In addressing whether to award Defendant's Profits, the court found: "It is *likely* that [defendant's] conduct diverted sales from Banjo Buddies" on the basis that the marketing "was confusingly similar" and the "markets for the two products were 'either the same or substantially overlapping.' "[7]

Mr. Hall also criticizes the fact that I was unable to determine lost donations attributable to the infringement and that this "undermines" my basis for an accounting of Defendant's Profits.[8] This criticism demonstrates his lack of understanding of trademark infringement remedies, particularly recovery of Defendant's Profits. One reason this remedy exists is because it may not be possible for a plaintiff to determine the amount of actual damage caused by a defendant in these matters.[9]

---

[2] Per the online Oxford dictionary, the definition of "profit" is: "a financial gain, especially the difference between the amount earned and the amount spent in buying, operating, or producing something."
https://en.oxforddictionaries.com/definition/profit
[3] 15 U.S. Code § 1117 - Recovery for violation of rights. For applicability of this statute to a non-profit entity, see *Dreamcatcher Software Dev., LLC v. Pop Warner Little Scholars, Inc.*, 298 F. Supp. 2d 276 (D. Conn. 2004): "The clear text of the statute indicates that 15 U.S.C. 1125(a)(1) applies to 'any person.' Thus, the fact that a specific defendant is a not-for-profit organization does not protect it from liability under the plain language of the statute."
[4] Hall report, ¶¶27, 33, Attachment 1.
[5] Cook report, p. 9: "Based on the above **summary of revenue**, America Can!'s claim for K4K's profits on sales made using the infringing mark total **$328,175,784**." The revenue amount shown is actually akin to "gross profit" since it is the net proceeds (selling price less fees paid to the auction company) K4K receives.
[6] Hall report, ¶¶20, 21, 57; Cook report, pp. 2-3.
[7] *Banjo Buddies, Inc. v. Joseph F. Renosky*, Appellant, 399 F.3d 168 (3d Cir. 2005) (emphasis added).
[8] Hall report, ¶¶20-23.
[9] See, for instance, *Venture Tape Corp. v. McGills Glass Warehouse*, F.3d 56 (1st Cir. 2008): "McGills first complains that Venture did not even attempt to show actual harm, and suggests that this failure means that there was no actual harm. Our case law does not support that inference. When a mark owner cannot prove actual damages attributable to the infringer's misconduct (e.g., specific instances of lost sales), its recovery of an equitable share of

Highly Confidential – Outside Attorneys Only



The inability to quantify the number of lost or "diverted" donations does not mean that there were no lost or diverted donations. It is inescapable that K4K's entry into the vehicle-donation market took donations that otherwise would have gone to America Can. The two organizations are direct competitors in the same geographic markets, use the same or similar advertising methods, engage in charitable giving to kids, and compete for a finite number of vehicle donations.[10] To assume otherwise, one would have to assume that without K4K in the vehicle-donation market, America Can would not have picked up a single K4K donation – all of K4K's donations would have gone to other car-donation charities or never would have been made.

I have not opined that every donation obtained by K4K was a lost donation to America Can. I recognize that some of the decline in, or loss of, America Can's vehicle donations is likely due to other factors (e.g., the economy, the existence of other vehicle-donation charities, America Can's own advertising spend), which is why I am unable to quantify a claim for lost donations and profits solely attributable to K4K's actions. However, there is more than adequate evidence to conclude that K4K likely diverted donations from America Can, which, per *Banjo Buddies*, is a factor to be considered in an award of Defendant's Profits.

**Deduction of Expenses**

Mr. Hall criticizes, and again calls "misleading," my accounting of Defendant's Profits because I did not deduct expenses or apportion the profit related to "non-trademark factors."[11] This criticism shows either a lack of familiarity with trademark infringement issues or disingenuousness, as the Lanham Act explicitly puts the burden of proving expenses and apportionment on the defendant.

Mr. Hall provided no analysis of his claimed deductions but simply accepted K4K's total reported expenses, which he put into two broad categories and which reduced its bottom-line profit[12] to only 1.4% of its total net revenue, as summarized below.

---

the infringer's profits serves, *inter alia*, as a "rough measure" of the likely harm that the mark owner incurred because of the infringement, while also preventing the infringer's unjust enrichment and deterring further infringement."
*See also, Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993): "Because proof of actual damage is often difficult, a court may award damages based on defendant's profits on the theory of unjust enrichment. *Id.* at 511. *See also Bandag, Inc.*, 750 F.2d at 918. The district court gave Lindy the opportunity to prove its damages under both methods: actual damages in the form of its lost profits, or if that proved too difficult, through proof of Bic's unjust enrichment in the form of Bic's profits."
*See also, Playboy Enterprises v. PK Sorren Export Co.*, 546 F. Supp. 987 (S.D. Fla. 1982): "The plaintiff need not demonstrate any actual damages in order to obtain an accounting for profits."
[10] In *Banjo Buddies*, these are the kinds of business and marketing facts the Court considered in concluding that sales were diverted.
[11] Hall report, ¶24.
[12] Because "profit" is a familiar term to most people and the nonprofit-accounting term "change in net assets" is not, I will use the terms "profit" and "Defendant's Profits" throughout this report to refer to K4K's revenue less expenses.

Highly Confidential – Outside Attorneys Only



| Table 1 – Summary of Mr. Hall's Accounting of K4K's Profits, 2008-2016[13] | |
|---|---:|
| Vehicle donation revenue | $ 280,169,000 |
| Functional Expenses: | |
| Fundraising portion of advertising and promotion | 83,186,000 |
| All other functional expenses | 192,943,000 |
| Total functional expenses | 276,129,000 |
| **Profit** | **$  4,040,000** |

Mr. Hall assumes, without any analysis or support, that K4K's total reported expenses were "incurred in generating vehicle donation revenue."[14] He failed to provide any detail of what his expense categories consisted of, why he broke them out that way, or how they related to K4K's car donation program. He also failed to include any revenue and expense for 2017, which he could have obtained from his client even if its 2017 Form 990 has not been filed. In my experience, Mr. Hall's expense deductions do not adequately meet the defendant's burden, per the Lanham Act, to "prove all elements of cost or deduction claimed," and should therefore be disregarded.

In the *Banjo Buddies*[15] case cited by Mr. Hall, the court held that the defendant "failed to satisfy his burden of proof regarding costs and deductions . . . the court observed that the [defendant expert] report's summary of direct expenses . . . was sorely lacking in detail, lumping costs into six broad categories with no explanation of what specific expenses those categories represented." The court also rejected the expert report's conclusion regarding the amount of shared expenses because it "did not show how 'each item of general expense contributed to the production of the infringing items in issue and offer a fair and acceptable formula for allocating a given portion of overhead to the particular infringing items at issue.' "

The K4K expenses on its Form 990, which Mr. Hall failed to present or analyze, provide valuable information that a damages expert and the trier of fact would find useful in determining which expenses should be deducted or excluded. These expenses from K4K's 2016 Form 990 are presented in the following table and are further analyzed below.

---

[13] Hall report, ¶27 and Attachment 1.
[14] Hall report, ¶27.
[15] *See Banjo Buddies supra*; *see also*, *Duro Co. of Ohio v. Duro Co. of New Jersey*, 56 F.2d 313, 315–16 (3d Cir. 1932): "It can be fairly said that large items of attempted charges against profits and large items of alleged depreciation should be itemized and should not be excepted [deducted], if generalized."

Highly Confidential – Outside Attorneys Only



**EXPERT REPORT**

| Table 2 – 2016 K4K Form 990 – Statement of Functional Expenses | | | | |
|---|---|---|---|---|
| | **(A)** <br> **Total** <br> **Expenses** | **(B)** <br> Program <br> services | **(C)** <br> Management <br> and general | **(D)** <br> Fundraising |
| Grants - Domestic | **$ 18,262,163** | $ 18,262,163 | - | - |
| Grants - Foreign | **200,458** | 200,458 | - | - |
| Officers compensation | **260,077** | 98,525 | 109,965 | 51,587 |
| Other salaries & wages | **2,881,559** | 413,252 | 1,222,977 | 1,245,330 |
| Payroll taxes | **360,243** | 97,266 | 133,290 | 129,687 |
| Legal | **557,073** | - | 557,073 | - |
| Accounting | **81,312** | - | 81,312 | - |
| Advertising and promotion | **17,880,457** | 2,769,881 | 81,472 | 15,029,104 |
| Office expenses | **440,943** | 135,682 | 202,624 | 102,637 |
| Information technology | **59,396** | - | 59,396 | - |
| Occupancy | **22,213** | 2,579 | 17,943 | 1,691 |
| Travel | **15,724** | - | 15,724 | - |
| Depreciation | **3,641** | 1,274 | 1,566 | 801 |
| Insurance | **45,136** | - | 45,136 | - |
| Subscriptions | **84,247** | - | 84,247 | - |
| Merchant fees | **78,986** | - | 78,986 | - |
| Repairs and maintenance | **45,990** | 16,097 | 19,776 | 10,117 |
| Licenses and permits | **40,365** | - | 40,365 | - |
| Other expenses | **19,958** | 19,958 | - | - |
| Total | **$ 41,339,941** | **$ 22,017,135** | **$ 2,751,852** | **$ 16,570,954** |

Per the Form 990 instructions, Column (B)–Program Services "are mainly those activities that further the organization's exempt purposes,"[16] which K4K reported in Part III of Form 990 as: "educational, developmental, and recreational programs for Jewish youth and their families." Based on this description, these expenses did not contribute to K4K's generation of car donation revenue and should therefore not be deducted. Certainly, Domestic and Foreign Grants totaling $18.5 million are wholly unrelated to K4K's vehicle-donation fundraising function and should be excluded from deductions. Mr. Hall acknowledged this very fact in his apportionment calculation wherein he excluded grants from total expenses "to determine what portion of Kars 4 Kids operational expenditures represents advertising in a fundraising capacity."[17] The same treatment should apply to the more than $600,000 in compensation/salary/payroll tax expenses K4K spends in running and managing its charitable programs, which is distinct from running and managing its vehicle-donation arm, the expenses of which are shown in Column (D) Fundraising. Likewise, the $2.8 million in advertising expense relating to its charitable programs (e.g., brochures for summer

---

[16] https://www.irs.gov/pub/irs-pdf/i990.pdf
[17] Hall report, ¶¶32, 33.

Highly Confidential – Outside Attorneys Only



camps, ads for educational programs, etc.) are irrelevant to and do not support K4K's vehicle-donation operations and should not be deducted from revenues. Indeed, all Program Services expenses in Column (B) are required by the IRS to be specifically segregated into that category because they support K4K's charitable programs and not its vehicle-donation fundraising activities. Therefore, none of the Column (B) expenses should be deducted from vehicle-donation fundraising revenues.

Here is another way to look at relevant expenses. K4K is a charitable entity that has two main functions or business segments – (1) its fundraising function, which consists primarily of obtaining donated vehicles and selling them for a profit, and (2) its program services function, which consists of using the profits from fundraising for its charitable programs. If it were a for-profit entity whose primary business was obtaining donated vehicles and selling them for a profit, those profits would be paid to the owners or shareholders instead of being expended on non-business-related charitable programs. Any charitable causes it elected to spend its income on (a common expense item for most for-profit businesses) would not be deducted in an accounting of Defendant's Profits because charitable expenses are a discretionary expense that do not contribute to the business's sales and profits. Therefore, regardless of whether K4K is a non-profit entity, it does not make sense to deduct the profits it expends on its charitable programs or the expenses it incurs in running those programs because those expenditures do not contribute to the generation of the infringing revenue. In sum, any expenses that do not contribute to fundraising, or revenue generation, should not be deducted from revenue.

Per the Form 990 instructions, Column (C)–Management and General expenses "relate to the organization's overall operations and management, rather than to fundraising activities or program services. Overall management usually includes the salaries and expenses of the organization's chief executive officer and his or her staff, unless a part of their time is spent directly supervising program services or fundraising activities. In that case, their salaries and expenses should be allocated among management, fundraising, and program services." These general overhead expenses – such as officer salaries, legal and accounting expense, and office rent – are the general shared expenses that support the overall organization. But because the overall organization consists of two main segments – its fundraising function and program services function, these expenses should be allocated between the two segments, if they are to be deducted at all. The *Banjo Buddies* court rejected the conclusion of the defendant's expert report regarding the amount of shared expenses because it "did not show how 'each item of general expense contributed to the production of the infringing items in issue and offer a fair and acceptable formula for allocating a given portion of overhead to the particular infringing items at issue.' "

A number of court cases describe allocation methods for general overhead expenses such as these, which are typically allocated based on infringing-product revenue.[18] Because there is no

---

[18] See, e.g. Duro Co. of Ohio v. Duro Co. of New Jersey, 56 F.2d 313, 315–16 (3d Cir. 1932). Carter Products, Inc. v. Colgate-Palmolive Co., 214 F.Supp. 383, 406-07 (D.Md.1963).

Highly Confidential – Outside Attorneys Only



EXPERT REPORT

revenue associated with K4K's charitable program segment, general overhead expenses can be allocated based on the direct expenses of the two operating segments (Columns B and D), as shown in the following table.

| | (B) Program services | (C) Mgt. & general (M&G) | (D) Fund-raising | (E=B+D) Allocation Base | (F=B/E) Program services % | (G=D/E) Fund-raising % | (H=CxG) M&G allocated to Fundraising | (I=D+H) Fundraising with allocated M&G |
|---|---|---|---|---|---|---|---|---|
| Year | | | | | | | | |
| 2008 | $ 14,634 | $ 350 | $ 7,507 | $ 22,142 | 66% | 34% | $ 119 | $ 7,626 |
| 2009 | 15,469 | 389 | 7,658 | 23,127 | 67% | 33% | 129 | 7,787 |
| 2010 | 21,415 | 642 | 9,075 | 30,491 | 70% | 30% | 191 | 9,266 |
| 2011 | 20,339 | 805 | 10,048 | 30,387 | 67% | 33% | 266 | 10,314 |
| 2012 | 18,745 | 890 | 9,154 | 27,900 | 67% | 33% | 292 | 9,446 |
| 2013 | 18,019 | 982 | 8,668 | 26,687 | 68% | 32% | 319 | 8,987 |
| 2014 | 19,482 | 1,441 | 9,918 | 29,400 | 66% | 34% | 486 | 10,404 |
| 2015 | 23,520 | 2,527 | 13,110 | 36,630 | 64% | 36% | 905 | 14,015 |
| 2016 | 22,017 | 2,752 | 16,571 | 38,588 | 57% | 43% | 1,182 | 17,753 |
| **Total** | **$ 173,640** | **$ 10,778** | **$ 91,711** | **$ 265,351** | | | **$3,888** | **$ 95,599** |

Table 3 – Allocation of K4K Management and General Expenses ($000's)[19]

Per the Form 990 instructions, Column (D)–Fundraising expenses "are the expenses incurred in soliciting cash and noncash contributions, gifts, and grants." Based on this description, these expenses directly relate to the generation of vehicle-donation revenue, and could properly be deducted from claimed revenues. The largest expense in this category is Advertising and promotion of $15.0 million (see Table 2), which would include use of the infringing mark. Some courts have held that expenses incurred in advertising the infringing mark will not be deducted.[20] Nevertheless, assuming all Column (D) expenses and the portion of Column (C) expenses allocated to Column (D) above are legitimate deductions, Defendant's Profits are summarized below.

---

[19] K4K IRS Form 990 for years 2008-2016
[20] Weil, Roman, *et al. Litigation Services Handbook,* 4th Edition (2007), p 20•29.

Highly Confidential – Outside Attorneys Only



EXPERT REPORT

| Table 4 – Calculation of Defendant's Profits | | |
|---|---|---|
| Year | Revenue[21] | Less Fundraising[22] | Defendant's Profits |
| 2008 | $ 23,003,060 | $ 7,625,989 | $ 15,377,071 |
| 2009 | 24,653,912 | 7,787,287 | 16,866,625 |
| 2010 | 29,130,893 | 9,266,388 | 19,864,505 |
| 2011 | 29,976,125 | 10,314,006 | 19,662,119 |
| 2012 | 26,964,821 | 9,446,363 | 17,518,458 |
| 2013 | 28,229,162 | 8,987,289 | 19,241,873 |
| 2014 | 34,756,266 | 10,404,266 | 24,352,000 |
| 2015 | 39,071,455 | 14,014,932 | 25,056,523 |
| 2016 | 44,383,024 | 17,752,687 | 26,630,337 |
| 2017[23] | 48,007,066 | 19,202,261 | 28,804,805 |
| 2008-2017 | $ 328,175,784 | $ 114,801,468 | $ 213,374,316 |

The above measure of Defendant's Profits is more reasonable than Mr. Hall's measure, which simply accepts all of K4K's reported expenses as deductions without any analysis or support and results in profit of only 1.4% of revenue. In *Banjo Buddies*, the Third Circuit found that defendant expert's "'bottom line' lacks credibility" because it showed no profits after deducting costs. Similarly, Mr. Hall's insignificant bottom line, which includes four years of losses out of a nine-year period, lacks credibility.

In addition to improperly deducting expenses that do not relate to the company's revenue-generating fundraising segment, Mr. Hall improperly offsets total profits with four years of losses.[24] In an authoritative text on trademarks, *McCarthy on Trademarks*, the author observes, "Where, during the infringement period, defendant has some loss years and some profit years, the Ninth Circuit has held that defendant is not entitled to set off loss years against profit years, but must account to plaintiff for profits made in any one year."[25] Various Third Circuit cases advocate a similar approach.[26]

An alternative measure of K4K's profit is the grant funds it provides to charitable organizations, as this amount is an indication of the funds it has available to donate after paying all its operating expenses required to generate those funds. The primary recipient of these funds is K4K's sister company, Oorah, as shown in the following table.

---

[21] Total Contributions and Grants as listed on Form 990.
[22] *See* Table 3, column I
[23] 2017 revenue estimated by applying latest 5-year (2011-2016) CAGR (8.2%) to 2016 revenue. 2017 fundraising estimate based on 2016 fundraising w/allocated M&G (see Table 3) divided by 2016 revenue and multiplied by estimated 2017 revenue.
[24] Hall report, Attachment 1.
[25] McCarthy on Trademarks and Unfair Competition, Third Ed. (1995), p. 30-111.
[26] Jones Apparel Group, Inc. v. Steinman, 466 F.Supp. 560, 563 n. 4 (E.D. Pa. 1979). Carter Products, Inc. v. Colgate-Palmolive Co., 214 F.Supp. 383, 406-07 (D.Md.1963). MacBeth Evans Glass Co. v. L. E. Smith Glass Co., 21 F.2d 553, 555 (W.D.Pa.1927).

Highly Confidential – Outside Attorneys Only



EXPERT REPORT

| | | Domestic Non-Oorah[28] | Non-Domestic[29] | Total Grants from K4K |
|---|---|---|---|---|
| Table 5 – Oorah Income from Kars 4 Kids | | | | |
| Year | Oorah[27] | Domestic Non-Oorah[28] | Non-Domestic[29] | Total Grants from K4K |
| 2008 | $ 14,520,000 | $ 4,800 | - | $ 14,524,800 |
| 2009 | 12,700,000 | - | - | 12,700,000 |
| 2010 | 19,487,834 | - | - | 19,487,834 |
| 2011 | 18,118,906 | - | - | 18,118,906 |
| 2012 | 14,484,318 | - | - | 14,484,318 |
| 2013 | 12,601,932 | - | - | 12,601,932 |
| 2014 | 13,058,550 | 721,789 | - | 13,780,339 |
| 2015 | 17,196,997 | 88,254 | 95,044 | 17,380,295 |
| 2016 | 18,262,163 | - | 200,458 | 18,462,621 |
| 2017[30] | 19,753,338 | | | 19,753,338 |
| Total | $ 160,184,038 | $ 814,843 | $ 295,502 | $ 161,294,383 |

Based on the above measures in Tables 4 and 5, K4K's revenue from its vehicle-donation program, less related expenses – i.e., Defendant's Profits per the Lanham Act – are **$161.3 million to $213.4 million**.

**Apportionment of Defendant's Profits**

While the Lanham Act does not specifically mention apportionment, many courts have addressed it in Lanham Act decisions.[31] As discussed in *McCarthy on Trademarks*, apportionment in this context means "the infringer's burden to prove the proportion of his total profits which may not have been due to use of the infringing mark."[32] McCarthy cites the U.S. Supreme Court on this issue, which concluded that: "[A] sufficient reason for not requiring complainant in the present case to make an apportionment between the profits attributable to defendant's use of the offending mark and those attributable to the intrinsic merit of defendant's shoes is that such an apportionment is inherently impossible."[33] He follows with a similar California Supreme Court opinion:

> The difficulty lies in ascertaining what proportion of the profit is due to the trademark, and what to the intrinsic value of the commodity; and as this cannot be ascertained with any reasonable certainty, it is more consonant with reason and

---

[27] K4K IRS Form 990, Schedule I
[28] Difference between K4K IRS Form 990, Part IX, Line 1 and grants to Oorah in previous column.
[29] K4K IRS Form 990, Part IX, Line 3
[30] 2017 K4K grants to Oorah estimated based on 2016 K4K grants to Oorah divided by 2016 total revenue and multiplied by estimated 2017 revenue in Table 4 ($19,753,338 = 18,262,163 / 44,383,024 x 48,007,066)
[31] Lindy Pen Co. v. Bic Pen Corp., 982 F.2d 1400, 1408 (9th Cir. 1993); see also, e.g., Holiday Inns, Inc. v. Airport Holiday Corp., 493 F. Supp. 1025 (N.D. Tex. 1980), aff'd, 683 F.2d 931 (5th Cir. 1982); Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc., No. 94-CIV-2663(RPP), 1999 WL 108739, at *4 (S.D.N.Y. Mar. 3, 1999), on remand from 146 F.3d 66 (2d Cir. 1998), aff'd, No. 99-7329, 2000 WL 220504 (2d Cir. Jan. 12, 2000).
[32] *McCarthy*, p. 30-102.
[33] *Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251, 60 L. Ed. 629, 36 S.Ct. 269 (1916) (as cited in *McCarthy supra*).

Highly Confidential – Outside Attorneys Only



EXPERT REPORT

justice that the owner of the trademark should have the whole profit than that he should be deprived of any part of it by the fraudulent act of the defendant.[34]

McCarthy goes on to say: "But if the infringer can prove a fair basis of apportionment, then profits awarded will be apportioned according to the effect the infringement had on the infringer's sales."[35]

Mr. Hall claims to have "apportioned Kars 4 Kids $4.040 million of vehicle donation revenues less expenses," although he does not say what he is apportioning it to.[36] The purpose of apportionment, as explained above, is to determine the amount of the infringer's profits attributable to the alleged infringement versus other factors. Therefore, assuming Mr. Hall understands this, because his apportionment calculation is based on the ratio of K4K's advertising expense incurred in its fundraising segment divided by its total reported expenses, less grants paid to charities, he is implicitly acknowledging that all advertising and promotion done for fundraising (i.e., to solicit vehicle donations) was allegedly infringing. This assumption is consistent with Esti Landau's deposition testimony that almost all the advertising expense for fundraising related to the alleged infringing Mark.[37]

Although he never explains it, Mr. Hall's apportionment calculation, what he terms the "Advertising for Fundraising Ratio," appears to be based on the following logic: K4K spends X dollars operating the company (total functional expenses less grants), and its alleged infringing advertising (advertising expense for fundraising) makes up Y dollars of those operations; therefore, the resulting ratio of Y/X reflects the infringing activity as a percent of the company's total operating activity. This apportionment calculation is mechanically incorrect, as it is comparing expenses from unrelated operating segments. The denominator – which he calculates as total functional expenses less grants – reflects more than the company's operating expenses of its fundraising segment. He appropriately deducted grants – which, as discussed above, do not generate revenue – from the denominator but failed to remove all other non-fundraising-related expenses. Thus, he has a mismatch between advertising expense for the fundraising function on one hand, and operating expense that still includes program services on the other.[38] Because K4K revenue is only generated from the company's fundraising segment, only expenses from that segment should be included in his apportionment denominator to avoid the mismatch, as shown in the table below.

---

[34] *Graham v. Plate*, 40 Cal. 593 (1871) as cited in *McCarthy*.
[35] *McCarthy*, p. 30-104.
[36] Hall report, ¶31.
[37] Landau deposition, pp. 27-32
[38] I understand that per Note 4 of K4K's 2016 audited financial statements that K4K does some "joint" advertising that includes both segments and therefore allocates those joint advertising costs, which shows that K4K understands the necessity of allocating its advertising expense to fundraising versus the other segments.

Highly Confidential – Outside Attorneys Only



EXPERT REPORT

| | | - **Incorrect** - | - **Correct** - |
|---|---|---|---|
| Year | K4K Advertising for Fundraising | K4K Total Functional Expenses Less Grants | K4K Total Expenses for Fundraising[40] |
| 2008 | $ 6,838,060 | $ 7,966,390 | $ 7,625,989 |
| 2009 | 6,760,187 | 10,816,616 | 7,787,287 |
| 2010 | 7,954,302 | 11,645,143 | 9,266,388 |
| 2011 | 9,151,788 | 13,072,372 | 10,314,006 |
| 2012 | 8,560,901 | 14,305,475 | 9,446,363 |
| 2013 | 7,982,919 | 15,066,952 | 8,987,289 |
| 2014 | 9,048,707 | 17,060,400 | 10,404,266 |
| 2015 | 11,859,532 | 21,777,117 | 14,014,932 |
| 2016 | 15,029,104 | 22,877,320 | 17,752,687 |
| Total | $ 83,185,500 (a) | $ 134,587,785 (b) | $ 95,599,207 (c) |
| | | (a / b) | (a / c) |
| **Allocation %** | | **61.8%** | **87.0%** |

Table 6 – Corrected Apportionment Calculation[39]

## B.   Support for "First to Market Analysis"

In my original report, I performed an analysis which demonstrated that America Can "preceded K4K in most states (based on when an organization first reported donations) …"[41] Mr. Hall criticizes this analysis but provides no alternative analysis or rationale as to why it is inappropriate—other than to state his opinion that it somehow constitutes a legal opinion regarding when the trademark is first used. Mr. Hall's assumption is incorrect, as I never stated that first-reported donations equated to first use of the trademark (although it is reasonable to assume such events would be closely correlated). My analysis simply demonstrated who was first in the car donation market based on earliest reported donations, and that K4K surpassed America Can in the number of donations in each state, except for Texas, soon after its entry. Because America Can's first donations in each state were generally two or more years in advance of K4K's (five years on average), it is reasonable to conclude that America Can entered the market first and used the mark first in those states. For Mr. Hall's criticism to be valid, he would need to show evidence that K4K began using the mark first but was unable to obtain a single donation for two or more years thereafter.

---

[39] Source: Kars 4 Kids Form 990's
[40] Source is Table 4, Fundraising column that includes both Fundraising expense and allocated Management and General expense.
[41] Cook report, p. 6. My statement that "CFK began using the Mark first" is independent of my analysis of who preceded whom in donations in each state. "First use" is a liability assumption that I am accepting from counsel.

Highly Confidential – Outside Attorneys Only



### C.   Impact of K4K on America Can's Sales

Mr. Hall repeats the same argument raised in his Opinion 1, criticizing my opinion that "K4K's market entry and growth in each of CFK's markets, along with its high advertising spend, likely had an effect on CFK's donations and inability to return to previous levels."[42] As stated above, I do not ignore the impact of other factors on America Can's donations, which is the primary reason I was unable to perform a calculation of America Can's actual lost-donations damages and which is a common situation in trademark matters. My response here, as above, is that it is inescapable that K4K's entry into the vehicle-donation market took donations that otherwise would have gone to America Can. Mr. Hall has done nothing to invalidate that conclusion. He has attempted to show that other factors contributed to America Can's loss of sales and market share, or that America Can has performed well against the market, as though he were rebutting an actual-damages lost-profits analysis, which is not relevant here. But other than his simplistic apportionment calculation discussed above, he has failed to meet defendant's burden to demonstrate what portion of K4K's revenues relate to the alleged infringement versus other factors. Nevertheless, I will address the factors he cites as having an impact on America Can's donations.

**Other Car-Donation Charities**

Mr. Hall points out that other car-donation charities were in the vehicle-donation market, "potentially impacting AC's market share," and that "This is a factor that likely impacted AC's donations, other than Kars 4 Kids' alleged use of the mark, that Mr. Cook ignores."[43] While Mr. Hall exhibits no qualms using the words "potentially" and "likely" in his opinions, the results of his market-share analysis – in which he notably left out the shares of K4K and the rest of the market – indicate something different, as shown in the following table.

---

[42] Hall report, ¶¶38, 39.
[43] Hall report, ¶¶40, 41.

Highly Confidential – Outside Attorneys Only



EXPERT REPORT

| Table 7 – Donated Vehicles – Market Share Over Time | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year | U.S. Total | AC | K4K | All Others | AC Share | K4K Share | All others Share |
| 2004 | 970,516 | 15,334 | ■ | ■ | 1.6% | ■ | ■ |
| 2005 | 325,372 | 11,503 | ■ | ■ | 3.5% | ■ | |
| 2006 | 318,498 | 13,835 | ■ | ■ | 4.3% | ■ | |
| 2007 | 343,202 | 14,757 | ■ | ■ | 4.3% | ■ | |
| 2008 | 271,136 | 14,300 | ■ | ■ | 5.3% | ■ | |
| 2009 | 213,833 | 14,483 | ■ | ■ | 6.8% | ■ | |
| 2010 | 193,531 | 9,471 | ■ | ■ | 4.9% | ■ | |
| 2011 | 190,539 | 7,811 | ■ | ■ | 4.1% | ■ | |
| 2012 | 164,449 | 7,391 | ■ | 1 | 4.5% | ■ | |
| 2013 | 146,274 | 7,436 | ■ | ■ | 5.1% | ■ | |
| 2014 | 176,970 | 7,819 | ■ | | 4.4% | ■ | |
| Market share increase/decrease, 2004-2014 | | | | | + 2.8% | ■ | |
| Percentage change in market share, 2004-2014 | | | | | 180% | ■ | |
| 2014 market share without K4K (assuming K4K donations split pro rata between AC and All others) | | | | | 8.2% | - | |

As shown above, America Can's market share more than doubled (180% increase) over the 10-year period, 2004 to 2014, while the "All others" market share ■■■■■■■■■■■■■■ ■■■■■■■■■ and became the dominant player in the vehicle-donation market, as shown in the following chart.[44]



---

[44] *See* Attachment C for source numbers. The "All others" in this chart differs from that in the table above it due to breaking out Wheels for Wishes from All others in the chart.

Highly Confidential – Outside Attorneys Only



EXPERT REPORT

As shown in Table 7 above, without K4K in the market, and allocating its donations between America Can and All others, America Can's 2014 market share would almost double, from 4.4% to 8.2%. These market share changes, along with the other similarities between K4K and America Can, indicate that K4K likely took share from America Can and All others, as well as potentially increased the total market. However, the numbers alone do not provide the basis to conclude, as Mr. Hall erroneously does, that All others took share from America Can.

Mr. Hall makes at least six references to America Can's increase in donations and outperforming the market.[45] With this heavy emphasis on America Can's donation performance, he appears to imply that simply because its market share increased, it was not affected by K4K's dominating market presence. He fails to acknowledge that America Can's donations and market share could have been higher absent K4K's market entrance and use of the mark. As discussed above, given the similarity of their markets, services, charitable focus, etc., it would be implausible to assume that America Can did not lose some market share to K4K.

**Advertising Spend**

Mr. Hall takes issue with the findings from my analysis that shows that, while America Can was first to market in 42 of 51 states (by two or more years in 40 states), K4K surpassed America Can's donation level in each state generally within one to two years of its entry and came to dominate the market.[46] And as shown in Table 2 of my previous report, K4K far surpassed America Can in advertising spend.

Despite these findings, Mr. Hall appears to be arguing that K4K had no impact on America Can's donations in states outside of Texas. He also states that "It is reasonable to conclude that AC's decision to reduce its advertising spending impacted its vehicle donations."[47] While it may be reasonable to draw that conclusion, another reasonable conclusion is that as K4K came to dominate the market while using the infringing Mark in its advertising, and America Can's vehicle donations declined to generally less than 10 units per state outside of Texas, it made financial sense for America Can to reduce its advertising spending—especially if it believed marketplace confusion was diverting donations to K4K and damaging America Can's reputation and good will.

Mr. Hall stated that K4K's advertising expense per donated vehicle is much less than that of America Can. He did not indicate what point he was trying to make with this observation or how it supported his opinions. However, his analysis failed to consider the value of donations received and was focused only on units. K4K may receive more vehicle donations than America Can and have a lower advertising spend per unit, but its average revenue per vehicle is generally less than half that of America Can's, as shown below.

---

[45] Hall report, ¶¶46-49.
[46] Cook report, Table 3.
[47] Hall report, ¶53.

Highly Confidential – Outside Attorneys Only



| Table 8 – Average Revenue per Vehicle[48] | | |
|---|---|---|
| Year | AC | K4K |
| 2008 | $ 693 | $ 305 |
| 2009 | 639 | 278 |
| 2010 | 862 | 388 |
| 2011 | 1,020 | 529 |
| 2012 | 1,082 | 495 |
| 2013 | 1,011 | 430 |
| 2014 | 1,033 | 427 |
| 2015 | 863 | 427 |
| Average | $ 900 | $410 |

Mr. Hall states that the inability of the overall vehicle-donation market and America Can to recover their pre-recession level of donations "suggests that Kars 4 Kids' advertising is more effective on a dollar-for-dollar basis than AC's advertising for reasons unrelated to the use of the [Marks]…"[49] This opinion is purely speculative, as he has provided no evidence to support how donors and prospective donors respond to the Mark versus other aspects of the advertising done by the parties (*e.g.*, the K4K "jingle").

**Reliance on a Spurious Website**

In an apparent attempt to show why donors might prefer K4K over America Can, Mr. Hall cites a single website, donationstips.com, that has eight different "top" or "best" lists for car donation charities, including "Top 6 Charities to Donate a Car in Denver" (or Los Angeles, or Sacramento, or New York, etc.). Mr. Hall only referred to the "The 6 Best Car Donation Charities in the US" list, which happens to include K4K at number six. But he failed to mention that, somewhat confusingly, none of the other "top" or "best" lists by city on the site include K4K. He also failed to mention that "The 4 Most Reputable Car Donation Charities" articles on the website included America Can but not K4K.

From the "Best" list article cited by Mr. Hall, he quoted four alleged "additional benefits" offered by K4K "in contrast with other non-profits that accept vehicles." However, he failed to do any research showing (or simply opted not to disclose) that America Can offers the same or better benefits, as summarized below.

---

[48] See Attachment C for source numbers.
[49] Hall report, ¶57.

Highly Confidential – Outside Attorneys Only



| Table 9 – Comparison of "Benefits" | |
|---|---|
| **K4K Benefits from Article** | **America Can Benefits[50]** |
| They can pick up a car donation without a title with some additionally signed paperwork. | Same. But K4K subcontracts this out whereas America Can does its own title work. Also, America Can can do same-day pickup. |
| The donor does not need to be present at the time of the pick-up of the donated car. | Same |
| Towing representatives from all 50 states, licensed and insured. | Same |
| The donor will get a 3-day, 2-night hotel voucher with its donation. | Since this has caused many complaints for both parties, America Can now offers a $50 Visa gift card, or Texas Ranger tickets when in season. |
| -- | Platinum badge from Guidestar.org (https://www.guidestar.org/profile/46-2077931) |
| -- | 2017 Top-Rated Nonprofit from Greatnonprofits.org (https://greatnonprofits.org/awards/search/search:cars+for+kids) |

In addition to Mr. Hall's biased and selective disclosure of information from this website, he failed to do any due diligence to test the legitimacy and integrity of the site or its creator. The "about" section tells nothing about the entity that created the site or more importantly the criteria that it uses to rank its "best" charities or a statement representing its independence, *i.e.*, whether it receives any remuneration from organizations featured in the lists (which is often the case with these kinds of review sites[51]).

I checked the website registration and found that it was registered to Felix Ocampo Luces, and the registrant organization was Grupo FLX CA in Caracas, Venezuela.[52] The registrant address could not be found on any online maps. However, Grupo FLX CA has a website with phone numbers and an email address (no physical address). It appears to be a family-owned business in Caracas that provides road and construction signage. Felix Ocampo Luces (the name "felixol" also appears on the donationstips.com website) is a young man currently studying languages in Hangzhou, China.[53] We sent emails to Felix's personal email address (provided by his mother) and to the email address shown on donationstips.com asking about the website content and sponsorship and have not received any reply, which along with the other findings strongly indicates that the website is a sham. Mr. Hall's reliance on this website shows lack of independence and due care expected of an independent expert.

---

[50] From America Can website; information provided by America Can's COO, Malcolm Wentworth; other sources as noted.
[51] See, *e.g.*, https://www.theguardian.com/money/2013/jan/26/fake-reviews-plague-consumer-websites
[52] Website registration search from https://www.godaddy.com/whois
[53] This according to his mother—who answers the phone at Grupo FLX—and according to Felix's Facebook page.

Highly Confidential – Outside Attorneys Only



Furthermore, while Mr. Hall touted the one positive website he found, he neglected to mention all the negative attention K4K has received over the years, which tends to invalidate the point he was trying to make even if donationstips.com were a legitimate source.[54]

### D. Mischaracterization and/or Misunderstanding of Liability Assumption and Marketplace Confusion

Mr. Hall claims that my statement, "K4K has spent over $75 million in advertising that wrongfully used the Mark from 2004 through 2014," is a legal conclusion.[55] Interestingly, Mr. Hall's own apportionment calculation implicitly assumes that K4K's advertising in fundraising is infringing (assuming he understands that the purpose of an apportionment calculation is to apportion revenue to infringing actions versus other factors). When damages experts perform their analysis of damages, they presume liability, which, in this case, is that K4K's use of the term "KARS 4 KIDS" is wrongful use. As a damages expert I offer no legal opinion regarding infringement or confusion.

Mr. Hall made several repetitive criticisms of my reference to K4K documents that indicate confusion in the marketplace and by donors.[56] He mistakenly believes or purposely misconstrues this evidence to mean that I was using it to show "examples of diverted donations." My intent was simply to show examples of confusion in the marketplace, which Mr. Hall apparently does not understand the purpose of in trademark cases.[57] Regardless, as stated above, I am not opining on or providing any analysis of confusion, but in this instance simply observing that the record shows it existed.

---

[54] Here are a few examples:
- K4K Management presentation entitled, "Points of Negativity," K4K0113205 reputation-C2.pdf
- Minnesota Compliance Review, CAN-0017925-84
- BBB Report: K4K0551845-49
- D Rating by Charity Watch: https://www.charitywatch.org/ratings-and-metrics/kars4kids/757
- Costly and Continuous Kars4Kids Ads Disguise Charity's Real Purpose: https://www.charitywatch.org/charitywatch-articles/costly-and-continuous-kars4kids-ads-disguise-charity-39-s-real-purpose/179
- Catchy Jingle Not a Green Light to Donate: https://www.charitywatch.org/charitywatch-articles/catchy-jingle-not-a-green-light-to-donate/92
- Kars4Kids is questioned by charity watchdogs: http://www.startribune.com/kars4kids-is-questioned-by-charity-watchdogs/136191368/
- Dedicated blog to report K4K alleged scams: http://kars4kids-scam.blogspot.com/
- K4K Misleading Free Vacation Offer with Donation per Ripoff Report: https://www.ripoffreport.com/reports/kars-4-kids/lakewood-new-jersey-08701/kars-4-kids-misleading-free-vacation-offer-with-donation-lakewood-new-jersey-263345.

[55] Hall report, ¶61. To the extent the portion of K4K's total advertising expense of $75 million in program services and management does not use the "Kars 4 Kids" Mark, there would clearly be no wrongful use of the Mark associated with that portion of the total advertising expense.

[56] Hall report, ¶¶23, 59, 62.

[57] *See, e.g.*, *Interpace Corporation v. Lapp, Inc.*, 721 F.2d 460 (3d Cir. 1983): "The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion. Where the trademark owner and the alleged infringer deal in competing goods or services, the court need rarely look beyond the mark itself."

Highly Confidential – Outside Attorneys Only



Mr. Hall also criticized my mention of a corrective advertising approach to damages because I did not identify a methodology for making that determination. One methodology for quantifying such damages would be to assume that American Can would be required to spend the same amount on fundraising advertising as K4K to correct confusion in the marketplace and reinstate itself in the public eye as owner of the Mark. That measure for the nine-year period, 2008 to 2016, based on K4K's advertising expense for fundraising totals **$83.2 million** (*see* Table 6 above).

Bryce R. Cook

Highly Confidential – Outside Attorneys Only



| EXPERT REPORT |
|---|

### ATTACHMENT A

### Documents Considered
*(Added since original report)*

- Expert report of David Hall dated February 15, 2018
- Expert report of Melissa A. Pittaoulis dated February 15, 2018
- America Can Cars for Kids 2015 Form 990
- America Can (dba Texas Can) 2015 Form 990
- Car Donation Foundation (dba Wheels for Wishes) 2010-2016 Form 990
- Depositions of Eliyohu Mintz, Esti Landau Highly, Malcom Wentworth, Malka Keller, Asher Moskovits, Cheryl Poldugrach, and Richard Marquez
- 2003-2014 IRS Non-Cash Individual Contribution Report
- CAN-00178740 – CAN-00179617
- K4K0062233 impacts to car donations-C2.pdf
- K4K0113205 reputation-C2.pdf
- K4K0113212 2010 to 2011 msn marketing reports-C2.xls
- K4K0113213 2010 to 2011 msn marketing reports-C2.xls
- K4K0113214 2011 car donations by state-C2.xls
- K4K0113215 2010 to 2011 msn marketing reports-C2.xls
- K4K0113216 2004-2012 google ppc-C2.xls
- K4K0113217 2008 - 2011 online versus offline donations-C2.xls
- K4K0113218 2002 to 2011 reports-C2.xls
- K4K0113219 2010 to 2011 msn marketing reports-C2.xls
- K4K0113220 2008 to 2011 searches-C2.xls
- K4K0138532 2012 program advertising and In- kind-C2.xls
- https://en.oxforddictionaries.com
- 15 U.S. Code § 1117 - Recovery for violation of rights.
- *Dreamcatcher Software Dev., LLC v. Pop Warner Little Scholars, Inc.*, 298 F. Supp. 2d 276 (D. Conn. 2004
- *Banjo Buddies, Inc. v. Joseph F. Renosky*, Appellant, 399 F.3d 168 (3d Cir. 2005)
- *Venture Tape Corp. v. McGills Glass Warehouse*, F.3d 56 (1st Cir. 2008)
- *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993)
- *Bandag, Inc.*, 750 F.2d at 918.
- *Playboy Enterprises v. PK Sorren Export Co.*, 546 F. Supp. 987 (S.D. Fla. 1982)
- *Duro Co. of Ohio v. Duro Co. of New Jersey*, 56 F.2d 313, 315–16 (3d Cir. 1932)
- https://www.irs.gov/pub/irs-pdf/i990.pdf
- *Carter Products, Inc. v. Colgate-Palmolive Co.*, 214 F.Supp. 383, 406-07 (D.Md.1963)
- K4K IRS Form 990 for years 2008-2016
- Weil, Roman, *et al. Litigation Services Handbook*, 4th Edition (2007)
- McCarthy on Trademarks and Unfair Competition, Third Ed. (1995), p. 30-111.
- Jones Apparel Group, Inc. v. Steinman, 466 F.Supp. 560, 563 n. 4 (E.D. Pa. 1979).
- MacBeth Evans Glass Co. v. L. E. Smith Glass Co., 21 F.2d 553, 555 (W.D.Pa.1927).
- Holiday Inns, Inc. v. Airport Holiday Corp., 493 F. Supp. 1025 (N.D. Tex. 1980), aff'd, 683 F.2d 931 (5th Cir. 1982)

Highly Confidential – Outside Attorneys Only



- Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc., No. 94-CIV-2663(RPP), 1999 WL 108739, at *4 (S.D.N.Y. Mar. 3, 1999), on remand from 146 F.3d 66 (2d Cir. 1998), aff'd, No. 99-7329, 2000 WL 220504 (2d Cir. Jan. 12, 2000).
- *Interpace Corporation v. Lapp, Inc.*, 721 F.2d 460 (3d Cir. 1983):
- https://www.guidestar.org/profile/46-2077931
- https://greatnonprofits.org/awards/search/search:cars+for+kids
- https://www.theguardian.com/money/2013/jan/26/fake-reviews-plague-consumer-websites
- https://www.godaddy.com/whois
- American Can Website
- Kars4Kids website

Highly Confidential – Outside Attorneys Only

*America Can! v. Kars 4 Kids*
**Market Share Analysis**                                                                                    **Attachment B**

| | | Unit Donations [1] | | | Market Share | | | | Allocation of K4K Units to America Can and All Others | | | | | | | | |
| Year | U.S. Total | AC | K4K | All Others | AC | K4K | All Others | | Market Share [AC & All Others Only] | | Allocation of K4K Units | | But-for Market with K4K Units Allocated | | | | |
| | | | | | | | | | AC | Others | AC | Others | Unit Donations | | | Market Share | |
| | | | | | | | | | | | | | AC | Others | Total | AC | Others |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004 | 970,516 | 15,334 | | | 1.6% | | | | | | | | | | | | |
| 2005 | 325,372 | 11,503 | | | 3.5% | | | | | | | | | | | | |
| 2006 | 318,498 | 13,835 | | | 4.3% | | | | | | | | | | | | |
| 2007 | 343,202 | 14,757 | | | 4.3% | | | | | | | | | | | | |
| 2008 | 271,136 | 14,300 | | | 5.3% | | | | | | | | | | | | |
| 2009 | 213,833 | 14,483 | | | 6.8% | | | | | | | | | | | | |
| 2010 | 193,531 | 9,471 | | | 4.9% | | | | | | | | | | | | |
| 2011 | 190,539 | 7,811 | | | 4.1% | | | | | | | | | | | | |
| 2012 | 164,449 | 7,391 | | | 4.5% | | | | | | | | | | | | |
| 2013 | 146,274 | 7,436 | | | 5.1% | | | | | | | | | | | | |
| 2014 | 176,970 | 7,819 | | | 4.4% | | | | | | | | | | | | |

**Change in Market Share:**

| | | |
|---|---|---|
| Market share increase/decrease, 2004-2014 | 2.8% |  |
| Percentage change in market share, 2004-2014 | 180% | |

**Notes:**
(1) U.S. Total units per IRS Non-Cash Individual Contribution Reports
    AC units per CAN-00177453 (also known as "CFK Sales 2004 - 2017.xls")
    K4K units per K4K0089669.xls

*America Can! v. Kars 4 Kids*                                                                 **Attachment C**
**Market Share Analysis with Wheels for Wishes**

### Unit Donations [1]

| Year | U.S. Total | AC | K4K | Wheels for Wishes | All Others |
|------|-----------|------|------|-------------------|-----------|
| 2008 | 271,136 | 14,300 | | | |
| 2009 | 213,833 | 14,483 | | | |
| 2010 | 193,531 | 9,471 | | 3,443 | |
| 2011 | 190,539 | 7,811 | | 18,568 | |
| 2012 | 164,449 | 7,391 | | 32,631 | |
| 2013 | 146,274 | 7,436 | | 42,598 | |
| 2014 | 176,970 | 7,819 | | 51,106 | |
| 2015 | | 8,518 | | 48,199 | |

### Calculation of Wheels for Wishes Vehicle Donation Units

#### Calculation of American Can and Kars 4 Kids Avg. Revenue per Unit

| | America Can! | | | Kars 4 Kids | | | | Wheels for Wishes [2] | |
|------|--------------|-------|----------|-------------|-------|----------|-------------|-----------------------|----------------------|
| Year | Revenue | Units | $ per Unit | Revenue | Units | $ per Unit | Avg. $ per Unit | Revenue | Est. Units (Avg. $ per Unit) |
| 2008 | $ 9,908,857 | 14,300 | $ 693 | | | | $ 499 | | |
| 2009 | 9,261,402 | 14,483 | 639 | | | | 459 | | |
| 2010 | 8,165,092 | 9,471 | 862 | | | | 625 | $ 2,153,161 | 3,443 |
| 2011 | 7,970,247 | 7,811 | 1,020 | | | | 775 | 14,381,579 | 18,568 |
| 2012 | 7,993,764 | 7,391 | 1,082 | | | | 788 | 25,724,026 | 32,631 |
| 2013 | 7,519,794 | 7,436 | 1,011 | | | | 721 | 30,707,640 | 42,598 |
| 2014 | 8,073,314 | 7,819 | 1,033 | | | | 730 | 37,305,950 | 51,106 |
| 2015 | 7,350,814 | 8,518 | 863 | | | | 645 | 31,098,064 | 48,199 |
| Avg. | | | $ 900 | | | | | | |

### Market Share Percentages

| Year | U.S. Total | AC | K4K | Wheels for Wishes | All Others |
|------|-----------|-----|------|-------------------|-----------|
| 2010 | 100% | 5% | | 2% | |
| 2011 | 100% | 4% | | 10% | |
| 2012 | 100% | 4% | | 20% | |
| 2013 | 100% | 5% | | 29% | |
| 2014 | 100% | 4% | | 29% | |



**U.S. Market Share of Donated Vehicles**

**Notes:**
(1) U.S. Total units per IRS Non-Cash Individual Contribution Reports
    AC units per CAN-00177453 (also known as "CFK Sales 2004 - 2017.xls")
    K4K units per K4K0089669.xls.  Full-year 2015 donation data not available; units estimated based on IRS Form 990 non-cash donation revenue divided by 2014 avg. revenue per vehicle.
    Wheels for Wishes units based on calculated estimate (far right column)
(2) Data per IRS Form 990 filings (non-cash contribution revenue)

# EXHIBIT 3

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF NEW JERSEY
     ---------------------------------------------------x
3    KARS 4 KIDS INC.,

4                          Plaintiff,

5       -vs.-

6    AMERICA CAN!,

7                          Defendant.

8    Civil Action No. 14-7770
     ---------------------------------------------------x
9

10                * * * HIGHLY CONFIDENTIAL * * *

11

12                          2333 East Thomas Road
                            Phoenix, Arizona
13
                            March 15, 2018
14                          9:39 a.m.

15

16        The Videotaped Deposition of BRYCE R. COOK,

17   taken before Amy L. Zoller, a Certified Reporter,

18   Certificate No. 50911, for the State of Arizona.

19

20

21

22

23          ELLEN GRAUER COURT REPORTING CO, LLC
               126 East 56th Street, Fifth Floor
24                 New York, New York 10022
                       212-750-6434
25                     REF:  116968

```
 1   A P P E A R A N C E S:

 2

 3   ORRICK, HERRINGTON & SUTCLIFFE, LLP

 4   For Plaintiff:

 5        51 West 52nd Street

 6        New York, New York 10019-6142

 7   BY:  DAVID LITTERINE-KAUFMAN, ESQ.

 8        dlitterinekaufman@orrick.com

 9

10

11   YANAROS LAW, P.C.

12   For Defendant and the Witness:

13        15851 Dallas Parkway, Suite 600

14        Addison, Texas 75001

15   BY:  VALERIE YANAROS WILDE, ESQ.

16        valerie@yanaroslaw.com

17

18

19   DeLEON LAW GROUP

20   For Defendant and the Witness:

21        4322 Walnut Hill Lane

22        Dallas, Texas 75229-6436

23   BY:  MANUEL TORRES, JD, CPA

24        J. MANUEL TORRES-RODRIGUEZ, ESQ.

25        manny.torres@attorney-cpa.com
```

```
 1   A P P E A R A N C E S:

 2

 3   ALSO PRESENT:

 4         Ed Kishel, Videographer

 5         Adam Ashlock, CPA

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1   ------------------- I N D E X --------------------
2   WITNESS                    EXAMINATION BY          PAGE
3   BRYCE R. COOK              MR. LITTERINE-KAUFMAN  6, 208
4                              MS. YANAROS WILDE         206
5
6
7   ----------------- E X H I B I T S -----------------
8   DESCRIPTION        DESCRIPTION              FOR I.D.
9   Exhibit 1          Expert Report 01/16/18       11
10  Exhibit 2          Expert Report 03/01/18       11
11  Exhibit 3          Charts 2002-2014 Online and  86
12                     Offline All Auto Sites
13  Exhibit 4          2009 Form 990 Joy for Our    88
14                     Youth, Bates CAN-001777731
15  Exhibit 5          Rebuttal Expert Report of    97
16                     David A. Hall
17  Exhibit 6          Find Reports, K4K0085313    154
18  Exhibit 7          1989-2002 Old Database,     175
19                     Bates CAN-00178025
20  Exhibit 8          ND, SD, VT, Totals, Bates   180
21                     CAN-00177453
22
23                 (EXHIBITS TO BE PRODUCED)
24           (ALL EXHIBITS HIGHLY CONFIDENTIAL)
25
```

```
1                COOK - HIGHLY CONFIDENTIAL
2       Q.     America Can! saw a sharp decline in donations
3    in 2005, correct?
4       A.     Yes.
5       Q.     And another sharp decline in donations in 2010,
6    correct?
7       A.     Yes.
8       Q.     And America Can!'s donations then remained at
9    low levels through 2015, correct?
10      A.     Yes.  Relative to its past, the prior years.
11      Q.     Now, you agree that factors other than Kars 4
12   Kids use of the mark caused at least some of the
13   purported losses in donations by America Can!, correct?
14      A.     Yes, I believe that's reasonable to assume.
15      Q.     Okay.  What other factors do you think caused a
16   decline in America Can!'s donations?
17      A.     Well, I haven't studied specifically causation
18   elements.  But, you know, we could -- we could assume
19   that economic factors caused decline.  In 2005, obviously
20   there was the tax change on deductibility of car
21   donations that had a big impact.  The recession and
22   subsequent higher demand for used vehicles in 2010 and
23   thereon -- thereafter had -- likely had an impact.  And
24   there could be, you know, impact from other car donation
25   organizations that participate in this market.
```

```
 1              COOK - HIGHLY CONFIDENTIAL
 2      Q.    Okay.  Did you do any analysis of how much any
 3  of those factors contributed to any decrease in donations
 4  to America Can!?
 5      A.    No.
 6      Q.    Do you have any opinion on how much any of
 7  those factors contributed to any decrease in donations to
 8  America Can!?
 9      A.    No.
10      Q.    One of the factors you mentioned that
11  potentially affected donations to America Can! was a
12  recession; is that right?
13      A.    Yes.
14      Q.    Okay.  And when did that recession occur?
15      A.    The recession officially, according to the
16  Bureau of Economic Analysis, started in December 2007 and
17  hit bottom in 2009.
18      Q.    Is it your opinion that the recession was, to
19  some extent, responsible for America Can!'s low levels of
20  donations in 2010 through 2015?
21      A.    I believe it would have had an impact in some
22  of the earlier years following the recession.  But, for
23  instance, when you look at America Can!, it begins to
24  recover in 2013, maybe even 2012.  Let me see one moment.
25  Did I -- Kars 4 Kids.
```

```
 1                  COOK - HIGHLY CONFIDENTIAL
 2             So I'm looking at my chart on 7, which compares
 3      the two.  So you can see that Kars 4 Kids has a
 4      relatively big decrease in 2010, not as big as America
 5      Can!, and then another sizeable decrease in 2011, and
 6      then a very small decrease in 2012, and then begins to
 7      pick up in '13 and thereafter.
 8             Whereas, America Can!, going back to the chart
 9      on page 2, is basically flat in 2013, the year that Kars
10      4 Kids sees a sizeable increase and begins to recover.
11      Q.    Okay.  I guess I'll just ask my question again.
12      So is your opinion that the recession was partly
13      responsible for America Can!'s low level of donations in
14      2010 through 2015?
15      A.    Yes.  And as -- just to restate my answer, in
16      the early years, I believe it had more of an impact than
17      in later years when, for instance, Kars 4 Kids was
18      recovering, as well as the rest of the economy was
19      recovering.  America Can!'s donation levels still stayed
20      somewhat low.
21      Q.    And when do you think the effects of the
22      recession on America Can!'s donation levels tapered off?
23      A.    Well, if you use Kars 4 Kids as a benchmark,
24      the effects of the recession seemed to last through about
25      2012.  And then their donations shoot up again
```

```
 1              COOK - HIGHLY CONFIDENTIAL

 2    thereafter.

 3         Q.    Are you -- so are you giving an opinion that

 4    the effects of the recession on America Can!'s donations

 5    ended in 2012?

 6         A.    No.  I'm comparing to Kars 4 Kids to show what

 7    appears to be the effects of the recession have been

 8    overcome because Kars 4 Kids are -- their donations are

 9    growing again by 2013.  And I believe that's consistent

10    with economic indicators as well that the recovery is

11    well along on its way.  It begins in 2010, 2011 and 2012,

12    and continues to pick up.  There's some lag in the used

13    car donation market that goes beyond just the recession.

14    And I talk about those in the report as well.  But the

15    effects of the recession, at least as felt by Kars 4

16    Kids, again seems to be over by 2013.  So I would say

17    that -- that seems to be generally consistent with what's

18    going on in the economy and would likely have had

19    negligible effect, if any, on America Can! in that same

20    time frame.  So there would be other factors besides the

21    recession in 2013 that is keeping America Can!'s vehicle

22    donations at low levels.

23         Q.    Have you done any analysis of the extent to

24    which the recession caused a decline in America Can!'s

25    vehicle donation levels for any year?
```

```
 1              COOK - HIGHLY CONFIDENTIAL
 2      A.     Well, I looked at vehicle donations as compiled
 3  by the IRS that Mr. Hall cited in his report, and I did
 4  some additional analysis on that in my second report.  I
 5  also looked at used car sales which I cite in one of the
 6  footnotes.  Footnote 5 is an article that has used car
 7  sales and talks about the issues impacting that.
 8      Q.     Are you familiar with the term "causal
 9  relationship"?
10      A.     Yes.
11      Q.     What do you understand it to mean?
12      A.     It's cause and effect.  Something that actually
13  has a cause on -- something acts to cause an action.
14      Q.     Okay.
15      A.     A result.
16      Q.     And are you familiar with the term
17  "correlation"?
18      A.     Yes.
19      Q.     And do you understand there to be a distinction
20  between a correlation and a causal relationship?
21      A.     Certainly.
22      Q.     What is that distinction?
23      A.     Correlation means two events or two impacts may
24  occur simultaneously.  But that does not necessarily mean
25  that one was caused by the other.
```

```
1              COOK - HIGHLY CONFIDENTIAL
2    Texas then declined in 2008 through 2012; is that
3    correct?
4         A.    Yes.
5         Q.    Was the decline in America Can!'s donations
6    outside of Texas more pronounced than the decline of its
7    donations from within Texas?
8         A.    Yes.  Substantially so.
9         Q.    Do you have any opinion why America Can!'s
10   donations from outside of Texas declined more sharply
11   than its donations from Texas?
12        A.    Well, one thing that we see when we look at the
13   first-to-market analysis is that -- well, see -- well,
14   America Can! was in each of these states and growing as
15   we see through 2007.  Kars 4 Kids at that same time is
16   growing at even faster rates and had by 2004 -- 2003,
17   2004, already surpassed America Can! in pretty much all
18   of the states.  So one conclusion that I would draw from
19   that is that that fact, along with the fact that Kars 4
20   Kids is spending substantially more on advertising, is
21   one cause of America Can!'s decline in those non-Texas
22   locations.
23        Q.    Now, when you say that, are you assuming that
24   Kars 4 Kids was not advertising in Texas during that
25   time?
```

```
 1              COOK - HIGHLY CONFIDENTIAL
 2   corresponds with K4K's growth in the same non-Texas
 3   markets.  And then in answering that when you asked me
 4   what does that mean, I said I didn't say it caused
 5   because I didn't know how much it caused.  But I did say
 6   that it's inescapable that some portion was caused,
 7   because they're in the same markets vying for a finite
 8   number of vehicles.  So if one is growing and the other
 9   is declining, then that's why I am opining in this
10   manner.
11        Q.    So you have -- you believe that Kars 4 Kids'
12   growth did cause a decline in America Can!'s donations,
13   but you have no ability to quantify the amount of that
14   decline in America Can!'s donations?
15        A.    Yes.  I've said that many times throughout the
16   deposition.
17        Q.    And so it could be one donation, for all you
18   know?
19        A.    I'm sure it's more than one.
20        Q.    What makes you sure of that?
21        A.    Because they're -- they're getting millions of
22   donations -- or I'm sorry, thousands of donations.  So I
23   would assume it's more than one.
24        Q.    Okay.  But you're assuming that.  You've done
25   no --
```

Highly Confidential - Pursuant to Protective Order                80

```
 1                  COOK - HIGHLY CONFIDENTIAL
 2       A.     Right.
 3       Q.     -- analysis to support that?
 4       A.     No, I agree, there's no survey of it.  Mr. Hall
 5  or Kars 4 Kids could have conducted surveys of donors and
 6  potential donors, and they didn't do that.  So we don't
 7  have direct evidence of actual cars being diverted.  But
 8  we have markets, and we know that this is in the same
 9  market.  And, again, I can go over the factors again,
10  same advertising methods, same general charitable cause
11  to benefit kids, all of those things speak to whether
12  sales would be diverted -- or donations would be
13  diverted.
14       Q.     And just to clarify your testimony again, when
15  you say markets, you mean states, correct?
16       A.     Yeah, I'm talking about a geographic market.
17  When I say market, a geographic market.
18       Q.     As you said, you haven't done any analysis of
19  whether that's an appropriate definition of a market?
20       A.     I don't think it really matters.  I mean, if
21  you say -- if both organizations count their number of
22  donations by state, so take the state of Arizona, for
23  instance, that is a market where they put money into to
24  advertise and where they get vehicles from.  And they
25  track their donations by state.  So to me, that is a
```