Karen A. Confoy
Christopher R. Kinkade
Allison L. Hollows
**FOX ROTHSCHILD LLP**
Princeton Pike Corporate Center
997 Lenox Drive
Lawrenceville, NJ 08648-2311
Telephone: (609) 896-3600
Facsimile: (609) 896-1469

Ruben C. DeLeon (*pro hac vice*)
**DELEON LAW GROUP**
13601 Preston Road, Suite E920
Dallas, TX 75240

Aubrey D. (Nick) Pittman (*pro hac vice* pending)
**THE PITTMAN LAW FIRM, P.C.**
100 Crescent Court, Suite 700
Dallas, TX 75201

Valerie Yanaros Wilde (*pro hac vice*)
**YANAROS LAW, P.C.**
5057 Keller Springs Road Suite 300
Addison, TX 75001

*Attorneys for Defendant/Counterclaimant America Can!*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KARS 4 KIDS INC., | Case No. 3:14-cv-07770-PGS-LHG |
| Plaintiff, | **DECLARATION OF KAREN A. CONFOY IN SUPPORT OF DEFENDANT AMERICA CAN!'S OPPOSITION TO PLAINTIFF KARS 4 KIDS INC.'S MOTION IN LIMINE NO. 1** |
| v. | |
| AMERICA CAN!, | |
| Defendant. | *Filed Electronically* |

I, Karen A. Confoy, Esq., do hereby declare as follows:

      1.     I am a partner at Fox Rothschild LLP, attorneys for Defendant/Counterclaimant

America Can! (CFK) in the above captioned matter. I submit this declaration in support of CFK's

Opposition to Plaintiff Kars 4 Kids, Inc.'s Motion in Limine No. 1 to Exclude the Entirety of Bryce R. Cook's Opinions. I have knowledge of the following, and if called as a witness, could testify competently hereto.

2.    Attached hereto and made a part hereof as **Exhibit 1** is a true and accurate copy of excerpts of the deposition transcript of Bryce R. Cook.

3.    Attached hereto and made a part hereof as **Exhibit 2** are true and accurate copies of email correspondence, marked with Bates Nos. CAN-00001124-26; CAN-00008759-60; CAN-00009017-18; CAN-00076205; CAN-00077500; CAN-00100984; CAN-00066086-88; CAN-00005639-40; CAN-00005624; CAN-00005627-28.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing statements are true and correct.


Executed on: February 28, 2019            _s/ Karen A. Confoy_____
                                         Karen A. Confoy

# Exhibit 1

*KARS 4 KIDS INC. VS.*

*AMERICA CAN!*

---

*BRYCE R. COOK*

*March 15, 2018*

*Highly Confidential - Pursuant to Protective Order*

---



ELLEN GRAUER
COURT REPORTING CO. LLC

126 East 56th Street, Fifth Floor  New York, New York 10022
P:  212-750-6434   F:  212-750-1097
www.ellengrauer.com

*Original File 116968.TXT*

*Min-U-Script® with Word Index*

1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE DISTRICT OF NEW JERSEY
    ----------------------------------------------------x
3   KARS 4 KIDS INC.,

4                           Plaintiff,

5      -vs.-

6   AMERICA CAN!,

7                           Defendant.

8   Civil Action No. 14-7770
    ----------------------------------------------------x
9

10               * * * HIGHLY CONFIDENTIAL * * *

11

12                      2333 East Thomas Road
                        Phoenix, Arizona
13
                        March 15, 2018
14                      9:39 a.m.

15

16        The Videotaped Deposition of BRYCE R. COOK,

17   taken before Amy L. Zoller, a Certified Reporter,

18   Certificate No. 50911, for the State of Arizona.

19

20

21

22

23           ELLEN GRAUER COURT REPORTING CO, LLC
              126 East 56th Street, Fifth Floor
24                 New York, New York 10022
                        212-750-6434
25                      REF:  116968

```
 1              COOK - HIGHLY CONFIDENTIAL
 2   consistently used its Cars for Kids Mark (the Mark) in
 3   interstate commerce and in connection with its charitable
 4   fundraising services.
 5              Do you see that?
 6       A.    Yes.
 7       Q.    And is the basis for that also the allegations
 8   in America Can!'s Answer and Counterclaims?
 9       A.    Yes.
10       Q.    You do not have any -- any personal knowledge
11   of America Can!'s use of that designation -- withdrawn.
12              You do not have any personal knowledge of
13   America Can!'s use of the designation Kars 4 Kids since
14   1989, correct?
15       A.    No personal knowledge of, for instance, actual
16   advertising using the term.  I did do an analysis of
17   first to market, and I think that does give an indication
18   of when -- at least when the company was in the -- in
19   each state or each market.  But I don't have -- I don't
20   have personal knowledge and have not seen documents or
21   advertisements using the mark.
22       Q.    And we'll talk about this a little more later.
23   But the first-to-market analysis you mentioned, that's
24   the one based on when each party first received donations
25   out of a given state; is that right?
```

```
 1                COOK - HIGHLY CONFIDENTIAL
 2       A.    Correct.
 3       Q.    And the basis of that is not an analysis of any
 4   actual advertising done by any party, correct?
 5       A.    No, that's not the basis, no.
 6             MR. LITTERINE-KAUFMAN:  I think we're
 7   approaching an hour.  So let's take a 10-minute break.
 8             THE VIDEOGRAPHER:  We are going off the
 9   record.  The time is 10:34 a.m.  Please mind your
10   microphones, folks, when you leave.  Thank you.
11             (Recess taken at 10:34 a.m. to 10:48 a.m.)
12             THE VIDEOGRAPHER:  This is Tape Number 2 of
13   the deposition of Bryce Cook.  We are now back on the
14   record at 10:48 a.m. on March 15, 2018.
15       Q.    (BY MR. LITTERINE-KAUFMAN:)  Please take a look
16   at page 2 of your opening report.
17       A.    Okay.
18       Q.    What does the chart in the middle of page 2
19   show?
20       A.    It shows America Can! vehicle donation units
21   from 1997 to the -- to 2017, which year is an estimate.
22       Q.    Okay.  So this is the number of vehicles
23   donated to America Can! in each of those years; is that
24   correct?
25       A.    Yes.
```

```
 1              COOK - HIGHLY CONFIDENTIAL
 2      Q.    America Can! saw a sharp decline in donations
 3  in 2005, correct?
 4      A.    Yes.
 5      Q.    And another sharp decline in donations in 2010,
 6  correct?
 7      A.    Yes.
 8      Q.    And America Can!'s donations then remained at
 9  low levels through 2015, correct?
10      A.    Yes.  Relative to its past, the prior years.
11      Q.    Now, you agree that factors other than Kars 4
12  Kids use of the mark caused at least some of the
13  purported losses in donations by America Can!, correct?
14      A.    Yes, I believe that's reasonable to assume.
15      Q.    Okay.  What other factors do you think caused a
16  decline in America Can!'s donations?
17      A.    Well, I haven't studied specifically causation
18  elements.  But, you know, we could -- we could assume
19  that economic factors caused decline.  In 2005, obviously
20  there was the tax change on deductibility of car
21  donations that had a big impact.  The recession and
22  subsequent higher demand for used vehicles in 2010 and
23  thereon -- thereafter had -- likely had an impact.  And
24  there could be, you know, impact from other car donation
25  organizations that participate in this market.
```

```
 1                COOK - HIGHLY CONFIDENTIAL
 2        Q.     Okay.  Did you do any analysis of how much any
 3   of those factors contributed to any decrease in donations
 4   to America Can!?
 5        A.     No.
 6        Q.     Do you have any opinion on how much any of
 7   those factors contributed to any decrease in donations to
 8   America Can!?
 9        A.     No.
10        Q.     One of the factors you mentioned that
11   potentially affected donations to America Can! was a
12   recession; is that right?
13        A.     Yes.
14        Q.     Okay.  And when did that recession occur?
15        A.     The recession officially, according to the
16   Bureau of Economic Analysis, started in December 2007 and
17   hit bottom in 2009.
18        Q.     Is it your opinion that the recession was, to
19   some extent, responsible for America Can!'s low levels of
20   donations in 2010 through 2015?
21        A.     I believe it would have had an impact in some
22   of the earlier years following the recession.  But, for
23   instance, when you look at America Can!, it begins to
24   recover in 2013, maybe even 2012.  Let me see one moment.
25   Did I -- Kars 4 Kids.
```

```
 1              COOK - HIGHLY CONFIDENTIAL

 2          So I'm looking at my chart on 7, which compares

 3   the two.  So you can see that Kars 4 Kids has a

 4   relatively big decrease in 2010, not as big as America

 5   Can!, and then another sizeable decrease in 2011, and

 6   then a very small decrease in 2012, and then begins to

 7   pick up in '13 and thereafter.

 8          Whereas, America Can!, going back to the chart

 9   on page 2, is basically flat in 2013, the year that Kars

10   4 Kids sees a sizeable increase and begins to recover.

11      Q.    Okay.  I guess I'll just ask my question again.

12   So is your opinion that the recession was partly

13   responsible for America Can!'s low level of donations in

14   2010 through 2015?

15      A.    Yes.  And as -- just to restate my answer, in

16   the early years, I believe it had more of an impact than

17   in later years when, for instance, Kars 4 Kids was

18   recovering, as well as the rest of the economy was

19   recovering.  America Can!'s donation levels still stayed

20   somewhat low.

21      Q.    And when do you think the effects of the

22   recession on America Can!'s donation levels tapered off?

23      A.    Well, if you use Kars 4 Kids as a benchmark,

24   the effects of the recession seemed to last through about

25   2012.  And then their donations shoot up again
```

```
1                 COOK - HIGHLY CONFIDENTIAL
2    thereafter.
3         Q.   Are you -- so are you giving an opinion that
4    the effects of the recession on America Can!'s donations
5    ended in 2012?
6         A.   No.  I'm comparing to Kars 4 Kids to show what
7    appears to be the effects of the recession have been
8    overcome because Kars 4 Kids are -- their donations are
9    growing again by 2013.  And I believe that's consistent
10   with economic indicators as well that the recovery is
11   well along on its way.  It begins in 2010, 2011 and 2012,
12   and continues to pick up.  There's some lag in the used
13   car donation market that goes beyond just the recession.
14   And I talk about those in the report as well.  But the
15   effects of the recession, at least as felt by Kars 4
16   Kids, again seems to be over by 2013.  So I would say
17   that -- that seems to be generally consistent with what's
18   going on in the economy and would likely have had
19   negligible effect, if any, on America Can! in that same
20   time frame.  So there would be other factors besides the
21   recession in 2013 that is keeping America Can!'s vehicle
22   donations at low levels.
23        Q.   Have you done any analysis of the extent to
24   which the recession caused a decline in America Can!'s
25   vehicle donation levels for any year?
```

Highly Confidential - Pursuant to Protective Order          49

```
 1              COOK - HIGHLY CONFIDENTIAL
 2        A.    Well, I looked at vehicle donations as compiled
 3   by the IRS that Mr. Hall cited in his report, and I did
 4   some additional analysis on that in my second report.  I
 5   also looked at used car sales which I cite in one of the
 6   footnotes.  Footnote 5 is an article that has used car
 7   sales and talks about the issues impacting that.
 8        Q.    Are you familiar with the term "causal
 9   relationship"?
10        A.    Yes.
11        Q.    What do you understand it to mean?
12        A.    It's cause and effect.  Something that actually
13   has a cause on -- something acts to cause an action.
14        Q.    Okay.
15        A.    A result.
16        Q.    And are you familiar with the term
17   "correlation"?
18        A.    Yes.
19        Q.    And do you understand there to be a distinction
20   between a correlation and a causal relationship?
21        A.    Certainly.
22        Q.    What is that distinction?
23        A.    Correlation means two events or two impacts may
24   occur simultaneously.  But that does not necessarily mean
25   that one was caused by the other.
```

1                COOK - HIGHLY CONFIDENTIAL

2       Q.    Okay.  And so have you done any analysis that

3   would establish the extent of any causal relationship

4   between the recession and a decline in America Can!'s

5   donations in any year?

6       A.    Yeah.  I think conceptually, we understand --

7   and I think this is a very elementary understanding --

8   that the recession has a causal effect on personal income

9   and therefore on people's willingness to donate.  You can

10  see that.  It's in articles, one of the articles that I

11  cited.  So I believe there is a causal effect from the

12  recession on car donations.

13      Q.    And just to be clear then, so the process

14  you're describing is the recession causes household

15  incomes to go down.  And the decrease in household

16  incomes causes a decrease in car donations.  Is that

17  right?

18      A.    Yes.

19      Q.    Another factor you mentioned that potentially

20  affected donations to America Can! was an increase in the

21  value of used cars.  Is that right?

22      A.    Yes.

23      Q.    Okay.  And your opinion is that an increase in

24  the value of used cars was partly responsible for America

25  Can!'s low levels of donations in 2010 through 2015.  Is

```
 1               COOK - HIGHLY CONFIDENTIAL
 2    that right?
 3        A.    It could have been.  I don't know how long that
 4    went on because, again, I would -- just as the effects of
 5    the recession seem to loosen up on Kars 4 Kids in 2013
 6    and thereafter, I would say the same thing about the
 7    value of used cars.  It seemed not to have as much of an
 8    impact on Kars 4 Kids.
 9        Q.    Are you saying that the value of used cars
10    declined in 2011 or 2012 or 2013?
11        A.    No.  It increased, is what my report says.
12        Q.    If the value of used cars increases, that means
13    that potential donors are less likely to donate vehicles;
14    is that correct?
15        A.    That's the -- the logic, yes, the reasoning.
16        Q.    Okay.
17        A.    And also I should say, the value is a
18    reflection -- it's a two -- this is a two-way causation
19    thing.  Because it's also -- a higher value is a
20    reflection that people want used cars and are holding on
21    to used cars.  So it's not just that cars are higher
22    value, therefore people are going to retain them.  It's
23    also that they are retaining them because their personal
24    incomes are lower and people -- and unemployment is
25    higher.  So there are less used cars in the market that
```

```
 1                  COOK - HIGHLY CONFIDENTIAL
 2   makes lower supply, means you're going to have higher
 3   prices, higher value.
 4        Q.    So it's your opinion that an increase in the
 5   value of used cars caused fewer donations to go to
 6   America Can! in 2009; is that correct?
 7        A.    It would affect all donations in the US in --
 8   whenever this article says, 2009 to 2012, is at least
 9   cited in this article.  So I believe that, yeah, roughly
10   in that time frame, there would be some impact felt.
11        Q.    Felt by America Can!?
12        A.    By all participants in the car donation market.
13        Q.    Including America Can!?
14        A.    Yes.  Of course.  They're a participant in the
15   market.
16        Q.    Now, you said the article you cited covers the
17   period 2009 to 2012.  Do you have any opinion about the
18   effect of the value of used cars on vehicle donations
19   after 2012?
20        A.    No.  Other than, again, as I said on the
21   recession, if you use Kars 4 Kids as a benchmark, it's
22   growing again very -- at a very healthy rate starting in
23   2013.  So whatever impact the economy or the value of
24   used cars has is -- is overcome by Kars 4 Kids' growth.
25        Q.    Now, Kars 4 Kids' growth in that period time,
```

```
 1              COOK - HIGHLY CONFIDENTIAL
 2    there are a number of factors that could be responsible
 3    for that, correct?
 4         A.    Yes.
 5         Q.    They could have changed their advertising
 6    strategy, for example, to a more effective advertising
 7    strategy; is that right?
 8         A.    There could be, yeah, company decisions,
 9    advertising strategies, certainly.
10         Q.    Okay.  So it's not necessarily the case that an
11    increase in Kars 4 Kids -- in donations received by Kars
12    4 Kids means that the effects of an increase in the value
13    of used cars have diminished or ended, correct?
14         A.    Not necessarily.  But what it shows is that
15    whatever effects the recession and the value of used cars
16    has, is outpaced by whatever it is that Kars 4 Kids is
17    doing.
18         Q.    But that -- those -- that could be unique to
19    Kars 4 Kids, correct?
20         A.    It could.  Sure.
21         Q.    What percentage of the decrease in America
22    Can!'s car donations was caused by the recession?
23         A.    I believe we've already talked about this.  I
24    haven't quantified the specific impacts.  I'm not doing a
25    causation actual damages lost profit calculation.  If I
```

1                    COOK - HIGHLY CONFIDENTIAL

2    were, then I would need to isolate the cause and effect

3    and the impact on car donations that was caused by the

4    wrongful conduct.  I'm not doing that here, so I haven't

5    disaggregated all those factors and quantified each

6    individual impact.  If that will save any time and

7    additional questions you have on the factors.  I'm

8    opining on generally there was a decline, and some of

9    that is likely even, as I said in my second report,

10   inescapably due to Kars 4 Kids being in the market.

11        Q.    And I think you've answered this question

12   already, but just to be clear, what percentage of the

13   decrease in America Can!'s car donations was caused by an

14   increase in the value of used cars?

15        A.    I just answered that question.  I didn't

16   quantify specific impacts.

17        Q.    Okay.

18        A.    Because that's not what is required in the --

19   in the monetary remedy that Kars 4 Kids is -- or America

20   Can! is claiming.

21        Q.    Are you saying that's not required by cases

22   interpreting the Lanham Act?

23        A.    My understanding is that you don't need to show

24   how much the trademark caused in actual damages.  The

25   claim is for -- seeking unjust enrichment.  Not actual

```
 1              COOK - HIGHLY CONFIDENTIAL
 2   damages.
 3        Q.    Sorry.  So that's your understanding of the
 4   holdings of various cases interpreting the Lanham Act?
 5        A.    Well, yes.  Unjust enrichment is not actual
 6   damages, right?  I think we can agree on that.  It's
 7   looking at the profit and gain of the defendant for
 8   unlawful use of the mark.
 9        Q.    I --
10        A.    That's what we're trying to determine here.
11   And I have included an analysis of the markets and the
12   donations of each because one factor that is addressed in
13   one seminal case that Mr. Hall cites called Banjo Buddies
14   is whether sales were diverted.  And so I've done this
15   analysis to show indications of where that could have
16   happened and what could have been the cause of those
17   diverted sales.  But I haven't quantified specifics.
18   Because in Banjo Buddies, for instance, the Court said it
19   is likely that sales are diverted.  And that wasn't even
20   based on looking at markets or sales.  That was simply
21   based on factors such as similar, you know, advertising
22   channels, targeting similar customers, and being in the
23   same market.
24        Q.    The reason I ask is just that you testified
25   earlier that a quantification of the effects of specific
```

```
 1            COOK - HIGHLY CONFIDENTIAL
 2   factors is not what's required in the monetary remedy
 3   that America Can! is claiming.  And it just sounded to me
 4   like you were interpreting case law there, explaining
 5   what needs to be proven to establish the amount of a
 6   monetary remedy.
 7        A.    I actually have some direct quotes that say
 8   that.  So I didn't need to do any interpretation.  I
 9   mean, we can go to I believe it's Footnote 9 in my second
10   report that specifically says that.
11        Q.    You're quoting from judicial opinions?
12        A.    Yes, yes.
13        Q.    Okay.  I -- okay.
14        A.    It you'd like, we could go there rather than
15   trying to see what my opinion is, and I can show you what
16   it is that I've cited that says that you don't need to
17   specifically quantify.
18        Q.    I think that I will leave interpretation of
19   case law to the judge.  So I'm not going to engage in a
20   debate over what the opinions you've cited mean.
21        A.    Yeah, I'm -- I agree.  I'm not trying to say
22   what they mean.  I'm simply citing them.
23        Q.    Okay.  Now, I think you testified earlier that
24   there was a sharp decline in America Can!'s donations in
25   2005 as well.  Is that correct?
```

 1              COOK - HIGHLY CONFIDENTIAL

 2        A.    Yes.   That's what the chart and the data show.

 3        Q.    What factors do you believe caused the sharp

 4   decline in America Can!'s donations in 2005?

 5        A.    I believe I already answered that question.

 6   Which I'll give it again.   But there was a change in IRS

 7   regulations regarding the claimability of donations or

 8   how much can be claimed as a deduction for a donation.

 9        Q.    But you have not quantified the impact of that

10   change in tax law on America Can!'s donations, correct?

11        A.    As I've indicated, I haven't quantified any of

12   the impacts.

13        Q.    Have you identified any specific donations to

14   Kars 4 Kids that you believe would have gone to America

15   Can! but for Kars 4 Kids' use of its mark?

16        A.    Did you say any specific donations?

17        Q.    I did.

18        A.    No, I haven't.

19        Q.    If you could take a look at your reply report,

20   which is Exhibit 2.   Turn to page 3.

21        A.    Okay.

22        Q.    The final sentence in the second paragraph

23   says:  However, there is more than adequate evidence to

24   conclude that K4K likely diverted donations from America

25   Can! which per Banjo Buddies is a factor to be considered

```
 1              COOK - HIGHLY CONFIDENTIAL
 2   in an award of defendant's profits.
 3              Do you see that?
 4       A.    Yes.
 5       Q.    What is the more-than-adequate evidence you're
 6   referring to?
 7       A.    In addition to the similarities in -- well,
 8   it's the exact same mark.  Similar to Banjo Buddies.
 9   Kars 4 Kids and America Can! compete in the exact same
10   market, which is seeking donations of vehicles for the
11   purpose of helping disadvantaged kids, youth; and the use
12   of similar advertising methods and channels and in the
13   same geographic areas.  So those are all the evidence.
14   And then I would say there's quantitative evidence, even
15   though I haven't specifically identified what that exact
16   impact is, but comparing America Can!'s donations to Kars
17   4 Kids, vis-a-vis the recession and other general
18   impacts, looking at advertising of the two companies, all
19   of those are strong evidence to indicate that there were
20   likely diverted donations.
21       Q.    Okay.  So the first -- well, let me just make
22   sure I have them all.  So you said similarities in
23   marketing, is that correct, is one of the --
24       A.    Yeah, I would say the -- I would say the same
25   market.  They're in the exact same market.
```

1                    COOK - HIGHLY CONFIDENTIAL

2       Q.    Okay.  So the same market.

3       A.    Uh-huh.

4       Q.    Also, that the purpose of donating to each

5   charity is to help children.  Is that -- that's another

6   piece of evidence you believe supports a finding of

7   diverted donations?

8       A.    I wouldn't say supports a finding.  I'm not

9   going to opine on, you know, legal rulings, but I would

10  say supports the conclusion that there were -- there

11  would likely be a diversion of some sales, some portion

12  of -- or donations, some portion of America Can!'s

13  donations to Kars 4 Kids.

14      Q.    Okay.  And then did you say similarities in the

15  designations used by the two charities?  I'm

16  paraphrasing, but was that one of the factors?

17      A.    By designations, what do you mean?

18      Q.    I mean the phrase, Cars for Kids, spelled with

19  a C, and Kars 4 Kids, spelled with a K and the number 4?

20      A.    I didn't say that, but I think that's -- that's

21  reasonable.  That's a reasonable assumption.

22      Q.    Okay.  And then you said quantitative evidence?

23      A.    Right.  Looking at the actual donations of the

24  two organizations, the first-to-market analysis, for

25  instance.  And also the advertising spend of both.

```
 1                COOK - HIGHLY CONFIDENTIAL
 2       Q.    Okay.  Is there any other evidence that leads
 3   you to conclude that donations were likely diverted from
 4   America Can! to Kars 4 Kids?
 5       A.    Let's see, I mentioned the similarity of the
 6   advertising methods and channels.
 7       Q.    Anything else?
 8       A.    I think that's it.
 9       Q.    Okay.
10       A.    It is mentioned -- I do mention it several
11   times in my report, and I believe in both reports, so if
12   I missed anything that's in the report, I would amend my
13   response to include whatever I've opined on in the
14   report.
15       Q.    Sure.  I just want to make sure that we discuss
16   each of the pieces of evidence that you've described.  So
17   if you think of another, please let me know.
18       A.    Sure.
19       Q.    So one of the ones you said, then, is that Kars
20   4 Kids and America Can! compete in the same geographic
21   market.  Is that right?
22       A.    Yes.
23       Q.    Okay.  And what is the geographic market in
24   which they compete?
25       A.    Every state in the United States.
```

Highly Confidential - Pursuant to Protective Order          61

```
1                  COOK - HIGHLY CONFIDENTIAL

2        Q.    Okay.  How do you define a market?

3        A.    I'm just using each state as an individual

4    market.

5        Q.    Okay.  What basis do you have to define a

6    market as a state?

7        A.    That's how each of the organizations quantifies

8    their donations is on a state-by-state basis.

9        Q.    Quantifies where?

10       A.    Their donations on a state-by-state basis in

11   their databases in their tracking of their donations.

12       Q.    So you don't think, for example, a metropolitan

13   area could be defined as a market?

14       A.    Certainly it could.

15       Q.    Okay.  Do you know if America Can! and Kars 4

16   Kids are advertising in all of the same metropolitan

17   areas?

18       A.    That, I don't have personal knowledge of.

19       Q.    And did you do any analysis of the extent to

20   which America Can! and Kars 4 Kids are operating in

21   overlapping markets?

22       A.    Well, it's -- I think that's a -- that

23   conclusion is borne out by the fact that they all have

24   donations in the same states.

25       Q.    Okay.  So if you define a market as a state,
```

```
 1                 COOK - HIGHLY CONFIDENTIAL
 2    then they all have donations from the same states?
 3        A.    Yes.
 4        Q.    Okay.  Do you know whether or not America Can!
 5    and Kars 4 Kids are all advertising in the same states?
 6        A.    Presently or any time in the period of the
 7    infringement?
 8        Q.    At any time in the period covered by your
 9    report.
10        A.    I don't have personal knowledge of ad campaigns
11    and what was done in each market.
12        Q.    And by market, you mean state?
13        A.    Yes.
14        Q.    America Can! has other direct competitors in
15    the same geographic markets, correct?
16        A.    Yes.
17              MS. YANAROS WILDE:  Object to form.
18              MR. LITTERINE-KAUFMAN:  What's wrong with
19    the form?
20              MS. YANAROS WILDE:  It -- you were
21    misstating testimony.
22        A.    I'm sorry, can you ask the question again?
23              MR. LITTERINE-KAUFMAN:  Okay.  I don't
24    believe I was describing testimony.
25        Q.    (BY MR. LITTERINE-KAUFMAN:)  But America Can!
```

```
 1              COOK - HIGHLY CONFIDENTIAL
 2   has other direct competitors in the same geographic
 3   markets, correct?
 4       A.    In its -- in its geographic markets, yes, it
 5   does.
 6       Q.    Okay.  Did you do any analysis of what the
 7   effect of America Can! having other direct competitors in
 8   the same geographic markets is?
 9       A.    I didn't quantify the specific amount, as I've
10   already indicated.
11       Q.    And did you do any analysis of the effect of
12   Kars 4 Kids and America Can! being direct competitors in
13   the same geographic markets?
14       A.    No, not -- well, the effect of America Can! --
15   or Kars 4 Kids being in America Can!'s market?  I guess
16   when you do a side-by-side comparison, which I do in, you
17   know, a number of charts as well as in table -- in my
18   second report, Table 7 on page 13, that gives an
19   indication of the amount of sales that we could be
20   talking about -- or I'm sorry, I keep saying sales; I
21   mean donations.  The amount of donations that at least
22   we're starting from.  But obviously some of the donations
23   that Kars 4 Kids has obtained while America Can! has
24   declined or stayed constant could be due to other
25   factors.  All of which we've discussed, but as I've said
```

```
 1                COOK - HIGHLY CONFIDENTIAL
 2    multiple times now, I haven't quantified the relative
 3    impact of each, including Kars 4 Kids.
 4         Q.    Okay.  I think another piece of evidence you
 5    cited that leads to your conclusion of diverted donations
 6    is that you believe Kars 4 Kids and America Can! used the
 7    same or similar advertising methods --
 8         A.    Yes.
 9         Q.    -- is that right?
10               What do you mean by the same or similar
11    advertising methods?
12         A.    Radio, print, TV, Internet.
13         Q.    Do you know if America Can! uses direct
14    mailing?
15         A.    I don't recall.  By print, I assume that means
16    ads in publications such as newspapers and magazines as
17    well as potentially direct mail, but I don't recall
18    specifically every type of advertising method used.
19         Q.    Have you done any comparison of the advertising
20    methods used by America Can! and Kars 4 Kids?
21         A.    No.
22         Q.    So what leads you to say that they use the same
23    or similar advertising methods?
24         A.    That's my understanding from the pleadings.
25         Q.    And I believe another piece of evidence that
```

```
 1              COOK - HIGHLY CONFIDENTIAL
 2   you believe leads you to conclude that donations were
 3   diverted from America Can! to Kars 4 Kids is that both
 4   America Can! and Kars 4 Kids engage in charitable giving
 5   to kids.  Is that right?
 6        A.    Yes.
 7        Q.    America -- do you know what the mission of
 8   America Can! is?
 9        A.    You mean their explicit mission statement, or
10   just generally what their charitable program is all
11   about?
12        Q.    What their charitable program is all about.
13        A.    Yes, I do.
14        Q.    And what is it?
15        A.    It's operating schools, academies for
16   underprivileged and underserved youth and at-risk youth.
17        Q.    Where are those schools and academies?
18        A.    In Texas.  They've had some out of Texas, I
19   understand in the past, but now they're located in Texas.
20        Q.    Do you know how many they had outside of Texas?
21        A.    I did at one point.  I don't recall the number
22   now.
23        Q.    And do you know for how long they had schools
24   outside of Texas?
25        A.    I don't recall.
```

```
 1              COOK - HIGHLY CONFIDENTIAL
 2      Q.    Okay.  Do you know if there's any religious
 3  affiliation for the schools operated by America Can!?
 4      A.    In what I've seen, I have not run across that.
 5      Q.    Okay.  Do you know what the general aim of Kars
 6  4 Kids charitable activities is?
 7      A.    Yes.
 8      Q.    Okay.  And what is that?
 9      A.    That's to help Orthodox Jewish children kind of
10  reconnect with their faith, in primarily New York and New
11  Jersey, as I understand it, through special summer camps
12  and programs, as well as tuition assistance for Orthodox
13  Jewish private schools.
14      Q.    Okay.  Would you agree that those are different
15  purposes?
16      A.    When you get down to real specifics, they are.
17  But the advertising Kars 4 Kids doesn't really get to
18  that.  The advertising that people really hear is this is
19  -- these are donations that go to help kids.
20      Q.    Do you think people do any reading about the
21  charities after hearing advertisements and before
22  donating?
23      A.    I'm sure some do, yes.
24      Q.    And do you think they would learn about the
25  charities' respective purposes when they did that?
```

```
 1                COOK - HIGHLY CONFIDENTIAL
 2       A.    Yes, I'm sure some could.  And some might spend
 3   more time than others, some less time.  And it may not be
 4   as clear without doing a lot of digging on the Kars 4
 5   Kids' side exactly the religious purposes of their
 6   charitable cause.
 7       Q.    Now, you say -- I'm looking at page 5 of your
 8   opening report, Exhibit 1.  You say:  Kars 4 Kids is a
 9   national organization dedicated to addressing the
10   educational, material, emotional and spiritual needs of
11   disadvantaged Jewish children and their families.
12            Do you see that?
13       A.    Yes.
14       Q.    And so you were able to find Kars 4 Kids'
15   mission, correct?
16       A.    Yes, that was -- yes, I believe that was on
17   their website.
18       Q.    So one could learn the mission simply by
19   looking at Kars 4 Kids' website; is that correct?
20       A.    Yes, I believe so.
21       Q.    Okay.  So --
22       A.    But, again, I don't -- and I'm not opining on
23   this, but I don't recall how easily that's seen.  Whether
24   someone would just look at the first page, and I don't
25   know if -- I don't recall if the mission is explicitly
```

```
 1              COOK - HIGHLY CONFIDENTIAL
 2   stated on the first page and how big the font size is and
 3   all those kinds of things that, you know, unless you were
 4   really going to do some digging, you know, would you see
 5   that.
 6       Q.    But it is certainly at least available on the
 7   Internet?
 8       A.    Yes.
 9       Q.    So isn't it -- isn't it possible that a donor
10   would want to support one of the charity's missions and
11   would not want to support the other charity's mission?
12       A.    I'm sure that could happen.
13       Q.    Do you think it's likely that it has happened?
14              MS. YANAROS WILDE:  Objection.  Calls for
15   speculation.
16       A.    I would be speculating, but I think it's --
17   it's a logical conclusion.  Certainly there would be some
18   people, for instance, that you know, are probably bigoted
19   and wouldn't want to donate to a religious cause that's
20   not their own faith, simply for that reason.
21       Q.    (BY MR. LITTERINE-KAUFMAN:)  And then another
22   piece of evidence that we discussed in support of your --
23   that you believe supports your conclusion that donations
24   were diverted from America Can! to Kars 4 Kids is
25   similarities between the phrase Cars for Kids, spelled
```

```
 1              COOK - HIGHLY CONFIDENTIAL
 2   with a C, and the phrase Kars 4 Kids, spelled with a K
 3   and the number 4; is that correct?
 4       A.    I don't believe I say that in my report.  But I
 5   think that makes sense.
 6       Q.    I mean, I'm not trying to put words in your
 7   mouth.  If you don't think that's a piece of evidence
 8   that supports it --
 9       A.    No, I would agree if someone were to make that
10   statement that because they are exactly the same
11   phonetically, that that would -- that would be a piece of
12   evidence, yeah.
13       Q.    Since you don't talk about it in your report
14   then, fair to say that you haven't done any analysis of
15   the extent to which those would be perceived as similar?
16       A.    No, I haven't done any kind of confusion
17   analysis, as I point out.
18       Q.    Let's look at page 3 of your opening report,
19   which is Exhibit 1.
20       A.    Okay.
21       Q.    And there's a chart on that page.  What does
22   that chart -- excuse me.  What does that chart depict?
23       A.    It shows America Can!'s vehicle donations from
24   1997 through 2017 broken out between total, Texas
25   donations and all other donations.
```

Highly Confidential - Pursuant to Protective Order          70

```
 1                COOK - HIGHLY CONFIDENTIAL
 2       Q.    And what -- what does all other donations mean?
 3       A.    Anything outside of Texas.
 4       Q.    Can you tell from the chart or do you otherwise
 5   know how many donations America Can! received from
 6   outside Texas in the years before 2003?
 7       A.    From the chart, the scale is such that the
 8   numbers don't really show up.  But you can go to the
 9   underlying data and it's less than a thousand.  It's
10   probably -- I know in some markets it's like ten per --
11   per market or per state.
12       Q.    So a relatively small number as compared to its
13   Texas donations?
14       A.    Right.
15       Q.    And then -- all right.  So then beginning in
16   2003, America Can!'s donations from outside of Texas
17   began to increase; is that right?
18       A.    Yes.
19       Q.    And they increased to a peak in 2007; is that
20   right?
21       A.    Yes.
22       Q.    And in -- that 2007 peak was approximately
23   4,000 vehicles?
24       A.    Correct.
25       Q.    And America Can!'s donations from outside of
```

**Highly Confidential - Pursuant to Protective Order          71**

```
 1                COOK - HIGHLY CONFIDENTIAL
 2    Texas then declined in 2008 through 2012; is that
 3    correct?
 4         A.    Yes.
 5         Q.    Was the decline in America Can!'s donations
 6    outside of Texas more pronounced than the decline of its
 7    donations from within Texas?
 8         A.    Yes.  Substantially so.
 9         Q.    Do you have any opinion why America Can!'s
10    donations from outside of Texas declined more sharply
11    than its donations from Texas?
12         A.    Well, one thing that we see when we look at the
13    first-to-market analysis is that -- well, see -- well,
14    America Can! was in each of these states and growing as
15    we see through 2007.  Kars 4 Kids at that same time is
16    growing at even faster rates and had by 2004 -- 2003,
17    2004, already surpassed America Can! in pretty much all
18    of the states.  So one conclusion that I would draw from
19    that is that that fact, along with the fact that Kars 4
20    Kids is spending substantially more on advertising, is
21    one cause of America Can!'s decline in those non-Texas
22    locations.
23         Q.    Now, when you say that, are you assuming that
24    Kars 4 Kids was not advertising in Texas during that
25    time?
```

```
 1                 COOK - HIGHLY CONFIDENTIAL
 2       A.    Not advertising in Texas?
 3       Q.    Correct.
 4       A.    I don't know if they were or not.  I was
 5  talking about states outside of Texas, not Texas.
 6       Q.    Right.  But there was a more precipitous
 7  decline in states outside of Texas than inside Texas?
 8       A.    Right.
 9       Q.    You seem to be citing Kars 4 Kids advertising
10  as a possible explanation for that decline outside of
11  Texas.  And so I'm wondering, then, why didn't Kars 4
12  Kids advertising have the same effect on donations in
13  Texas?
14       A.    Right.  I -- I couldn't tell you that.
15       Q.    Do you know if Kars 4 Kids was advertising in
16  Texas during that time?
17       A.    I've seen some of their advertising expense
18  schedules, but I don't recall the by-state amounts or if
19  they're shown.
20       Q.    Would it matter to your opinion one way or --
21  withdrawn.
22             Would it matter to any of the opinions
23  expressed in your report one way or the other if Kars 4
24  Kids was or was not advertising in Texas during that
25  period of time?
```

```
 1                    COOK - HIGHLY CONFIDENTIAL
 2        A.    No.
 3        Q.    Turning back to the graph on page 3 of your
 4   opening report, which is Exhibit 1.  It looks like by
 5   2011, America Can!'s donations from outside of Texas had
 6   almost disappeared entirely; is that right?
 7        A.    Right.  2011 they've declined to a very small
 8   amount and then decline again in '12 and '13.
 9        Q.    And -- I mean, is it fair to say they've almost
10   disappeared entirely?
11        A.    Right.  They -- I mean, I can't tell again on
12   the scale, but they're probably below 200 in 2011.
13        Q.    So would you call that almost disappearing
14   entirely?
15             MS. YANAROS WILDE:  Objection.  Asked and
16   answered.
17        A.    I think we're just -- we're mincing words here.
18   I'd say yeah, you could probably say that, relative to
19   having been at 4,000 and relative to Kars 4 Kids donation
20   levels.  And in some states, it did disappear entirely.
21   They got zero donations in that year.  So I think that's
22   probably a fair statement.
23        Q.    I mean, the reason I ask is because those were
24   actually your words.
25        A.    Right.  I -- I know that.
```

```
 1              COOK - HIGHLY CONFIDENTIAL
 2        Q.    I wanted to make sure you were still of that
 3   opinion.
 4        A.    Yes.
 5        Q.    Is it fair to say that in each year between
 6   1997 and 2017, the majority of America Can!'s donations
 7   came from Texas?
 8        A.    Yes.
 9        Q.    Is it fair to say that in each year between
10   1997 and 2017, America Can! received over two times as
11   many donations from Texas as it received from the rest of
12   the country combined?
13        A.    Yes.
14        Q.    And isn't it the case that in some years,
15   America Can!'s donations from Texas were several times
16   more than its donations from the rest of the country
17   combined?
18        A.    Yes.  If you just look at it from a static
19   basis, all those things you are saying are correct.  But
20   that doesn't take into account trends.
21        Q.    What do you mean by a static basis and that
22   doesn't take into account trends?
23        A.    So as I point out in the report, the growth
24   from the non-Texas donations in '06 and '07, after the
25   big decline from the IRS ruling, the growth in the
```

```
 1              COOK - HIGHLY CONFIDENTIAL
 2   non-Texas donations is at a much faster pace than Texas.
 3   So when it peaks at 4,000 units in 2007, if it had
 4   continued to grow at that rate, then perhaps it would
 5   have gotten past Texas.  But for some reason, after 2007,
 6   the non-Texas donations continue to decline until they
 7   become, as I say in the report, they essentially
 8   disappear, whatever the words are.
 9        Q.    Okay.  Putting aside what could have happened
10   under some hypothetical set of circumstances, just
11   looking at the historical numbers of donations that
12   America Can! has received, in many years it was several
13   times the -- America Can! received donations from outside
14   of Texas in many years that were a multiple of several
15   times the donations it received from Texas; is that
16   correct?
17        A.    Yes.
18        Q.    So earlier we talked about the difference
19   between correlation and causation.  Do you remember that?
20        A.    Yes.
21        Q.    Now, in the paragraph below your chart, you say
22   that the decline in America Can!'s donations from outside
23   of Texas after 2007 corresponds with Kars 4 Kids' growth
24   in the same non-Texas markets; is that right?
25        A.    Yes.
```

```
1              COOK - HIGHLY CONFIDENTIAL
2        Q.    Okay.  Now, those were your words, corresponds
3   with.  Correct?
4        A.    Yes.
5        Q.    What did you mean by that?
6        A.    Exactly what it says.  I chose that word
7   specifically because I couldn't say that it caused.
8   Although I would say that it has some impact.  I believe
9   it caused some portion of the decline.  But -- and I say
10  that elsewhere in the report.  But I can't say the entire
11  decline was caused by, so I said it corresponds with.
12       Q.    And your belief that it's likely that some
13  portion of the decline was caused by the growth of
14  America Can!'s donations is based on the evidence we
15  discussed earlier, the similarity of markets, the
16  similarity of methods and channels, that both are
17  charities intended to help children; is that right?
18       A.    I think you said America Can!'s.
19       Q.    Oh, I may have misspoke.
20       A.    That's okay.  Substitute Kars 4 Kids for that,
21  and then, yes, I think that's -- that's correct.
22       Q.    Yes.  Yes.  You are correct.  I was asking
23  about the growth of Kars 4 Kids.
24             So in your opening report on the sentence that
25  goes from page 2 to page 3, you say:  K4K's market entry
```

**Highly Confidential - Pursuant to Protective Order**          77

```
 1              COOK - HIGHLY CONFIDENTIAL
 2   and growth in each of CFK's markets, along with its high
 3   advertising spend, likely had an effect on CFK's
 4   donations and inability to return to previous levels.
 5              Do you see that?
 6        A.    Yes.
 7        Q.    And then looking at page 3 of your reply
 8   report, Exhibit 2 -- let me know when you're there.
 9        A.    Yes.
10        Q.    The second sentence on that page is:  Is
11   inescapable that Kars 4 Kids entry into the donation
12   market took donations that otherwise would have gone to
13   America Can!.
14              Do you see that?
15        A.    I'm sorry, what page in that report?
16        Q.    That's page 3 of your reply report, the second
17   sentence.
18        A.    Yes.
19        Q.    So what caused you to go from likely had an
20   effect to it is inescapable that there was an effect?
21        A.    Because Mr. Hall criticizes my use of the word
22   "likely," even though that's the term that the Court used
23   in Banjo Buddies, and even though he uses that same term
24   "likely" and "potential" later on in his report with
25   respect to advertising.  And then he goes to great
```

 1                COOK - HIGHLY CONFIDENTIAL

 2    lengths to try and -- or to attempt to show, it appears

 3    to me, that Kars 4 Kids had no impact.  He does things

 4    like look -- he says multiple times that America Can!

 5    actually increased its market share and America Can! grew

 6    sales over a certain period of time.  So I wanted to get

 7    on the record in response to that that not only is it

 8    likely; it's inescapable.  You know, you can't say that I

 9    know for a fact based on talking to a customer who was

10    confused or, you know, for whatever reason decided to --

11    or its donation was changed or diverted from one

12    organization to the other, because that evidence doesn't

13    exist.  There's no survey to do that.  But what we do

14    have is two charitable organizations vying for automobile

15    donations in the same market, using the same advertising

16    methods, limited number of vehicles to be donated.  So

17    that's why I would say it's inescapable that some have

18    gone to Kars 4 Kids as opposed to America Can!.

19         Q.    But you did testify a few moments ago that you

20    couldn't say that Kars 4 Kids' growth in the same

21    non-Texas markets caused a decline in America Can!'s

22    donations in those markets, right?  I'm paraphrasing.

23         A.    Right, right.  I think we need to look at the

24    words, because I chose my words carefully so that I

25    wouldn't misstate.  So the words I used, the decline

```
 1              COOK - HIGHLY CONFIDENTIAL
 2   corresponds with K4K's growth in the same non-Texas
 3   markets.  And then in answering that when you asked me
 4   what does that mean, I said I didn't say it caused
 5   because I didn't know how much it caused.  But I did say
 6   that it's inescapable that some portion was caused,
 7   because they're in the same markets vying for a finite
 8   number of vehicles.  So if one is growing and the other
 9   is declining, then that's why I am opining in this
10   manner.
11        Q.    So you have -- you believe that Kars 4 Kids'
12   growth did cause a decline in America Can!'s donations,
13   but you have no ability to quantify the amount of that
14   decline in America Can!'s donations?
15        A.    Yes.  I've said that many times throughout the
16   deposition.
17        Q.    And so it could be one donation, for all you
18   know?
19        A.    I'm sure it's more than one.
20        Q.    What makes you sure of that?
21        A.    Because they're -- they're getting millions of
22   donations -- or I'm sorry, thousands of donations.  So I
23   would assume it's more than one.
24        Q.    Okay.  But you're assuming that.  You've done
25   no --
```

```
 1              COOK - HIGHLY CONFIDENTIAL

 2      A.    Right.

 3      Q.    -- analysis to support that?

 4      A.    No, I agree, there's no survey of it.  Mr. Hall

 5  or Kars 4 Kids could have conducted surveys of donors and

 6  potential donors, and they didn't do that.  So we don't

 7  have direct evidence of actual cars being diverted.  But

 8  we have markets, and we know that this is in the same

 9  market.  And, again, I can go over the factors again,

10  same advertising methods, same general charitable cause

11  to benefit kids, all of those things speak to whether

12  sales would be diverted -- or donations would be

13  diverted.

14      Q.    And just to clarify your testimony again, when

15  you say markets, you mean states, correct?

16      A.    Yeah, I'm talking about a geographic market.

17  When I say market, a geographic market.

18      Q.    As you said, you haven't done any analysis of

19  whether that's an appropriate definition of a market?

20      A.    I don't think it really matters.  I mean, if

21  you say -- if both organizations count their number of

22  donations by state, so take the state of Arizona, for

23  instance, that is a market where they put money into to

24  advertise and where they get vehicles from.  And they

25  track their donations by state.  So to me, that is a
```

Highly Confidential - Pursuant to Protective Order          81

```
 1              COOK - HIGHLY CONFIDENTIAL
 2    market.  Or we can just talk about the United States as a
 3    whole.  If it bothers you that, you know, we're getting
 4    too specific on states, we can, you know, look at the
 5    United States as a whole.
 6        Q.    Do you know whether either party tracks their
 7    donations by metropolitan area?
 8        A.    I haven't seen -- well, maybe I have.  Most of
 9    what I've seen, and I recall now, it's always by state.
10        Q.    If a party did track their donations by
11    metropolitan area, would you think then that metropolitan
12    area is an appropriate way to define a market?
13        A.    That would be --
14              MS. YANAROS WILDE:  Objection.  Asked and
15    answered.
16        A.    I would say that would be a submarket.  I mean,
17    you can keep cutting it down by geography.  It doesn't
18    affect my opinion at all.  I mean, I presume if Kars 4
19    Kids is in a major metropolitan area, like Maricopa
20    County, the Phoenix area here, that's the largest
21    metropolitan area in the state, then that would be where
22    most of the donations would likely come from.  And so you
23    would presume if that's where the market is for cars,
24    then that's where the companies are going to advertise
25    and seek for donations.
```

```
 1                  COOK - HIGHLY CONFIDENTIAL

 2        Q.    (BY MR. LITTERINE-KAUFMAN:)  Sure, but if,

 3   let's say, Kars 4 Kids were in a given metropolitan area

 4   advertising there, and America Can! was not advertising

 5   in that metropolitan area, then you could not conclude,

 6   am I right, that donations from that metropolitan area

 7   were diverted from America Can! to Kars 4 Kids?

 8        A.    Right.  I would have to revisit my -- my

 9   analysis.  If you could show me, if Mr. Hall could point

10   out or someone could point out some evidence, I would

11   have to look at that and see if there was actually

12   advertising being done in a market where Kars 4 Kids got

13   donations and America Can! was not in that particular

14   locale and didn't do any advertising.

15                  MR. LITTERINE-KAUFMAN:  I think it's been

16   about an hour again, so why don't we take another short

17   break.

18                  THE VIDEOGRAPHER:  We are now going off the

19   record.  The time is 11:48 a.m. on March 15, 2018.

20                  (Recess taken at 11:48 a.m. to 12:07 p.m.)

21                  THE VIDEOGRAPHER:  This is Tape Number 3 of

22   the deposition of Bryce Cook.  We are now going back on

23   the record.  The time is 12:07 p.m. on March 15, 2018.

24        Q.    (BY MR. LITTERINE-KAUFMAN:)  Earlier we were

25   discussing different pieces of evidence that you believe
```

1                COOK - HIGHLY CONFIDENTIAL

2    show that donations were diverted from America Can! to

3    Kars 4 Kids.  Do you recall that?

4         A.    Yes.

5         Q.    And I think one of the factors you mentioned

6    that we haven't yet discussed is that Kars 4 Kids and

7    America Can! are competing for a finite number of

8    vehicles.  Is that correct?

9         A.    Yes.

10        Q.    Okay.  What did you mean by competing for a

11   finite number of vehicles?

12        A.    There's not an infinite number of vehicles.

13   Finite means a certain number.

14        Q.    It's true, is it not, that Kars 4 Kids can

15   increase the number of donations in a market by entering

16   the market?

17        A.    Yes.  In fact, I acknowledge that in my second

18   report.

19        Q.    Right.  So Kars 4 Kids can get people to donate

20   vehicles who would not otherwise have donated vehicles?

21        A.    I would agree to that.

22        Q.    Have you done any analysis of how many of the

23   donations Kars 4 Kids have received are donations that

24   would not have been made but for Kars 4 Kids' entry into

25   a market?

Highly Confidential - Pursuant to Protective Order                84

```
 1                COOK - HIGHLY CONFIDENTIAL
 2      A.    No.  As I clearly indicate in my report, I've
 3  done no quantification of the impact of Kars 4 Kids on
 4  America Can! donations.
 5      Q.    All right.  If you could turn to your reply
 6  report, which is Exhibit 2, page 13.
 7      A.    Okay.
 8      Q.    What does Table 7 on this page, which is titled
 9  Donated Vehicles Market Share Overtime, show?
10      A.     It shows the donated vehicles for the US as
11  compiled by the IRS.  This is a data source that Mr. Hall
12  also used.  It shows America Can!'s, Kars 4 Kids, and all
13  other donors or organizations that take donations, and
14  then it shows the relative market share of each.
15      Q.    And I think you just said this, but to be
16  clear, so the US totals column is taken from IRS
17  publications; is that correct?
18      A.    Well, the dollar amount.  We had to estimate
19  the number of units because the IRS doesn't have units,
20  but the dollar amount.
21      Q.    But the US total column is not in any way based
22  on the values in the America Can! column or the Kars 4
23  Kids column?
24      A.     Yeah, we had to -- as attached in my Exhibit C,
25  we had to estimate the unit donations based on a value
```

**Highly Confidential - Pursuant to Protective Order**          85

```
 1              COOK - HIGHLY CONFIDENTIAL
 2   per donation.  And I believe in this case, it was based
 3   on the only values that we had available, which is the
 4   range between America Can! and Kars 4 Kids.
 5        Q.    So would a change in either the number of
 6   vehicles donated to America Can! or the number of
 7   vehicles donated to Kars 4 Kids affect the value in the
 8   US total column?
 9        A.    Well, actually I may need to amend my response.
10   My footnote says that the units ties directly to US total
11   units per IRS non-cash individual contribution reports.
12   So now I'm not so sure that we did that estimate.  I know
13   we did with respect to Wheels for Wishes.  We had to
14   estimate that.  But I'm not sure that we did that for the
15   IRS.  So -- and I just don't recall now if the IRS gave
16   actual units as well as dollar amount claimed.
17        Q.    Okay.  So if the IRS publication cited in
18   Footnote 1 of Attachment C of your reply report give
19   units of donations, then changes to the values in the AC
20   and K4K column in Table 7 would not change the values in
21   the US total column; is that correct?
22        A.    That's correct.  Yeah.
23        Q.    And I think we've been sort of assuming this,
24   but just to make it explicit, what are the figures in the
25   column labeled K4K?
```

```
 1              COOK - HIGHLY CONFIDENTIAL
 2    royalty would be in this case?
 3        A.    Correct.
 4        Q.    On page 9 of your opening report, you say,
 5    quote:  CFK would be unwilling to license the mark for
 6    anything less than the incremental profit it earns on its
 7    donations.
 8              Do you see that?
 9        A.    Yes.
10        Q.    What's your basis for that statement?
11        A.    Basic economics, that a company who wants to
12    earn a profit, or in this case it's a non-profit that
13    wants to earn a certain -- well, I'll use the term
14    profit, revenue minus expense, would be unwilling to
15    license away rights that would impinge on that profit
16    without getting something in return.  So if they felt --
17    if America Can! felt that giving Kars 4 Kids a license to
18    use the mark in its territory, such as the entire US,
19    would cause it to lose sales, then you know, that just
20    wouldn't make business sense.  It wouldn't be
21    economically rational to do so without getting a royalty
22    that equated to that amount.
23        Q.    Did you discuss with Mr. Wentworth or anyone
24    else at America Can! the circumstances under which they
25    would be willing to license what they consider their
```

```
 1                 COOK - HIGHLY CONFIDENTIAL
 2   mark?
 3       A.    No.
 4       Q.    Your report also discusses corrective
 5   advertising as a potential measure of monetary relief; is
 6   that right?
 7       A.    Yes.
 8       Q.    And you haven't performed an analysis of how
 9   much corrective advertising would be needed; is that
10   correct?
11       A.    That's correct.  Other than to give a sort of
12   rough approximation in my reply report that using as a
13   measure of correcting advertising the actual advertising
14   expense of Kars 4 Kids.  The assumption being that
15   whatever was spent by Kars 4 Kids, the same amount or
16   more would need to be spent by America Can! to correct
17   that perception in the marketplace and repair what has
18   been incorrectly portrayed.
19       Q.    Do you believe that the entire amount that Kars
20   4 Kids has spent on fundraising is an accurate measure of
21   the amount of corrective advertising that would be
22   needed?
23       A.    You said the entire amount on fundraising?  Or
24   do you mean advertising fundraising?
25       Q.    I meant advertising fundraising.  Thank you.
```

```
 1                 COOK - HIGHLY CONFIDENTIAL
 2        A.     I could see where some people might think
 3   that's a reasonable approximation of what would be
 4   required.  It would depend on the facts and circumstances
 5   of the markets that they're in and the consumer, how
 6   educated and sophisticated they are.  It would take a --
 7   probably a more in-depth market analysis, but I think,
 8   you know, as a rough approximation, that offers a good
 9   starting point.
10        Q.     A good starting point or a good measure of the
11   amount of corrective advertising?
12        A.     It's a rough measure.  May be a good starting
13   point.  Let me see -- I'm going to check the language of
14   my report --
15        Q.     Feel free.
16        A.     -- to see if I said it was a good measure.  I
17   just want to see exactly how I stated that.
18               So I just say that measure.  I don't qualify it
19   as to whether it's good or rough.  And I just say that
20   measure is based on one methodology.  And as I've already
21   expressed to you, it's my opinion that's a rough
22   approximation, rough measure.
23        Q.     Just reading this final paragraph of your reply
24   report, it seemed to me like you were stopping short of
25   adopting this methodology yourself and opining that this
```

```
 1              COOK - HIGHLY CONFIDENTIAL
 2    was a reliable methodology by which to calculate
 3    corrective advertising.  Is that -- is that the case or
 4    not?
 5         A.    I think it's a measure that informs -- that
 6    would help inform the Court's decision.  So it's a
 7    measure that I wanted to put out there.  I'm not opining
 8    that this is how much it will take to correct the
 9    misperception and the confusion in the marketplace.  I am
10    simply saying as a basis of a reasonable assumption, one
11    could assume that it would take as much advertising to
12    correct as the original advertising.
13         Q.    One could assume that.  Do you assume that?
14         A.    It's an assumption.  I don't know if -- I don't
15    have the basis to say if that's how much it would take.
16    I've already said that.
17         Q.    Turn to page 16 of your reply report.
18         A.    Okay.
19         Q.    So here you describe your efforts to
20    investigate the legitimacy of the website
21    DonationsTips.com, is that fair?
22         A.    Yes.
23         Q.    And the first step in your investigation was to
24    do a WHOIS search with the domain name registrar for the
25    domain DonationsTips.com; is that right?
```

```
 1              COOK - HIGHLY CONFIDENTIAL
 2      A.    Yes.
 3      Q.    And then that provided you with an address; is
 4 that right?
 5      A.    It provided a lot of information.  Probably
 6 about 50 or 60 different lines of information regarding
 7 the registration, including the name of the registrant,
 8 the address of the registrant, the organization of the
 9 registrant.  I can't remember if there was other contact
10 information, but that was sufficient for us to make -- to
11 look up the organization and the individual, and we were
12 able to find information.
13      Q.    All right.  And then you -- one of the pieces
14 of information, I think you said, was an address; is that
15 right?
16      A.    Yes.
17      Q.    For the registrant?
18      A.    Of the registrant organization.  Yes.
19      Q.    Okay.  And you then cross-checked that address
20 against several online maps; is that right?
21      A.    Yes.
22      Q.    Okay.  And then you visited the website of the
23 registrant organization that was listed with the domain
24 name registrar; is that right?
25      A.    Yes.
```

1                C E R T I F I C A T E

2

3    STATE OF ARIZONA     )

4                         )

5    COUNTY OF MARICOPA   )

6

7            BE IT KNOWN that I took the foregoing

8    deposition pursuant to Notice; that the witness was

9    duly sworn by me; and that said transcript is a full,

10   true, and accurate record of the proceedings; that the

11   proceedings were taken down by me in shorthand and

12   thereafter reduced to print under my direction; that I

13   have acted in compliance with ACJA 7-206.

14           I CERTIFY that I am in no way related to any

15   of the parties hereto nor am I in any way interested in

16   the outcome hereof.

17           Pursuant to request, notification was provided

18   that the deposition is available for review and

19   signature.  DATED this 27th day of March, 2018.

20

21

22

23

24   _____

25   Amy L. Zoller

# Exhibit 2

Redacted

| From: | Kelly Dickerson [kgreeson@carsforkids.org] |
|---|---|
| Sent: | 2/14/2013 9:39:14 AM |
| To: | Jennifer Kitchens [JKitchens@carsforkids.org] |
| CC: | Malcolm Wentworth TC [mwentworth@texanscan.org] |
| Subject: | RE: 144480 - add on in Carrollton |

I called Copart. They don't have this car in their inventory and they don't have it scheduled. I called the donor to follow up but had to leave a message.

**Kelly Dickerson**

Assistant Director of Cars for Kids | Texans Can Cars for Kids | 1911 E. Division St | Arlington, TX 76011 | p **817 274 5437** | f 817 469 1945| www.carsforkids.org

**Texans Can Academies -** Graduating thinkers by giving them a second chance with help from people like you!

**From:** Jennifer Kitchens
**Sent:** Wednesday, February 13, 2013 6:10 PM
**To:** Kelly Dickerson
**Cc:** Malcolm Wentworth TC
**Subject:** FW: 144480 - add on in Carrollton
**Importance:** High

Kelly,

I just spoke to this donor and he definitely intended for us to have this donation. He said he will call them in the morning to let them know that he wanted us to have this car. Please call Copart first thing in the morning to see if they have this vehicle and let them know that it should have been our donation and see what they need to transfer into our name. Please let donor know as soon as you can if he needs to contact Copart himself and also to verify that he cancelled with Kars 4 Kids. If we get it all worked out and transferred over to us, please send him some Mavs tickets for all of his help.

Thanks,

**Jennifer Kitchens**

Director | Texans Can Cars for Kids | 1911 E. Division St. | Arlington, TX 76011 | p (817)274-5437 | f (817)469-1945 | c (214)882-7359 | www. carsforkids.org

**Texans Can Academies -** Graduating thinkers by giving them a second chance with help from people like you!

**From:** Malcolm Wentworth [mailto:mwentworth@texanscan.org]
**Sent:** Wednesday, February 13, 2013 3:41 PM
**To:** Jennifer Kitchens
**Subject:** Fwd: 144480 - add on in Carrollton

**Highly Confidential-Outside Counsel Only**

Can you please work on this?  Contact the donor and see if their intent was to donate to us we could help get the vehicle to us if they want.

---------- Forwarded message ----------
From: **Dori Grecu** <dgrecu@carsforkids.org>
Date: Wed, Feb 13, 2013 at 2:43 PM
Subject: 144480 - add on in Carrollton
To: information <info@carsforkids.org>

Pickup canceled: Sherryl called and said Trey called the donor on this add on and the donor told him we had already came and picked up the vehicle today, the driver never went out on this run.  I called the donor and discovered that he made a donation with us and also KARS FOR KIDS, he apologized for the mix up because he thought he was donating to the Dallas Can.  I called Titan and both Sherryl and Lois are aware the add on has been cancelled.  This is NOT  a dry run.

Dori Grecu

Donation Specialist ¦ Texans Can Cars for Kids ¦ 1911 E. Division St. | Arlington, TX 76011 ¦ (972)/(817)274-5437 — Office ¦ (817)469-1946 — Fax

**Texans Can Academies -** Graduating thinkers by giving them a second chance with help from people like you!

--

Malcolm Wentworth

Chief Operating Officer

Texans Can

325 W. 12th St

Dallas, TX 75208

214-878-2153

www.TexansCan.org Corporate

www.CarsforKids.org Cars for Kids Program

```
---------------------------------------------------------------------
Confidential Notice: This email message, including all attachments, is for the sole use
of the intended recipient(s) and may contain confidential student information.
Unauthorized use or disclosure is prohibited under the federal Family Education Rights
and Privacy Act (20 U.S.C. &1232g; 34CFR Part 99). If you are not the intended recipient,
you may not use, disclose, copy or disseminate this information. Please contact the
sender by reply email and destroy all copies of the original message, including
attachments.

Aviso confidencial: Este mensaje de correo electronico, incluyendo sus anexos, es para
uso exclusivo del destinatario, o destinatarios, al que esta dirigido y es posible que
contenga informacion confidencial del estudiante. El uso o divulgacion no autorizado
queda prohibido de conformidad con la Ley de Derechos y Privacidad de Educacion de la
```

Familia (Family Education Rights Privacy Act- 20 U.S.C. &1232g; 34CFR Part 99). Si usted
no es el destinatario al que se dirigir este mensaje, usted no puede utilizar, divulgar,
copiar o difundir esta informacion. Por favor pongase en contactocon el remitente
respondiendo via correo electronico y destruya todas las copias del mensaje original,
incluyendo los anexos.

Anti-Discrimination Notice: It is the policy of Texans Can! not to discriminate on the
basis of race, color, national origin, gender or handicap in its vocational programs,
services or activities as required by Title VI of the Civil Rights Act of 1964, as
amended; Title IX of the Education Amendments of 1972; and Section 503 and 504 of the
Rehabilitation Act of 1973, as amended.

Aviso antidiscriminatorio: La politica de Texans Can! es no discriminar en base a raza,
color, origen nacional, genero o discapacidad en sus programas, servicios o actividades
vocacionales tal como lo obliga la Seccion VI de la Ley de Derechos Civiles (Civil Rights
Act) de 1964, conforme a sus enmiendas; Seccion IX de las Enmiendas de Educacion
(Education Amendments) de 1972; y la Seccion 503 y 504 de la Ley de Reh

**Highly Confidential-Outside Counsel Only**

| | |
|---|---|
| **From**: | Jennifer Kitchens [JKitchens@carsforkids.org] |
| **Sent**: | 3/23/2015 10:47:28 AM |
| **To**: | donations [donations@carsforkids.org] |
| **Subject**: | FW: Your Messages |

I spoke to Copart and they couldn't locate this car in their inventory based on the limited info that I had. So I called Kars 4 Kids, and they said they have this car & confirmed that Copart picked it up but wouldn't give me any other information. I called the donor back and left him a voicemail to return my call. I will see if he is willing to call them and cancel the donation with them and get the VIN # so I can call Copart and have them located it that way and move it to our account.

I will update once he calls me back.

Thanks,

Jennifer Kitchens

Director of Cars for Kids | America Can! Cars for Kids| 1911 E. Division St | Arlington, TX 76011 | p 817 274 5437 | f 817 469 1945|
www.WriteOffTheCarNotTheKid.org

**Supporting Texans Can Academies –** Remember write off the car, not the kid!

**From:** Jennifer Kitchens
**Sent:** Sunday, March 22, 2015 12:53 PM
**To:** donations
**Subject:** Fwd: Your Messages

He called back and he said he intended to donate to us but thinks he was duped by another company. I will call Copart & IAAI tomorrow to see if either picked up this car in Corpus Christie and find out who submitted it. He said he will call who ever it is and cancel it with them and give it to us because we are who he wanted to give it to. He said he Googled us and clicked on a link and filled out an online form and got a return email Saying thanks for the donation and he would be getting a vacation voucher which he thought was odd. He never actually spoke to anyone at the donation company, just a wrecker service called Lamar towing who picked up his car.

Sent from my iPhone

Begin forwarded message:

**From:** <service@alliancecommunications.com>
**Date:** March 22, 2015 at 2:19:46 AM CDT
**To:** <donations@carsforkids.org>
**Subject: Your Messages**

===========0000192701================
Sun 22-Mar-15 01:18a

Confidentiality - Highly Confidential-Outside Counsel Only

=====================================

Leah 3/22/2015 2:08:18 AM
UCN: 12633540
CALLTYPE: |OTHER CALLS |
|CALLER: ███████████
|PHONE: █████████ |
|ALT #: ████████
CALLER ID: ████████
|EMAIL: █████████████ |
|MESSAGE: HE DONATED A CAR ABOUT A
WEEK AGO AND NOW THINKS HE MAY HAVE
BEEN SCAMMED. |
DISPATCH NOTES: TEXT SENT TO JORDAN
03/22/2015 02:06A LEA


--------------------------------------
Message History Account: 192701
Taken: Sun 22-Mar-2015 2:06a LEA
Serial#: 1
===========0000192701================

Confidentiality - Highly Confidential-Outside Counsel Only

CAN-00008760

| From: | Dori Grecu [dgrecu@carsforkids.org] |
|---|---|
| Sent: | 1/22/2015 4:39:54 PM |
| To: | Jennifer Kitchens [JKitchens@carsforkids.org]; Coraima Lopez [CLopez@carsforkids.org] |
| CC: | donations [donations@carsforkids.org] |
| Subject: | RE: Lot# 15001515 Clm# 515-161694, Heather Kay |

Here's Kathy's reply from Asset Support:

Hello Dori,

I want to help in any way I can.  I've contacted the yard to have them call the donor to verify she wants
the vehicle to go to your charity.
Then she will need to call the other charity and let them know she wants it to go to you.

I think this will clear this confusing situation for all parties.  What do you think?


CORAIMA,

I've put a follow up date of 1/23.  Please check and make sure Copart is taking care of our donation;
they are supposed to cancel the donation with Kars and put ours in inventory.

Thanks,


Dori Grecu
Donation Supervisor/Dispatcher | America Can Cars for Kids | 1911 E. Division St. | Arlington, TX 76011 |
p (817)274-5437 – f (817)469-1945 - www.CarsforKids.org
Supporting Texans Can Academies - Remember write off the car, not the kid!

-----Original Message-----
From: Jennifer Kitchens
Sent: Thursday, January 22, 2015 4:32 PM
To: donations
Subject: FW: Lot# 15001515 Clm# 515-161694, Heather Kay

What's this status on this?

Jennifer Kitchens
Director of Cars for Kids | America Can! Cars for Kids| 1911 E. Division St | Arlington, TX 76011 | p 817
274 5437 | f 817 469 1945| www.WriteOffTheCarNotTheKid.org

Supporting Texans Can Academies – Remember write off the car, not the kid!

-----Original Message-----
From: Dori Grecu
Sent: Thursday, January 22, 2015 3:04 PM
To: Marketing Asset Support (AssetSupport2@Copart.Com)
Cc: Information
Subject: FW: Lot# 15001515 Clm# 515-161694, Heather Kay

Kathy,

I could really use your help, there's a confusion here.  I just spoke with our donor Heather Kay and she
intended to donate to us and quite possibly Kars for Kids may have tried to take the donation.  If she
called them, it was by pure accident.  She told me that your driver picked up the vehicle on Monday, and
as far as she's concerned, she gave the vehicle to us.  Please make sure that we get credit for this
donation.  If there's a duplicate assignment out there with Kars, please cancel it; Ms. Kay made it very
clear she wants to make her donation to America Can Cars for Kids.  Please receive this vehicle in
inventory under AMC3.  Please let me know if you have any questions.


Thank you,


Dori Grecu
Donation Supervisor/Dispatcher | America Can Cars for Kids | 1911 E. Division St. | Arlington, TX 76011 |
p (817)274-5437 – f (817)469-1945 - www.CarsforKids.org Supporting Texans Can Academies - Remember write
off the car, not the kid!

Confidentiality - Highly Confidential-Outside Counsel Only

```
-----Original Message-----
From: Dori Grecu
Sent: Tuesday, January 20, 2015 1:12 PM
To: 'Marketing Asset Support'; donations
Cc: Information
Subject: RE: Lot# 15001515 Clm# 515-161694, Heather Kay

Please diary it out for a couple of days while we are trying to reach the donor.

Thank you,

Dori Grecu
Donation Supervisor/Dispatcher | America Can Cars for Kids | 1911 E. Division St. | Arlington, TX 76011 |
p (817)274-5437 – f (817)469-1945 – www.CarsforKids.org Supporting Texans Can Academies – Remember write
off the car, not the kid!


-----Original Message-----
From: Marketing Asset Support [mailto:AssetSupport2@Copart.Com]
Sent: Tuesday, January 20, 2015 12:52 PM
To: donations
Cc: Information; Marketing Asset Support
Subject: FW: Lot# 15001515 Clm# 515-161694, Heather Kay

Hello Cars for Kids,
Please note this donor has decided to give her vehicle to a different charity.
Thanks,

Kathy Gilland
Asset Support Supervisor
Copart
(972) 391-5453 Office


-----Original Message-----
From: Tina Roseboom
Sent: Tuesday, January 20, 2015 12:09 PM
To: DL- Marketing Asset Support
Subject: Lot# 15001515 Clm# 515-161694

Hello,

We need to cancel this assignment as owner decided to go with another Charity.


Many thanks,

Tina Roseboom
Office Supervisor
Copart Yard 68
```

Confidentiality - Highly Confidential-Outside Counsel Only
CAN-00009018

| **From**: | Jordan Kitchens [jokitchens@carsforkids.org] |
| **Sent**: | 12/7/2015 1:04:49 PM |
| **To**: | Information [Info@carsforkids.org] |
| **Subject**: | 170685 FYI |

I was taking this donation, and the donor's first question was did we already have a donation setup for them. I could not find them in our database so I setup a new donation. The donor's niece was calling in for her aunt, but while she was there her aunt wanted to know why we hadn't already picked up the vehicle. Confused, I looked under different possible names that we might possibly have, but we did not have a donation for this donor. So then her aunt started off with a toll free number 877-, I informed her that was not our toll free number but the number for Kars4Kids. She thought we were the same company because the person she spoke to said made it seem like they were with the Can Academies. I informed her they are not affiliated with the Can Academies and they are based out of New Jersey. She said they were supposed to pickup their vehicle this morning, but never showed. I called Cris and he said he could be there within the hour to have it picked up. Donor wanted us to have the entire time, and will cancel with Kars4Kids. Skip is headed to the donor's pickup now.


Thank you,


Jordan Kitchens

Donation Specialist | America Can! Cars for Kids | 7100 Marvin D Love Fwy | Dallas TX 75237 | p 972-274-5437 | f 972-572-1243 |
www.carsforkids.org

**Supporting Texans Can Academies –** Remember write off the car, not the kid!

Highly Confidential-Outside Counsel Only

| | |
|---|---|
| **From**: | Jordan Kitchens [jokitchens@carsforkids.org] |
| **Sent**: | 10/6/2015 8:53:25 AM |
| **To**: | Information [Info@carsforkids.org] |
| **CC**: | donations [donations@carsforkids.org] |
| **Subject**: | RE: Please inactivate 168797 |

The donor called back and confirmed that his wife also submitted the vehicle for donation to another company, Kars4Kids. The donor apologized saying he did not know the difference between the two of us. When he and his wife were speaking about donating they both found a cars for kids and just assumed it was the same place. He will stick with them since they are picked up the vehicle.

Thank you,

Jordan Kitchens

Donation Specialist | America Can! Cars for Kids | 7100 Marvin D Love Fwy | Dallas TX 75237 | p 972-274-5437 | f 972-572-1243 | www.carsforkids.org

**Supporting Texans Can Academies –** Remember write off the car, not the kid!

**From:** Jordan Kitchens
**Sent:** Tuesday, October 06, 2015 8:46 AM
**To:** Information
**Cc:** donations
**Subject:** Please inactivate 168797

Please inactivate 168797 – when this donor originally thought about donating, he was submitting an online form and stopped when he noticed we were Texas based. Colin replied that we pick up donations nationwide, and the donor replied with the information to have the vehicle picked up. I submitted it to Copart, and then Copart sent an email stating the vehicle was already picked up by another company. We left messages trying to confirm the cancellation. I looked in Copart's notes, there is another lot number in there notes where it states another company picked this vehicle up, but because it does not belong to our seller code I cannot see who the other company is.

Thank you,

Jordan Kitchens

Donation Specialist | America Can! Cars for Kids | 7100 Marvin D Love Fwy | Dallas TX 75237 | p 972-274-5437 | f 972-572-1243 | www.carsforkids.org

**Supporting Texans Can Academies –** Remember write off the car, not the kid!

Highly Confidential-Outside Counsel Only

Highly Confidential-Outside Counsel Only

| | |
|---|---|
| **From**: | Erica Black [eblack@carsforkids.org] |
| **Sent**: | 1/20/2016 8:45:26 AM |
| **To**: | Jordan Kitchens [jokitchens@carsforkids.org]; Information [Info@carsforkids.org] |
| **CC**: | donations [donations@carsforkids.org] |
| **Subject**: | RE: Please inactivate 172321 |

Done.

FYI: This vehicle is in Illinois.


Erica Black

Assistant Director of Cars for Kids | America Can! Cars for Kids | 7100 Marvin D Love Frwy | Dallas, TX 75237 |

p 972 274 5437 | f 972 542 1243| www.carsforkids.org


**Supporting Texans Can Academies –** Remember write off the car, not the kid!


**From:** Jordan Kitchens
**Sent:** Wednesday, January 20, 2016 8:44 AM
**To:** Information
**Cc:** donations
**Subject:** Please inactivate 172321


Please inactivate 172321 – I followed up with the donor today for her VIN number, and the donor donated to Kars4Kids. She submitted the information to us and when Colin asked for the VIN she said she would call back with that information. Instead she went to Kars4Kids website thinking it was ours and entered the VIN and the information which created a donation for them. Copart picked up her car yesterday for Kars4Kids. The donor apologized for the mistake, she will stick with Kars4Kids this time since they already picked up the vehicle, and will consider us again in the future.


Thank you,


Jordan Kitchens

Call Center Supervisor | America Can! Cars for Kids | 7100 Marvin D Love Fwy | Dallas TX 75237 | p 972-274-5437 | f 972-572-1243| www.carsforkids.org


**Supporting Texans Can Academies –** Remember write off the car, not the kid!

Highly Confidential-Outside Counsel Only

| From: | Jordan Kitchens [jokitchens@carsforkids.org] |
|---|---|
| Sent: | 7/22/2015 3:52:38 PM |
| To: | ████████████████████████ |
| Subject: | RE: Your Online Donation - 166946 |

It's not a problem at all Sir, we definitely do appreciate the consideration. If something does happen or if you just have further questions in the future about or organization, please do not hesitate to ask. Thank you again!


Have a terrific day,


Jordan Kitchens

Donation Specialist | America Can! Cars for Kids | 7100 Marvin D Love Fwy | Dallas TX 75237 | p 972-274-5437 | f 972-572-1243 |
www.carsforkids.org


**Supporting Texans Can Academies –** Remember write off the car, not the kid!


**From:** ████████████████████████
**Sent:** Wednesday, July 22, 2015 3:38 PM
**To:** Jordan Kitchens
**Subject:** Re: Your Online Donation - 166946


Thanks for clarifying this Jordan. Sorry for the confusion/inconvenience but I didn't realize this was a separate company. As my car is already on the books with Kars4Kids I will follow up with them but will contact you should I run into any issues.

Best regards,

████████


On Wed, Jul 22, 2015 at 3:56 PM, Jordan Kitchens <jokitchens@carsforkids.org> wrote:

Good afternoon Sir,


Thank you so much for the information, your new donation reference number is 515-166946. I tired submitting your pickup with our tow company, Copart, but it looks like there is already an assignment with Kars4Kids to have the vehicle picked up for you. We are a separate organization from Kars4Kids. We will be happy to accept your donation for Cars for Kids, but we would need you to cancel the donation with them before we could submit the pickup. Unfortunately, we both use the same tow company for out-of-state donations, and only one can submit a pickup for a vehicle. If you would like to donate the vehicle to us please call Kars4Kids at (877) 527-7454 to cancel the donation; and we will be more than happy to have this vehicle scheduled for a convenient time for you.


Thank you again for the information, and I look forward to hearing from you!

Highly Confidential-Outside Counsel Only

Have a wonderful day,


Jordan Kitchens

Donation Specialist | America Can! Cars for Kids | 7100 Marvin D Love Fwy | Dallas TX 75237 | p 972-274-5437 | f 972-572-1243 |
www.carsforkids.org


**Supporting Texans Can Academies –** Remember write off the car, not the kid!


**From:** ██████████████████████████████████

**Sent:** Wednesday, July 22, 2015 2:11 PM

**To:** Jordan Kitchens <jokitchens@carsforkids.org>; Coraima Lopez <CLopez@carsforkids.org>

**Subject:** Re: Your Online Donation - 166072


Dear Jordan and Coraima,

Thanks for your patience and following up on my original request to donate my car. I apologize for my unavailability but I have had a very hectic work schedule. I am planning to be at home this coming Friday July 24th and would like to arrange for pick up if possible. Please find below a detailed response to your info request.

Best regards,

Jonathan

1.       Address to mail Tax receipt. ████████████████████████████████████████
2.       Address to pick up the vehicle. ██████████████████████████████
3.       Best time for the towing company to contact you to schedule pick up? 10am-5pm @ ████████████
4.       Color of the vehicle. Black
5.       Vehicle Identification #. 1HGEJ8255WL105734
6.       How did you hear about us? If TV or Radio, what station? Internet research
7.       Are the tires good for towing? Yes
8.       Is the vehicle accessible for a tow truck to back up to it? Yes
9.       Will you have title and keys at the time of pick up? Yes



On Wed, Jul 15, 2015 at 9:59 AM, Jordan Kitchens <jokitchens@carsforkids.org> wrote:

Dear ████████████


Thank you for considering donating to America Can Cars for Kids. We are definitely interested in your donation. We can arrange a free pick up that is convenient for you. All we need is a little additional information about your donation. If you'd like I can contact you to coordinate everything and make the donation process as smooth as possible. Or feel free to reply back with the following information if this option best fits your busy schedule.

Highly Confidential-Outside Counsel Only

1.    Address to mail Tax receipt.

2.    Address to pick up the vehicle.

3.    Best time for the towing company to contact you to schedule pick up?

4.    Color of the vehicle.

5.    Vehicle Identification #.

6.    How did you hear about us? If TV or Radio, what station?

7.    Are the tires good for towing?

8.    Is the vehicle accessible for a tow truck to back up to it?

9.    Will you have title and keys at the time of pick up?


We know you have many charities to choose from and we appreciate that you are considering us. Your donation gives hope and helps keep students in school and earn their high school diploma. It is people like you, who truly make a difference.


If you are ready to schedule pick up please contact me at 866-835-5437 or we can complete the process via email.


Thank you again and have a great day,


Jordan Kitchens

Donation Specialist | America Can! Cars for Kids | 7100 Marvin D Love Fwy | Dallas TX 75237 | p 972-274-5437 | f 972-572-1243 | www.carsforkids.org


**Supporting Texans Can Academies –** Remember write off the car, not the kid!

Highly Confidential-Outside Counsel Only

CAN-00066088

| From: | Malcolm Wentworth [mwentworth@texanscan.org] |
|---|---|
| Sent: | 12/18/2012 10:42:52 PM |
| To: | CR Creative Group [cheryl@crcreativegroup.com] |
| CC: | Richard Marquez [RMarquez@texanscan.org] |
| Subject: | Re: Donor confused |

Just looking for future.  Thanks

Malcolm Wentworth
Chief Operating Officer
Texans Can
325 W 12th St
Dallas, TX 75208
www.texanscan.org
www.carsforkids.org
www.texanscancars.org
On Dec 18, 2012 10:41 PM, "CR Creative Group" <cheryl@crcreativegroup.com> wrote:
All ads have been changed Malcolm there is nothing else I can do - Sorry


On 12/18/12 10:31 PM, Malcolm Wentworth wrote:

Long story here but jest is donor said phone number difficult (kids) so her husband went on line after hearing our add for maverick tickets.  Note this is also a repeat donor from 2010.  Here is where the problem began. Husband went to kars 4 kids by mistake.  Received call from donor tonight asking where her tickets were.  We couldn't find it because she didn't donate to us.  Now it gets interesting because the donor said the Copart driver responded yes to her question that he picked up for Dallas can JFK.

We tracked it down as Copart is picking up Kars 4 kids locally.

Donor is calling kars 4 kids and demanding return of her car.  They told her she would be receiving her maverick tickets when they scheduled her pickup when she asked.

Bottom line while kids may sound good we need to stop using it and use the numbers 5437.  Three donor complaints in 7 days.

Malcolm Wentworth
Chief Operating Officer
Texans Can
325 W 12th St
Dallas, TX 75208
www.texanscan.org
www.carsforkids.org
www.texanscancars.org

-------------------------------------------------------------------------------
Confidential Notice: This email message, including all attachments, is for the sole use
of the intended recipient(s) and may contain confidential student information.
Unauthorized use or disclosure is prohibited under the federal Family Education Rights
and Privacy Act (20 U.S.C. &1232g; 34CFR Part 99). If you are not the intended recipient,
you may not use, disclose, copy or disseminate this information. Please contact the
sender by reply email and destroy all copies of the original message, including
attachments.

Aviso confidencial: Este mensaje de correo electronico, incluyendo sus anexos, es para
uso exclusivo del destinatario, o destinatarios, al que esta dirigido y es posible que
contenga informacion confidencial del estudiante. El uso o divulgacion no autorizado
queda prohibido de conformidad con la Ley de Derechos y Privacidad de Educacion de la

     CAN-00005639

Familia (Family Education Rights Privacy Act- 20 U.S.C. &1232g; 34CFR Part 99). Si usted
no es el destinatario al que se dirigir este mensaje, usted no puede utilizar, divulgar,
copiar o difundir esta informacion. Por favor pongase en contactocon el remitente
respondiendo via correo electronico y destruya todas las copias del mensaje original,
incluyendo los anexos.

Anti-Discrimination Notice: It is the policy of Texans Can! not to discriminate on the
basis of race, color, national origin, gender or handicap in its vocational programs,
services or activities as required by Title VI of the Civil Rights Act of 1964, as
amended; Title IX of the Education Amendments of 1972; and Section 503 and 504 of the
Rehabilitation Act of 1973, as amended.

Aviso antidiscriminatorio: La politica de Texans Can! es no discriminar en base a raza,
color, origen nacional, genero o discapacidad en sus programas, servicios o actividades
vocacionales tal como lo obliga la Seccion VI de la Ley de Derechos Civiles (Civil Rights
Act) de 1964, conforme a sus enmiendas; Seccion IX de las Enmiendas de Educacion
(Education Amendments) de 1972; y la Seccion 503 y 504 de la Ley de Reh

Cheryl Rios

*CEO, CR Creative Group*



www.CRCreativeGroup.com

Contact me: Cheryl.Rios1

Like us on Facebook

View my profile on Linked

Designed with WiseStamp - Get yours.

CAN-00005640

**From**:     Malcolm Wentworth [mwentworth@texanscan.org]
**Sent**:      12/19/2012 5:54:59 PM
**To**:        Richard Marquez [RMarquez@texanscan.org]; Cheryl Rios [Cheryl@CRCreativeGroup.com]
**Subject**:   Kars 4 Kids vehicle situation update

We were able to get the donors vehicle from Kars 4 Kids today.  The donor called and complained and K4K released the vehicle to us.  Copart has switched the vehicle to us.

The donor called back and she is so excited that we were able to get it back.  Apparently this is her second donation and she had three relatives that have gone to Dallas Can and that is why she was so concerned with the donations going anywhere else.

--
Malcolm Wentworth
Chief Operating Officer
Texans Can
325 W. 12th St
Dallas, TX 75208
214-878-2153
**www.TexansCan.org** Corporate
**www.CarsforKids.org** Cars for Kids Program

Confidentiality - Highly Confidential-Outside Counsel Only                                                    CAN-00005624

| | |
|---|---|
| **From**: | Cathleen Egger [Cathleen.Egger@Copart.Com] |
| **Sent**: | 12/19/2012 12:04:12 PM |
| **To**: | Jennifer Kitchens [JKitchens@carsforkids.org] |
| **CC**: | Matt Richards [Matt.Richards@Copart.Com]; information [info@carsforkids.org] |
| **Subject**: | Re: Copart Lot # 29813582 |

The lot can be seller changed at that point.

Thank you,

Sent from my iPhone

On Dec 19, 2012, at 11:45 AM, "Jennifer Kitchens" <JKitchens@carsforkids.org> wrote:
Once they have been contacted, will you need to cancel the other lot# so we can put a new one in?  Or can that lot # just be switched to our Seller#?

Thank you,

Jennifer Kitchens

Director | Texans Can Cars for Kids | 1911 E. Division St. | Arlington, TX 76011 | p (817)274-5437 | f (817)469-1945 | c (214)882-7359 | www. **carsforkids.org**

**Texans Can Academies -** Graduating thinkers by giving them a second chance with help from people like you!

---

**From:** Cathleen Egger [mailto:Cathleen.Egger@Copart.Com]
**Sent:** Wednesday, December 19, 2012 11:42 AM
**To:** Jennifer Kitchens
**Cc:** Matt Richards; information
**Subject:** Re: Copart Lot # 29813582

Jennifer,

I will have the yard contact Kars to get this completed.

Thank you,

Sent from my iPhone

On Dec 19, 2012, at 11:27 AM, "Jennifer Kitchens" <JKitchens@carsforkids.org> wrote:
Matt,

This assignment was entered by Kars 4 Kids, seller# C860.  The donor intended this donation come to us and has spoken to Kars 4 Kids to cancel the assignment with them.  I also spoke to Kars 4 Kids and they were going to contact you to let you know to switch the assignment to us.  I have been trying to reach someone in your Grand Prairie office to see if this has been taken care of but no one is answering the phone.  I tried submitting this car under our log in but it won't let me because this car is already submitted under another lot #.  Please have someone contact me regarding this matter as soon as possible.

Confidentiality - Highly Confidential-Outside Counsel Only

Thank you,

Jennifer Kitchens

Director | Texans Can Cars for Kids | 1911 E. Division St. | Arlington, TX 76011 | p (817)274-5437 | f (817)469-1945 | c (214)882-7359 | www. **carsforkids.org**

**Texans Can Academies -** Graduating thinkers by giving them a second chance with help from people like you!

--
**Cathleen Egger**
Regional Account Manager
Copart
505 Idlewild Road
Grand Prairie, TX 75051
(214) 263-4808 Office
Mobile
Fax

--
**Cathleen Egger**
Regional Account Manager
Copart
505 Idlewild Road
Grand Prairie, TX 75051
(214) 263-4808 Office
Mobile
Fax

Confidentiality - Highly Confidential-Outside Counsel Only

CAN-00005628