**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| KARS 4 KIDS, INC.,<br><br>     Plaintiff,<br><br>v.<br><br>AMERICA CAN!,<br><br>    Defendant. | **MEMORANDUM**<br>**AND ORDER**<br><br><br>Civil Action No.<br>3:14-cv-7770 (PGS) (DEA) |
| AMERICA CAN! Cars for Kids,<br><br>     Plaintiff,<br><br>v.<br><br>KARS 4 KIDS, INC.,<br><br>    Defendant. | Civil Action No.<br>3:16-cv-4232 (PGS) (DEA) |

**SHERIDAN, U.S.D.J.**

  This matter comes before the Court on five *in limine* motions filed by both Plaintiff/Defendant Kars for Kids and Plaintiff/Defendant America Can!. The Court incorporates herein the facts of this case as set forth in the memorandum on summary judgment, ECF No. 142.

  **(1) <u>Kars 4 Kids' motion to exclude the opinion of Bryce Cook, America Can!'s expert on damages</u>**

  Kars 4 Kids seeks to exclude the opinion of Bryce Cook, America Can!'s expert on damages. "Under the Federal Rules of Evidence, a trial judge acts as a 'gatekeeper' to ensure that 'any and all expert testimony or evidence is not only relevant, but also reliable.'" *Pineda v. Ford*

1

*Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (quoting *Kannankeril v. Terminix Int'l Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)). When faced with a proffer of expert testimony under Federal Rule of Evidence 702, "the trial judge must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert v. Merrell–Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993). "Rule 702 has three major requirements: (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." *Pineda*, 520 F.3d at 244. The parties have not raised any dispute as to Mr. Cook's qualification to testify as an expert.

The proffered testimony must be reliable; that is, "the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *Id.* at 742 (quoting *Daubert*, 509 U.S. at 590). "[S]o long as the process or technique the expert used in formulating the opinion is reliable," such testimony will be deemed admissible. *Id.* The reliability of an expert's testimony is assessed using an eight-factor test set forth by the Third Circuit:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*United States v. Mitchell*, 365 F.3d 215, 235 (3d Cir. 2004).

"Finally, Rule 702 requires that the expert testimony must fit the issues in the case"; that is, "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Schneider*, 320 F.3d at 404. "In assessing whether an expert's proposed testimony 'fits,' we

are asking 'whether [the] expert testimony proffered . . . is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *United States v. Schiff*, 602 F.3d 152, 173 (3d Cir. 2010) (citing *Daubert*, 509 U.S. at 591).

Kars 4 Kids seeks to bar America Can!'s damages expert from testifying, claiming that he "offers nothing more than his subjective belief that, absent Kars 4 Kids' use of the KARS 4 KIDS marks, *every single donation* Kars 4 Kids received over a *nine-year period* would have gone to America Can." (Memo. of Law in Support of Pl. Motion *In Limine* No. 1 to Exclude the Entirety of Bryce R. Cook's Opinions ("Memo in Support of Motion *In Limine* No. 1"), ECF No. 150-1 at 1). Mr. Cook's report purports to set forth three different types of claims for damages that total America Can!'s claim for damages; they are: a claim for Kars 4 Kids' profits; the royalty that Kars 4 Kids "would have had to pay if [America Can!] had agreed to license the [m]ark"; and the cost of corrective advertising. (Cook Report at 8-10).

Under the Lanham Act, the non-infringing party may recover as damages "(1) [the infringer's] profits, (2) any damages sustained by the [non-infringer], and (3) the costs of the action." 15 U.S.C. § 1117(a). "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a).

First, America Can! seeks to recover the profits of Kars 4 Kids. Cook determined that the revenues of Kars 4 Kids would be determined by adding up the revenues reported on Kars 4 Kids' annual Form 990's. In order to confirm the revenues on the Form 990 was correct, he compared those revenues to the auction sales revenue from America Can!'s database. Cook also examined auction sales revenue from Kars 4 Kids' database and its 2010 audited financial statement. The 2010 statement indicated that "substantially all" of Kars 4 Kids' revenue are from donations. (Cook

Report, ECF No. 150-2 at 8). Once he was assured that the revenues on the Form 990s was reasonable, he then calculated the total of Kars 4 Kids' revenues as reported on Form 990 for the years 2008 through 2017. Relying on that sum, Cook concluded, "[America Can!'s] claim for [Kars 4 Kids'] profits on sales made using the infringing mark total $328,175,784." (*Id.* at 9).

Although this calculation is a relatively simple use of addition, it is *Kars 4 Kids'* burden to prove that the total revenues should be discounted by expenses based on the statute. 15 U.S.C. § 1117(a). In short, the jury may be unaware that the use of the revenues as reported on the Form 990 is an acceptable method to determine damages. Cook's presentation as to his method of finding the gross revenues by adding revenues from the Form 990s is of assistance to the jury.

Moreover, Kars 4 Kids has an expert who will testify as to the expenses that may be deducted from the total revenues to determine the profit. Mr. Cook intends to discredit Kars 4 Kids' expert by arguing certain costs should not be deducted. More specifically, Cook's rebuttal report offers several theories, but most notably, he asserts that the use of the term "profit" is of a different nature when applied to not-for-profit corporations as opposed to a corporation's profit. As such, Cook concludes that "any expenses that do not contribute to fundraising, or revenue generation, should not be deducted from revenue." (Cook Rebuttal Report, ECF No. 150-2 at 6).

In determining what revenues to discount, Cook examined a table, which was derived from the Form 990s:

| Table 2 – 2016 K4K Form 990 – Statement of Functional Expenses | | | | |
|---|---|---|---|---|
| | (A) Total Expenses | (B) Program services | (C) Management and general | (D) Fundraising |
| Grants - Domestic | $ 18,262,163 | $ 18,262,163 | - | - |
| Grants - Foreign | 200,458 | 200,458 | - | - |
| Officers compensation | 260,077 | 98,525 | 109,965 | 51,587 |
| Other salaries & wages | 2,881,559 | 413,252 | 1,222,977 | 1,245,330 |
| Payroll taxes | 360,243 | 97,266 | 133,290 | 129,687 |
| Legal | 557,073 | - | 557,073 | - |
| Accounting | 81,312 | - | 81,312 | - |
| Advertising and promotion | 17,880,457 | 2,769,881 | 81,472 | 15,029,104 |
| Office expenses | 440,943 | 135,682 | 202,624 | 102,637 |
| Information technology | 59,396 | - | 59,396 | - |
| Occupancy | 22,213 | 2,579 | 17,943 | 1,691 |
| Travel | 15,724 | - | 15,724 | - |
| Depreciation | 3,641 | 1,274 | 1,566 | 801 |
| Insurance | 45,136 | - | 45,136 | - |
| Subscriptions | 84,247 | - | 84,247 | - |
| Merchant fees | 78,986 | - | 78,986 | - |
| Repairs and maintenance | 45,990 | 16,097 | 19,776 | 10,117 |
| Licenses and permits | 40,365 | - | 40,365 | - |
| Other expenses | 19,958 | 19,958 | - | - |
| Total | $ 41,339,941 | $ 22,017,135 | $ 2,751,852 | $ 16,570,954 |

(*Id.* at 5). Cook provided a detailed analysis of this table and how the expenses it presents should

be discounted:

> Per the Form 990 instructions, Column (B)–Program Services "are mainly those activities that further the organization's exempt purposes," which K4K reported in Part III of Form 990 as: "educational, developmental, and recreational programs for Jewish youth and their families." Based on this description, these expenses did not contribute to K4K's generation of car donation revenue and should therefore not be deducted. Certainly, Domestic and Foreign Grants totaling $18.5 million are wholly unrelated to K4K's vehicle-donation fundraising function and should be excluded from deductions. Mr. Hall acknowledged this very fact in his apportionment calculation wherein he excluded grants from total expenses "to determine what portion of Kars 4 Kids operational expenditures represents advertising in a fundraising capacity." The same treatment should apply to the more than $600,000 in compensation/salary/payroll tax expenses K4K spends in running and managing its charitable programs, which is distinct from running and managing its vehicle-donation arm, the expenses of which are shown in Column (D) Fundraising. Likewise, the $2.8 million in advertising expense relating to its charitable programs (e.g., brochures for summer camps, ads for educational programs, etc.) are irrelevant to and do not support K4K's vehicle donation operations and should not be deducted from revenues. Indeed, all Program Services expenses in Column (B) are required by the IRS to be specifically segregated into that category because they support K4K's charitable programs and not its vehicle-donation fundraising

activities. Therefore, none of the Column (B) expenses should be deducted from vehicle-donation fundraising revenues.

(*Id.* (footnotes omitted)).

Although Cook initially opined that profits should be calculated on all revenues generated, in his rebuttal report he discounted total fundraising costs because those "expenses directly relate to the generation of vehicle-donation revenue" which decreased Cook's total to $213,374,316. (Cook Rebuttal Report, ECF No. 150-2 at 8). He also states that as an "alternative measure," the factfinder could use "the grant funds [Kars 4 Kids] provides to charitable organizations, as this amount is an indication of the funds it has available to donate after paying all its operating expenses required to generate those funds." (*Id.*). That reduction amounted to total profits of $161,294,383; leading Cook to conclude that these numbers constituted the range of Kars 4 Kids' profits. (*Id.* at 9).

Cook's findings regarding profits, which derived from his mathematical calculations, were supported by a reliable methodology. Cook explained the standards which governed his use of the Form 990 revenues. His technique was consistent with the *Banjo Buddies* court's analysis of damages. Accordingly, Cook's calculations sufficiently satisfy the multifactor test set forth in *Mitchell*, 365 F.3d at 235, and his analysis was tied to the facts of the case and will be of assistance to the jury, in accordance with the mandate of *Daubert*, 509 U.S. at 591. As such, Kars 4 Kids' motion to bar Cook's testimony on damages as disgorgement of profits is denied.

Regarding his second theory concerning the amount of royalties that Kars 4 Kids would have had to pay to license the mark, Cook was also unable to render a conclusion. He did not discuss this methodology in his rebuttal report. Cook is therefore barred from testifying as to damages based on hypothetical royalties.

Finally, with regard to the third methodology – corrective advertising – Cook was unable to conclude what amount of corrective advertising would be necessary to correct confusion but stated "the trier of fact may find the total advertising [spent] useful as a starting point for addressing this method." (*Id.* at 10). Whereas, "his rebuttal report concluded that the total was $86.3 million. Although the new figure was more precise, there is no methodology supporting how Cook arrived at this opinion. He merely concluded the amount of corrective advertising should be the total advertising spent by Kars 4 Kids. It is speculative to argue, without citation to authority, that the corrective advertising for America Can! should equal the total advertising expenditures by Kars 4 Kids. Further, it is at best unclear how that figure would assist the trier of fact in rendering a decision.

Cook's finding as to the third methodology was wholly conclusory. The use of total advertising cost does not meet the eight-factor test under *Mitchell*. It is unclear what method Cook used, if any, or whether it would be subject to peer review. The known or potential rate of error is very high in light of this extremely off-hand imprecise contention. For example, Mr. Cook states that $86.3 million is a good starting point. The use of the words "starting point" infers that there are factors that may add or subtract from that amount. Mr. Cook does not set forth any such factors within his report. As such, his imprecise statement is not reliable. His testimony regarding corrective advertising is barred.

In sum, Cook's use of the Form 990s as a means to determine revenue may be valuable for assisting the jury in resolving the issues of damages. However, he reached no conclusion as to the hypothetical royalty, rendering him unable to assist the trier of fact on that calculation. Finally, his corrective advertising figure ($86.3 million) was based solely on an imprecise remark, especially

when he gives no guidance as to the factors a jury would be required to assess if they worked from the "starting point."

### (2) <u>Kars 4 Kids' Motion *in Limine* No. 2: Attorneys General Investigations</u>

Kars 4 Kids seeks to exclude evidence of three investigations conducted by state attorneys general in Minnesota, Oregon, and Pennsylvania because they are irrelevant and prejudicial. (Memo. in Support of Motion *In Limine* No. 2, ECF No. 152). More precisely America Can! seeks to admit into evidence a "Compliance Review of the Charitable Solicitation Activities and Financial Reporting of Kars 4 Kids and its Relationship to Oorah, Inc.," dated 2017 by Attorney General Lori Swanson of Minnesota (Compliance Review), plus two single-page press releases from Pennsylvania and Oregon. America Can! seeks to admit these documents because they are relevant on three grounds.

America Can! argues the Compliance Review and the two press releases are relevant to the validity of the assignment of trademark rights, to damages calculations (15 U.S.C. § 1117(a)), and to its injury in the context of its trademark dilution claim. Although America Can! claims the Compliance Review and the two press releases should be admitted, each will be addressed separately with the press releases being addressed first.

Generally, under the Public Records exception to the hearsay rule (Fed. R. Evid. 803(8)), a public record will be admitted if it is a "record or statement of a public office" if it sets out, "in a civil case . . . factual findings from a legally authorized investigation" and "neither the source of information nor other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(A)(iii), (8)(B). The trial court has discretion concerning admissibility of such evidence. *Wilson v. Attaway*, 757 F.2d 1227, 1245 (11th Cir. 1985). Here, the press releases do not set forth "findings from a legally authorized investigation" in that both press releases discuss a settlement

without support or substance behind the content. As such, the motion *In Limine* to bar admission of the Pennsylvania and Oregon press releases is granted.

Returning to the Compliance Review, a different analysis applies. The Compliance review is a twenty-seven page report. It describes: (1) Kars 4 Kids and its affiliates; (2) how it failed to disclose the revenue spent on fundraising and overhead costs; (3) it failed to monitor the charities to which it contributed; and (4) it failed to disclose that the charity program was substantially more limited in focus than represented in its advertisements. In another section, it noted a misstatement on the Kars 4 Kids federal tax reporting averring that Kars 4 Kids reported "net, not gross, revenues on its IRS Form 990." (Doc, 161-1, p. 10). Most of those topics may impact the value of the mark.

America Can! sets forth three grounds for admitting the evidence as relevant to: "(1) K4K's purported date of initial use of its claimed marks; (2) damages; and (3) the injury caused America Can! By Kars 4 Kid's trademark infringement." (Def.'s Br. in Opp. to Pl.'s Motion *In Limine* No. 2 to Exclude Evidence, Testimony, and Argument Regarding Attorneys General Investigations ("Def.'s Opp. to Pl.'s Motion *in Limine* No. 2"), ECF No. 160 at 5).

The Compliance Review is relevant to damages. Specifically, the Compliance Review found that Kars 4 Kids misled the government and the public about the amount of revenue that was spent on advertising vs. charitable purposes, and it made findings about Kars 4 Kids' actual amount of advertising expenditures.

In addition, the Compliance Review has a tendency to support America Can!'s trademark dilution claim. Assuming America Can! can establish the other elements of the dilution claim, the report has a tendency to show that Kars 4 Kids' "use causes dilution by lessening the capacity of [America Can!'s] mark to identify and distinguish goods or services." *800-JR Cigar*, 437 F. Supp. 2d at 293.

The Court finds that the probative value of the Compliance Review is relevant and substantially outweighed by the risk of unfair prejudice, confusing the issues, or misleading the jury. As such, the motion in limine to bar admission of the Compliance Review is denied.

In sum, the Court tentatively finds the Compliance Review to be admissible under the public records exception to the hearsay rule and declines to exclude the evidence under Rule 403. Additionally, Kars 4 Kids may propose reasonable redactions to the report, which the Court shall consider.

## Minnesota Discovery Requests

In the course of conducting the investigation that resulted in the Compliance Review, the Minnesota Attorney General issued discovery requests to Kars 4 Kids.[1] One such request was for copies of "all documents that memorialize or describe any agreement, affiliation, or relationship, or other arrangement, whether formal or informal, between [Kars 4 Kids] and Oorah." (Confoy Decl., Ex. 7, ECF No. 161-5). In response, Kars 4 Kids stated, "Subsequent to 2009, Oorah and Kars [4 Kids] ceased to have a formal grant application process. Rather, Kars [4 Kids] made grants to Oorah on a discretionary basis. We do not have any other documents pertaining to agreements between Kars [4 Kids] and Oorah." (*Id.*) (hereinafter "Response).

America Can! seeks to admit this Response as a statement of opposing party exception to the hearsay rule. Fed. R. Evid. 801(d)(2). This Response, however, is not relevant evidence of an absence of an assignment for several reasons. First, the Response references agreements *subsequent to 2009*. Second, the statement discusses agreements between *Oorah* and Kars 4 Kids. And third, the statement references *documents pertaining to* agreements. The alleged assignment

---

[1] Minnesota law permits the Attorney General to "obtain discovery from any person regarding any matter, fact, or circumstance, not privileged, that is relevant to the subject matter involved in [an] investigation." Minn. Stat. Ann. § 309.533.

occurred in 2000, was made from OKR to Joy for Our Youth, Inc. (which later became Kars 4 Kids),[2] and was undisputedly an oral assignment. (ECF No. 184, T62:3-8).

Kars 4 Kids' Response is not probative of the date of any alleged assignment. To introduce such evidence to refute Kars 4 Kids' claim of an assignment would do nothing but confuse the issues, mislead the jury, and pose a risk of unfair prejudice. The Response is inadmissible under Federal Rule of Evidence 403.

### (3) Kars 4 Kids' Motion *in Limine* No. 3: Business Registrations

Kars 4 Kids seeks to exclude evidence of America Can!'s business registrations from being introduced at trial, arguing that "[t]he jury is not likely to appreciate the legal distinction between registering to do business under a designation and public use of a designation in advertising sufficient to acquire trademark rights." (Memo. of Law in Support of Pl.'s Motion *In Limine* No. 3 to Exclude Evidence, Testimony, and Argument Regarding America Can's Business Registrations ("Memo. in Support of Motion *In Limine* No. 3"), ECF No. 153 at 4). Kars 4 Kids cites *Three Rivers Confections, LLC v. Warman*, 660 Fed. App'x 103, 105 (3d Cir. 2016), which held that "a copy of the Pennsylvania Department of State listing" for a mark, *alone*, was insufficient, stating, "[a]bsent further evidence of ownership, such as market penetration, from which a reasonable jury could conclude that [defendant] owned the [mark] as a senior user, summary judgment for [plaintiff] was warranted."

However, in *Three Rivers*, the court did not hold that business registration evidence is not admissible, merely that business registration evidence, *alone*, is insufficient to establish a claim for infringement. The business registration is certainly admissible as probative of priority of use.

---

[2] America Can!'s counsel at oral argument stated, "if there was an assignment, it might have been to [Oorah], but there's no assignment as to [Kars 4 Kids]." (ECF No. 184, T59:1-4). No party contends that an assignment was made between Oorah and Kars 4 Kids.

There does not appear to be any risk of prejudice or of confusing or misleading the jury. Kars 4 Kids is free to argue to the jury that the business registration alone is not sufficient, but America Can! is also permitted to present the evidence to the jury. Kars 4 Kids' motion to exclude evidence of America Can!'s business registrations is denied.

### (4) Cars for Kids' Motion *in Limine*: Opinion of Alex Simonson

America Can! seeks to exclude a survey conducted by Kars 4 Kids' expert, and corresponding opinion testimony that purports to show secondary meaning. The objective of the survey was to assess the secondary meaning of the term "Kars 4 Kids." Kars 4 Kids counters that the survey is reliable under Evidence Rule 702. The survey at issue, created by Dr. Alex Simonson,[3] was conducted online and aurally (without any text appearing) on a nationwide group of United States consumers who are over eighteen years of age. (Confoy Decl., Ex. 1, Simonson Report at 2). Participants were divided into a test cell and a control cell. (*Id.*).

Prior to commencing, participants read the following:

> In this survey, there are no right or wrong answers, but there are questions that ask for your beliefs and understanding. Please do your best to answer each question to the best of your beliefs and understanding. If there's any question that you cannot answer, please don't guess. Just indicate "Don't Know/Not Sure," and proceed to the next question.

(*Id.* at 10). Simonson then describes in detail how the survey proceeded:

> Respondents were then told:
>
>> For the first question, please click on the audio file and listen to the question.
>
> The text of the audio was as follows:

---

[3] The parties do not dispute that Simonson is qualified to testify as an expert. Simonson is a "marketing researcher with a Ph.D. in marketing from Columbia University School of Business." (Confoy Decl., Ex. 1, Simonson Rep. at 1). His lengthy curriculum vitae can be found at Appendix A of his report.

**Test cell:** Have you or haven't you heard the term Kars 4 Kids? Please just indicate, I have, I haven't, or don't know/not sure.

**Control cell:** Have you or haven't you heard the term Gifts for kids? Please just indicate, I have, I haven't, or don't know/not sure.

If a respondent could not hear the question, he/she had a second chance to hear the audio clip. If, after the second time, a respondent still could not hear the question, that interview would terminate.

For all those proceeding beyond that point, respondents were told based on the question they had just heard:

Please record your answer below. If you don't recall the term and need to hear the term again, please click the play button below.

The text of the second audio was as follows:

**Test cell:** Kars 4 Kids.

**Control cell:** Gifts for kids.

If a respondent indicated that he/she had heard of the term, he/she proceeded to the Palladino Secondary Meaning Question.

**Palladino Secondary Meaning Question**

The respondents were then asked:

Do you associate the term you just heard with one particular organization or with more than one organization?

To avoid order biases, the question was rotated such that about ½ the respondents saw the question as worded above and about ½ of the respondents saw the question reversed as follows:

Do you associate the term you just heard with more than one organization or with one particular organization?

As per the generally accepted procedure, the response alternatives included a "Don't Know/Not Sure" option.

**Organization**

For any respondent stating "one particular organization," he/she was asked the following open-ended question and the answer was recorded verbatim:

> Please tell us anything you can recall or identify about this organization or its advertising that will help us to know what organization you're referring to.

The response alternatives included a "Don't Know/Not Sure" option.

**Jingle**

To further identify what organization the respondents were thinking of when they chose "one particular organization," they were asked the following filter question and open-ended follow up. (The filter question is asked to avoid potentially leading respondents.)

> To the best of your recollection, have you or haven't you heard this organization's jingle?

Respondents could choose "I've heard it," "I've not heard it" or "Don't Know/Not Sure." For any respondent choosing "I've heard it," he/she was asked the following open-ended question and the answer was recorded verbatim:

> If you haven't already done so in any earlier question, so that we know what jingle you're referring to and so we can identify it, please write out as much of the jingle that you can recall word-for-word, as best you can.

(*Id.* at 10-12).

"[T]he general trend has been toward the admission of surveys of various kinds. Surveys are . . . routinely admitted in trademark and false advertising cases to show actual confusion, genericness of a name or secondary meaning, all of which depend on establishing that certain associations have been drawn in the public mind." *Schering Corp. v. Pfizer, Inc.*, 189 F.3d 218, 225 (2d Cir. 1999) (Sotomayor, J.). "The majority rule is that while technical deficiencies can

reduce a survey's weight, they will not prevent the survey from being admitted into evidence." 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 32:170 (5th ed. 2019).

"[M]ethodological deficiencies in a survey generally relate to the weight given the survey's conclusions rather than to its admissibility." *J&J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 369 (D.N.J. 2002). "However, when the deficiencies are so substantial that they render the survey's conclusions untrustworthy, the court should exclude the survey from evidence." *Id.* "Significant methodological deficiencies lessen the survey's probative value so that its probative value is substantially outweighed by the prejudice, waste of time, and confusion that it would cause at trial." *Id.* The Third Circuit has stated that a properly conducted survey must meet the following requirements:

> A proper universe must be examined and a Representative sample must be chosen; the persons conducting the survey must be experts; the data must be properly gathered and accurately reported. It is essential that the sample design, the questionnaires and the manner of interviewing meet the standards of objective surveying and statistical techniques. Just as important, the survey must be conducted independently of the attorneys involved in the litigation. The interviewers or sample designers should, of course, be trained, and ideally should be unaware of the purposes of the survey or the litigation. A fortiori, the Respondents should be similarly unaware.

*Pittsburgh Press Club v. United States*, 579 F.2d 751, 758 (3d Cir. 1978).

"Above all, the survey's design must fit the issue which is to be decided by the jury, and not some inaccurate restatement of the issue, lest the survey findings inject confusion or inappropriate definitions into evidence, confounding rather than assisting the jury." *J&J Snack Foods*, 220 F. Supp. 2d at 370. "Only if the expert testimony and related survey are useful, reliable, and have probative value after all of their deficiencies are taken into account is the evidence admissible." *Id.* In my view, the survey here has several faults.

First, the "universe" of the survey is too broad. The survey included all "[m]ales and females"; "18 years of age or older"; and "[r]eside in the United States." (Expert Report of Simonson at 5). Essentially the survey was of all adults residing in the United States. "The courts have held that to be probative . . . a survey must rely on responses of prospective purchasers [or donors] of the products in question." *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 322 (S.D.N.Y. 2000). In *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 307-08 (S.D.N.Y. 2001), relied upon by America Can!, the court excluded a survey that "failed to establish that the interviewees were potential consumers of the clothing in question" and "was not conducted in close proximity to [the] stores." Here, the survey failed to establish the interviewees were potential donors of vehicles to a not-for-profit corporation. The survey of the general population made no attempt to limit the universe of individuals taking the survey. In fact, Simonson conceded in his report:

> Given the strength of the mark in the *general population*, it is likely that the level would be higher among those in the particular universe of Kars 4 Kids, specifically those who had recently donated their car or who are interested in donating their car in the near future because, consistent with the principles of consumer behavior, those consumers are more "involved," . . . and are more likely to attend to relevant advertising.

(Simonson Report at 26). Kars 4 Kids' failure to limit the universe of this survey to, for example, individuals who own vehicles or owners of vehicles who were considering a donation. This renders the universe overly broad.[4]

---

[4] In *National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.*, 532 F. Supp. 651, 657-58 (W.D. Wash. 1982), a court held a survey universe comprising "the entire population of the continental United States between the ages of thirteen and thirty-five" admissible because survey questions grouped respondents into "likely potential purchasers of the NFL football jersey replicas." The Court noted, however, that case law indicated "the relevant universe is potential purchasers." *Id.* at 657. And the Court was "impressed with the steps plaintiffs took to insure reliability of the survey." *Id.* at 658. The survey here did not include any questions designed to group respondents into the relevant universe, such as, based on their ownership of or likelihood of donating a vehicle. In addition, as discussed in this section, the Court notes that other factors present in the survey here rendered it confusing to respondents.

Also problematic is the leading nature of the survey questions. For example, the initial survey question tests "Kars 4 Kids" against "Gifts for Kids". Then, several questions below, the survey queries about the jingle ("to the best of your recollection, have you or haven't you heard this organization's jingle?") That question, which is very suggestive, leads the interviewee to the song or jingle associated with Kars 4 Kids. Further, counsel for America Can! represented (at oral argument) that his client has no jingle. This question focuses or leads the interviewee on the jingle, which is commercially advertised on radio and television. (April 2, 2019 Transcript, ECF 184, at 101:17-22). Survey questions should be "framed in a clear, precise and nonleading manner." *Ranch v. Greeson*, 2015 WL 7871047 at *3 (Dec. 3, 2015) (quoting 3 Callmann on Unfair Competition, Trademarks & Monopolies § 20:23 (4th ed., 2014)). The survey question therefore did "not capture '*unprompted* consumer reaction as to association between a given trade symbol and a given source of the product,'" *id.* (quoting *Sno-Wizard Mfg., Inc. v. Eisemann Prod. Co.*, 791 F.2d 423, 427 (5th Cir. 1986)); rather, it led interviewees to a preordained answer.

In addition, the Court agrees that the question – "Do you associate the term you just heard with one particular organization or with more than one organization?" – was confusing because it failed to include an option for respondents who do not associate the phrase with any particular organization. Although the participants were given the option to choose "don't know/not sure," this option does not necessarily cure the possible confusion for individuals who do not immediately think of an organization. This argument further weighs against admitting the survey into evidence.

Finally, America Can! challenges the "ceiling effect" employed by Simonson in using the control phrase "gifts for kids." As indicated above, Simonson divided respondents into a test cell and a control cell. "The respondents in the test cell were asked about the term 'Kars 4 Kids' and those in the control cell were asked about a commonly known, descriptive term, "Gifts for kids."

(Simonson Report at 2). However, "[r]espondents in both cells (test and control) indicated similar levels of recognition (43% "Kars 4 Kids" and 39% "Gifts for kids").

Simonson indicates that a ceiling effect may have been attributable to the fact that recognition of Kars 4 Kids was only 43%. Specifically, he attributes this low recognition to two possibilities: (1) a ceiling effect artificially reduced the identified recognition levels; that is, respondents might wrongly indicate they have heard the term "Gifts for kids" because it is "a commonly known, descriptive term for the idea of giving gifts to children," which artificially depressed the percentages or (2) "a majority of adults in the United States have never heard of the term 'Gifts for kids.'" (Simonson Report at 15). Simonson suggests that the former is a more persuasive explanation and argues that the next question, which addressed association with an organization, "indicates the level of secondary meaning of the term 'Kars 4 Kids.'" (*Id.* at 16).

However, Pittaoulis, America Can!'s expert, posits a third possibility, "that respondents were interpreting the question literally and were trying to recall whether they had heard the term 'Gifts for kids' used in isolation and not in connection with other descriptive terms." (Pittaoulis Report at ¶ 27). The Court finds Pittaoulis' criticism persuasive. When this possible reason is considered in conjunction with the problematic question – "Do you associate the term you just heard with one particular organization or with more than one organization?" upon which Simonson relies to overcome the ceiling effect, it is clear that there was a real probability that respondents were confused.

While any individual flaw discussed herein may not, by itself, be sufficient to justify excluding the survey evidence, the totality of those deficiencies leads the Court to find that the prejudicial effect of Kars 4 Kids' survey substantially outweighs its diminished probative value, making it of little use to the jury. *See* Fed. R. Evid. 403; *see also Trouble v. Wet Seal, Inc.*, 179 F.

Supp. 2d 291, 308 (S.D.N.Y. 2001). It also poses a substantial risk of confusion the issues, misleading the jury, and unfair prejudice. Fed. R. Evid. 403. Accordingly, the survey results and any opinion evidence based on the survey results are inadmissible. *See* Fed. R. Evid. 703.

### (5) America Can!'s Omnibus Motion *in Limine* No. 1: Evidence of Kars 4 Kids' use of the "TM" Symbol

America Can! seeks an order excluding Kars 4 Kids' argument that the use of a "TM" symbol is required to reserve rights in a mark and precluding Kars 4 Kids from seeking testimony, or offering evidence, that America Can!'s non-use of the "TM" symbol precludes it from asserting rights in its mark. (Def. br., ECF No. 154-1, at 3-4). America Can! argues that the use of a "TM" symbol is not required to establish trademark ownership rights, and for that reason, such evidence is legally insignificant and should be excluded as irrelevant and unfairly prejudicial, pursuant to Rule 403. (*Id.* at 4).

In response, Kars 4 Kids argues that it does not seek such an order, but instead, is entitled to present evidence of how America Can! uses the "TM" symbol in connection with the designation "Cars for Kids" and the tagline "Write Off the Car, not the Kid." (Pl. br., ECF No. 256, at 1-2). Specifically, Kars 4 Kids seeks to present evidence that America Can! has omitted the use of the "TM" symbol from its designation "Cars for Kids," along with America Can!'s use of the "TM" symbol in its tagline "Write Off the Car, not the Kid" to show that America Can! has used the "TM" symbol in the past, and therefore knew how to assert a claim of trademark rights for "Cars for Kids" when it believed it was using that designation as a trademark. (*Id.* at 1). Kars 4 Kids argues that because America Can! failed to communicate to the public that it claimed rights in the "Cars for Kids" designation, a jury can conclude that the omission of the "TM" symbol indicates that America Can! never intended to use the designation as trade mark use. (*Id.* at 1-2). Accordingly, Kars 4 Kids argues that this is relevant to the determination of whether America

19

Can!'s use of the "Cars for Kids" designation was of a type that could give rise to trademark rights in that mark. (*Id.* at 2).

The use of the "TM" symbol, in connection with unregistered trademarks, may serve as "a informal and quasi-legalistic notice to ward off competitors who may consider adoption of a similar mark [or] . . . [t]o use as evidence in applying for registration or in infringement litigation." 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 19:148 (5th ed. 2019). While use of the "TM" symbol may be an attempt to educate the public about a purported trademark, "the mere addition of the trademark symbol is not sufficient to transform a nontrademark use of a designation into a trademark use." *Id.*; *see also CSL Silicones, Inc. v. Midsun Grp. Inc.*, 301 F. Supp. 3d 328, 349 (D. Conn. 2018) ("The use of a 'TM' symbol in connection with a mark, either registered or unregistered, is not statutorily required, and does not, by itself, establish trademark rights."); *In Re Volvo Cars of N. Am. Inc.*, 46 U.S.P.Q.2d 1455 (T.T.A.B. 1998) ("use of the ["TM" symbol] indicating that DRIVE SAFELY is a trademark of [VOLVO] does not transform this unregistrable phrase into a trademark indicating source or origin.").

The Court finds that the probative value of America Can!'s past use of the "TM" symbol is not substantially outweighed by the risk of unfair prejudice to America Can! under Rule 403. Though the use of a "TM" symbol on an unregistered trademark does not conclusively establish trademark use, the use or nonuse of the "TM" symbol is probative of whether a party intended to convey a message to the public that it was asserting trademark use. Here, the non-use of a "TM" symbol for America Can!'s designation "Cars for Kids," in contrast with the use of the "TM" symbol for America Can!'s tagline "Write Off the Car, not the Kid" is probative of whether America Can! intended the use of "Cars for Kids" to designate trademark use. For these reasons,

America Can!'s motion *in limine* is denied and Kars 4 Kids may present evidence of how America Can! uses the "TM" symbol.

**(6)** **America Can!'s Omnibus Motion *in Limine* No. 2: Excluding Statements that Survey Data is Necessary to Prove Secondary Meaning and for an Order that America Can! May Offer Kars 4 Kids' Survey Data, if Otherwise Admissible, In Support of Its Case**

America Can! argues that the Court should enter an order precluding Kars 4 Kids "from arguing that survey evidence is necessary to prove secondary meaning." (Def.'s Brief in Support of Omnibus Motion at 6). Kars 4 Kids counters that it "does not dispute that survey evidence is necessary to prove that a term has attained secondary meaning" but claims it should be permitted to ask the jury to draw an inference based on America Can!'s failure to provide a survey.

The Third Circuit has "not yet held that a consumer survey is mandatory to establish likelihood of confusion in a Lanham Act case." *Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467, 476 (3d Cir. 1990). Consumer surveys are "useful, and indeed the most direct method of demonstrating secondary meaning and likelihood of confusion." *Id.* However, "a plaintiff's failure to conduct such a survey where it has the financial resources to do so, could lead a jury to infer that the plaintiff believes the results of the survey will be unfavorable." *Id.* at 475. The Court has excluded Kars 4 Kids' survey leaving both parties without survey data to rely upon, this issue is therefore moot.

America Can! also moves for an order permitting it to rely on the data in Kars 4 Kids' survey as part of its proofs on secondary meaning. America Can! is only pursuing this argument "[i]f the survey data is admissible." (Def.'s Brief in Support of Omnibus Motion at 10). As previously discussed, the survey is not admissible at trial. Therefore, America Can!'s motion is denied as moot.

**(7) America Can!'s Motion *in Limine* No. 3: Excluding the "1-877-KARS-4-KIDS" Jingle During Jury Selection and Trial**

America Can! seeks an order precluding Kars 4 Kids from playing its "1-877" Jingle (hereinafter "the Jingle") during Jury selection and during the trial, arguing that it is irrelevant, unfairly prejudicial, and will likely confuse and mislead the jury about the issues in the case. America Can! argues first that the Jingle is irrelevant as it is not an asserted trademark in this case, where Kars 4 Kids asserted trademarks are "1-877-KARS-4-KIDS" and "KARS 4 KIDS." (Def. br. at 11). While the Jingle does contain the mark "1-877-KARS-4-KIDS," America Can! argues that the Jingle has many other elements, such as the lyrics, the rhythm, instruments, and the singer's voices. According to America Can!, a jury, when listening to the Jingle, may not recognize the asserted trademarks contained therein, but instead may recognize the other elements and unfairly attribute that recognition to the Kars 4 Kids asserted trademarks. (*Id.*) In response, Kars 4 Kids argues that any prejudice America Can! may face as a result of admitting the Jingle is outweighed by its probative value, because the Jingle is demonstrative of the asserted trademarks' uses in advertising, which is critical in determining whether a mark qualifies as a service mark. (Pl. br. at 6-7).

"A service mark is defined as a word, name, symbol, device or advertising of services to identify the service of the entity and distinguish them from the services of others." *Holiday Inns, Inc. v. Trump*, 617 F. Supp. 1443, 1464 (D.N.J. 1985) (quoting *Estate of Presley v. Russen,* 513 F. Supp. 1339, 1362 (D.N.J. 1981)). The determination of whether a company name is being used "as a service mark is a question of fact to be determined from the manner of use . . . These critical factors can be determined only by careful scrutiny of the exact manner in which the term is used by the applicant in its advertising media." 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 19:88 (5th ed. 2019).

First, the Court finds the Jingle is relevant, as it contains both asserted trademarks. The lyrics to the Jingle are: "1-877-kars-4-kids / k-a-r-s kars 4 kids / 1-877-kars-4-kids / donate your car today." The Jingle makes use of the "1-877-KARS-4-KIDS" asserted trademark by expressly stating that asserted trademark in the Jingle. Likewise, the Jingle expressly uses the "Kars 4 Kids" asserted trademark as well. America Can! argues that it is difficult to audibly discern whether the Jingle is stating "cars for kids" or "kars 4 kids," as both sound the same, and therefore will confuse and mislead a jury; however, the Jingle makes clear that it is referring to Kars 4 Kids, and not Cars for Kids, by spelling out "**k**-a-r-s kars 4 kids." (emphasis added). Second, the Court finds the probative value of the Jingle outweighs any prejudice to America Can! under Rule 403, as it shows the extent of the advertising of the asserted trademarks by Kars 4 Kids, which is necessary for determining the ownership of the marks, market penetration, and level of consumer awareness. Regarding America Can!'s concerns with the jury confusing the Jingle for an asserted trademark, such concerns may be addressed by an appropriate limiting instruction, informing the jury that the Jingle itself is not an asserted trademark, rather, the Jingle contains two asserted trademarks. Accordingly, America Can's! motion *in limine* is denied in part and granted in part. Kars 4 Kids may present evidence, refer to, and play the Jingle during the trial; however Kars 4 Kids is precluded from presenting, referring to, or playing the Jingle during jury selection.

**(8)** **America Can!'s Motion *in Limine* Nos. 4 and 5: Excluding Kars 4 Kids' Use of the Marks Prior to 2003 and Excluding Evidence of Assignment of Kars 4 Kids' Marks**

America Can! seeks an order precluding Kars 4 Kids from offering evidence of its asserted trademarks prior to August 3, 2000. America Can! argues that because Kars 4 Kids did not exist as a corporate entity prior to August 3, 2000, it cannot claim a priority of use of the asserted trademarks prior to that date. (Def. br. at 15). America Can! argues that any evidence of use prior to 2000 is use by different corporate entities, and as such is irrelevant. (*Id.*) In another *in limine*

motion, America Can! seeks to exclude evidence that Kars 4 Kids has rights in the asserted trademarks due to an alleged assignment. (*Id.* at 17-18). In response, Kars 4 Kids argues that there was a valid assignment, and it should be allowed to introduce evidence of such an assignment at trial. (Pl. br. at 8).

In asserting a claim for trademark infringement, a party must show that it owns the claimed mark. *A &H Swimwear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000) (citing *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 437 (3d Cir. 2000)). Trademarks may be assigned or transferred, and "following a proper assignment, the assignee steps into the shoes of the assignor." *Premier Dental Prods. Co. v. Darby Dental Supply Co.*, 794 F.2d 850, 853 (3d Cir. 1986). When there is no documentary evidence of an assignment,

> "it may be proven by the clear and uncontradicted oral testimony of a person in a position to have actual knowledge." 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 18:4 (4th ed. 2005). However, courts must be cautious in scenarios that do not involve clear written documents of assignment. "Requiring strong evidence to establish an assignment is appropriate both to prevent parties from using self-serving testimony to gain ownership of trademarks and to give parties incentive to identify expressly the ownership of the marks they employ." *TMT North America, Inc. v. Magic Touch GmbH*, 124 F.3d 876, 884 (7th Cir. 1997).

*Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 822 (3d Cir. 2006).

Here, Kars 4 Kids has presented the affidavit of Rabbi Eliyohu Mintz, the CEO of OKR, which it argues shows evidence of an assignment between the Oorah Kiruv Rechokim Fund ("OKR"), of which Mintz was previously vice president, to Joy for Our Youth, Inc. ("Joy"). Kars 4 Kids alleges that Joy registered the name "Kars 4 Kids" as an alternative name in New Jersey, and then formally changed its name to Kars 4 Kids in 2014. (ECF No. 122, at 5). According to Kars 4 Kids, OKR's mission was to support Jewish children and families. OKR accomplished this mission by acquiring and then later selling automobiles. At some point, OKR assigned or

conveyed the "mission" of OKR to another company, Oorah, Inc., and conveyed or assigned the asserted trademarks to Joy in order to support Oorah, Inc., by acquiring and selling automobiles. In response, America Can! argues that OKR is not the predecessor of Joy and Kars 4 Kids, but instead, is the predecessor to Oorah Inc., a separate corporate entity which would have been assigned the asserted trademarks, and not Kars for Kids. (Pl. reply br. ECF No. 167, at 12).

At oral argument, the parties agreed that taking an additional deposition of Rabbi Eliyohu Mintz would be beneficial for the purposes of exploring the relationship between OKR, Oorah, Inc., Joy, and Kars 4 Kids, and the Court ordered the parties to conduct that deposition. (ECF No. 178).

Thereafter, in a letter dated April 5, 2019, America Can! informed the Court it no longer believed such a deposition was necessary, and instead renewed its argument that Kars 4 Kids should be precluded from offering evidence of any assignment. (ECF No. 181). For the first time, America Can! argued that Kars 4 Kids should be barred from presenting Rabbi Mintz's affidavit based on the "sham affidavit" doctrine. (*Id.* at 1-2). A sham affidavit is an affidavit that "contradicts earlier deposition testimony without a satisfactory or plausible explanation[,]" and a court may disregard a sham affidavit if "it is 'clear' the affidavit was offered 'solely' to defeat summary judgment." *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 391-392 (3d Cir. 2017) (quoting *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007)). America Can!'s arguments appear to be an attempt to reargue issues previously decided on summary judgment. Though America Can! never expressly argued that Rabbi Mintz's affidavit should be disregarded based on the sham affidavit doctrine, it argued that it was "unreliable because statements made are contradicted by other evidence in this case." (Def. br. in opp. to Summary Judgment, ECF No. 124, at 10). However, based on the arguments and evidence presented to the Court, including

Rabbi Mintz's affidavit, the Court concluded summary judgment was not proper as genuine issues of material fact existed regarding surrounding the priority dates of each asserted marks, and when the asserted marks were put into interstate commerce. (*See* Mem. Op., Oct. 25, 2018, ECF No. 142, at 10). For example, upon re-examination of the deposition testimony of Rabbi Mintz, he testified that OKR was the "predecessor organization of Oorah and Joy . . . it sort of . . . moved into . . . Joy and Oorah . . . we closed that organization and we just moved everything into these two." (Dep. Of Rabbi Eliyohu Mintz, ECF No. 118-7, T203:15-205:12). When asked if there was an agreement that memorialized the closing of OKR and the creation of Joy and Oorah, Rabbi Mintz responded, "I don't know. Probably there is. I don't know if there is." (*Id.* at T205:13-17).

Regardless of whether affidavit of Rabbi Mintz is presented at trial, Rabbi Mintz may still testify to its substance, and will be subject to cross-examination; accordingly, Rabbi Mintz's affidavit makes no difference to the Court's analysis. Here, the Court finds Kars 4 Kids' evidence of an assignment relevant to the issues to be tried at trial. The issue of a valid assignment is a question of fact that is more properly presented to a jury, rather than determined as an *in limine* motion. Accordingly, a jury can best determine the credibility of Rabbi Eliyohu Mintz, and determine whether Kars 4 Kids or Oorah, Inc. is the predecessor to OKR, and therefore the holder of a valid assignment. The Court also finds evidence of Kars 4 Kids' use of the "KARS 4 KIDS" and "1-877-KARS-4-KIDS" marks prior to August 3, 2000 relevant, should a jury determine that Kars 4 Kids holds a valid assignment to those trademarks. For these reasons, America Can!'s motions *in limine* are denied and Kars 4 Kids may present evidence of its use of the asserted trademarks prior to August 3, 2000, and of any alleged assignment.

**(9) America Can!'s Motion *in Limine* No. 6:  Excluding Kars 4 Kids Argument that Its Claimed Mark is Famous**

America Can! argues that Kars 4 Kids should be precluded from presenting evidence that its "KARS 4 KIDS" mark and "1-877-KARS-4-KIDS" mark are famous because Kars 4 Kids' secondary meaning expert conceded that the survey demonstrated the asserted trademarks are not famous.  In response, Kars 4 Kids argues that it should not be barred from presenting such evidence, because survey evidence is not the only evidence that may be considered in determining whether a mark is famous.  (Pl. br. at 9).

Kars 4 Kids brought a claim for dilution under N.J.S.A. § 56:3-13 and 15 U.S.C. § 1125(c)(1).  To qualify for protection under dilution law, Kars 4 Kids must show that America Can! used its marks in commerce, those marks are famous, and that America Can!'s use causes dilution of the distinctive quality of the mark.  *See Platypus Wear, Inc. v. Bad Boy Club, Inc.*, No. 08-02662, 2009 WL 2147843, at *3 (D.N.J. July 15, 2009); 15 U.S.C. § 1125(c)(1).  "[A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."  15 U.S.C. § 1125(c)(2)(A). The following factors are relevant in the determination of "whether a mark possesses the requisite degree of recognition":

> (i)  The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
> (ii)  The amount, volume, and geographic extent of sales of goods or services offered under the mark.
> (iii)  The extent of actual recognition of the mark.
> (iv)  Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

*Id.*; *see also* N.J. Stat. § 56:3-13.20 (listing similar factors to consider in determining whether a mark is famous under New Jersey State law). Finally, to achieve the status of "famous," Professor McCarthy suggests that "the mark must be a 'household name' – a name immediately familiar to

very nearly everyone, everywhere in the nation." 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 24:104 (5th ed. 2019).

In arguing that Kars 4 Kids' asserted trademarks are not famous, America Can! points to the deposition testimony of Alex Simonson, Ph.D., Kars 4 Kids' expert. Simonson testified at deposition regarding the results of the survey, and in response to a question about why he chose the specific group of respondents for the survey, the following colloquy occurred:

> A. This was a general population survey . . . the survey could have been used . . . , not just for secondary meaning, but for fame . . . .
> Q. Are you testifying that this survey was also conducted in order to show fame for the plaintiff?
> A. It was conducted in order to be able to extract out fame numbers, were they there, correct.
> Q. Were you able to extract fame numbers?
> A. I didn't think the numbers were sufficient for what I thought I would use for fame.
> Q. What would be a sufficient number for fame?
> A. I don't have a per se number in my head, but very high recognition numbers, typically higher than secondary meaning numbers.

(ECF 154-2, Ex. 2, T63:14 to 64:16).

The results of the survey concluded that the term "KARS 4 KIDS" has reached a secondary meaning level of around forty-one to forty-two percent in the United States. (ECF 154-2, Ex. 1, at 3). According to America Can!, this is far below the seventy-three percent consumer recognition found to establish fame by the Trademark Trial and Appeal Board ("TTAB") in *Nat'l Pork Bd. & Nat'l Pork Producers Council v. Supreme Lobster and Seafood Co.*, 96 U.S.P.Q.2d 1479 (T.T.A.B. 2010). (*See* Pl. br. at 19, 21). However, in *National Pork Board*, the TTAB found the National Pork Board and National Pork Producers Council's mark "THE OTHER WHITE MEAT" famous where it had consumer awareness rates of eighty to eighty-five percent, and rates of correct source recognition at around seventy percent. *Nat'l Pork Bd. & Nat'l Pork Producers Council*, 96 U.S.P.Q.2d at 1479 (collecting cases where fame was found in consumer awareness rates ranging

from seventy-three percent to eighty percent). Regardless of whether a forty-one to forty-two percent secondary meaning level is enough to establish fame, Simonson testified that he was not able to extract any fame numbers from the survey.

The Court concluded summary judgment was not proper as genuine issues of material fact existed regarding whether Kars 4 Kids' asserted marks are famous. (*See* Mem. Op., Oct. 25, 2018, ECF No. 142, at 13-14). Accordingly, the Court finds evidence that Kars 4 Kids' asserted marks are famous is relevant to the issues to be tried at trial, specifically if Kars 4 Kids is entitled to protection under dilution law, and accordingly will permit Kars 4 Kids to present such evidence. Kars 4 Kids has indicated that it intends to present evidence that its asserted marks are famous through several different sources, including: (1) advertisements in the publication *The Jewish Press*, (2) a nationwide mailing list; (3) national advertisements on Yahoo! and Google; (4) advertisements in Reader's Digest; (5) advertisements on billboards; (6) the Kars 4 Kids Jingle on major radio broadcast networks; and (7) advertising on online internet radio and streaming services. (*See* Pl. br. at 9-11). Based on this proffer, the Court will allow Kars 4 Kids to argue that its asserted marks are famous in its opening statements. However, if Kars 4 Kids is unable to prove that its asserted marks are famous, the Court will instruct the jury accordingly. For these reasons, America Can!'s Motion *in Limine* to exclude Kars 4 Kids' argument that its claimed mark is famous is denied.

## ORDER

This matter having come before the Court on Kars 4 Kids, Inc.'s Motions *in limine* (ECF Nos. 150, 152, and 153) and America Can!'s Motions *in limine* (ECF Nos. 154 and 155), and the Court having carefully reviewed and taken into consideration the submissions of the parties, as

well as the arguments and exhibits therein presented, and for good cause shown, and for all of the foregoing reasons,

**IT IS** on this 18th day of April, 2019,

**ORDERED** that Kars 4 Kids, Inc.'s Motion *in limine* to Exclude the Entirety of Bryce R. Cook's Opinion (ECF No. 150) is **GRANTED** in part and denied in part as follows:

1. The motion *in limine* to bar Bryce Cook from testifying as to damages based on hypothetical royalties is **GRANTED**;

2. The motion *in limine* to bar Bryce Cook from testifying as to damages based on corrective advertising is **GRANTED**;

3. The motion *in limine* to bar Bryce Cook from testifying as to damages based on total profits is **DENIED**; and it is further

**ORDERED** that Kars 4 Kids, Inc.'s Motion *in limine* to Exclude Evidence, Testimony, and Argument Regarding Attorneys' General Investigations (ECF No. 152) is **GRANTED** in part and **DENIED** in part as follows:

1. Kars 4 Kids, Inc.'s Motions to exclude press releases issued by the Attorneys Generals of Oregon and Pennsylvania are **GRANTED**;

2. Kars 4 Kids, Inc.'s Motion to exclude The Compliance Review issued by the Minnesota Attorney General is **GRANTED** in part and **DENIED** in part as follows:

   a. The motion *in limine* to bar admission of the Document Request of the Minnesota Attorney General and the Response of Kars 4 Kids is **GRANTED**;

   b. The motion *in limine* to bar admission of the Compliance Review of the Minnesota Attorney General is **DENIED**;

c.  The Court will consider proposed redactions to the Minnesota Compliance Review in accordance with the following briefing schedule:

  i.  Kars 4 Kids may submit proposed redactions and a brief supporting its position no later than **April 23, 2019**;

  ii.  America Can! may submit a brief in opposition to those proposed redactions no later than **April 26, 2019**; and it is further

**ORDERED** that Kars 4 Kids, Inc.'s Motion to Exclude Evidence, Testimony, and Argument regarding America Can!'s Business Registrations (ECF No. 153) is **DENIED**; and it is further

**ORDERED** that America Can!'s Motion to Exclude Kars 4 Kids' Survey Concerning Secondary Meaning and the Corresponding Opinion Testimony of Alex Simonson, Ph.D. (ECF No. 155), is **GRANTED**; and it is further

**ORDERED** that America Can!'s Omnibus Motion in Limine (ECF No. 154) is **DENIED**:

1.  America Can!'s Motion in Limine to Preclude Kars 4 Kids' Argument that the Use of the "TM" Symbol is Required to Reserve its Rights in a Mark is **DENIED**;

2.  America Can!'s Motion in Limine to Exclude Statements that Survey Data is Necessary to Prove Secondary Meaning is **DENIED** as moot;

3.  America Can!'s Motion in Limine to Allow it to Rely on the Secondary Meaning Survey Data is **DENIED** as moot;

4.  America Can!'s Motion in Limine to Exclude the Playing of the "1-877" Jingle is **DENIED**;

5. America Can!'s Motion in Limine to Preclude Kars 4 Kids from Offering Evidence of Use of the Claimed "KARS 4 KIDS" or "1-877-KARS-4-KIDS" mark prior to August 3, 2000, is **DENIED**;

6. America Can!'s Motion in Limine to Exclude Kars 4 Kids' Argument that its Claimed Marks are Famous is **DENIED**.


*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

April 18, 2019