1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW JERSEY
2


3
    _____
4   KARS 4 KIDS, INC.,
                     PLAINTIFF
5
       Vs.                                CIVIL NO.
6                                         14-7770 (PGS)
    AMERICA CAN!,
7                    DEFENDANT            REDACTED VERSION
    _____
8


9


10                              **NOVEMBER 21, 2019**
                                CLARKSON S. FISHER COURTHOUSE
11                              402 EAST STATE STREET
                                TRENTON, NEW JERSEY  08608
12


13


14
    B E F O R E:        THE HONORABLE PETER G. SHERIDAN
15                      U.S. DISTRICT COURT JUDGE
                        DISTRICT OF NEW JERSEY
16


17


18


19
    **HEARING ON DAMAGES**
20


21


22


23
                     FRANCIS J. GABLE, C.C.R.,C.R.R.
24                      OFFICIAL U.S. REPORTER
                         (856) 889-4761
25

1  A P P E A R A N C E S:

2

3       WALSH, PIZZI, O'REILLY, FALANGA, LLP
        BY:  MARC D. HAEFNER, ESQUIRE
        FOR THE PLAINTIFF

4

5       ORRICK, HERRINGTON & SUTCLIFFE, LLP
        BY:  PETER D. VOGL, ESQUIRE
6            DAVID LITTERINE-KAUFMAN, ESQUIRE
             BRIGGS WRIGHT, ESQUIRE
7       FOR THE PLAINTIFF

8

        FOX ROTHSCHILD, LLP
9       BY:  CHRISTOPHER R. KINKADE, ESQUIRE
             ALLISON L. HOLLOWS, ESQUIRE
10      FOR THE DEFENDANT

11

        THE PITTMAN LAW FIRM, PC
12      BY:  AUBREY NICK PITTMAN, ESQUIRE
        FOR THE DEFENDANT

13

14      YANAROS LAW, PC
        BY:  VALERIE YANAROS WILDE, ESQUIRE
15      FOR THE DEFENDANT

16

17

18

19

20

21

22

23

24

25

1                              WITNESS

2

     MALCOLM WENTWORTH                                  11
3    DIRECT EXAMINATION OF MALCOLM WENTWORTH BY MR.     11
     PITTMAN
4    CROSS-EXAMINATION OF MALCOLM WENTWORTH BY MR.      46
     VOGL
5    REDIRECT EXAMINATION OF MALCOLM WENTWORTH BY MR.   56
     PITTMAN
6    RECROSS-EXAMINATION OF MALCOLM WENTWORTH BY MR.    62
     VOGL
7    BRYCE COOK                                         63
     DIRECT EXAMINATION OF BRYCE COOK BY MR. PITTMAN    64
8    CROSS-EXAMINATION OF BRYCE COOK BY MR.             101
     LITTERINE-KAUFMAN
9    REDIRECT EXAMINATION OF BRYCE COOK BY MR. PITTMAN  122
     ESTI LANDAU                                        127
10   DIRECT EXAMINATION OF ESTI LANDAU BY MR. VOGL      127
     CROSS-EXAMINATION OF ESTI LANDAU BY MR. KINKADE    139
11   REDIRECT EXAMINATION OF ESTI LANDAU BY MR. VOGL    152
     DAVID HALL                                         154
12   DIRECT EXAMINATION OF DAVID HALL BY MR.            155
     LITTERINE-KAUFMAN
13   CROSS-EXAMINATION OF DAVID HALL BY MR. PITTMAN     186

14

15

16

17

18

19

20

21

22

23

24

25

1
                         EXHIBITS
2

3    Defense Exhibit ACCFK-438 was marked into          15
     evidence
4    Defense Exhibit ACCFK-439 was marked into          16
     evidence
5    Defense Exhibit ACCFK-440 was marked into          17
     evidence
6    Defense Exhibit ACCFK-441 was marked into          19
     evidence
7    Defense Exhibit ACCFK-442 was marked into          23
     evidence
8    Defense Exhibit ACCFK-449 was marked into          24
     evidence
9    Defense Exhibit ACCFK-443 was marked into          32
     evidence
10   Defense Exhibit ACCFK-444 was marked into          35
     evidence
11   Defense Exhibit ACCFK-445 was marked into          37
     evidence
12   Defense Exhibit ACCFK-446 was marked into          65
     evidence
13   Defense Exhibit ACCFK-447 was marked into          76
     evidence
14   Defense Exhibit ACCFK-448 was marked into          100
     evidence
15   Plaintiff Exhibit K4K-500 was marked into          133
     evidence
16   Plaintiff Exhibit k4k-111 was marked into          155
     evidence
17   Plaintiff Exhibit K4KDX-507 was marked into        169
     evidence
18   Plaintiff Exhibit K4KDX-508 was marked into        173
     evidence
19   Plaintiff Exhibit K4KDX-509 was marked into        176
     evidence
20   Plaintiff Exhibit K4KDX-513 was marked into        178
     evidence
21   Plaintiff Exhibit K4KDX-523 was marked into        185
     evidence
22

23

24

25

| | | |
|---|---|---|
| | 1 | THE COURT:  Good morning. |
| | 2 | (Counsel say good morning.) |
| | 3 | THE COURT:  Please be seated. |
| | 4 | So, are the parties ready to go? |
| 00:00 | 5 | MR. VOGL:  Yes, your Honor. |
| | 6 | THE COURT:  All right.  So we had a brief |
| | 7 | conversation in my chambers, and we're going to hear testimony |
| | 8 | first.  We agreed that Cars For Kids with a C will proceed |
| | 9 | initially and present their witnesses, and then we'd go into |
| 00:00 | 10 | Kars 4 Kids with a K after that. |
| | 11 | Do you agree with that, Mr. Pittman? |
| | 12 | MR. PITTMAN:  Yes, your Honor. |
| | 13 | THE COURT:  Okay.  So we're ready to go. |
| | 14 | MR. VOGL:  The only request, your Honor, may I make |
| 00:00 | 15 | a record of my objection to certain of the testimony that may |
| | 16 | be given in this case? |
| | 17 | THE COURT:  You may. |
| | 18 | MR. VOGL:  Thank you, your Honor. |
| | 19 | Thank you, and good morning, your Honor.  As your |
| 00:00 | 20 | Honor knows, the parties have exchanged witness lists for |
| | 21 | today's proceedings.  In the witness list that America Can! |
| | 22 | provided to us they identified a fact witness, Mr. Wentworth. |
| | 23 | And in addition to identifying Mr. Wentworth they gave us some |
| | 24 | general categories that he either will or may testify on.  And |
| 00:01 | 25 | with respect to may testify, they identified that he may also |

1   provide testimony regarding corrective advertising, and a

2   hypothetical reasonable royalty.

3          And your Honor is -- it is our position that both of

4   those types of damages are compensatory damages, they are not

00:01   5   equitable.  And indeed your Honor has previously ruled that

6   corrective advertising is not going to be a part of this

7   proceeding.

8          Your Honor also has ruled that their expert witness

9   could not testify as to reasonable royalty; there has been no

00:01   10   disclosure of a reasonable royalty calculus that they are

11   intending to present today.  It's not presented in their

12   pretrial order.  And as the *Bornstein* case here in the Third

13   Circuit indicates, you need to identify all types of damages

14   that you're seeking in this case, and reasonable royalty is

00:02   15   not disclosed.

16          So we would ask your Honor not to allow Mr.

17   Wentworth to testify as to either corrective advertising and

18   hypothetical reasonable royalty, as your Honor has already

19   decided both of those issues in our favor.  Thank you, your

00:02   20   Honor.

21          THE COURT:  So, if I can just follow up with you for

22   a second --

23          MR. VOGL:  Sure.

24          THE COURT:  If I recall the law correct, you can

00:02   25   seek corrective advertising and a royalty, but then if you

1   attempt to use that as your measure of damages, then you're

2   not entitled to loss of profits; right?

3        MR. VOGL:  Not entitled to disgorgement of profits,

4   correct.

00:03   5        THE COURT:  And what I had ruled back in May I guess

6   it was, was that what we were looking at was loss of profits;

7   right?

8        MR. VOGL:  Disgorgement of our profits, yes.

9        THE COURT:  Disgorgement of your profits --

00:03   10        MR. VOGL:  Correct, your Honor.

11        THE COURT:  Thank you for correcting me there.

12        MR. VOGL:  Yes.

13        THE COURT:  So the only issue that I really have

14   left is the disgorgement of profits; right?

00:03   15        MR. VOGL:  That is correct, your Honor.

16        THE COURT:  And do you disagree with that, Mr.

17   Pittman?

18        MR. PITTMAN:  Yes, your Honor.

19        THE COURT:  Okay.  Why don't you tell me why.

00:03   20        MR. PITTMAN:  Your Honor, I'll take them separately.

21   The law allows -- in addition to disgorgement of profits, the

22   law also allows corrective advertising, which is a form of

23   damages.  And the statute 15 U.S.C. Section 1117 is clear that

24   it allows:  Number (1), defendant's profits, (2), any damages

00:04   25   sustained by the plaintiff, and (3) cost of the action.

1           So the statute itself provides that in addition to

2    the disgorgement of profits any other damages that were

3    sustained by the plaintiff, in this case those would be

4    corrective advertising damages that America Can! Cars For Kids

00:04   5    would have to pay to repair the reputation that has been

6    damaged by K4K in Texas.  So those are -- that's in addition

7    to -- the corrective advertising rather is in addition to the

8    disgorgement of defendant's profits.

9           As to the reasonable royalties, the reasonable

00:04   10   royalties can be a substitute for defendant's profits.  So

11   that the Court in equity, if the Court decides that the --

12   that it would rather take the reasonable royalty assessment as

13   opposed to -- so you can do either/or; it wouldn't be

14   disgorgement of profits plus reasonable royalties, you can

00:05   15   take -- if your Honor's satisfied with the evidence of

16   disgorgement, because we have two experts, if your Honor's

17   satisfied with that, then your Honor can just take the

18   disgorgement of profit number that our expert and their expert

19   calculates.

00:05   20          On the other hand, if the Court believes that the --

21   there's some issues with some of the expenses they're trying

22   to deduct or some other uncertainties about that number, then

23   the Court can do the reasonable royalties as an alternative to

24   the disgorgement.  So you wouldn't get both of them, your

00:05   25   Honor, you would get --

*United States District Court*
*Trenton, New Jersey*

1          THE COURT:  Didn't I already make this decision

2    earlier that this case was about the disgorgement of profits?

3    And the reason we didn't have it presented to the jury was

4    because it required an accounting type of situation.  So, I

00:06    5    thought that was a decision that the Court had to make.

6          So, I've already decided the issue; I don't see why

7    I should redo that decision.

8          MR. PITTMAN:  Thank you, your Honor.

9          THE COURT:  All right.  So then with regard to

00:06   10   reasonable royalties, I don't see why that's germane to this

11   hearing.  And I suppose I would put corrective advertising in

12   the same realm.  So, I don't see why that's reasonable or

13   germane to this proceeding as well as evidence.  So I would

14   deny -- in accepting the testimony today, we should just be

00:07   15   focused on the loss of profits.

16          MR. PITTMAN:  Thank you, your Honor.

17          MR. VOGL:  Thank you, your Honor.

18          THE COURT:  So I can tell you what I said

19   previously, in part anyway.  When I previously ruled I

00:07   20   indicated:  An accounting of the infringer's profits is

21   available if the defendant is unjustly enriched, if the

22   plaintiff sustained damages or if an accounting is necessary

23   to deter infringement.  And that's *Banjo Buddies*, 399 F.3d

24   168, 178 (3d. Cir. 2005).

00:07   25          An award of the trademark infringer's profits

1    originated in the law as a way of compensating the plaintiff

2    for sales lost to the infringer, when the parties are in

3    competition with each other.  That's 3 McCarthy On Trademarks

4    And Unfair Competition, Section 30:59, 5th Edition, 2019.

00:08    5           In situations where parties compete, it is not

6    appropriate to award both plaintiff's damages and defendant's

7    profits, because defendant's profits are an attempt to measure

8    a plaintiff's actual loss.  That comes from 3 McCarthy On

9    Trademarks, Section 30:73, 5th Edition again, 2019.

00:08    10          Moreover, damages and profits cannot be awarded

11   simultaneously if it would result in overcompensation; where

12   the parties directly compete overcompensation may result if

13   plaintiff seeks both damages for lost profits on sales

14   diverted to the infringer, and the profits made on those sales

00:09    15   by the infringer.

16          And that ruling was on May 9th, 2019.

17          So, I've already gone through those two issues.  And

18   it seems to me what they're trying to prevent here is a double

19   recovery by Cars For Kids with a C.  So, what I ruled was

00:09    20   based on all the evidence that I had at the time in May,

21   before we began the trial; that the damages would be resolved

22   by calculating the disgorgement of Kars 4 Kids profits.  Thank

23   you.

24          Mr. Pittman, you may proceed.

00:10    25          MR. PITTMAN:  Your Honor, America Can! Cars For Kids

1    calls Malcolm Wentworth.

2            THE COURT:  Okay.  Mr. Wentworth.

3            THE COURT:  Although he was sworn during testimony,

4    Dolores, we should re-swear the witness.

00:10   5            (MALCOLM WENTWORTH), sworn

6            THE DEPUTY CLERK:  State your name for the record.

7            THE WITNESS:  Malcolm Wentworth.

8            THE COURT:  You may be seated.  Good morning, Mr.

9    Wentworth.

00:10   10            THE WITNESS:  Good morning, your Honor.

11            MR. PITTMAN:  May I approach the witness with a

12    notebook?

13            THE COURT:  You may.

14            (Handing to witness.)

00:10   15    (DIRECT EXAMINATION OF MALCOLM WENTWORTH BY MR. PITTMAN:)

16    Q.  Sir, can you reintroduce yourself to the judge and tell

17    him what you do for a living?

18    A.  My name is Malcolm Wentworth, I am the chief operating

19    officer for America Can! Cars For Kids.

00:11   20    Q.  You're here in your role as corporate representative for

21    America Can! Cars For Kids?

22    A.  Yes, sir.

23    Q.  Can you give us a sense of what you've done to prepare

24    yourself to testify today?

00:11   25    A.  I have gone over all of the material; talked with prior

Wentworth - Direct - Pittman

1    employees, current employees; and reread all of the testimony

2    and have looked at a lot of documents.

3    Q.   Have you reviewed business records from America Can! Cars

4    For Kids over the years?

00:12    5    A.   Yes, sir.

6    Q.   Now, let me ask you about some of the requests that

7    America Can! Cars For Kids and America Can! are making today.

8    One of the things that y'all are asking the judge for is

9    injunctive relief; is that right?

00:12    10    A.   Yes, sir.

11    Q.   From a factual standpoint as an officer of the

12    organization, why is America Can! Cars For Kids requesting

13    injunctive relief?

14    A.   Primarily so we don't have to do this again.  If they can

00:12    15    continue to use our name throughout the State of Texas, then

16    they will continue to cause potential donors to be misled,

17    confused, and we will have to do this all over again.

18    Q.   Now, during the liability phase of the trial both sides

19    presented evidence with which there was argument that it was

00:13    20    likelihood of confusion and actual confusion.  Do you recall

21    generally that testimony?

22    A.   Yes, sir.

23    Q.   Have any of those kinds of acts or kinds of instances

24    continued since the trial?

00:13    25    A.   Yes, sir.

*United States District Court*
*Trenton, New Jersey*

Wentworth - Direct - Pittman

 1  Q.  And does America Can! Cars For Kids have any concern

 2  whether these types of acts of confusion will continue?

 3  A.  Yes, sir, they will continue.

 4  Q.  Now, since the jury verdict has America Can! Cars For

 5  Kids seen any advertisings in Texas from Kars 4 Kids or K4K?

 6  A.  Yes, sir.

 7  Q.  Let me ask you to take a look at what's marked as America

 8  Can! Cars For Kids Exhibit 438.

 9          THE COURT:  How did we mark documents during the

10  trial, Mr. Pittman, your documents?

11          MR. PITTMAN:  Your Honor, the documents were

12  premarked, we were instructed at the last trial to premark

13  them prior to trial, to give them a -- to give them a number.

14          THE COURT:  So we used ACCFK?

15          MR. PITTMAN:  Correct, your Honor.

16          THE COURT:  Okay, thank you.

17  Q.  Can you identify Exhibit 438?

18  A.  Yes, sir.  It is a screen shot of a Google search in

19  Texas.

20          MR. PITTMAN:  Your Honor, America Can! Cars For Kids

21  offers ACCFK Exhibit 438 in evidence.

22          THE COURT:  Any objections?

23          MR. VOGL:  Your Honor, I don't know who did this

24  screen search, so I would object until we get to that.

25          THE COURT:  All right.  So you think Mr. Pittman

00:13
00:14
00:14
00:14
00:15

*14*

Wentworth - Direct - Pittman

1    needs more foundation.

2              MR. VOGL:  Yes, your Honor.

3              THE COURT:  So Mr. Pittman, if you would continue

4    with that.

00:15    5    BY MR. PITTMAN:

6    Q.   Mr. Wentworth, during the course of time after the jury

7    verdict, have you and your employees made various searches on

8    engines like Google.

9    A.   Yes, sir.

00:15    10   Q.   And during that time did you personally take screen shots

11   of various items that were on Google and Fox News and other

12   items?

13   A.   Yes, sir, and I sent them to you.

14   Q.   And is Exhibit 438 one of those items that y'all searched

00:15    15   and found the Kars 4 Kids information?

16   A.   Yes, sir, with the local Kars 4 Kids 877 -- or excuse me;

17   yes, sir.

18             THE COURT:  When did you take that screen shot, Mr.

19   Wentworth?

00:16    20             THE WITNESS:  Sir, I took probably 50 of them over

21   the course of the end of the trial, through two days ago, sir.

22   Q.   Sir, if you look at the bottom of the screen shot on

23   Exhibit 438, do you see the date there?

24   A.   Yes, sir, September 10th.

00:16    25   Q.   2019?

Wentworth - Direct - Pittman

1   A.   Yes, sir.  Sorry.

2              MR. PITTMAN:  Your Honor, move into evidence Exhibit

3   438.

4              MR. VOGL:  I maintain my objection, your Honor.  We

00:16   5   still don't know if Mr. Wentworth actually did this.  We heard

6   that someone, either he or his team did it.  I'd like to know

7   that Mr. Wentworth did it so he can testify as to this

8   document specifically.

9              THE COURT:  Can you just ask him that question?

00:16   10              MR. PITTMAN:  Yes.

11   BY MR. PITTMAN:

12   Q.   Sir, is this one of the Google searches you did?

13   A.   Yes, sir.

14              MR. PITTMAN:  Your Honor, move for admission of

00:16   15   Exhibit 438.

16              MR. VOGL:  No objection.

17              THE COURT:  All right, admitted.

18              (Defense Exhibit ACCFK-438 was marked into

19   evidence.)

00:17   20   BY MR. PITTMAN:

21   Q.   Sir, did you see other ads after the jury verdict?

22   A.   Yes, sir.

23   Q.   Take a look at what's marked as ACCFK-439.

24   A.   Yes, sir.

00:17   25   Q.   And what is ACCFK-439?

Wentworth - Direct - Pittman

1 A.   It is a screen shot of banner ads for Kars 4 Kids with a

2 K.

3 Q.   And this is a banner add that was found where?

4 A.   On a cellphone.

00:17   5 Q.   And it was on a search for what?

6 A.   This was just GuideLive, sir.

7        MR. PITTMAN:  Your Honor, move for admission of

8 ACCFK-439.

9        THE COURT:  Any objections, Mr. Vogl?

00:17   10        MR. VOGL:  No objection.

11        THE COURT:  Okay, admitted.

12        (Defense Exhibit ACCFK-439 was marked into

13 evidence.)

14 Q.   Sir, take a look now at what's marked as ACCFK Exhibit

00:18   15 440.

16 A.   Yes, sir.

17 Q.   And what is Exhibit 440?

18 A.   It is a screen shot of again showing Kars 4 Kids banner

19 ads for Weather.com.

00:18   20 Q.   And it's a search that was done of Weather.com in what

21 area?

22 A.   In the DFW area, specifically for Arlington.

23 Q.   Can you look at the screen shot and tell the Court when

24 this ad appeared?

00:18   25 A.   14 November 2019.

Wentworth - Direct - Pittman

1  Q.   Just about a week ago?

2  A.   Yes, sir.

3        MR. PITTMAN:  Your Honor, move for admission of

4  ACCFK-440.

00:18  5        MR. VOGL:  Again, your Honor, I would ask that the

6  witness clarify whether he did this particular screen shot or

7  whether someone on his team did it.

8  BY MR. PITTMAN:

9  Q.   Mr. Wentworth, is this one of the screen shots you

00:19  10  provided?

11  A.   I do believe so.  I sent you so many, this one in

12  particular I do believe so.

13        MR. PITTMAN:  Your Honor, move for admission of

14  Exhibit 440.

00:19  15        MR. VOGL:  It really doesn't answer my question,

16  your Honor.  He provided it, but who did it.

17        THE COURT:  All right, admitted.

18        Someone on your staff did it; right, Mr. Wentworth?

19        THE WITNESS:  Yes, sir.

00:19  20        THE COURT:  Okay.  It's admitted.

21        (Defense Exhibit ACCFK-440 was marked into

22  evidence.)

23  BY MR. PITTMAN:

24  Q.   Now, Mr. Wentworth, in looking at the ad that's on 440

00:19  25  that appeared in Arlington, Texas, what does K4K say about --

1  about where they can take ads -- I'm sorry; where they can

2  receive donations of automobiles?

3  A.  Nationwide, sir.

4  Q.  And nationwide, in your opinion does that include Texas?

00:19  5  A.  Specifically Texas, because it's shown in Texas.

6  Q.  So the way you look at this in terms of why you're

7  requesting the injunction, do you look at this Exhibit 440 to

8  say that Kars 4 Kids is still accepting nationwide donations?

9  A.  Yes, sir.

00:20  10  Q.  Now, take a look at now what I've marked as ACCFK Exhibit

11  449.

12  A.  I do not have a 449.  My ends in 445.

13  Q.  Well, let me ask you then -- let me move to 441.

14  A.  But I can see 449?

00:20  15          THE COURT:  Can you take 449 down please?

16  A.  What number was that again please?

17  Q.  441?

18  A.  Got it.

19  Q.  And can you identify Exhibit 441?

00:21  20  A.  Yes, sir.

21  Q.  And what is it?

22  A.  It is a home page for FoxNews.com.

23  Q.  And can you tell the Court whether Exhibit 441 is a

24  search you did or an ad that appeared on there from a search

00:21  25  you did?

Wentworth - Direct - Pittman

1  A.   It's not a search, it's one of my home buttons, it's the

2  home page to Fox News.  So it wasn't a search on anything

3  other than the FoxNews.com.

4  Q.   So it's --

5  A.   It's their front main webpage.

6  Q.   So Fox News is something you've got on your desktop?

7  A.   Yes, sir.

8  Q.   And is that shown in the lines here of the different

9  things you have?

10  A.   Yes, sir.

11  Q.   And so this is an ad that appeared on your computer as

12  you were looking for Fox News?

13  A.   Yes, sir.

14        MR. PITTMAN:  I move for admission of ACCFK-441.

15        THE COURT:  Any objection?

16        MR. VOGL:  No objection.

17        THE COURT:  Okay, admitted.

18        (Defense Exhibit ACCFK-441 was marked into

19  evidence.)

20  BY MR. PITTMAN:

21  Q.   Now, sir, since the jury verdict have you seen or heard

22  of instances of K4K possibly continuing to actually receive

23  donations in Texas?

24  A.   Yes, sir.

25  Q.   Such as what?

Wentworth - Direct - Pittman

1   A.   Such as my executive director called them --

2              MR. VOGL:  Objection, your Honor; hearsay.

3              THE COURT:  Frank, can you just repeat that answer?

4              (Answer read back by the reporter.)

00:23   5              THE COURT:  Do you wish to respond to that

6   objection?

7              MR. PITTMAN:  Yes, your Honor.  It's not offered for

8   the truth, it's offered for the effect.  The effect of that

9   call is that -- as this witness will testify, is that she

00:23   10  received a call back from K4K, and that would be an admission,

11  it wouldn't be hearsay.

12             THE COURT:  I don't know about that.  Okay,

13  sustained.  Next question.

14  BY MR. PITTMAN:

00:23   15  Q.   Sir, did there come a time when someone from K4K

16  contacted someone from America Can! Cars For Kids?

17  A.   To pick up a vehicle --

18             MR. VOGL:  Same objection, your Honor.

19             THE COURT:  Wait; you can't complete the question

00:23   20  for your attorney, Mr. Wentworth.

21             So, Mr. Pittman, can you restate the question?

22  Q.   Sir, did there come a time on September 21st, 2019, at

23  3:30 p.m., where someone from K4K called one of your directors

24  on her cellphone?

00:24   25             MR. VOGL:  Objection, your Honor; hearsay.

*United States District Court*
*Trenton, New Jersey*

1          THE COURT:  No, it didn't ask that, he just said if

2    there was a communication.  He can answer that question.

3          MR. VOGL:  Okay.

4    A.  Yes, sir.

5    Q.  I'm going to ask you to now take a look at ACCFK Exhibit

6    442.

7    A.  Yes, sir.

8    Q.  And what is Exhibit 442?

9    A.  It is a screen shot of my executive director's cellphone.

10          MR. PITTMAN:  Your Honor, move for admission of

11    ACCFK-442.

12          THE COURT:  Well, I think you need more foundation.

13    Q.  Sir, in looking at Exhibit 442, there's a telephone

14    number on there where the call -- where the call originated?

15    A.  Yes, sir.

16    Q.  Do you see that?  And whose telephone number is that,

17    sir?

18    A.  That is coming from Kars 4 Kids with a K call center.

19    Q.  And how do you know that this number is their call

20    center?

21    A.  Because they identified themselves as Kars 4 Kids.

22          MR. VOGL:  Objection, your Honor; this is the

23    hearsay that we asked the Court exclude.

24          THE COURT:  All right.

25          MR. PITTMAN:  Your Honor, it's an admission if it's

Wentworth - Direct - Pittman

1    -- if it's K4K saying that we're K4K, that's not hearsay.

2    That's a classic admission, your Honor.

3              MR. VOGL:  He didn't hear it, your Honor.

4              THE WITNESS:  I did hear it.

5              THE COURT:  Hold on, Mr. Wentworth, please.

6              THE WITNESS:  I'm sorry.

7              THE COURT:  I didn't hear you, Mr. Vogl.

8              MR. VOGL:  I'm sorry, your Honor.  I said the point

9    is, your Honor, that this particular phone number and this

10   particular phone is not Mr. Wentworth's phone.  And this

11   particular phone number, whatever it is, he only knows it

12   because he's allegedly spoken to somebody who told him that

13   this call came in.

14             THE COURT:  Okay.  So Mr. Pittman, can you ask Mr.

15   Wentworth if he knows or knew of Kars 4 Kids' phone number?

16             MR. PITTMAN:  Yes.

17             THE COURT:  And I suppose what I need to do, I'm

18   looking at this screen shot as I would look at a photo; so,

19   you know, Mr. Wentworth would have to testify this is what he

20   saw at the time.

21             MR. PITTMAN:  Correct.

22             THE COURT:  So you haven't laid that foundation.

23   BY MR. PITTMAN:

24   Q.   Mr. Wentworth, how did you come about receiving this

25   screen shot?

Wentworth - Direct - Pittman

1    A.    Because I listened to the phone call and after it was

2    over I called you and said --

3    Q.    Don't talk about attorney/client communication.

4    A.    Okay.  And then we took a snapshot.  She sent it to me

00:26    5    and I sent it to you, but I listened to the call on speaker

6    phone.

7    Q.    So can you tell the Court whether the Exhibit 442, the

8    732 number, was a phone call that was made by someone who

9    represented that they were from K4K?

00:27    10   A.    Yes, sir.

11              MR. PITTMAN:  I move for admission of Exhibit 442.

12              THE COURT:  Do you object, Mr. Vogl?

13              MR. VOGL:  No objection.

14              THE COURT:  All right, admitted.

00:27    15              (Defense Exhibit ACCFK-442 was marked into

16   evidence.)

17   BY MR. PITTMAN:

18   Q.    Sir, earlier we were looking for Exhibit 449 --

19              MR. PITTMAN:  May I approach, your Honor?

00:27    20              THE COURT:  You may.  Did you show it to your

21   adversary?

22              MR. PITTMAN:  Yes.  We already sent them these

23   yesterday, but I'll give him another copy.

24              MR. VOGL:  Thank you.

00:27    25              (Handing to witness.)

Wentworth - Direct - Pittman

1    BY MR. PITTMAN:

2    Q.   I'm now showing you what's been marked as Exhibit 449.

3    Can you identify Exhibit 449?

4    A.   Yes, sir, it is a screen shot from the Star-Telegram.com,

00:27   5    the digital website.

6    Q.   And Exhibit 449, is that similar to the other documents

7    we've discussed that were obtained by you or your people?

8    A.   Yes, sir.

9           MR. PITTMAN:  Your Honor, move for admission of

00:28   10    Exhibit 449.

11           MR. VOGL:  No objection.

12           THE COURT:  All right, admitted.

13           (Defense Exhibit ACCFK-449 was marked into

14    evidence.)

00:28   15    BY MR. PITTMAN:

16    Q.   And sir, what is the Fort Worth Star-Telegram?

17    A.   That is the Fort Worth and surrounding areas' digital

18    newspaper.

19    Q.   So is it your understanding that there was a search on a

00:28   20    Fort Worth Star Telegram and this Kars 4 Kids ad appeared?

21    A.   I don't believe it was a search, it was just reviewing

22    different articles that were on it that led up to these pop-up

23    banners.  So it wasn't a search for anything specific, it was

24    from their just links on their webpage.

00:28   25    Q.   So it wasn't -- the computer where this appeared, there

*United States District Court*
*Trenton, New Jersey*

Wentworth - Direct - Pittman

1    wasn't necessarily a search done for cars.

2    A.    Correct.

3    Q.    Is this what's called a pop-up ad?

4    A.    Pop-up banner ad, yes, sir.

00:29    5    Q.    Now, sir, one of the things that we're asking the Court

6    for is money damages, and we're also asking for an injunction.

7    Do you have an opinion whether future money damages would be

8    satisfactory, or would that be an injunction that you're

9    requesting?

00:29    10    MR. VOGL:  Your Honor --

11    THE COURT:  Well, I don't understand the question,

12    so it's sustained.  Next question.

13    Q.    Sir, in terms of your reasons for wanting an injunction,

14    we've just looked at a number of ads that have continued since

00:29    15    the jury verdict; does America Can! Cars For Kids have an

16    opinion as to whether or not you believe an injunction is

17    necessary to prevent further ads like the ones we've just

18    looked at?

19    A.    Yes, sir.  Or we'll be back here again.

00:30    20    Q.    Now, let me ask you about the reputation and goodwill of

21    America Can! Cars For Kids.  What kinds of things has America

22    Can! Cars For Kids done over the years in Texas to establish

23    your reputation and goodwill?

24    A.    We have provided students with a multitude of items from

00:30    25    clothing to housing; to help them on their way to schools; in

Wentworth - Direct - Pittman

1  the community our reputation is one excellence.  We've been a

2  staple throughout Texas for our prowess, for 2019 Nonprofit of

3  the Year by the Dallas Business Journal; the accolades and

4  recognition we get, our CFO was awarded CFO of the year.  This

00:31    5  tarnishes and would continue to tarnish our name as well as

6  financially hurt us.

7  Q.   So, what effect do you believe if the Court doesn't grant

8  an injunction, what effect do you think it would have on the

9  ability of America Can! Cars For Kids to sort of manage its

00:31    10  own reputation and goodwill?

11  A.   We would always have to continue to separate ourselves

12  from Kars 4 Kids with a K.  Issues that, you know, somebody

13  possibly laugh about it, the Jimmy Fallon issue, the Bill

14  O'Reilly, when they make fun of the jungle, and then we go

00:32    15  places and people, oh yeah, I know you; and to have us

16  continually have to say no, we're not them.

17     We don't have the attorney generals coming down our

18  back and we have to defend ourselves; no, that's not us.  When

19  we go the National Automotive Conference and we wear our badge

00:32    20  Cars For Kids, every year they say oh, we know who you are; no

21  that's not us.  It would just continue.

22     MR. PITTMAN:  Your Honor, may I approach the

23  witness?

24     THE COURT:  You may.

00:32    25     (Handing to witness.)

Wentworth - Direct - Pittman

1          THE COURT:  Did you show that document to your

2     adversary?

3          MR. PITTMAN:  Your Honor, it's a copy of an exhibit

4     of theirs that they gave us yesterday.

00:33     5          THE COURT:  So he still needs to know what you're

6     looking at.

7          MR. PITTMAN:  Yes.

8          (Showing to counsel.)

9     Q.   Sir, can you take a look at what's marked as K4K Exhibit

00:33    10    502?

11    A.   Yes, sir.

12    Q.   And what is it?

13    A.   It appears to be a Kars 4 Kids landing page, Kars 4 Kids

14    with a K, telling how their program works in Texas.

00:33    15    Q.   Their program works where?

16    A.   It says in TX, Texas.

17    Q.   And where does it say in the K4K ad that you're looking

18    at that's Exhibit 502, where does it say K4K picks up

19    vehicles?

00:33    20    A.   Nationwide.

21    Q.   And can you turn over to the next page?

22    A.   Yes, sir.

23    Q.   Does this say -- does it indicate on this K4K webpage

24    where K4K picks up cars in Texas?

00:34    25    A.   Everywhere.

Wentworth - Direct - Pittman

1  Q.   It names dozens of cities; is that correct?

2  A.   Yes, sir, Abilene, Abloy, Dallas, Big Sandy, probably a

3  hundred of them.

4  Q.   And is that continued on the third page?

5  A.   Yes, sir.

6  Q.   Now, at the top of page 1 of Exhibit 502, do you see

7  there there's something at the very top, it's in probably the

8  smallest print on the page?

9  A.   Yes, sir.

10  Q.   Do you see that?

11  A.   Yes, sir.

12  Q.   What does that say?

13  A.   We are not currently accepting donations in Texas.

14  Q.   Now, sir, let's assume that that's true, let's assume

15  that Kars 4 Kids says that they can't pick up cars in Texas,

16  but they continue to advertise like they're doing on Exhibit

17  502 and some of the other advertisements we've seen; if they

18  continue to advertise in Texas but can't pick up cars in

19  Texas, how would America Can! Cars For Kids be hurt if at all?

20  A.   Sir, it's the same premise now is when our donors look

21  for us and accidently click on their paid advertisement, it's

22  going to see and show oh, we can't pick up in Texas; so my

23  donors are going to think are these guys idiots or what.

24  Because you're paying an ad, it runs across all of the

25  Internet in Texas, and yet you can't pick up in Texas.

Wentworth - Direct - Pittman

1          So ultimately they are either going to give to Kars 4

2    Kids with a K, or they're going to be frustrated and not give

3    to me and find somebody else that is in Texas.

4    Q.   So you mean whether Kars 4 Kids picks up in Texas or not,

5    the fact that they are just advertising in Texas, that affects

6    you?

7    A.   If they advertise in Texas and we know there's been

8    confusion and there will be continued confusion, when our

9    donors go to their website and if they were to have it big as,

10   you know, the largest font there, oh, well we can't pick up in

11   Texas; so they're going to end up looking for somebody else

12   that is not Cars For Kids with a C.

13   Q.   Let me ask you now to take a look at America Can! Cars

14   For Kids Exhibit 421.

15   A.   Yes, sir.  421.  Yes, sir.

16   Q.   And what is Exhibit 421?

17   A.   421 is a landing page for Kars 4 Kids with a K to donate

18   your car.

19   Q.   And you heard during the liability trial that this was a

20   page that was being used by K4K?

21   A.   Yes, sir.

22   Q.   And at some point after the jury verdict did you find

23   out -- or what did you find out about this website?

24   A.   That it has my Cars For Kids with a C throughout.

25   Q.   And in terms of the website itself, did you find out it

Wentworth - Direct - Pittman

1   was parked?

2   A.   Yes, sir.

3   Q.   And can you explain what that means that a website is

4   parked or a URL is parked?

00:37   5   A.   It's not being redirected to a live webpage.  If anybody

6   goes there it will just show website is not currently active.

7   Q.   And at some point after that dotcom was parked, what if

8   anything did you notice about donations to America Can! Cars

9   For Kids?

00:38   10   A.   Our donations in specifically Dallas and Houston, picked

11   up significantly.

12   Q.   And what did you think this meant as it relates to this

13   dotcom that K4K was using?

14   A.   Well, it can only mean one thing --

00:38   15        MR. VOGL:  Your Honor, objection; calls for

16   speculation.

17        THE COURT:  I'll allow the witness to testify.

18   A.   It can only mean one thing because we did not change

19   anything --

00:38   20        THE COURT:  I should clarify that; I'll allow him to

21   testify as to the impact it had on Cars For Kids with a C.

22        MR. PITTMAN:  Correct.

23   BY MR. PITTMAN:

24   Q.   So what impact did it have on America Can! Cars For Kids

00:39   25   donations in Texas?

Wentworth - Direct - Pittman

1    A.   Our car donation numbers increased significantly.

2    Q.   Now, what if anything did America Can! Cars For Kids do

3    to investigate whether this impact on your donations was a

4    result of the parking of the URL?

5    A.   Because we did not change any advertising, the only thing

6    that was different was the Cars For Kids with a C dotcom was

7    parked.  So donors were able to find us on dotorg, versus

8    going directly to Kars 4 Kids with a K.

9    Q.   And did you ask your expert, Mr. Cook, to take a look at

10   it to do an analysis of that?

11   A.   I did, sir.

12   Q.   I ask you to take a look at what's marked as America Can!

13   Cars For Kids Exhibit 443.  Can you identify Exhibit 443?

14   A.   Yes, sir.  It is a spreadsheet that I am responsible for

15   to track comparison and comparative years of donations by

16   different areas.

17   Q.   And were the documents from which this Exhibit 443 was

18   compiled made and kept in the regular course of business at

19   America Can! Cars For Kids?

20   A.   Yes, sir.

21   Q.   And were the documents kept by your organization as part

22   of its regular practice?

23   A.   Yes, sir.

24   Q.   Were the documents prepared by your organization at or

25   near a time of the events in the document?

Wentworth - Direct - Pittman

1  A.   Yes, sir.

2  Q.   And do you have knowledge of the events recorded in

3  Exhibit 443?

4  A.   Yes, sir.

5        MR. PITTMAN:  Your Honor, we offer into evidence

6  ACCFK Exhibit 443.

7        MR. VOGL:  No objection, your Honor.

8        THE COURT:  All right, admitted.

9        (Defense Exhibit ACCFK-443 was marked into

10  evidence.)

11  BY MR. PITTMAN:

12  Q.   And sir, did you provide this information to Mr. Cook?

13  A.   I did, sir.

14  Q.   By the way, what percentage would you say America Can!

15  Cars For Kids receives donations through their URL, the

16  dotorg?

17  A.   It's approximately 40 percent, but I use that loosely,

18  because people still go to the website and call in.  So, I

19  believe that number is significantly more, but I can tell you

20  factually that 40 percent send us an online from our website

21  directly, but they also go and get our phone number.

22        I don't know how many people remember a phone number

23  from listening to it or seeing it on TV; if you're driving in

24  your car you're not writing it down, so I believe that number

25  to be significantly more, but there's no way to quantitatively

Wentworth - Direct - Pittman

1    validate that.

2    Q.   Now, you testified a moment ago that this -- that the

3    CarsForKids.com URL is not currently being used, it's being

4    parked; can you -- the URL that America Can! Cars For Kids

00:42   5    uses is what?

6    A.   That we use?

7    Q.   Yes, sir.

8    A.   It's www C-a-r-s-F-o-r-K-i-d-s dot o-r-g.

9    Q.   So as far as the parking of the CarsForKids.com website,

00:42   10   what if any is the impact of that website remaining parked?

11   A.   Well, there's two; one, the positive note is that we can

12   continue to get some of the donations that our donors are

13   looking for our name, and Kars 4 Kids with a K is not getting

14   them.

00:42   15        The bad thing about it is if somebody goes to find us

16   and finds our name at a website that is down and consistently

17   down, they're going to look at us as incompetent, and why

18   would I give to somebody that can't even keep their own

19   website up.

00:43   20   Q.   So, what is it that America Can! Cars For Kids is asking

21   the Court to do regarding the CarsForKids.com URL?

22   A.   Transfer our -- our name dotcom to us.

23   Q.   Now, in terms of the experts --

24        THE COURT:  Wait; can you go into a little bit more

00:43   25   depth on that?

1          MR. PITTMAN:  Yes, your Honor.

2   Q.   Sir, the CarsForKids.com URL, how is the spelling of

3   that?

4   A.   Www C-a-r-s-F-o-r-K-i-d-s dotcom, c-o-m.  The only

5   difference is the last three letters.

6   Q.   And the Cars For Kids is the same name that y'all use for

7   your dotorg website?

8   A.   Exactly the same, it's just the last three -- the dotorg

9   versus dotcom.

10  Q.   And the advertising that y'all use is also spelled the

11  same way as is this dotcom you're asking the Court to turn

12  over to you?

13  A.   Yes, sir.

14          THE COURT:  Mr. Wentworth, what are you asking me to

15  transfer to you?

16          THE WITNESS:  The --

17          THE COURT:  Is it a domain name?

18          THE WITNESS:  It is a domain, yes, sir, of our name,

19  C-a-r-F-o-r-K-i-d-s dotcom.

20          THE COURT:  Okay, thank you.

21  BY MR. PITTMAN:

22  Q.   Now, you mentioned a moment ago that you have provided

23  some information to expert Mr. Cook; during the course of the

24  trial and afterwards did Mr. Cook actually have an occasion to

25  visit America Can! Cars For Kids' facilities?

Wentworth - Direct - Pittman

1  A.  Yes, sir.

2  Q.  Take a look at what's marked as ACCFK Exhibit 444.

3  A.  Yes, sir.

4  Q.  What is Exhibit 444?

00:45  5  A.  444 is a breakdown -- a screen shot breakdown of

6  advertisers with what the budget was for each every month and

7  total budget.

8  Q.  And were these documents -- or the documents from which

9  this exhibit was complied, were they made and kept in the

00:45  10  ordinary course of your business?

11  A.  Yes, sir.

12  Q.  Was it a regular practice for your business to keep such

13  records?

14  A.  Yes, sir.

00:45  15  Q.  Were they prepared at or near the time of the events

16  reflected in the exhibit?

17  A.  Yes, sir.

18  Q.  Do you have knowledge of the events recorded in the

19  documents?

00:45  20  A.  Yes, sir.

21         MR. PITTMAN:  Your Honor, we offer into evidence

22  ACCFK-444.

23         MR. VOGL:  No objection.

24         THE COURT:  All right, admitted.

00:45  25         (Defense Exhibit ACCFK-444 was marked into

Wentworth - Direct - Pittman

1    evidence.)

2    BY MR. PITTMAN:

3    Q.   And did you provide this document to Mr. Cook?

4    A.   I did, sir.

00:45    5    Q.   Did you have any discussion with Mr. Cook regarding

6    what's reflected in Exhibit 444?

7    A.   Yes, sir.

8    Q.   Sir, which organization owns the mark Cars For Kids?

9    A.   America Can! Cars For Kids.

00:46    10   Q.   And at some point the mark was owned by America Can!

11   A.   Yes, sir.

12   Q.   And how did the mark come to be owned by America Can!

13   Cars For Kids?

14   A.   We transferred ownership, sir.

00:46    15   Q.   Can you take a look at what's marked as ACCFK Exhibit

16   445.

17   A.   Yes, sir.

18   Q.   Can you identify that?

19   A.   That is where Richard Marquez, the assignor/president/CEO

00:46    20   of America Can! signed over the trademark and everything else

21   to America Can! Cars For Kids.

22        MR. PITTMAN:  Your Honor, offer into evidence

23   ACCFK-445.

24        MR. VOGL:  No objection.

00:47    25        THE COURT:  Admitted.

*United States District Court*
*Trenton, New Jersey*

Wentworth - Direct - Pittman

1          (Defense Exhibit ACCFK-445 was marked into

2     evidence.)

3          THE COURT:  When did that happen?

4     BY MR. PITTMAN:

00:47    5     Q.   What was the date of the board meeting where that

6     happened, sir?

7     A.   I don't recall off top of my head.  It's documented

8     public notice with our board meeting, I just don't remember.

9     Q.   Sir, let me ask you a few questions about your awareness

00:47   10     of K4K.  Did you do any research within the company to

11     determine when America Can! Cars For Kids first became aware

12     of K4K?

13     A.   Yes, sir.

14     Q.   And when was that?

00:47   15     A.   2011 is when I took over.

16     Q.   Well, did you come -- the research that you did of your

17     records, did you come to find out about the 2003 letter?

18     A.   The 2003 cease and desist, yes, sir.

19     Q.   Do you have an understanding as to whether someone found

00:48   20     out about K4K at the time --

21     A.   They did, but --

22          THE COURT:  Hold on, Mr. Wentworth.

23          You didn't complete your question, Mr. Pittman.  I

24     don't know what he's answering.  Can you please restate it?

00:48   25          MR. PITTMAN:  I'm sorry, your Honor.

*United States District Court*
*Trenton, New Jersey*

Wentworth - Direct - Pittman

1    Q.   Did you come to find out -- or what did you come to find

2    out about the 2003 letter as it relates to someone being aware

3    of K4K in Texas?

4    A.   The 2003 letter, we don't know what documentation that

00:48    5    they saw, but we assumed that because we no longer saw any

6    Kars 4 Kids with a K advertising that they had acknowledged

7    it; didn't respond to it, but acknowledged it, and pulled back

8    their advertising.

9    Q.   So, let me ask you to take a look at K4KX-25.  Is that

00:49    10    the letter you're referring to?

11    A.   Yes, sir.

12    Q.   And in K4K Exhibit 25, does it focus on Kars 4 Kids or

13    K4K's conduct in Texas?

14    A.   Yes, sir, just Texas.

00:49    15    Q.   Now, in your review of the information there at America

16    Can! Cars For Kids, did you see any -- did you see any

17    information where it would lead you to believe that K4K kept

18    operating in Texas let's say 2004?

19    A.   We've not been able to find any, sir.

00:50    20    Q.   2005?

21    A.   No, sir.

22    Q.   2006?

23    A.   No, sir.

24    Q.   2007?

00:50    25    A.   No, sir.

Wentworth - Direct - Pittman

1  Q.   When did you personally first become aware of the

2  defendant/plaintiff K4K?

3  A.   In 2011, sir.

4  Q.   And how did you become aware of K4K in 2011?

00:50  5  A.   That's when I was reassigned to the Cars For Kids

6  program.

7  Q.   Now --

8       THE COURT:  Mr. Wentworth, you're saying you became

9  aware of Kars 4 Kids with a K in 2011; is that right?

00:50  10      THE WITNESS:  Yes, sir.

11      THE COURT:  Was there anyone else in your

12  organization that knew of Kars 4 Kids with a K before that

13  time?

14      THE WITNESS:  Obviously there were people that knew

00:51  15  about them based on the 2003 letter.

16      THE COURT:  Why do you say obviously?

17      THE WITNESS:  Because we sent a cease and desist

18  letter in 2003.

19      THE COURT:  All right.

00:51  20  BY MR. PITTMAN:

21  Q.   Now, I believe you testified a moment ago that the people

22  there thought that K4K had --

23      MR. VOGL:  Objection, your Honor.

24      THE COURT:  What's the objection?

00:51  25      MR. VOGL:  As to people there thought.  This is

Wentworth - Direct - Pittman

1  going to a speculative answer that he's seeking from this

2  witness.

3          THE COURT:  Oh, you think it's speculation?

4          MR. VOGL:  Absolutely.

00:51   5          THE COURT:  Well, let me hear the whole question and

6  then I'll decide.

7  BY MR. PITTMAN:

8  Q.   Sir -- I was going to repeat the testimony you just gave,

9  but I'll ask the question this way.  During the course of your

00:51  10  being the chief operating officer and during the course of

11  this entire lawsuit, did you have an occasion to both speak to

12  your employees, and also look at actual documents and records

13  there within the company?

14  A.   Yes, sir.

00:52  15  Q.   And have you seen any documents, anything there within

16  the company, anything K4K has produced in this lawsuit, did

17  you see anything showing that K4K had specific ads in Texas

18  papers?

19  A.   No, sir.

00:52  20  Q.   Specific ads in Texas -- on Texas radio?

21  A.   No, sir.

22          THE COURT:  During what years?

23          THE WITNESS:  I started in 2005 through 2011, sir.

24          THE COURT:  Okay.

00:52  25  Q.   And in terms of the belief that K4K had stopped operating

Wentworth - Direct - Pittman

1  in Texas -- again, we are just talking about Texas here now

2  for purposes of this trial; did the company form a belief that

3  K4K was not advertising in Texas after the 2003 letter?

4      MR. VOGL:  Objection, your Honor.  He referenced did

00:53  5  the company have a belief.  If he has an opinion, your Honor,

6  he's certainly -- I have no objection to that.  But the

7  company having a belief is very speculative.

8      THE COURT:  So, sustained.  You can rephrase the

9  question.

00:53  10  BY MR. PITTMAN:

11  Q.  Sir, who's responsibility was it to find out about

12  whether K4K was advertising in Texas after 2003?  As the chief

13  operating officer, were you charged with that responsibility?

14  A.  Not in 2003, because I wasn't with the company.

00:53  15  Q.  No, I'm saying when you became chief operation officer --

16  A.  Yes, sir.

17  Q.  -- in 2011, were you in charge with the responsibility of

18  trying to find out that information?

19  A.  Yes, sir.

00:54  20  Q.  And have you been able to find any advertising in Texas

21  by K4K in 2004?

22  A.  No, sir.

23  Q.  2005?

24  A.  No, sir.

00:54  25  Q.  2006.

*United States District Court*
*Trenton, New Jersey*

Wentworth - Direct - Pittman

1  A.   No, sir.

2  Q.   2007?

3  A.   No, sir.

4  Q.   And I believe you testified that you started doing some

5  work in 2005, but you became chief operation officer in 2011?

6  A.   Yes, sir.

7  Q.   And at that time how did you personally become aware of

8  K4K?

9  A.   Because we heard them, we saw them on the Internet using

10  Kars 4 Kids with a K.

11  Q.   Were you receiving any calls in your call center?

12  A.   Yes, sir.

13  Q.   In that 2011 timeframe?

14  A.   Yes, sir.

15  Q.   Now, once you became aware, personally aware, in the 2011

16  timeframe, what did you do?

17  A.   In 2011 we started to evaluate what the issue would be,

18  moving on to 2012.

19  Q.   Did you contact lawyers?

20  A.   Yes, sir.

21  Q.   And after you became aware in the 2011 timeframe and made

22  contact with lawyers, did there come a time where a second

23  cease and desist letter was sent?

24  A.   Yes, sir, 2013 we sent the second cease and desist,

25  because it was everywhere and using --

Wentworth - Direct - Pittman

1          THE COURT:  What do you mean everywhere?  When you

2    say it, what is it?

3          THE WITNESS:  Their advertising.

4    Q.  And that was in what timeframe?

00:55    5    A.  2012, end of with 2012, 2013.

6    Q.  And take a look at Exhibit 408.

7    A.  Yes, sir.

8    Q.  And after you became aware of K4K in the 2011/2012

9    timeframe, did you direct your attorneys to take legal action?

00:56    10   A.  We directed them to file a cease and desist.

11   Q.  Or to send one?

12   A.  To send one sir, yes, sir.

13         THE COURT:  I didn't catch the exhibit number you're

14   looking at.

00:56    15         MR. PITTMAN:  It's 408, your Honor.

16   Q.  And who is Exhibit 408, the 2013 cease and desist letter,

17   sent to?

18   A.  It was sent to Kars 4 Kids, DBA Joy For Our Youth.

19   Q.  Now, I want you to read, sir, the second sentence that's

00:57    20   on Exhibit 408.

21   A.  As you know Kars 4 Kids has been using its Kars 4

22   Kids --

23   Q.  No, second sentence, I'm sorry, in the first --

24   A.  Second sentence, first paragraph:  It has recently come

00:57    25   to our client's attention that you are blatantly infringing on

*United States District Court*
*Trenton, New Jersey*

Wentworth - Direct - Pittman

1    the Cars For Kids with a C trademark rights through your use

2    of Kars 4 Kids with a K in Houston.

3    Q.   Now, this letter says -- what you just read, it has

4    recently come to our attention; do you see that?

00:58    5    A.   Yes, sir.

6    Q.   Now, after sending this cease and desist letter on March

7    28, 2013, where you indicate that it has recently come to

8    ACCFK's attention, did K4K stop advertising in Texas after it

9    was sent the March 28th, 2013 cease and desist letter?

00:58    10    A.   No, sir.

11    Q.   Now, at some point after the March 28th, 2013 cease and

12    desist letter was sent, was contact made with K4K to discuss a

13    resolution of the infringement that is discussed in the March

14    28, 2013 letter?

00:59    15    A.   Yes, sir.

16    Q.   And was a resolution reached?

17    A.   No, sir.

18    Q.   Now, as part of your role in this matter, were you also

19    responsible for assisting in the selection of law firms to

00:59    20    assist in defending against K4K's claims?

21    A.   Yes, sir.

22    Q.   Let me ask you, the Court had a question about the

23    assignment, and we looked at our notes, it looks like that

24    occurred in August of 2013; does that refresh your

01:00    25    recollection?

Wentworth - Direct - Pittman

1  A.   I -- I'd have to look at the actual, but if that's what

2  -- this is an open record from our board meeting, yes.

3  Q.   Now, as part of your duties as chief operations officer,

4  are you responsible for paying the lawyers that are handling

01:00  5  the defense of K4K's claims against you in the prosecution of

6  the lawsuit?

7  A.   Yes, sir.

8  Q.   And what has America Can! and America Can! Cars For Kids

9  paid in reasonable and necessary attorneys fees?

01:00  10  A.   Through September it was just a little over $4.1 million.

11  Q.   And are you asking the Court to award ACCFK these fees

12  and costs?

13  A.   Yes, sir.

14  Q.   And are you asking the Court to allow their attorneys to

01:01  15  submit their invoices in writing to the Court for

16  consideration after this trial?

17  A.   Yes, sir.

18       MR. PITTMAN:  May I have a moment, your Honor?

19       THE COURT:  You may.

01:01  20       (Brief pause.)

21       MR. PITTMAN:  Your Honor, there was a question

22  regarding the assignment, and I would ask if the Court would

23  take judicial notice of the assignment that's recorded in the

24  United States Patent and Trademark Office, so that the Court

01:02  25  would have that date.

*United States District Court*
*Trenton, New Jersey*

Wentworth - Cross - Vogl

1          THE COURT:  Mr. Vogl?

2          MR. VOGL:  Your Honor, I'm going to ask a couple

3    questions, and I'd ask your Honor to wait until I ask my

4    questions and decide that issue.

01:02    5          THE COURT:  All right.  You may renew your request

6    later on.

7          MR. PITTMAN:  Thank you, your Honor.

8          At this time I pass the witness, your Honor.

9          THE COURT:  All right.  Mr. Vogl?

01:02   10   (CROSS-EXAMINATION OF MALCOLM WENTWORTH BY MR. VOGL:)

11   Q.  Good morning, Mr. Wentworth.

12   A.  Good morning, sir.

13          MR. VOGL:  If I could ask you to put up 439, please?

14   Q.  Mr. Wentworth, you testified on your direct that this is

01:03   15   an ad that I believe you said appeared on a phone; is that

16   correct?

17   A.  Yes, sir.

18   Q.  And I think you referred to it as a pop-up banner ad;

19   right?

01:03   20   A.  It's a paid pop-up banner ad, sir.

21   Q.  So, in order for -- well, let me ask it this way.  Have

22   you ever visited my client's Kars 4 Kids, Kars4Kids.com site?

23   A.  Yes, sir.

24   Q.  And do you know whether any of your colleagues and

01:04   25   employees in your group have visited my client's Kars4Kids.com

Wentworth - Cross - Vogl

1  site?

2  A.  I'm sure some of them have, sir.

3  Q.  So, how do pop-up ads appear -- if I'm looking up

4  something, if I'm looking up this particular page here, how

01:04  5  does a pop-up ad appear?

6  A.  Google Analytics and all the other search engines have

7  different criteria; if you've previously searched on a lawn

8  mower, it will reappear periodically.

9  Q.  So if I'm looking for a new car and I go to the Chevy

01:04  10  site and I'm looking at the Chevy site, sometime later if I'm

11  looking at Ford a Chevy ad may appear in that Ford site;

12  correct?

13  A.  Possibly.  I'm not sure it would be that fast, but they'd

14  probably go with whatever your latest search was.

01:05  15  Q.  Right.  So in order for this pop-up ad of Kars 4 Kids, my

16  client, to appear here, someone would have had to have gone on

17  to my client's site first to get that pop-up ad to appear;

18  correct?

19  A.  No, sir.  They may have searched for a Cars For Kids with

01:05  20  a C, and depending on what your paid advertising analytics was

21  that would show up.

22  Q.  But in this example, for Kars 4 Kids to appear on this

23  site, somebody in your shop, either you or one of your

24  employees, would have had to gone on to my client's site first

01:05  25  for it to pop-up on this particular site; correct?

Wentworth - Cross - Vogl

1   A.   I do not know the answer to that, sir.  It's possible,

2   but I do not know.

3        MR. VOGL:  Let's go to 440, please?

4   Q.   Here's another, and this is also -- this Kars 4 Kids

01:06   5   banner is also a pop-up; correct?

6   A.   Yes, sir.

7   Q.   So, is it your testimony you don't know sitting here

8   today, whether you or one of your employees had to go to my

9   client's site for that pop-up ad to appear on this particular

01:06  10   page; is that your testimony?

11  A.   My testimony is Google Analytics is so sophisticated that

12  they may not have had to have gone to your website at all.

13  They may have done a search for a car donation, donate your

14  car for a tax; it does not necessarily have to be that they

01:06  15  went to your website.  It means that they searched for

16  something that whoever is doing your Google Analytics as far

17  as your paid search terms, plugged this in, sir.

18  Q.   But you don't know specifically in this example -- you

19  can't tell me that I'm wrong, in other words, that this

01:07  20  particular site -- this particular banner ad popped up because

21  you or one of your employees already had visited my client's

22  site first before it appeared on this next site; correct?

23  A.   Correct.

24  Q.   Mr. Wentworth, if my client doesn't take donations from

01:07  25  Texas donors, then it can't divert donations from America

*United States District Court*
*Trenton, New Jersey*

Wentworth - Cross - Vogl

1  Can!; correct?

2  A.   If they don't, that would be correct, yes, sir.

3       MR. VOGL:   502, please?

4  Q.   Mr. Wentworth, I believe you testified earlier you've

01:08  5  seen this document; correct?

6  A.   Yes, sir.

7  Q.   And you identified it as I guess an advertisement for my

8  client Kars 4 Kids in Texas; correct?

9  A.   It's a webpage, I'm not sure you'd say that was an

01:08  10 advertisement.

11 Q.   Okay.  So did you or any of your employees attempt to

12 donate a car off of this site?

13 A.   Online, no, sir.

14 Q.   Do you have any information as to whether or not if you

01:09  15 try to donate a car on this line, whether the car would be

16 accepted if it was coming from Texas?

17 A.   I do not know, sir.

18      MR. VOGL:   445, please?

19 Q.   All right.  Mr. Wentworth, I believe you testified this

01:09  20 is the assignment from America Can! to America Can! Cars For

21 Kids; is that correct?

22 A.   Yes, sir.

23 Q.   And I believe this is an assignment of the Cars For Kids,

24 C-a-r-s-F-o-r-K-i-d-s mark; is that correct?

01:09  25 A.   Yes, sir.

Wentworth - Cross - Vogl

1   Q.   Would it surprise you to learn that this document wasn't

2   filed with the U.S. Patent and Trademark Office until this

3   year?

4   A.   I do not know, sir.

01:10   5   Q.   Do you have any information to doubt that it was filed

6   this year?

7   A.   No, sir.

8   Q.   Why did it take so long -- if you were claiming rights

9   nationally, and that you, America Can! Cars For Kids owned

01:10   10   those rights, why did it take so long to file this particular

11   document with the U.S. Patent and Trademark Office?

12   A.   I do not know, sir.

13   Q.   Mr. Wentworth, you testified earlier about that my

14   client's use of the name Kars 4 Kids is tarnishing your good

01:11   15   name; is that fair?

16   A.   Yes, sir.

17   Q.   You also testified that there was a letter sent in 2003;

18   correct?

19   A.   Yes, sir.

01:11   20   Q.   And you weren't really part of the automobile donation

21   business at Cars For Kids at that time; correct?

22   A.   I wasn't part of America Can! at that time, sir.

23   Q.   So the individuals that were there, do you know who

24   specifically ordered that that letter go out on behalf of

01:11   25   America Can! or Texas Can I believe wrote the letter?

Wentworth - Cross - Vogl

1  A.  Who specifically?

2  Q.  Yes.

3  A.  No, sir.

4  Q.  So I think you mentioned that you first heard of my

5  client in 2011; is that correct?

6  A.  I'm sorry; say that again?

7  Q.  Sure, sorry.  When did you first hear of my client, Kars

8  4 Kids?

9  A.  Me personally, when I went to Cars For Kids, which was

10  2011.

11  Q.  Are you testifying here today that no one at America Can!

12  or Texas Can heard of my client before 2011?

13  A.  I'm not saying that, sir.  You asked me personally, I

14  personally was unaware of it.

15  Q.  And do you know -- my question then as a follow-up and

16  that is, are you aware of anyone at Cars For Kids -- let me

17  strike that.

18       Are you saying that no one at America Can! Texas Can or

19  any of the affiliated Can Academies, ever heard of my client

20  before 2011; is that your testimony?

21  A.  You never asked that question of me, sir, you asked me

22  personally.

23  Q.  Okay.

24       THE COURT:  Wait a second, Mr. Vogl; just state your

25  question, we'll have Mr. Wentworth --

Wentworth - Cross - Vogl

1          MR. VOGL:  Sure.

2    Q.   Mr. Wentworth, I understand I asked you personally.  Now

3    what I am saying is, are you telling me -- are you telling the

4    Court more importantly, are you telling the Court that you

01:13   5    have -- that no one at Cars For Kids, your client, your

6    organization, or Texas Can, heard of my client before 2011; is

7    that what you're telling us?

8    A.   No, sir, because in 2003 somebody at the company sent a

9    cease and desist.

01:13   10   Q.   Did anyone at your company follow up?  Do you have any

11   information on whether anyone followed up after the 2003

12   letter?

13   A.   I don't have any -- there wasn't anything about that

14   after.

01:13   15   Q.   You're saying there's no paper; is that what you're

16   saying?

17   A.   Correct.

18   Q.   And you have no information as to whether or not anyone

19   followed up with my client in 2004; correct?

01:13   20   A.   No, sir.

21   Q.   2005?

22   A.   No, sir.

23   Q.   2006 through 2013.

24   A.   Through 20 I think '12 I believe, the USPTO is when I

01:14   25   think you -- your client challenged it.  So I think that's the

1    first time.

2    Q.   You're referring to the fact that that's in 2012 is when

3    your organization for the first time claimed national rights

4    by filing a trademark application in the United States Patent

01:14    5    and Trademark Office; correct?

6    A.   Yes, sir.

7    Q.   You didn't file it in 2003, did you?

8    A.   No, sir.

9    Q.   Filed it in 2012; right?

01:14    10    A.   I'm sorry?

11    Q.   You filed the application for Cars For Kids, your

12    spelling, only in 2012; correct?

13    A.   Correct.

14    Q.   Do you have any information as to whether your client's

01:14    15    use of Cars For Kids is tarnishing my client's good name?

16    A.   Only thing I could go on is speculation, is absolutely

17    no, because I haven't been sued by any state; we haven't been

18    hit by any Better Business Bureau; we have nothing negative on

19    ours.  So my -- my general premise would be no, sir, I'm not

01:15    20    hurting you.

21    Q.   And you're aware, though, that your organization had a

22    school in St. Louis for a time; do you remember that?

23    A.   Yes, sir.

24    Q.   That doesn't exist anymore; right?

01:15    25    A.   No, sir.

Wentworth - Cross - Vogl

1  Q.  You shut the doors.

2  A.  Yes, sir.

3  Q.  And you've had incidents at your Can Academies, haven't

4  you, with students, aggressive students, tardy students,

01:15   5  students who skip school, students who have been in trouble;

6  correct?

7  A.  Correct.

8  Q.  You don't think that could have a negative impact on my

9  client's reputation?

01:15   10  A.  Any student being absent in Texas affect something for

11  yours?  No, sir.

12  Q.  You picked the absent part.  How about pulling a knife,

13  how about pulling a knife, do you think that might have an

14  effect on my client's reputation?

01:15   15  A.  No, sir.

16  Q.  Why not?

17  A.  Because you are not us.

18  Q.  Indeed we are not you.

19      You've had a number of different law firms represent

01:16   20  you in the course of this litigation; correct?

21  A.  Yes, sir.

22  Q.  First there was Haynes and Boone; correct?

23  A.  Yes, sir.

24  Q.  Then Cindy Dodds?

01:16   25  A.  Cindy Dodds was just a transition to help us find another

Wentworth - Cross - Vogl

1  attorney, which was Klemchuck.

2  Q.  But you paid her; correct?

3  A.  Just not for actually the work, but for consulting

4  finding somebody.

01:16  5  Q.  But she entered an appearance in this case; correct?

6  A.  Yes, sir.

7  Q.  And then the Klemchuck law firm; do you remember them?

8  A.  Yes, sir.

9  Q.  How long were they a party to this case?

01:16  10  A.  Five months.

11  Q.  Did you let them go?

12  A.  Yes, sir.

13  Q.  Why did you let them go?

14  A.  I think that's probably attorney/client, but I'm not

01:17  15  sure, but I would suspect it is.

16  Q.  Okay.  But you paid them as well; correct?

17  A.  Yes, sir.

18  Q.  And then Mr. Deleon's Law Group, they were also in this

19  case for a time, were they not?

01:17  20  A.  Yes, sir.

21  Q.  And with Mr. Deleon, Ms. Wilde and Mr. Torres were a part

22  of that organization for a time as well; correct?

23  A.  Yes, sir.

24  Q.  And then after Mr. Deleon withdrew, Mr. Pittman joined

01:17  25  Ms. Wilde and Mr. Torres; correct?

Wentworth - Redirect - Pittman

1    A.   Correct.

2    Q.   And of course Fox Rothschild has been your local counsel

3    throughout the litigation; correct?

4    A.   Yes, sir.

01:17    5    Q.   So Mr. Wentworth, each time you replace counsel new

6    counsel has to learn the case; correct?

7    A.   Yes, sir.

8    Q.   I guess I'm asking you, are you aware over the course of

9    the last several weeks when the expert depositions occurred,

01:18    10   Mr. Pittman had two other attorneys with him for each of those

11   depositions; do you know that?

12   A.   I was not privied to the actual depositions sir, so no.

13   Q.   So you didn't authorize that.

14   A.   I authorized Mr. Pittman to do what he thinks is in my

01:18    15   company's best interest.

16   Q.   Including bringing two additional attorneys to each of

17   those two depositions.

18   A.   If that's what he feels is in our best interest, yes,

19   sir.

01:18    20        MR. VOGL:  No further questions, your Honor.

21        THE COURT:  All right.  Thank you.

22        Redirect?

23   (REDIRECT EXAMINATION OF MALCOLM WENTWORTH BY MR. PITTMAN:)

24   Q.   Sir, would it refresh your recollection if I showed you

01:19    25   the resolution where there was a transfer of the intellectual

*United States District Court*
*Trenton, New Jersey*

Wentworth - Redirect - Pittman

1  property of the trademarks from America Can! to America Can!

2  Cars For Kids?

3  A.   Yes, sir.

4       (Handing to witness.)

01:19  5  Q.   What is the document you're looking at?

6  A.   This document is from our board of trustees resolution,

7  regarding the transfer of America Can!'s assets to Cars For

8  Kids in this separation.

9  Q.   And does this document now refresh your recollection as

01:19  10  to when America Can! transferred the rights to Cars For Kids

11  -- to America Can! Cars For Kids?

12  A.   Yes, sir, it's actually 15 days before we started

13  operating separately under a separate 501(c)(3), and a

14  separate EIN, sir.

01:20  15  Q.   And what is that date?

16  A.   This -- the date of this is August 15th, 2003.

17  Q.   2000 what?

18  A.   2013, I'm sorry.

19  Q.   So August 15th, 2013 is --

01:20  20  A.   Yes, sir.

21  Q.   -- when it was transferred from America Can! to America

22  Can! Cars For Kids; correct?

23  A.   Yes, sir.

24  Q.   Now, just to be clear, America Can! and America Can! Cars

01:20  25  For Kids are both parties to this lawsuit.

*United States District Court*
*Trenton, New Jersey*

Wentworth - Redirect - Pittman

1    A.   Yes, sir.

2    Q.   So, regardless of when the transfer happened, the owners

3    of that mark from the 2008 through 2019, they're both parties

4    to this lawsuit.

01:20    5    A.   And I'm here representing both, sir.

6    Q.   Now, there was a question about the --

7             MR. PITTMAN:   Pull up 440?

8    Q.   There was a question about the advertising and the

9    advertising analytics.   So I just want to make sure that we're

01:21    10    on the same page.   Now, Exhibit 440 appeared on the computer

11    of someone physically located where?

12    A.   In Texas.

13    Q.   In Texas; is that right?

14    A.   Yes, sir.

01:21    15    Q.   So whether it was someone who had searched K4K's site or

16    someone who was looking for Kars 4 Kids generally, it was

17    still an ad in Texas --

18    A.   Yes, sir.

19    Q.   Is that your understanding?

01:21    20    A.   Yes, sir.

21    Q.   Now, going back again you were talking about some of the

22    analytics that would lead to some of these advertising for K4K

23    showing up.   And you were saying that it could show up if

24    someone just was searching for Cars For Kids with a C?

01:22    25    A.   It could show up with whatever -- whoever's doing their

1    Google Analytics and what their key search terms are, it could

2    simply as donate my car.

3    Q.    In fact, go back to Exhibit 408.  Sir, the charts that

4    are on the cease and desist letter that y'all sent to K4K in

01:23    5    2013, what search terms was K4K using?

6    A.    "Donate your car today", "full tax deduction" and "hotel

7    voucher".

8    Q.    And you see the -- are you looking at the screen?

9    A.    Yes, sir.

01:23    10    Q.    What search terms was --

11    A.    Oh, this one, Can Academies.

12    Q.    What other search terms was K4K using in 2013?

13    A.    Our name, Cars For Kids, Can Academies, which has nothing

14    to do with car donation program or our name.

01:23    15    Q.    And 2013, this was the instance where y'all found out

16    that they were actually using --

17    A.    Texans Can Academy.

18    Q.    And Cars with a C?

19    A.    Correct.

01:24    20    Q.    And again this was 2013 when y'all discovered this.

21    A.    Yes, sir.

22            THE COURT:  Wait; Mr. Pittman, the basis of redirect

23    is to go over points that Mr. Vogl brought up.  I'm not

24    opening up new testimony here; you had your chance.  And now

01:24    25    you're way beyond where we were.  So I think you better

1    bring -- you can clarify points that Mr. Vogl had presented.

2    Q.   Sir, I was asking you about -- Mr. Vogl had some

3    questions about when y'all discovered things, that's why I was

4    trying to ask you about the dates.

5         But let me ask you about, Mr. Vogl was talking to you

6    about the Google Analytics, so are these the search terms that

7    you were talking to Mr. Vogl about?

8              THE COURT:  Hold on.

9              MR. VOGL:  Objection, your Honor.  I was talking to

10   him about the pop-up ad, I wasn't talking about this

11   particular document whatsoever.

12             THE COURT:  That's what I don't remember, anything

13   on this document.  So I don't know why you're there.  Next

14   question.

15             MR. PITTMAN:  I apologize, your Honor.

16   BY MR. PITTMAN:

17   Q.   Sir, you were talking to Mr. Vogl about certain search

18   terms, and you were saying that these search terms will lead

19   to those kinds of pop-up ads that we're talking about; is that

20   what you said?

21   A.   Yes, sir.

22   Q.   And so my question to you is, are these the kinds of

23   search terms that would lead to the pop-up ads that we were

24   talking about?

25             MR. VOGL:  Calls for speculation, your Honor, I

Wentworth - Redirect - Pittman

1   object to this.

2          THE COURT:  Well, calls for speculation; I'll allow

3   that answer.

4   A.   They probably have like we do thousands of search terms.

01:25      5          THE COURT:  All right.  So I'll sustain the

6   objection, now that I heard the answer.

7   Q.   Are these examples?

8   A.   Yes, sir.

9   Q.   Now, finally, in terms of the actual evidence of when you

01:26     10   found out about K4K -- so again, I was asking you about Texas,

11   and Mr. Vogl had some questions to you about whether other

12   people may have said something or may have known --

13          THE COURT:  Would you just state a question?  I

14   don't understand why we have these long paragraphs before we

01:26     15   get into the questions.

16   Q.   Sir, can you tell the Court whether you saw any evidence

17   in that 2004 to 2010 timeframe of ads that K4K ran in Texas?

18          MR. VOGL:  Your Honor, to be clear, does he mean

19   this gentleman, this witness, or the entire organization?

01:26     20   It's unclear as to the nature of the response we're going to

21   get.

22          THE COURT:  Okay.  Can you clarify the question, Mr.

23   Pittman?

24   Q.   Sir, have you searched through all of the records and

01:26     25   talked to all of the people there at your operation about --

Wentworth - Redirect - Pittman

1    about information related to K4K?

2    A.   Yes, sir.

3    Q.   And did you find any information showing that they were

4    advertising in Texas, specifically in Texas, Texas radio,

5    Texas TV, in between 2003 and the 2011 timeframe that you say

6    you discovered them?

7    A.   No, sir.

8            MR. PITTMAN:  Pass the witness.

9            THE COURT:  All right.  Do you have any

10   clarification?

11           MR. VOGL:  Two, your Honor.

12   (RECROSS-EXAMINATION OF MALCOLM WENTWORTH BY MR. VOGL:)

13   Q.   Mr. Wentworth, you sat through the liability case;

14   correct?

15   A.   Yes, sir.

16   Q.   And you heard Rabbi Mintz and Asher Moskovits testify

17   about the mailings and the postcards that all went out and

18   went out to Texas; did you hear that testimony?

19   A.   Yes, sir.

20   Q.   With respect to that assignment document that you

21   referenced, do you have any understanding as to why that

22   document wasn't filed with the U.S. Patent and Trademark

23   Office until 2019?

24   A.   As I stated earlier when you asked, I do not, sir.

25           MR. VOGL:  No further questions, your Honor.  Thank

Wentworth - Redirect - Pittman

1    you.

2                    THE COURT:  All right, thank you.

3                    Mr. Wentworth, you may step down.  Thank you, sir.

4                    THE WITNESS:  Thank you.

01:28    5            (Witness excused.)

6                    THE COURT:  Next witness.

7                    MR. PITTMAN:  Your Honor, America Can! Cars For Kids

8    calls Bryce Cook.

9                    THE COURT:  Do you want to take a break now?  And

01:28   10    then we'll be back in 10 minutes.

11                    MR. VOGL:  Thank you.

12                    (Recess.)

13                    THE COURT:  Please be seated.

14                    Mr. Pittman, next witness.

01:45   15                    MR. VOGL:  Your Honor, I would like to reintroduce

16    my colleague, Mr. David Litterine-Kaufman.

17                    THE COURT:  Hello, Mr. Kaufman.

18                    MR. LITTERINE-KAUFMAN:  Good afternoon, your Honor.

19                    THE COURT:  So you're going to do the cross?

01:46   20                    MR. LITTERINE-KAUFMAN:  I am, your Honor, yes.

21                    MR. PITTMAN:  And America Can! Cars For Kids calls

22    Bryce Cook.

23                    THE COURT:  All right.  Mr. Cook?

24                    (BRYCE COOK), sworn.

01:46   25                    THE DEPUTY CLERK:  State your name for the record.

Cook - Direct - Pittman

1          THE WITNESS:  Bryce Cook.

2          THE COURT:  Just spell your last name for us, Mr.

3   Cook?

4          THE WITNESS:  C-o-o-k.

01:46    5          THE COURT:  All right, thank you.

6          Mr. Pittman?

7          MR. PITTMAN:  Thank you, your Honor.

8   (DIRECT EXAMINATION OF BRYCE COOK BY MR. PITTMAN:)

9   Q.   Mr. Cook, can you introduce yourself -- reintroduce

01:46    10  yourself to the judge, tell him what you do for a living?

11  A.   Yes, my name is Bryce Cook, and I'm a managing

12  director/consultant at Ankura Consulting Group.

13  Q.   And what does Ankura Consulting Group do?

14  A.   Ankura is a global consulting firm that consults in the

01:47    15  areas of economics, accounting and business management, as

16  well as disputes in litigation.

17  Q.   And how many offices and consulting professionals does

18  your company have?

19  A.   I believe we have at last count 29 offices around the

01:47    20  world, and approximately a thousand employees.

21          THE COURT:  So, Mr. Kaufman, before we go into the

22  substance of Mr. Cook's testimony, do you object or have any

23  grounds that he's not an expert in the field?

24          MR. LITTERINE-KAUFMAN:  It would depend on how the

01:47    25  field is defined, your Honor.

*United States District Court*
*Trenton, New Jersey*

Cook - Direct - Pittman

1          THE COURT:  Well, I'm trying to get around a half

2    hour of testimony about what Mr. Cook's done with his life.

3          MR. LITTERINE-KAUFMAN:  Sure, I understand, your

4    Honor.  We would have no objection to --

01:47     5          THE COURT:  Can I accept his C.V. as his

6    credentials?

7          MR. LITTERINE-KAUFMAN:  Yes, your Honor.

8          THE COURT:  So you can skip that, Mr. Pittman, and

9    go to the next --

01:47    10          MR. PITTMAN:  Okay, your Honor.  We offer into

11    evidence his C.V. which is Exhibit 446.

12          THE COURT:  All right.  So you don't have any

13    objections; right, Mr. Kaufman?

14          MR. LITTERINE-KAUFMAN:  No objection, your Honor.

01:48    15          THE COURT:  All right.  So the C.V. is admitted.

16          (Defense Exhibit ACCFK-446 was marked into

17    evidence.)

18    BY MR. PITTMAN:

19    Q.   Mr. Cook, let's get to your assignment in this case.

01:48    20    What were you asked to do?

21    A.   So, two things primarily:  The first was to determine

22    damages, the appropriate damage remedy to use in this matter;

23    as well as to analyze how the two companies in this lawsuit

24    competed against each other, how they performed against each

01:48    25    other; and the conditions of the market in which they

*United States District Court*
*Trenton, New Jersey*

Cook - Direct - Pittman

1    operated.

2    Q.   And what types of information do you normally review in

3    order to be able to determine damages?

4    A.   Well, there's typically voluminous information that both

01:48   5    parties produce regarding their financial and business

6    records; there is the record of deposition testimony of each

7    side; there are the pleadings, all the things of that nature.

8    There are public filings that they make in this case, the IRS

9    Form 990 that each party files.

01:49   10   Q.   And besides looking at the documents you reviewed from

11   both parties and from the previous trial, did you do anything

12   else to understand sort of the landscape to what you were

13   about to do?

14   A.   Yes, I did.  I had discussions with Mr. Malcolm

01:49   15   Wentworth, the chief operating officer of America Can! Cars

16   For Kids; I also had the opportunity to visit their

17   headquarters and basically see the operation from top the

18   bottom, how it functions; how its information and IT system

19   works; how the auction works.

01:49   20   Q.   And Mr. Wentworth indicated, as I'm about to get into

21   some of your opinions, Mr. Wentworth indicated that he

22   provided you with some information for the purpose of

23   determining whether there was some sort of I guess diversion

24   of donations with respect to a website?

01:50   25   A.   Yes.

Cook - Direct - Pittman

1    Q.   Do you recall that?  Do you have a summary of your

2    opinions as to whether K4K obtained donations at the expense

3    of America Can! Cars For Kids?

4    A.   Yes, I do.  That would be my first chart.

01:50    5    Q.   Are you taking a look at it?

6    A.   Yes.

7    Q.   Can you explain what's shown here?

8    A.   Yes.  So, based on my market analysis and analysis of the

9    two companies' performance in that market, this basically

01:50   10    summarizes the factors that you would consider in determining

11    whether one company took market share, or in other parlance,

12    diverted donations from the other.

13         So these factors include:  First, they were direct

14    competitors in the same geographic market, and in this case

01:50   15    specifically Texas; they competed for a finite number of

16    vehicles, there are only so many people that have cars that

17    they're willing to give up; they use the same or similar

18    advertising methods, radio, some television, billboards and

19    online is the largest; they used of course the same or similar

01:51   20    marks, the Cars For Kids mark; and lastly, they had the same

21    charitable mission that they advertised, which was to benefit

22    kids.

23         So considering all these factors and fact that they

24    competed in the same way and used the same mark, it's

01:51   25    inescapable that one would take donations from the other.  And

Cook - Direct - Pittman

1    that final factor that results in one -- ascending to number

2    one in the market has to do with, as I testified earlier, the

3    advertising that they do; how much they spend, and the people

4    that they're able to reach, whether that's in terms of having

01:51    5    their ad first in the Google ads, or how much, you know, on

6    the airwaves the demographic that they reached through numbers

7    of potential donors.

8                MR. LITTERINE-KAUFMAN:  Your Honor, just object to

9    his answer.  He hasn't yet been qualified as an expert, but

01:52    10    he's giving expert opinion testimony.

11                THE COURT:  So we've accepted his C.V., but you

12    didn't tell us what field that you're offering Mr. Cook as an

13    expert.  Before I can rule on that we need to know same, Mr.

14    Pittman.

01:52    15                MR. PITTMAN:  Yes, your Honor, thank you.

16    BY MR. PITTMAN:

17    Q.   Sir, have you testified as an expert before?

18    A.   Yes, I have.

19    Q.   And have you given or lectured as it relates to the

01:52    20    subject of economic damages?

21    A.   Yes, I have, many occasions.

22                MR. PITTMAN:  Your Honor, at the previous trial the

23    Court accepted Mr. Cook as an expert in the field of forensic

24    accounting and analysis, market entry dynamics and

01:52    25    performance.  At this time I'd like to re-offer him as an

Cook - Direct - Pittman

1 expert in those categories, as well as to offer him as an

2 expect in the calculation of damages.

3            THE COURT:  All right.  Any objections to that, Mr.

4 Kaufman?

01:53     5            MR. LITTERINE-KAUFMAN:  No objections, your Honor.

6            THE COURT:  All right.  So Mr. Cook is approved as

7 an expert in all those areas, including calculation of

8 damages.

9            MR. PITTMAN:  Thank you, your Honor.

01:53    10 BY MR. PITTMAN:

11 Q.  Mr. Cook, we were discussing chart number 1.  Did you

12 look at any hard data to support your conclusion?

13 A.  Yes.  So, in addition to this market analysis and the

14 conceptual framework that helped me arrive at this opinion,

01:53    15 recently there has been an event that has allowed me to

16 compare hard data and ascertain quantitatively an impact to

17 Cars with a C, basically the donations that it receives.

18 Q.  And did you prepare charts that sort of demonstrate this

19 analysis?

01:53    20 A.  I did.

21 Q.  And what charts are those?

22 A.  So the following three charts; if you can bring up chart

23 2.

24 Q.  So let's go through them pretty rapidly -- or succinctly

01:54    25 I should say.  What's reflected in chart 2?

*United States District Court*
*Trenton, New Jersey*

Cook - Direct - Pittman

1   A.   So this is a comparison of vehicles donated in the last

2   three years, 2016 through 2018; the last I should say full

3   three years, since we don't have all of 2019 yet.  First line

4   is America Can! Cars For Kids donations received, the second

01:54   5   line is K4K donations.

6        As you can see, America Can! Cars For Kids' donations

7   declined in each of the last two years, at a rate of 10

8   percent.  And on an annual basis they were losing on average

9   883 units.

01:54   10        On the other hand, Kars 4 Kids with a K was growing in

11   its donations received in Texas, this is all in Texas, at a

12   rate of 21 percent.  And interestingly they took approximately

13   the same number of units on average that America Can! Cars For

14   Kids lost, K4K took ███.

01:55   15   Q.   And what about chart 3?

16   A.   Chart 3 then looks at the next year, and this is 2019,

17   through the latest numbers that I had when I put this chart

18   together, which was September of 2019.  And this now -- this

19   now relates to what I previously mentioned was an event that

01:55   20   allows us to quantify an impact.

21   Q.   What event was that?

22   A.   And that event is after the trial in May of 2019, it's my

23   understanding that K4K ceased using the domain

24   CarsForKids.com, and that's Cars with a C dotcom; and

01:55   25   purportedly they stopped taking donations at some point in

Cook - Direct - Pittman

1    June.  And so that's marked by the red bars in 2019 when this

2    event happened.

3         And as you can see, there's an immediate growth in

4    America Can!'s donations received.  So these bars are the

01:56    5    monthly donations received by America Can! Cars For Kids.  You

6    look at 2019 versus 2018, the blue bars, consistent with the

7    prior chart you can see that the average is still declining

8    going into 2019, January to May, those blue bars in 2019 are

9    lower on average than in 2018.

01:56    10        But then again with the parking of that domain name and

11   the purported departure from the market of Kars with a K, you

12   can see that America Can! Cars For Kids' donations in

13   September are just under 1,000 compared to the year prior

14   September of just over 500.  So they've almost doubled year

01:56    15   over year by September.

16   Q.   And finally chart 5?

17   A.   Actually chart 4.

18   Q.   Oh yes, chart 4.

19   A.   Yes.  So this then sums up the month.  So we can see

01:57    20   rather than a monthly basis, this period of June to September.

21   I wanted to compare that June to September after the parking

22   of the domain name.  And you can see that the red bar which is

23   June through September 2019, is 30 percent higher than that

24   same period of time in 2018.

01:57    25        And 2018 was on the decline I showed at the beginning

*United States District Court*
*Trenton, New Jersey*

Cook - Direct - Pittman

1  with the chart showing America Can! Cars For Kids had been

2  declining while K4K was increasing; and not until the domain

3  name was parked and K4K purportedly left the market did

4  donations again jump up significantly.

01:57   5  Q.   Chart 5?

6  A.   So this pertains to advertising that America Can! Cars

7  For Kids did on a monthly basis.  Because one question that

8  you might ask is, could America Can! Cars For Kids advertising

9  spend have had the impact on that increase.  So I looked at

01:58  10  that.

11       What this shows us is that in 2018 on average America

12  Can! is spending about $235,000, that's the lighter green

13  bars.  But beginning in November of 2018, Cars with a C began

14  increasing its advertising by $50,000 per month in Sirius

01:58  15  radio.  So that again started in November 2018.

16       As you see they continued that amount of advertising,

17  and then it began to decline again just in the last couple

18  months, through July and August.  What this shows us -- if

19  you'll go back two charts, to chart 3 please.  Can we go back

01:59  20  to chart 3 -- there we go.

21       So, November 2018, America Can! ups its advertising by

22  $50,000 a month.  But when we look at the 2019 chart, those

23  blue bars, there's no change; they actually are lower than

24  2018 year over year.  And it's not until again June or July

01:59  25  that we see the big increase in donations actually pick up.

*United States District Court*
*Trenton, New Jersey*

Cook - Direct - Pittman

1   And concurrently we saw that advertising spend actually went

2   down in that period.

3        So basically what that tells us is that advertising

4   spend, while it may have some impact, was far overshadowed by

01:59   5   the other main event that occurred in June 2019, which was the

6   parking of the domain name and the purported departure of K4K.

7   Q.   Now, let me ask you about your damages calculations

8   opinions.

9        THE COURT:  Wait, before you go on; Mr. Cook, you

02:00   10   had discussed briefly parking of the domain name?

11        THE WITNESS:  Yes.

12        THE COURT:  Can you define what you mean by the

13   parking of the domain name?

14        THE WITNESS:  Yes.  So that just means they stopped

02:00   15   using it.  It's still registered to K4K, but they no longer

16   use it.  So if you go to the CarsForKids.com website, I

17   believe it still comes up, but says not in use or under

18   construction or something like that.

19        Or comes up as a non -- I can't remember actually

02:00   20   what it is, but it's something that indicates that it's not in

21   use.

22        THE COURT:  Okay.  So they have some explanation of

23   that, like this website is no longer used or this name is no

24   longer used?

02:01   25        THE WITNESS:  I don't know if it's an explanation or

Cook - Direct - Pittman

1    just doesn't come up, but basically they're not -- they're not

2    using it anymore is my understanding, that they've ceased

3    to -- you can't click through to donate or get information

4    anymore.

02:01    5         THE COURT:  Okay, thank you.

6    BY MR. PITTMAN:

7    Q.  Sir, as far as your damages calculation, in your

8    experiences as an expert what damages remedy is used in a case

9    such as this one?

02:01    10   A.  So typically what you'll find from the Lanham Act,

11   Section 1117, is the monetary remedy most often used is

12   defendant's profits.

13   Q.  And why is that?

14   A.  Usually it's because the facts and circumstances of the

02:01    15   case make it much more available, and analytically it's able

16   to be determined with a reasonable degree of certainty,

17   compared to lost profits, which is much more difficult to tie

18   that to use of a trademark.

19   Q.   Now, in terms of the damages methodology for experts in

02:02    20   your field, what's required to determine the infringer's

21   revenue?

22   A.   Well, again per that monetary remedy section of the

23   Lanham Act, the mark holder's -- the mark holder is required

24   to prove defendant's sales only.  And then the defendant has

02:02    25   the burden of setting forth any deductions, which would

*United States District Court*
*Trenton, New Jersey*

Cook - Direct - Pittman

1    include costs or any of the deductions that they feel are

2    necessary.

3    Q.   Now, as a damages expert, how do you typically apply that

4    methodology to determine the infringer's profits or revenue?

02:02  5    A.   Right, so if I'm representing the mark holder who's been

6    infringed, then we'll ask for in discovery production of

7    documents, which in this case Kars 4 Kids produced voluminous

8    documents on what their revenues are in Texas and their

9    donations received.  So that's the kind of documents we would

02:03  10   search for and then try to verify it the best we can that they

11   appear accurate and reliable.

12        And then on the defendant's side, we would take a

13   further step, if I represent a defendant, in analyzing the

14   costs that are incurred in generating those revenues.

02:03  15   Q.   So, in this case you were asked to determine K4K's

16   revenue earned in Texas from car donations; correct?

17   A.   That is correct.

18   Q.   And what documents did you review to be able to give his

19   Honor that number?

02:03  20   A.   So, as I mentioned, Kars 4 Kids produced a voluminous

21   production in response to the Court's order that it do so with

22   respect to the State of Texas; we received a number of very

23   large Excel spreadsheets that show what appear to be the types

24   of donation records that we have previously seen produced in

02:04  25   this case, but that all relate the donors that had a Texas

*United States District Court*
*Trenton, New Jersey*

Cook - Direct - Pittman

1    address.  So that's the kind of document we looked at; as well

2    as there were some supporting very low level donor receipts

3    and documents of that nature.

4    Q.   And did you prepare a summary for the Court of the gross

02:04    5    revenue and the net revenue and the net profits?

6    A.   Yes, I did.

7    Q.   Let me ask you to take a look at ACCFK Exhibit 447.

8    A.   Are we going to put that on the screen --

9    Q.   I just want you to identify it.

02:04    10   A.   Oh yes, there we go.  So yes, that was -- that's the

11   attachment to my expert report in this matter, my latest

12   report, that shows at the top the Kars 4 Kids with a K vehicle

13   count received in Texas from 2008 through June 30, 2019, as

14   well as the gross and net revenue.  And then my identification

02:05    15   and analysis of incremental costs, which get to a bottom line

16   incremental profit number.

17        MR. PITTMAN:  Your Honor, we offer America Can! Cars

18   For Kids Exhibit 447.

19        THE COURT:  Any objections?

02:05    20        MR. LITTERINE-KAUFMAN:  No objection, your Honor.

21        THE COURT:  All right, admitted.

22        (Defense Exhibit ACCFK-447 was marked into

23   evidence.)

24   BY MR. PITTMAN:

02:05    25   Q.   Sir, on Exhibit 447, you indicate gross revenue of what

Cook - Direct - Pittman

1  amount?

2  A.   The total amount there is ████████, approximately.

3  Q.   And under gross revenue you've got a footnote, footnote

4  number 2; can you just briefly tell the Court what that --

02:05   5  what documents that number was derived from?

6  A.   Right.  So that comes from documents that Kars with a K

7  produced, and the gross revenue indicates the auction sales

8  price that the third-party auction service that Kars with a K

9  uses, charged to Kars with a K.

02:06   10  Q.   In terms of collection of that revenue, what is your

11  understanding of --

12       THE COURT:  Can you just go through that again?

13  Charge to -- what do you mean by that?

14       THE WITNESS:  Yes; I'm sorry, I probably didn't say

02:06   15  that correctly.  So the gross revenue is the revenue that the

16  third-party auction service provider --

17  Q.   Take a step back.  Explain further for the judge about

18  who takes these cars and who sells them and who reports this

19  information.

02:06   20  A.   Yes.  So just real quickly the process is -- the business

21  model is, there is a call center that generates through -- you

22  know, the company generates through advertising, calls that

23  come in or Internet hits that come in, which they process by

24  contacting a third-party service provider, Copart is the main

02:07   25  one in this country, that then provides the towing service to

Cook - Direct - Pittman

1   pick up the vehicle, and then the auction service to auction

2   it off and processing the title and paperwork.

3        And then they, that is Copart, the third-party

4   processor, remits the funds to -- back to Kars with a K, net

02:07   5   of what they retain for their costs and their profit.  Which

6   would be the cost of towing and, you know, doing the auction

7   service.

8        THE COURT:  Okay.  So, going back to your chart,

9   447, gross revenue, can you just define what that is and then

02:07  10  what net revenue is?

11       THE WITNESS:  Yes.  So gross revenue is what the

12  auction price would be that Copart or the third-party provider

13  receives upon auction.  Net revenue is what is actually

14  remitted to -- back to Kars 4 Kids, it's what they receive.

02:07  15  And so that is net of what Copart retains, towing and

16  providing that service.

17       THE COURT:  All right, thank you.

18  BY MR. PITTMAN:

19  Q.  So, the ██████████ reflects all the cars that were picked

02:08  20  up and sold in Texas by this third-party administrator?

21  A.  Yes.

22  Q.  And then the ██████████ is this third-party administrator

23  takes the cars, sells it, auction fees, towing fees, it

24  deducts that before it sends the balance to K4K.

02:08  25  A.  That's correct.

*United States District Court*
*Trenton, New Jersey*

Cook - Direct - Pittman

1   Q.   And can you tell the Court the balance that was sent to

2   K4K for the period 2008 through June 30th, 2019 from Texas

3   donations?

4   A.   Yes ███████, approximately.

02:08   5   Q.   Now, that ██████████ that's reflected here as gross

6   revenue, again that's before deduction of any expenses; do you

7   and K4K's expert agree --

8        THE COURT:   Wait a second; I don't think that's

9   correct, Mr. Pittman.   You said ████████████, he said that was

02:09   10   before any deductions.

11        Is that right?

12        THE WITNESS:   You said gross revenue; the ████ is

13   the net revenue.   After Copart, you know, retaining for towing

14   and so fort.

02:09   15   Q.   Right.   So the ████ net revenue that you've got here,

16   which reflects the total sales of all the cars in Texas less

17   the amount for towing and other expenses from the third-party,

18   that's the ██████████; correct?

19   A.   Yes.

02:09   20   Q.   Now, do you and K4K's expert agree on that number being

21   the net revenue?

22   A.   Yes, we do.   No dispute on that.

23   Q.   So the dispute between you and K4K's expert as you

24   understand it is is whether -- strike that.

02:09   25        What are the areas of disagreement between you and

1   K4K's expert as it relates to the computation of incremental

2   profit?

3   A.   Right.

4   Q.   Just categories now.

02:10   5   A.   Yes.  So I'll just point out that all the expenses that I

6   show here, there is no dispute about.  The incremental

7   expenses, we're both in agreement on.

8        Where the dispute arises is in -- the opposing expert

9   makes a deduction for a purported apportionment to infringing

02:10   10   versus non-infringing factors, in which he further reduces

11   that ███████████ by another 37 percent down to ███████████.  I

12   disagree with his methodology and just the underlying

13   assumption on that.

14        The second big adjustment is he then further reduces by

02:10   15   50 percent that revenue number for a single line item expense,

16   which is the grant money that is funneled over to the sister

17   company, Oorah, he's deducting that as a deductible expense.

18        And then the third area are common expenses that he

19   allocates to the Texas revenue that he assumes contributed to

02:11   20   the car donation revenue in Texas.  And I disagree with that.

21   Q.   So just so we're clear, the three areas -- and I'll talk

22   to you about each of those.  One is the apportionment of

23   revenues; correct?

24   A.   Yes.

02:11   25   Q.   Then there is the grant money; correct?

Cook - Direct - Pittman

1    A.    Yes, the grants, yes.

2    Q.    And then common expenses.

3    A.    And then common expenses.

4    Q.    So let me ask you about the profit apportionment that Mr.

02:11    5    Hall is suggesting.  Are you aware that he uses what he calls

6    cost-based apportionment?

7    A.    Yes, I'm aware of that.

8    Q.    And would you agree with that?

9    A.    No, I don't -- I'm aware of cost-based apportionment and

02:11    10    how that's used and have used it myself in matters, but I

11    don't believe the way he's done it is consistent with any way

12    that I've ever seen done before.

13    Q.    Well, let me ask you, based on your analysis of the

14    donations and the market, do you believe there should be any

02:12    15    apportionment of profit?  In other words, this ██████, do

16    you believe that should be reduced under the concept of

17    apportionment?

18    A.    Right, and that's -- that's the biggest I think dispute

19    is the underlying assumption for why apportionment is even

02:12    20    necessary in this case.  Because this is not a case where

21    there have been different types of advertising, some of which

22    used the infringing mark and some of which don't.  My

23    understanding is that all of the advertising used the

24    infringing mark, and I believe that's been testified to by

02:12    25    some of the witnesses, I believe I site that in one of my

Cook - Direct - Pittman

1    prior reports.

2         So if you understand the donors donate after they hear

3    advertising and all that advertising used the infringing mark,

4    then the assumption is that all advertising was using the

02:13    5    infringing mark, and therefore all donations are based -- all

6    donation revenue is based on use of the infringing mark.  And

7    so there would be no reason to apportion anything to

8    non-infringing use of the mark.

9    Q.   So, it's your belief that there shouldn't have been any

02:13    10   apportionment at all.

11   A.   Correct.  And unless the other side had evidence that

12   they could have introduced that showed that there were some

13   donors that donated because they heard a different ad that

14   didn't use the mark, which I see no evidence of; or they could

02:13    15   have done a survey for instance, they have all the donors'

16   contact information, they could have contacted the donors; I'm

17   aware that a lot of companies when donors call in, they have a

18   script and collect data on how they heard about the company,

19   in which channel, advertising channel they heard to call in,

02:13    20   and I used that kind of information on prior cases to be able

21   to apportion and segregate out infringing versus

22   non-infringing advertising, but in this case my understanding

23   is that all the advertising infringed.

24        THE COURT:  Can you just explain for me, Mr. Cook,

02:14    25   when you say there's this category apportionment, and I know

Cook - Direct - Pittman

1    you've been answering questions on it, can you just explain

2    what you mean by apportionment?

3              THE WITNESS:  Certainly.

4              THE COURT:  And what costs it goes to?

02:14    5              THE WITNESS:  Right.  So apportionment is not a

6    cost; apportionment is a methodology to segregate the revenue

7    between infringing and non-infringing revenue.

8              So classically, for instance, like in a patent case

9    you might have a device that has a component that is alleged

02:14    10   to infringe a patent.  And so using a cost-based approach you

11   would say that component, that that patent and component makes

12   up 20 percent of the device cost, and therefore you apply 20

13   percent to the device revenue.

14             THE COURT:  Okay.

02:15    15             THE WITNESS:  Right?  Or in advertising, I've done

16   cases where -- on a trademark case, where over a period of

17   time the plaintiff has claimed all revenue that the defendant

18   earned while using the mark.  But we were able to determine

19   that some of the advertising used the mark and some of it

02:15    20   didn't.  Some radio ads used the mark, some didn't.  Some of

21   the online advertising went through a certain website that

22   didn't use the mark, or through e-mail blasts that didn't use

23   the mark.  And so that's the kind of apportionment analysis

24   that is really based on a proper cost-based method.

02:15    25   BY MR. PITTMAN:

*United States District Court*
*Trenton, New Jersey*

Cook - Direct - Pittman

1  Q.   Now, in terms of both the ███████ --

2           THE COURT:  Wait, hold on.  So you're saying in this

3  case, there was no way to determine a factor for apportionment

4  between infringing and non-infringing advertising?

02:16    5           THE WITNESS:  Right, based on the understanding that

6  all the advertising used the mark.  Had there been advertising

7  channels that didn't use the mark, then they could have done

8  an apportionment analysis that said look, you know, just using

9  an example, 30 percent of this radio ad never used the mark,

02:16    10 and we're going to say 30 percent of our revenue we're going

11 to deny because that doesn't use the mark.  That would be one

12 way that I have seen it done before.

13          THE COURT:  So Mr. Wentworth had testified that he

14 didn't know of any advertising in Texas from -- well, he

02:16    15 started in 2008; he goes back to 2003, until either 2011 or

16 2012.  So could you apportion that out?

17          THE WITNESS:  Well, we have Kars with a K's own

18 advertising records and expenses that show that they did

19 advertise in Texas, and that's what you see here on the

02:17    20 screen.  If you look about halfway down, and maybe you can

21 adjust --

22          THE COURT:  I see it, Texas.

23          THE WITNESS:  Oh yeah, you've got it on your screen.

24 So do you see the Texas Specific Advertising Expense, the

02:17    25 biggest one is online advertising using Google.  And they know

Cook - Direct - Pittman

1    how many hits were at Texas addresses, so you can see every

2    year they had Google expense.  They also did some Texas radio

3    station down at the bottom, went on and off for some years.

4    And then their national advertising, which is primarily Yahoo,

02:17    5    that was also every year.  So there was definitely K4K

6    advertising going on in each year 2008.

7            THE COURT:  And these numbers that you see in Texas

8    Specific Advertising Expenses, where did you derive those

9    numbers from?

02:17    10           THE WITNESS:  Those come directly from the records

11   that Kars 4 Kids produced, and Mr. Hall and I are both in

12   agreement on those numbers.  We have no dispute on those

13   numbers.

14           THE COURT:  Okay.

02:18    15   BY MR. PITTMAN:

16   Q.   And there were some years for Texas specific, for

17   instance, 2010, '11 and '12, there was no money spent on Texas

18   radio stations; correct?

19   A.   Yes, yes, you can see that, yeah, 2010 through 2012.  And

02:18    20   again, 2016, and it looks like recently they haven't as well.

21   Q.   And what you show on Texas radio stations for 2008, 2009,

22   how are those amounts compared to what they are spending in

23   2013 and 2014?

24   A.   Well, as you can see they went from below ███████ a year

02:18    25   in 2008/2009, to a ███████ and then ███████ range in 2013 and

Cook - Direct - Pittman

1    2014.

2    Q.   So from 2008 to 2012, there was very little Texas radio

3    station advertising according to the records that you looked

4    at?

5    A.   Yes, that's correct.

6    Q.   Now, on the issue again of apportionment, is it your

7    testimony that all of the -- or is it your testimony that

8    you're not aware of any advertising K4K did that didn't use

9    the infringing mark in Texas?

10   A.   Yes, that's my understanding based on the records I've

11   seen, as well as the testimony in this matter.

12   Q.   Now, even assuming apportionment had been proper, did Mr.

13   Hall have the type of information from which he could have

14   done an analysis of donors to see if they didn't hear the

15   infringing mark or if they donated for some other reason?

16   A.   Yes.  As I mentioned the donor information that was

17   received has donor contact information, address, phone number,

18   so they could have contacted those donors and done a survey.

19   Q.   It's your understanding Mr. Hall did not do that?

20   A.   That's right.

21   Q.   The next category you talked about the grants and I

22   believe you said Mr. Hall is also asking that you deduct

23   grants from this incremental profit.

24   A.   That's correct --

25   Q.   In order to determine the incremental --

Cook - Direct - Pittman

1    A.   That's the next big differentiating factor between his
2    and my calculation after apportionment.  Now we're talking
3    about expense deductions, and he deducts the grants that are
4    funneled to Oorah.
02:20  5    Q.   And how much is Mr. Hall trying to deduct for the grants
6    given to Oorah?
7    A.   Over 50 percent of the remaining apportioned revenue that
8    he determines, is -- he's deducting for this grant expense.
9    He's allocating it to Texas, because there's no specific
02:20  10   dollar amount that comes out of Texas, it's just an
11   allocation.  But yes, it's over 50 percent.
12   Q.   So ██████████ is --
13   A.   That's correct, ██████████ of the approximately ██
14   ██████ of apportioned revenue that he's using.
02:21  15             THE COURT:  And what was the percent on
16   apportionment?
17             THE WITNESS:  So apportionment he's using 63
18   percent.  He takes the ██████████ net and says I'm going to
19   reduce that by 37 percent or multiply by 63 percent to get
02:21  20   what he's calling infringed revenue, and then from that he
21   makes his deductions, and the first big one is the grants of
22   over 50 percent.
23             THE COURT:  I see.
24             THE WITNESS:  So he accepts all of these incremental
02:21  25   advertising expenses, but then he goes beyond that and takes,

*United States District Court*
*Trenton, New Jersey*

Cook - Direct - Pittman

1  you know, another -- whacks off another 50 percent.

2  Q.   So is he suggesting that 37 percent is non-infringing

3  revenue?

4  A.   That's correct.  When we go up to the apportionment part,

02:21  5  he's saying that ████████ in revenue, he's attributing 37

6  percent to non-infringing factors.

7  Q.   But you didn't see 37 percent of the advertising that

8  didn't use the infringing mark, did you.

9  A.   No.  His assumption is based on as he explains it a

02:22  10  proxy.  He's saying that advertising as a percentage of total

11  organizational operating expense, is a proxy for customers who

12  donated because of advertising versus other factors.  And I

13  will just say from an accounting and finance standpoint,

14  there's no way to ascertain or assign revenue based on the

02:22  15  percentage of advertising as a percentage of total company

16  costs.  I've never heard of anything like that.

17  Q.   And he called it advertising-to-fund ratio?

18  A.   That's correct.

19  Q.   Have you as an expert ever heard of such a ratio?

02:22  20  A.   No, I haven't.

21  Q.   Have you ever seen in any expert materials?

22  A.   No.

23       THE COURT:  Sorry to interrupt you again; when you

24  are looking at this 37 percent non-infringing --

02:23  25       THE WITNESS:  Yes, 37 percent is what he's

*United States District Court*
*Trenton, New Jersey*

Cook - Direct - Pittman

1    attributing to non-infringing factors.

2            THE COURT:  So, you multiplied by the 37 percent

3    from the gross amount or from the net --

4            THE WITNESS:  The net.

02:23    5            THE COURT:  The net?

6            THE WITNESS:  Yeah.  So the net of ███████, he's

7    reducing by 37 percent or multiplying by 63, to get █

8    ██████.  So that becomes -- that becomes his new revenue

9    number.

02:23    10            THE COURT:  Okay.

11            THE WITNESS:  Yeah.

12    BY MR. PITTMAN:

13    Q.   And then he takes that ██████████ and he reduces --

14    A.   Another 50 percent -- 51 percent for the grants, yeah,

02:23    15    that's the ██████████, as well always the incremental

16    expenses that I have here, and then there's the third item

17    that we disagree with.

18    Q.   And Mr. Hall defines this ██████████ in grants as an

19    expense?

02:23    20    A.   Yes, he does.

21    Q.   How is this different from -- well, strike that.

22            Do you consider it a true expense in the accounting

23    sense of the word?

24    A.   No, not a business expense because the for-profit and a

02:24    25    not-for-profit operate in different ways, and this is clearly

*United States District Court*
*Trenton, New Jersey*

Cook - Direct - Pittman

1    not an expense used to generate revenue.  It's not a business

2    expense.

3    Q.   And how is it different, this grant, what he calls an

4    expense, different from the other expenses some of which you

02:24    5    allow deductions for?

6    A.   So, the grants are paid out of what's left over.  Unlike

7    a typical business expense that's generally incurred to

8    generate the revenue, whether that's cost of goods sold or

9    salaries or occupancy expense that are needed to run the

02:24    10   business, grants are not needed to run the business.  That's

11   what's left over.

12        So, when you look at a for-profit business, what's left

13   over, the profit is used as dividends to pay or distributions

14   goes back to the shareholders or owners.  In a not-for-profit

02:25    15   company what's left over after paying the business expenses is

16   channeled in the form of grants to their charitable mission

17   operation, which in this case is the sister company Oorah.

18   Q.   Have you ever seen grants deducted for the purpose of

19   determining incremental profits in a trademark case?

02:25    20   A.   Well, I haven't had a nonprofit trademark case, so -- the

21   answer would be yes, but I haven't had a nonprofit trademark

22   case before.

23   Q.   You've never seen it deducted?

24   A.   That's correct.

02:25    25   Q.   And the expert material that you looked at -- and you're

*United States District Court*
*Trenton, New Jersey*

Cook - Direct - Pittman

1    aware that Mr. Hall also submitted some expert materials?

2    A.    Yes.

3    Q.    Is that some of the same stuff you rely on as an expert?

4    A.    Yes.  And by expert materials are you talking about

5    reliance on publications and texts?

6    Q.    Yes, like the McCarthy, the --

7    A.    Yes.

8    Q.    Have you seen anything in your time as an expert where a

9    grant has been deducted for the purpose of determining

10   incremental profits in a trademark case?

11   A.    No, and I can't say that I've seen nonprofit companies

12   addressed in those -- those treatises.  But no, to answer your

13   question, I haven't seen that.

14   Q.    Now, the last area where you say you and Mr. Hall have

15   disagreement is in what he calls common expenses?

16   A.    Yes.

17   Q.    Can you tell the judge what Mr. Hall's definition of

18   common expenses are?

19   A.    So, Mr. Hall has assumed that all expenses incurred on a

20   national level of Kars with a K, should be allocated to Texas.

21   And there's a big problem with that because a large number of

22   those expenses are for the charitable mission.  It's what the

23   IRS requires them to break out into different categories,

24   expenses that are for the charitable mission called program

25   services, versus those expenses that are for fundraising,

Cook - Direct - Pittman

1    which in this case is for soliciting car donations.

2         So the IRS already requires them to break those out

3    into those separate categories.  But Mr. Hall ignored that in

4    his analysis and simply took every single expense that was

02:27   5    reported on that Form 990, whether it was program services or

6    any other category, and assumed that it contributed to the car

7    donation revenue.

8    Q.  And what was that approach called that Mr. Hall was

9    using?

02:27   10   A.  So he's using what's called the full absorption approach,

11   in which every expense is assumed to somehow contribute to the

12   infringing revenue.

13   Q.  And what approach are you using?

14   A.  I'm using what's called the incremental approach, in

02:28   15   which you look at only those expenses that would have been

16   avoided or saved if the infringing revenue hadn't been

17   produced.

18        So, in other words, if K4K didn't have a Texas

19   operation which makes up approximately three or four percent

02:28   20   of its total revenue, would it still have continued to incur

21   certain expenses, or would some expenses have gone away.  The

22   only expenses that would have gone away are these Texas

23   specific advertising expenses.  So those are what we call

24   incremental expenses.

02:28   25   Q.  And what do experts say is the approach that best meets

Cook - Direct - Pittman

1   the purposes of the Lanham Act?

2   A.   So, from a purely accounting and financial economic

3   perspective, the incremental approach is absolutely the proper

4   method for assessing profit contribution of a segment,

02:29   5   division, territory; any piece of an entire company you should

6   never allocate costs.  That's sort of a fundamental doctrine

7   so to speak in financial accounting and management accounting.

8           THE COURT:  You never allocate costs?

9           THE WITNESS:  Right, not if you're trying to

02:29   10   ascertain the product contribution or economic benefit of a

11   subsidiary or territory or segment, because that disguises the

12   true contribution of that entity.  So you would only look at

13   incremental costs.

14   A.   Therefore, to answer your question, Mr. Pittman, the

02:29   15   appropriate approach to use in determining economic benefit or

16   a defendant's profits, damages remedy, in my opinion is the

17   incremental approach.  Because based on basic finance and

18   accounting that is what best measures the economic benefit

19   contributed by that territory or segment or whatever it is

02:30   20   that we're analyzing.

21           THE COURT:  So, I'm assuming that Kars 4 Kids has a

22   location where they work out of and they have rent, or some

23   kind of mortgage.

24           THE WITNESS:  Right.

02:30   25           THE COURT:  They have heat and air conditioning, and

Cook - Direct - Pittman

 1  probably security costs, things like that; do you include that
 2  in incremental costs or not?
 3            THE WITNESS:  So, if you use the incremental
 4  approach, you wouldn't.  If none of the -- if the heat, the
02:30  5  depreciation, the rent, if none of that goes down when that
 6  four percent of Texas revenue is lost, because that's all
 7  Texas makes up of their total revenue is four percent, and you
 8  assume that the headquarter's costs still keep going on, the
 9  CEO salary still keeps getting paid the same, then that's a
02:31  10  non-incremental expense and should not be deducted.  Based
 11  again, on basic accounting and finance teaching on how to
 12  assess economic benefit for profit contribution.
 13            THE COURT:  So when you define incremental costs,
 14  and you have Texas specific advertising expenses, that's an
02:31  15  incremental cost?
 16            THE WITNESS:  Yes, yes, absolute, we're both in
 17  agreement, Mr. Hall and I, that those are the incremental
 18  expenses.  The only -- the only place we disagree is he
 19  includes the allocation of grants as an incremental expense as
02:31  20  well.  And then there's one smaller item which we'll talk
 21  about that's very small that I don't believe he's
 22  demonstrated.
 23  BY MR. PITTMAN:
 24  Q.   In your incremental approach looking here at Exhibit 447,
02:31  25  you do have some Texas specific advertising expenses, and you

Cook - Direct - Pittman

1    have Google, Dallas, Yellow Pages, radio stations, and

2    national advertising.  So you also allow some national

3    advertising as an incremental expense?

4    A.   Yes, there was Yahoo national advertising, which for

02:32    5    whatever reason they weren't able to produce invoices or

6    specific billing information related to Texas; so Mr. Hall

7    just allocated it based on revenue, and we accepted that.

8         I mean I would have preferred to see what -- you know,

9    why Google, the actual website hits within Texas; I think that

02:32    10   would have been a more accurate representation.  But we

11   accepted his allocation based on revenue for the Yahoo.

12   Q.   And what is your understanding as an expert as to who was

13   supposed to -- or who has the burden to establish the

14   deductibility of expenses?

02:32    15        MR. LITTERINE-KAUFMAN:  Objection, your Honor; it's

16   a legal question, it's not something that he's qualified to

17   testify on or shouldn't.

18        THE COURT:  Frank, can you just read back the

19   question?

02:33    20        (Question read back by the reporter.)

21        THE COURT:  I'll sustain this one.  Because you're

22   asking which party; right?

23        MR. PITTMAN:  Yes, your Honor.  As between him and

24   Mr. Hall, which expert.

02:33    25        THE COURT:  Oh.  I guess you can ask him whether he

*United States District Court*
*Trenton, New Jersey*

Cook - Direct - Pittman

1    thought it was his obligation.

2    BY MR. PITTMAN:

3    Q.   Sir, as an expert -- and how many years have you been

4    doing this?

02:33    5    A.   30 years, over 30 years now.

6    Q.   As an expert what is your understanding as to who had the

7    burden on expenses?

8         MR. LITTERINE-KAUFMAN:  Objection, your Honor; it's

9    the same question.

02:33    10        THE COURT:  It is.

11        So, Mr. Cook, did you feel it was your obligation to

12   determine common expenses?

13        THE WITNESS:  Right.  In my experience working on

14   both sides, plaintiff and defendant, my experience is that the

02:34    15   plaintiff must prove defendant's sales only; and that the

16   defendant has the obligation or the infringer has the

17   obligation and burden to prove the deductions expenses.

18        THE COURT:  All right, thank you.  You said that

19   earlier.  So on common expenses, you had indicated that if you

02:34    20   were going to do it, if you were going to allow an adjustment

21   on that, it would be four percent because that's the

22   percentage of Texas revenues against Kars 4 Kids' entire

23   revenue?

24        THE WITNESS:  That would be one step, yes, based on

02:34    25   the revenue, and Mr. Hall and I don't disagree on the

Cook - Direct - Pittman

1    percentage of revenue.  But the other step is determining if

2    those expenses even related to in any way --

3             THE COURT:  That's my question.  So, can you point

4    out, if you know, what expenses common, whatever your

02:35   5    adversary --

6             MR. PITTMAN:  Hall.

7             THE COURT:  Called as common expenses, which ones

8    you wouldn't allow and which ones you would under your

9    analysis.

02:35   10            THE WITNESS:  Yes.

11            THE COURT:  I'm sorry; it's a weak phrased question,

12   but it's the best I can do.

13            THE WITNESS:  No, your Honor, I totally understand

14   where you're getting at.  So, this is the benefit of the IRS

02:35   15   Form 990, is that it breaks it into three categories:  Program

16   services, which is the charitable mission; the fundraising

17   arm, which is for solicitation of donations and operation of

18   the fundraising arm; and then a third category called

19   management in general, which is sort of the overall catchall.

02:36   20            The instructions in filling out that form the IRS

21   requires the 501(c)(3) to only put in program services those

22   expenses that relate to its charitable mission.  So Mr. Hall,

23   for instance, has included salaries that he says benefit and

24   contribute to car donation, but he's including salaries that

02:36   25   are in the program services, and the IRS says you can't do

*United States District Court*
*Trenton, New Jersey*

Cook - Direct - Pittman

 1   that.

 2          And if we assume that Kars 4 Kids reported correctly

 3   and accurately, then anything in that program services column,

 4   particularly the grants, should not be deducted.  Only those

02:36  5   expenses in the fundraising column relate to the car donation

 6   operation and should be deductible.  And even those contain

 7   certain expense categories, such as, for instance, office

 8   expense, which you think well yeah, every company has office

 9   expense, it's legitimate to allocate that, and I would agree

02:37 10   if you could prove that it somehow relates to the car donation

11   program.

12          But we know that their office in addition to the car

13   donation program they have real estate that they've taken on

14   and that they're operating that would be part of that

02:37 15   fundraising arm.  And there is perhaps rabbinical activities

16   going on there and other activities that they have discussed

17   that I've heard in this trial, that are not just part of the

18   car donation program.

19          So, in my experience just to get to -- cut to the

02:37 20   chase, if you're going to use common expenses, you need to

21   demonstrate from a general ledger or a good discussion why

22   each of those expense line items actually contribute to or

23   relate to the infringing revenue.  And if you don't do that

24   and you have just for instance a line item that says other

02:38 25   expenses, which there is one, or bad debt, which Mr. Hall

Cook - Direct - Pittman

1  includes, and there's clearly -- there wouldn't be any bad

2  debt expense related to car donation, that's where the analyst

3  has to exercise some sort of judgment and do some analysis in

4  making the deductions, and not just blanket accept everything

02:38  5  that's reported.

6          THE COURT:  Thank you.

7  BY MR. PITTMAN:

8  Q.   And Mr. Cook, what is the dollar amount of the common

9  expenses that Mr. Hall applies with which you disagree?

02:38  10  A.   Let's see; the dollar amount -- well, I can tell you all

11  combined he's basically deducting 99 percent of that net

12  revenue number, 99 percent goes away under his calculation,

13  and he only leaves one percent, or ██████████ left.

14          Which demonstrates really what would be called a

02:39  15  perverse incentive for being able to deduct grants.  Because

16  it would make the damage remedy under the Lanham Act have no

17  effect for a nonprofit organization that can simply claim oh

18  well, you know, all of our grant money which is everything

19  left over, you know, after expenses, that's an expense.

02:39  20          And so they basically can infringe without impunity on

21  these kind of cases, where defendant's profits are a monetary

22  remedy, because they would never have to pay any profit other

23  than a, you know, immaterial amount.

24  Q.   Finally look at ACCFK Exhibit 448.  And what is Exhibit

02:39  25  448?

*United States District Court*
*Trenton, New Jersey*

Cook - Direct - Pittman

1   A.   So this is just a final summary which comes from 447, the

2   total column; it starts with the net revenue of ███████,

3   and shows all of the incremental expense deductions that Mr.

4   Hall and I are in agreement on, with the exception of his

02:40   5   grants.  And it gets to a bottom line incremental profit

6   number of ██████████.

7              MR. PITTMAN:  I'm going to offer into evidence, your

8   Honor, Exhibit 448.

9              THE COURT:  Any objections?

02:40   10              MR. LITTERINE-KAUFMAN:  No objection.

11              THE COURT:  All right, admitted.

12              (Defense Exhibit ACCFK-448 was marked into

13   evidence.)

14   BY MR. PITTMAN:

02:40   15   Q.   Now, sir, can you tell -- you identified about ████████

16   in grants, ███████ in -- I'm sorry; ███████ or so in

17   apportionment, █████████ in grants, and ███████ or so in

18   common expenses.  Can you tell the Court the difference, the

19   dollar difference, in the amount you say represent incremental

02:40   20   profit, and what Mr. Hall is representing as profit from

21   Texas?

22   A.   Yes.  And just to make clear, when you say I've

23   identified that ████████ in grants, that was -- that Mr. Hall

24   has identified that I have analyzed.

02:41   25   Q.   Correct.

*United States District Court*
*Trenton, New Jersey*

Cook - Cross - Litterine-Kaufman

1   A.   Yes.  So as I pointed out he's essentially deducting 99

2   percent of that ██████████, which gets to his number of

3   ██████ approximately; versus the ██████████ that I show of

4   incremental profit.

02:41   5   Q.   Finally, Mr. Cook, the opinions that you provided today,

6   have you provided your opinions to the Court to a reasonable

7   degree of economic certainty?

8   A.   Yes, I believe so.

9   Q.   And do all those opinions use universally accepted

02:41   10   standard principles of economics and damages calculations for

11   trademark cases?

12   A.   Yes, they do.

13          MR. PITTMAN:  Pass the witness.

14          THE COURT:  All right.  Mr. Kaufman?

02:42   15          MR. WRIGHT:  May I approach, your Honor?

16          THE COURT:  You may.

17          (Handing to witness and Court.)

18          THE COURT:  You may proceed.

19   (CROSS-EXAMINATION OF BRYCE COOK BY MR. LITTERINE-KAUFMAN:)

02:42   20   Q.   Good afternoon, Mr. Cook.

21   A.   Good afternoon.

22   Q.   You testified on direct that you went and visited America

23   Can!; is that correct?

24   A.   Yes, that is.

02:42   25   Q.   And you made that visit in July, 2019; is that correct?

Cook - Cross - Litterine-Kaufman

1   A.   Yes.

2   Q.   Now, you prepared reports in this action that were dated

3   January and March 2018 as well; correct?

4   A.   That is correct.

02:43  5   Q.   And in those 2018 reports you calculated Kars 4 Kids'

6   profits or what you determined to be Kars 4 Kids' profits;

7   correct?

8   A.   Yes, at a national level.

9   Q.   And that was for purposes of opining on the amount of any

02:43  10   disgorgement remedy; correct?

11   A.   Yes, that's correct.

12   Q.   You wanted your 2018 reports to be complete; right?

13   A.   Yes, at the time based on a national level of defendant's

14   profits, that's correct.

02:43  15   Q.   But you didn't do a visit to America Can! in order to

16   calculate Kars 4 Kids' profits for your 2018 reports, did you.

17   A.   At that point I hadn't visited, that's correct.

18   Q.   Now, the visit to America Can! that occurred in July of

19   '19, you were there for just one day; right?

02:43  20   A.   Correct.

21   Q.   And it wasn't even the whole day, was it.

22   A.   It was about a half day.

23   Q.   Would you say it was about a few hours?

24   A.   Yes, a few hours, half day, however you want to say it.

02:44  25   Q.   So you flew down -- or you flew to Dallas; correct?

*United States District Court*
*Trenton, New Jersey*

Cook - Cross - Litterine-Kaufman

1    A.    Yes.

2    Q.    And you had lunch on the flight; right?

3    A.    I believe so.

4    Q.    And you were back at the airport to fly home by dinner

02:44    5    time; correct?

6    A.    That is correct.

7    Q.    So your entire visit happened between lunch and dinner?

8    A.    Yes, it did.

9    Q.    You spoke a little bit on direct about an apportionment

02:45    10    that Mr. Hall performed; is that correct?

11    A.    Yes.

12    Q.    And would you agree that the general goal of an

13    apportionment analysis is to apportion revenue between

14    infringing and non-infringing factors?

02:45    15    A.    Yes.

16    Q.    In your experience courts allow apportionment as a

17    deduction when calculating profits; correct?

18         MR. PITTMAN:  Your Honor, I'm going to object; it

19    calls for a legal conclusion.

02:45    20         THE COURT:  Denied.

21    A.    I have used apportionment in my own calculations as I

22    testified; I'm not sure how the court ultimately ruled on

23    those.  As I think about it I believe that there were summary

24    judgment rulings on the ones that went to trial.  So I'm not

02:45    25    sure how the courts have ruled.

*United States District Court*
*Trenton, New Jersey*

Cook - Cross - Litterine-Kaufman

1   Q.   But in your experience courts allow apportionment as a

2   deduction under the Lanham Act --

3         THE COURT:  So I'll sustain that.

4   Q.   You mentioned that there were at least two cases in which

02:46   5   you performed an apportionment analysis in the past?

6   A.   Yes.

7   Q.   And apportionment was a big issue in those cases; right?

8   A.   Yes, it was.

9   Q.   And you were engaged in those cases by the alleged

02:46   10   infringer; correct?

11   A.   Correct.

12   Q.   And just to make clear, in those cases you did do an --

13   you advocated for an apportionment; correct?

14   A.   Yes, it was something that could absolutely be done

02:46   15   readily in those cases based on the data and facts.

16   Q.   In this case you served a report, I believe it was on

17   October 22nd, 2018; does that sound right to you?  2019 I

18   mean.

19   A.   Yes, that was my most recent report, that's correct.

02:46   20   Q.   And in that report you discussed factors that could have

21   contributed to Kars 4 Kids receiving donations other than

22   advertising with the marks; correct?

23   A.   Are you referring to where I refer to Mr. Hall's citing

24   of factors?

02:47   25   Q.   Yes, I am.

Cook - Cross - Litterine-Kaufman

1  A.  So, I referred to what Mr. Hall said certain factors

2  were.

3  Q.  Okay.  And one of the factors discussed in your report is

4  people's desire to support Kars 4 Kids' charitable cause;

02:47  5  isn't that right?

6  A.  That's one of the factors Mr. Hall cites.

7  Q.  And one factor is the tax benefit of making a donation to

8  a charity; correct?

9  A.  That's another factor that he cites.

02:47  10  Q.  And another is the convenience of donating a vehicle as a

11  way to get it out of your driveway say; correct?

12  A.  That's another factor that he cites.

13  Q.  Do you agree that those were factors that contributed to

14  Kars 4 Kids receiving donations?

02:47  15  A.  Sure, there are many factors that contribute; the

16  question is did the use of the infringing mark concurrently

17  contribute.

18  Q.  To be clear, you agree that those factors did contribute

19  to Kars 4 Kids receiving donations.

02:48  20  A.  Sure.

21  Q.  In this case you did not do an apportionment; correct?

22  A.  No.  As I've already stated, one, that's not my burden to

23  do; and two, I didn't feel that the underlying facts merited

24  or demonstrated that there would be a way to do that, unless a

02:48  25  survey was done.

*United States District Court*
*Trenton, New Jersey*

Cook - Cross - Litterine-Kaufman

1 Q.  So the profits figure that you put forward, that assumes

2 that every donation Kars 4 Kids received from a donor in

3 Texas, was the result of advertising using the Kars 4 Kids

4 marks; isn't that right?

02:48   5 A.  Yes, that's correct.

6 Q.  On direct you testified a little bit about the

7 advertising for fundraising ratio, do you recall that?

8 A.  Yes.

9 Q.  And that's the ratio that Mr. Hall uses to apportion Kars

02:49   10 4 Kids' revenue from Texas donors; correct?

11 A.  Yes.

12 Q.  Now, the advertising for fundraising ratio would only

13 apply when the infringer is a nonprofit; isn't that right?

14 A.  The way he's used it based on fundraising and excluding

02:49   15 grants from the denominator of his calculation, that's

16 correct.  But just the fundamental assumption that advertising

17 somehow relates to the percentage of customers that donated --

18 or I should say donors that donated based on hearing the ad,

19 that has no basis in accounting or finance or marketing; I've

02:50   20 never heard anything like that proxy that he assumes.

21 Q.  That wasn't really my question, though.  My question is

22 you can only use the advertising for fundraising ratio in a

23 case where the infringer is a nonprofit; isn't that right?

24 A.  Well, I would disagree that you could use that

02:50   25 advertising for fundraising ratio for the very fact -- reasons

*United States District Court*
*Trenton, New Jersey*

Cook - Cross - Litterine-Kaufman

1    I just stated.  I believe it's an improper application.

2  Q.   One of the inputs into the advertising for fundraising

3    ratio is the amount of -- is the amount spent on advertising

4    for the purposes of fundraising; correct?

5  A.   Yes.

6  Q.   And only nonprofits spend on advertising for the purposes

7    of fundraising; isn't that right?

8  A.   Yes.

9  Q.   So there would only be that input in a case where the

10   alleged infringer was a nonprofit; isn't that correct?

11 A.   Yes.  If you're asking me about the inputs, the input

12   itself, there's nothing wrong with that number advertising

13   used in fundraising, it's how it's used that's wrong.

14 Q.   And Mr. Cook, you testified on direct that you've never

15   done a case that involved -- excuse me; withdrawn.

16        Mr. Cook, you testified on direct that you've never

17   done a nonprofit trademark case; correct?

18 A.   That's correct.

19 Q.   Now, I'd like to talk about some of the documents that

20   you and Mr. Hall used to identify deductible expenses.  One

21   such document is the Form 990s that Kars 4 Kids filed with the

22   IRS; isn't that right?

23 A.   Yes.

24 Q.   And you would agree that a Form 990 is among the best

25   sources for financial information about a nonprofit; correct?

Cook - Cross - Litterine-Kaufman

1    A.   Yes, at a high level, but not necessarily at a detailed

2    level for purposes of proving the direct assistance or direct

3    contribution of a common expense to infringing revenue.

4    Q.   So I'll just ask the question one more time.  You'd agree

02:52    5    that a Form 990 is among the best sources for financial

6    information about a nonprofit; isn't that right?

7    A.   Yes, at a high general level, that's correct.

8    Q.   Do you have in front of you a transcript of your November

9    6th, 2019 deposition?

02:52    10    A.   Is that in one of the tabs?

11    Q.   No, it's a separate bound book.

12    A.   I don't have that.

13    Q.   We'll circle back to that.

14         In your past work as an expert you've reviewed Form

02:52    15    990s to ascertain revenue and expenses; right?

16    A.   Yes.

17    Q.   And you and Mr. Hall also relied on Kars 4 Kids' general

18    ledger for advertising and marketing accounts; correct?

19    A.   Yes, only -- they only produced a general ledger for the

02:53    20    advertising and marketing, but for none of the other expenses,

21    none of the other common expenses such as occupancy or salary

22    or office expense.  It was only for advertising.

23    Q.   But the general ledger for advertising, marketing and

24    accounts was one -- was one of the documents that you and Mr.

02:53    25    Hall both relied on; correct?

*United States District Court*
*Trenton, New Jersey*

Cook - Cross - Litterine-Kaufman

1    A.   Yes.  Yeah, and I would have liked to have seen that for

2    all the other accounts, but we only got it for the advertising

3    and marketing.

4    Q.   As a general matter you consider a company's general

02:53    5    ledger to be a reliable document for proving expenses;

6    correct?

7    A.   A qualified yes; I mean unless there's reason to doubt

8    the company's accounting or accuracy in the accounting.  But

9    generally, yes, a general ledger will have certainly give you

02:54    10   a much more detailed level than just a high level financial

11   report like a Form 990.

12   Q.   And you have no reason to dispute the reliability of Kars

13   4 Kids' general ledger; correct?

14   A.   Well, I can't verify the voracity of it or dispute the

02:54    15   reliability, I simply accepted it, because -- that's the only

16   information that was available, and I accepted it for purposes

17   of my analysis, yes.

18   Q.   Just to be clear you have no reason to dispute it, do

19   you?

02:54    20   A.   Well, we did -- as I mentioned in my deposition, we did

21   find some errors in it, but that's not uncommon.  I think for

22   general purposes it was reliable enough to quantify the Texas

23   advertising expenses.  And especially when -- when tied back

24   to supporting documents as Mr. Hall attempted to do on certain

02:55    25   of those advertising categories, that makes it even more

Cook - Cross - Litterine-Kaufman

1   reliable.

2   Q.   In your opinion, from an accounting standpoint the level

3   of detail in a general ledger is sufficient to prove

4   deductibility; correct?

02:55   5   A.   It would depend on the facts and circumstances of each

6   matter.  Because, for instance, in some cases a general ledger

7   might not provide enough detail, it might only have general

8   transactions that don't describe specifically what it was for

9   or how it related to the infringing revenue.

02:55   10   So, as a general proposition I would say typically a

11   general ledger will give you detailed information that may be

12   sufficient to determine whether that expense contributes or it

13   directly assists in the generation of infringing revenue.  But

14   again, that can vary case to case.

02:55   15   Q.   And the general ledger that you reviewed in this case, it

16   provided sufficient detail to establish deductibility;

17   correct?

18   A.   Yes, for the advertising expenses, yes, I would agree to

19   that.

02:56   20   Q.   You and Mr. Hall also both relied on a spreadsheet

21   summarizing Kars 4 Kids' Google advertising expenses in Texas;

22   correct?

23   A.   Yes.

24   Q.   You tried to tie that spreadsheet back to source

02:56   25   documents from Google; right?

Cook - Cross - Litterine-Kaufman

1    A.   Yes, there were source documents that K4K produced that

2    we tried to tie back but were unable to.

3    Q.   And the reason you tried to tie the spreadsheet back to

4    source documents was because you didn't want to rely on a

02:56    5    document that was created by Kars 4 Kids; correct?

6    A.   Yes, we -- we weren't even sure Kars 4 Kids produced that

7    document, we assumed they did.  By produced I mean created.

8    But yeah, we always would like to gain a level of comfort.

9    Just like Mr. Hall did in the advertising expenses that he

02:57    10   tied back to invoices and supporting documentation, we would

11   have liked to have done the same thing for Google.

12   Q.   You'd consider a document that came from Google to be a

13   reliable source to document those Google expenses, wouldn't

14   you?

02:57    15   A.   Yes, I would.

16   Q.   And you and Mr. Hall also both relied on five

17   spreadsheets summarizing Kars 4 Kids's advertising expenses

18   for Microsoft Bing; correct?

19   A.   Yes.

02:57    20   Q.   And similarly, you would consider a document generated by

21   Microsoft to be a reliable source document for those expenses;

22   correct?

23   A.   Yes.

24   Q.   You're aware and you testified on direct that Mr. Hall

02:57    25   deducted a portion of Kars 4 Kids' common expenses under the

Cook - Cross - Litterine-Kaufman

1  full absorption approach; correct?

2  A.   Yes.

3  Q.   And common expenses are things like wages for customer

4  service representatives, things of that nature; correct?

02:58   5  A.   Yes, as well as for education and summer camps and things

6  of that nature which he deducted which I disagree with.

7  Q.   Also rent, heat, mortgage, security costs, those things

8  are all common expenses?

9  A.   Yes, but he also included those common expenses that

02:58  10  relate to the program services beyond just the fundraising

11  aspect.

12  Q.   Okay.  To be clear though, my question wasn't about

13  program services, my question was just those are types of

14  common expenses; correct?

02:58  15  A.   Well, again, if you look at a Form 990 which he's relying

16  on, the company does break those out between fundraising and

17  program services.  So when you say rent, the company's

18  required to allocate that rent between fundraising and program

19  services, which it did.  Mr. Hall accepted the entire line

02:58  20  item in all three categories, and did not exclude the rent

21  that was allocated to program services.

22  Q.   Is whether rent a common expense, does that depend on

23  whether it is a program service -- in the program services

24  column or in the fundraising column, or is rent just always a

02:59  25  common expense?

Cook - Cross - Litterine-Kaufman

1  A.   Well, according to the IRS instructions you -- the

2  501(c)(3) is required to allocate common expenses to the

3  specific areas, fundraising or program services.  Those that

4  they can't allocate that don't have a direct -- direct

02:59   5  approach or direct assistance in producing either one of those

6  areas, are put into a third category called management in

7  general.

8  Q.   I'll ask my question again.  I feel like --

9       THE COURT:  I think he's answering them, so go to

02:59   10  your next question.

11       MR. LITTERINE-KAUFMAN:  Yes, your Honor.

12  Q.   Kars 4 Kids would not have been able to get donations

13  from Texas donors if it did not have customer service

14  representatives to process those donations; correct?

02:59   15  A.   I would agree with that.

16  Q.   And to be clear, your analysis does not make any

17  deduction for the wages paid to customer service

18  representatives; correct?

19  A.   That's correct, because I just looked at the incremental

03:00   20  approach, which assumes that those customer service

21  representatives would still receive the same salary if the

22  four percent of Texas donations hadn't been received.  So

23  there was no incremental difference.

24  Q.   And you did not deduct them in your analysis.

03:00   25  A.   That is correct.

Cook - Cross - Litterine-Kaufman

1    Q.   Kars 4 Kids wouldn't have been able to get donations from

2    Texas donors if it didn't incur expenses to maintain an

3    office; correct?

4    A.   That could be debatable, but yes, I understand that

03:00    5    generally a company will have office and overhead expenses.

6    Again, with the caveat that if you're going to include that,

7    you should exclude that portion that the company allocates to

8    program services as we just discussed.

9    Q.   But you didn't deduct anything for office expenses;

03:00    10   correct?

11   A.   No, I'm using the incremental approach which just assumes

12   that only the expenses that change or that directly are

13   incurred as a result of the Texas operation would be deducted.

14        MR. LITTERINE-KAUFMAN:   Could we bring up ACCFK

03:01    15   Exhibit 447?

16   Q.   Can you just remind us what this document is, Mr. Cook?

17   A.   Yes, this is my summary analysis of K4K's revenue, the

18   incremental expenses that it incurred that Mr. Hall and I are

19   both in agreement on.  Which then gets down to the incremental

03:02    20   profit that K4K earned in this period of time, which totals

21   ██████████████.

22   Q.   I'd like to focus specifically on the line that says: On

23   line advertising - Google.  So, according to this document

24   that you prepared, Kars 4 Kids was advertising with Google in

03:02    25   Texas every year between 2008 and June 30th, 2019; correct?

Cook - Cross - Litterine-Kaufman

1    A.    That's what the record shows, yes.

2    Q.    And I don't know how good you are at mental math, but can

3    you tell how much Kars 4 Kids spent on advertising with Google

4    in Texas between 2008 and 2011?

03:02    5    A.    About ███████.

6          MR. LITTERINE-KAUFMAN:   You can take that down;

7    thank you.

8    Q.    You testified on direct that you don't deduct Kars 4

9    Kids' grant expenses in your calculation of profits; correct?

03:03    10    A.    That's correct.

11    Q.    And the effect of not deducting grant expenses is that

12    you treat those expenses as profits; correct?

13    A.    Yes.

14    Q.    So the amount -- the amount that Kars 4 Kids spent on

03:03    15    grant expenses are part of the net profits number that you

16    believe is recoverable in this case.

17    A.    That's correct, because that's the surplus that is then

18    discretionary which they funnel over to their sister

19    organization.

03:03    20    Q.    And it's your understanding that substantially all of

21    Kars 4 Kids' revenue comes from its vehicle donation program;

22    correct?

23    A.    Yes.

24    Q.    And you'd agree that Kars 4 Kids could not have made any

03:03    25    grants if it was not operating a vehicle donation program?

*United States District Court*
*Trenton, New Jersey*

Cook - Cross - Litterine-Kaufman

1    A.    Would you ask that again, please?

2    Q.    Would you agree that Kars 4 Kids could not have made any

3    grants if it was not operating the vehicle donation program,

4    given that it is the source of substantially all of Kars 4

03:04    5    Kids' revenue?

6    A.    No, that's obvious.  As I testified, whatever surplus is

7    left over after paying the business expenses, that's what's

8    available to be funneled as a grant.

9    Q.    So no vehicle donation revenue, no grants.

03:04    10    A.    Correct.

11    Q.    And you'd also agree that it's likely Kars 4 Kids would

12    have spent less on grants if it didn't have the revenue it

13    received from Texas donors; correct?

14    A.    Yes, that's probably true.  Again, Texas only makes up

03:04    15    about four percent of revenue.  But yeah, there would be some

16    amount of grants that might relate to a small decrease or

17    increase of revenue related to Texas.  But again, that's just

18    based on -- those grants are not required to generate the

19    revenue, they're just simply what's made out of what's left

03:05    20    over.

21    Q.    But if Kars 4 Kids didn't have the revenue from the Texas

22    donors, they likely would have made less grants; correct?

23    A.    Yes, you could assume four percent less.

24    Q.    Your opinion assumes that Kars 4 Kids was advertising

03:05    25    with the Kars 4 Kids marks in Texas between 2008 and 2019;

*United States District Court*
*Trenton, New Jersey*

Cook - Cross - Litterine-Kaufman

1    correct?

2    A.   Yes.

3    Q.   So I'd like you to consider a brief hypothetical.  Let's

4    assume Kars 4 Kids did not advertise using the marks in Texas

03:05    5    at any point between 2004 and 2013; do you understand my

6    hypothetical?

7    A.   Yes.

8    Q.   If that were the case, then you'd have no opinion about

9    the amount of disgorgeable profits that Kars 4 Kids would have

03:05    10   earned from Texas during that period of time; correct?

11   A.   Well, then it becomes a liability question and as a

12   damages expert I don't weigh in on that.

13   Q.   If that were the case there would be no disgorgement of

14   profits --

03:06    15   A.   If you're telling me there's no liability, no

16   infringement using the mark, then there's no need for damage

17   testimony.

18   Q.   You testified that you've observed an increase in

19   donations to America Can! beginning in June 2019; correct?

03:06    20   A.   Yes.

21   Q.   And it's your opinion that taking down the Cars For Kids

22   with a C dotcom website after the trial caused that increase;

23   is that right?

24   A.   My testimony was along with the purported withdrawal from

03:07    25   the market of Kars with a K.

*United States District Court*
*Trenton, New Jersey*

Cook - Cross - Litterine-Kaufman

1 Q.  So you'd agree there are other factors aside from taking

2 down the website that likely were responsible for any increase

3 in donations to America Can!?

4 A.  My testimony is it's those two factors combined that

03:07   5 would explain the majority of that increase.

6 Q.  And you haven't done anything to quantify how much of the

7 increase is because of the website being taken down versus

8 Kars 4 Kids no longer accepting donations from Texas, have

9 you?

03:07   10 A.  No, the data doesn't exist to do that.  At least it

11 hasn't been produced that it exists to be able to do that.

12 Q.  Before the website was taken down, potential donors

13 presumably visited the website; correct?

14 A.  Yes.

03:07   15 Q.  And when the website was up the number of donations it

16 caused was, at most, the number of people who visited the

17 website; would you agree with that?

18 A.  Yes.

19 Q.  You don't know how many people visited the website before

03:08   20 it was taken down, do you?

21 A.  I don't believe that data has been produced.  If it had I

22 would have analyzed that and I would have factored it into the

23 calculation and the analysis that I did.

24 Q.  So you don't know how many donations that website was

03:08   25 responsible for before it was taken down; correct?

Cook - Cross - Litterine-Kaufman

1  A.  I believe I already answered that question; that data

2  hasn't been produced, so yes, I'm not aware of it.

3  Q.  Just to be clear then, you don't know how many donations

4  America Can! gained because the website was no longer active;

03:08  5  correct?

6  A.  No, not -- I can't disaggregate that from the purported

7  departure of Kars with a K from the Texas market.

8  Q.  Now, going back to the reports you prepared in 2018, in

9  those reports you opined on what you consider to be

03:09  10  disgorgeable nationwide profits; correct?

11  A.  Yes.

12  Q.  And in those reports you calculated that Kars 4 Kids'

13  disgorgeable profits nationwide were between 161.3 million and

14  $233.4 million; is that correct?

03:09  15  A.  Yeah, I believe that's correct.  Without checking your

16  numbers, I'll accept that you're reading me the right numbers.

17  Q.  It's my understanding from your reports that those are

18  the numbers.

19  A.  Okay.

03:09  20  Q.  And after you made those reports there was a jury trial

21  in this case; right?

22  A.  Yes.

23  Q.  And the jury returned a verdict of infringement in Texas

24  only; correct?

03:09  25  A.  Yes, that's my understanding.

Cook - Cross - Litterine-Kaufman

1    Q.   And then because of that jury verdict you reduced what

2    you believe to be the new amount of Kars 4 Kids' disgorgeable

3    profits to ▮▮▮▮▮▮▮▮▮; correct?

4    A.   Yes, based on the State of Texas only, that's correct.

03:09   5    Q.   So that's a reduction of approximately 90 percent from

6    the reports you prepared before the jury trial?

7    A.   Without doing the math exactly that seems reasonable,

8    because as I've already testified Texas makes up approximately

9    four percent of the nationwide donation revenue that K4K

03:10   10   received.

11   Q.   The profits that figure you came up with is what you

12   believed to be Kars 4 Kids' total incremental profits from

13   Texas donors between 2008 and June 30th, 2019; correct?

14   A.   Yes.

03:10   15   Q.   And you can't say whether that's the same amount by which

16   America Can! was harmed; correct?

17   A.   No, I'm not doing an actual damages calculation or lost

18   profits, I'm doing a defendant's profits calculation.

19   Q.   So you don't know what America Can!'s actual harm was.

03:10   20   A.   No, I never did that calculation.

21   Q.   And you can't identify any specific donations to Kars 4

22   Kids that would have gone to America Can! but for Kars 4 Kids'

23   use of the marks?

24   A.   Not specific by donor, but as I think my analysis showed

03:11   25   at the beginning of my direct I believe that there is a strong

Cook - Cross - Litterine-Kaufman

1    empirical finding that donations received by K4K once they got

2    out of the market, went back to Cars with a C.  And so I think

3    there's a very strong correlation there that that analysis

4    demonstrates.

03:11    5    Q.   But you can't identify a specific donor in Texas who

6    donated a car to Kars 4 Kids instead of America Can! because

7    of the use of the marks; correct?

8    A.   Well, that's not what a forensic accountant or economist

9    would do, that would be fact testimony or the findings of

03:11    10    perhaps a survey expert.  So -- I know there's been evidence

11    introduced on that subject; I was at trial when some of that

12    evidence has been introduced of confusion, so I'm aware that

13    it occurred, but it was not part of my study as an economic

14    and accounting study.

03:11    15    Q.   And you can't right now tell me that a particular car or

16    a particular donor was donated -- car was donated or donor

17    made a donation to America Can! because of the use of the

18    marks by Kars 4 Kids; correct?  You couldn't identify a donor,

19    you couldn't identify a car.

03:12    20    A.   No, that's beyond the scope of what an expert economist

21    or accountant would do.

22          MR. LITTERINE-KAUFMAN:  Pass the witness, your

23    Honor.

24          THE COURT:  All right.  Redirect?

03:12    25

Cook - Redirect - Pittman

1   (REDIRECT EXAMINATION OF BRYCE COOK BY MR. PITTMAN:)

2   Q.   Just a couple of questions.  One, you were asked about

3   the fundraising to advertising ratio, and whether you had

4   worked on nonprofits as it relates to that.  Would you use

03:12   5   that ratio that Mr. Hall used, called fundraising to

6   advertising ratio, in any context?

7   A.   No, I wouldn't.  As I already explained, he takes

8   advertising as a percentage of total costs and assumes that's

9   a proxy for donors who heard the ads.  And I think that's a

03:13   10   very poor proxy and a misuse or misapplication of that ratio.

11   Q.   And this is a nonprofit case?

12   A.   Yes, it is.

13   Q.   And you thought it was inappropriate for this case?

14   A.   I did, yes.

03:13   15   Q.   Now, you also were asked questions about the grants that

16   were conducted and whether they could have been received.  Let

17   me ask you, in a profit company, assuming this were a profit

18   company, the amount that was given as grants, what would that

19   amount be or what would that -- those profits, those excess

03:13   20   profits, what would that be called in a profit company?

21   A.   Right; the analogous to, what's the analogy from a for

22   profit to a nonprofit.  I think the analogy is a for-profit

23   after it pays its business expenses has profit left over,

24   which it distributes as dividends or profits back to the

03:14   25   owners, the shareholders; whereas a nonprofit company, such as

Cook - Redirect - Pittman

1   Kars 4 Kids or America Can!, whatever surplus profit's left

2   over after paying the business expenses, gets distributed in

3   the form of grants through its nonprofit charitable mission.

4   Q.   And in a profit based company, the amount that Mr. Hall

03:14   5   wants to deduct as what he calls an expense, would it be an

6   expense in a profit company?

7   A.   No, because it's that surplus again, it's not -- it's not

8   required -- grant expense is not required to solicit

9   donations.  And even the IRS specifically says keep your

03:14   10   grants separate from your fundraising for solicitation of

11   donations in fundraising; they're two separate categories.

12   Q.   And did the activities that these two entities are

13   engaged in, do they have some characteristics of a profit

14   company?

03:15   15   A.   Yes, they -- they're basically commercial enterprises.

16   They engage in the marketplace using advertising, using a

17   business model, and they both succeed to varying extents as

18   bringing in a large amount of revenue and a large amount of

19   profit surplus.

03:15   20   Q.   And finally, you were asked questions about the Google

21   advertising that's on Exhibit 447; did you do any analysis to

22   determine what this Google advertising was, or did you just

23   accept K4K's word?

24   A.   We tried to do some analysis; there was no context for

03:15   25   that file, it didn't indicate who it was prepared by, whether

*United States District Court*
*Trenton, New Jersey*

1   that was Kars 4 Kids or a Google source document.  For all we

2   know it could have been a Google source document.  As I

3   indicated we would have liked to have tried to tie that back

4   to even lower level source documents, but were unable to do

03:16   5   so.  So again, there was just no context provided by Kars 4

6   Kids with a K in the document production regarding that

7   document.

8           MR. PITTMAN:  Pass the witness.

9           MR. LITTERINE-KAUFMAN:  A couple questions, your

03:16   10   Honor?

11          THE COURT:  No, I think we're finished with Mr.

12   Cook.  I usually only allow direct, cross and then redirect.

13   I gave Mr. Vogl extra time today only because Mr. Pittman went

14   beyond his -- his questions went beyond the direct testimony.

03:16   15   So that's why I allowed him to do that.

16          So, Mr. Cook, thank you for coming.  And you may

17   step down.

18          THE WITNESS:  Thank you, your Honor.

19          (Witness excused.)

03:16   20          THE COURT:  All right.  So we'll break for 10

21   minutes or so and then we'll be back out.

22          (Recess.)

23          THE COURT:  Mr. Pittman, you rest?

24          MR. PITTMAN:  Yes, your Honor.

03:34   25          THE COURT:  All right.  Mr. Vogl?

1          MR. HAEFNER:  Before we begin though, your Honor,

2     just as a housekeeping matter, it's 2:41, I know your Honor

3     wants to finish at a reasonable time.  I've been keeping track

4     of the time, five hours --

03:34     5          THE COURT:  I know, but everybody's late.  I mean

6     Mr. Pittman went a long time, the cross went a long time.

7          MR. HAEFNER:  And I've been keeping track of how

8     much time each party has used, your Honor.

9          THE COURT:  Okay.

03:34    10          MR. HAEFNER:  So on that calculation America Can!

11     has 30 minutes left, and we have an hour and 40 minutes.  So I

12     want to highlight it now, because I don't want there to be a

13     sudden rush at the end.

14          THE COURT:  Well, what does that mean?  How long --

03:35    15     why don't you tell me how long it's going to take you to

16     finish your case?

17          MR. VOGL:  So I'll need 20 minutes with this first

18     witness, and we will expedite the direct; Mr. Kaufman will be

19     doing that direct of Mr. Hall.

03:35    20          THE COURT:  So you have two witnesses?

21          MR. VOGL:  Yes; our fact witness in response to

22     their fact witness, and our rebuttal expert.

23          THE COURT:  All right.  So you have 20 minutes --

24     and how long is the next witness?

03:35    25          MR. LITTERINE-KAUFMAN:  Maybe 40, 45 minutes, your

1    Honor.

2              THE COURT:  Okay.  So that's an hour?

3              MR. HAEFNER:  Approximately, your Honor.

4              THE COURT:  And how much cross do you need, Mr.

03:36   5    Pittman?

6              MR. PITTMAN:  I would say 40 minutes total for the

7    two witnesses.

8              THE COURT:  Okay.  So I'll go to 4:30; it's 2:45.

9              MR. PITTMAN:  Your Honor, we would -- we've talked

03:36   10   in chambers about sort of a wrap-up, because we've got five

11   elements or so, so that if the Court can give me maybe 15

12   minutes to wrap, sort of like a closing argument?

13             THE COURT:  I'll let you do a brief.

14             MR. HAEFNER:  In lieu of closing arguments, your

03:36   15   Honor?

16             THE COURT:  In lieu of closing arguments.

17             MR. VOGL:  And the laches argument, your Honor, you

18   want that to be done today?

19             THE COURT:  I have that all done I believe, unless

03:36   20   you have new facts you want to bring.

21             MR. VOGL:  No, I mean the facts that have come out

22   today have supported what we're saying, but I think you've got

23   everything in the briefs, your Honor, if you prefer that.

24             MR. HAEFNER:  We can put the new facts that came out

03:36   25   today in our closing brief to your Honor.

Landau - Direct - Vogl

1              THE COURT:  When we finish up the testimony, if I

2      have time to hear the laches, I'll do that.  I know which way

3      I'm leaning.  So if you have some facts that you wish to add

4      that came out today, then I'll listen to them now, before I

5      leave today.

6              MR. VOGL:  Okay.

7              THE COURT:  All right.  Mr. Vogl?

8              MR. VOGL:  May I approach, your Honor?

9              THE COURT:  You may.

10             MR. VOGL:  And plaintiff Kars 4 Kids calls Ms.

11     Landau to the stand, please.

12             (ESTI LANDAU), affirmed.

13             THE DEPUTY CLERK:  State your name for the record.

14             THE WITNESS:  Esti Landau.

15             THE COURT:  Can you just spell your last name?

16             THE WITNESS:  L-a-n-d-a-u.

17             MR. VOGL:  Thank you, your Honor.

18     (DIRECT EXAMINATION OF ESTI LANDAU BY MR. VOGL:)

19     Q.   Ms. Landau, can you please remind us where you work and

20     what your job title is?

21     A.   Yeah, I'm the chief operating officer at Kars 4 Kids,

22     Inc.

23     Q.   And what are your responsibilities as chief operating

24     officer for Kars 4 Kids, Inc.?

25     A.   I oversee the advertising and marketing for Kars 4 Kids,

Landau - Direct - Vogl

1    as well as I generally oversee the daily business operations

2    with te car donation program.

3    Q.    How long have you been in that role?

4    A.    That official capacity since January of 2019.

03:38    5    Q.    And how long have you been with Kars 4 Kids all together?

6    A.    I've been there since 2002 and I've been very involved in

7    all aspects of the car donation program since then.

8    Q.    Including advertising and promotion of the car donation

9    business?

03:39    10    A.    Yes.

11    Q.    Ms. Landau, were you involved in the collection of

12    documents in preparation for this case?

13    A.    Yes.

14    Q.    And what role did you serve there?

03:39    15    A.    We went through our internal documents to collect

16    expenses and revenue information as it pertains to Texas.

17    Q.    And does Kars 4 Kids have a practice of keeping invoices

18    and revenue information in the ordinary course of business?

19    A.    Yes, we do.

03:39    20    Q.    And did you also collect information from any third-party

21    vendors?

22    A.    Yes, we collected information from Copart auctions.

23    Q.    Who is Copart, please?

24    A.    Copart helps us sell -- pick up and sell donated

03:39    25    vehicles.

Landau - Direct - Vogl

1  Q.   And do they help you pick up and sell donated vehicles in

2  Texas?

3  A.   Yes.

4  Q.   And what did you collect from Copart?

03:39    5  A.   We collected all pick-up information related to Texas

6  donors.

7  Q.   And what did you do with the information that you

8  collected internally from Copart?

9  A.   We handed that over to our counsel.

03:40   10  Q.   Did you ever have conversations with Kars 4 Kids' expert

11  David Hall in connection with this case?

12  A.   Yes.

13  Q.   Approximately how many such conversations did you have?

14  A.   I would say we had about five or six conversations.

03:40   15  Q.   And generally what did you discuss?

16  A.   So we discussed what we had produced, the expenses and

17  advertising that -- that pertained to Texas.

18  Q.   And do you recall discussing with him any other things

19  about Texas with respect to advertising and expenses?

03:40   20  A.   Not -- the revenue and the amount of expenses that were

21  specific to Texas and that were nationwide.  As well as the

22  number of donations that came in from Texas.

23  Q.   You were here this morning; correct?

24  A.   Yes.

03:40   25  Q.   And you heard Mr. Wentworth's testimony; correct?

*United States District Court*
*Trenton, New Jersey*

Landau - Direct - Vogl

1    A.   That's correct.

2    Q.   And you recall him testifying about your domain name

3    C-a-r-s-F-o-r-K-i-d-s dotcom?

4    A.   Yes.

03:41    5    Q.   Does the C-a-r-s-F-o-r-K-i-d-s dotcom website currently

6    generate donations to Kars 4 Kids from Texas?

7    A.   No, shortly after the jury verdict we took down that

8    website.

9    Q.   Has the CarsForKids.com, C-a-r-s-F-o-r-K-i-d-s dotcom

03:41    10   website, ever generated donations to Kars 4 Kids from Texas?

11   A.   Yes.

12   Q.   Approximately how many?

13   A.   I would say about 20 per year on average.

14   Q.   And how do you know that?

03:41    15   A.   So we have access to information from our Google

16   Analytics, as well as our internal record, that's what they

17   indicate.

18   Q.   So how significant of a source of donations from Texas

19   donors was the CarsForKids, C-a-r-s-F-o-r-K-i-d-s dotcom

03:41    20   website?

21   A.   That's a very insignificant source.  Our other

22   advertising and our new website is a much bigger source and

23   much more significant for us.

24   Q.   Ms. Landau, you also were here this morning to hear Mr.

03:42    25   Wentworth discuss the fact that his company owns the domain

Landau - Direct - Vogl

1  name, C-a-r-s-F-o-r-K-i-d-s dotorg?

2  A.   Yes.

3  Q.   Do you know if anyone is using C-a-r-s-F-o-r-K-i-d-s

4  dotnet?

03:42   5  A.   That website belongs to the Children's Hospital of

6  Chicago, they're also accepting car donations in Texas.

7  Q.   And you know that why?

8  A.   Because we knew about them for many years, we coexisted

9  with them.

03:42   10  Q.   So you've been coexisting with C-a-r-s-F-o-r-K-i-d-s

11  dotnet?

12  A.   That's correct.

13  Q.   Ms. Landau, does Kars 4 Kids currently accept donations

14  from Texas donors located in the State of Texas?

03:43   15  A.   No, we don't.

16  Q.   So if a donor's located in Texas, Kars 4 Kids will not

17  accept their donation.

18  A.   That's correct.

19  Q.   Why does Kars 4 Kids not accept donations from donors in

03:43   20  Texas?

21  A.   Well, in deference to the jury verdict we decided to take

22  that step not to accept donations.

23  Q.   And when did Kars 4 Kids stop accepting donations of car

24  located in Texas from Texas donors?

03:43   25  A.   So in June of 2019.

Landau - Direct - Vogl

1   Q.   What about if a donor is located in Texas is seeking to

2   donate a car outside of Texas; let's say the car's in Colorado

3   but the donor's in Texas, will Kars 4 Kids accept that

4   donation?

03:44   5   A.   Not currently, no.

6   Q.   And when did Kars 4 Kids stop accepting donations of cars

7   outside of Texas from Texas donors?

8   A.   That was in October of 2019.

9   Q.   Why did Kars 4 Kids stop accepting those donations in

03:44   10   October 2019?

11   A.   As time goes on we, you know, assess and review the

12   protocol that we put in place since the jury verdict, and we

13   decided to take that extra step, extra measure.

14   Q.   So you just used the word protocol; what -- can you

03:44   15   please describe what you mean by protocol?

16   A.   So in June 2019 we let the customer service

17   representatives know that we're no longer picking up cars in

18   Texas.  We put a protocol in place where our system will not

19   allow any donation in Texas to be saved, to go through the

03:44   20   process.

21   Q.   Did you hear Mr. Cook testify earlier regarding his

22   projection of donations Kars 4 Kids would receive from Texas

23   donors from June to November 2019?

24   A.   I don't -- you have to remind me of what his number was.

03:45   25   I remember him saying it.

Landau - Direct - Vogl

1   Q.   I guess the question is, do you recall that he did a

2   projection of what he thought your donations were going to be

3   from June to November of 2019?

4   A.   Yes.

03:45   5   Q.   And do you have any opinion as to whether or not his

6   projections are too high or too low or about right?

7   A.   We didn't take donations from Texas since June, so it's

8   much too high.  We've taken maybe a handful.

9   Q.   Does Kars 4 Kids notify potential Texas donors that it

03:45   10   will not accept their donation?

11   A.   Yes.

12   Q.   Can I ask you to turn to K4KX-500.  We'll put that up on

13   the screen.

14        Ms. Landau, do you recognize this document?

03:46   15   A.   Yes, this is a -- it's a webpage in our Kars 4 Kids

16   website.

17   Q.   And is this webpage maintained by Kars 4 Kids in the

18   ordinary course of business?

19   A.   Yes.

03:46   20        MR. VOGL:  Your Honor, I move to admit K4KX-500 into

21   evidence.

22        THE COURT:  Any objections?

23        MR. KINKADE:  No objection, your Honor.

24        THE COURT:  All right, admitted.

03:46   25        (Plaintiff Exhibit K4K-500 was marked into

*United States District Court*
*Trenton, New Jersey*

Landau - Direct - Vogl

1    evidence.)

2    BY MR. VOGL:

3    Q.   Ms. Landau, what is the purpose of this page?

4    A.   This page is to inform any potential donor in Texas, any

03:46    5    potential donor in Texas that we're currently not accepting

6    donations there.  So if someone fills out the form, we say I'm

7    sorry, we're currently not accepting donations in Texas.

8    Q.   So if I'm a potential Texas donor and I put in my address

9    onto your website, will it accept my donation?

03:46   10    A.   No.

11    Q.   Will that potential Texas donor see this particular

12    exhibit, K4KX-500?

13    A.   Yes.

14    Q.   What do Kars 4 Kids call center representatives do when a

03:47   15    Texas donor attempts to donate to Kars 4 Kids?

16    A.   They inform the donor that we're not currently accepting

17    donations in Texas.

18    Q.   What happens if a Kars 4 Kids representative forgets to

19    follow that protocol?

03:47   20    A.   Well, the system is problematically set up that it's -- a

21    message will pop-up and it won't allow it to save.  So at that

22    point they'll inform the potential donor that the car cannot

23    be accepted and we're not picking up donations from Texas

24    donors.  It's a very full proof system that we sent up.

03:47   25    Q.   And since when has that system been in place?

Landau - Direct - Vogl

1    A.   So we started that system in June 2019.

2    Q.   Does Kars 4 Kids do specific Texas advertising through

3    Google?

4    A.   No.

03:48    5    Q.   Do you know whether any Kars 4 Kids advertisements are

6    accessible in Texas?

7    A.   So only our nationwide advertising is currently

8    accessible in Texas, which would include our SiriusXM radio,

9    as well as the banners that, you know, were referred to a lot,

03:48    10   that was part of a national campaign for anyone that comes to

11   visit our website.

12   Q.   And we did hear some testimony earlier today about banner

13   adds; you were here for that?

14   A.   Yes, I did hear that.

03:48    15   Q.   So do you have an understanding how banner ads work?

16   A.   Banner ads can work in many different ways, but what we

17   purchase the only -- it's kind of on the category of display

18   advertising.  So, as opposed to like a text ad which will show

19   up when someone does a Google search, these are display ads

03:49    20   where you can actually visualize the ad and see something.

21   And the only kind of display ads that we buy is when someone

22   visits our website and then goes to another site on the web

23   and they'll get a banner.

24   Q.   So the only way someone could see your ad is if they were

03:49    25   first on your website; correct?

Landau - Direct - Vogl

1   A.   That's correct.

2   Q.   And you can impose that limitation.

3   A.   That's a only thing we buy so that's the only thing

4   there.

03:49   5   Q.   Can online pop-up ads be modified in any way to say that

6   Kars 4 Kids does not accept donations from Texas donors?

7   A.   Technically you can add text or a banner that says that,

8   yes.

9   Q.   And in fact you've done that with some of your ads, some

03:50   10   of those websites in Texas that we saw earlier; correct?

11   A.   Right we've added banners to them yes.

12   Q.   And what does the banner say?

13   A.   We're not currently accepting donations in Texas.

14   Q.   And if you're ordered to do so, can the SiriusXM

03:50   15   advertisements be modified in any way to say that Kars 4 Kids

16   does not accept donations from Texas donors?

17   A.   We can add a voiceover or something like that to the ad

18   that would say that.

19   Q.   So do you think it's necessary to make those

03:50   20   modifications to prevent Texas donors from donating to Kars 4

21   Kids?

22   A.   No, I don't think they're necessary modifications that

23   we'd have to make.

24   Q.   Why not?

03:50   25   A.   We actually -- we put such strict protocols in place,

Landau - Direct - Vogl

1   such protocols that there's no way a Texas donor at this point

2   can donate to Kars 4 Kids.  So either when they come to our

3   website we'll have a banner, you know, show them that we're

4   not taking, or a customer service representative if they're

03:50   5   calling over the phone will inform them that we're not taking

6   those donations.

7   Q.   And again if a customer representative makes a mistake?

8   A.   The system's going to spit it out, it's not going to let

9   it go through.

03:51   10   Q.   And when you say spit it out --

11   A.   Just to cancel it, not proceed to the next step.

12          THE COURT:  So is your system set up that way now?

13          THE WITNESS:  Yes, it is.

14          We weren't ordered to do it but we decided to go

03:51   15   ahead and do that.

16          THE COURT:  Thank you.

17          MR. VOGL:  Can we go back to 500 please?

18   Q.   So again, if someone in Texas is trying to donate to Kars

19   4 Kids, your organization, and they happen to be in Texas and

03:51   20   they put in a Texas address or Texas zip code, this is what

21   they see?

22   A.   Yes.

23   Q.   They see this exhibit --

24   A.   When they hit submit, this is the page they get.

03:52   25   Q.   What effect has stopping taking cars out of Texas had on

Landau - Direct - Vogl

1    your revenues?

2    A.   Well, the projection was about -- you know, we take an

3    average of about ▮▮▮ cars a month, so we stopped taking those

4    cars; so it's about five or six months I guess since the jury

03:52    5    verdict, so it's about close to ▮▮▮▮ cars we haven't taken;

6    as well as -- so the profits would be about ▮▮▮▮▮▮ revenue

7    on that.

8    Q.   Did you hear Mr. Wentworth testify about a call that he

9    listened to from Kars 4 Kids after contacting Kars 4 Kids to

03:53    10    make a donation?

11    A.   Yes.

12    Q.   You saw the document that Mr. Wentworth discussed

13    referencing the call; correct?

14    A.   Yes, I did.

03:53    15    Q.   Have you had a chance to research that call at your call

16    center?

17    A.   Yes, I did.

18    Q.   What did you find out?

19    A.   So, after much research there wasn't that much

03:53    20    information on the document, just the time of the call, I was

21    able to trace that call back to the number that they called.

22    The only information we had in our system was that phone

23    number and I think it said it was like a Ford Escort, but it

24    had no information where the donor was located or where the

03:53    25    car was located.

*United States District Court*
*Trenton, New Jersey*

Landau - Cross - Kinkade

1          So the person was calling to follow up on that and had

2    they gotten any of that information the system would have

3    cancelled it.  So the donor would -- the potential donor would

4    have been informed that we're not accepting donations in

03:53  5    Texas.

6              MR. VOGL:  No further questions, your Honor.

7              THE COURT:  Okay.  Cross.

8    (CROSS-EXAMINATION OF ESTI LANDAU BY MR. KINKADE:)

9    Q.  Good afternoon, Ms. Landau.

03:54  10   A.  We meet again.

11   Q.  Yes, we do.  You remember I'm Chris Kinkade from Fox

12   Rothschild, yes, we met back in May.  I'll try to be brief

13   here as the afternoon wears on.

14        So you had just testified a few minutes ago about

03:54  15   Google Analytics; did you provide any of those Google

16   Analytics data to Mr. Hall?

17   A.  Well, any information of the cars that were received from

18   the Kars 4 Kids website were on the full donation records that

19   we sent over.  Everything was in the car donation records, so

03:54  20   you should have gotten that information.

21   Q.  Did you provide Mr. Hall with any of the website traffic

22   data for Texas?

23   A.  No.

24   Q.  Did you provide him with any ad-clicks for Texas?

03:54  25   A.  How many what?

*United States District Court*
*Trenton, New Jersey*

Landau - Cross - Kinkade

1   Q.   Ad-clicks?

2   A.   I think we set a Google -- an extensive Google document

3   from all the advertising that we did in Google, so yes.

4   Q.   To Mr. Hall?

03:55   5   A.   It was a very extensive document.

6   Q.   Okay.  Because one of the categories that he says he

7   spoke with you about was specifically identify the portion of

8   K4K's advertising that's national in reach, and provide his

9   percent of revenue approach.  Do you remember talking with him

03:55   10  about that?

11  A.   I think I'm mixed up.  Repeat the question?  Go ahead.

12  Q.   So he spoke with you --

13       THE COURT:  You didn't understand the question?

14       THE WITNESS:  I didn't understand the original

03:55   15  question.

16       THE COURT:  You better rephrase --

17  Q.   You spoke with him about you said with the advertising,

18  both the national advertising and the Texas specific

19  advertising; correct?

03:55   20  A.   That's correct.

21  Q.   And for a lot of that advertising you didn't have Texas

22  specific data; correct?

23  A.   For some of it?  Most of it.

24  Q.   Right, most of it.  And so then he had to apply some

03:55   25  apportionment analysis; right?

Landau - Cross - Kinkade

1   A.   Well, it depends, which -- give me the specifics.

2   Q.   So if he was looking at national only data that he

3   provided, he had to apportion that to Texas; correct?

4   A.   Depending on which vendor that was.

03:56   5   Q.   Right.

6   A.   Tell me which vendor and I'll tell you.

7   Q.   But you recall that some of the vendors only have -- you

8   only have national data for; right?

9   A.   I think he mentioned Yahoo.

03:56   10   Q.   Right.  And what about Google?

11   A.   Google he didn't say that about.

12   Q.   What about billboards that you did through CBS?

13   A.   Google owned billboards we were able to -- if we did in

14   Texas we were able to determine that.

03:56   15   Q.   How many Texas billboards do you have?

16   A.   I'm not sure that we did Texas billboards.

17   Q.   So, when we're looking at -- when he's trying to figure

18   out what advertising expenses were in Texas and trying to

19   analyze that data and you're talking about having analytics --

03:56   20   right?  You were just testifying about Google Analytics that

21   you had for your website; correct?

22   A.   Yes.

23   Q.   And those would show where visitors come from; correct?

24   A.   Yes.

03:56   25   Q.   And how many visitors you get on a per-day or per-month

Landau - Cross - Kinkade

 1    basis?

 2    A.   Right.

 3    Q.   And click-through rates, are you familiar with what

 4    click-through rates are?

 5    A.   That wouldn't be in Google Analytics --

 6    Q.   Do track those?

 7    A.   Google ad words.

 8    Q.   Do you track those Google ad words?

 9    A.   I have people that do that for me, yes.

10    Q.   Did you provide Mr. Hall with any of the data of viewers

11    coming through Google ad words from Texas?

12    A.   We had specific reports that were from Google that showed

13    expenses just for Texas.

14    Q.   Expenses on what you were paying for ad words?

15    A.   Yes.

16    Q.   But did you provide him with any of the data of how many

17    viewers were actually coming from Texas?

18    A.   I'm not -- I don't remember the document exactly, if you

19    pull it up I think and show the clicks because it all gets

20    calculated by a click.

21    Q.   And when somebody's filling out the form like we just saw

22    in K4K Exhibit 500 -- I'm sorry.  We didn't actually see the

23    form, but you testified that when somebody fills out the form

24    they would now presently come to the "we're real sorry about

25    this" landing page; correct?

Landau - Cross - Kinkade

1  A.   Yes.

2  Q.   When they fill out that form there's also a field in that

3  form of where did you hear about us; correct?

4  A.   Yes.

03:58  5  Q.   And do you track that data?

6  A.   We have it in our system.

7  Q.   Okay.  Did you provide any of that data to Mr. Hall?

8  A.   It was probably in the donation records.

9  Q.   So instead of estimating where the different viewers that

03:58  10  received your advertising came from -- or where those

11  advertising dollars were going in Texas, you could have

12  provided additional data to Mr. Hall; correct?

13  A.   Verify what you mean by viewers.

14  Q.   When somebody visits your website and then click through

03:58  15  to the donation page; correct?

16  A.   Okay, what?  I don't have the question --

17  Q.   So the apportionment analysis that you're assisting Mr.

18  Hall with was to evaluate how much of these national scope

19  advertising is attributable to Texas; correct?

03:58  20  A.   Which national, which ones?

21  Q.   Like SiriusXM radio, that is a national advertising that

22  K4K uses; correct?

23  A.   Yes.

24  Q.   Is there any different advertising that it runs in Texas?

03:58  25  A.   No.

*United States District Court*
*Trenton, New Jersey*

Landau - Cross - Kinkade

1  Q.  Okay.  So, in order to apportion the advertising expenses

2  for SiriusXM radio, Mr. Hall had to do an analysis, an

3  apportionment analysis, to estimate the amount of expenses

4  that were attributable to Texas; correct?

03:59  5  A.  Correct.

6  Q.  Sirius, is that a field that somebody can fill in on the

7  form if asked where did they hear about you?

8  A.  Yes.

9  Q.  Okay.  So K4K actually possesses data that would tell Mr.

03:59  10  Hall how many people came to its site and attempted to donate

11  after hearing SiriusXM; correct?

12  A.  Not the ones that actually went through the process, not

13  -- if you'd like, you know, to trust the accuracy of that.

14  Q.  But that would be actual data instead of an estimate;

03:59  15  correct?

16  A.  Yes.

17  Q.  And you just testified a few minutes ago that you've

18  recently in October stopped accepting donations from residents

19  outside of Texas where the vehicle is located inside of Texas;

04:00  20  correct?

21  A.  No.

22  Q.  I'm sorry.  What did you -- when did you stop that?

23  A.  That was initially in June.  Then we haven't picked up a

24  car that's located in Texas and have them send a truck to pick

04:00  25  up those cars, we stopped that in June already.

Landau - Cross - Kinkade

1  Q.   So I got that backwards.  And October was when you

2  stopped accepting cars outside of Texas from people within

3  Texas.

4  A.   That's right.

04:00  5  Q.   Okay.  But Mr. Hall said that you did not provide him

6  with data for donations for cars in Texas from residents

7  outside of Texas; is that accurate?

8  A.   We provided information just for the donors that were in

9  Texas.

04:00  10  Q.   And did you provide Mr. Hall with the website statistics

11  for C-a-r-s-F-o-r-K-i-d-s dotcom?

12  A.   No.

13  Q.   In his report Mr. Hall also said that he spoke with you

14  and Mr. Moskovits, and found out that as you just testified

04:01  15  K4K did not run any new advertising in Texas after the jury's

16  verdict; is that correct?

17  A.   That's correct.

18  Q.   Okay.  But K4K has continued advertising in Texas;

19  correct?

04:01  20  A.   Nothing specific to Texas.

21  Q.   But the national ads are still viewable in Texas;

22  correct?

23  A.   The national ads.

24  Q.   And the website is still accessible in Texas.

04:01  25  A.   Yes.

*United States District Court*
*Trenton, New Jersey*

Landau - Cross - Kinkade

1   Q.   And the phones are still answered when the caller calls

2   from Texas.

3   A.   That's like I said, someone tries to donate we let them

4   know we don't take that donation.

04:01   5   Q.   And you can chat with people on line from Texas?

6   A.   Yes.

7   Q.   Have you tried to block any phone calls from Texas?

8   A.   Tried to block?

9   Q.   Yes.

04:01   10   A.   Well, this way we can let the donor know why they're

11   being blocked which is why we don't take donations.  We

12   haven't blocked the calls, no.

13   Q.   Have tried to block any IP addresses, computer IP

14   addresses from --

04:02   15   A.   From the website, no.

16   Q.   Has K4K implemented any geographic exclusions for

17   national advertising on Google?

18   A.   Yes.

19   Q.   So you're saying you wouldn't see a K4K ad in Texas?

04:02   20   A.   No, not when you do a Google search.

21   Q.   What about Bing?

22   A.   No, we excluded it as well.

23   Q.   And Yahoo?

24   A.   Yeah.

04:02   25   Q.   Sirius?

Landau - Cross - Kinkade

1   A.   Yahoo's not separate from Bing anymore so that's one, but

2   Sirius can't be excluded so when we could we did.

3   Q.   Sorry; say that again?

4   A.   Sirius can't be excluded.

04:02   5   Q.   But you could put in a disclaimer --

6   A.   As I mentioned -- or testified earlier that it is a

7   possibility to do that.  But waiting further direction from

8   the Court we didn't do anything to national advertising.

9   Q.   What about radio?

04:02   10   A.   We're not advertising in Texas radio currently.

11   Q.   And TV?

12   A.   Not either.

13   Q.   So what national TV broadcasts?

14   A.   We don't do any national TV currently.

04:03   15   Q.   You're off all those late night shows?

16   A.   Which late night shows?

17   Q.   All the --

18   A.   Those were -- I mean if someone mentions me I can't tell

19   them to exclude us; if Jimmie Fallon wants to make a joke

04:03   20   about the commercial, that I can't exclude.

21        MR. KINKADE:  Can we please have K4K Exhibit 500

22   again?

23   Q.   Ms. Landau, so this is the page a prospective donor would

24   now see; right?

04:03   25   A.   Yes.

*United States District Court*
*Trenton, New Jersey*

Landau - Cross - Kinkade

1  Q.   This is still advertising the Kars 4 Kids with a K mark;

2  correct?

3  A.   The Kars 4 Kids mark is on there.

4  Q.   And there's a click here link to go to the main page?

04:04   5  A.   Well, they can start over again, so if they do that again

6  it kind of repeats the cycle.

7  Q.   Right.

8  A.   As long as it's really a Texas donation we're giving them

9  the option -- maybe they put the wrong zip code in they can

04:04  10  try again, otherwise if it is Texas it will continue to give

11  them this page.

12  Q.   Right.  And so this page, if there were no injunction,

13  what would it look like?

14  A.   There is no injunction.

04:04  15  Q.   Right.  So if I were a donor outside of Texas, what would

16  I see when I try to fill out this form?

17  A.   If you're a donor outside of Texas and donating a car,

18  where?

19  Q.   New Jersey.

04:04  20  A.   We go thank you, thanks for your donation.

21  Q.   Okay, great.  So assuming there's no injunction entered

22  by this Court, this page could just pop back up as a thank you

23  for your donation?

24  A.   Well we did this without the injunction, so -- depending

04:04  25  what the Court rules I guess that's what we'll do.

*United States District Court*
*Trenton, New Jersey*

Landau - Cross - Kinkade

1   Q.   So potential Texas donors of cars is still seeing this

2   page when searching for Kars 4 Kids with a K?

3          THE COURT:  When you say this page, you mean 500?

4          MR. KINKADE:  Yes.

04:05  5   A.   No, this is not -- this page only displays to people who

6   actually try to attempt to -- that's when -- that's when this

7   page will come up.

8   Q.   So if someone in Texas were searching for my client,

9   America Can! Cars For Kids, and went -- landed on your page

04:05  10  and attempted to donate a car because they weren't sure who

11  they were donating to, they would land on this page; correct?

12  A.   Potentially.  We're not bidding on the Google ad words

13  though, I doubt they would get to us.

14  Q.   That wasn't my question.  My question is if they were in

04:05  15  Texas and tried to donate, they would land on this page;

16  correct?

17  A.   Correct.

18          MR. KINKADE:  Could we please have ACCFK-440?

19  A.   Do I have that?

04:05  20  Q.   No, you don't have a copy of that right now, it will be

21  on the screen and I can hand you a copy if you would like.

22          THE COURT:  Can you read that?

23          THE WITNESS:  Yeah, I'm good.

24  Q.   Can you see this, Ms. Landau?

04:06  25  A.   Yes.

Landau - Cross - Kinkade

1   Q.   Okay.  And do you recall the testimony this morning about

2   this exhibit from Mr. Wentworth?

3   A.   Yes.

4   Q.   So, people in Texas can still see Kars 4 Kids

04:06   5   advertising; correct?

6   A.   If they came to our website.

7   Q.   Okay.  If they came to your website when?

8   A.   Probably within the last 30 days.

9   Q.   Are you sure about that?

04:06   10   A.   That's the way retargeting works.

11   Q.   You said it's stored on the -- where is the information

12   stored?

13   A.   Which information?

14   Q.   Well, let me --

04:06   15        THE COURT:  Mr. Kinkade, why don't you ask one more

16   question and Ms. Landau will answer that.

17        MR. KINKADE:  I'm going to switch to a --

18        THE COURT:  You're crossing over each other and it's

19   hard to transcribe.

04:07   20        MR. KINKADE:  I apologize.

21   Q.   Did Kars 4 Kids implement any advertising restrictions to

22   block pop-ups to Texas users?

23   A.   Actually we'd like to submit a list of zip codes in Texas

24   and ask them to restrict it.  Apparently they didn't do such a

04:07   25   good job.

Landau - Cross - Kinkade

1  Q.   So Kars 4 Kids ads are still -- with a K, I'm sorry; are

2  still blocking potential donors from reaching America Can!

3  Cars For Kids; correct?

4  A.   No, I don't know how you got to that.  That line of

04:07     5  reasoning I'm not sure.

6  Q.   On this page there's like most of the sites there's a

7  limited number of advertising blocks; correct?

8  A.   Does America Can -- would they otherwise show up here?  I

9  can't like answer to that that it would be otherwise an

04:07     10  America Can! ad here.

11  Q.   My question was there's a limited number of advertising

12  spaces on this website; correct?

13  A.   Okay, yes.

14  Q.   Similar to the limited number of billboards; correct?

04:08     15  A.   Limited number of billboards where?

16  Q.   Along the road.

17  A.   I guess so, yes.

18  Q.   So if you're buying up the advertising space someone else

19  cannot; correct?

04:08     20  A.   We're not buying specific advertising on this website.

21  Q.   If your ads are in a space can someone else occupy that

22  space?

23  A.   Not at the same exact minute, no.

24  Q.   If you recall back in May we went over all those 990s and

04:08     25  I think over the last decade Kars 4 Kids with a K had expended

Landau - Redirect - Vogl

1   over ███████ on advertising; does that sound accurate?

2   A.   Yes.

3   Q.   Did you hear Mr. Cook's cross-examination a short while

4   ago when he testified that the Texas specific Google ads from

04:08   5   about 2008 to 2011 were about ██████?

6   A.   Yes.

7   Q.   Do you know what percentage of a ████████ dollars

8   ██████ is?

9   A.   Point three percent.

04:09   10   Q.   Three?

11   A.   Point three.

12   Q.   Point three?

13        MR. KINKADE:   Nothing further, your Honor.

14        THE COURT:   All right.   Redirect?

04:09   15   (REDIRECT EXAMINATION OF ESTI LANDAU BY MR. VOGL:)

16   Q.   You saw the document that Mr. Cook was referring to that

17   showed the donations -- excuse me -- the advertising that was

18   done on Google; correct?

19   A.   Yes, it was a little hard to see back there I have to be

04:09   20   honest though.

21        MR. VOGL:   Can we bring that one up?   I think it

22   is...

23        THE COURT:   I think it's 447.

24        MR. VOGL:   447 I believe, yes.

04:10   25   Q.   This is the -- do you recall seeing that document?

*United States District Court*
*Trenton, New Jersey*

Landau - Redirect - Vogl

1    A.    From far away, yeah.

2              THE COURT:  You can read it, Ms. Landau?

3              THE WITNESS:  Um-hmm, thanks.

4    Q.    And you notice that this document starts in 2008, do you

04:10    5    see that?

6    A.    Yes.

7    Q.    You've been with the company since 2002; correct?

8    A.    That's correct.

9    Q.    Were Kars 4 Kids ads accessible in Texas between 2002 and

04:10    10    2008?

11   A.    Yes.

12              MR. KINKADE:  Objection; beyond the scope.

13              MR. VOGL:  We're talking about this document.

14              THE COURT:  He didn't refer to it.

04:10    15              MR. VOGL:  But he was talking about the online

16   advertising for Google on this document.

17              THE COURT:  All right.  So you can refer to Google

18   numbers --

19              MR. KINKADE:  Your Honor, I also didn't go into

04:10    20   historical advertising before 2008.

21              THE COURT:  I'm sorry?

22              MR. KINKADE:  I also did not examine the witness on

23   advertising prior to 2008.

24              THE COURT:  Overruled.

04:11    25   BY MR. VOGL:

Landau - Redirect - Vogl

1  Q.  So you're familiar with the fact that online advertising

2  Google in Texas took place between 2008 and 2018; correct?

3  A.  Yes.  2019.

4  Q.  2019 as well.  And you've had responsibility for that.

04:11  5  A.  Yes.

6  Q.  So you have reason to know.

7  A.  Yes, we do.

8          MR. VOGL:  No further questions, your Honor.

9          THE COURT:  All right, thank you.

04:11  10          You may step down, Ms. Landau.

11          (Witness excused.)

12          THE COURT:  I've been keeping track of the time:

13  Mr. Vogl went 17 minutes plus one minute, 18 minutes; and

14  cross was from 3:02 to 3:18, so you went 16 minutes.

04:11  15          All right.  Next witness?

16          MR. LITTERINE-KAUFMAN:  Kars 4 Kids calls David

17  Hall, your Honor.

18          THE COURT:  You may take the stand.

19          (DAVID HALL), sworn.

04:12  20          THE COURT:  Mr. Hall, can you just spell your last

21  name?

22          THE WITNESS:  David Hall, H-a-l-l.

23          THE COURT:  Thank you, Mr. Hall.

24          THE WITNESS:  You're welcome.

04:12  25

Hall - Direct - Litterine-Kaufman

1  (DIRECT EXAMINATION OF DAVID HALL BY MR. LITTERINE-KAUFMAN:)

2  Q.   Mr. Hall, can you please introduce yourself to the Court?

3  A.   Yes, as I said I'm David Hall, I'm a managing director at

4  Alvarez and Marsal, and a consultant for that firm at Alvarez

04:12  5  and Marsal.

6        MR. LITTERINE-KAUFMAN:  Can we please bring up K4K

7  Exhibit 111, which was entered into evidence during the

8  liability phase of trial?

9  Q.   Do you recognize this Mr. Hall?

04:13  10  A.   Yes, I do.

11  Q.   And what is it?

12  A.   It is my C.V. or resume.

13        MR. LITTERINE-KAUFMAN:  Your Honor, as we did with

14  Mr. Cook, we would offer Exhibit 111 as Mr. Hall's

04:13  15  credentials.

16        THE COURT:  Any objection, Mr. Pittman?

17        MR. PITTMAN:  No objection, your Honor.

18        THE COURT:  All right.  So it was already admitted,

19  I'll admit it again just in case.

04:13  20        MR. LITTERINE-KAUFMAN:  Thank you, your Honor.

21        (Plaintiff Exhibit k4k-111 was marked into

22  evidence.)

23        MR. LITTERINE-KAUFMAN:  And we would offer Mr. Hall

24  as an expert in forensic accounting and market analysis, which

04:13  25  is the topics he addressed during the liability phase, and

Hall - Direct - Litterine-Kaufman

1   also damages calculations.

2           THE COURT:  All right.  Any objections, Mr. Pittman?

3           MR. PITTMAN:  No objection, your Honor.

4           THE COURT:  So Mr. Hall is accepted as an expert in

04:13  5   those fields mentioned by Mr. Kaufman.

6   BY MR. LITTERINE-KAUFMAN:

7   Q.   What was your assignment for this hearing today?

8   A.   My assignment for 2019 post verdict was to review,

9   analyze and provide my opinions on Mr. Cook's opinions and his

04:13  10  expert reports; as well as my other assignment was to

11  independently calculate profits subject to disgorgement for

12  Kars 4 Kids.

13  Q.   And what materials did you consider in doing that?

14  A.   I considered materials that I've received over time from

04:14  15  2018 through 2019 that include legal filings; Form 990s, which

16  are IRS financial documents for nonprofits; I also reviewed

17  specific donor records for both parties, America Can! and Kars

18  4 Kids with a K; also general ledger extracts for Kars 4 Kids;

19  various number of invoices and other documents that I've

04:14  20  listed in my report that I considered.

21  Q.   One of the categories of documents you mentioned was

22  invoices; based on your experience as a damages expert, are

23  invoices a reliable source to determine a company's

24  expenditures?

04:15  25  A.   Yes, unless there's some -- one off reason that an

Hall - Direct - Litterine-Kaufman

1    invoice has an issue, yes, they are as they are a

2    contemporaneous record of a transaction a company has with a

3    third-party.

4    Q.   Another one of the materials you mentioned was Kars 4

04:15    5    Kids' general ledger; can you briefly explain what a general

6    ledger is?

7    A.   Sure, it's an entity's kind of base level accounting

8    record of its transactions that really form the basis for any

9    of its financial statements or summary statements about its

04:15    10    expenses and revenues and any transaction it has.

11    Q.   And based on your experience as a damages expert, is a

12    company's general ledger a reliable source to determine

13    expenditures?

14    A.   Yes, it is.

04:15    15    Q.   Why is that?

16    A.   Because as I mentioned it's contemporaneously kept in the

17    normal course of business, and it is the source ultimately of

18    a company's financial records and financial statements.  And

19    so I've seen it many times used as the source, an acceptable

04:16    20    source for experts in many different cases and environments.

21    Q.   Another category was Kars 4 Kids' IRS Form 990s; based on

22    your experience as a damages expert, is a Form 990 a reliable

23    source to determine expenditures?

24    A.   Yes, it is.

04:16    25    Q.   Why?

Hall - Direct - Litterine-Kaufman

1   A.   It is a IRS document that is required for nonprofits.

2   It's really the tax return for a nonprofit, even though they

3   don't have profits subject to taxation the way for-profit or

4   individuals have with the IRS; but it reflects the underlying

5   financial records, and particularly when it's done by a

6   third-party like an accounting firm, that review the entity's

7   accounting records and reflect it in the 990.

8   Q.   In performing your assignment for this hearing, did you

9   request any documents that were not provided to you?

10  A.   No.  Everything I requested was provided.

11  Q.   Did you do an on-site visit of Kars 4 Kids offices?

12  A.   No.

13  Q.   Why not?

14  A.   I didn't think I needed to given my access by telephone

15  to the president and chief operating officer, as well as

16  access to the financial records I requested through counsel,

17  to perform my assignments.

18  Q.   And who selected the methodologies that you used in

19  performing your assignment for today?

20  A.   I did.  Once the Court had ordered a defendant's profits

21  measure, I decided of the methodologies that I pursued and

22  executed.

23        MR. LITTERINE-KAUFMAN:  Can we bring up K4KX-510

24  please?

25  Q.   And this is in your binder as well, Mr. Hall.

Hall - Direct - Litterine-Kaufman

1    A.   Thank you.

2    Q.   Do you recognize this document?

3    A.   Yes.

4    Q.   What is it?

04:18    5    A.   It is my expert report, dated October 18th, 2019.

6    Q.   Does it set forth your opinions about disgorgement of

7    Kars 4 Kids' profits from Texas donors?

8    A.   Yes, it does.

9         MR. LITTERINE-KAUFMAN:  Your Honor, Kars 4 Kids

04:18    10   moves the admission into evidence of K4KX-510.

11        THE COURT:  Any objections?

12        MR. PITTMAN:  Yes, your Honor.  This is -- there's

13   so much hearsay in this document, it's 59 pages; Mr. Hall has

14   assumption after assumption, legal exclusions, hearsay of his

04:18    15   own, and typically --

16        THE COURT:  So Mr. Pittman's objection is sustained.

17   I'll listen to Mr. Hall's testimony.  And I don't believe I

18   accepted the expert report from Mr. Pittman's expert either.

19        MR. LITTERINE-KAUFMAN:  I don't believe it was

04:19    20   offered, your Honor.

21        Can we bring up then K4KDX-505, which is a

22   demonstrative?

23   BY MR. LITTERINE-KAUFMAN:

24   Q.   Mr. Hall, do you recognize this document?

04:19    25   A.   Yes.

Hall - Direct - Litterine-Kaufman

1  Q.  What is it?

2  A.  It is a table from my expert report, page 4.

3  Q.  And what was Kars 4 Kids' net revenue from vehicle

4  donations from Texas donors for the period 2008 through June

5  30, 2019?

6  A.  The net revenue figure is on the top far right column of

7  ████████ -- basically ████████████.

8  Q.  And that was the same figure that Mr. Cook gave earlier;

9  correct?

10  A.  It is, yes.

11  Q.  What is the bottom row of this chart?

12  A.  The bottom row is a different time period with the exact

13  same information reflected from the source records, and the

14  bottom row time period is 2013 through June 30th, 2019.

15  Q.  Why did you also calculate net revenues for 2013 through

16  2019?

17  A.  Kars 4 Kids' counsel requested that I do that, based on a

18  legal issue in the case.

19  Q.  Do you have an opinion about which of those time periods

20  is the correct one to use here?

21  A.  I do not.

22       MR. LITTERINE-KAUFMAN:  We can take that down,

23  please.

24  Q.  Did you perform an apportionment analysis as part of your

25  profits calculation?

Hall - Direct - Litterine-Kaufman

1   A.   Yes.

2   Q.   Why did you do that?

3   A.   Both from my experience on other intellectual property

4   matters, and review of damages treatises or publications

04:21   5   related to the subject matter, I understood that and

6   understand that that's necessary if there's an assessment that

7   not one hundred percent of the revenue, in this case in the

8   vehicle donation revenue in Texas, was attributable to the

9   subject trademark or subject intellectual property.

04:21   10   Q.   Why do you think that not all of the revenue in this case

11   is attributable to the subject trademark?

12   A.   For several reasons.  First, with my work both in 2018

13   and 2019 I gained an understanding of the vehicle donation

14   market with other entities as well as Kars 4 Kids, and gained

04:21   15   an understanding through independent research on what drives

16   vehicle donations.

17         Also coupled with that, my own personal experience as

18   far as donating, I understand that there's other factors

19   involved other than the subject -- the subject trademarks.

04:22   20   Q.   And in your opinion how do people typically choose their

21   charity to donate to?

22   A.   Typically I believe the number one factor is the

23   charitable mission, that donors look for ways to donate to

24   entities that are pursuing a mission that they agree with or

04:22   25   like a great deal.

Hall - Direct - Litterine-Kaufman

1  Q.  What other factors aside from Kars 4 Kids advertising

2  could have caused donors in Texas to donate to Kars 4 Kids?

3  You mentioned the charitable mission; are there others?

4  A.  Yes, there are.  Another one that comes to mind that's

04:22  5  reflected in the GAO, Government Accounting Office records on

6  the study of vehicle donations, is the tax deductibility.

7  That appeals to donors being able to get documentation for a

8  donated vehicle that allows them a financial benefit in the

9  form of a tax deduction.

04:23  10  Q.  Any other factors?

11  A.  Yes.  Convenience factor; is it easy to do, does the

12  charity make it easy, as opposed to a more difficult process.

13  I saw that in the information as well that I reviewed related

14  to the industry, the vehicle donation industry, and I think

04:23  15  reasonably that's a factor that drives donations as well.

16  Q.  In your opinion, are there likely to be a multitude of

17  other factors too that would cause people to donate to Kars 4

18  Kids?

19  A.  I think there likely is, and some of them could be

04:23  20  individual per person on what they're deciding to donate to,

21  but the three identified I think captures a lot of it, but

22  certainly there's likely more.

23       THE COURT:  What are your three?  Tax deductibility,

24  convenience and donating vehicles; what's your third?

04:23  25       THE WITNESS:  The third I think was the primary one,

*United States District Court*
*Trenton, New Jersey*

Hall - Direct - Litterine-Kaufman

1    and that's the mission of the charity that people decide on.

2    But you listed the other two, sir.

3    Q.   Those three factors you mentioned, aren't they true of

4    other vehicle donation charities as well?

04:24    5    A.   Yes, they are from my review of the market, yes.

6    Q.   So if they're true of other vehicle donation charities as

7    well, why do they support an apportionment of Kars 4 Kids'

8    revenue?

9    A.   That fact that they're common to other donations is

04:24    10    really irrelevant as far as assessing apportionment or not,

11    based on the trademark or other factors.  In fact, if anything

12    I think it supports the notion that other charities recognize

13    the importance of those factors and spend money to be able to

14    provide those factors, as far as their mission, tax

04:24    15    deductibility and convenience.

16    Q.   In your opinion should Kars 4 Kids' revenue be

17    apportioned here?

18    A.   Yes.

19    Q.   Why is that?

04:25    20    A.   Because I don't think it's reasonable to conclude that a

21    hundred percent of the Texas vehicle donation revenue is

22    attributable to the trademarks at issue, given the facts and

23    circumstances as we've described as far as other factors.  And

24    not apportioning it assumes every penny of every dollar of the

04:25    25    ████████      revenue for Texas was attributable to the

*United States District Court*
*Trenton, New Jersey*

Hall - Direct - Litterine-Kaufman

1  trademarks.

2  Q.   How did you calculate the portion of revenues related to

3  trademark versus other factors?

4  A.   I used a ratio of costs that I describe in my report as

04:25   5  advertising for fundraising ratio.

6      MR. LITTERINE-KAUFMAN:  Can we bring up please

7  K4KDX-535, which is another demonstrative?

8  Q.   Does this demonstrative accurately depict the formula you

9  used for the advertising for fundraising ratio?

04:26  10  A.   Yes, it does.

11  Q.   Can you just walk us through it?

12  A.   Sure.  I know there were some discussion earlier about it

13  I heard today too, but the top amount on the left, the

14  numerator, is the dollars spent on advertising for

04:26  15  fundraising.  And I did this annually, so for each year.  And

16  I got that figure off of Kars 4 Kids' 990 forms.  So that's

17  the numerator, trying to isolate in the numerator the dollars

18  spent for advertising with the trademark.

19  Q.   And what about the denominator?

04:26  20  A.   The denominator is all expenses less grants, and all

21  expenses includes of course the numerator, but it also

22  includes other expenses; that the biggest single one is labor,

23  both management and wages, and that's in the denominator, and

24  then I subtracted grants to calculate a ratio.

04:27  25  Q.   So that's how you did the calculation.  What does that

Hall - Direct - Litterine-Kaufman

1    ratio show or what does it capture?

2    A.   It's an estimating tool I've used and employed here to

3    try to reasonably assess the portion of the Texas vehicle

4    revenue that is based on the numerator, the dollars spent on

04:27   5    advertising, compared to all other costs other than grants,

6    which those costs are incurred to provide those factors I

7    talked about and other factors as far as the mission of the

8    charity, the management and labor to do that of course, that

9    cost.  And you wouldn't want to just do labor or management

04:27   10   compensation in isolation, they have, you know, buildings

11   associated with it; I heard heat and HVAC and other efforts.

12       So all of the expenses other than grants captures -- is

13   attempting to capture both the trademark aspect of it, and the

14   other efforts that represent kind of the other factors

04:28   15   individuals might assess when donating vehicles.

16   Q.   Based on your experience as a damages expert, why is it

17   reasonable to use a ratio like this that is based on expenses

18   to apportion revenue?

19   A.   Both a treatise that I reviewed that discusses

04:28   20   apportionment and the cost-based apportionment, had examples

21   that were similar; not exactly like this, as this is a

22   not-for-profit, so fundraising is unique for trademark for

23   this for my experience, and I heard from Mr. Cook as well and

24   understand that.

04:28   25       But also the notion -- and I've used it before in other

Hall - Direct - Litterine-Kaufman

1    matters -- where your you're isolating the effort with the

2    trademark, or building the brand or the trademark in the

3    numerator compared to all operating costs, which I've done

4    before, but not in a not-for-profit kind of case.

5  Q.   So have you used ratios similar to the advertising for

6    fundraising ratio to apportion revenue in the past?

7  A.   Yes.

8  Q.   Based on your experience as a damages expert, do you

9    think it would be reasonable not to do an apportionment here?

10 A.   I do not.  Again that would be assuming a hundred percent

11   of every dollar of vehicle donations was attributable to its

12   trademark, when we know there are other factors that donors

13   are considering in deciding to donate to Kars 4 Kids, their

14   vehicle.

15           THE COURT:  So, what was your ratio?

16           THE WITNESS:  The amount for each year?

17           THE COURT:  Yes.

18           THE WITNESS:  It was -- overall for the all years it

19   was 63 percent.  So most of it I concluded was for the

20   trademark, the numerator being greater than -- or greater, you

21   know, 63 percent of the denominator, but I did it for each

22   year.  And so the calculation is specific to each year because

23   Kars 4 Kids had that data for each year.

24           THE COURT:  All right.  So if I understood Mr...

25           MR. LITTERINE-KAUFMAN:  Mr. Cook, your Honor?

*United States District Court*
*Trenton, New Jersey*

1      THE COURT:  Mr. Cook, correct; he said that you

2  apportioned 63 percent of the revenues to infringing profits,

3  and 37 non-infringing; is that right?

4      THE WITNESS:  That's correct.  He reflected my ratio

04:30    5  accurately, 63 percent infringing, and 37 percent due to other

6  factors.

7      MR. LITTERINE-KAUFMAN:  Could we just bring up

8  K4KDX-507, which is a demonstrative?

9  BY MR. LITTERINE-KAUFMAN:

04:31   10  Q.  So Mr. Hall, can you just explain what this is?

11  A.  Yes.  It's a table from my report from page 7 of my

12  report.

13  Q.  And what does it show?

14  A.  It summarizes by the two time periods we discussed

04:31   15  earlier the effect on the revenue of the advertising for

16  fundraising ratio that I applied.  And the top line is for the

17  full-time period of 2008 to 2019, and it shows the impact of

18  applying 63 percent or almost two-thirds attributable to the

19  trademark to the ███████████ yielding a ███████████ on the

04:31   20  far right column at the top row.

21  Q.  So just to be clear, in your expert opinion how much of

22  Kars 4 Kids' net revenues for 2013 to June 30, 2019 were from

23  use of the mark?

24      MR. PITTMAN:  I'm going to object.  This is outside

04:32   25  the scope of what the Court ordered the parties to do.  The

Hall - Direct - Litterine-Kaufman

**1**  Court ordered the parties to calculate the incremental profits

**2**  from 2008 to June 30th, 2019.  So any other opinion is outside

**3**  the Court's order.

**4**       THE COURT:  All right.  Overruled.

**5**  Q.  I'll just ask the question again for the record.  How

**6**  much of Kars 4 Kids' net revenue in your opinion is from use

**7**  of the Kars 4 Kids' marks in Texas between 2013 and June 30,

**8**  2019?

**9**  A.  ████████████  reflected on the far right column.

**10**  Q.  And how much for 2008 through June 30, 2019?

**11**  A.  ████████████.

**12**  Q.  And you mentioned that you excluded in your advertising

**13**  for fundraising ratio, you excluded grants from the

**14**  denominator; why was that?

**15**  A.  I did because the mission of course is central and

**16**  important to Kars 4 Kids and it is the single largest expense,

**17**  but by including it, it would drive the ratio down well under

**18**  50 percent.  And I thought to be conservative and reasonable

**19**  to not include it, and that all the other costs reflected Kars

**20**  4 Kids' management and labor and efforts to have the --

**21**  execute on its mission.  And so not including the grants made

**22**  the advertising ratio higher, and I felt that was more

**23**  reasonable.

**24**       MR. LITTERINE-KAUFMAN:  Your Honor, just for the

**25**  benefit of the record, Kars 4 Kids would move into evidence

04:32
04:32
04:32
04:33
04:33

*United States District Court*
*Trenton, New Jersey*

Hall - Direct - Litterine-Kaufman

1   K4KDX-507.

2          THE COURT:  Any objections?

3          MR. PITTMAN:  Your Honor, objection for the reasons

4   stated, that it puts something into evidence that the witness

04:33   5   wasn't offered to form an opinion about.  It's outside the

6   scope of the order of the Court.

7          THE COURT:  All right.  So I'll admit same.

8          (Plaintiff Exhibit K4KDX-507 was marked into

9   evidence.)

04:34   10          MR. LITTERINE-KAUFMAN:  We can take that down now.

11   Thank you.

12   BY MR. LITTERINE-KAUFMAN:

13   Q.  After you apportioned Kars 4 Kids' revenue --

14          THE COURT:  I'm sorry to interrupt you, Mr. Kaufman,

04:34   15   but you're not asserting that this is still a demonstrative,

16   are you?

17          MR. LITTERINE-KAUFMAN:  No, your Honor.

18          THE COURT:  This supports his -- it's more like a

19   summary of his testimony.

04:34   20          MR. LITTERINE-KAUFMAN:  Correct, yes, your Honor.  I

21   would call it a summary, that's a good way to word it.  Thank

22   you.

23          THE COURT:  You may continue, Mr. Kaufman.

24   Q.  After you apportioned Kars 4 Kids' revenue from Texas

04:34   25   donors, what was the next step you took?

Hall - Direct - Litterine-Kaufman

1   A.   The next step was to evaluate what methodology to use to

2   calculate profits, and once you have a revenue figure to

3   calculate profits it's -- the deduction of costs becomes

4   central to that.

04:35     5            And so based on my -- the facts and circumstances here

6   and how Kars 4 Kids operated, I decided to use a full

7   absorption accounting method, which is one of the generally

8   accepted methods for calculating defendant's profits, and of

9   course commonly used for company's financial statements,

04:35    10   general accepted accounting principles, the full absorption

11   method.

12   Q.   Did you hear Mr. Cook testify earlier that he used the

13   incremental approach?

14   A.   Yes, I did.

04:35    15   Q.   And under the incremental approach, what is the test for

16   whether an expense should be deducted?

17   A.   It's called -- sometimes termed a but-for test, and that

18   is but for the revenue in question would the cost have been

19   incurred.  And if so that's an incremental cost and would be

04:36    20   deducted under an incremental method.

21   Q.   Based on your experience as a damages expert, is the

22   incremental approach appropriate in this case?

23   A.   Not in this case, no, I don't believe it is.

24   Q.   Why not?

04:36    25   A.   Because Kars 4 Kids is an entity that basically has a

Hall - Direct - Litterine-Kaufman

1  single source revenue, which is its vehicle donation revenue;

2  and it is operated nationally without, you know, business

3  segments or business divisions, it basically operates

4  nationally with a single source revenue and incurs costs to

04:36    5  support that effort.  And unlike many for-profit companies

6  I've worked with in analyzing this, there's not several

7  divisions or even many divisions or profit centers.

8      And so I believe that the proper way to reflect an

9  accounting for any subpart of the Kars 4 Kids would be to

04:37   10  fully allocate the costs, because those costs benefit the

11  national operation on that single source revenue.

12  Q.  In your opinion, when is the incremental approach

13  appropriate?

14  A.  As I mentioned when there's a particular product or

04:37   15  division or part of a company with several or many revenue

16  sources, where that's in question, I think the incremental

17  approach is proper in those for -- obviously for lost profits,

18  but also for disgorgement of profits.  And that's distinct

19  from this situation in my view.

04:37   20  Q.  Did you hear Mr. Cook testify earlier that the

21  incremental approach is appropriate because Texas should be

22  treated as a separate business segment?  Did you hear

23  testimony along those lines from him?

24  A.  Yes, I did.

04:37   25  Q.  Do you agree with that?

Hall - Direct - Litterine-Kaufman

1    A.   No.

2    Q.   Why not?

3    A.   Texas is in question here because of a court ruling, not

4    because a particular business segment or geography for Kars 4

04:38    5    Kids.  It's operated nationally and not as a business segment

6    for Texas.

7    Q.   Do you know if Kars 4 Kids has any employees in Texas?

8    A.   I don't believe they do.

9    Q.   Do you know if Kars 4 Kids has any offices in Texas?

04:38    10   A.   I'm not aware they do.

11   Q.   At any point during this litigation, did Mr. Cook use

12   aspects of the full absorption approach to calculate Kars 4

13   Kids' profits?

14   A.   Yes.

04:38    15   Q.   When did he do that?

16   A.   His second report in 2018 and his first report in 2019 in

17   July, he allocated some of the common costs that he discussed,

18   which is an element of full absorption accounting allocating

19   common costs.  So in part he did.

04:38    20   Q.   And is he doing that in the opinion he gave today?

21   A.   No, he isn't.

22        MR. LITTERINE-KAUFMAN:  Please bring up K4KDX-508.

23   Q.   So, one of the categories of expenses you deducted was

24   Texas specific advertising; correct?

04:39    25   A.   Yes.

Hall - Direct - Litterine-Kaufman

1  Q.  Can you describe what this chart is?

2  A.   It's a table from page 8 of my report, that begins with

3  the revenue figures, apportioned revenue figures we just

4  summarized and I justified discussed.  And then below that is

04:39  5  a deduction for Texas specific advertising based on the

6  analysis I performed.

7          MR. LITTERINE-KAUFMAN:  Kars 4 Kids would move into

8  evidence K4KDX-508 as another summary exhibit.

9          THE COURT:  Mr. Pittman?

04:39  10          MR. PITTMAN:  No objection.

11          THE COURT:  No objection?  All right, admitted.

12          (Plaintiff Exhibit K4KDX-508 was marked into

13  evidence.)

14  BY MR. LITTERINE-KAUFMAN:

04:39  15  Q.  What types of advertising did Kars 4 Kids direct

16  specifically to Texas?

17  A.  Primarily online, and there's radio advertising.

18  Q.  In your opinion, how much should be deducted for Texas

19  specific advertising between 2013 and June 30, 2019?

04:40  20  A.  ████████.

21  Q.  And what about the period 2008 through June 30, 2019?

22  A.  ████████, and that's a figure Mr. Cook and I agree on

23  that I heard earlier today.

24  Q.  Is one of the Texas specific advertising expenses you

04:40  25  deducted advertising with Google?

Hall - Direct - Litterine-Kaufman

1   A.   Yes.

2   Q.   What documents did you use to calculate the amount of

3   Kars 4 Kids advertising expense with Google?

4   A.   Spreadsheets provided by Kars 4 Kids that was accessed

04:41   5   from Google.

6   Q.   And so you sort of said this, but just to make clear do

7   you know where those spreadsheets originated?

8   A.   Oh yes, I'm sorry; Google -- yes, through a portal that

9   Kars 4 Kids and its customers can access to obtain summaries

04:41   10   by year and month of their spend, advertising spend with

11   Google.

12   Q.   And based on your experience as a damages expert, is a

13   report like that a reliable source to determine advertising

14   spend with Google?

04:41   15   A.   Yes.

16   Q.   Did you also deduct Texas specific advertising with

17   Microsoft Bing?

18   A.   Yes.

19   Q.   And what documents did you use to calculate the amount of

04:41   20   Kars 4 Kids advertising spend with Bing in Texas?

21   A.   Spreadsheets by time period that Kars 4 Kids provided to

22   counsel and then to us.

23   Q.   And do you know where those spreadsheets originated?

24   A.   Also from Microsoft -- well, as with Google, from the

04:42   25   vendor in this case, Microsoft Bing, has those records for its

*United States District Court*
*Trenton, New Jersey*

Hall - Direct - Litterine-Kaufman

1   customers to access.

2   Q.   And do you consider them a reliable source to determine

3   deductible spending with Bing?

4   A.   Yes.

04:42   5   Q.   Why is that?

6   A.   Both Google and Bing are third-parties and accessing the

7   records that they billed to Kars 4 Kids and Kars 4 Kids

8   incurred with them, in my experience is a reasonable support

9   for a cost, and other matters would be relied upon and

04:42   10  certainly was by this -- by both parties in this matter.

11  Q.   And did you also deduct advertising expenses for radio

12  advertising in Texas?

13  A.   Yes.

14  Q.   And what documents did you use to determine the amount of

04:43   15  that expense?

16  A.   Two sources, both from Kars 4 Kids:  Their general ledger

17  extract for national advertising -- I'm sorry -- for Texas

18  specific advertising; as well as invoices we requested to

19  review related to those general ledger entries in the extract

04:43   20  we received.

21          MR. LITTERINE-KAUFMAN:  We can take down that

22  exhibit.

23  Q.   Now, I'd like to talk about national advertising

24  expenses.  What type of national advertising expenses did you

04:43   25  deduct?

Hall - Direct - Litterine-Kaufman

1   A.   Online and radio primarily; there was some smaller

2   amounts related to print media, but online and radio were the

3   two biggest dollar amounts.

4   Q.   And did you deduct the entirety of national advertising

04:43    5   expenditures?

6   A.   No.  Their national advertising spend is their second

7   largest expense category after grants, nowhere near the total,

8   just a portion that I estimated for Texas.

9   Q.   And did you deduct them under the full absorption or the

04:44   10   incremental approach?

11   A.   The full absorption and the incremental approach, both

12   depending on the vendor.

13        MR. LITTERINE-KAUFMAN:  Please bring up K4KDX-509.

14   Q.   Do you recognize this?

04:44   15   A.   Yes.

16   Q.   What is it?

17   A.   It's another table from my report, page 10 of my report.

18        MR. LITTERINE-KAUFMAN:  Your Honor, we'd offer into

19   evidence K4KDX-509 as a summary exhibit.

04:44   20        MR. PITTMAN:  No objection.

21        THE COURT:  All right, it's admitted.

22        (Plaintiff Exhibit K4KDX-509 was marked into

23   evidence.)

24   BY MR. LITTERINE-KAUFMAN:

04:44   25   Q.   In your opinion, how much have you deducted for

1   nationwide advertising between 2013 and June 2019 under the

2   full absorption approach?

3   A.   ██████████

4   Q.   And what about for the period 2008 through 2019?

04:45   5   A.   ██████████, and that's a figure Mr. Cook and I agree upon.

6   Q.   What documents did you rely on to determine Kars 4 Kids'

7   national advertising expenditures?

8   A.   I just want to clarify; we agree on the incremental

9   portion of that ████, this is presenting my full absorption.

04:45   10   So, he has a ██████████ figure for his incremental, this is my

11   full absorption.  So he agrees with most of it.

12   Q.   And what accounts for the difference between your full

13   absorption figure and Mr. Cook's incremental figure for

14   national advertising?

04:45   15   A.   Some national radio that I believe benefits Texas, and

16   from a full absorption perspective should be allocated to

17   Texas as I've done, and that makes up the ██████████ difference.

18   Q.   Now, what documents did you rely on to determine Kars 4

19   Kids' nationwide advertising expenses?

04:46   20   A.   General ledger information extract from Kars 4 Kids, as

21   well as invoices.

22   Q.   Did you do anything to confirm the accuracy of the

23   general ledger information?

24   A.   Yes, we checked over 200 invoices to the general ledger,

04:46   25   and other than some very small issues, $9 one place, $29

Hall - Direct - Litterine-Kaufman

1  another, they matched.  So over 200 of the invoices matched to

2  the general ledger which gave me a strong indication that

3  relying on the general ledger dollars for this category was

4  reasonable to do.

04:46     5           MR. LITTERINE-KAUFMAN:  Can we bring up please

6  K4KDX-513?

7  Q.   Do you recognize this document?

8  A.   Yes.

9  Q.   What is it?

04:47    10  A.   It's a summary from my report that adds on to what we've

11  been looking at and what I've been testifying to, it adds on

12  Texas portion of grant expenses.

13  Q.   Does it also add in Texas portion of common expenses?

14  A.   It does, yes.  Above that row it's got common expenses

04:47    15  for the two time periods indicated, but again it's the Texas

16  portion based on an allocation.

17           MR. LITTERINE-KAUFMAN:  Kars 4 Kids office into

18  evidence K4KDX-513 as a summary exhibit.

19           THE COURT:  Mr. Pittman?

04:47    20           MR. PITTMAN:  No objection.

21           THE COURT:  All right, admitted.

22           (Plaintiff Exhibit K4KDX-513 was marked into

23  evidence.)

24  BY MR. LITTERINE-KAUFMAN:

04:47    25  Q.   Can you explain briefly, Mr. Hall, how you calculated the

1  Texas portion of common expenses?

2  A.   Yes.  After accounting for grants and the advertising

3  separately, I reviewed the 990s for all years to identify the

4  common expenses that Kars 4 Kids incurred to both support its

5  vehicle donation efforts, as well as its charitable mission,

6  to execute its charitable mission.  And I established a cost

7  estimating relationship percent of revenue calculation that

8  was then able to able to allocate to Texas based on the Texas

9  revenue, a portion of the common expenses that supported and

10  in my view a full absorption accounting should be deducted to

11  measure profits for Texas.

12  Q.   And in your opinion, how much have you deducted to

13  account for the Texas portion of Kars 4 Kids' common expenses

14  between 2013 and June 30, 2019?

15  A.   ███████████

16  Q.   And what about for 2008 through June 30, 2019?

17  A.   Just over ███████████, ██████████

18  Q.   And can you tell us what the Texas portion of grants line

19  refers to?

20       THE COURT:  Wait, before you get there; can you tell

21  me all the different categories of common expenses that you

22  included?

23       THE WITNESS:  Yes, sir.  It's on attachment 5 of my

24  report and I can summarize the largest dollar ones without

25  looking at that, but that would be where the attachment 5

Hall - Direct - Litterine-Kaufman

1    contains the summary of the 990s.  The largest expense is

2    labor, management compensation and wages, and then office

3    expenses.  And in fact the labor -- the labor related payroll

4    tax is about two-thirds of ███████████.

04:49      5         The office expenses take that amount to about 80

6    percent of the ██████████.  And then I thought it was

7    reasonable because of the single source of revenue and its

8    central mission that the revenue funds to all other

9    categories, I included and allocated as well given at how it

04:50     10    operates nationally as opposed to a region or division.

11         THE COURT:  So you had two major ones, labor and

12    office expenses, and the third is everything else?

13         THE WITNESS:  Well, there's about 20 -- more than a

14    dozen listed; they're from the 990s and I summarized them in

04:50     15    attachment 4, and I can certainly review those.

16         THE COURT:  So Mr. Cook, he indicated that you

17    included as expenses that we're looking at here, expenses that

18    were used to support the program; did you do that?

19         THE WITNESS:  I did, yes, and I understand his

04:50     20    categorization of those, but given how it's a single source

21    revenue and then the revenue's used to fund the programs, and

22    the fund programs are part of the basis for donors deciding to

23    donate their vehicles, I thought it was reasonable and most

24    accurately reflects Texas profits to include the benefit, that

04:51     25    cost which benefited Texas in the profit calculations.  That's

Hall - Direct - Litterine-Kaufman

1   what the full absorption accounting method does.

2           THE COURT:  Could you just re-explain that to me?

3           THE WITNESS:  Sure.  The costs incurred for programs

4   is part of what the expenditures Kars 4 Kids does to execute

04:51   5   its programs in addition to grants.

6           THE COURT:  I see.  So those programs are related to

7   the grants, and you found the grants to be a cost.

8           THE WITNESS:  The grants to be a cost, they're part

9   of fulfilling their mission.  Most of the way Kars 4 Kids

04:51   10  fulfills its mission is through grants to its sister

11  organization, but it also does a small amount relative to the

12  grants of its own programs to fulfill its mission.  And that

13  of course is part of fulfilling the missions, helps it in

14  obtaining donor vehicles, given what people like to donate

04:52   15  vehicles for as far as its mission.

16          THE COURT:  Thank you.

17          THE WITNESS:  You're welcome.

18          MR. LITTERINE-KAUFMAN:  Can we bring up please

19  K4KX-24, which was admitted into evidence during the liability

04:52   20  phase?  And could we go to the page labeled 6 of 48?

21  Q.  What's this document, Mr. Hall?

22  A.  This is a summary page of Kars 4 Kids' 990 for the year

23  2016.  And as you can see from the entries of the

24  organization, name of the organization, it's an IRS return for

04:52   25  Kars 4 Kids.

*United States District Court*
*Trenton, New Jersey*

Hall - Direct - Litterine-Kaufman

1           MR. LITTERINE-KAUFMAN:  Can we go please to page 15

2  out of 48?

3  Q.  And what is this page?

4  A.  This page is a detail, several pages into the return that

04:53    5  Kars 4 Kids provides on an annual basis of its functional

6  expenses.  You see at the top it says:  Part IX, Roman Numeral

7  IX, Statement of Functional Expenses.

8  Q.  So what does this summarize?

9  A.  This summarizes by category the expenses Kars 4 Kids

04:53   10  incurs.  And as Mr. Cook indicated they are divided into

11  categories, and I know from being a treasurer of a nonprofit

12  that -- how this form works and the categories.  And column A

13  is the total, total expenses; and the other three columns,

14  program service expenses, management and general expenses, and

04:53   15  fundraising make up that total.

16  Q.  And what is the first line in this statement of

17  functional expenses?

18  A.  The grant expenses for Kars 4 Kids for that year.

19  Q.  And is it this line on the 990 that you used to calculate

04:54   20  Kars 4 Kids' grant expenses?

21  A.  Yes.  And it's also reflected on the summary page we

22  looked at as the first category of expenses for Kars 4 Kids.

23  Q.  So how does the IRS categorize a nonprofit's grant

24  expenditures?

04:54   25  A.  As an expense.  And if we can go to that first page it

Hall - Direct - Litterine-Kaufman

1   shows by category how they do it; it does it on this page as

2   well, but in summary I think it's of note to see.  I forget

3   the page number.

4       On the right-hand column under current year, you see

04:54   5   line 13, is grants and similar amounts paid, it's 18,462,000,

6   and you can see on the left-hand column that the IRS

7   categorizes that as expense.

8   Q.   Do you agree with Mr. Cook that grants are similar to

9   profits in a for-profit company?

04:55   10  A.   No, I don't.

11  Q.   Why not?

12  A.   It's just very different.  It's the essence of a profit

13  versus a not-for-profit, and to me is a -- really a not

14  relevant comparison given that grants are the central function

04:55   15  of a not-for-profit or their charitable mission, and this

16  grant expense reflects that.  It's their single largest

17  expense, and without it they could not be a not-for-profit,

18  nor could they get vehicle donation revenue.

19      So to me it's the most essential expense it has, and

04:55   20  it's reflected on the IRS forms that way as an expense, and in

21  no way in my view is a profit, and calling an expense a

22  profit, because in a for-profit situation that would be the

23  case; to me it's not persuasive or reasonable.

24      THE COURT:  You're at 4:05, so you're testimony has

04:56   25  gone 43 minutes right now.  So you're over your hour now,

Hall - Direct - Litterine-Kaufman

1   which is what you asked for.

2          MR. LITTERINE-KAUFMAN:  Yes, your Honor, okay.  Then

3   can I put up one demonstrative and sit down?

4          THE COURT:  I didn't tell you you were over yet,

04:56   5   so --

6          MR. LITTERINE-KAUFMAN:  Thank you, your Honor.

7          Can we bring up K4KDX-523?

8   Q.   What is this, Mr. Hall?

9   A.   It's a summary from my report on my two approaches.  I

04:56   10   mentioned my full absorption approach throughout, but I also

11   did to evaluate Mr. Cook's approach did an incremental measure

12   of Kars 4 Kids profits as well.

13   Q.   And which of these do you believe to be the appropriate

14   method?

04:56   15   A.   The full absorption approach.

16   Q.   And can you just describe for us your conclusion for each

17   of these periods of time and methods?

18   A.   Yes.  For the top row, the 2013 to 2019 period, full

19   absorption conclusion would be █████; the incremental for

04:57   20   that same time period method would be ██████.  The next row

21   is the longer time period from 2008 to 2019, the full

22   absorption approach yields ██████; and the incremental

23   ██████.

24          And of note the differential between my full absorption

04:57   25   conclusion and incremental for the longer time period is

*United States District Court*
*Trenton, New Jersey*

Hall - Direct - Litterine-Kaufman

1  basically the difference between the common costs being

2  allocated or not.  They are allocated in the full absorption;

3  in the incremental they are not.  And so that's the primary

4  reason for the difference.

04:58  5       MR. LITTERINE-KAUFMAN:  Pass the witness, your

6  Honor.

7            THE COURT:  All right.  Mr. Pittman?

8            MR. LITTERINE-KAUFMAN:  Your Honor, I'm sorry; if I

9  could just move into evidence, K4KDX-523.

04:58  10           THE COURT:  Do you object to that, Mr. Pittman?

11           MR. PITTMAN:  No objection.

12           THE COURT:  All right, admitted.

13           (Plaintiff Exhibit K4KDX-523 was marked into

14  evidence.)

04:58  15           MR. LITTERINE-KAUFMAN:  And now I pass the witness.

16           MR. PITTMAN:  May I approach the witness, your

17  Honor?

18           THE COURT:  You may.

19           (Handing to witness.)

04:59  20           THE COURT:  So before you begin, Mr. Pittman; Mr.

21  Kaufman, you admitted a number of documents, but we don't have

22  them as documents, right?  They were just slides that you put

23  up there.  So, I need a copy of K4KDX-507, 508, 509, 513; 24

24  was previously admitted; and K4KDX-523.

05:00  25           MR. LITTERINE-KAUFMAN:  Your Honor, we'll provide

Hall - Cross - Pittman

1    copies of those to the Court.

2              THE COURT:  Thank you.

3              All right.  Mr. Pittman.

4              MR. PITTMAN:  Thank you, your Honor.

04:58    5    (CROSS-EXAMINATION OF DAVID HALL BY MR. PITTMAN:)

6    Q.   Mr. Hall, according to your assessment, K4K's gross

7    revenue from Texas donations from 2008 to 2019 is ▮▮▮▮▮▮▮;

8    correct?

9    A.   That sounds right, yes.

05:00   10    Q.   And based on your analysis of your client's documents,

11    K4K's net revenue from Texas donations from 2008 through June

12    30th, 2019 is 1▮▮▮▮▮▮; correct?

13    A.   Correct.

14    Q.   Now, K4K did provide you with information or calculations

05:00   15    of the donation received in Texas by donors living outside of

16    Texas; correct?

17    A.   That's correct.  They just received data for Texas

18    addresses for donors.

19    Q.   So other than this ▮▮▮▮▮▮▮ that we are aware of,

05:01   20    there were other donations that were received in Texas by

21    donors living outside of Texas; correct?

22    A.   I don't know that to be the case.

23    Q.   Well, did you hear Ms. Landau testify that they were?

24    A.   Yes, but I haven't seen data on that.

05:01   25    Q.   Did you ask for data so that you could give the Court an

Hall - Cross - Pittman

 1   accurate assessment of the calculations of donations received

 2   in Texas by donors living outside of Texas, did you ask for

 3   that?

 4   A.   I requested data for Texas donors because I believe that

05:01   5   most reasonably reflects the advertising related to Texas, and

 6   could perform my calculations based on that.

 7   Q.   So you can't provide the Court with the additional

 8   revenue that K4K received from pickups in Texas; is that

 9   right?

05:01   10   A.   I don't have that information.

 11   Q.   Now, let me -- so sir, what I'd like to do is I'd like

 12   for you to tell the Court before we get going to some of your

 13   reasoning, I'd like you to tell the Court the differences

 14   between what you're doing and what Mr. Hall testified about.

05:02   15   Are you with me?

 16   A.   Yes, I think you mean Mr. Cook.

 17   Q.   Mr. Hall and Mr. Cook; you're Mr. Hall --

 18   A.   Yes.

 19   Q.   Mr. Cook testified; correct?

05:03   20   A.   Correct.

 21   Q.   So, in terms of what you call apportioning, the

 22   advertising and fundraising apportioning, what is that dollar

 23   number, sir?

 24   A.   Approximately ███████; I don't have the figure right

05:03   25   in front of me.

Hall - Cross - Pittman

1   Q.   You've got it on K4K Exhibit 528; correct?  If you need a

2   calculator I can give you a calculator.

3   A.   I don't need a calculator, I just need to turn to that.

4        528?

05:03   5   Q.   Yes, sir.

6   A.   Oh, yes.  Yes, it's the difference -- it's not calculated

7   on here, but I think ████████ is close.  It's --

8   Q.   If I calculate it and tell you it's ████████, does that

9   sound about right?

05:04   10   A.   It does.

11   Q.   Now, in terms of the grant deduction that you're asking

12   the Court to allow from the incremental profits, what is the

13   amount of that?

14   A.   ████████.

05:04   15   Q.   Now, in terms of what you call the common expense

16   deduction that Mr. Cook disagrees with you on, what's the

17   total of that?

18   A.   ████████.

19   Q.   Would you trust my calculation if I told you that the

05:04   20   total is ████████?  Does that sound about right?

21   A.   You're looking at it, I can't tell, but if you ran the

22   calculation for purposes of your question I won't dispute that

23   number.

24   Q.   And just so we're clear, you're asking the Court to allow

05:05   25   K4K to deduct from the revenue in Texas, to deduct all of

Hall - Cross - Pittman

1  these items in calculating the incremental profits; is that

2  right, sir?

3  A.   No, that's not correct.   The end of your question you

4  said incremental profits, and this would be the full

05:05  5  absorption of the common expense deduction, relates to the

6  full absorption.   So I don't agree with your question.

7  Q.   So I'll use that term not as the incremental approach,

8  but I understand your hesitation.   So, in terms of the profits

9  that would be disgorged or awarded to America Can! Cars For

05:06  10  Kids, you're asking the Court to deduct ███████ from the

11  gross revenue; correct?

12  A.   Yes, from the ███████ of gross revenue, which is 16

13  million of net revenue, yes.   For the full absorption.

14  Q.   And despite that ███████ was earned from Texas

05:06  15  donations, you're telling the Court that America Can! Cars For

16  Kids should only receive ██████; is that right?

17  A.   No.   ███████ was not earned by Kars 4 Kids as your

18  question asked.

19  Q.   Well, ███████ was earned from revenue from cars sold

05:06  20  that were donated to K4K; correct?

21  A.   That's correct, and Kars 4 Kids netted out of that ██

22  ██████, not ██.

23  Q.   So, ███████ that was received by K4K, you're telling

24  the Court that you believe that America Can! should only get

05:07  25  ██████; is that right?

Hall - Cross - Pittman

1    A.   Yes.

2    Q.   Now, let me first ask you about your -- what you call

3    apportionment.  Now, you agreed with me at your deposition,

4    didn't you, that it's your burden as K4K's expert to

05:07    5    demonstrate whether apportionment is appropriate or accurate;

6    correct?

7    A.   Not from a legal prospective, I think I made that clear

8    in my deposition, but my understanding of which party is -- in

9    a non-legal way from a damage prospective, yes, the burden

05:07    10   would be on the infringer.

11   Q.   Well, actually you told me at your deposition that it was

12   your burden, Mr. Hall's burden as K4K's expert to demonstrate

13   it; right?

14   A.   We had a number of questions on that, I don't think --

05:07    15   I've been hired as an expert, so I've certainly taken on the

16   role of deducting costs.  But from -- what the treatises say

17   they identify parties, not experts, but I understand what

18   you're asking.

19   Q.   Can you take a look at your deposition, page 157, line 11

05:08    20   through 23?

21   A.   Yes, one moment.  Page 57?

22   Q.   Yes, sir.  And my question to you was:  "Well, as between

23   you and Mr. Cook, who do you believe has the burden as the

24   expert to prove the proportion of profit which may or may not

05:08    25   be due to the use of the infringing mark?"

Hall - Cross - Pittman

1          What's your answer?

2    A.   I'm on page 57; what line?

3    Q.   157, sir.

4    A.   Oh, I'm sorry.  I'm sorry.

05:08   5          Yes.  As I said from a damages expert, not a legal, is

6    my understanding from the treatises.  And the treatises

7    identify parties, but certainly as I said, I have taken on the

8    analysis of the deductible costs.

9    Q.   Now, in trying to satisfy your burden, you identified

05:09   10   several factors that you say contribute to donations to K4K;

11   correct?

12   A.   I did identify factors that -- yes, that caused vehicle

13   donations, reasonably caused them, yes.

14   Q.   Let me put up those features that you identified.

05:09   15          THE COURT:  Wait, before you take this down; Mr.

16   Hall, Mr. Pittman put up this little chart --

17          THE WITNESS:  Yes.

18          THE COURT:  Do you agree with that way he put this

19   chart together?

05:09   20          THE WITNESS:  If those are the differences between

21   Mr. Cook's incremental measure of profits and the difference

22   between my full absorption, yes.

23          THE COURT:  Okay.

24          THE WITNESS:  I do agree with those dollar amounts.

05:10   25          THE COURT:  Okay, thank you.

Hall - Cross - Pittman

1  BY MR. PITTMAN:

2  Q.   Now, in your report and I believe you also testified

3  about it, you identified three factors or examples which you

4  say contribute to donations for K4K; correct?

05:10  5  A.   Yes.

6  Q.   And these factors are directly from your expert report;

7  correct?

8  A.   Yes.

9  Q.   Now, isn't it true that you can't show the judge whether

05:10  10  donors donated vehicles to K4K specifically because of these

11  three factors?

12  A.   I don't have the records to specifically identify donor

13  by donor by those factors.

14  Q.   And in fact sir, you did not contact a single donor to

05:10  15  determine whether they were donating for factors other than

16  the infringing mark, did you.

17  A.   I did not.

18  Q.   And K4K gave you the names, e-mail addresses, phone

19  numbers of the donors; correct?

05:11  20  A.   That was part of the records of the vehicle donation

21  revenue information, correct.

22  Q.   And did hear Mr. Cook say even when experts do an

23  apportionment in cases where it might be applicable, that they

24  do some kind of survey or analysis; did you hear Mr. Cook say

05:11  25  that?

Hall - Cross - Pittman

1  A.   Yes, but not in all cases, that's not the basis of

2  survey.  It is in some, and others there's cost-based

3  apportionment that I cited from the treatise that is the basis

4  and not a survey.

05:11  5  Q.   So just to be clear, you didn't do any survey or analysis

6  of the donors whose information you had to determine whether

7  you could tell the Court that any donor donated for one of

8  these reasons, instead of the infringement of the mark; is

9  that true, sir?

05:11  10  A.   That is true, I did a cost-based apportionment versus any

11  survey.

12  Q.   And in fact, you told me at your deposition, didn't you,

13  that you did not even attempt to isolate and find out from

14  donors whether they were donating because of one of these

05:12  15  factors.

16  A.   I testified at my deposition and here I've not contacted

17  donors.

18  Q.   That wasn't my question.  My question was you testified

19  that you didn't even try to; do you recall that testimony,

05:12  20  sir?

21  A.   Yes, it wasn't part of my scope, I didn't attempt to

22  contact any donors.

23  Q.   Now, instead of trying to attempt to contact donors where

24  you can tell the Court what a donor actually may have thought,

05:12  25  you used what you call advertising-to-fundraising ratio;

Hall - Cross - Pittman

1  correct?

2  A.  Yes, as an apportionment methodology.

3  Q.  Now, as far as this ratio, this is the same ratio that

4  you used in your other report when you were doing it for 50

05:12    5  states; correct?

6  A.  Yes, I think you're referring to the 2018 report of mine,

7  yes.

8  Q.  And that was a report for 50 states; correct?

9  A.  Yes, covered national.

05:13   10  Q.  Now, isn't it true, sir, that you have never used a

11  specific "advertising-to-fundraising ratio" before as an

12  expert?

13  A.  I have not, because I've not had a trademark case or

14  profit -- disgorgement of profits case that involved a

05:13   15  nonprofit.

16  Q.  So the answer is you've never used it before.

17  A.  I have not.  I've used similar ratio on other trademark

18  case, but it wasn't a nonprofit and it wasn't fundraising

19  involved.

05:13   20  Q.  In fact, didn't you also tell me at your deposition that

21  you're not aware of any expert who has ever used a specific

22  advertising-to-fundraising ratio; do you recall telling me

23  that, sir?

24  A.  I do, because I'm not aware of a case like this for

05:13   25  fundraising, but I did testify other advertising ratios have

Hall - Cross - Pittman

1 been used for for-profit matters.

2 Q.   But you said you're not aware of any other experts who

3 use what you're asking the Court to use here in

4 advertising-to-fundraising ratio; is that right?

05:13   5 A.   Not specifically, because I don't know of a case like

6 this.

7 Q.   And I also asked you at your deposition to bring some

8 expert materials that experts such as yourself rely on in

9 calculating damages; do you recall that?

05:14   10 A.   Yes, I cite those treatises in my reports.

11 Q.   And then we asked you to look at those information -- the

12 treatises from all over the country that experts use, we asked

13 you to look at those materials and identify in any of those

14 materials where any experts have referenced the specific

05:14   15 advertising-to-fundraising ratio; do you recall that?

16 A.   I do.

17 Q.   And you weren't able to find that, were you, sir.

18 A.   Correct, there were no nonprofit cases I saw in any of

19 those materials referenced, so I did not see this specific

05:14   20 method.  But I saw cost-based apportionment method.

21 Q.   Now, again you're asking the Court to deduct 37 percent,

22 because you consider that to be "non-infringing" use; correct?

23 A.   I do, based on my methodology.

24 Q.   Now, let me ask you, can you tell the Court of the

05:14   25 donations received in Texas, can you tell the Court whether

Hall - Cross - Pittman

1    any of these donors did not see the infringing mark as their

2    first contact with K4K?

3    A.    I don't have that information.

4    Q.    And in fact, you didn't do any analysis to determine

05:15    5    whether -- whether the donors, again, saw the infringing ad as

6    their first contact with K4K; is that right?

7    A.    I did not do an analysis like that, that wasn't part of

8    my scope.

9    Q.    Now, let's move to the next category, of the common

05:15    10    expenses.  You also told me at your deposition that it's your

11    burden as K4K's expert to prove the expenses; correct?

12    A.    From a non-legal prospective and understanding that the

13    treatises cite the parties' burden, either defendant or

14    plaintiff, but I understood your question as far as my role

05:15    15    here, yes.

16    Q.    Now, just to be clear, you just testified -- well, let me

17    ask you the question.  You believe that every single expense

18    reported by K4K in the Form 990 should be allocated to Texas

19    and deducted as an expense; is that right?

05:16    20    A.    I do, because of the way Kars 4 Kids operates, yes.

21    Q.    And in fact you assume that a portion of every expense,

22    whether it was program services, management or general, you

23    assume that every expense should be deducted; correct?

24    A.    Yes, based on again how Kars 4 Kids operates.

05:16    25    Q.    Take a look at K4K Exhibit 510.  That's your report I

Hall - Cross - Pittman

1    believe?

2    A.   Yes, I'm there.

3    Q.   And attachment 5 of your report; can you go to that?

4    A.   Yes, I'm there.

05:16    5    Q.   In attachment 5 let's look at some of these expenses,

6    specific expenses.  Look at Licenses and Permits, do you see

7    that, ███████; do you see that?

8    A.   Yes, I do.

9    Q.   Can you tell the Court what type of licenses and permits

05:17    10    that relate to?

11    A.   Not specifically, and a small portion of this would have

12    been -- about two and a half percent of this would have been

13    allocated to Texas in my calculation.

14           MR. PITTMAN:  Objection, your Honor; nonresponsive.

05:17    15           THE COURT:  You made an objection?

16           MR. PITTMAN:  Yes, sir.

17           THE COURT:  You want me to respond?

18           MR. PITTMAN:  Yes, sir.

19           THE COURT:  I couldn't hear you.  Could you just

05:17    20    tell me what your objection is?

21           MR. PITTMAN:  Yes, your Honor.  I can rephrase the

22    question.

23              THE COURT:  Okay.

24           MR. PITTMAN:  Or repeat it rather.

05:17    25    BY MR. PITTMAN:

Hall - Cross - Pittman

1   Q.   Sir, in looking at attachment 5 of your report, you show

2   an amount of ▋▋▋▋ for Licenses and Permits; my question was

3   can you tell the Court what that's for?

4   A.   Not specifically, no.

05:18    5   Q.   Can you tell the Court whether K4K paid for any licenses

6   and permits in the State of Texas?

7   A.   No, I can't.  I don't know that.

8   Q.   Let's look at another item.  All Other Expenses is an

9   amount ▋▋▋▋; do you see that?

05:18    10  A.   I do.

11  Q.   Can you tell the Court what All Other means?

12  A.   Yes, it's all the other business expenses they have to

13  raise vehicle donation revenue and execute its mission, and

14  record it on an annual basis on their 990s.

05:18    15  Q.   You can't tell the Court what specifically that includes,

16  can you, sir?

17  A.   I did not look beyond the 990s as to what's included

18  there, but it's a common line item for businesses to have All

19  Other category of expenses.

05:18    20  Q.   And can you tell the Court whether All Other expenses

21  were incurred in Texas?

22  A.   They were incurred nationally as I indicated how they

23  operated and it benefited everywhere, but I don't know the

24  location that any of them were specific to Texas.

05:19    25  Q.   There's an item, Bad Debt Expense; do you see that?

Hall - Cross - Pittman

1  A.  Yes.

2  Q.  Do you know if K4K had any bad debts in Texas?

3  A.  As far as vendors not paying in Texas?

4  Q.  Yes, sir.

05:19  5  A.  I don't know that.

6  Q.  There's another amount for Repairs and Maintenance of a

7  ████████████████████, ████████; do you see that?

8  A.  Yes.

9  Q.  Can you tell the Court what items were repaired or

05:19  10  maintained in that amount?

11  A.  I don't have that information.

12  Q.  Can you tell the Court whether K4K repaired anything in

13  Texas?

14  A.  No, I can't.

05:19  15  Q.  In fact, you testified that K4K didn't have any offices

16  in Texas; correct?

17  A.  That's correct.

18  Q.  No employees in Texas?

19  A.  I'm not aware of any.

05:19  20  Q.  You also testified or told me at your deposition that K4K

21  didn't need any extra help in New Jersey as a result of the

22  Texas donations; correct?  Didn't need any extra employees,

23  extra assistance?

24  A.  Not that I'm aware of, but I also testified that if the

05:20  25  revenue volume increased over time, they would certainly need

Hall - Cross - Pittman

1    that.

2    Q.   Now, in allocating what you call common expenses, you

3    didn't do an analysis to determine how much time K4K spent on

4    real estate or the rabbinical training or educational programs

05:20    5    or camps or anything; is that right?

6    A.   That's correct.

7            THE COURT:  Is there an objection?

8            MR. LITTERINE-KAUFMAN:  There is, your Honor; it

9    assumes facts not in evidence.  I don't it's been established

05:20    10    that Kars 4 Kids spent anything on any of those things.

11            THE COURT:  Overruled.  Next question.

12    BY MR. PITTMAN:

13    Q.   Sir, you're aware that Kars 4 Kids had -- some of the

14    money that they raised from donations they purchased real

05:20    15    estate with; you're aware of that, aren't you?

16    A.   I believe I've seen information on that, but -- you're

17    referring to donations of real estate to them or -- I'm not

18    aware of purchases, I'm aware of donations.  So I'm not sure

19    what you're referring to.

05:21    20    Q.   You recall some testimony about some high rises that K4K

21    purchased?  Do you recall that from the previous trial?

22    A.   No.

23    Q.   Now, at the time of your report you stated that you

24    hadn't been to their New Jersey offices to observe how they

05:21    25    operate or how the expenses relate to the operation; correct?

Hall - Cross - Pittman

1   A.   That's correct.

2   Q.   Now, here there's also an expense for legal expenses.

3   You're asking the Court to allow a deduction for legal

4   expenses that K4K incurred in suing America Can!, aren't you?

05:21   5   A.   I've allocated all of these expenses for the reason I

6   stated, the way Kars 4 Kids operated, and that does include

7   legal expenses of two and a half percent of any of these

8   categories has been allocated to Texas, yes.

9   Q.   Now, you worked on another case with Mr. Vogl's firm

05:22   10   where you were representing the holder of a mark; correct?

11   A.   Yes.

12   Q.   And there you used what's called the incremental or the

13   hybrid approach; right?

14   A.   I described it as a hybrid approach, which is part

05:22   15   incremental, part allocation of cost, which is a full

16   absorption.  So it's a combination.

17   Q.   Now, speaking of the full absorption, you didn't use the

18   full absorption in that case that you worked on with Mr.

19   Vogl's firm where you were representing the trademark holder;

05:22   20   is that right?

21   A.   No, the facts and circumstances were different as far as

22   the sources of revenue compared to here.

23   Q.   Did not use full absorption.

24   A.   Not the full absorption aspects of it; it did as far as

05:22   25   allocating some common covers.

*United States District Court*
*Trenton, New Jersey*

Hall - Cross - Pittman

1   Q.   In fact sir, didn't you tell me that you have never used

2   the full absorption methodology, as that term is used in the

3   expert materials?

4   A.   That is true, I've never had a case like this where it's

05:22   5   essentially a single revenue source entity that has one

6   charitable application.  So I've had not the facts and

7   circumstances to apply the full absorption that are evident

8   here.

9   Q.   Now, you agree with me that experts all across the

05:23   10   country do use the incremental approach that Mr. Cook used.

11   A.   Yes, I've seen that approach used, yes.

12   Q.   And you also told me that that the expert material that

13   you rely on suggests that many courts also accept the

14   incremental method; do you recall telling me that?

05:23   15   A.   Yes.  Courts have accepted the full absorption method as

16   well, and incremental, yes.

17   Q.   And in fact, you also told me that in expert materials

18   that you have seen, that you use, that this area, the New

19   Jersey area, uses the incremental approach; do you recall

05:23   20   that?

21   A.   I don't recall New Jersey specific --

22   Q.   Third Circuit.

23   A.   I do recall you referencing a circuit, yes.

24   Q.   And it's your understanding from your expert materials

05:23   25   that the Third Circuit experts use the incremental approach?

Hall - Cross - Pittman

1  A.   I don't know that I said experts use; I think it

2  referenced the circuit having accepted the incremental

3  approach, yes.

4  Q.   Now, you've asked for a deduction for all the

05:24  5  advertising; correct?

6  A.   No.

7  Q.   For all of the advertising, the Google Texas specific,

8  you take deductions for all of that, don't you?

9  A.   Yes.  It's a small fraction of the ██████████ of

05:24  10  advertising, I thought you were referring to on this.

11  Q.   Well, no, I'm actually referring to your report.  You

12  deduct the advertising.

13  A.   Yes, Texas specific, and then a Texas portion of national

14  advertising that reaches Texas, yes.

05:24  15  Q.   But you told me in your deposition that you read in your

16  expert materials that some courts don't allow deductions for

17  advertising an infringing mark; do you recall telling me that?

18  A.   I recall you identifying in a treatise that and having me

19  read that is what I recall.

05:25  20  Q.   You say you heard that --

21       THE COURT:  So Mr. Pittman, you're over your 40

22  minutes.  So I added your 16 from your prior individual, plus

23  the time now.  You can keep going for a few minutes --

24       MR. PITTMAN:  I'm near done, your Honor, I'm close.

05:25  25       THE COURT:  Okay.

Hall - Cross - Pittman

1   BY MR. PITTMAN:

2   Q.   Now, let's talk about the grants that you are also asking

3   for a deduction; I think we said that was ███████████.  Are you

4   aware -- well, strike that.

05:25    5        On your attachment 5 you show ███████████ in revenue

6   and ███████████ in grants; do you see that?

7   A.   Yes.  Combining the two top line items for expenses,

8   grants is the first one and then scholarships is the second

9   one, yes.

05:25   10   Q.   Are you aware of any of this grant money that would have

11   been given to a Texas resident or to benefit a Texas resident?

12   A.   I don't have geography information on grants.

13   Q.   You didn't ask K4K if any of the grant money benefited

14   Texas residents?

05:26   15   A.   I did not ask that.

16   Q.   Now, you didn't see anything in which you were reviewing

17   that said that the grants had to be in a certain amount;

18   correct?

19   A.   No, I've not seen any -- I'm sorry; can you repeat that

05:26   20   question?  I'm not sure I understand.

21   Q.   That the grants -- these ███████████ in grants or the █

22   ███████████ that you're trying to deduct, you didn't see anything

23   that said that the grants had to be in a certain amount.

24   A.   No, I don't recall seeing that.

05:26   25   Q.   Now, so something like rent expense would be in a certain

Hall - Cross - Pittman

1   amount based on a lease; correct?

2   A.   Yes.

3   Q.   And you also found out, didn't you, that the amount of

4   the grants is discretionary.

05:26   5   A.   I've seen information from the May trial about that, but

6   obviously it's central.  The fact of them I don't believe is

7   discretionary, the amount depends on the vehicle donation

8   revenue each year.

9   Q.   So they didn't have to give ██████████ of grants, it

05:27   10   was discretionary; is that right?

11   A.   I believe they to maintain their nonprofit status and to

12   track vehicle donations they have to do a substantial amount

13   of grants, but I don't know of a specific number.  But I know

14   what they actually did do as far as grants, and that's over

05:27   15   ██████████.

16   Q.   Okay.  A couple more questions.  You've never worked on

17   a nonprofit case where you were trying to deduct grants in

18   calculating a defendant's profits; is that right?

19   A.   I have not.  I've worked on a couple of nonprofit

05:27   20   matters, but they didn't involve fundraising, just happened to

21   involve nonprofit entities in a dispute.

22   Q.   And how long have you been an expert?

23   A.   31 years.

24   Q.   So in 31 years this is the first time you've ever come to

05:27   25   court and asked a court to deduct grants in calculating the

*United States District Court*
*Trenton, New Jersey*

Hall - Cross - Pittman

1    defendant's profits in a trademark case; is that right?

2    A.   It's the only case I've had like this, and I certainly

3    have asked courts to deduct expenses, and this is an expense

4    that I do believe should be deducted.

05:28   5    Q.   My question is this is the first time you've ever

6    requested that; correct?

7    A.   Yes, because it's the first case I've had like this.

8              MR. PITTMAN:  Pass the witness.

9              THE COURT:  All right.  Any redirect?

05:28   10             MR. LITTERINE-KAUFMAN:  No redirect, your Honor.

11             THE COURT:  All right, thank you.

12             You may step down, Mr. Hall.

13             THE WITNESS:  Thank you, sir.

14             THE COURT:  Thanks for coming in.

05:28   15             (Witness excused.)

16             THE COURT:  So, Mr. Kaufman, you rest?

17             MR. LITTERINE-KAUFMAN:  Yes, Kars 4 Kids rests, your

18    Honor.

19             THE COURT:  So, do you wish to be heard on laches?

05:28   20             MR. VOGL:  Well, your Honor, if I understood you

21    correctly, you have our briefs clearly, and we put most of the

22    evidence in through those briefs, but if there's maybe one or

23    two points I could raise based on today's testimony?

24             THE COURT:  You may.

05:28   25             MR. VOGL:  Two points, your Honor.

*United States District Court*
*Trenton, New Jersey*

**1**          THE COURT:  You may.

**2**          MR. VOGL:  So just to set the stage here, your

**3**    Honor, under Third Circuit law the doctrine of laches as you

**4**    know bars a claim when there's inexcusable delay in bringing

05:29  **5**    the suit, and prejudice to the defendant as a result of the

**6**    delay.

**7**          Your Honor, I think what we heard today supports

**8**    what we heard at the liability phase of the trial, is that

**9**    America Can! has known about my client's use of Kars 4 Kids,

05:29  **10**   and has known about my client's use of Kars 4 Kids in Texas

**11**   all the way back to 2003.  They sent the letter, my client had

**12**   been in the market; mailers, actual types of other promotional

**13**   materials.  Publications had been used, Readers Digest, the

**14**   Jewish Press had been sent nationally, so our client's use has

05:29  **15**   been open and notorious throughout that time.

**16**          What you heard today is that Exhibit 447, this is

**17**   ACCFX-447 --

**18**          THE COURT:  I know that one.

**19**          MR. VOGL:  Okay.  That particular document, your

05:30  **20**   Honor, evidences specific Texas related advertising.  This one

**21**   starts with 2008.  If you couple this document with the

**22**   testimony that your Honor heard during the trial, supporting

**23**   the fact that my client's use went all the way back to the

**24**   1990s, at least as early as 2003, your Honor, when they wrote

05:30  **25**   the letter.

1          The fact that they allowed my client to continue to

2     operate in Texas, throughout the United States, open and

3     notoriously using Kars 4 Kids, suggests two things, your

4     Honor:  Number one, they weren't being damaged and they're not

05:30   5     being damaged now; and moreover, your Honor, they are not

6     entitled to disgorgement.  Six years is the statute of

7     limitations here in New Jersey; 12 years is how long they've

8     waited before they put my client on notice that they all of a

9     sudden had an issue with my client using Kars 4 Kids.

05:31   10          You also heard, your Honor, that both sides are

11     coexisting with the Cars For Kids, their spelling, dotnet

12     site, that also takes car donations.  And that site allows you

13     to take car donations out of Texas, your Honor.  So, we're all

14     coexisting, whether we like it or not.  We all picked let's

05:31   15     say a bad name, Kars 4 Kids; it's very descriptive.  No one

16     gets the single use of that phrase; whether it's -- and

17     particularly the proper spelling of that word.

18          And so the fact that they didn't go after us until

19     we went after then, that they countersued, and the fact that

05:31   20     they waited until 2013 to do this assignment between

21     organizations -- and I can represent to you, your Honor, that

22     they did not file that assignment until 2019.

23          There's absolutely no injury that they've suffered,

24     absolutely no injunction that's necessary, and absolutely no

05:32   25     disgorgement of my client's profits; let alone any other type

*United States District Court*
*Trenton, New Jersey*

1  of enhanced damages, et cetera, et cetera.

2         This case is a case where they waited, they sat on

3  their hands, and allowed my client to of course inject its

4  mark into the market; creating losses that my client now will

05:32   5  incur if any damages are assessed in this case.  And the

6  losses would be incurred because they didn't do anything, they

7  sat on their hands.  That's laches; it's textbook laches, your

8  Honor.

9         THE COURT:  Thank you.

05:32   10         MR. VOGL:  Thank you, your Honor.

11         THE COURT:  Mr. Pittman, do you wish to be heard on

12  that?

13         MR. PITTMAN:  Yes, your Honor.  Your Honor, the

14  claim of laches is one that actually can easily be dispensed

05:32   15  with.  K4K, they've got the burden to show that they were, as

16  Mr. Vogl put it, open and notorious.

17         The evidence that we have -- you know, setting aside

18  the hurdle that they've got to go over that they waived their

19  right for laches, that they've got to overcome the hurdle that

05:33   20  if laches were really applicable, then they perpetrated a

21  fraud on the Court by them filing their suit when they also

22  would have waited.

23         But besides that, in looking at the actual evidence,

24  they have zero evidence that they were advertising

05:33   25  specifically in Texas after the 2003 cease and desist letter

1   was sent.  That letter was sent, guess what happened; they

2   stopped.  Zero evidence, during the --

3            THE COURT:  Well, if you look at 447, it has Google

4   advertising or something on there, for all those years; so how

05:33   5   do you deal with that?

6            MR. PITTMAN:  Well, first they started in 2008.  So,

7   if they started in 2008 as that represents, laches doesn't

8   apply, because the lawsuit was filed six years from that date.

9   So it doesn't apply.  Period, end of story on the 2008.

05:34   10           Mr. Vogl has to show that it was something before

11   2008.  He's got to show that it was 2004, '5, '6, '7, that's

12   what he's got to show.  Because again the statute of

13   limitations as he pointed out is six years.  So we go back six

14   years from the 2014 filing; that's why we did a calculation of

05:34   15   damages from 2008.  So that is within the statute of

16   limitations of the six years.  So laches wouldn't apply based

17   on that chart.

18           But even if we were discussing that chart, the

19   Google Analytics, as Ms. Landau testified, that was national

05:34   20   advertising, that was not public advertising.

21           So for it to be open and notorious as Mr. Vogl

22   pointed out, plenty of cases say this, if they were

23   advertising in the Dallas Morning News, they'd have an

24   argument; Houston Chronicle, they'd have an argument.  They

05:35   25   showed zero advertising in Texas for 2003, 2004, 2005, 2006,

1    2007, 2008, 2009, 2010.

2           Even their own document from Mr. Hall says that he

3    was unable to identify specific advertising in Texas for most

4    of that time, most of those earlier periods in 2008, '9, '10,

5    '11 and '12.  But they've got to show prior to that time.  Mr.

6    Vogl, again, at the previous trial didn't introduce any

7    evidence whatsoever showing specific advertising in Texas.

8           Mr. Wentworth testified that he became aware in

9    2011.  What did he do when he became aware?  He hired lawyers.

10   What did the lawyers do?  They sent a cease and desist letter.

11   Mr. Vogl cannot be -- the infringement that Mr. Wentworth

12   testified that he found out about in 2011, 2012, Mr. Vogl is

13   unable to show that that infringement even occurred in Texas.

14   Again, we're talking about Texas; he can't show that it

15   happened in Texas prior to the time Mr. Wentworth found out

16   about it.

17          K4K knew of our marks in 2003.  Again, they

18   disappeared; that's willful infringement.  The courts also say

19   as another reason for denying it, the courts say that willful

20   infringement is an element that helps defeat a laches claim.

21   They willfully infringed.

22          Mr. Vogl has time and time again said that they

23   received the 2003 cease and desist letter, and willfully used

24   Cars For Kids mark, willfully used the URL of CarsForKids.com;

25   that's willful infringement, the jury found willful

1  infringement, that's an element that allows this Court to

2  exclude laches even if it applied.

3        So, your Honor, we believe that they knew the facts

4  of their infringement; they willfully continued to infringe,

05:37  5  but they hid it from America Can! Cars For Kids because they

6  left Texas.  Mr. Wentworth testified that he saw nothing in

7  his records, nothing from his people showing that they did

8  anything in 2004, 2005, 2006, 2007.

9        So again, it's their burden; they've got to show

05:37  10  that we knew about their open -- again, it can't be private

11  use.  This Google Analytics -- if they're sending stuff to one

12  or two people or 10 subscribers on the Jewish Press, that's

13  not open and obvious use for which America Can! should have

14  known.

05:37  15        So again, it's an equitable defense.  The Court can

16  look at their willful infringement; the Court can look at the

17  facts showing that they are unable to show direct advertising

18  in Texas that America Can! Cars For Kids should have known

19  about.

05:37  20        And then, your Honor, finally there are distinctive

21  acts of infringement.  Mr. Wentworth testified that they found

22  out in 2011 about certain acts of infringement.  Mr. Vogl

23  hasn't argued that they were doing that infringement later.

24  The use of the website, CarsForKids.com, they found out about

05:38  25  that in 2012; so the statute wouldn't have started until 2012

1    for that.

2           And your Honor, we briefed all the cases that

3    discuss when --

4           THE COURT:  I read them.

05:38   5           MR. PITTMAN:  There are situations where a cease and

6    desist letter can eliminate any claim.  If you look at the *VOX*

7    *Amplification* case, it's an Eastern District of New York 2014

8    case; you can look at the *Fendi* case, Southern District of New

9    York case; but they all say that if you send a cease and

05:38   10   desist letter, and someone -- the infringer ceases the

11   infringement or hides the infringement, you can't assert

12   laches later.  And that's what happened here in 2003, and

13   that's what led to the filing of the lawsuit in 2014.

14          So your Honor, we believe that laches is

05:39   15   inappropriate.  But even if it is considered on its merits, we

16   believe that it fails on the merits.

17          THE COURT:  Okay, got it.  Thank you.

18          Do you wish to reply?

19          MR. VOGL:  Just two seconds, your Honor.

05:39   20          THE COURT:  You may.

21          MR. VOGL:  Your Honor, Mr. Wentworth testified that

22   his people hadn't seen anything in 2010 -- 2009, 2010, 2011.

23   Their own document 447 shows that there's been Google

24   advertising in Texas, Yellow Page advertising, radio stations

05:39   25   in Texas using our client's Kars 4 Kids ad.  It can't get more

1  obvious that our client was using the name Kars 4 Kids in

2  Texas.

3        There's a 2005 Readers Digest that we talked about

4  in the liability phase --

05:40    5        THE COURT:  You see, the best argument Mr. Pittman

6  has, is that unclean hands can be used to prevent the use of

7  laches as a defense.  And he's indicated, and the jury did

8  find, that there was willful infringement.

9        MR. VOGL:  Yes.

05:40   10        THE COURT:  Which could show that; right?  So what

11  do you say about that?

12        MR. VOGL:  Sure.  Well, willful infringement doesn't

13  mean the type of -- it is not bad faith, your Honor; bad faith

14  is necessary.  The cases that they cite are out of circuit

05:40   15  cases.  The case that your Honor should look at is *Carnegie*

16  *Mellon University v. Marvell Tech. Group*, it's 20'4 WL 183212,

17  it's a Western District of Pennsylvania case that was affirmed

18  by the Federal Circuit.

19        And in that case, that America Can! -- the law

05:41   20  within the Third Circuit is otherwise.  There's no -- willful

21  infringement does not defeat laches in this circuit, your

22  Honor.  Because willful infringement means that we went in

23  there knowing -- and we had -- this is not a counterfeiting

24  case where we were intentionally copying them; the logos are

05:41   25  different; the names are different; the jingle that everybody

1   talks about is different.  So we weren't literally copying

2   them.

3          That type of egregious behavior, vexatious activity

4   certainly has an effect on whether laches can be applied.  But

05:41  5   in this situation it is -- the determination of the jury is

6   that the marks were too close.  This is an infringement case,

7   your Honor, not a counterfeiting case.

8          THE COURT:  All right, thank you.

9          MR. VOGL:  Thank you, your Honor.

05:41  10          THE COURT:  I'll read that case.

11          Before we leave for the day, let me just go over the

12   exhibits that I have admitted into evidence.  Can I just read

13   them down?  ACCFK-438; ACCFK-439; ACCFK-440; 441; 442; 449;

14   443; 444; 445.  Then Mr. Cook's testimony, Kars 4 Kids with a

05:43  15   K, 446, that's his C.V.; ACCFK-447; 448; K4K-500; I believe

16   K4K-111; K4KDX-507 -- this is what I need documents on --

17   K4KDX-508; K4K-DX-509; 513; there was K4K-24, but that had

18   been previously admitted; K4KDX-523.  And that was it.

19          There was a letter, the second letter from the

05:44  20   attorneys, which was ACCFK-408, I don't have that as being

21   admitted.  That's what I have.  Any others?

22          MR. VOGL:  I believe that's it, your Honor, on our

23   side.

24          THE COURT:  Any other documents?

05:44  25          MR. PITTMAN:  No, your Honor.  Exhibit 408 was

*United States District Court*
*Trenton, New Jersey*

1    admitted at the previous trial.

2              THE COURT:  Oh, so we did that in May?

3              MR. PITTMAN:  Yes, your Honor.

4              THE COURT:  So 408 was previously admitted, okay.

05:45    5              Thank you.  I was going allow both parties to do

6    briefs on the damages; how much time do you need?

7              MR. VOGL:  Your Honor, just to be clear, would you

8    like finding of facts and conclusions of law, or brief, or

9    both?

05:45    10              THE COURT:  Well, I'd like finding of facts and

11    conclusions of law just on this portion.

12              MR. VOGL:  Understood.

13              THE COURT:  Not on the whole trial.

14              MR. VOGL:  Understood.

05:45    15              THE COURT:  So that would be great.

16              MR. VOGL:  With a brief as well?

17              THE COURT:  I could use a brief.  So you had the

18    burden of proof, so do you want to submit yours first?  I

19    think you do.

05:45    20              MR. VOGL:  The burden of proof on the --

21              THE COURT:  Profits, and what the expenses are and

22    things of that nature.  I wasn't sure how to do that.  I know

23    we let Mr. Pittman go first.

24              MR. VOGL:  They had the burden of proof to prove

05:46    25    damages.

*United States District Court*
*Trenton, New Jersey*

1           THE COURT:  To show damages.

2           MR. VOGL:  Yes.

3           THE COURT:  So Mr. Pittman, can you hand in your

4  brief within two weeks?

05:46    5           MR. PITTMAN:  We can, your Honor.

6           THE COURT:  Then you'll have two weeks after that.

7  So, today is the 21st; December 5th.  So yours is due December

8  5th; and you're 14 days after that, December 19th.

9           MR. VOGL:  That's fine, yes, your Honor.

05:46   10           THE COURT:  So if you could in those also just

11  include a few definitions; one on incremental and full

12  absorption, and that parking term has me a little bit

13  perplexed.  So if you can put in -- I understand what they

14  mean by it, we're not using it anymore, but that's kind of a

05:47   15  loosey-goosey definition, so I could use something better than

16  that.

17           I think that's it.

18           MR. VOGL:  Very good.

19           THE COURT:  So thank you for coming in.

05:47   20           MR. HAEFNER:  Your Honor, I have your documents,

21  your set of documents, 507, 508, 509, 513 and 523.

22           THE COURT:  Are they marked?

23           MR. HAEFNER:  They're labeled on the side.  They

24  don't have official exhibit sticker; would you like them --

05:47   25           THE COURT:  Dolores will put stickers on them.

1          Mr. Pittman, do you want to review these documents

2   before I accept them?

3          (Counsel reviewing.)

4          THE COURT:  You don't have any objections to me

05:48   5   accepting those; right?

6          MR. PITTMAN:  No objection.

7          THE COURT:  Okay.  Have a good day.

8          (Counsel say thank you.)

9          (Matter concluded.)

10              - - -

11

12

13   "I certify that the foregoing is a correct transcript from the

14   record of proceedings in the above-entitled matter."

15

16   /S/ Francis J. Gable, C.C.R., C.R.R.   November 26, 2019

17

18   _____        _____

19   Signature of Court Reporter                    Date

20

21

22

23

24

25

*United States District Court*
*Trenton, New Jersey*



**$**

**'**

'10 [1] - 211:4
'11 [2] - 85:17, 211:5
'12 [3] - 52:24, 85:17, 211:5
'19 [1] - 102:19

**/**

/S [1] - 218:16

**0**

08608 [1] - 1:11

**1**

1 [3] - 7:24, 28:6, 69:11
1,000 [1] - 71:13
1,110,647 [1] - 188:18
10 [9] - 63:10, 70:7, 80:11, 87:13, 89:7, 89:13, 124:20, 176:17, 212:12
10.1 [2] - 167:19, 168:11
100 [1] - 4:14
101 [1] - 3:8
10th [1] - 14:24
11 [3] - 3:2, 3:3, 190:19
111 [2] - 155:7, 155:14
1117 [2] - 7:23, 74:11
12 [1] - 208:7
14-7770 [1] - 1:6
15 [5] - 4:3, 7:23, 57:12, 126:11, 182:1
152 [1] - 3:11
154 [1] - 3:11
155 [2] - 3:12, 4:16
157 [2] - 190:19, 191:3
15th [2] - 57:16, 57:19
161.3 [1] - 119:13
168 [1] - 9:24
169 [1] - 4:17
17 [2] - 4:5, 154:13
173 [1] - 4:18
176 [1] - 4:19
178 [2] - 4:20, 9:24

183212 [1] - 214:16
185 [1] - 4:21
186 [1] - 3:13
18th [1] - 159:5
19 [1] - 4:6
1990s [1] - 207:24
19th [1] - 217:8

**2**

2 [4] - 7:24, 69:23, 69:25, 77:4
2,000 [1] - 138:5
20 [7] - 52:24, 83:12, 125:17, 125:23, 130:13, 180:13
20'4 [1] - 214:16
200 [2] - 177:24, 178:1
2000 [1] - 57:17
2002 [3] - 128:6, 153:7, 153:9
2003 [23] - 37:17, 37:18, 38:2, 38:4, 39:15, 39:18, 41:3, 41:12, 41:14, 50:17, 52:8, 52:11, 53:7, 57:16, 62:5, 84:15, 207:11, 207:24, 209:25, 210:25, 211:17, 211:23, 213:12
2004 [8] - 38:18, 41:21, 52:19, 61:17, 117:5, 210:11, 210:25, 212:8
2005 [8] - 38:20, 40:23, 41:23, 42:5, 52:21, 210:25, 212:8, 214:3
2005) [1] - 9:24
2006 [5] - 38:22, 41:25, 52:23, 210:25, 212:8
2007 [4] - 38:24, 42:2, 211:1, 212:8
2008 [35] - 58:3, 76:13, 79:2, 84:15, 85:6, 85:21, 86:2, 114:25, 115:4, 116:25, 120:13, 152:5, 153:4, 153:10, 153:20, 153:23,

154:2, 160:4, 167:17, 168:2, 168:10, 173:21, 177:4, 179:16, 184:21, 186:7, 186:11, 207:21, 210:6, 210:7, 210:9, 210:11, 210:15, 211:1, 211:4
2008/2009 [1] - 85:25
2009 [3] - 85:21, 211:1, 213:22
2010 [6] - 61:17, 85:17, 85:19, 211:1, 213:22
2011 [24] - 37:15, 39:3, 39:4, 39:9, 40:23, 41:17, 42:5, 42:13, 42:15, 42:17, 42:21, 51:5, 51:10, 51:12, 51:20, 52:6, 62:5, 84:15, 115:4, 152:5, 211:9, 211:12, 212:22, 213:22
2011/2012 [1] - 43:8
2012 [12] - 42:18, 43:5, 53:2, 53:9, 53:12, 84:16, 85:19, 86:2, 211:12, 212:25
2013 [27] - 42:24, 43:5, 43:16, 44:7, 44:9, 44:11, 44:14, 44:24, 52:23, 57:18, 57:19, 59:5, 59:12, 59:15, 59:20, 85:23, 85:25, 117:5, 160:14, 160:15, 167:22, 168:7, 173:19, 177:1, 179:14, 184:18, 208:20
2014 [5] - 85:23, 86:1, 210:14, 213:7, 213:13
2016 [3] - 70:2, 85:20, 181:23
2018 [21] - 70:2, 71:6, 71:9, 71:24, 71:25, 72:11, 72:13, 72:15, 72:21, 72:24, 102:3, 102:5, 102:12, 102:16, 104:17, 119:8, 154:2, 156:15, 161:12, 172:16, 194:6
2019 [65] - 1:10, 10:4, 10:9, 10:16, 14:25, 16:25, 20:22, 26:2, 58:3, 62:23, 70:3, 70:16, 70:18, 70:22, 71:1, 71:6, 71:8,

71:23, 72:22, 73:5, 76:13, 79:2, 101:25, 104:17, 108:9, 114:25, 116:25, 117:19, 120:13, 128:4, 131:25, 132:8, 132:10, 132:16, 132:23, 133:3, 135:1, 154:3, 154:4, 156:8, 156:15, 159:5, 160:5, 160:14, 160:16, 161:13, 167:17, 167:22, 168:2, 168:8, 168:10, 172:16, 173:19, 173:21, 177:1, 177:4, 179:14, 179:16, 184:18, 184:21, 186:7, 186:12, 208:22, 218:16
21 [2] - 1:10, 70:12
21st [2] - 20:22, 217:7
22nd [1] - 104:17
23 [2] - 4:7, 190:20
233.4 [1] - 119:14
24 [2] - 4:8, 185:23
25 [1] - 38:12
26 [1] - 218:16
28 [2] - 44:7, 44:14
28th [2] - 44:9, 44:11
29 [1] - 64:19
2:41 [1] - 125:2
2:45 [1] - 126:8

**3**

3 [7] - 7:25, 10:3, 10:8, 70:15, 70:16, 72:19, 72:20
30 [16] - 71:23, 76:13, 84:9, 84:10, 96:5, 125:11, 150:8, 160:5, 167:22, 168:10, 173:19, 173:21, 179:14, 179:16
30:59 [1] - 10:4
30:73 [1] - 10:9
30th [6] - 79:2, 114:25, 120:13, 160:14, 168:2, 186:12
31 [2] - 205:23, 205:24
32 [1] - 4:9

**35** [1] - 4:10
**362** [1] - 177:9
**37** [13] - 4:11, 80:11, 87:19, 88:2, 88:5, 88:7, 88:24, 88:25, 89:2, 89:7, 167:3, 167:5, 195:21
■■ ■■
**399** [1] - 9:23
**3:02** [1] - 154:14
**3:18** [1] - 154:14
**3:30** [1] - 20:23
**3d** [1] - 9:24

### 4

**4** [215] - 1:4, 5:10, 10:22, 13:5, 14:15, 14:16, 16:1, 16:18, 18:8, 21:18, 21:21, 22:15, 24:20, 26:12, 27:13, 28:15, 29:1, 29:4, 29:17, 31:8, 33:13, 38:6, 38:12, 39:9, 39:12, 42:10, 43:18, 43:21, 44:2, 46:22, 47:15, 47:22, 48:4, 49:8, 50:14, 51:8, 58:16, 70:10, 71:17, 71:18, 75:7, 75:20, 76:12, 78:14, 85:11, 93:21, 96:22, 98:2, 102:5, 102:6, 102:16, 104:21, 105:4, 105:14, 105:19, 106:2, 106:3, 106:10, 107:21, 108:17, 109:13, 110:21, 111:5, 111:6, 111:17, 111:25, 113:12, 114:1, 114:24, 115:3, 115:8, 115:14, 115:21, 115:24, 116:2, 116:4, 116:11, 116:21, 116:24, 116:25, 117:4, 117:9, 118:8, 119:12, 120:2, 120:12, 120:21, 120:22, 121:6, 121:18, 123:1, 124:1, 124:5, 127:10, 127:21, 127:24, 127:25, 128:5, 128:17, 129:10, 130:6, 130:10, 131:13, 131:16, 131:19,
131:23, 132:3, 132:6, 132:9, 132:22, 133:9, 133:15, 133:17, 134:14, 134:15, 134:18, 135:2, 135:5, 136:6, 136:15, 136:20, 137:2, 137:19, 138:9, 139:18, 148:1, 148:3, 149:2, 150:4, 150:21, 151:1, 151:25, 153:9, 154:16, 156:12, 156:18, 157:4, 157:21, 158:11, 159:7, 159:9, 160:2, 160:3, 160:17, 161:14, 162:1, 162:2, 162:17, 163:7, 163:16, 164:16, 166:13, 166:23, 167:22, 168:6, 168:7, 168:16, 168:20, 168:25, 169:13, 169:24, 170:6, 170:25, 171:9, 172:4, 172:7, 172:9, 172:12, 173:7, 173:15, 174:3, 174:4, 174:9, 174:20, 174:21, 175:7, 175:16, 177:6, 177:18, 177:20, 178:17, 179:4, 179:13, 180:15, 181:4, 181:9, 181:22, 181:25, 182:5, 182:9, 182:18, 182:20, 182:22, 184:12, 189:17, 189:21, 196:20, 196:24, 200:10, 200:13, 201:6, 206:17, 207:9, 207:10, 208:3, 208:9, 208:15, 213:25, 214:1, 215:14
**4.1** [1] - 45:10
**40** [6] - 32:17, 32:20, 125:11, 125:25, 126:6, 203:21
**400** [1] - 138:3
**402** [1] - 1:11
**408** [7] - 43:6, 43:15, 43:16, 43:20, 59:3, 215:25, 216:4

**421** [4] - 29:14, 29:15, 29:16, 29:17
**43** [1] - 183:25
**438** [7] - 13:8, 13:17, 13:21, 14:14, 14:23, 15:3, 15:15
**439** [1] - 46:13
**440** [8] - 16:15, 16:17, 17:14, 17:24, 18:7, 48:3, 58:7, 58:10
**441** [5] - 18:13, 18:17, 18:19, 18:23, 215:13
**442** [6] - 21:8, 21:13, 23:7, 23:11, 215:13
**443** [6] - 31:13, 31:17, 32:3, 32:6, 215:14
**444** [5] - 35:2, 35:4, 35:5, 36:6, 215:14
**445** [4] - 18:12, 36:16, 49:18, 215:14
**446** [2] - 65:11, 215:15
**447** [13] - 76:7, 76:18, 76:25, 78:9, 94:24, 100:1, 114:15, 123:21, 152:23, 152:24, 207:16, 210:3, 213:23
**448** [4] - 99:24, 99:25, 100:8, 215:15
**449** [10] - 18:11, 18:12, 18:14, 18:15, 23:18, 24:2, 24:3, 24:6, 24:10, 215:13
**45** [1] - 125:25
**46** [1] - 3:4
**48** [2] - 181:20, 182:2
**4:05** [1] - 183:24
**4:30** [1] - 126:8

### 5

**5** [15] - 71:16, 72:5, 89:18, 100:16, 100:17, 100:23, 179:23, 179:25, 197:3, 197:5, 198:1, 204:3, 204:5, 204:21, 210:11



**5.9** [2] - 187:24, 188:7
**50** [10] - 14:20, 80:15, 87:7, 87:11, 87:22, 88:1, 89:14, 168:18, 194:4, 194:8
**500** [5] - 71:14,

137:17, 142:22, 147:21, 149:3
**501(c)(3** [3] - 57:13, 97:21, 113:2
**502** [5] - 27:10, 27:18, 28:6, 28:17, 49:3
**507** [1] - 217:21
**508** [2] - 185:23, 217:21
**509** [2] - 185:23, 217:21
**51** [1] - 89:14
**510** [1] - 196:25
**513** [3] - 185:23, 215:17, 217:21
**523** [1] - 217:21
**528** [2] - 188:1, 188:4
**56** [1] - 3:5
**57** [2] - 190:21, 191:2
**59** [1] - 159:13
**5th** [4] - 10:4, 10:9, 217:7, 217:8

### 6

**6** [4] - 100:15, 100:16, 181:20, 210:11
■■ ■■ 
**62** [1] - 3:6
**63** [9] - 3:7, 87:17, 87:19, 89:7, 166:19, 166:21, 167:2, 167:5, 167:18
**64** [1] - 3:7
**65** [1] - 4:12
**6th** [1] - 108:9

### 7

**7** [2] - 167:11, 210:11
■■ ■■
**732** [1] - 23:8
**76** [1] - 4:13

### 8

**8** [1] - 173:2
**80** [1] - 180:5
**856** [1] - 1:24
**877** [1] - 14:16
**883** [1] - 70:9
■■ ■■
**889-4761** [1] - 1:24

### 9

**9** [2] - 177:25, 211:4
**90** [1] - 120:5
**99** [3] - 99:11, 99:12, 101:1
**990** [13] - 66:9, 92:5, 97:15, 107:24, 108:5, 109:11, 112:15, 157:22, 158:7, 164:16, 181:22, 182:19, 196:18
**990s** [10] - 107:21, 108:15, 151:24, 156:15, 157:21, 179:3, 180:1, 180:14, 198:14, 198:17
**9th** [1] - 10:16

### A

**Abilene** [1] - 28:2
**ability** [1] - 26:9
**able** [22] - 31:7, 38:19, 41:20, 66:3, 68:4, 74:15, 75:18, 82:20, 83:18, 95:5, 99:15, 113:12, 114:1, 118:11, 138:21, 141:13, 141:14, 162:7, 163:13, 179:8, 195:17
**Abloy** [1] - 28:2
**above-entitled** [1] - 218:14
**absent** [2] - 54:10, 54:12
**absolute** [1] - 94:16
**absolutely** [6] - 53:16, 93:3, 104:14, 208:23, 208:24
**Absolutely** [1] - 40:4
**absorption** [34] - 92:10, 112:1, 170:7, 170:10, 172:12, 172:18, 176:9, 176:11, 177:2, 177:9, 177:11, 177:13, 177:16, 179:10, 181:1, 184:10, 184:15, 184:19, 184:22, 184:24, 185:2, 189:5, 189:6, 189:13, 191:22, 201:16, 201:17, 201:18, 201:23,

201:24, 202:2, 202:7, 202:15, 217:12

**Academies** [4] - 51:19, 54:3, 59:11, 59:13

**Academy** [1] - 59:17

**accept** [15] - 65:5, 99:4, 119:16, 123:23, 131:13, 131:17, 131:19, 131:22, 132:3, 133:10, 134:9, 136:6, 136:16, 202:13, 218:2

**acceptable** [1] - 157:19

**accepted** [16] - 49:16, 68:11, 68:23, 95:7, 95:11, 101:9, 109:15, 109:16, 112:19, 134:23, 156:4, 159:18, 170:8, 170:10, 202:15, 203:2

**accepting** [16] - 9:14, 18:8, 28:13, 118:8, 131:6, 131:23, 132:6, 132:9, 134:5, 134:7, 134:16, 136:13, 139:4, 144:18, 145:2, 218:5

**accepts** [1] - 87:24

**access** [5] - 130:15, 158:14, 158:16, 174:9, 175:1

**accessed** [1] - 174:4

**accessible** [4] - 135:6, 135:8, 145:24, 153:9

**accessing** [1] - 175:6

**ACCFK** [12] - 13:14, 13:21, 16:14, 18:10, 21:5, 32:6, 35:2, 36:15, 45:11, 76:7, 99:24, 114:14

**ACCFK's** [1] - 44:8

**ACCFK-408** [1] - 215:20

**ACCFK-438** [3] - 4:3, 15:18, 215:13

**ACCFK-439** [6] - 4:4, 15:23, 15:25, 16:8, 16:12, 215:13

**ACCFK-440** [5] - 4:5, 17:4, 17:21, 149:18, 215:13

**ACCFK-441** [3] - 4:6, 19:14, 19:18

**ACCFK-442** [3] - 4:7, 21:11, 23:15

**ACCFK-443** [2] - 4:9, 32:9

**ACCFK-444** [3] - 4:10, 35:22, 35:25

**ACCFK-445** [3] - 4:11, 36:23, 37:1

**ACCFK-446** [2] - 4:12, 65:16

**ACCFK-447** [3] - 4:13, 76:22, 215:15

**ACCFK-448** [2] - 4:14, 100:12

**ACCFK-449** [2] - 4:8, 24:13

**ACCFX-447** [1] - 207:17

**accidently** [1] - 28:21

**accolades** [1] - 26:3

**according** [4] - 86:3, 113:1, 114:23, 186:6

**account** [1] - 179:13

**accountant** [2] - 121:8, 121:21

**accounting** [28] - 9:4, 9:20, 9:22, 64:15, 68:24, 88:13, 89:22, 93:2, 93:7, 93:18, 94:11, 106:19, 109:8, 110:2, 121:14, 155:24, 157:7, 158:6, 158:7, 170:7, 170:10, 171:9, 172:18, 179:2, 179:10, 181:1

**Accounting** [1] - 162:5

**accounts** [4] - 108:18, 108:24, 109:2, 177:12

**accuracy** [3] - 109:8, 144:13, 177:22

**accurate** [6] - 75:11, 95:10, 145:7, 152:1, 187:1, 190:5

**accurately** [4] - 98:3, 164:8, 167:5, 180:24

**acknowledged** [2] - 38:6, 38:7

**Act** [5] - 74:10, 74:23, 93:1, 99:16, 104:2

**action** [2] - 7:25, 43:9, 102:2

**active** [2] - 30:6, 119:4

**activities** [3] - 98:15, 98:16, 123:12

**activity** [1] - 215:3

**acts** [4] - 12:23, 13:2, 212:21, 212:22

**actual** [12] - 10:8, 12:20, 40:12, 45:1,

56:12, 61:9, 95:9, 120:17, 120:19, 144:14, 207:12, 209:23

**Ad** [1] - 140:1

**ad** [38] - 16:24, 17:24, 18:24, 19:11, 24:20, 25:3, 25:4, 27:17, 28:24, 46:15, 46:18, 46:20, 47:5, 47:11, 47:15, 47:17, 48:9, 48:20, 58:17, 60:10, 68:5, 82:13, 84:9, 106:18, 135:18, 135:20, 135:24, 136:17, 139:24, 142:7, 142:8, 142:11, 142:14, 146:19, 149:12, 151:10, 196:5, 213:25

**ad-clicks** [1] - 139:24

**Ad-clicks** [1] - 140:1

**add** [5] - 16:3, 127:3, 136:7, 136:17, 178:13

**added** [2] - 136:11, 203:22

**addition** [8] - 5:23, 7:21, 8:1, 8:6, 8:7, 69:13, 98:12, 181:15

**additional** [3] - 56:16, 143:12, 187:7

**address** [4] - 76:1, 86:17, 134:8, 137:20

**addressed** [2] - 91:12, 155:25

**addresses** [5] - 85:1, 146:13, 146:14, 186:18, 192:18

**adds** [3] - 135:13, 178:10, 178:11

**adjust** [1] - 84:21

**adjustment** [2] - 80:14, 96:20

**administrator** [2] - 78:20, 78:22

**admission** [12] - 15:14, 16:7, 17:3, 17:13, 19:14, 20:10, 21:10, 21:25, 22:2, 23:11, 24:9, 159:10

**admit** [3] - 133:20, 155:19, 169:7

**admitted** [26] - 15:17, 16:11, 17:17, 17:20, 19:17, 23:14, 24:12, 32:8, 35:24, 65:15, 76:21, 100:11, 133:24, 155:18,

173:11, 176:21, 178:21, 181:19, 185:12, 185:21, 185:24, 215:12, 215:18, 215:21, 216:1, 216:4

**Admitted** [1] - 36:25

**ads** [27] - 15:21, 16:1, 16:19, 18:1, 25:14, 25:17, 40:17, 40:20, 47:3, 60:19, 60:23, 61:17, 68:5, 83:20, 122:9, 135:15, 135:16, 135:19, 135:21, 136:5, 136:9, 145:21, 145:23, 151:1, 151:21, 152:4, 152:13

**adversary** [3] - 23:21, 27:2, 97:5

**advertise** [5] - 28:16, 28:18, 29:7, 84:19, 117:4

**advertised** [1] - 67:21

**advertisement** [3] - 28:21, 49:7, 49:10

**advertisements** [3] - 28:17, 135:5, 136:15

**advertisers** [1] - 35:6

**Advertising** [2] - 84:24, 85:8

**advertising** [198] - 6:1, 6:6, 6:17, 6:25, 7:22, 8:4, 8:7, 9:11, 29:5, 31:5, 34:10, 38:6, 38:8, 41:3, 41:12, 41:20, 43:3, 44:8, 47:20, 58:8, 58:9, 58:22, 62:4, 67:18, 68:3, 72:6, 72:8, 72:14, 72:16, 72:21, 73:1, 73:3, 77:22, 81:21, 81:23, 82:3, 82:4, 82:19, 82:22, 82:23, 83:15, 83:19, 83:21, 84:4, 84:6, 84:14, 84:18, 84:25, 85:4, 85:6, 86:3, 86:8, 87:25, 88:7, 88:10, 88:12, 88:15, 88:17, 92:23, 94:14, 94:25, 95:2, 95:3, 95:4, 104:22, 106:3, 106:7, 106:12, 106:16, 106:22, 106:25, 107:2, 107:3, 107:6, 107:12, 108:18, 108:20, 108:22, 108:23, 109:2,

109:23, 109:25, 110:18, 110:21, 111:9, 111:17, 114:23, 114:24, 115:3, 116:24, 122:3, 122:6, 122:8, 123:16, 123:21, 123:22, 127:25, 128:8, 129:17, 129:19, 130:22, 135:2, 135:7, 135:18, 140:3, 140:8, 140:17, 140:18, 140:19, 140:21, 141:18, 143:10, 143:11, 143:19, 143:21, 143:24, 144:1, 145:15, 145:18, 146:17, 147:8, 147:10, 148:1, 150:5, 150:21, 151:7, 151:11, 151:18, 151:20, 152:1, 152:17, 153:16, 153:20, 153:23, 154:1, 162:1, 164:5, 164:9, 164:14, 164:18, 165:5, 166:5, 167:15, 168:12, 168:22, 172:24, 173:5, 173:15, 173:17, 173:19, 173:24, 173:25, 174:3, 174:10, 174:13, 174:16, 174:20, 175:11, 175:12, 175:17, 175:18, 175:23, 175:24, 176:4, 176:6, 177:1, 177:7, 177:14, 177:19, 179:2, 187:5, 187:22, 193:25, 194:11, 194:22, 194:25, 195:4, 195:15, 203:5, 203:7, 203:10, 203:12, 203:14, 203:17, 207:20, 209:24, 210:4, 210:20, 210:23, 210:25, 211:3, 211:7, 212:17, 213:24

**advertising-to-fund** [1] - 88:17

**advertising-to-fundraising** [5] - 193:25, 194:11,

194:22, 195:4, 195:15

**advertisings** [1] - 13:5

**advocated** [1] - 104:13

**affect** [1] - 54:10

**affects** [1] - 29:5

**affiliated** [1] - 51:19

**affirmed** [2] - 127:12, 214:17

**afternoon** [5] - 63:18, 101:20, 101:21, 139:9, 139:13

**afterwards** [1] - 34:24

**aggressive** [1] - 54:4

**ago** [8] - 14:21, 17:1, 33:2, 34:22, 39:21, 139:14, 144:17, 152:4

**agree** [27] - 5:11, 79:7, 79:20, 81:8, 98:9, 103:12, 105:13, 105:18, 107:24, 108:4, 110:18, 113:15, 115:24, 116:2, 116:11, 118:1, 118:17, 161:24, 171:25, 173:22, 177:5, 177:8, 183:8, 189:6, 191:18, 191:24, 202:9

**agreed** [2] - 5:8, 190:3

**agreement** [5] - 80:7, 85:12, 94:17, 100:4, 114:19

**agrees** [1] - 177:11

**ahead** [2] - 137:15, 140:11

**air** [1] - 93:25

**airport** [1] - 103:4

**airwaves** [1] - 68:6

**alleged** [3] - 83:9, 104:9, 107:10

**allegedly** [1] - 22:12

**ALLISON** [1] - 2:9

**allocate** [8] - 93:6, 93:8, 98:9, 112:18, 113:2, 113:4, 171:10, 179:8

**allocated** [12] - 91:20, 95:7, 112:21, 172:17, 177:16, 180:9, 185:2, 196:18, 197:13, 201:5, 201:8

**allocates** [2] - 80:19, 114:7

**allocating** [4] - 87:9, 172:18, 200:2,

201:25

**allocation** [5] - 87:11, 94:19, 95:11, 178:16, 201:15

**allow** [19] - 6:16, 30:17, 30:20, 45:14, 61:2, 90:5, 95:2, 96:20, 97:8, 103:16, 104:1, 124:12, 132:19, 134:21, 188:12, 188:24, 201:3, 203:16, 216:5

**allowed** [4] - 69:15, 124:15, 208:1, 209:3

**allows** [7] - 7:21, 7:22, 7:24, 70:20, 162:8, 208:12, 212:1

**almost** [2] - 71:14, 167:18

**alone** [1] - 208:25

**alternative** [1] - 8:23

**Alvarez** [2] - 155:4

**AMERICA** [1] - 1:6

**America** [98] - 5:21, 8:4, 10:25, 11:19, 11:21, 12:3, 12:7, 12:12, 13:1, 13:4, 13:7, 13:20, 20:16, 25:15, 25:21, 26:9, 28:19, 29:13, 30:8, 30:24, 31:2, 31:12, 31:19, 32:14, 33:4, 33:20, 34:25, 36:9, 36:10, 36:12, 36:20, 36:21, 37:11, 38:15, 45:8, 48:25, 49:20, 50:9, 50:22, 50:25, 51:11, 51:18, 57:1, 57:7, 57:10, 57:11, 57:21, 57:24, 63:7, 63:21, 66:15, 67:3, 70:4, 70:6, 70:13, 71:4, 71:5, 71:12, 72:1, 72:6, 72:8, 72:11, 72:21, 76:17, 101:22, 102:15, 102:18, 117:19, 118:3, 119:4, 120:16, 120:19, 120:22, 121:6, 121:17, 123:1, 125:10, 149:9, 151:2, 151:8, 151:10, 156:17, 189:9, 189:15, 189:24, 201:4, 207:9, 212:5, 212:13, 212:18, 214:19

**amount** [44] - 72:16,

77:1, 77:2, 79:17, 87:10, 89:3, 99:8, 99:10, 99:23, 100:19, 102:9, 107:3, 115:14, 116:16, 117:9, 120:2, 120:15, 122:18, 122:19, 123:4, 123:18, 129:20, 144:3, 164:13, 166:16, 174:2, 174:19, 175:14, 180:5, 181:11, 188:13, 198:2, 198:9, 199:6, 199:10, 204:17, 204:23, 205:1, 205:3, 205:7, 205:12

**amounts** [5] - 85:22, 176:2, 176:3, 183:5, 191:24

**Amplification** [1] - 213:7

**analogous** [1] - 122:21

**analogy** [2] - 122:21, 122:22

**analysis** [39] - 31:10, 67:8, 68:24, 69:13, 69:19, 76:15, 81:13, 83:23, 84:8, 86:14, 92:4, 97:9, 99:3, 103:13, 104:5, 109:17, 113:16, 113:24, 114:17, 118:23, 120:24, 121:3, 123:21, 123:24, 140:25, 143:17, 144:2, 144:3, 155:24, 160:24, 173:6, 186:10, 191:8, 192:24, 193:5, 196:4, 196:7, 200:3

**analyst** [1] - 99:2

**analytically** [1] - 74:15

**Analytics** [12] - 47:6, 48:11, 48:16, 59:1, 60:6, 130:16, 139:15, 139:16, 141:20, 142:5, 210:19, 212:11

**analytics** [4] - 47:20, 58:9, 58:22, 141:19

**analyze** [3] - 65:23, 141:19, 156:9

**analyzed** [2] - 100:24, 118:22

**analyzing** [3] - 75:13, 93:20, 171:6

**Ankura** [3] - 64:12, 64:13, 64:14

**annual** [3] - 70:8, 182:5, 198:14

**annually** [1] - 164:15

**answer** [15] - 17:15, 20:3, 21:2, 40:1, 48:1, 61:3, 61:6, 68:9, 90:21, 91:12, 93:14, 150:16, 151:9, 191:1, 194:16

**Answer** [1] - 20:4

**answered** [2] - 119:1, 146:1

**answering** [3] - 37:24, 83:1, 113:9

**anyway** [1] - 9:19

**apologize** [2] - 60:15, 150:20

**appeals** [1] - 162:7

**appear** [9] - 47:3, 47:5, 47:11, 47:16, 47:17, 47:22, 48:9, 75:11, 75:23

**appearance** [1] - 55:5

**appeared** [9] - 16:24, 17:25, 18:24, 19:11, 24:20, 24:25, 46:15, 48:22, 58:10

**applicable** [2] - 192:23, 209:20

**application** [4] - 53:4, 53:11, 107:1, 202:6

**applied** [3] - 167:16, 212:2, 215:4

**applies** [1] - 99:9

**apply** [8] - 75:3, 83:12, 106:13, 140:24, 202:7, 210:8, 210:9, 210:16

**applying** [1] - 167:18

**apportion** [9] - 82:7, 82:21, 84:16, 103:13, 106:9, 141:3, 144:1, 165:18, 166:6

**apportioned** [7] - 87:7, 87:14, 163:17, 167:2, 169:13, 169:24, 173:3

**apportioning** [3] - 163:24, 187:21, 187:22

**apportionment** [48] - 80:9, 80:22, 81:4, 81:6, 81:9, 81:15, 81:17, 81:19, 82:10, 82:25, 83:2, 83:5, 83:6, 83:23, 84:3, 84:8, 86:6, 86:12,

87:2, 87:16, 87:17, 88:4, 100:17, 103:9, 103:13, 103:16, 103:21, 104:1, 104:5, 104:7, 104:13, 105:21, 140:25, 143:17, 144:3, 160:24, 163:7, 163:10, 165:20, 166:9, 190:3, 190:5, 192:23, 193:3, 193:10, 194:2, 195:20

**approach** [44] - 11:11, 23:19, 26:22, 83:10, 92:8, 92:10, 92:13, 92:14, 92:25, 93:3, 93:15, 93:17, 94:4, 94:24, 101:15, 112:1, 113:5, 113:20, 114:11, 127:8, 140:9, 170:13, 170:15, 170:22, 171:12, 171:17, 171:21, 172:12, 176:10, 176:11, 177:2, 184:10, 184:11, 184:15, 184:22, 185:16, 189:7, 201:13, 201:14, 202:10, 202:11, 202:19, 202:25, 203:3

**approaches** [1] - 184:9

**appropriate** [8] - 10:6, 65:22, 93:15, 170:22, 171:13, 171:21, 184:13, 190:5

**approved** [1] - 69:6

**area** [6] - 16:21, 16:22, 80:18, 91:14, 202:18, 202:19

**areas** [7] - 31:16, 64:15, 69:7, 79:25, 80:21, 113:3, 113:6

**areas'** [1] - 24:17

**argued** [1] - 212:23

**argument** [6] - 12:19, 126:12, 126:17, 210:24, 214:5

**arguments** [2] - 126:14, 126:16

**arises** [1] - 80:8

**Arlington** [2] - 16:22, 17:25

**arm** [3] - 97:17, 97:18,

98:15
**arrive** [1] - 69:14
**articles** [1] - 24:22
**ascending** [1] - 68:1
**ascertain** [4] - 69:16, 88:14, 93:10, 108:15
**Asher** [1] - 62:16
**aside** [3] - 118:1, 162:1, 209:17
**aspect** [2] - 112:11, 165:13
**aspects** [3] - 128:7, 172:12, 201:24
**assert** [1] - 213:11
**asserting** [1] - 169:15
**assess** [4] - 94:12, 132:11, 165:3, 165:15
**assessed** [1] - 209:5
**assessing** [2] - 93:4, 163:10
**assessment** [4] - 8:12, 161:6, 186:6, 187:1
**assets** [1] - 57:7
**assign** [1] - 88:14
**assignment** [14] - 44:23, 45:22, 45:23, 49:20, 49:23, 62:20, 65:19, 156:7, 156:8, 156:10, 158:8, 158:19, 208:20, 208:22
**assignments** [1] - 158:17
**assignor/president/ CEO** [1] - 36:19
**assist** [1] - 44:20
**assistance** [3] - 108:2, 113:5, 199:23
**assisting** [2] - 44:19, 143:17
**assists** [1] - 110:13
**associated** [1] - 165:11
**assume** [8] - 28:14, 94:8, 98:2, 116:23, 117:4, 196:21, 196:23
**assumed** [5] - 38:5, 91:19, 92:6, 92:11, 111:7
**assumes** [9] - 80:19, 106:1, 106:20, 113:20, 114:11, 116:24, 122:8, 163:24, 200:9
**assuming** [5] - 86:12, 93:21, 122:17, 148:21, 166:10
**assumption** [7] -

80:13, 81:19, 82:4, 88:9, 106:16, 159:14
**attachment** [8] - 76:11, 179:23, 179:25, 180:15, 197:3, 197:5, 198:1, 204:5
**attempt** [7] - 7:1, 10:7, 49:11, 149:6, 193:13, 193:21, 193:23
**attempted** [3] - 109:24, 144:10, 149:10
**attempting** [1] - 165:13
**attempts** [1] - 134:15
**attention** [3] - 43:25, 44:4, 44:8
**attorney** [3] - 20:20, 26:17, 55:1
**attorney/client** [2] - 23:3, 55:14
**attorneys** [6] - 43:9, 45:9, 45:14, 56:10, 56:16, 215:20
**attributable** [8] - 143:19, 144:4, 161:8, 161:11, 163:22, 163:25, 166:11, 167:18
**attributing** [2] - 88:5, 89:1
**AUBREY** [1] - 2:12
**auction** [10] - 66:19, 77:7, 77:8, 77:16, 78:1, 78:6, 78:12, 78:13, 78:23
**auctions** [1] - 128:22
**August** [4] - 44:24, 57:16, 57:19, 72:18
**authorize** [1] - 56:13
**authorized** [1] - 56:14
**automobile** [1] - 50:20
**automobiles** [1] - 18:2
**Automotive** [1] - 26:19
**available** [4] - 9:21, 74:15, 109:16, 116:8
**average** [7] - 70:8, 70:13, 71:7, 71:9, 72:11, 130:13, 138:3
**avoided** [1] - 92:16
**award** [3] - 9:25, 10:6, 45:11
**awarded** [3] - 10:10, 26:4, 189:9
**aware** [37] - 37:11, 38:2, 39:1, 39:4, 39:9, 42:7, 42:15,

42:21, 43:8, 51:16, 53:21, 56:8, 81:5, 81:7, 81:9, 82:17, 86:8, 91:1, 111:24, 119:2, 121:12, 172:10, 186:19, 194:21, 194:24, 195:2, 199:19, 199:24, 200:13, 200:15, 200:18, 204:4, 204:10, 211:8, 211:9
**awareness** [1] - 37:9

## B

**backwards** [1] - 145:1
**bad** [7] - 33:15, 98:25, 99:1, 199:2, 208:15, 214:13
**Bad** [1] - 198:25
**badge** [1] - 26:19
**balance** [2] - 78:24, 79:1
**Banjo** [1] - 9:23
**banner** [14] - 16:1, 16:3, 16:18, 25:4, 46:18, 46:20, 48:5, 48:20, 135:12, 135:15, 135:23, 136:7, 136:12, 137:3
**Banner** [1] - 135:16
**banners** [3] - 24:23, 135:9, 136:11
**bar** [1] - 71:22
**bars** [7] - 71:1, 71:4, 71:6, 71:8, 72:13, 72:23, 207:4
**base** [1] - 157:7
**based** [49] - 10:20, 39:15, 67:8, 81:6, 81:9, 81:13, 82:5, 82:6, 83:10, 83:24, 84:5, 86:10, 88:9, 88:14, 93:17, 95:7, 96:24, 102:13, 104:15, 106:14, 106:18, 116:18, 120:4, 123:4, 156:22, 157:11, 157:21, 160:17, 163:11, 165:4, 165:17, 165:20, 170:5, 173:5, 174:12, 178:16, 179:8, 186:10, 187:6, 193:2, 193:10, 195:20, 195:23, 196:24, 205:1,

206:23, 210:16
**Based** [4] - 94:10, 165:16, 166:8, 170:21
**basic** [2] - 93:17, 94:11
**basis** [12] - 59:22, 70:8, 71:20, 72:7, 106:19, 142:1, 157:8, 180:22, 182:5, 193:1, 193:3, 198:14
**became** [9] - 37:11, 39:8, 41:15, 42:5, 42:15, 42:21, 43:8, 211:8, 211:9
**become** [3] - 39:1, 39:4, 42:7
**becomes** [4] - 89:8, 117:11, 170:3
**began** [3] - 10:21, 72:13, 72:17
**begin** [2] - 125:1, 185:20
**beginning** [4] - 71:25, 72:13, 117:19, 120:25
**begins** [1] - 173:2
**behalf** [1] - 50:24
**behavior** [1] - 215:3
**belief** [5] - 40:25, 41:2, 41:5, 41:7, 82:9
**believes** [1] - 8:20
**belongs** [1] - 131:5
**below** [2] - 85:24, 173:4
**benefit** [13] - 67:21, 93:10, 93:15, 93:18, 94:12, 97:14, 97:23, 105:7, 162:8, 168:25, 171:10, 180:24, 204:11
**benefited** [3] - 180:25, 198:23, 204:13
**benefits** [1] - 177:15
**best** [9] - 56:15, 56:18, 75:10, 92:25, 93:18, 97:12, 107:24, 108:5, 214:5
**Better** [1] - 53:18
**better** [3] - 59:25, 140:16, 217:15
**between** [31] - 62:5, 79:23, 79:25, 83:7, 84:4, 87:1, 95:23, 103:7, 103:13, 112:16, 112:18, 114:25, 115:4, 116:25, 117:5, 119:13, 120:13,

153:9, 154:2, 168:7, 173:19, 177:1, 177:12, 179:14, 184:24, 185:1, 187:14, 190:22, 191:20, 191:22, 208:20
**beyond** [8] - 59:25, 87:25, 112:10, 121:20, 124:14, 153:12, 198:17
**bidding** [1] - 149:12
**Big** [1] - 28:2
**big** [7] - 29:9, 72:25, 80:14, 87:1, 87:21, 91:21, 104:7
**bigger** [1] - 130:22
**biggest** [4] - 81:18, 84:25, 164:22, 176:3
**Bill** [1] - 26:13
**billboards** [7] - 67:18, 141:12, 141:13, 141:15, 141:16, 151:14, 151:15
**billed** [1] - 175:7
**billing** [1] - 95:6
**binder** [1] - 158:25
**Bing** [8] - 111:18, 146:21, 147:1, 174:17, 174:20, 174:25, 175:3, 175:6
**bit** [4] - 33:24, 103:9, 106:6, 217:12
**blanket** [1] - 99:4
**blasts** [1] - 83:22
**blatantly** [1] - 43:25
**block** [4] - 146:7, 146:8, 146:13, 150:22
**blocked** [2] - 146:11, 146:12
**blocking** [1] - 151:2
**blocks** [1] - 151:7
**blue** [3] - 71:6, 71:8, 72:23
**board** [4] - 37:5, 37:8, 45:2, 57:6
**book** [1] - 108:11
**Boone** [1] - 54:22
**Bornstein** [1] - 6:12
**bottom** [8] - 14:22, 66:18, 76:15, 85:3, 100:5, 160:11, 160:12, 160:14
**bound** [1] - 108:11
**brand** [1] - 166:2
**break** [5] - 63:9, 91:23, 92:2, 112:16, 124:20
**breakdown** [2] - 35:5

breaks [1] - 97:15
brief [9] - 5:6, 117:3, 126:13, 126:25, 139:12, 216:8, 216:16, 216:17, 217:4
Brief [1] - 45:20
briefed [1] - 213:2
briefly [4] - 73:10, 77:4, 157:5, 178:25
briefs [4] - 126:23, 206:21, 206:22, 216:6
BRIGGS [1] - 2:6
bring [16] - 60:1, 69:22, 114:14, 126:20, 152:21, 155:6, 158:23, 159:21, 164:6, 167:7, 172:22, 176:13, 178:5, 181:18, 184:7, 195:7
bringing [3] - 56:16, 123:18, 207:4
broadcasts [1] - 147:13
brought [1] - 59:23
BRYCE [8] - 3:7, 3:7, 3:8, 3:9, 63:24, 64:8, 101:19, 122:1
Bryce [4] - 63:8, 63:22, 64:1, 64:11
Buddies [1] - 9:23
budget [2] - 35:6, 35:7
building [1] - 166:2
buildings [1] - 165:10
burden [18] - 74:25, 95:13, 96:7, 96:17, 105:22, 190:4, 190:9, 190:12, 190:23, 191:9, 196:11, 196:13, 209:15, 212:9, 216:18, 216:20, 216:24
Bureau [1] - 53:18
Business [2] - 26:3, 53:18
business [30] - 12:3, 31:18, 35:10, 35:12, 50:21, 64:15, 66:5, 77:20, 89:24, 90:1, 90:7, 90:10, 90:12, 90:15, 116:7, 122:23, 123:2, 123:17, 128:1, 128:9, 128:18, 133:18, 157:17, 171:2, 171:3, 171:22, 172:4,

172:5, 198:12
businesses [1] - 198:18
but-for [1] - 170:17
buttons [1] - 19:1
buy [2] - 135:21, 136:3
buying [2] - 151:18, 151:20
BY [75] - 2:3, 2:5, 2:9, 2:12, 2:14, 3:3, 3:4, 3:5, 3:6, 3:7, 3:8, 3:9, 3:10, 3:10, 3:11, 3:12, 3:13, 11:15, 14:5, 15:11, 15:20, 17:8, 17:23, 19:20, 20:14, 22:23, 23:17, 24:1, 24:15, 30:23, 32:11, 34:21, 36:2, 37:4, 39:20, 40:7, 41:10, 46:10, 56:23, 60:16, 62:12, 64:8, 65:18, 68:16, 69:10, 74:6, 76:24, 78:18, 83:25, 85:15, 89:12, 94:23, 96:2, 99:7, 100:14, 101:19, 122:1, 127:18, 134:2, 139:8, 152:15, 153:25, 155:1, 156:6, 159:23, 167:9, 169:12, 173:14, 176:24, 178:24, 186:5, 192:1, 197:25, 200:12, 204:1

**C**

c-o-m [1] - 34:4
C-o-o-k [1] - 64:4
C.C.R [1] - 218:16
C.C.R.,C.R.R [1] - 1:23
C.R.R [1] - 218:16
C.V [6] - 65:5, 65:11, 65:15, 68:11, 155:12, 215:15
calculate [13] - 102:16, 156:11, 160:15, 164:2, 164:24, 168:1, 170:2, 170:3, 172:12, 174:2, 174:19, 182:19, 188:8
calculated [5] - 102:5, 119:12, 142:20, 178:25, 188:6
calculates [1] - 8:19

calculating [7] - 10:22, 103:17, 170:8, 189:1, 195:9, 205:18, 205:25
calculation [20] - 69:2, 69:7, 74:7, 87:2, 99:12, 106:15, 115:9, 118:23, 120:17, 120:18, 120:20, 125:10, 160:25, 164:25, 166:22, 179:7, 188:19, 188:22, 197:13, 210:14
calculations [8] - 73:7, 101:10, 103:21, 156:1, 180:25, 186:14, 187:1, 187:6
calculator [3] - 188:2, 188:3
calculus [1] - 6:10
caller [1] - 146:1
campaign [1] - 135:10
camps [2] - 112:5, 200:5
CAN [1] - 1:6
Can't's [3] - 57:7, 71:4, 120:19
cancel [1] - 137:11
cancelled [1] - 139:3
cannot [4] - 10:10, 134:22, 151:19, 211:11
capacity [1] - 128:4
capture [2] - 165:1, 165:13
captures [2] - 162:21, 165:12
car [40] - 29:18, 31:1, 32:24, 47:9, 48:13, 48:14, 49:12, 49:15, 59:2, 59:6, 59:14, 75:16, 80:20, 92:1, 92:6, 97:24, 98:5, 98:10, 98:12, 98:18, 99:2, 121:6, 121:15, 121:16, 121:19, 128:2, 128:7, 128:8, 131:6, 131:23, 132:2, 134:22, 138:25, 139:19, 144:24, 148:17, 149:10, 208:12, 208:13
car's [1] - 132:2
CARFORKIDS [1] - 34:19
Carnegie [1] - 214:15
cars [21] - 25:1, 27:24,

28:15, 28:18, 67:16, 77:18, 78:19, 78:23, 79:16, 132:6, 132:17, 137:25, 138:3, 138:4, 138:5, 139:17, 144:25, 145:2, 145:6, 149:1, 189:19
Cars [90] - 5:8, 8:4, 10:19, 10:25, 11:19, 11:21, 12:3, 12:7, 12:12, 13:1, 13:4, 13:8, 13:20, 20:16, 25:15, 25:21, 25:22, 26:9, 26:20, 28:19, 29:12, 29:13, 29:24, 30:8, 30:21, 30:24, 31:2, 31:6, 31:13, 31:19, 32:15, 33:4, 33:20, 34:6, 34:25, 36:8, 36:9, 36:13, 36:21, 37:11, 38:16, 39:5, 44:1, 45:8, 47:19, 49:20, 49:23, 50:9, 50:21, 51:9, 51:16, 52:5, 53:11, 53:15, 57:2, 57:7, 57:10, 57:11, 57:22, 57:24, 58:24, 59:13, 59:18, 63:7, 63:21, 66:15, 67:3, 67:20, 69:17, 70:4, 70:6, 70:13, 70:24, 71:5, 71:12, 72:1, 72:6, 72:8, 72:13, 76:17, 117:21, 121:2, 149:9, 151:3, 189:9, 189:15, 208:11, 211:24, 212:5, 212:18
CARSFORKIDS [11] - 33:8, 34:4, 49:24, 130:3, 130:5, 130:9, 130:19, 131:1, 131:3, 131:10, 145:11
CarsForKids [1] - 130:19
CarsForKids.com [9] - 33:3, 33:9, 33:21, 34:2, 70:24, 73:16, 130:9, 211:24, 212:24
case [84] - 5:16, 6:12, 6:14, 8:3, 9:2, 55:5, 55:9, 55:19, 56:6, 62:13, 65:19, 66:8, 67:14, 74:8, 74:15, 75:7, 75:15, 75:25, 81:20, 82:22, 83:8,

83:16, 84:3, 90:17, 90:19, 90:20, 90:22, 91:10, 92:1, 104:16, 105:21, 106:23, 107:9, 107:15, 107:17, 110:14, 110:15, 115:16, 117:8, 117:13, 119:21, 122:11, 122:13, 125:16, 128:12, 129:11, 155:19, 160:18, 161:7, 161:10, 166:4, 170:22, 170:23, 174:25, 183:23, 186:22, 194:13, 194:14, 194:18, 194:24, 195:5, 201:9, 201:18, 202:4, 205:17, 206:1, 206:2, 206:7, 209:2, 209:5, 213:7, 213:8, 213:9, 214:15, 214:17, 214:19, 214:24, 215:6, 215:7, 215:10
catch [1] - 43:13
catchall [1] - 97:19
categories [18] - 5:24, 69:1, 80:4, 91:23, 92:3, 97:15, 98:7, 109:25, 112:20, 123:11, 140:6, 156:21, 172:23, 179:21, 180:9, 182:1, 182:12, 201:8
categorization [1] - 180:20
categorize [1] - 182:23
categorizes [1] - 183:7
category [14] - 82:25, 86:21, 92:6, 97:18, 113:6, 135:17, 157:21, 176:7, 178:3, 182:9, 182:22, 183:1,

196:9, 198:19
caused [5] - 117:22,
118:16, 162:2,
191:12, 191:13
caveat [1] - 114:6
CBS [1] - 141:12
cease [16] - 37:18,
39:17, 42:23, 42:24,
43:10, 43:16, 44:6,
44:9, 44:11, 52:9,
59:4, 209:25,
211:10, 211:23,
213:5, 213:9
ceased [2] - 70:23,
74:2
ceases [1] - 213:10
cellphone [3] - 16:4,
20:24, 21:9
center [6] - 21:18,
21:20, 42:11, 77:21,
134:14, 138:16
centers [1] - 171:7
central [5] - 168:17,
170:4, 180:8,
183:14, 205:6
CEO [1] - 94:9
certain [11] - 5:15,
60:17, 83:21, 92:21,
98:7, 105:1, 109:24,
204:17, 204:23,
204:25, 212:22
Certainly [1] - 83:3
certainly [10] - 41:6,
109:9, 162:22,
175:10, 180:15,
190:15, 191:7,
199:25, 206:2, 215:4
certainty [2] - 74:16,
101:7
certify [1] - 218:13
cetera [2] - 209:1
CFO [2] - 26:4
challenged [1] - 52:25
chambers [2] - 5:7,
126:10
chance [2] - 59:24,
138:15
change [4] - 30:18,
31:5, 72:23, 114:12
channel [2] - 82:19
channeled [1] - 90:16
channels [1] - 84:7
characteristics [1] -
123:13
Charge [1] - 77:13
charge [1] - 41:17
charged [2] - 41:13,
77:9
charitable [14] - 67:21,
90:16, 91:22, 91:24,

97:16, 97:22, 105:4,
123:3, 161:23,
162:3, 179:5, 179:6,
183:15, 202:6
charities [3] - 163:4,
163:6, 163:12
charity [5] - 105:8,
161:21, 162:12,
163:1, 165:8
chart [21] - 67:4,
69:11, 69:22, 69:25,
70:15, 70:17, 71:7,
71:16, 71:17, 71:18,
72:1, 72:19, 72:20,
72:22, 78:8, 160:11,
173:1, 191:16,
191:19, 210:17,
210:18
Chart [2] - 70:16, 72:5
charts [5] - 59:3,
69:18, 69:21, 69:22,
72:19
chase [1] - 98:20
chat [1] - 146:5
checked [1] - 177:24
checking [1] - 119:15
Chevy [3] - 47:9,
47:10, 47:11
Chicago [1] - 131:6
chief [10] - 11:18,
40:10, 41:12, 41:15,
42:5, 45:3, 66:15,
127:21, 127:23,
158:15
Children's [1] - 131:5
choose [1] - 161:20
Chris [1] - 139:11
CHRISTOPHER [1] -
2:9
Chronicle [1] - 210:24
Cindy [2] - 54:24,
54:25
Cir [1] - 9:24
circle [1] - 108:13
circuit [4] - 202:23,
203:2, 214:14,
214:21
Circuit [6] - 6:13,
202:22, 202:25,
207:3, 214:18,
214:20
circumstances [6] -
74:14, 110:5,
163:23, 170:5,
201:21, 202:7
cite [3] - 195:10,
196:13, 214:14
cited [1] - 193:3
cites [3] - 105:6,
105:9, 105:12

cities [1] - 28:1
citing [1] - 104:23
CIVIL [1] - 1:5
claim [5] - 99:17,
207:4, 209:14,
211:20, 213:8
claimed [2] - 53:3,
83:17
claiming [1] - 50:8
claims [2] - 44:20,
45:5
clarification [1] -
62:10
clarify [5] - 17:6,
30:20, 60:1, 61:22,
177:8
CLARKSON [1] - 1:10
classic [1] - 22:2
classically [1] - 83:8
clear [18] - 7:23,
57:24, 61:18, 80:21,
100:22, 104:12,
105:18, 109:18,
112:12, 113:16,
119:3, 167:21,
174:6, 188:24,
190:7, 193:5,
196:16, 216:7
clearly [3] - 89:25,
99:1, 206:21
CLERK [3] - 11:6,
63:25, 127:13
click [7] - 28:21, 74:3,
142:3, 142:4,
142:20, 143:14,
148:4
click-through [2] -
142:3, 142:4
clicks [3] - 139:24,
140:1, 142:19
client [19] - 47:16,
48:24, 49:8, 51:5,
51:7, 51:12, 51:19,
52:5, 52:6, 52:19,
52:25, 149:8,
207:11, 208:7,
208:8, 208:9, 209:3,
209:4, 214:1
client's [19] - 43:25,
46:22, 46:25, 47:17,
47:24, 48:9, 48:21,
50:14, 53:14, 53:15,
54:9, 54:14, 186:10,
207:9, 207:10,
207:14, 207:23,
208:25, 213:25
close [4] - 138:5,
188:7, 203:24, 215:6
closing [1] - 126:12,
126:14, 126:16,

126:25
clothing [1] - 25:25
code [2] - 137:20,
148:9
codes [1] - 150:23
coexisted [1] - 131:8
coexisting [3] -
131:10, 208:11,
208:14
colleague [1] - 63:16
colleagues [1] - 46:24
collect [4] - 82:18,
128:15, 128:20,
129:4
collected [3] - 128:22,
129:5, 129:8
collection [2] - 77:10,
128:11
Colorado [1] - 132:2
column [11] - 98:3,
98:5, 100:2, 112:24,
160:6, 167:20,
168:9, 182:12,
183:4, 183:6
columns [1] - 182:13
combination [1] -
201:16
combined [2] - 99:11,
118:4
Combining [1] - 204:7
comfort [1] - 111:8
coming [8] - 21:18,
26:17, 49:16,
124:16, 142:11,
142:17, 206:14,
217:19
commercial [2] -
123:15, 147:20
common [39] - 80:18,
81:2, 81:3, 91:15,
91:18, 96:12, 96:19,
97:4, 97:7, 98:20,
99:8, 100:18, 108:3,
108:21, 111:25,
112:3, 112:8, 112:9,
112:14, 112:22,
112:25, 113:2,
163:9, 172:17,
172:19, 178:13,
178:14, 179:1,
179:4, 179:9,
179:13, 179:21,
185:1, 188:15,
189:5, 196:9,
198:18, 200:2,
201:25
commonly [1] - 170:9
communication [2] -
21:2, 23:3
community [1] - 26:1

companies [4] -
65:23, 82:17, 91:11,
171:5
companies' [1] - 67:9
company [34] - 37:10,
40:13, 40:16, 41:2,
41:5, 41:7, 41:14,
52:8, 52:10, 64:18,
67:11, 77:22, 80:17,
82:18, 88:15, 90:15,
90:17, 93:5, 98:8,
112:16, 114:5,
114:7, 112:17,
122:18, 122:20,
122:25, 123:4,
123:6, 123:14,
130:25, 153:7,
157:2, 171:15, 183:9
company's [8] -
56:15, 109:4, 109:8,
112:17, 156:23,
157:12, 157:18,
170:9
comparative [1] -
31:15
compare [2] - 69:16,
71:21
compared [6] - 71:13,
74:17, 85:22, 165:5,
166:3, 201:22
comparison [3] -
31:15, 70:1, 183:14
compensating [1] -
10:1
compensation [2] -
165:10, 180:2
compensatory [1] -
6:4
compete [2] - 10:5,
10:12
competed [3] - 65:24,
67:15, 67:24
competition [1] - 10:3
Competition [1] - 10:4
competitors [1] -
67:14
compiled [1] - 31:18
complete [2] - 20:19,
37:23, 102:12
complied [1] - 35:9
component [3] - 83:9,
83:11
computation [1] -
80:1
computer [4] - 19:11,
24:25, 58:10, 146:13
concept [1] - 81:16
conceptual [1] - 69:14
concern [1] - 13:1
conclude [1] - 163:20

concluded [2] -
166:19, 218:9
conclusion [5] -
69:12, 103:19,
184:16, 184:19,
184:25
conclusions [2] -
216:8, 216:11
concurrently [2] -
73:1, 105:16
conditioning [1] -
93:25
conditions [1] - 65:25
conduct [1] - 38:13
conducted [1] -
122:16
Conference [1] -
26:19
confirm [1] - 177:22
confused [1] - 12:17
confusion [6] - 12:20,
13:2, 29:8, 121:12
connection [1] -
129:11
conservative [1] -
168:18
consider [10] - 67:10,
89:22, 109:4,
111:12, 111:20,
117:3, 119:9,
156:13, 175:2,
195:22
consideration [1] -
45:16
considered [3] -
156:14, 156:20,
213:15
considering [1] -
67:23, 166:13
consistent [2] - 71:6,
81:11
consistently [1] -
33:16
construction [1] -
73:18
consultant [1] - 155:4
Consulting [2] -
64:12, 64:13
consulting [3] - 55:3,
64:14, 64:17
consults [1] - 64:14
contact [10] - 42:19,
42:22, 44:12, 82:16,
86:17, 192:14,
193:22, 193:23,
196:2, 196:6
contacted [4] - 20:16,
82:16, 86:18, 193:16
contacting [2] - 77:24,
138:9

contain [1] - 98:6
contains [1] - 180:1
contemporaneous [1]
- 157:2
contemporaneously
[1] - 157:16
context [3] - 122:6,
123:24, 124:5
continually [1] - 26:16
continue [14] - 12:15,
12:16, 13:2, 13:3,
14:3, 26:5, 26:11,
26:21, 28:16, 28:18,
33:12, 148:10,
169:23, 208:1
continued [8] - 12:24,
25:14, 28:4, 29:8,
72:16, 92:20,
145:18, 212:4
continuing [1] - 19:22
contribute [8] - 92:11,
97:24, 98:22,
105:15, 105:17,
105:18, 191:10,
192:4
contributed [5] -
80:19, 92:6, 93:19,
104:21, 105:13
contributes [1] -
110:12
contribution [5] -
93:4, 93:10, 93:12,
94:12, 108:3
Convenience [1] -
162:11
convenience [3] -
105:10, 162:24,
163:15
conversation [1] - 5:7
conversations [3] -
129:10, 129:13,
129:14
Cook [52] - 31:9,
32:12, 34:23, 34:24,
36:3, 36:5, 63:8,
63:22, 63:23, 64:1,
64:3, 64:9, 64:11,
65:19, 68:12, 68:23,
69:6, 69:11, 73:9,
82:24, 96:11, 99:8,
101:5, 101:20,
107:14, 107:16,
114:16, 124:12,
124:16, 132:21,
152:16, 155:14,
160:8, 165:23,
166:25, 167:1,
170:12, 171:20,
172:11, 173:22,
177:5, 180:16,

182:10, 183:8,
187:16, 187:17,
187:19, 188:16,
190:23, 192:22,
192:24, 202:10
COOK [8] - 3:7, 3:7,
3:8, 3:9, 63:24, 64:8,
101:19, 122:1
Cook's [8] - 64:22,
65:2, 152:3, 156:9,
177:13, 184:11,
191:21, 215:14
Copart [10] - 77:24,
78:3, 78:12, 78:15,
79:13, 128:22,
128:23, 128:24,
129:4, 129:8
copies [1] - 186:1
copy [5] - 23:23, 27:3,
149:20, 149:21,
185:23
copying [2] - 214:24,
215:1
corporate [1] - 11:20
correct [203] - 6:24,
7:4, 7:15, 28:1,
46:16, 47:12, 47:18,
47:25, 48:5, 48:22,
49:1, 49:2, 49:5,
49:8, 49:21, 49:24,
50:18, 50:21, 51:5,
52:19, 53:5, 53:12,
54:6, 54:20, 54:22,
55:2, 55:5, 55:16,
55:22, 55:25, 56:3,
56:6, 57:22, 62:14,
75:16, 75:17, 78:25,
79:9, 79:18, 80:23,
80:25, 85:18, 86:5,
86:24, 87:13, 88:4,
88:18, 90:24,
101:23, 101:25,
102:3, 102:4, 102:7,
102:10, 102:11,
102:14, 102:17,
102:25, 103:5,
103:6, 103:10,
103:17, 104:10,
104:13, 104:19,
104:22, 105:8,
105:11, 105:21,
106:5, 106:10,
106:16, 107:4,
107:10, 107:17,
107:18, 107:25,
108:7, 108:18,
108:25, 109:6,
109:13, 110:4,
110:17, 110:22,
111:5, 111:18,

111:22, 112:1,
112:4, 112:14,
113:14, 113:18,
113:19, 113:25,
114:3, 114:10,
114:25, 115:9,
115:10, 115:12,
115:17, 115:22,
116:13, 116:22,
117:1, 117:10,
117:19, 118:13,
118:25, 119:5,
119:10, 119:14,
119:15, 119:24,
120:3, 120:4,
120:13, 120:16,
121:7, 121:18,
129:23, 129:25,
130:1, 131:12,
131:18, 135:25,
136:1, 136:10,
138:13, 140:19,
140:20, 140:22,
141:3, 141:21,
141:23, 142:25,
143:3, 143:12,
143:15, 143:19,
143:22, 144:4,
144:11, 144:15,
144:20, 145:16,
145:17, 145:19,
145:22, 148:2,
149:11, 149:16,
150:5, 151:3, 151:7,
151:12, 151:14,
151:19, 152:18,
153:7, 153:8, 154:2,
160:9, 160:20,
167:1, 167:4,
172:24, 186:8,
186:12, 186:16,
186:17, 186:21,
187:19, 188:1,
189:3, 189:11,
189:20, 189:21,
190:6, 191:11,
192:4, 192:7,
192:19, 192:21,
194:1, 194:5, 194:8,
195:22, 196:11,
196:23, 199:16,
199:17, 199:22,
200:6, 200:25,
201:1, 201:10,
203:5, 204:18,
205:1, 206:6, 218:13
Correct [22] - 7:10,
13:15, 22:21, 25:2,
30:22, 48:23, 52:17,
53:13, 54:7, 56:1,
59:19, 82:11,

100:25, 102:20,
104:11, 116:10,
144:5, 149:17,
169:20, 186:13,
187:20, 195:18
correcting [1] - 7:11
corrective [8] - 6:1,
6:6, 6:17, 6:25, 7:22,
8:4, 8:7, 9:11
correctly [3] - 77:15,
98:2, 206:21
correlation [1] - 121:3
cost [23] - 7:25, 78:6,
81:6, 81:9, 83:6,
83:10, 83:12, 83:24,
90:8, 94:15, 165:9,
165:20, 170:18,
170:19, 175:9,
179:6, 180:25,
181:7, 181:8, 193:2,
193:10, 195:20,
201:15
cost-based [8] - 81:6,
81:9, 83:10, 83:24,
165:20, 193:2,
193:10, 195:20
costs [31] - 45:12,
75:1, 75:14, 76:15,
78:5, 83:4, 88:16,
93:6, 93:8, 93:13,
94:1, 94:2, 94:8,
94:13, 112:7, 122:8,
164:4, 165:5, 165:6,
166:3, 168:19,
170:3, 171:4,
171:10, 172:17,
172:19, 181:3,
185:1, 190:16, 191:8
Counsel [3] - 5:2,
218:3, 218:8
counsel [8] - 27:8,
56:2, 56:5, 56:6,
129:9, 158:16,
160:17, 174:22
count [2] - 64:19,
76:13
counterfeiting [2] -
214:23, 215:7
countersued [1] -
208:19
country [3] - 77:25,
195:12, 202:10
couple [7] - 46:2,
72:17, 122:2, 124:9,
205:16, 205:19,
207:21
coupled [1] - 161:17
course [20] - 14:6,
14:21, 31:18, 34:23,
35:10, 40:9, 40:10,

54:20, 56:2, 56:8, 67:19, 128:18, 133:18, 157:17, 164:21, 165:8, 168:15, 170:9, 181:13, 209:3
court [4] - 103:22, 172:3, 205:25
Court [68] - 8:11, 8:20, 8:23, 9:5, 16:23, 18:23, 21:23, 23:7, 25:5, 26:7, 33:21, 34:11, 44:22, 45:11, 45:14, 45:15, 45:22, 45:24, 52:4, 61:16, 68:23, 76:4, 77:4, 79:1, 100:18, 101:6, 101:17, 126:11, 147:8, 148:22, 148:25, 155:2, 158:20, 167:25, 168:1, 169:6, 186:1, 186:25, 187:7, 187:12, 187:13, 188:12, 188:24, 189:10, 189:15, 189:24, 193:7, 193:24, 195:3, 195:21, 195:24, 195:25, 197:9, 198:3, 198:5, 198:11, 198:15, 198:20, 199:9, 199:12, 201:3, 209:21, 212:1, 212:15, 212:16, 218:19
COURT [284] - 1:1, 1:15, 5:1, 5:3, 5:6, 5:13, 5:17, 6:21, 6:24, 7:5, 7:9, 7:11, 7:13, 7:16, 7:19, 9:1, 9:9, 9:18, 11:2, 11:3, 11:8, 11:13, 13:9, 13:14, 13:16, 13:22, 13:25, 14:3, 14:18, 15:9, 15:17, 16:9, 16:11, 17:17, 17:20, 18:15, 19:15, 19:17, 20:3, 20:5, 20:12, 20:19, 21:1, 21:12, 21:24, 22:5, 22:7, 22:14, 22:17, 22:22, 23:12, 23:14, 23:20, 24:12, 25:11, 26:24, 27:1, 27:5, 30:17, 30:20, 32:8, 33:24, 34:14, 34:17, 34:20, 35:24, 36:25, 37:3, 37:22, 39:8, 39:11, 39:16, 39:19, 39:24,

40:3, 40:5, 40:22, 40:24, 41:8, 43:1, 43:13, 45:19, 46:1, 46:5, 46:9, 51:24, 56:21, 59:22, 60:8, 60:12, 61:2, 61:5, 61:13, 61:22, 62:9, 63:2, 63:6, 63:9, 63:13, 63:17, 63:19, 63:23, 64:2, 64:5, 64:21, 65:1, 65:5, 65:8, 65:12, 65:15, 68:11, 69:3, 69:6, 73:9, 73:12, 73:22, 74:5, 76:19, 76:21, 77:12, 78:8, 78:17, 79:8, 82:24, 83:4, 83:14, 84:2, 84:13, 84:22, 85:7, 85:14, 87:15, 87:23, 88:23, 89:2, 89:5, 89:10, 93:8, 93:21, 93:25, 94:13, 95:18, 95:21, 95:25, 96:10, 96:18, 97:3, 97:7, 97:11, 99:6, 100:9, 100:11, 101:14, 101:16, 101:18, 103:20, 104:3, 113:9, 121:24, 124:11, 124:20, 124:23, 124:25, 125:5, 125:9, 125:14, 125:20, 125:23, 126:2, 126:4, 126:8, 126:13, 126:16, 126:19, 127:1, 127:7, 127:9, 127:15, 133:22, 133:24, 137:12, 137:16, 139:7, 140:13, 140:16, 149:3, 149:22, 150:15, 150:18, 152:14, 152:23, 153:2, 153:14, 153:17, 153:21, 153:24, 154:9, 154:12, 154:18, 154:20, 154:23, 155:16, 155:18, 156:2, 156:4, 159:11, 159:16, 162:23, 166:15, 166:17, 166:24, 167:1, 168:4, 169:2, 169:7, 169:14, 169:18, 169:23, 173:9, 173:11, 176:21, 178:19, 178:21, 179:20,

180:11, 180:16, 181:2, 181:6, 181:16, 183:24, 184:4, 185:7, 185:10, 185:12, 185:18, 185:20, 186:2, 191:15, 191:18, 191:23, 191:25, 197:15, 197:17, 197:19, 197:23, 200:7, 200:11, 203:21, 203:25, 206:9, 206:11, 206:14, 206:16, 206:19, 206:24, 207:1, 207:18, 209:9, 209:11, 210:3, 213:4, 213:17, 213:20, 214:5, 214:10, 215:8, 215:10, 215:24, 216:2, 216:4, 216:10, 216:13, 216:15, 216:17, 216:21, 217:1, 217:3, 217:6, 217:10, 217:19, 217:22, 217:25, 218:4, 218:7
Court's [2] - 75:21, 168:3
COURTHOUSE [1] - 1:10
courts [8] - 103:16, 103:25, 104:1, 202:13, 203:16, 206:3, 211:18, 211:19
Courts [1] - 202:15
covered [1] - 194:9
covers [1] - 201:25
created [2] - 111:5, 111:7
creating [1] - 209:4
credentials [2] - 65:6, 155:15
criteria [1] - 47:7
CROSS [8] - 3:4, 3:8, 3:10, 3:13, 46:10, 101:19, 139:8, 186:5
cross [6] - 63:19, 124:12, 125:6, 126:4, 152:3, 154:14
Cross [1] - 139:7
cross-examination [1] - 152:3
CROSS-EXAMINATION [8] - 3:4, 3:8, 3:10, 3:13,

46:10, 101:19, 139:8, 186:5
crossing [1] - 150:18
current [2] - 12:1, 183:4
customer [7] - 112:3, 113:13, 113:17, 113:20, 132:16, 137:4, 137:7
customers [4] - 88:11, 106:17, 174:9, 175:1
cut [1] - 98:19
cycle [1] - 148:6

D

daily [1] - 128:1
Dallas [6] - 26:3, 28:2, 30:10, 95:1, 102:25, 210:23
damage [4] - 65:22, 99:16, 117:16, 190:9
damaged [3] - 8:6, 208:4, 208:5
damages [46] - 6:4, 6:13, 7:1, 7:23, 7:24, 8:2, 8:4, 9:22, 10:6, 10:10, 10:13, 10:21, 25:6, 25:7, 65:22, 66:3, 68:20, 69:2, 69:8, 73:7, 74:7, 74:8, 74:19, 75:3, 93:16, 101:10, 117:12, 120:17, 156:1, 156:22, 157:11, 157:22, 161:4, 165:16, 166:8, 170:21, 174:12, 191:5, 195:9, 209:1, 209:5, 210:15, 216:6, 216:25, 217:1
DAMAGES [1] - 1:19
data [26] - 69:12, 69:16, 82:18, 104:15, 118:10, 118:21, 119:1, 139:16, 139:22, 140:22, 141:2, 141:8, 141:19, 142:10, 142:16, 143:5, 143:7, 143:12, 144:9, 144:14, 145:6, 166:23, 186:17, 186:24, 186:25, 187:4
Date [1] - 218:19
date [6] - 14:23, 37:5, 45:25, 57:15, 57:16,

210:8
dated [2] - 102:2, 159:5
dates [1] - 60:4
DAVID [7] - 2:6, 3:11, 3:12, 3:13, 154:19, 155:1, 186:5
David [5] - 63:16, 129:11, 154:16, 154:22, 155:3
days [4] - 14:21, 57:12, 150:8, 217:8
DBA [1] - 43:18
deal [2] - 161:25, 210:5
debatable [1] - 114:4
debt [2] - 98:25, 99:2
Debt [1] - 198:25
debts [1] - 199:2
decade [1] - 151:25
December [3] - 217:7, 217:8
decide [3] - 40:6, 46:4, 163:1
decided [7] - 6:19, 9:6, 131:21, 132:13, 137:14, 158:21, 170:6
decides [1] - 8:11
deciding [3] - 162:20, 166:13, 180:22
decision [3] - 9:1, 9:5, 9:7
decline [2] - 71:25, 72:17
declined [1] - 70:7
declining [2] - 71:7, 72:2
decrease [1] - 116:16
deduct [22] - 8:22, 86:22, 87:5, 99:15, 113:24, 114:9, 115:8, 123:5, 174:16, 175:11, 175:25, 176:4, 176:9, 188:25, 189:10, 195:21, 203:12, 204:22, 205:17, 205:25, 206:3
deducted [19] - 90:18, 90:23, 91:9, 94:10, 98:4, 111:25, 112:6, 114:13, 170:16, 170:20, 172:23, 173:18, 173:25, 176:25, 179:10, 179:12, 196:19, 196:23, 206:4
deductibility [6] -

95:14, 110:4, 110:16, 162:6, 162:23, 163:15
**deductible** [5] - 80:17, 98:6, 107:20, 175:3, 191:8
**deducting** [6] - 80:17, 87:8, 99:11, 101:1, 115:11, 190:16
**deduction** [15] - 59:6, 79:6, 80:9, 103:17, 104:2, 113:17, 162:9, 170:3, 173:5, 188:11, 188:16, 189:5, 201:3, 203:4, 204:3
**deductions** [11] - 74:25, 75:1, 79:10, 87:3, 87:21, 90:5, 96:17, 99:4, 100:3, 203:8, 203:16
**deducts** [2] - 78:24, 87:3
**defeat** [2] - 211:20, 214:21
**defend** [1] - 26:18
**defendant** [8] - 9:21, 74:24, 75:13, 83:17, 96:14, 96:16, 196:13, 207:5
**DEFENDANT** [4] - 1:7, 2:10, 2:12, 2:15
**defendant's** [17] - 7:24, 8:8, 8:10, 10:6, 10:7, 74:12, 74:24, 75:12, 93:16, 96:15, 99:21, 102:13, 120:18, 158:20, 170:8, 205:18, 206:1
**defendant/plaintiff** [1] - 39:2
**defending** [1] - 44:20
**Defense** [24] - 4:3, 4:4, 4:5, 4:6, 4:7, 4:8, 4:9, 4:10, 4:11, 4:12, 4:13, 4:14, 15:18, 16:12, 17:21, 19:18, 23:15, 24:13, 32:9, 35:25, 37:1, 65:16, 76:22, 100:12
**defense** [3] - 45:5, 212:15, 214:7
**deference** [1] - 131:21
**define** [3] - 73:12, 78:9, 94:13
**defined** [1] - 64:25
**defines** [1] - 89:18
**definitely** [1] - 85:5
**definition** [2] - 91:17, 217:15

**definitions** [1] - 217:11
**degree** [2] - 74:16, 101:7
**delay** [2] - 207:4, 207:6
**Deleon** [2] - 55:21, 55:24
**Deleon's** [1] - 55:18
**demographic** [1] - 68:6
**demonstrate** [4] - 69:18, 98:21, 190:5, 190:12
**demonstrated** [2] - 94:22, 105:24
**demonstrates** [2] - 99:14, 121:4
**demonstrative** [6] - 159:22, 164:7, 164:8, 167:8, 169:15, 184:3
**Denied** [1] - 103:20
**denominator** [6] - 106:15, 164:19, 164:20, 164:23, 166:21, 168:14
**deny** [2] - 9:14, 84:11
**denying** [1] - 211:19
**departure** [3] - 71:11, 73:6, 119:7
**depict** [1] - 164:8
**deposition** [14] - 66:6, 108:9, 109:20, 190:3, 190:8, 190:11, 190:19, 193:12, 193:16, 194:20, 195:7, 196:10, 199:20, 203:15
**depositions** [4] - 56:9, 56:11, 56:12, 56:17
**depreciation** [1] - 94:5
**depth** [1] - 33:25
**DEPUTY** [3] - 11:6, 63:25, 127:13
**derive** [1] - 85:8
**derived** [1] - 77:5
**describe** [5] - 110:8, 132:15, 164:4, 173:1, 184:16
**described** [2] - 163:23, 201:14
**descriptive** [1] - 208:15
**desire** [1] - 105:4
**desist** [16] - 37:18, 39:17, 42:23, 42:24, 43:10, 43:16, 44:6, 44:9, 44:12, 52:9,

59:4, 209:25, 211:10, 211:23, 213:6, 213:10
**desktop** [1] - 19:6
**despite** [1] - 189:14
**detail** [4] - 110:3, 110:7, 110:16, 182:4
**detailed** [3] - 108:1, 109:10, 110:11
**deter** [1] - 9:23
**determination** [1] - 215:5
**determine** [25] - 37:11, 65:21, 66:3, 74:20, 75:4, 75:15, 83:18, 84:3, 86:25, 96:12, 110:12, 123:22, 141:14, 156:23, 157:12, 157:23, 174:13, 175:2, 175:14, 177:6, 177:18, 192:15, 193:6, 196:4, 200:3
**determined** [2] - 74:16, 102:6
**determines** [1] - 87:8
**determining** [6] - 66:23, 67:10, 90:19, 91:9, 93:15, 97:1
**device** [2] - 83:9, 83:12, 83:13
**DFW** [1] - 16:22
**difference** [10] - 34:5, 100:18, 100:19, 113:23, 177:12, 177:17, 185:1, 185:4, 188:6, 191:21
**differences** [2] - 187:13, 191:20
**different** [24] - 19:8, 24:22, 31:6, 31:16, 47:7, 54:19, 81:21, 82:13, 89:21, 89:25, 90:3, 90:4, 91:23, 135:16, 143:9, 143:24, 157:20, 160:12, 179:21, 183:12, 201:21, 214:25, 215:1
**differential** [1] - 184:24
**differentiating** [1] - 87:1
**difficult** [2] - 74:17, 162:12
**Digest** [2] - 207:13, 214:3
**digital** [2] - 24:5, 24:17

**dinner** [2] - 103:4, 103:7
**DIRECT** [8] - 3:3, 3:7, 3:10, 3:12, 11:15, 64:8, 127:18, 155:1
**direct** [22] - 43:9, 46:14, 67:13, 101:22, 103:9, 106:6, 107:14, 107:16, 108:2, 111:24, 113:4, 113:5, 115:8, 120:25, 124:12, 124:14, 125:18, 125:19, 173:15, 212:17
**directed** [1] - 43:10
**direction** [1] - 147:7
**directly** [7] - 10:12, 31:8, 32:21, 85:10, 110:13, 114:12, 192:6
**director** [2] - 20:1, 155:3
**director's** [1] - 21:9
**director/consultant** [1] - 64:12
**directors** [1] - 20:23
**disaggregate** [1] - 119:6
**disagree** [9] - 7:16, 80:12, 80:20, 89:17, 94:18, 96:25, 99:9, 106:24, 112:6
**disagreement** [2] - 79:25, 91:15
**disagrees** [1] - 188:16
**disappeared** [1] - 211:18
**disclaimer** [1] - 147:5
**disclosed** [1] - 6:15
**disclosure** [1] - 6:10
**discovered** [3] - 59:20, 60:3, 62:6
**discovery** [1] - 75:6
**discretionary** [4] - 115:18, 205:4, 205:7, 205:10
**discuss** [4] - 44:12, 129:15, 130:25, 213:3
**discussed** [12] - 24:7, 44:13, 73:10, 98:16, 104:20, 105:3, 114:8, 129:16, 138:12, 167:14, 172:17, 173:4
**discusses** [1] - 165:19
**discussing** [3] - 69:11, 129:18,

210:18
**discussion** [3] - 36:5, 98:21, 164:12
**discussions** [1] - 66:14
**disgorgeable** [4] - 117:9, 119:10, 119:13, 120:2
**disgorged** [1] - 189:9
**disgorgement** [19] - 7:3, 7:14, 7:21, 8:2, 8:8, 8:14, 8:16, 8:18, 8:24, 9:2, 10:22, 102:10, 117:13, 156:11, 159:6, 171:18, 194:14, 208:6, 208:25
**Disgorgement** [2] - 7:8, 7:9
**disguises** [1] - 93:11
**dispensed** [1] - 209:14
**display** [3] - 135:17, 135:19, 135:21
**displays** [1] - 149:5
**dispute** [7] - 79:22, 79:23, 80:6, 80:8, 81:18, 85:12, 109:12, 109:14, 109:18, 188:22, 205:21
**disputes** [1] - 64:16
**distinct** [1] - 171:18
**distinctive** [1] - 212:20
**distributed** [1] - 123:2
**distributes** [1] - 122:24
**distributions** [1] - 90:13
**DISTRICT** [4] - 1:1, 1:1, 1:15, 1:15
**District** [3] - 213:7, 213:8, 214:17
**diversion** [1] - 66:23
**divert** [1] - 48:25
**diverted** [2] - 10:14, 67:12
**divided** [1] - 182:10
**dividends** [2] - 90:13, 122:24
**division** [3] - 93:5, 171:15, 180:10
**divisions** [3] - 171:3, 171:7
**doctrine** [2] - 93:6, 207:3
**document** [50] - 15:8, 27:1, 31:25, 36:3, 49:5, 50:1, 50:11,

57:5, 57:6, 57:9, 60:11, 60:13, 62:20, 62:22, 76:1, 107:21, 109:5, 111:5, 111:7, 111:12, 111:13, 111:20, 111:21, 114:16, 114:23, 124:1, 124:2, 124:6, 124:7, 133:14, 138:12, 138:20, 140:2, 140:5, 142:18, 152:16, 152:25, 153:4, 153:13, 153:16, 158:1, 159:2, 159:13, 159:24, 178:7, 181:21, 207:19, 207:21, 211:2, 213:23

**documentation** [3] - 38:4, 111:10, 162:7

**documented** [1] - 37:7

**documents** [47] - 12:2, 13:9, 13:10, 13:11, 24:6, 31:17, 31:21, 31:24, 35:8, 35:19, 40:12, 40:15, 66:10, 75:7, 75:8, 75:9, 75:18, 76:3, 77:5, 77:6, 107:19, 108:24, 109:24, 110:25, 111:1, 111:4, 124:4, 128:12, 128:15, 156:16, 156:19, 156:21, 158:9, 174:2, 174:19, 175:14, 177:6, 177:18, 185:21, 185:22, 186:10, 215:16, 215:24, 217:20, 217:21, 218:1

**Dodds** [2] - 54:24, 54:25

**dollar** [10] - 87:10, 99:8, 99:10, 100:19, 163:24, 166:11, 176:3, 179:24, 187:22, 191:24

**dollars** [10] - 143:11, 152:7, 164:14, 164:17, 165:4, 178:3, 179:17, 180:4, 180:6, 199:7

**Dolores** [2] - 11:4, 217:25

**domain** [11] - 34:17, 34:18, 70:23, 71:10, 71:22, 72:2, 73:6,

73:10, 73:13, 130:2, 130:25

**Donate** [1] - 59:6

**donate** [23] - 29:17, 48:13, 49:12, 49:15, 59:2, 74:3, 82:2, 132:2, 134:15, 137:2, 137:18, 144:10, 146:3, 149:10, 149:15, 161:21, 161:23, 162:2, 162:17, 162:20, 166:13, 180:23, 181:14

**donated** [15] - 70:1, 82:13, 86:15, 88:12, 106:17, 106:18, 121:6, 121:16, 128:24, 129:1, 162:8, 189:20, 192:10, 193:7

**donating** [9] - 105:10, 136:20, 148:17, 149:11, 161:18, 162:24, 165:15, 192:15, 193:14

**donation** [52] - 31:1, 48:13, 50:20, 59:14, 75:24, 80:20, 82:6, 92:7, 97:24, 98:5, 98:10, 98:13, 98:18, 99:2, 105:7, 106:2, 115:21, 115:25, 116:3, 116:9, 120:9, 121:17, 128:2, 128:7, 128:8, 131:17, 132:4, 132:19, 133:10, 134:9, 138:10, 139:18, 139:19, 143:8, 143:15, 146:4, 148:8, 148:20, 148:23, 161:8, 161:13, 162:14, 163:4, 163:6, 163:21, 171:1, 179:5, 183:18, 186:15, 192:20, 198:13, 205:7

**donations** [101] - 18:2, 18:8, 19:23, 28:13, 30:8, 30:10, 30:25, 31:3, 31:15, 32:15, 33:12, 48:24, 48:25, 66:24, 67:2, 67:12, 67:25, 69:17, 70:4, 70:5, 70:6, 70:11, 70:25, 71:4, 71:5, 71:12, 72:4, 72:25,

75:9, 75:16, 79:3, 81:14, 82:5, 92:1, 97:17, 104:21, 105:14, 105:19, 113:12, 113:14, 113:22, 114:1, 117:19, 118:3, 118:8, 118:15, 118:24, 119:3, 120:21, 121:1, 123:9, 123:11, 129:22, 130:6, 130:10, 130:18, 131:6, 131:13, 131:19, 131:22, 131:23, 132:6, 132:9, 132:22, 133:2, 133:7, 134:6, 134:7, 134:17, 134:23, 136:6, 136:13, 136:16, 137:6, 139:4, 144:18, 145:6, 146:11, 152:17, 160:4, 161:16, 162:6, 162:15, 163:9, 166:11, 186:7, 186:11, 186:20, 187:1, 189:15, 191:10, 191:13, 192:4, 195:25, 199:22, 200:14, 200:17, 200:18, 205:12, 208:12, 208:13

**done** [28] - 11:23, 16:20, 25:1, 25:22, 48:13, 65:2, 81:11, 81:12, 82:15, 83:15, 84:7, 84:12, 86:14, 86:18, 104:14, 105:25, 107:15, 107:17, 111:11, 118:6, 126:18, 126:19, 136:9, 152:18, 158:5, 166:3, 177:17, 203:24

**donor** [32] - 76:2, 86:16, 86:17, 106:2, 120:24, 121:5, 121:16, 121:18, 132:1, 134:4, 134:5, 134:8, 134:11, 134:15, 134:16, 134:22, 137:1, 138:24, 139:3, 146:10, 147:23, 148:15, 148:17, 156:17, 181:14, 192:12, 192:13,

192:14, 193:7, 193:24

**donor's** [2] - 131:16, 132:3

**donors** [61] - 12:16, 28:20, 28:23, 29:9, 31:7, 33:12, 48:25, 68:7, 75:25, 82:2, 82:13, 82:16, 82:17, 86:14, 86:18, 106:10, 106:18, 113:13, 114:2, 116:13, 116:22, 118:12, 120:13, 122:9, 129:6, 130:19, 131:14, 131:19, 131:24, 132:7, 132:23, 133:9, 134:24, 136:6, 136:16, 136:20, 145:8, 149:1, 151:2, 159:7, 160:4, 161:23, 162:2, 162:7, 166:12, 169:25, 180:22, 186:15, 186:18, 186:21, 187:2, 187:4, 192:10, 192:19, 193:6, 193:14, 193:17, 193:22, 193:23, 196:1, 196:5

**donors'** [2] - 82:15

**doors** [1] - 54:1

**dot** [1] - 33:8

**dotcom** [15] - 30:7, 30:13, 31:6, 33:22, 34:4, 34:9, 34:11, 34:19, 70:24, 117:22, 130:3, 130:5, 130:9, 130:19, 145:11

**dotnet** [3] - 131:4, 131:11, 208:11

**dotorg** [5] - 31:7, 32:16, 34:7, 34:8, 131:1

**double** [1] - 10:18

**doubled** [1] - 71:14

**doubt** [3] - 50:5, 109:7, 149:13

**down** [31] - 18:15, 26:17, 32:24, 33:16, 33:17, 63:3, 73:2, 80:11, 84:20, 85:3, 94:5, 102:25, 114:19, 115:6, 117:21, 118:2, 118:7, 118:12, 118:20, 118:25,

124:17, 130:7, 154:10, 160:22, 168:17, 169:10, 175:21, 184:3, 191:15, 206:12, 215:13

**dozen** [1] - 180:14

**dozens** [1] - 28:1

**drive** [1] - 168:17

**drives** [2] - 161:15, 162:15

**driveway** [1] - 105:11

**driving** [1] - 32:23

**due** [3] - 167:5, 190:25, 217:7

**during** [15] - 11:3, 12:18, 13:9, 14:6, 14:10, 29:19, 34:23, 40:10, 117:10, 155:7, 155:25, 172:11, 181:19, 207:22, 210:2

**During** [2] - 40:9, 40:22

**duties** [1] - 45:3

**dynamics** [1] - 68:24

---

**E**

**e-mail** [2] - 83:22, 192:18

**early** [1] - 207:24

**earned** [7] - 75:16, 83:18, 114:20, 117:10, 189:14, 189:17, 189:19

**easily** [1] - 209:14

**EAST** [1] - 1:11

**Eastern** [1] - 213:7

**easy** [2] - 162:11, 162:12

**economic** [8] - 68:20, 93:2, 93:10, 93:15, 93:18, 94:12, 101:7, 121:13

**economics** [2] - 64:15, 101:10

**economist** [2] - 121:8, 121:20

**Edition** [2] - 10:4, 10:9

**education** [1] - 112:5

**educational** [1] - 200:4

**effect** [10] - 20:8, 26:7, 26:8, 54:14, 99:17, 115:11, 137:25, 167:15, 215:4

**effort** [2] - 166:1, 171:5

**efforts** [4] - 165:11, 165:14, 168:20, 179:5
**egregious** [1] - 215:3
**EIN** [1] - 57:14
**either** [11] - 5:24, 6:17, 15:6, 29:1, 47:23, 84:15, 113:5, 137:2, 147:12, 159:18, 196:13
**either/or** [1] - 8:13
**element** [3] - 172:18, 211:20, 212:1
**elements** [1] - 126:11
**eliminate** [1] - 213:6
**empirical** [1] - 121:1
**employed** [1] - 165:2
**employees** [13] - 12:1, 14:7, 40:12, 46:25, 47:24, 48:8, 48:21, 49:11, 64:20, 72:7, 199:18, 199:22
**end** [6] - 14:21, 29:11, 43:5, 125:13, 189:3, 210:9
**ends** [1] - 18:12
**engage** [1] - 123:16
**engaged** [2] - 104:9, 123:13
**engines** [2] - 14:8, 47:6
**enhanced** [1] - 209:1
**enriched** [1] - 9:21
**entered** [3] - 55:5, 148:21, 155:7
**enterprises** [1] - 123:15
**entire** [6] - 40:11, 61:19, 93:5, 96:22, 103:7, 112:19
**entirety** [1] - 176:4
**entities** [4] - 123:12, 161:14, 161:24, 205:21
**entitled** [4] - 7:2, 7:3, 208:6, 218:14
**entity** [3] - 93:12, 170:25, 202:5
**entity's** [2] - 157:7, 158:6
**entries** [2] - 175:19, 181:23
**entry** [1] - 68:24
**environments** [1] - 157:20
**equitable** [2] - 6:5, 212:15
**equity** [1] - 8:11
**errors** [1] - 109:21
**Escort** [1] - 138:23

**especially** [1] - 109:23
**ESQUIRE** [8] - 2:3, 2:5, 2:6, 2:6, 2:9, 2:9, 2:12, 2:14
**essence** [1] - 183:12
**essential** [1] - 183:19
**essentially** [2] - 101:1, 202:5
**establish** [3] - 25:22, 95:13, 110:16
**established** [2] - 179:6, 200:9
**estate** [4] - 98:13, 200:4, 200:15, 200:17
**ESTI** [8] - 3:9, 3:10, 3:10, 3:11, 127:12, 127:18, 139:8, 152:15
**Esti** [1] - 127:14
**estimate** [2] - 144:3, 144:14
**estimated** [1] - 176:8
**estimating** [3] - 143:9, 165:2, 179:7
**et** [2] - 209:1
**evaluate** [4] - 42:17, 143:18, 170:1, 184:11
**event** [6] - 69:15, 70:19, 70:21, 70:22, 71:2, 73:5
**events** [4] - 31:25, 32:2, 35:15, 35:18
**everywhere** [3] - 42:25, 43:1, 198:23
**Everywhere** [1] - 27:25
**evidence** [73] - 4:3, 4:4, 4:5, 4:6, 4:7, 4:8, 4:9, 4:10, 4:11, 4:12, 4:13, 4:14, 4:15, 4:16, 4:17, 4:18, 4:19, 4:20, 4:21, 8:15, 9:13, 10:20, 12:19, 13:21, 15:2, 15:19, 16:13, 17:22, 19:19, 23:16, 24:14, 32:5, 32:10, 35:21, 36:1, 36:22, 37:2, 61:9, 61:16, 65:11, 65:17, 76:23, 82:11, 82:14, 100:7, 100:13, 121:10, 121:12, 133:21, 134:1, 155:7, 155:22, 159:10, 168:25, 169:4, 169:9, 173:8, 173:13, 176:19,

176:23, 178:18, 178:23, 181:19, 185:9, 185:14, 200:9, 206:22, 209:17, 209:23, 209:24, 210:2, 211:7, 215:12
**evidences** [1] - 207:20
**evident** [1] - 202:7
**exact** [2] - 151:23, 160:12
**Exactly** [1] - 34:8
**exactly** [3] - 120:7, 142:18, 165:21
**EXAMINATION** [24] - 3:3, 3:4, 3:5, 3:6, 3:7, 3:8, 3:9, 3:10, 3:10, 3:11, 3:12, 3:13, 11:15, 46:10, 56:23, 62:12, 64:8, 101:19, 122:1, 127:18, 139:8, 152:15, 155:1, 186:5
**examination** [1] - 152:3
**examine** [1] - 153:22
**example** [3] - 47:22, 48:18, 84:9
**examples** [3] - 61:7, 165:20, 192:3
**Excel** [1] - 75:23
**excellence** [1] - 26:1
**exception** [1] - 100:4
**excess** [1] - 122:19
**exchanged** [1] - 5:20
**exclude** [6] - 21:23, 112:20, 114:7, 147:19, 147:20, 212:2
**excluded** [5] - 146:22, 147:2, 147:4, 168:12, 168:13
**excluding** [1] - 106:14
**exclusions** [2] - 146:16, 159:14
**excuse** [3] - 14:16, 107:15, 152:17
**excused** [4] - 63:5, 124:19, 154:11, 206:15
**execute** [4] - 168:21, 179:6, 181:4, 198:13
**executed** [1] - 158:22
**executive** [2] - 20:1, 21:9
**exercise** [1] - 99:3
**exhibit** [12] - 27:3, 35:9, 35:16, 43:13, 134:12, 137:23, 150:2, 173:8,

175:22, 176:19, 178:18, 217:24
**Exhibit** [101] - 4:3, 4:4, 4:5, 4:6, 4:7, 4:8, 4:9, 4:10, 4:11, 4:12, 4:13, 4:14, 4:15, 4:16, 4:17, 4:18, 4:19, 4:20, 4:21, 13:8, 13:17, 13:21, 14:14, 14:23, 15:2, 15:15, 15:18, 16:12, 16:14, 16:17, 17:14, 17:21, 18:7, 18:10, 18:19, 18:23, 19:18, 21:5, 21:8, 21:13, 23:7, 23:11, 23:15, 23:18, 24:2, 24:3, 24:6, 24:10, 24:13, 27:9, 27:18, 28:6, 28:16, 29:14, 29:16, 31:13, 31:17, 32:3, 32:6, 32:9, 35:2, 35:4, 35:25, 36:6, 36:15, 37:1, 38:12, 43:6, 43:16, 43:20, 58:10, 59:3, 65:11, 65:16, 76:7, 76:18, 76:22, 76:25, 94:24, 99:24, 100:8, 100:12, 114:15, 123:21, 133:25, 142:22, 147:21, 155:7, 155:14, 155:21, 169:8, 173:12, 176:22, 178:22, 185:13, 188:1, 196:25, 207:16, 215:25
**exhibits** [1] - 215:12
**EXHIBITS** [1] - 4:1
**exist** [2] - 53:24, 118:10
**exists** [1] - 118:11
**expect** [1] - 69:2
**expedite** [1] - 125:18
**expended** [1] - 151:25
**expenditures** [7] - 156:24, 157:13, 157:23, 176:5, 177:7, 181:4, 182:24
**expense** [57] - 67:2, 80:15, 80:17, 85:2, 87:3, 87:8, 88:11, 89:19, 89:22, 89:24, 90:1, 90:2, 90:4, 90:7, 90:9, 92:4, 92:11, 94:10, 94:19, 95:3, 98:7, 98:8, 98:9, 98:22, 99:2, 99:19, 100:3, 108:3,

108:22, 110:12, 112:22, 112:25, 123:5, 123:6, 123:8, 168:16, 170:16, 174:3, 175:15, 176:7, 180:1, 182:25, 183:7, 183:16, 183:17, 183:19, 183:20, 183:21, 188:15, 189:5, 196:17, 196:19, 196:21, 196:23, 201:2, 204:25, 206:3
**Expense** [2] - 84:24, 198:25
**expenses** [131] - 8:21, 79:6, 79:17, 80:5, 80:7, 80:18, 81:2, 81:3, 84:18, 87:25, 89:16, 90:4, 90:15, 91:15, 91:18, 91:19, 91:22, 91:24, 91:25, 92:15, 92:21, 92:22, 92:23, 92:24, 94:14, 94:18, 94:25, 95:14, 96:7, 96:12, 96:17, 96:19, 97:2, 97:4, 97:7, 97:22, 98:5, 98:20, 98:25, 99:9, 99:19, 100:18, 107:20, 108:15, 108:20, 108:21, 109:5, 109:23, 110:18, 110:21, 111:9, 111:13, 111:17, 111:21, 111:25, 112:3, 112:8, 112:9, 112:14, 113:2, 114:2, 114:5, 114:9, 114:12, 114:18, 115:9, 115:11, 115:12, 115:15, 116:7, 122:23, 123:2, 128:16, 129:16, 129:19, 129:20, 141:18, 142:13, 144:1, 144:3, 157:10, 164:20, 164:21, 164:22, 165:12, 165:17, 172:23, 173:24, 175:11, 175:24, 177:19, 178:12, 178:13, 178:14, 179:1, 179:4, 179:9, 179:13, 179:21, 180:3, 180:5, 180:12, 180:17,

182:6, 182:9, 182:13, 182:14, 182:17, 182:18, 182:20, 182:22, 196:10, 196:11, 197:5, 197:6, 198:12, 198:19, 198:20, 200:2, 200:25, 201:2, 201:4, 201:5, 201:7, 204:7, 206:3, 216:21

**Expenses** [4] - 85:8, 142:14, 182:7, 198:8

**experience** [16] - 96:13, 96:14, 98:19, 103:16, 104:1, 156:22, 157:11, 157:22, 161:3, 161:17, 165:16, 165:23, 166:8, 170:21, 174:12, 175:8

**experiences** [1] - 74:8

**expert** [70] - 6:8, 8:18, 31:9, 34:23, 56:9, 64:23, 68:9, 68:10, 68:13, 68:17, 68:23, 69:1, 69:7, 74:8, 75:3, 76:11, 79:7, 79:20, 79:23, 80:1, 80:8, 88:19, 88:21, 90:25, 91:1, 91:3, 91:4, 91:8, 95:12, 95:24, 96:3, 96:6, 108:14, 117:12, 121:10, 121:20, 125:22, 129:10, 155:24, 156:4, 156:10, 156:22, 157:11, 157:22, 159:5, 159:18, 160:2, 165:16, 166:8, 167:21, 170:21, 174:12, 190:4, 190:12, 190:15, 190:24, 191:5, 192:6, 194:12, 194:21, 195:8, 196:11, 202:3, 202:12, 202:17, 202:24, 203:16, 205:22

**experts** [14] - 8:16, 33:23, 74:19, 92:25, 157:20, 190:17, 192:22, 195:2, 195:8, 195:12, 195:14, 202:9, 202:25, 203:1

**explain** [9] - 30:3,

67:7, 82:24, 83:1, 118:5, 157:5, 167:10, 178:25, 181:2

**Explain** [1] - 77:17

**explained** [1] - 122:7

**explains** [1] - 88:9

**explanation** [2] - 73:22, 73:25

**extensive** [2] - 140:2, 140:5

**extents** [1] - 123:17

**extra** [6] - 124:13, 132:13, 199:21, 199:22, 199:23

**extract** [3] - 175:17, 175:19, 177:20

**extracts** [1] - 156:18

## F

**F.3d** [1] - 9:23

**facilities** [1] - 34:25

**fact** [28] - 5:22, 29:5, 53:2, 59:3, 67:23, 106:25, 121:9, 125:21, 125:22, 130:25, 136:9, 154:1, 163:9, 163:11, 180:3, 192:14, 193:12, 194:20, 196:4, 196:21, 199:15, 202:1, 202:17, 205:6, 207:23, 208:1, 208:18, 208:19

**factor** [9] - 68:1, 84:3, 87:1, 105:7, 105:9, 105:12, 161:22, 162:11, 162:15

**factored** [1] - 118:22

**factors** [41] - 67:10, 67:13, 67:23, 80:10, 88:6, 88:12, 89:1, 103:14, 104:20, 104:24, 105:1, 105:3, 105:6, 105:13, 105:15, 105:18, 118:1, 118:4, 161:18, 162:1, 162:10, 162:17, 163:3, 163:11, 163:13, 163:14, 163:23, 164:3, 165:6, 165:7, 165:14, 166:12, 167:6, 191:10, 191:12, 192:3, 192:6, 192:11,

192:13, 192:15, 193:15

**facts** [17] - 74:14, 104:15, 105:23, 110:5, 126:20, 126:21, 126:24, 127:3, 163:22, 170:5, 200:9, 201:21, 202:6, 212:3, 212:17, 216:8, 216:10

**factual** [1] - 12:11

**factually** [1] - 32:20

**fails** [1] - 213:16

**fair** [1] - 50:15

**faith** [2] - 214:13

**FALANGA** [1] - 2:2

**Fallon** [2] - 26:13, 147:19

**familiar** [2] - 142:3, 154:1

**far** [20] - 33:9, 48:16, 73:4, 74:7, 153:1, 160:6, 161:18, 163:10, 163:14, 163:23, 165:7, 167:20, 168:9, 181:15, 194:3, 196:14, 199:3, 201:21, 201:24, 205:14

**fast** [1] - 47:13

**favor** [1] - 6:19

**features** [1] - 191:14

**Federal** [1] - 214:18

**fees** [4] - 45:9, 45:11, 78:23

**felt** [1] - 168:22

**Fendi** [1] - 213:8

**few** [7] - 37:9, 102:23, 102:24, 139:14, 144:17, 203:23, 217:11

**field** [7] - 64:23, 64:25, 68:12, 68:23, 74:20, 143:2, 144:6

**fields** [1] - 156:5

**figure** [13] - 106:1, 120:11, 141:17, 160:6, 160:8, 164:16, 170:2, 173:22, 177:5, 177:10, 177:13, 187:24

**figures** [2] - 173:3

**file** [5] - 43:10, 50:10, 53:7, 123:25, 208:22

**filed** [5] - 50:2, 50:5, 53:11, 62:22, 107:21, 210:8

**Filed** [1] - 53:9

**files** [1] - 66:9

**filing** [4] - 53:4, 209:21, 210:14, 213:13

**filings** [2] - 66:8, 156:15

**fill** [3] - 143:2, 144:6, 148:16

**filling** [1] - 97:20, 142:21

**fills** [2] - 134:6, 142:23

**final** [2] - 68:1, 100:1

**Finally** [2] - 99:24, 101:5

**finally** [4] - 61:9, 71:16, 123:20, 212:20

**finance** [4] - 88:13, 93:17, 94:11, 106:19

**financial** [14] - 66:5, 93:2, 93:7, 107:25, 108:5, 109:10, 156:16, 157:9, 157:18, 158:5, 158:16, 162:8, 170:9

**financially** [1] - 26:6

**findings** [1] - 121:9

**fine** [1] - 217:9

**finish** [3] - 125:3, 125:16, 127:1

**finished** [1] - 124:11

**finite** [1] - 67:15

**FIRM** [1] - 2:11

**firm** [6] - 55:7, 64:14, 155:4, 158:6, 201:9, 201:19

**firms** [2] - 44:19, 54:19

**first** [32] - 5:8, 37:11, 39:1, 43:23, 43:24, 47:17, 47:24, 48:22, 51:4, 51:7, 53:1, 53:3, 65:21, 67:4, 68:5, 87:21, 125:17, 135:25, 172:16, 182:16, 182:22, 182:25, 190:2, 196:2, 196:6, 204:8, 205:24, 206:5, 206:7, 210:6, 216:18, 216:23

**First** [4] - 54:22, 67:13, 70:3, 161:12

**FISHER** [1] - 1:10

**five** [5] - 111:16, 125:4, 126:10, 129:14, 138:4

**Five** [1] - 55:10

**flew** [2] - 102:25

**flight** [1] - 103:2

**fly** [1] - 103:4

**focus** [2] - 38:12, 114:22

**focused** [1] - 9:15

**follow** [5] - 6:21, 51:15, 52:10, 134:19, 139:1

**follow-up** [1] - 51:15

**followed** [2] - 52:11, 52:19

**following** [1] - 69:22

**font** [1] - 29:10

**footnote** [2] - 77:3

**FOR** [5] - 2:3, 2:7, 2:10, 2:12, 2:15

**for-profit** [8] - 89:24, 90:12, 122:22, 158:3, 171:5, 183:9, 183:22, 195:1

**Ford** [3] - 47:11, 138:23

**foregoing** [1] - 218:13

**forensic** [3] - 68:23, 121:8, 155:24

**forget** [1] - 183:2

**forgets** [1] - 134:18

**form** [17] - 7:22, 41:2, 90:16, 97:20, 123:3, 134:6, 142:21, 142:23, 143:2, 143:3, 144:7, 148:16, 157:8, 162:9, 169:5, 182:12

**Form** [13] - 66:9, 92:5, 97:15, 107:21, 107:24, 108:5, 108:14, 109:11, 112:15, 156:15, 157:21, 157:22, 196:18

**forms** [2] - 164:16, 183:20

**formula** [1] - 164:8

**fort** [1] - 79:14

**Fort** [3] - 24:16, 24:17, 24:20

**forth** [2] - 74:25, 159:6

**forward** [1] - 106:1

**foundation** [3] - 14:1, 21:12, 22:22

**four** [8] - 92:19, 94:6, 94:7, 96:21, 113:22, 116:15, 116:23, 120:9

**Fox** [6] - 14:11, 19:2, 19:6, 19:12, 56:2, 139:11

**FOX** [1] - 2:8

**FoxNews.com** [2] -

18:22, 19:3
**fraction** [1] - 203:9
**framework** [1] - 69:14
**Francis** [1] - 218:16
**FRANCIS** [1] - 1:23
**Frank** [2] - 20:3, 95:18
**fraud** [1] - 209:21
**front** [3] - 19:5, 108:8, 187:25
**frustrated** [1] - 29:2
**fulfill** [1] - 181:12
**fulfilling** [2] - 181:9, 181:13
**fulfills** [1] - 181:10
**full** [39] - 59:6, 70:2, 92:10, 112:1, 134:24, 139:18, 167:17, 170:6, 170:10, 172:12, 172:18, 176:9, 176:11, 177:2, 177:9, 177:11, 177:12, 177:16, 179:10, 181:1, 184:10, 184:15, 184:18, 184:21, 184:24, 185:2, 189:4, 189:6, 189:13, 191:22, 201:15, 201:17, 201:18, 201:23, 201:24, 202:2, 202:7, 202:15, 217:11
**full-time** [1] - 167:17
**fully** [1] - 171:10
**fun** [1] - 26:14
**function** [1] - 183:14
**functional** [2] - 182:5, 182:17
**Functional** [1] - 182:7
**functions** [1] - 66:18
**fund** [3] - 88:17, 180:21, 180:22
**fundamental** [2] - 93:6, 106:16
**fundraising** [40] - 91:25, 97:16, 97:18, 98:5, 98:15, 106:7, 106:12, 106:14, 106:22, 106:25, 107:2, 107:4, 107:7, 107:13, 112:10, 112:16, 112:18, 112:24, 113:3, 122:3, 122:5, 123:10, 123:11, 164:5, 164:9, 164:15, 165:22, 166:6, 167:16,

168:13, 182:15, 187:22, 193:25, 194:11, 194:18, 194:22, 194:25, 195:4, 195:15, 205:20
**funds** [2] - 78:4, 180:8
**funnel** [1] - 115:18
**funneled** [3] - 80:16, 87:4, 116:8
**future** [1] - 25:7

## G

**Gable** [1] - 218:16
**GABLE** [1] - 1:23
**gain** [1] - 111:8
**gained** [3] - 119:4, 161:13, 161:14
**GAO** [1] - 162:5
**General** [1] - 177:20
**general** [34] - 5:24, 53:19, 97:19, 98:21, 103:12, 108:7, 108:17, 108:19, 108:23, 109:4, 109:9, 109:13, 109:22, 110:3, 110:6, 110:7, 110:10, 110:11, 110:15, 113:7, 156:18, 157:5, 157:12, 170:10, 175:16, 175:19, 177:23, 177:24, 178:2, 178:3, 182:14, 196:22
**generally** [8] - 12:21, 58:16, 90:7, 109:9, 114:5, 128:1, 129:15, 170:7
**generals** [1] - 26:17
**generate** [4] - 90:1, 90:8, 116:18, 130:6
**generated** [2] - 111:20, 130:10
**generates** [2] - 77:21, 77:22
**generating** [1] - 75:14
**generation** [1] - 110:13
**gentleman** [1] - 61:19
**geographic** [2] - 67:14, 146:16
**geography** [2] - 172:4, 204:12
**germane** [2] - 9:10, 9:13
**given** [12] - 5:16,

68:19, 87:6, 116:4, 122:18, 158:14, 163:22, 180:9, 180:20, 181:14, 183:14, 204:11
**global** [1] - 64:14
**goal** [1] - 103:12
**goods** [1] - 90:8
**goodwill** [3] - 25:20, 25:23, 26:10
**Google** [64] - 13:18, 14:8, 14:11, 15:12, 47:6, 48:11, 48:16, 59:1, 60:6, 68:5, 84:25, 85:2, 95:1, 95:9, 110:21, 110:25, 111:11, 111:12, 111:13, 114:23, 114:24, 115:3, 123:20, 123:22, 124:1, 124:2, 130:15, 135:3, 135:19, 139:15, 140:2, 140:3, 141:10, 141:11, 141:13, 141:20, 142:5, 142:7, 142:8, 142:11, 142:12, 146:17, 146:20, 149:12, 152:4, 152:18, 153:16, 153:17, 154:2, 173:25, 174:3, 174:5, 174:8, 174:11, 174:14, 174:24, 175:6, 203:7, 210:3, 210:19, 212:11, 213:23
**goosey** [1] - 217:15
**Government** [1] - 162:5
**grant** [20] - 26:7, 80:16, 80:25, 87:8, 90:3, 91:9, 99:18, 115:9, 115:11, 115:15, 116:8, 123:8, 178:12, 182:18, 182:20, 182:23, 183:16, 188:11, 204:10, 204:13
**grants** [63] - 81:1, 86:21, 86:23, 87:3, 87:5, 87:21, 89:14, 89:18, 90:6, 90:10, 90:16, 90:18, 94:19, 98:4, 99:15, 100:5, 100:16, 100:17,

100:23, 106:15, 115:25, 116:3, 116:9, 116:12, 116:16, 116:18, 116:22, 122:15, 122:18, 123:3, 123:10, 164:20, 164:24, 165:5, 165:12, 168:13, 168:21, 176:7, 179:2, 179:18, 181:5, 181:7, 181:8, 181:10, 181:12, 183:5, 183:8, 183:14, 204:2, 204:8, 204:12, 204:17, 204:21, 204:23, 205:4, 205:9, 205:13, 205:14, 205:17, 205:25
**great** [3] - 148:21, 161:25, 216:15
**greater** [2] - 166:20
**green** [1] - 72:12
**gross** [14] - 76:4, 76:14, 76:25, 77:3, 77:7, 77:15, 78:9, 78:11, 79:5, 79:12, 89:3, 186:6, 189:11, 189:12
**grounds** [1] - 64:23
**group** [1] - 46:25
**Group** [4] - 55:18, 64:12, 64:13, 214:16
**growing** [1] - 70:10
**growth** [1] - 71:3
**guess** [10] - 7:5, 49:7, 56:8, 66:23, 95:25, 133:1, 138:4, 148:25, 151:17, 210:1
**GuideLive** [1] - 16:6
**guys** [1] - 28:23

## H

**H-a-l-l** [1] - 154:22
**HAEFNER** [9] - 2:3, 125:1, 125:7, 125:10, 126:3, 126:14, 126:24, 217:20, 217:23
**half** [6] - 65:1, 102:22, 102:24, 197:12, 199:7, 201:7
**halfway** [1] - 84:20
**HALL** [6] - 3:11, 3:12, 3:13, 154:19, 155:1,

186:5
**Hall** [76] - 81:5, 85:11, 86:13, 86:19, 86:22, 87:5, 89:18, 91:1, 91:14, 91:19, 92:3, 92:8, 94:17, 95:6, 95:24, 96:25, 97:6, 97:22, 98:25, 99:9, 100:4, 100:20, 100:23, 103:10, 105:1, 105:6, 106:9, 107:20, 108:17, 108:25, 109:24, 110:20, 111:9, 111:16, 111:24, 112:19, 114:18, 122:5, 123:4, 125:19, 129:11, 139:16, 139:21, 140:4, 142:10, 143:7, 143:12, 143:18, 144:2, 144:10, 145:5, 145:10, 145:13, 154:17, 154:20, 154:22, 154:23, 155:2, 155:3, 155:9, 155:23, 156:4, 158:25, 159:13, 159:24, 167:10, 178:25, 181:21, 184:8, 186:6, 187:14, 187:17, 191:16, 206:12, 211:2
**Hall's** [5] - 91:17, 104:23, 155:14, 159:17, 190:12
**hand** [6] - 8:20, 70:10, 149:21, 183:4, 183:6, 217:3
**handed** [1] - 129:9
**handful** [1] - 133:8
**Handing** [6] - 11:14, 23:25, 26:25, 57:4, 101:17, 185:19
**handling** [1] - 45:4
**hands** [3] - 209:3, 209:7, 214:6
**hard** [4] - 69:12, 69:16, 150:19, 152:19
**harm** [1] - 120:19
**harmed** [1] - 120:16
**Haynes** [1] - 54:22
**head** [1] - 37:7
**headquarter's** [1] - 94:8
**headquarters** [1] - 66:17

**hear** [25] - 5:7, 22:3, 22:4, 22:7, 40:5, 51:7, 62:18, 82:2, 86:14, 127:2, 130:24, 132:21, 135:12, 135:14, 138:8, 143:3, 144:7, 152:3, 170:12, 171:20, 171:22, 186:23, 192:22, 192:24, 197:19

**heard** [31] - 15:5, 19:21, 29:19, 42:9, 51:4, 51:12, 51:19, 52:6, 61:6, 62:16, 82:13, 82:18, 82:19, 88:16, 88:19, 98:17, 106:20, 122:9, 129:25, 164:13, 165:11, 165:23, 173:23, 203:20, 206:19, 207:7, 207:8, 207:16, 207:22, 208:10, 209:11

**HEARING** [1] - 1:19

**hearing** [5] - 9:11, 106:18, 144:11, 156:7, 158:8

**hearsay** [7] - 20:2, 20:11, 20:25, 21:23, 22:1, 159:13, 159:14

**heat** [4] - 93:25, 94:4, 112:7, 165:11

**Hello** [1] - 63:17

**help** [4] - 25:25, 54:25, 129:1, 199:21

**helped** [1] - 69:14

**helps** [3] - 128:24, 181:13, 211:20

**HERRINGTON** [1] - 2:5

**hesitation** [1] - 189:8

**hid** [1] - 212:5

**hides** [1] - 213:11

**high** [6] - 108:1, 108:7, 109:10, 133:6, 133:8, 200:20

**higher** [2] - 71:23, 168:22

**highlight** [1] - 125:12

**hired** [2] - 190:15, 211:9

**historical** [1] - 153:20

**hit** [2] - 53:18, 137:24

**hits** [3] - 77:23, 85:1, 95:9

**hmm** [1] - 153:3

**Hold** [3] - 22:5, 37:22, 60:8

**hold** [1] - 84:2

**holder** [4] - 74:23, 75:5, 201:10, 201:19

**holder's** [1] - 74:23

**HOLLOWS** [1] - 2:9

**home** [4] - 18:22, 19:1, 19:2, 103:4

**honest** [1] - 152:20

**Honor** [185] - 5:5, 5:12, 5:14, 5:18, 5:19, 5:20, 6:3, 6:5, 6:8, 6:16, 6:18, 6:20, 7:10, 7:15, 7:18, 7:20, 8:17, 8:25, 9:8, 9:16, 9:17, 10:25, 11:10, 13:11, 13:15, 13:20, 13:23, 14:2, 15:2, 15:4, 15:14, 16:7, 17:3, 17:5, 17:13, 17:16, 20:2, 20:7, 20:18, 20:25, 21:10, 21:22, 21:25, 22:2, 22:3, 22:8, 22:9, 23:19, 24:9, 25:10, 26:22, 27:3, 30:15, 32:5, 32:7, 34:1, 35:21, 36:22, 37:25, 39:23, 41:4, 41:5, 43:15, 45:18, 45:21, 46:2, 46:3, 46:7, 46:8, 56:20, 60:9, 60:15, 60:25, 61:18, 62:11, 62:25, 63:7, 63:15, 63:18, 63:20, 64:7, 64:25, 65:4, 65:7, 65:10, 65:14, 68:8, 68:15, 68:22, 69:5, 69:9, 75:19, 76:17, 76:20, 95:15, 95:23, 96:8, 97:13, 100:8, 101:15, 103:18, 113:11, 121:23, 124:10, 124:18, 124:24, 125:1, 125:2, 125:8, 126:1, 126:3, 126:9, 126:15, 126:17, 126:23, 126:25, 127:8, 127:17, 133:20, 133:23, 139:6, 152:13, 153:19, 154:8, 154:17, 155:13, 155:17, 155:20, 156:3, 159:9, 159:12, 159:20, 166:25, 168:24, 169:3, 169:17, 169:20, 176:18,
184:2, 184:6, 185:6, 185:8, 185:17, 185:25, 186:4, 197:14, 197:21, 200:8, 203:24, 206:10, 206:18, 206:20, 206:25, 207:3, 207:7, 207:20, 207:22, 207:24, 208:4, 208:5, 208:10, 208:13, 208:21, 209:8, 209:10, 209:13, 212:3, 212:20, 213:2, 213:14, 213:19, 213:21, 214:13, 214:15, 214:22, 215:7, 215:9, 215:22, 215:25, 216:3, 216:7, 217:5, 217:9, 217:20

**Honor's** [2] - 8:15, 8:16

**HONORABLE** [1] - 1:14

**Hospital** [1] - 131:5

**hotel** [1] - 59:6

**hour** [4] - 65:2, 125:11, 126:2, 183:25

**hours** [3] - 102:23, 102:24, 125:4

**housekeeping** [1] - 125:2

**housing** [1] - 25:25

**Houston** [3] - 30:10, 44:2, 210:24

**hundred** [2] - 28:3, 152:7, 161:7, 163:21, 166:10

**hurdle** [2] - 209:18, 209:19

**hurt** [2] - 26:6, 28:19

**hurting** [1] - 53:20

**HVAC** [1] - 165:11

**hybrid** [2] - 201:13, 201:14

**hypothetical** [4] - 6:2, 6:18, 117:3, 117:6

---

**I**

**identification** [1] - 76:14

**identified** [11] - 5:22, 5:25, 21:21, 49:7, 100:15, 100:23, 100:24, 162:21,
191:9, 191:14, 192:3

**identify** [20] - 6:13, 13:17, 18:19, 24:3, 31:13, 36:18, 76:9, 107:20, 120:21, 121:5, 121:18, 121:19, 140:7, 179:3, 190:17, 191:7, 191:12, 192:12, 195:13, 211:3

**identifying** [2] - 5:23, 203:18

**idiots** [1] - 28:23

**ignored** [1] - 92:3

**immaterial** [1] - 99:23

**immediate** [1] - 71:3

**impact** [10] - 30:21, 30:24, 31:3, 33:10, 54:8, 69:16, 70:20, 72:9, 73:4, 167:17

**implement** [1] - 150:21

**implemented** [1] - 146:16

**importance** [1] - 163:13

**important** [1] - 168:16

**importantly** [1] - 52:4

**impose** [1] - 136:2

**improper** [1] - 107:1

**impunity** [1] - 99:20

**inappropriate** [2] - 122:13, 213:15

**Inc** [2] - 127:22, 127:24

**INC** [1] - 1:4

**incentive** [1] - 99:15

**incidents** [1] - 54:3

**include** [11] - 18:4, 67:13, 75:1, 94:1, 114:6, 135:8, 156:15, 168:19, 180:24, 201:6, 217:11

**included** [6] - 97:23, 112:9, 179:22, 180:9, 180:17, 198:17

**includes** [5] - 94:19, 99:1, 164:21, 164:22, 198:15

**including** [4] - 69:7, 97:24, 168:17, 168:21

**Including** [1] - 56:16, 128:8

**incompetent** [1] - 33:17

**increase** [8] - 72:9,
72:25, 116:17, 117:18, 117:22, 118:2, 118:5, 118:7

**increased** [2] - 31:1, 199:25

**increasing** [2] - 72:2, 72:14

**incremental** [67] - 76:15, 76:16, 80:1, 80:6, 86:23, 86:25, 87:24, 89:15, 90:19, 91:10, 92:14, 92:24, 93:3, 93:13, 93:17, 94:2, 94:3, 94:10, 94:13, 94:15, 94:17, 94:19, 94:24, 95:3, 100:3, 100:5, 100:19, 101:4, 113:19, 113:23, 114:11, 114:18, 114:19, 120:12, 168:1, 170:13, 170:15, 170:19, 170:20, 170:22, 171:12, 171:16, 171:21, 176:10, 176:11, 177:8, 177:10, 177:13, 184:11, 184:19, 184:22, 184:25, 185:3, 188:12, 189:1, 189:4, 189:7, 191:21, 201:12, 201:15, 202:10, 202:14, 202:16, 202:19, 202:25, 203:2, 217:11

**incur** [3] - 92:20, 114:2, 209:5

**incurred** [14] - 75:14, 90:7, 91:19, 114:13, 114:18, 165:6, 170:19, 175:8, 179:4, 181:3, 198:21, 198:22, 201:4, 209:6

**incurs** [2] - 171:4, 182:10

**indeed** [1] - 6:5

**Indeed** [1] - 54:18

**independent** [1] - 161:15

**independently** [1] - 156:11

**indicate** [5] - 27:23, 44:7, 76:25, 123:25, 130:17

**indicated** [10] - 9:20, 66:20, 66:21, 96:19, 124:3, 178:15,

**infringer** [10] - 10:2, 10:14, 10:15, 96:16, 104:10, 106:13, 106:23, 107:10, 190:10, 213:10
**infringer's** [4] - 9:20, 9:25, 74:20, 75:4
**infringing** [40] - 43:25, 80:9, 80:10, 81:22, 81:24, 82:3, 82:5, 82:6, 82:8, 82:21, 82:22, 83:7, 84:4, 86:9, 86:15, 88:2, 88:6, 88:8, 88:24, 89:1, 92:12, 92:16, 98:23, 103:14, 105:16, 108:3, 110:9, 110:13, 167:2, 167:3, 167:5, 190:25, 192:16, 195:22, 196:1, 196:5, 203:17
**inject** [1] - 209:3
**injunction** [11] - 18:7, 25:6, 25:8, 25:13, 25:16, 26:8, 148:12, 148:14, 148:21, 148:24, 208:24
**injunctive** [2] - 12:9, 12:13
**injury** [1] - 208:23
**input** [2] - 107:9, 107:11
**inputs** [2] - 107:2, 107:11
**inside** [1] - 144:19
**insignificant** [1] - 130:21
**instance** [8] - 59:15, 82:15, 83:8, 85:17, 97:23, 98:7, 98:24, 110:6
**instances** [2] - 12:23, 19:22
**instead** [5] - 121:6, 143:9, 144:14, 193:8, 193:23
**instructed** [1] - 13:12
**instructions** [2] - 97:20, 113:1
**intellectual** [3] - 56:25, 161:3, 161:9
**intending** [1] - 6:11
**intentionally** [1] - 214:24
**interest** [2] - 56:15, 56:18
**interestingly** [1] - 70:12
**internal** [2] - 128:15,

**indicates** [3] - 6:13, 73:20, 77:7
**indication** [1] - 178:2
**individual** [2] - 162:20, 203:22
**individuals** [3] - 50:23, 158:4, 165:15
**industry** [2] - 162:14
**inescapable** [1] - 67:25
**inexcusable** [1] - 207:4
**inform** [4] - 134:4, 134:16, 134:22, 137:5
**information** [59] - 14:15, 32:12, 34:23, 38:15, 38:17, 41:18, 49:14, 50:5, 52:11, 52:18, 53:14, 62:1, 62:3, 66:2, 66:4, 66:18, 66:22, 74:3, 77:19, 82:16, 82:20, 86:13, 86:16, 86:17, 95:6, 107:25, 108:6, 109:16, 110:11, 128:16, 128:18, 128:20, 128:22, 129:5, 129:7, 130:15, 138:20, 138:22, 138:24, 139:2, 139:17, 139:20, 145:8, 150:11, 150:13, 160:13, 162:13, 177:20, 177:23, 186:14, 187:10, 192:21, 193:6, 195:11, 196:3, 199:11, 200:16, 204:12, 205:5
**informed** [1] - 139:4
**infringe** [3] - 83:10, 99:20, 212:4
**infringed** [4] - 75:6, 82:23, 87:20, 211:21
**infringement** [23] - 9:23, 44:13, 117:16, 119:23, 193:8, 211:11, 211:13, 211:18, 211:20, 211:25, 212:1, 212:4, 212:16, 212:21, 212:22, 212:23, 213:11, 214:8, 214:12, 214:21, 214:22, 215:6

180:16, 182:10, 198:22, 214:7

130:16
**internally** [1] - 129:8
**Internet** [3] - 28:25, 42:9, 77:23
**interrupt** [2] - 88:23, 169:14
**introduce** [3] - 64:9, 155:2, 211:6
**introduced** [1] - 82:12, 121:11, 121:12
**investigate** [1] - 31:3
**invoice** [1] - 157:1
**invoices** [11] - 45:15, 95:5, 111:10, 128:17, 156:19, 156:22, 156:23, 175:18, 177:21, 177:24, 178:1
**involve** [2] - 205:20, 205:21
**involved** [6] - 107:15, 128:6, 128:11, 161:19, 194:14, 194:19
**IP** [2] - 146:13
**irrelevant** [1] - 163:10
**IRS** [17] - 66:8, 91:23, 92:2, 97:14, 97:20, 97:25, 107:22, 113:1, 123:9, 156:16, 157:21, 158:1, 158:4, 181:24, 182:23, 183:6, 183:20
**is..** [1] - 152:22
**isolate** [2] - 164:17, 193:13
**isolating** [1] - 166:1
**isolation** [1] - 165:10
**issue** [11] - 7:13, 9:6, 26:13, 42:17, 46:4, 86:6, 104:7, 157:1, 160:18, 163:22, 208:9
**Issues** [1] - 26:12
**issues** [4] - 6:19, 8:21, 10:17, 177:25
**IT** [1] - 66:18
**item** [8] - 80:15, 89:16, 94:20, 98:24, 112:20, 198:8, 198:18, 198:25
**items** [8] - 14:11, 14:12, 14:14, 25:24, 98:22, 189:1, 199:9, 204:7
**itself** [3] - 8:1, 29:25, 107:12
**IX** [2] - 182:6, 182:7

**J**

**January** [3] - 71:8, 102:3, 128:4
**JERSEY** [3] - 1:1, 1:11, 1:15
**Jersey** [6] - 148:19, 199:21, 200:24, 202:19, 202:21, 208:7
**Jewish** [2] - 207:14, 212:12
**Jimmie** [1] - 147:19
**Jimmy** [1] - 26:13
**jingle** [1] - 214:25
**job** [2] - 127:20, 150:25
**joined** [1] - 55:24
**joke** [1] - 147:19
**Journal** [1] - 26:3
**Joy** [1] - 43:18
**judge** [6] - 11:16, 12:8, 64:10, 77:17, 91:17, 192:9
**JUDGE** [1] - 1:15
**judgment** [2] - 99:3, 103:24
**judicial** [1] - 45:23
**July** [5] - 72:18, 72:24, 101:25, 102:18, 172:17
**jump** [1] - 72:4
**June** [31] - 71:1, 71:20, 71:21, 71:23, 72:24, 73:5, 76:13, 79:2, 114:25, 117:19, 120:13, 131:25, 132:16, 132:23, 133:3, 133:7, 135:1, 144:23, 144:25, 160:4, 160:14, 167:22, 168:2, 168:7, 168:10, 173:19, 173:21, 177:1, 179:14, 179:16, 186:11
**jungle** [1] - 26:14
**jury** [18] - 9:3, 13:4, 14:6, 15:21, 19:21, 25:15, 29:22, 119:20, 119:23, 120:1, 120:6, 130:7, 131:21, 132:12, 138:4, 211:25, 214:7, 215:5
**jury's** [1] - 145:15
**justified** [1] - 173:4

**K**

**K's** [1] - 84:17
**K4K** [94] - 8:6, 13:5, 17:25, 19:22, 20:10, 20:15, 20:23, 22:1, 23:9, 27:9, 27:17, 27:18, 27:23, 27:24, 29:20, 30:13, 37:10, 37:12, 37:20, 38:3, 38:12, 38:17, 39:2, 39:4, 39:22, 40:16, 40:17, 40:25, 41:3, 41:12, 41:21, 42:8, 43:8, 44:8, 44:12, 58:22, 59:4, 59:5, 59:12, 61:10, 61:17, 62:1, 67:2, 70:5, 70:14, 70:23, 72:2, 72:3, 73:6, 73:15, 78:24, 79:2, 85:5, 86:8, 92:18, 111:1, 114:20, 120:9, 121:1, 142:22, 143:22, 144:9, 145:15, 145:18, 146:16, 146:19, 147:21, 155:6, 186:14, 187:8, 188:1, 188:25, 189:20, 189:23, 191:10, 192:4, 192:10, 192:18, 196:2, 196:6, 196:18, 196:25, 198:5, 199:2, 199:12, 199:15, 199:20, 200:3, 200:20, 201:4, 204:13, 209:15, 211:17
**K4K's** [17] - 38:13, 44:20, 45:5, 58:15, 75:15, 79:7, 79:20, 79:23, 80:1, 114:17, 123:23, 140:8, 186:6, 186:11, 190:4, 190:12, 196:11
**k4k-111** [2] - 4:16, 155:21
**K4K-111** [1] - 215:16
**K4K-24** [1] - 215:17
**K4K-500** [3] - 4:15, 133:25, 215:15
**K4K-DX-509** [1] - 215:17
**K4KDX-505** [1] - 159:21
**K4KDX-507** [6] - 4:17,

167:8, 169:1, 169:8, 185:23, 215:16

**K4KDX-508** [5] - 4:18, 172:22, 173:8, 173:12, 215:17

**K4KDX-509** [4] - 4:19, 176:13, 176:19, 176:22

**K4KDX-513** [4] - 4:20, 178:6, 178:18, 178:22

**K4KDX-523** [6] - 4:21, 184:7, 185:9, 185:13, 185:24, 215:18

**K4KDX-535** [1] - 164:7

**K4KX-24** [1] - 181:19

**K4KX-25** [1] - 38:9

**K4KX-500** [3] - 133:12, 133:20, 134:12

**K4KX-510** [2] - 158:23, 159:10

**KARS** [1] - 1:4

**Kars** [219] - 5:10, 10:22, 13:5, 14:15, 14:16, 16:1, 16:18, 18:8, 21:18, 21:21, 22:15, 24:20, 26:12, 27:13, 28:15, 29:1, 29:4, 29:17, 31:8, 33:13, 38:6, 38:12, 39:9, 39:12, 42:10, 43:18, 43:21, 44:2, 46:22, 47:15, 47:22, 48:4, 49:8, 50:14, 51:7, 58:16, 70:10, 71:11, 75:7, 75:20, 76:12, 77:6, 77:8, 77:9, 78:4, 78:14, 84:17, 85:11, 91:20, 93:21, 96:22, 98:2, 102:5, 102:6, 102:16, 104:21, 105:4, 105:14, 105:19, 106:2, 106:3, 106:9, 107:21, 108:17, 109:12, 110:21, 111:5, 111:6, 111:17, 111:25, 113:12, 114:1, 114:24, 115:3, 115:8, 115:14, 115:21, 115:24, 116:2, 116:4, 116:11, 116:21, 116:24, 116:25, 117:4, 117:9, 117:25, 118:8,

119:7, 119:12, 120:2, 120:12, 120:21, 120:22, 121:6, 121:18, 123:1, 124:1, 124:5, 127:10, 127:21, 127:24, 127:25, 128:5, 128:17, 129:10, 130:6, 130:10, 131:13, 131:16, 131:19, 131:23, 132:3, 132:6, 132:9, 132:22, 133:9, 133:15, 133:17, 134:14, 134:15, 134:18, 135:2, 135:5, 136:6, 136:15, 136:20, 137:2, 137:18, 138:9, 139:18, 148:1, 148:3, 149:2, 150:4, 150:21, 151:1, 151:25, 153:9, 154:16, 156:12, 156:17, 156:18, 157:4, 157:21, 158:11, 159:7, 159:9, 160:3, 160:17, 161:14, 162:1, 162:2, 162:17, 163:7, 163:16, 164:16, 166:13, 166:23, 167:22, 168:6, 168:7, 168:16, 168:19, 168:25, 169:13, 169:24, 170:6, 170:25, 171:9, 172:4, 172:7, 172:9, 172:12, 173:7, 173:15, 174:3, 174:4, 174:9, 174:20, 174:21, 175:7, 175:16, 177:6, 177:18, 177:20, 178:17, 179:4, 179:13, 181:4, 181:9, 181:22, 181:25, 182:5, 182:9, 182:18, 182:20, 182:22, 184:12, 189:17, 189:21, 196:20, 196:24, 200:10, 200:13, 201:6, 206:17, 207:9, 207:10, 208:3, 208:9, 208:15, 213:25, 214:1, 215:14

**Kars4Kids.com** [2] - 46:22, 46:25

**Kaufman** [12] - 63:16, 63:17, 64:21, 65:13, 69:4, 101:14, 125:18, 156:5, 169:14, 169:23, 185:21, 206:16

**KAUFMAN** [64] - 2:6, 3:8, 3:12, 63:18, 63:20, 64:24, 65:3, 65:7, 65:14, 68:8, 69:5, 76:20, 95:15, 96:8, 100:10, 101:19, 113:11, 114:14, 115:6, 121:22, 124:9, 125:25, 154:16, 155:1, 155:6, 155:13, 155:20, 155:23, 156:6, 158:23, 159:9, 159:19, 159:23, 160:22, 164:6, 166:25, 167:7, 167:9, 168:24, 169:10, 169:12, 169:17, 169:20, 172:22, 173:7, 173:14, 175:21, 176:13, 176:18, 176:24, 178:5, 178:17, 178:24, 181:18, 182:1, 184:2, 184:6, 185:5, 185:8, 185:15, 185:25, 200:8, 206:10, 206:17

**keep** [5] - 33:18, 35:12, 94:8, 123:9, 203:23

**keeping** [4] - 125:3, 125:7, 128:17, 154:12

**keeps** [1] - 94:9

**kept** [5] - 31:18, 31:21, 35:9, 38:17, 157:16

**key** [1] - 59:1

**KIDS** [1] - 1:4

**kids** [1] - 67:22

**Kids** [252] - 5:8, 5:10, 8:4, 10:19, 10:22, 10:25, 11:19, 11:21, 12:4, 12:7, 12:12, 13:1, 13:5, 13:8, 13:20, 14:15, 14:16, 16:1, 16:18, 18:8, 20:16, 21:18, 21:21, 24:20, 25:15, 25:21, 25:22, 26:9, 26:12,

26:20, 27:13, 28:15, 28:19, 29:2, 29:4, 29:12, 29:14, 29:17, 29:24, 30:9, 30:21, 30:24, 31:2, 31:6, 31:8, 31:13, 31:19, 32:15, 33:4, 33:13, 33:20, 34:6, 36:8, 36:9, 36:13, 36:21, 37:11, 38:6, 38:12, 38:16, 39:5, 39:9, 39:12, 42:10, 43:18, 43:21, 43:22, 44:1, 44:2, 45:8, 46:22, 47:15, 47:19, 47:22, 48:4, 49:8, 49:21, 49:23, 50:9, 50:14, 50:21, 51:8, 51:9, 51:16, 52:5, 53:11, 53:15, 57:2, 57:8, 57:10, 57:11, 57:22, 57:25, 58:16, 58:24, 59:13, 63:7, 63:21, 66:16, 67:3, 67:20, 70:4, 70:10, 70:14, 71:5, 72:1, 72:7, 72:8, 75:7, 75:20, 76:12, 76:18, 78:14, 85:11, 93:21, 98:2, 104:21, 105:14, 105:19, 106:2, 106:3, 107:21, 111:5, 111:6, 113:12, 114:1, 114:24, 115:3, 115:14, 115:24, 116:2, 116:11, 116:21, 116:24, 116:25, 117:4, 117:9, 117:21, 118:8, 120:22, 121:6, 121:18, 123:1, 124:1, 124:6, 127:10, 127:21, 127:24, 127:25, 128:5, 128:17, 130:6, 130:10, 131:13, 131:16, 131:19, 131:23, 132:3, 132:6, 132:9, 132:22, 133:9, 133:15, 133:17, 134:14, 134:15, 134:18, 135:2, 135:5, 136:6, 136:15, 136:21, 137:2, 137:19, 138:9, 139:18, 148:1, 148:3, 149:2, 149:9, 150:4, 150:21, 151:1,

151:3, 151:25, 153:9, 154:16, 156:12, 156:18, 158:11, 159:9, 161:14, 162:1, 162:2, 162:18, 166:13, 166:23, 168:16, 168:25, 170:6, 170:25, 171:9, 172:5, 172:7, 172:9, 173:7, 173:15, 174:3, 174:4, 174:9, 174:20, 174:21, 175:7, 175:16, 177:20, 178:17, 179:4, 181:4, 181:9, 181:25, 182:5, 182:9, 182:18, 182:22, 184:12, 189:10, 189:16, 189:17, 189:21, 196:20, 196:24, 200:10, 200:13, 201:6, 206:17, 207:9, 207:10, 208:3, 208:9, 208:11, 208:15, 211:24, 212:5, 212:18, 213:25, 214:1, 215:14

**Kids'** [42] - 22:15, 34:25, 70:6, 71:12, 96:22, 102:5, 102:6, 102:16, 105:4, 106:10, 108:17, 109:13, 110:21, 111:25, 115:9, 115:21, 116:5, 119:12, 120:2, 120:12, 120:22, 129:10, 157:5, 157:21, 159:7, 160:3, 160:17, 163:7, 163:16, 164:16, 167:22, 168:6, 168:7, 168:20, 169:13, 169:24, 172:13, 177:6, 177:19, 179:13, 181:22, 182:20

**Kids's** [1] - 111:17

**kind** [14] - 75:9, 76:1, 82:20, 83:23, 93:23, 99:21, 135:17, 135:21, 148:6, 157:7, 165:14, 166:4, 192:24, 217:14

**kinds** [5] - 12:23,

25:21, 60:19, 60:22
**KINKADE** [13] - 2:9, 3:10, 3:10, 133:23, 139:8, 147:21, 149:4, 149:18, 150:17, 150:20, 152:13, 153:12, 153:19, 153:22
**Kinkade** [2] - 139:11, 150:15
**Klemchuck** [2] - 55:1, 55:7
**knife** [2] - 54:12, 54:13
**knowing** [1] - 214:23
**knowledge** [2] - 32:2, 35:18
**known** [5] - 61:12, 207:9, 207:10, 212:14, 212:18
**knows** [3] - 5:20, 22:11, 22:15

---

## L

**L-a-n-d-a-u** [1] - 127:16
**labeled** [2] - 181:20, 217:23
**labor** [8] - 164:22, 165:8, 165:9, 168:20, 180:2, 180:3, 180:11
**laches** [18] - 126:17, 127:2, 206:19, 207:3, 209:7, 209:14, 209:19, 209:20, 210:7, 210:16, 211:20, 212:2, 213:12, 213:14, 214:7, 214:21, 215:4
**laid** [1] - 22:22
**land** [2] - 149:11, 149:15
**LANDAU** [8] - 3:9, 3:10, 3:10, 3:11, 127:12, 127:18, 139:8, 152:15
**Landau** [16] - 127:11, 127:14, 127:19, 128:11, 130:24, 131:13, 133:14, 134:3, 139:9, 147:23, 149:24, 150:16, 153:2, 154:10, 186:23, 210:19
**landed** [1] - 149:9
**landing** [3] - 27:13,

29:17, 142:25
**landscape** [1] - 66:12
**Lanham** [5] - 74:10, 74:23, 93:1, 99:16, 104:2
**large** [4] - 75:23, 91:21, 123:18
**largest** [7] - 29:10, 67:19, 168:16, 176:7, 179:24, 180:1, 183:16
**last** [15] - 13:12, 34:5, 34:8, 56:9, 64:2, 64:19, 70:1, 70:2, 70:7, 72:17, 91:14, 127:15, 150:8, 151:25, 154:20
**lastly** [1] - 67:20
**late** [3] - 125:5, 147:15, 147:16
**latest** [3] - 47:14, 70:17, 76:11
**laugh** [1] - 26:13
**Law** [1] - 55:18
**law** [11] - 6:24, 7:21, 7:22, 10:1, 44:19, 54:19, 55:7, 207:3, 214:19, 216:8, 216:11
**LAW** [2] - 2:11, 2:14
**lawn** [1] - 47:7
**lawsuit** [8] - 40:11, 40:16, 45:6, 57:25, 58:4, 65:23, 210:8, 213:13
**lawyers** [5] - 42:19, 42:22, 45:4, 211:9, 211:10
**lead** [4] - 38:17, 58:22, 60:18, 60:23
**leaning** [1] - 127:3
**learn** [2] - 50:1, 56:6
**lease** [1] - 205:1
**least** [3] - 104:4, 118:10, 207:24
**leave** [2] - 127:5, 215:11
**leaves** [1] - 99:13
**lectured** [1] - 68:19
**led** [2] - 24:22, 213:13
**ledger** [22] - 98:21, 108:18, 108:19, 108:23, 109:5, 109:9, 109:13, 110:3, 110:6, 110:11, 110:15, 156:18, 157:5, 157:6, 157:12, 175:16, 175:19, 177:20, 177:23,

177:24, 178:2, 178:3
**left** [16] - 7:14, 72:3, 90:6, 90:11, 90:12, 90:15, 99:13, 99:19, 116:7, 116:19, 122:23, 123:1, 125:11, 164:13, 183:6, 212:6
**left-hand** [1] - 183:6
**legal** [13] - 43:9, 95:16, 103:19, 156:15, 159:14, 160:18, 190:7, 190:9, 191:5, 196:12, 201:2, 201:3, 201:7
**legitimate** [1] - 98:9
**less** [5] - 79:16, 116:12, 116:22, 116:23, 164:20
**letter** [29] - 37:17, 38:2, 38:4, 38:10, 39:15, 39:18, 41:3, 42:23, 43:16, 44:3, 44:6, 44:9, 44:12, 44:14, 50:17, 50:24, 50:25, 52:12, 59:4, 207:11, 207:25, 209:25, 210:1, 211:10, 211:23, 213:6, 213:10, 215:19
**letters** [1] - 34:5
**level** [13] - 76:2, 91:20, 102:8, 102:13, 108:1, 108:2, 108:7, 109:10, 110:2, 111:8, 124:4, 157:7
**liability** [10] - 12:18, 29:19, 62:13, 117:11, 117:15, 155:8, 155:25, 181:19, 207:8, 214:4
**Licenses** [2] - 197:6, 198:2
**licenses** [2] - 197:9, 198:5
**lieu** [2] - 126:14, 126:16
**life** [1] - 65:2
**lighter** [1] - 72:12
**likelihood** [1] - 12:20
**likely** [6] - 116:11, 116:22, 118:2, 162:16, 162:19, 162:22
**limitation** [1] - 136:2
**limitations** [4] - 208:7, 210:13, 210:16
**limited** [3] - 151:7,

151:11, 151:14
**Limited** [1] - 151:15
**line** [22] - 49:15, 70:3, 70:5, 76:15, 80:15, 98:22, 98:24, 100:5, 112:19, 114:22, 114:23, 146:5, 151:4, 167:16, 179:18, 182:16, 182:19, 183:5, 190:19, 191:2, 198:18, 204:7
**lines** [2] - 19:8, 171:23
**link** [1] - 148:4
**links** [1] - 24:24
**list** [2] - 5:21, 150:23
**listed** [3] - 156:20, 163:2, 180:14
**listen** [1] - 127:4, 159:17
**listened** [3] - 23:1, 23:5, 138:9
**listening** [1] - 32:23
**lists** [1] - 5:20
**literally** [1] - 215:1
**litigation** [4] - 54:20, 56:3, 64:16, 172:11
**LITTERINE** [64] - 2:6, 3:8, 3:12, 63:18, 63:20, 64:24, 65:3, 65:7, 65:14, 68:8, 69:5, 76:20, 95:15, 96:8, 100:10, 101:19, 113:11, 114:14, 115:6, 121:22, 124:9, 125:25, 154:16, 155:1, 155:13, 155:20, 155:23, 156:6, 158:23, 159:9, 159:19, 159:23, 160:22, 164:6, 166:25, 167:7, 167:9, 168:24, 169:10, 169:12, 169:17, 169:20, 172:22, 173:7, 173:14, 175:21, 176:13, 176:18, 176:24, 178:5, 178:17, 178:24, 181:18, 182:1, 184:2, 184:6, 185:5, 185:8, 185:15, 185:25, 200:8, 206:10, 206:17
**Litterine** [1] - 63:16
**Litterine-Kaufman** [1] - 63:16

**LITTERINE-KAUFMAN** [64] - 2:6, 3:8, 3:12, 63:18, 63:20, 64:24, 65:3, 65:7, 65:14, 68:8, 69:5, 76:20, 95:15, 96:8, 100:10, 101:19, 113:11, 114:14, 115:6, 121:22, 124:9, 125:25, 154:16, 155:1, 155:6, 155:13, 155:20, 155:23, 156:6, 158:23, 159:9, 159:19, 159:23, 160:22, 164:6, 166:25, 167:7, 167:9, 168:24, 169:10, 169:12, 169:17, 169:20, 172:22, 173:7, 173:14, 175:21, 176:13, 176:18, 176:24, 178:5, 178:17, 178:24, 181:18, 182:1, 184:2, 184:6, 185:5, 185:8, 185:15, 185:25, 200:8, 206:10, 206:17
**live** [1] - 30:5
**living** [5] - 11:17, 64:10, 186:15, 186:21, 187:2
**LLP** [3] - 2:2, 2:5, 2:8
**local** [2] - 14:16, 56:2
**located** [6] - 58:11, 131:14, 131:16, 131:24, 132:1, 138:24, 138:25, 144:19, 144:24
**location** [2] - 93:22, 198:24
**logos** [1] - 214:24
**Look** [1] - 197:6
**look** [49] - 13:7, 14:22, 15:23, 16:14, 16:23, 18:6, 18:7, 18:10, 21:5, 22:18, 27:9, 28:20, 29:13, 31:9, 31:12, 33:17, 35:2, 36:15, 38:9, 40:12, 43:6, 45:1, 67:5, 69:12, 71:6, 72:22, 76:7, 84:8, 84:20, 90:12, 92:15, 93:12, 99:24, 112:15, 148:13, 161:23, 190:19, 195:11,

195:13, 196:25, 197:5, 198:8, 198:17, 210:3, 212:16, 213:6, 213:8, 214:15

**looked** [10] - 12:2, 25:14, 25:18, 44:23, 72:9, 76:1, 86:3, 90:25, 113:19, 182:22

**looking** [30] - 7:6, 17:24, 19:12, 21:13, 22:18, 23:18, 27:6, 27:17, 29:11, 33:13, 43:14, 47:3, 47:4, 47:9, 47:10, 47:11, 57:5, 58:16, 59:8, 66:10, 88:24, 94:24, 141:2, 141:17, 178:11, 179:25, 180:17, 188:21, 198:1, 209:23

**looks** [3] - 44:23, 70:16, 85:20

**loosely** [1] - 32:17

**loosey** [1] - 217:15

**loosey-goosey** [1] - 217:15

**losing** [1] - 70:8

**loss** [4] - 7:2, 7:6, 9:15, 10:8

**losses** [2] - 209:4, 209:6

**lost** [7] - 10:2, 10:13, 70:14, 74:17, 94:6, 120:17, 171:17

**Louis** [1] - 53:22

**low** [2] - 76:2, 133:6

**lower** [3] - 71:9, 72:23, 124:4

**lunch** [2] - 103:2, 103:7

## M

**mail** [2] - 83:22, 192:18

**mailers** [1] - 207:12

**mailings** [1] - 62:17

**main** [4] - 19:5, 73:5, 77:24, 148:4

**maintain** [3] - 15:4, 114:2, 205:11

**maintained** [2] - 133:17, 199:10

**Maintenance** [1] - 199:6

**major** [1] - 180:11

**majority** [1] - 118:5

**Malcolm** [4] - 11:1, 11:7, 11:18, 66:14

**MALCOLM** [10] - 3:2, 3:3, 3:4, 3:5, 3:6, 11:5, 11:15, 46:10, 56:23, 62:12

**manage** [1] - 26:9

**management** [11] - 64:15, 93:7, 97:19, 113:6, 164:23, 165:8, 165:9, 168:20, 180:2, 182:14, 196:22

**managing** [2] - 64:11, 155:3

**MARC** [1] - 2:3

**March** [5] - 44:6, 44:9, 44:11, 44:13, 102:3

**mark** [43] - 13:9, 36:8, 36:10, 36:12, 49:24, 58:3, 67:20, 67:24, 74:23, 75:5, 81:22, 81:24, 82:3, 82:5, 82:6, 82:8, 82:14, 83:18, 83:19, 83:20, 83:22, 83:23, 84:6, 84:7, 84:9, 84:11, 86:9, 86:15, 88:8, 105:16, 117:16, 148:1, 148:3, 167:23, 190:25, 192:16, 193:8, 196:1, 201:10, 203:17, 209:4, 211:24

**marked** [49] - 4:3, 4:4, 4:5, 4:6, 4:7, 4:8, 4:9, 4:10, 4:11, 4:12, 4:13, 4:14, 4:15, 4:16, 4:17, 4:18, 4:19, 4:20, 4:21, 13:7, 15:18, 15:23, 16:12, 16:14, 17:21, 18:10, 19:18, 23:15, 24:2, 24:13, 27:9, 31:12, 32:9, 35:2, 35:25, 36:15, 37:1, 65:16, 71:1, 76:22, 100:12, 133:25, 155:21, 169:8, 173:12, 176:22, 178:22, 185:13, 217:22

**market** [19] - 65:25, 67:8, 67:9, 67:11, 67:14, 68:2, 68:24, 69:13, 71:11, 72:3, 81:14, 117:25, 119:7, 121:2, 155:24, 161:14,

163:5, 207:12, 209:4

**marketing** [6] - 106:19, 108:18, 108:20, 108:23, 109:3, 127:25

**marketplace** [1] - 123:16

**marks** [11] - 67:20, 104:22, 106:4, 116:25, 117:4, 120:23, 121:7, 121:18, 168:7, 211:17, 215:6

**Marquez** [1] - 36:19

**Marsal** [2] - 155:4, 155:5

**Marvell** [1] - 214:16

**matched** [2] - 178:1

**material** [3] - 11:25, 90:25, 202:12

**materials** [15] - 88:21, 91:1, 91:4, 156:13, 156:14, 157:4, 195:8, 195:13, 195:14, 195:19, 202:3, 202:17, 202:24, 203:16, 207:13

**math** [2] - 115:2, 120:7

**Matter** [1] - 218:9

**matter** [10] - 44:18, 65:22, 76:11, 86:11, 109:4, 110:6, 125:2, 161:5, 175:10, 218:14

**matters** [6] - 81:10, 161:4, 166:1, 175:9, 195:1, 205:20

**McCarthy** [3] - 10:3, 10:8, 91:6

**mean** [22] - 29:4, 30:14, 30:18, 43:1, 61:18, 73:12, 77:13, 83:2, 95:8, 104:18, 109:7, 111:7, 125:5, 125:14, 126:21, 132:15, 143:13, 147:18, 149:3, 187:16, 214:13, 217:14

**means** [5] - 30:3, 48:15, 73:14, 198:11, 214:22

**meant** [1] - 30:12

**measure** [7] - 7:1, 10:7, 132:13, 158:21, 179:11, 184:11, 191:21

**measures** [1] - 93:18

**media** [1] - 176:2

**meet** [1] - 139:10

**meeting** [3] - 37:5, 37:8, 45:2

**meets** [1] - 92:25

**Mellon** [1] - 214:16

**mental** [1] - 115:2

**mentioned** [18] - 34:22, 51:4, 70:19, 75:20, 86:16, 104:4, 109:20, 141:9, 147:6, 156:5, 156:21, 157:4, 157:16, 162:3, 163:3, 168:12, 171:14, 184:10

**mentions** [1] - 147:18

**merited** [1] - 105:23

**merits** [2] - 213:15, 213:16

**message** [1] - 134:21

**met** [1] - 139:12

**method** [12] - 83:24, 93:4, 170:7, 170:11, 170:20, 181:1, 184:14, 184:20, 195:20, 202:14, 202:15

**methodologies** [2] - 158:18, 158:21

**methodology** [8] - 74:19, 75:4, 80:12, 83:6, 170:1, 194:2, 195:23, 202:2

**methods** [3] - 67:18, 170:8, 184:17

**Microsoft** [5] - 111:18, 111:21, 174:17, 174:24, 174:25

**might** [8] - 54:13, 72:8, 83:9, 110:7, 116:16, 165:15, 192:23

**million** [67] - 45:10, 77:2, 78:19, 78:22, 79:4, 79:5, 79:9, 79:18, 80:11, 81:15, 84:1, 87:12, 87:13, 87:14, 87:18, 88:5, 89:6, 89:8, 89:13, 89:15, 89:18, 100:2, 100:6, 100:15, 100:16, 100:17, 100:23, 101:2, 101:3, 114:21, 119:13, 119:14, 120:3, 152:1, 152:7, 160:7, 163:25, 167:19, 168:9, 168:11, 179:17,

180:4, 180:6, 186:19, 187:24, 188:7, 189:12, 189:13, 189:14, 189:17, 189:19, 189:22, 189:23, 199:7, 203:9, 204:3, 204:5, 204:6, 204:21, 204:22, 205:9, 205:15

**mind** [1] - 162:4

**mine** [1] - 194:6

**Mintz** [1] - 62:16

**minute** [2] - 151:23, 154:13

**minutes** [17] - 63:10, 124:21, 125:11, 125:17, 125:23, 125:25, 126:6, 126:12, 139:14, 144:17, 154:13, 154:14, 183:25, 203:22, 203:23

**misapplication** [1] - 122:10

**misled** [1] - 12:16

**mission** [24] - 67:21, 90:16, 91:22, 91:24, 97:16, 97:22, 123:3, 161:23, 161:24, 162:3, 163:1, 163:14, 165:7, 168:15, 168:21, 179:5, 179:6, 180:8, 181:9, 181:10, 181:12, 181:15, 183:15, 198:13

**missions** [1] - 181:13

**mistake** [1] - 137:7

**misuse** [1] - 122:10

**mixed** [1] - 140:11

**model** [2] - 77:21, 123:17

**modifications** [2] - 136:20, 136:22

**modified** [2] - 136:5, 136:15

**moment** [5] - 33:2, 34:22, 39:21, 45:18, 190:21

**monetary** [3] - 74:11, 74:22, 99:21

**money** [10] - 25:6, 25:7, 80:16, 80:25, 85:17, 99:18, 163:13, 200:14, 204:10, 204:13

**month** [7] - 35:6, 71:19, 72:14, 72:22, 138:3, 141:25,

174:10
**monthly** [3] - 71:5, 71:20, 72:7
**months** [3] - 55:10, 72:18, 138:4
**Moreover** [1] - 10:10
**moreover** [1] - 208:5
**morning** [10] - 5:1, 5:2, 5:19, 11:8, 11:10, 46:11, 46:12, 129:23, 130:24, 150:1
**Morning** [1] - 210:23
**mortgage** [2] - 93:23, 112:7
**Moskovits** [2] - 62:16, 145:14
**most** [13] - 74:11, 104:19, 118:16, 140:24, 151:6, 166:19, 177:11, 180:23, 183:19, 187:5, 206:21, 211:3, 211:4
**Most** [2] - 140:23, 181:9
**move** [15] - 15:2, 15:14, 16:7, 17:3, 17:13, 18:13, 19:14, 21:10, 23:11, 24:9, 133:20, 168:25, 173:7, 185:9, 196:9
**moves** [1] - 159:10
**moving** [1] - 42:18
**mower** [1] - 47:8
**Mr..** [1] - 166:24
**multiplied** [1] - 89:2
**multiply** [1] - 87:19
**multiplying** [1] - 89:7
**multitude** [2] - 25:24, 162:16
**must** [1] - 96:15

### N

**name** [33] - 11:6, 11:18, 12:15, 26:5, 33:13, 33:16, 33:22, 34:6, 34:17, 34:18, 50:14, 50:15, 53:15, 59:13, 59:14, 63:25, 64:2, 64:11, 71:10, 71:22, 72:3, 73:6, 73:10, 73:13, 73:23, 127:13, 127:15, 130:2, 131:1, 154:21, 181:24, 208:15, 214:1
**names** [3] - 28:1,

192:18, 214:25
**national** [34] - 53:3, 85:4, 91:20, 95:2, 95:4, 102:8, 102:13, 135:10, 140:8, 140:18, 141:2, 141:8, 143:18, 143:20, 143:21, 145:21, 145:23, 146:17, 147:8, 147:13, 147:14, 171:11, 175:17, 175:23, 175:24, 176:4, 176:6, 177:7, 177:14, 177:15, 194:9, 203:13, 210:19
**National** [1] - 26:19
**nationally** [7] - 50:9, 171:2, 171:4, 172:5, 180:10, 198:22, 207:14
**Nationwide** [2] - 18:3, 27:20
**nationwide** [9] - 18:4, 18:8, 119:10, 119:13, 120:9, 129:21, 135:7, 177:1, 177:19
**nature** [6] - 61:20, 66:7, 76:3, 112:4, 112:6, 216:22
**near** [4] - 31:25, 35:15, 176:7, 203:24
**necessarily** [3] - 25:1, 48:14, 108:1
**necessary** [10] - 9:22, 25:17, 45:9, 75:2, 81:20, 136:19, 136:22, 161:6, 208:24, 214:14
**need** [17] - 6:13, 21:12, 22:17, 68:13, 98:20, 117:16, 125:17, 126:4, 185:23, 188:1, 188:3, 199:21, 199:22, 199:25, 215:16, 216:6
**needed** [3] - 90:9, 90:10, 158:14
**needs** [2] - 14:1, 27:5
**negative** [2] - 53:18, 54:8
**net** [24] - 76:5, 76:14, 78:4, 78:10, 78:15, 79:13, 79:15, 79:21, 87:18, 89:3, 89:4, 89:5, 89:6, 99:11, 100:2, 115:15,

160:3, 160:6, 160:15, 167:22, 168:6, 186:11, 189:13
**Net** [1] - 78:13
**netted** [1] - 189:21
**never** [16] - 51:21, 84:9, 88:16, 90:23, 93:6, 93:8, 99:22, 106:20, 107:14, 107:16, 120:20, 194:10, 194:16, 202:1, 202:4, 205:16
**new** [4] - 47:9, 56:5, 59:24, 89:8, 120:2, 126:20, 126:24, 130:22, 145:15
**New** [8] - 148:19, 199:21, 200:24, 202:18, 202:21, 208:7, 213:7, 213:8
**NEW** [3] - 1:1, 1:11, 1:15
**News** [5] - 14:11, 19:2, 19:6, 19:12, 210:23
**newspaper** [1] - 24:18
**Next** [6] - 20:13, 25:12, 60:13, 63:6, 154:15, 200:11
**next** [14] - 27:21, 48:22, 63:14, 65:9, 70:16, 86:21, 87:1, 113:10, 125:24, 137:11, 169:25, 170:1, 184:20, 196:9
**NICK** [2] - 2:12
**night** [2] - 147:15, 147:16
**NO** [1] - 1:5
**non** [16] - 73:19, 80:10, 82:8, 82:22, 83:7, 84:4, 88:2, 88:6, 88:24, 89:1, 94:10, 103:14, 167:3, 190:9, 195:22, 196:12
**non-incremental** [1] - 94:10
**non-infringing** [12] - 80:10, 82:8, 82:22, 83:7, 84:4, 88:2, 88:6, 88:24, 89:1, 103:14, 167:3, 195:22
**non-legal** [2] - 190:9, 196:12
**none** [4] - 94:4, 94:5, 108:20, 108:21
**Nonprofit** [1] - 26:2
**nonprofit** [23] - 90:20,

90:21, 91:11, 99:17, 106:13, 106:23, 107:10, 107:17, 107:25, 108:6, 122:11, 122:22, 122:25, 123:3, 158:2, 182:11, 194:15, 194:18, 195:18, 205:11, 205:17, 205:19, 205:21
**nonprofit's** [1] - 182:23
**nonprofits** [4] - 107:6, 122:4, 156:16, 158:1
**nonresponsive** [1] - 197:14
**normal** [1] - 157:17
**normally** [1] - 66:2
**not-for-profit** [7] - 89:25, 90:14, 165:22, 166:4, 183:13, 183:15, 183:17
**note** [3] - 33:11, 183:2, 184:24
**notebook** [1] - 11:12
**notes** [1] - 44:23
**Nothing** [2] - 145:20, 152:13
**nothing** [5] - 53:18, 59:13, 107:12, 212:6, 212:7
**notice** [5] - 30:8, 37:8, 45:23, 153:4, 208:8
**notify** [1] - 133:9
**notion** [2] - 163:12, 165:25
**notorious** [3] - 207:15, 209:16, 210:21
**notoriously** [1] - 208:3
**NOVEMBER** [1] - 1:10
**November** [8] - 16:25, 72:13, 72:15, 72:21, 108:8, 132:23, 133:3, 218:16
**nowhere** [1] - 176:7
**Number** [2] - 7:24, 208:4
**number** [55] - 8:18, 8:22, 13:13, 18:16, 21:14, 21:16, 21:19, 22:9, 22:11, 22:15, 23:8, 25:14, 32:19, 32:21, 32:22, 32:24, 43:13, 54:19, 67:15, 68:1, 69:11, 70:13, 75:19, 75:22, 76:16,

77:4, 77:5, 79:20, 80:15, 86:17, 89:9, 91:21, 99:12, 100:6, 101:2, 107:12, 115:15, 118:15, 118:16, 129:22, 132:24, 138:21, 138:23, 151:7, 151:11, 151:14, 151:15, 156:19, 161:22, 183:3, 185:21, 187:23, 188:23, 190:14, 205:13
**numbers** [12] - 31:1, 68:6, 70:17, 85:7, 85:9, 85:12, 85:13, 119:16, 119:18, 153:18, 192:19
**Numeral** [1] - 182:6
**numerator** [7] - 164:14, 164:17, 164:21, 165:4, 166:3, 166:20

### O

**O'REILLY** [1] - 2:2
**O'Reilly** [1] - 26:14
**o-r-g** [1] - 33:8
**object** [8] - 13:24, 23:12, 61:1, 64:22, 68:8, 103:18, 167:24, 185:10
**objection** [36] - 5:15, 15:4, 15:16, 16:10, 19:15, 19:16, 20:6, 20:18, 23:13, 24:11, 30:15, 32:7, 35:23, 36:24, 39:24, 41:6, 61:6, 65:4, 65:14, 76:20, 100:10, 133:23, 155:16, 155:17, 156:3, 159:16, 169:3, 173:10, 173:11, 176:20, 178:20, 185:11, 197:15, 197:20, 200:7, 218:6
**Objection** [10] - 20:2, 20:25, 21:22, 39:23, 41:4, 60:9, 95:15, 96:8, 153:12, 197:14
**objections** [12] - 13:22, 16:9, 65:13, 69:3, 69:5, 76:19, 100:9, 133:22, 156:2, 159:11, 169:2, 218:4
**obligation** [4] - 96:1,

96:11, 96:16, 96:17
**observe** [1] - 200:24
**observed** [1] - 117:18
**obtain** [1] - 174:9
**obtained** [2] - 24:7,
67:2
**obtaining** [1] - 181:14
**obvious** [3] - 116:6,
212:13, 214:1
**Obviously** [1] - 39:14
**obviously** [3] - 39:16,
171:17, 205:6
**occasion** [2] - 34:24,
40:11
**occasions** [1] - 68:21
**occupancy** [2] - 90:9,
108:21
**occupy** [1] - 151:21
**occurred** [6] - 44:24,
56:9, 73:5, 102:18,
121:13, 211:13
**October** [6] - 104:17,
132:8, 132:10,
144:18, 145:1, 159:5
**OF** [26] - 1:1, 1:15,
3:3, 3:4, 3:5, 3:6,
3:7, 3:8, 3:9, 3:10,
3:10, 3:11, 3:12,
3:13, 11:15, 46:10,
56:23, 62:12, 64:8,
101:19, 122:1,
127:18, 139:8,
152:15, 155:1, 186:5
**offer** [11] - 32:5, 35:21,
36:22, 65:10, 68:25,
69:1, 76:17, 100:7,
155:14, 155:23,
176:18
**offered** [4] - 20:7,
20:8, 159:20, 169:5
**offering** [1] - 68:12
**offers** [1] - 13:21
**office** [1] - 98:7, 98:8,
98:12, 108:22,
114:3, 114:5, 114:9,
178:17, 180:2,
180:5, 180:12
**Office** [6] - 45:24,
50:2, 50:11, 53:5,
62:23, 162:5
**officer** [11] - 11:19,
12:11, 40:10, 41:13,
41:15, 42:5, 45:3,
66:15, 127:21,
127:24, 158:15
**offices** [6] - 64:17,
64:19, 158:11,
172:9, 199:15,
200:24
**OFFICIAL** [1] - 1:24

**official** [2] - 128:4,
217:24
**often** [1] - 74:11
**ON** [1] - 1:19
**on-site** [1] - 158:11
**once** [3] - 42:15,
121:1, 170:2
**Once** [1] - 158:20
**one** [78] - 14:14,
15:12, 17:9, 17:11,
19:1, 20:23, 25:5,
26:1, 30:14, 30:18,
33:11, 43:11, 43:12,
47:23, 48:8, 48:21,
51:11, 51:18, 52:5,
59:11, 67:11, 67:25,
68:1, 68:2, 72:7,
74:9, 77:25, 81:25,
84:11, 84:25, 87:21,
94:20, 95:21, 96:24,
98:25, 99:13,
102:19, 105:3,
105:6, 105:7,
105:22, 108:4,
108:10, 108:24,
113:5, 140:6, 147:1,
150:15, 152:21,
154:13, 156:25,
157:4, 160:20,
161:7, 161:22,
162:4, 162:25,
164:22, 170:7,
172:23, 173:24,
177:25, 184:3,
190:21, 193:7,
193:14, 202:5,
204:8, 204:9,
206:22, 207:18,
207:20, 208:4,
208:15, 209:14,
212:11, 217:11
**One** [6] - 12:8, 80:22,
107:2, 107:20,
122:2, 156:21
**ones** [8] - 25:17, 97:7,
97:8, 103:24,
143:20, 144:12,
179:24, 180:11
**online** [9] - 32:20,
67:19, 83:21, 84:25,
136:5, 153:15,
154:1, 173:17, 176:2
**Online** [2] - 49:13,
176:1
**Oorah** [4] - 80:17,
87:4, 87:6, 90:17
**open** [7] - 45:2,
207:15, 208:2,
209:16, 210:21,
212:10, 212:13

**opening** [1] - 59:24
**operate** [3] - 89:25,
200:25, 208:2
**operated** [6] - 66:1,
170:6, 171:2, 172:5,
198:23, 201:6
**operates** [4] - 171:3,
180:10, 196:20,
196:24
**operating** [15] - 11:18,
38:18, 40:10, 40:25,
41:13, 57:13, 66:15,
88:11, 98:14,
115:25, 116:3,
127:21, 127:23,
158:15, 166:3
**operation** [11] - 41:15,
42:5, 61:25, 66:17,
90:17, 92:19, 97:17,
98:6, 114:13,
171:11, 200:25
**operations** [2] - 45:3,
128:1
**opined** [1] - 119:9
**opining** [1] - 102:9
**opinion** [25] - 18:4,
25:7, 25:16, 41:5,
68:10, 69:14, 93:16,
110:2, 116:24,
117:8, 117:21,
133:5, 160:19,
161:20, 162:16,
163:16, 167:21,
168:2, 168:6, 169:5,
171:12, 172:20,
173:18, 176:25,
179:12
**opinions** [9] - 66:21,
67:2, 73:8, 101:5,
101:6, 101:9, 156:9,
159:6
**opportunity** [1] -
66:16
**opposed** [4] - 8:13,
135:18, 162:12,
180:10
**opposing** [1] - 80:8
**option** [1] - 148:9
**order** [10] - 6:12,
46:21, 47:15, 66:3,
75:21, 86:25,
102:15, 144:1,
168:3, 169:6
**ordered** [6] - 50:24,
136:14, 137:14,
158:20, 167:25,
168:1
**ordinary** [3] - 35:10,
128:18, 133:18
**organization** [16] -

12:12, 31:21, 31:24,
36:8, 39:12, 52:6,
53:3, 53:21, 55:22,
61:19, 99:17,
115:19, 137:19,
181:11, 181:24
**organizational** [1] -
88:11
**organizations** [1] -
208:21
**original** [1] - 140:14
**originated** [4] - 10:1,
21:14, 174:7, 174:23
**ORRICK** [1] - 2:5
**otherwise** [4] -
148:10, 151:8,
151:9, 214:20
**ourselves** [2] - 26:11,
26:18
**outside** [13] - 132:2,
132:7, 144:19,
145:2, 145:7,
148:15, 148:17,
167:24, 168:2,
169:5, 186:15,
186:21, 187:2
**overall** [2] - 97:19,
166:18
**overcome** [1] - 209:19
**overcompensation**
[2] - 10:11, 10:12
**overhead** [1] - 114:5
**Overruled** [3] -
153:24, 168:4,
200:11
**oversee** [2] - 127:25,
128:1
**overshadowed** [1] -
73:4
**own** [9] - 26:10, 33:18,
84:17, 103:21,
159:15, 161:17,
181:12, 211:2,
213:23
**owned** [4] - 36:10,
36:12, 50:9, 141:13
**owners** [3] - 58:2,
90:14, 122:25
**ownership** [1] - 36:14
**owns** [2] - 36:8,
130:25

---

**P**

**p.m** [1] - 20:23
**page** [45] - 18:22,
19:2, 27:13, 27:21,
28:4, 28:6, 28:8,
29:17, 29:20, 47:4,

48:10, 58:10, 134:3,
134:4, 137:24,
142:25, 143:15,
147:23, 148:4,
148:11, 148:12,
148:22, 149:2,
149:3, 149:5, 149:7,
149:9, 149:11,
149:15, 151:6,
160:2, 167:11,
173:2, 176:17,
181:20, 181:22,
182:1, 182:3, 182:4,
182:21, 182:25,
183:1, 183:3,
190:19, 191:2
**Page** [2] - 190:21,
213:24
**Pages** [1] - 95:1
**pages** [2] - 159:13,
182:4
**paid** [12] - 28:21, 45:9,
46:20, 47:20, 48:17,
55:2, 55:16, 90:6,
94:9, 113:17, 183:5,
198:5
**paper** [1] - 52:15
**papers** [1] - 40:18
**paperwork** [1] - 78:2
**paragraph** [1] - 43:24
**paragraphs** [1] - 61:14
**parked** [8] - 30:1,
30:4, 30:7, 31:7,
33:4, 33:10, 72:3
**parking** [8] - 31:4,
33:9, 71:10, 71:21,
73:6, 73:10, 73:13,
217:12
**parlance** [1] - 67:11
**part** [27] - 6:6, 9:19,
31:21, 44:18, 45:3,
50:20, 50:22, 54:12,
55:21, 88:4, 98:14,
98:17, 115:15,
121:13, 135:10,
160:24, 171:15,
172:19, 180:22,
181:4, 181:8,
181:13, 192:20,
193:21, 196:7,
201:14, 201:15
**Part** [1] - 182:6
**particular** [18] - 17:6,
17:12, 22:9, 22:10,
22:11, 47:4, 47:25,
48:9, 48:20, 50:10,
60:11, 121:15,
121:16, 134:11,
171:14, 172:4,
207:19

**particularly** [3] - 98:4,
158:5, 208:17
**parties** [17] - 5:4, 5:20,
10:2, 10:5, 10:12,
57:25, 58:3, 66:5,
66:11, 156:17,
167:25, 168:1,
175:6, 175:10,
190:17, 191:7, 216:5
**parties'** [1] - 196:13
**party** [16] - 55:9, 66:9,
77:8, 77:16, 77:24,
78:3, 78:12, 78:20,
78:22, 79:17, 95:22,
125:8, 128:20,
157:3, 158:6, 190:8
**pass** [2] - 46:8, 185:15
**Pass** [6] - 62:8,
101:13, 121:22,
124:8, 185:5, 206:8
**past** [3] - 104:5,
108:14, 166:6
**patent** [3] - 83:8,
83:10, 83:11
**Patent** [5] - 45:24,
50:2, 50:11, 53:4,
62:22
**pause** [1] - 45:20
**pay** [3] - 8:5, 90:13,
99:22
**paying** [7] - 28:24,
45:4, 90:15, 116:7,
123:2, 142:14, 199:3
**payroll** [1] - 180:3
**pays** [1] - 122:23
**PC** [2] - 2:11, 2:14
**Pennsylvania** [1] -
214:17
**penny** [1] - 163:24
**people** [26] - 24:7,
26:15, 32:18, 32:22,
39:14, 39:21, 39:25,
61:12, 61:25, 67:16,
68:3, 118:16,
118:19, 142:9,
144:10, 145:2,
146:5, 149:5, 150:4,
161:20, 162:17,
163:1, 181:14,
212:7, 212:12,
213:22
**people's** [1] - 105:4
**per** [6] - 72:14, 74:22,
130:13, 141:25,
162:20
**per-day** [1] - 141:25
**per-month** [1] -
141:25
**percent** [58] - 32:17,
32:20, 70:8, 70:12,

71:23, 80:11, 80:15,
83:12, 83:13, 84:9,
84:10, 87:7, 87:11,
87:15, 87:18, 87:19,
87:22, 88:1, 88:2,
88:6, 88:7, 88:24,
88:25, 89:2, 89:7,
89:14, 92:19, 94:6,
94:7, 96:21, 99:11,
99:12, 99:13, 101:2,
113:22, 116:15,
116:23, 120:5,
120:9, 140:9, 152:9,
161:7, 163:21,
166:10, 166:19,
166:21, 167:2,
167:5, 167:18,
168:18, 179:7,
180:6, 195:21,
197:12, 201:7
**percentage** [9] -
32:14, 88:10, 88:15,
96:22, 97:1, 106:17,
122:8, 152:7
**perform** [3] - 158:17,
160:24, 187:6
**performance** [2] -
67:9, 68:25
**performed** [4] - 65:24,
103:10, 104:5, 173:6
**performing** [2] -
158:8, 158:19
**perhaps** [2] - 98:15,
121:10
**period** [18] - 71:20,
71:24, 73:2, 79:2,
83:16, 114:20,
117:10, 160:4,
160:12, 160:14,
167:17, 173:21,
174:21, 177:4,
184:18, 184:20,
184:21, 184:25
**Period** [1] - 210:9
**periodically** [1] - 47:8
**periods** [5] - 160:19,
167:14, 178:15,
184:17, 211:4
**Permits** [2] - 197:6,
198:2
**permits** [2] - 197:9,
198:6
**perpetrated** [1] -
209:20
**perplexed** [1] - 217:13
**person** [2] - 139:1,
162:20
**personal** [1] - 161:17
**personally** [9] - 14:10,
39:1, 42:7, 42:15,

51:9, 51:13, 51:14,
51:22, 52:2
**perspective** [2] - 93:3,
177:16
**persuasive** [1] -
183:23
**pertained** [1] - 129:17
**pertains** [2] - 72:6,
128:16
**perverse** [1] - 99:15
**PETER** [2] - 1:14, 2:5
**PGS** [1] - 1:6
**phase** [6] - 12:18,
155:8, 155:25,
181:20, 207:8, 214:4
**phone** [16] - 22:9,
22:10, 22:11, 22:15,
23:1, 23:6, 23:8,
32:21, 32:22, 46:15,
86:17, 137:5,
138:22, 146:7,
192:18
**phones** [1] - 146:1
**photo** [1] - 22:18
**phrase** [1] - 208:16
**phrased** [1] - 97:11
**physically** [1] - 58:11
**pick** [12] - 20:17,
28:15, 28:18, 28:22,
28:25, 29:10, 72:25,
78:1, 128:24, 129:1,
129:5, 144:24
**pick-up** [1] - 129:5
**picked** [5] - 30:10,
54:12, 78:19,
144:23, 208:14
**picking** [2] - 132:17,
134:23
**picks** [3] - 27:18,
27:24, 29:4
**pickups** [1] - 187:8
**piece** [1] - 93:5
**Pittman** [39] - 5:11,
7:17, 10:24, 13:10,
13:25, 14:3, 20:21,
22:14, 37:23, 55:24,
56:10, 56:14, 59:22,
61:23, 63:14, 64:6,
65:8, 68:14, 79:9,
93:14, 124:13,
124:23, 125:6,
126:5, 155:16,
156:2, 173:9,
178:19, 185:7,
185:10, 185:20,
186:3, 191:16,
203:21, 209:11,
214:5, 216:23,
217:3, 218:1
**PITTMAN** [133] - 2:11,

2:12, 3:3, 3:5, 3:7,
3:9, 3:13, 5:12, 7:18,
7:20, 9:8, 9:16,
10:25, 11:11, 11:15,
13:11, 13:15, 13:20,
14:5, 15:2, 15:10,
15:11, 15:14, 15:20,
16:7, 17:3, 17:8,
17:13, 17:23, 19:14,
19:20, 20:7, 20:14,
21:10, 21:25, 22:16,
22:21, 22:23, 23:11,
23:17, 23:19, 23:22,
24:1, 24:9, 24:15,
26:22, 27:3, 27:7,
30:22, 30:23, 32:5,
32:11, 34:1, 34:21,
35:21, 36:2, 36:22,
37:4, 37:25, 39:20,
40:7, 41:10, 43:15,
45:18, 45:21, 46:7,
56:23, 58:7, 60:15,
60:16, 62:8, 63:7,
63:21, 64:7, 64:8,
65:10, 65:18, 68:15,
68:16, 68:22, 69:9,
69:10, 74:6, 76:17,
76:24, 78:18, 83:25,
85:15, 89:12, 94:23,
95:23, 96:2, 97:6,
99:7, 100:7, 100:14,
101:13, 103:18,
122:1, 124:8,
124:24, 126:6,
126:9, 155:17,
156:3, 159:12,
167:24, 169:3,
173:10, 176:20,
178:20, 185:11,
185:16, 186:4,
186:5, 192:1,
197:14, 197:16,
197:18, 197:21,
197:24, 197:25,
200:12, 203:24,
204:1, 206:8,
209:13, 210:6,
213:5, 215:25,
216:3, 217:5, 218:6
**Pittman's** [2] - 159:16,
159:18
**PIZZI** [1] - 2:2
**place** [7] - 94:18,
132:12, 132:18,
134:25, 136:25,
154:2, 177:25
**places** [1] - 26:15
**plaintiff** [10] - 7:25,
8:3, 9:22, 10:1,
10:13, 83:17, 96:14,

96:15, 127:10,
196:14
**PLAINTIFF** [3] - 1:4,
2:3, 2:7
**Plaintiff** [14] - 4:15,
4:16, 4:17, 4:18,
4:19, 4:20, 4:21,
133:25, 155:21,
169:8, 173:12,
176:22, 178:22,
185:13
**plaintiff's** [2] - 10:6,
10:8
**pleadings** [1] - 66:7
**plenty** [1] - 210:22
**plugged** [1] - 48:20
**plus** [3] - 8:14, 154:13,
203:22
**point** [13] - 22:8,
29:22, 30:7, 36:10,
44:11, 70:25, 80:5,
97:3, 102:17, 117:5,
134:22, 137:1,
172:11
**Point** [3] - 152:9,
152:11, 152:12
**pointed** [3] - 101:1,
210:13, 210:22
**points** [4] - 59:23,
60:1, 206:23, 206:25
**poor** [1] - 122:10
**pop** [18] - 24:22, 25:3,
46:18, 46:20, 47:3,
47:5, 47:15, 47:17,
47:25, 48:5, 48:9,
60:10, 60:19, 60:23,
134:21, 136:5,
148:22, 150:22
**Pop** [1] - 25:4
**pop-up** [16] - 24:22,
25:3, 46:18, 46:20,
47:3, 47:5, 47:15,
47:17, 47:25, 48:5,
48:9, 60:10, 60:19,
60:23, 134:21, 136:5
**Pop-up** [1] - 25:4
**pop-ups** [1] - 150:22
**popped** [1] - 48:20
**portal** [1] - 174:8
**portion** [18] - 111:25,
114:7, 140:7, 164:2,
165:3, 176:8, 177:9,
178:12, 178:13,
178:16, 179:1,
179:9, 179:13,
179:18, 196:21,
197:11, 203:13,
216:11
**position** [1] - 6:3
**positive** [1] - 33:11

possesses [1] - 144:9
possibility [1] - 147:7
possible [1] - 48:1
possibly [2] - 19:22, 26:13
Possibly [1] - 47:13
post [1] - 156:8
postcards [1] - 62:17
potential [12] - 12:16, 68:7, 118:12, 133:9, 134:4, 134:5, 134:8, 134:11, 134:22, 139:3, 149:1, 151:2
Potentially [1] - 149:12
practice [3] - 31:22, 35:12, 128:17
prefer [1] - 126:23
preferred [1] - 95:8
prejudice [1] - 207:5
premark [1] - 13:12
premarked [1] - 13:12
premise [2] - 28:20, 53:19
preparation [1] - 128:12
prepare [3] - 11:23, 69:18, 76:4
prepared [7] - 31:24, 35:15, 102:2, 114:24, 119:8, 120:6, 123:25
present [2] - 5:9, 6:11
presented [4] - 6:11, 9:3, 12:19, 60:1
presenting [1] - 177:9
presently [1] - 142:24
president [1] - 158:15
Press [1] - 207:14, 212:12
presumably [1] - 118:13
pretrial [1] - 6:12
pretty [1] - 69:24
prevent [4] - 10:18, 25:17, 136:20, 214:6
previous [5] - 66:11, 68:22, 200:21, 211:6, 216:1
previously [9] - 6:5, 9:19, 47:7, 70:19, 75:24, 185:24, 215:18, 216:4
price [2] - 77:8, 78:12
Primarily [2] - 12:14, 173:17
primarily [3] - 65:21, 85:4, 176:1
primary [2] - 162:25, 185:3

principles [2] - 101:10, 170:10
print [2] - 28:8, 176:2
private [1] - 212:10
privied [1] - 56:12
problem [1] - 91:21
problematically [1] - 134:20
proceed [4] - 5:8, 10:24, 101:18, 137:11
proceeding [2] - 6:7, 9:13
proceedings [2] - 5:21, 218:14
process [6] - 77:20, 77:23, 113:14, 132:20, 144:12, 162:12
processing [1] - 78:2
processor [1] - 78:4
produce [2] - 66:5, 95:5
produced [15] - 40:16, 75:7, 75:20, 75:24, 77:7, 85:11, 92:17, 108:19, 111:1, 111:6, 111:7, 118:11, 118:21, 119:2, 129:16
producing [1] - 113:5
product [2] - 93:10, 171:14
production [3] - 75:6, 75:21, 124:6
professionals [1] - 64:17
profit [47] - 8:18, 76:16, 78:5, 80:2, 81:4, 81:15, 86:23, 89:24, 89:25, 90:12, 90:13, 90:14, 93:4, 94:12, 99:22, 100:5, 100:20, 101:4, 114:20, 122:17, 122:20, 122:22, 122:23, 123:4, 123:6, 123:13, 123:19, 158:3, 165:22, 166:4, 171:5, 171:7, 180:25, 183:9, 183:12, 183:13, 183:15, 183:17, 183:21, 183:22, 190:24, 194:14, 195:1
profit's [1] - 123:1
Profits [1] - 216:21
profits [78] - 7:2, 7:3,

7:6, 7:8, 7:9, 7:14, 7:21, 7:24, 8:2, 8:8, 8:10, 8:14, 9:2, 9:15, 9:20, 9:25, 10:7, 10:10, 10:13, 10:14, 10:22, 74:12, 74:17, 75:4, 76:5, 90:19, 91:10, 93:16, 99:21, 102:6, 102:14, 102:16, 103:17, 106:1, 115:9, 115:12, 115:15, 117:9, 117:14, 119:10, 119:13, 120:3, 120:11, 120:12, 120:18, 122:19, 122:20, 122:24, 138:6, 156:11, 158:3, 158:20, 159:7, 160:25, 167:2, 168:1, 170:2, 170:3, 170:8, 171:17, 171:18, 172:13, 179:11, 180:24, 183:9, 184:12, 188:12, 189:1, 189:4, 189:8, 191:21, 194:14, 205:18, 206:1, 208:25
program [29] - 27:14, 27:15, 39:6, 59:14, 91:24, 92:5, 97:21, 97:25, 98:3, 98:11, 98:13, 98:18, 112:10, 112:13, 112:17, 112:18, 112:21, 112:23, 113:3, 114:8, 115:21, 115:25, 116:3, 128:2, 128:7, 180:18, 182:14, 196:22
Program [1] - 97:15
programs [7] - 180:21, 180:22, 181:3, 181:5, 181:6, 181:12, 200:4
projection [3] - 132:22, 133:2, 138:2
projections [1] - 133:6
promotion [1] - 128:8
promotional [1] - 207:12
proof [4] - 134:24, 216:18, 216:20, 216:24
proper [6] - 83:24, 86:12, 93:3, 171:8,

171:17, 208:17
property [3] - 57:1, 161:3, 161:9
proportion [1] - 190:24
proposition [1] - 110:10
prosecution [1] - 45:5
prospective [4] - 147:23, 190:7, 190:9, 196:12
protocol [5] - 132:12, 132:14, 132:15, 132:18, 134:19
protocols [2] - 136:25, 137:1
prove [8] - 74:24, 96:15, 96:17, 98:10, 110:3, 190:24, 196:11, 216:24
provide [19] - 6:1, 32:12, 36:3, 110:7, 139:15, 139:21, 139:24, 140:8, 142:10, 142:16, 143:7, 145:5, 145:10, 156:9, 163:14, 165:6, 185:25, 186:14, 187:7
provided [17] - 5:22, 17:10, 17:16, 25:24, 34:22, 66:22, 101:5, 101:6, 110:16, 124:5, 141:3, 143:12, 145:8, 158:9, 158:10, 174:4, 174:21
provider [3] - 77:16, 77:24, 78:12
provides [3] - 8:1, 77:25, 182:5
providing [1] - 78:16
proving [2] - 108:2, 109:5
prowess [1] - 26:2
proxy [5] - 88:10, 88:11, 106:20, 122:9, 122:10
public [3] - 37:8, 66:8, 210:20
Publications [1] - 207:13
publications [2] - 91:5, 161:4
Pull [1] - 58:7
pull [1] - 142:19
pulled [1] - 38:7
pulling [2] - 54:12, 54:13

purchase [1] - 135:17
purchased [2] - 200:14, 200:21
purchases [1] - 200:18
purely [1] - 93:2
purported [5] - 71:11, 73:6, 80:9, 117:24, 119:6
purportedly [2] - 70:25, 72:3
purpose [4] - 66:22, 90:18, 91:9, 134:3
purposes [9] - 41:2, 93:1, 102:9, 107:4, 107:6, 108:2, 109:16, 109:22, 188:22
pursued [1] - 158:21
pursuing [1] - 161:24
put [26] - 9:11, 46:13, 70:17, 76:8, 97:21, 106:1, 113:6, 126:24, 132:12, 132:18, 133:12, 134:8, 136:25, 137:20, 147:5, 148:9, 184:3, 185:22, 191:14, 191:16, 191:18, 206:21, 208:8, 209:16, 217:13, 217:25
puts [1] - 169:4

**Q**

qualified [3] - 68:9, 95:16, 109:7
quantify [3] - 70:20, 109:22, 118:6
quantitatively [1] - 32:25, 69:16
questions [18] - 37:9, 46:3, 46:4, 56:20, 60:3, 61:11, 61:15, 62:25, 83:1, 122:2, 122:15, 123:20, 124:9, 124:14, 139:6, 154:8, 190:14, 205:16
quickly [1] - 77:20

**R**

Rabbi [1] - 62:16
rabbinical [2] - 98:15, 200:4
radio [22] - 40:20,

62:4, 67:18, 72:15, 83:20, 84:9, 85:2, 85:18, 85:21, 86:2, 95:1, 135:8, 143:21, 144:2, 147:9, 147:10, 173:17, 175:11, 176:1, 176:2, 177:15, 213:24

**raise** [2] - 198:13, 206:23

**raised** [1] - 200:14

**ran** [2] - 61:17, 188:21

**range** [1] - 85:25

**rapidly** [1] - 69:24

**rate** [2] - 70:7, 70:12

**rates** [2] - 142:3, 142:4

**rather** [4] - 8:7, 8:12, 71:20, 197:24

**ratio** [33] - 88:17, 88:19, 106:7, 106:9, 106:12, 106:22, 106:25, 107:3, 122:3, 122:5, 122:6, 122:10, 164:4, 164:5, 164:9, 164:24, 165:1, 165:17, 166:6, 166:15, 167:4, 167:16, 168:13, 168:17, 168:22, 193:25, 194:3, 194:11, 194:17, 194:22, 195:4, 195:15

**ratios** [2] - 166:5, 194:25

**re** [3] - 11:4, 68:25, 181:2

**re-explain** [1] - 181:2

**re-offer** [1] - 68:25

**re-swear** [1] - 11:4

**reach** [2] - 68:4, 140:8

**reached** [2] - 44:16, 68:6

**reaches** [1] - 203:14

**reaching** [1] - 151:2

**read** [12] - 20:4, 43:19, 44:3, 95:18, 95:20, 149:22, 153:2, 203:15, 203:19, 213:4, 215:10, 215:12

**Readers** [2] - 207:13, 214:3

**readily** [1] - 104:15

**reading** [1] - 119:16

**ready** [2] - 5:4, 5:13

**real** [6] - 77:20, 98:13, 142:24, 200:4,

200:14, 200:17

**really** [12] - 7:13, 17:15, 50:20, 83:24, 99:14, 106:21, 148:8, 157:8, 158:2, 163:10, 183:13, 209:20

**realm** [1] - 9:12

**reappear** [1] - 47:8

**reason** [13] - 9:3, 82:7, 86:15, 95:5, 109:7, 109:12, 109:18, 111:3, 154:6, 156:25, 185:4, 201:5, 211:19

**reasonable** [7] - 6:2, 6:9, 6:10, 6:14, 6:18, 8:9, 8:12, 8:14, 8:23, 9:10, 9:12, 45:9, 74:16, 101:6, 120:7, 125:3, 163:20, 165:17, 166:9, 168:18, 168:23, 175:8, 178:4, 180:7, 180:23, 183:23

**reasonably** [4] - 162:15, 165:3, 187:5, 191:13

**reasoning** [2] - 151:5, 187:13

**reasons** [5] - 25:13, 106:25, 161:12, 169:3, 193:8

**reassigned** [1] - 39:5

**rebuttal** [1] - 125:22

**receipts** [1] - 76:2

**receive** [6] - 18:2, 19:22, 78:14, 113:21, 132:22, 189:16

**received** [27] - 20:10, 70:4, 70:11, 71:4, 75:9, 75:22, 76:13, 86:17, 106:2, 113:22, 116:13, 120:10, 121:1, 122:16, 139:17, 143:10, 156:14, 175:20, 186:15, 186:17, 186:20, 187:1, 187:8, 189:23, 195:25, 211:23

**receives** [3] - 32:15, 69:17, 78:13

**receiving** [5] - 22:24, 42:11, 104:21, 105:14, 105:19

**recent** [1] - 104:19

**recently** [6] - 43:24,

44:4, 44:7, 69:15, 85:20, 144:18

**Recess** [2] - 63:12, 124:22

**recognition** [1] - 26:4

**recognize** [7] - 133:14, 155:9, 159:2, 159:24, 163:12, 176:14, 178:7

**recollection** [3] - 44:25, 56:24, 57:9

**record** [14] - 5:15, 11:6, 45:2, 63:25, 66:6, 115:1, 127:13, 130:16, 157:2, 157:8, 168:5, 168:25, 198:14, 218:14

**recorded** [3] - 32:2, 35:18, 45:23

**records** [26] - 12:3, 35:13, 37:17, 40:12, 61:24, 66:6, 75:24, 84:18, 85:10, 86:3, 86:10, 139:18, 139:19, 143:8, 156:17, 157:18, 158:5, 158:7, 158:16, 160:13, 162:5, 174:25, 175:7, 192:12, 192:20, 212:7

**recoverable** [1] - 115:16

**recovery** [1] - 10:19

**RECROSS** [2] - 3:6, 62:12

**RECROSS-EXAMINATION** [2] - 3:6, 62:12

**red** [2] - 71:1, 71:22

**REDIRECT** [6] - 3:5, 3:9, 3:11, 56:23, 122:1, 152:15

**redirect** [4] - 59:22, 124:12, 206:9, 206:10

**Redirect** [3] - 56:22, 121:24, 152:14

**redirected** [1] - 30:5

**redo** [1] - 9:7

**reduce** [1] - 87:19

**reduced** [2] - 81:16, 120:1

**reduces** [3] - 80:10, 80:14, 89:13

**reducing** [1] - 89:7

**reduction** [1] - 120:5

**refer** [3] - 104:23,

153:14, 153:17

**referenced** [5] - 41:4, 62:21, 195:14, 195:19, 203:2

**referencing** [2] - 138:13, 202:23

**referred** [3] - 46:18, 105:1, 135:9

**referring** [9] - 38:10, 53:2, 104:23, 152:16, 194:6, 200:17, 200:19, 203:10, 203:11

**refers** [1] - 179:19

**reflect** [2] - 158:7, 171:8

**reflected** [11] - 35:16, 36:6, 69:25, 79:5, 160:13, 162:5, 167:4, 168:9, 168:19, 182:21, 183:20

**reflects** [6] - 78:19, 79:16, 158:4, 180:24, 183:16, 187:5

**refresh** [3] - 44:24, 56:24, 57:9

**regard** [1] - 9:9

**regarding** [8] - 6:1, 33:21, 36:5, 45:22, 57:7, 66:5, 124:6, 132:21

**regardless** [1] - 58:2

**region** [1] - 180:10

**registered** [1] - 73:15

**regular** [3] - 31:18, 31:22, 35:12

**reintroduce** [3] - 11:16, 63:15, 64:9

**relate** [5] - 75:25, 97:22, 98:5, 98:23, 112:10, 116:16, 197:10, 200:25

**related** [16] - 62:1, 95:6, 97:2, 99:2, 110:9, 116:17, 129:5, 161:5, 162:13, 164:2, 175:19, 176:2, 180:3, 181:6, 187:5, 207:20

**relates** [9] - 30:12, 38:2, 68:19, 70:19, 80:1, 98:10, 106:17, 122:4, 189:5

**relationship** [1] - 179:7

**relative** [1] - 181:11

**relevant** [1] - 183:14

**reliability** [2] - 109:12, 109:15

**reliable** [11] - 75:11, 109:5, 109:22, 110:1, 111:13, 111:21, 156:23, 157:12, 157:22, 174:13, 175:2

**reliance** [1] - 91:5

**relied** [5] - 108:17, 108:25, 110:20, 111:16, 175:9

**relief** [2] - 12:9, 12:13

**rely** [6] - 91:3, 111:4, 177:6, 177:18, 195:8, 202:13

**relying** [2] - 112:15, 178:3

**remaining** [2] - 33:10, 87:7

**remedy** [8] - 65:22, 74:8, 74:11, 74:22, 93:16, 99:16, 99:22, 102:10

**remember** [10] - 32:22, 37:8, 53:22, 55:7, 60:12, 73:19, 132:25, 139:11, 140:9, 142:18

**remind** [3] - 114:16, 127:19, 132:24

**remits** [1] - 78:4

**remitted** [1] - 78:14

**renew** [1] - 46:5

**rent** [9] - 93:22, 94:5, 112:7, 112:17, 112:18, 112:20, 112:22, 112:24, 204:25

**repair** [1] - 8:5

**repaired** [2] - 199:9, 199:12

**Repairs** [1] - 199:6

**repeat** [4] - 20:3, 40:8, 197:24, 204:19

**Repeat** [1] - 140:11

**repeats** [1] - 148:6

**rephrase** [3] - 41:8, 140:16, 197:21

**replace** [1] - 56:5

**reply** [1] - 213:18

**report** [34] - 76:11, 76:12, 104:16, 104:19, 104:20, 105:3, 109:11, 145:13, 156:20, 159:5, 159:18, 160:2, 164:4, 167:11, 167:12, 172:16, 173:2,

resident [2] - 204:11
residents [3] - 144:18, 145:6, 204:14
resolution [4] - 44:13, 44:16, 56:25, 57:6
resolved [1] - 10:21
respect [5] - 5:25, 62:20, 66:24, 75:22, 129:19
respond [3] - 20:5, 38:7, 197:17
response [3] - 61:20, 75:21, 125:21
responsibilities [1] - 127:23
responsibility [4] - 41:11, 41:13, 41:17, 154:4
responsible [5] - 31:14, 44:19, 45:4, 118:2, 118:25
rest [2] - 124:23, 206:16
restate [2] - 20:21, 37:24
restrict [1] - 150:24
restrictions [1] - 150:21
rests [2] - 206:17
result [7] - 10:11, 10:12, 31:4, 106:3, 114:13, 199:21, 207:5
results [1] - 68:1
resume [1] - 155:12
retain [1] - 78:5
retaining [1] - 79:13
retains [1] - 78:15
retargeting [1] - 150:10
return [3] - 158:2, 181:24, 182:4
returned [1] - 119:23
revenue [121] - 74:21, 75:4, 75:16, 76:5, 76:14, 76:25, 77:3, 77:7, 77:10, 77:15, 78:9, 78:10, 78:11, 78:13, 79:6, 79:12, 79:13, 79:15, 79:21, 80:15, 80:19, 80:20, 82:6, 83:6, 83:7, 83:13, 83:17, 84:10, 87:7, 87:14, 87:20, 88:3, 88:5, 88:14, 89:8, 90:1, 90:8, 92:7, 92:12, 92:16, 92:20, 94:6, 94:7, 95:7, 95:11, 96:23, 96:25, 97:1, 98:23,

99:12, 100:2, 103:13, 106:10, 108:3, 108:15, 110:9, 110:13, 114:17, 115:21, 116:5, 116:9, 116:12, 116:15, 116:17, 116:19, 116:21, 120:9, 123:18, 128:16, 128:18, 129:20, 138:6, 140:9, 160:3, 160:6, 161:7, 161:8, 161:10, 163:8, 163:16, 163:21, 163:25, 165:4, 165:18, 166:6, 167:15, 168:6, 169:13, 169:24, 170:2, 170:18, 171:1, 171:4, 171:11, 171:15, 173:3, 179:17, 179:9, 180:7, 180:8, 180:21, 183:18, 186:7, 186:11, 187:8, 188:25, 189:11, 189:12, 189:13, 189:19, 192:21, 198:13, 199:25, 201:22, 202:5, 204:5, 205:8
revenue's [1] - 180:21
revenues [10] - 75:8, 75:14, 80:23, 96:22, 138:1, 157:10, 160:15, 164:2, 167:2, 167:22
review [11] - 38:15, 66:2, 75:18, 132:11, 156:8, 158:6, 161:4, 163:5, 175:19, 180:15, 218:1
reviewed [8] - 12:3, 66:10, 108:14, 110:15, 156:16, 162:13, 165:19, 179:3
reviewing [3] - 24:21, 204:16, 218:3
Richard [1] - 36:19
right-hand [1] - 183:4
rights [5] - 44:1, 50:8, 50:10, 53:3, 57:10
rises [1] - 200:20
road [1] - 151:16
role [6] - 11:20, 44:18, 128:3, 128:14, 190:16, 196:14
Roman [1] - 182:6

Rothschild [2] - 56:2, 139:12
ROTHSCHILD [1] - 2:8
row [7] - 160:11, 160:12, 160:14, 167:20, 178:14, 184:18, 184:20
royalties [5] - 8:9, 8:10, 8:14, 8:23, 9:10
royalty [7] - 6:2, 6:9, 6:10, 6:14, 6:18, 6:25, 8:12
rule [1] - 68:13
ruled [7] - 6:5, 6:8, 7:5, 9:19, 10:19, 103:22, 103:25
rules [1] - 148:25
ruling [2] - 10:16, 172:3
rulings [1] - 103:24
run [3] - 90:9, 90:10, 145:15
runs [2] - 28:24, 143:24
rush [1] - 125:13

**S**

salaries [3] - 90:9, 97:23, 97:24
salary [3] - 94:9, 108:21, 113:21
sales [7] - 10:2, 10:13, 10:14, 74:24, 77:7, 79:16, 96:15
Sandy [1] - 28:2
sat [3] - 62:13, 209:2, 209:7
satisfactory [1] - 25:8
satisfied [2] - 8:15, 8:17
satisfy [1] - 191:9
save [1] - 134:21
saved [2] - 92:16, 132:19
saw [15] - 22:20, 38:5, 42:9, 61:16, 73:1, 136:10, 138:12, 142:21, 152:16, 162:13, 195:18, 195:20, 196:5, 212:6
scholarships [1] - 204:8
school [2] - 53:22, 54:5
schools [1] - 25:25
scope [7] - 121:20,

143:18, 153:12, 167:25, 169:6, 193:21, 196:8
screen [21] - 13:18, 13:24, 14:10, 14:18, 14:22, 16:1, 16:18, 16:23, 17:6, 17:9, 21:9, 22:18, 22:25, 24:4, 35:5, 59:8, 76:8, 84:20, 84:23, 133:13, 149:21
script [1] - 82:18
search [28] - 13:18, 13:24, 16:5, 16:20, 18:24, 19:1, 19:2, 24:19, 24:21, 24:23, 25:1, 47:6, 47:14, 48:13, 48:17, 59:1, 59:5, 59:10, 59:12, 60:6, 60:17, 60:18, 60:23, 61:4, 75:10, 135:19, 146:20
searched [6] - 14:14, 47:7, 47:19, 48:15, 58:15, 61:24
searches [2] - 14:7, 15:12
searching [3] - 58:24, 149:2, 149:8
seated [3] - 5:3, 11:8, 63:13
Second [1] - 43:24
second [13] - 6:22, 42:22, 42:24, 43:19, 43:23, 51:24, 70:4, 79:8, 80:14, 172:16, 176:6, 204:8, 215:19
seconds [1] - 213:19
section [1] - 74:22
Section [4] - 7:23, 10:4, 10:9, 74:11
security [2] - 94:1, 112:7
see [67] - 9:6, 9:10, 9:12, 14:23, 15:21, 18:14, 21:16, 28:6, 28:10, 28:22, 38:16, 40:17, 44:4, 59:8, 66:17, 70:6, 71:3, 71:7, 71:12, 71:19, 71:22, 72:16, 72:25, 82:14, 84:19, 84:22, 84:24, 85:1, 85:7, 85:19, 85:24, 86:14, 87:23, 88:7, 95:8, 99:10, 134:11, 135:20, 135:24, 137:21, 137:23, 142:22, 146:19, 147:24, 148:16,

149:24, 150:4, 152:19, 153:5, 181:6, 181:23, 182:6, 183:2, 183:4, 183:6, 195:19, 196:1, 197:6, 197:7, 198:9, 198:25, 199:7, 204:6, 204:16, 204:22, 214:5

**seeing** [4] - 32:23, 149:1, 152:25, 204:24

**seek** [1] - 6:25

**seeking** [3] - 6:14, 40:1, 132:1

**seeks** [1] - 10:13

**segment** [6] - 93:4, 93:11, 93:19, 171:22, 172:4, 172:5

**segments** [1] - 171:3

**segregate** [2] - 82:21, 83:6

**selected** [1] - 158:18

**selection** [1] - 44:19

**sell** [3] - 128:24, 129:1

**sells** [2] - 77:18, 78:23

**send** [5] - 32:20, 43:11, 43:12, 144:24, 213:9

**sending** [2] - 44:6, 212:11

**sends** [1] - 78:24

**sense** [2] - 11:23, 89:23

**sent** [23] - 14:13, 17:11, 23:4, 23:5, 23:22, 39:17, 42:23, 42:24, 43:17, 43:18, 44:9, 44:12, 50:17, 52:8, 59:4, 79:1, 134:24, 139:19, 207:11, 207:14, 210:1, 211:10

**sentence** [3] - 43:19, 43:23, 43:24

**separate** [9] - 26:11, 57:13, 57:14, 92:3, 108:11, 123:10, 123:11, 147:1, 171:22

**separately** [3] - 7:20, 57:13, 179:3

**separation** [1] - 57:8

**September** [10] - 14:24, 20:22, 45:10, 70:18, 71:13, 71:14, 71:15, 71:20, 71:21, 71:23

**serve** [1] - 128:14

**served** [1] - 104:16

**service** [15] - 77:8, 77:16, 77:24, 77:25, 78:1, 78:7, 78:16, 112:4, 112:23, 113:13, 113:17, 113:20, 132:16, 137:4, 182:14

**services** [15] - 91:25, 92:5, 97:16, 97:21, 97:25, 98:3, 112:10, 112:13, 112:17, 112:19, 112:21, 112:23, 113:3, 114:8, 196:22

**set** [6] - 134:20, 137:12, 140:2, 159:6, 207:2, 217:21

**setting** [2] - 74:25, 209:17

**several** [6] - 56:9, 161:12, 171:6, 171:15, 182:4, 191:10

**share** [1] - 67:11

**shareholders** [2] - 90:14, 122:25

**SHERIDAN** [1] - 1:14

**shop** [1] - 47:23

**short** [1] - 152:3

**shortly** [1] - 130:7

**shot** [12] - 13:18, 14:18, 14:22, 16:1, 16:18, 16:23, 17:6, 21:9, 22:18, 22:25, 24:4, 35:5

**shots** [2] - 14:10, 17:9

**show** [33] - 23:20, 27:1, 28:22, 30:6, 47:21, 58:23, 58:25, 75:23, 80:6, 84:18, 85:21, 101:3, 135:18, 137:3, 141:23, 142:19, 151:8, 165:1, 167:13, 192:9, 198:1, 204:5, 209:15, 210:10, 210:11, 210:12, 211:5, 211:13, 211:14, 212:9, 212:17, 214:10, 217:1

**showed** [7] - 56:24, 71:25, 82:12, 120:24, 142:12, 152:17, 210:25

**Showing** [1] - 27:8

**showing** [9] - 16:18, 24:2, 40:17, 58:23,

62:3, 72:1, 211:7, 212:7, 212:17

**shown** [3] - 18:5, 19:8, 67:7

**shows** [10] - 72:11, 72:18, 76:12, 100:3, 115:1, 147:15, 147:16, 167:17, 183:1, 213:23

**shut** [1] - 54:1

**side** [5] - 66:7, 75:12, 82:11, 215:23, 217:23

**sides** [3] - 12:18, 96:14, 208:10

**Signature** [1] - 218:19

**signed** [1] - 36:20

**significant** [2] - 130:18, 130:23

**significantly** [5] - 30:11, 31:1, 32:19, 32:25, 72:4

**Similar** [1] - 151:14

**similar** [8] - 24:6, 67:17, 67:19, 165:21, 166:5, 183:5, 183:8, 194:17

**similarly** [1] - 111:20

**simply** [5] - 59:2, 92:4, 99:17, 109:15, 116:19

**simultaneously** [1] - 10:11

**single** [14] - 80:15, 92:4, 164:22, 168:16, 171:1, 171:4, 171:11, 180:7, 180:20, 183:16, 192:14, 196:17, 202:5, 208:16

**Sirius** [5] - 72:14, 144:6, 146:25, 147:2, 147:4

**SiriusXM** [5] - 135:8, 136:14, 143:21, 144:2, 144:11

**sister** [4] - 80:16, 90:17, 115:18, 181:10

**sit** [1] - 184:3

**site** [21] - 46:22, 47:1, 47:10, 47:11, 47:17, 47:23, 47:24, 47:25, 48:9, 48:20, 48:22, 49:12, 58:15, 81:25, 135:22, 144:10, 158:11, 208:12

**sites** [1] - 151:6

**sitting** [1] - 48:7

**situation** [4] - 9:4, 171:19, 183:22, 215:5

**situations** [2] - 10:5, 213:5

**Six** [1] - 208:6

**six** [6] - 129:14, 138:4, 210:8, 210:13, 210:16

**skip** [2] - 54:5, 65:8

**slides** [1] - 185:22

**small** [6] - 94:21, 116:16, 177:25, 181:11, 197:11, 203:9

**smaller** [2] - 94:20, 176:1

**smallest** [1] - 28:8

**snapshot** [1] - 23:4

**sold** [3] - 78:20, 90:8, 189:19

**solicit** [1] - 123:8

**solicitation** [2] - 97:17, 123:10

**soliciting** [1] - 92:1

**someone** [24] - 15:6, 17:7, 20:15, 20:16, 20:23, 23:8, 37:19, 38:2, 47:16, 58:11, 58:15, 58:16, 58:24, 134:6, 135:19, 135:21, 135:24, 137:18, 146:3, 147:18, 149:8, 151:18, 151:21, 213:10

**Someone** [1] - 17:18

**sometime** [1] - 47:10

**sometimes** [1] - 170:17

**sophisticated** [1] - 48:11

**Sorry** [3] - 15:1, 88:23, 147:3

**sorry** [25] - 18:1, 22:6, 22:8, 37:25, 43:23, 51:6, 51:7, 53:10, 57:18, 77:14, 97:11, 100:16, 134:7, 142:22, 142:24, 144:22, 151:1, 153:21, 169:14, 174:8, 175:17, 185:8, 191:4, 204:19

**sort** [10] - 26:9, 66:12, 66:23, 69:18, 93:6, 97:19, 99:3, 126:10, 126:12, 174:6

**sound** [4] - 104:17, 152:1, 188:9, 188:20

**sounds** [1] - 186:9

**source** [27] - 110:24, 111:1, 111:4, 111:13, 111:21, 116:4, 124:1, 124:2, 124:4, 130:18, 130:21, 130:22, 156:23, 157:12, 157:17, 157:19, 157:20, 157:23, 160:13, 171:1, 171:4, 171:11, 174:13, 175:2, 180:7, 180:20, 202:5

**sources** [5] - 107:25, 108:5, 171:16, 175:16, 201:22

**Southern** [1] - 213:8

**space** [3] - 151:18, 151:21, 151:22

**spaces** [1] - 151:12

**speaker** [1] - 23:5

**speaking** [1] - 201:17

**specific** [41] - 24:23, 40:17, 85:16, 87:9, 92:23, 94:14, 94:25, 95:6, 113:3, 120:21, 120:24, 121:5, 129:21, 135:2, 140:18, 140:22, 142:12, 145:20, 151:20, 152:4, 156:17, 166:22, 172:24, 173:5, 173:19, 173:24, 174:16, 175:18, 194:11, 194:21, 195:14, 195:19, 197:6, 198:24, 202:21, 203:7, 203:13, 205:13, 207:20, 211:3, 211:7

**Specific** [3] - 40:20, 84:24, 85:8

**specifically** [20] - 15:8, 16:22, 30:10, 48:18, 50:24, 51:1, 62:4, 67:15, 110:8, 114:22, 123:9, 140:7, 173:16, 192:10, 192:12, 195:5, 197:11, 198:4, 198:15, 209:25

**Specifically** [1] - 18:5

**specifics** [1] - 141:1

**speculation** [5] - 30:16, 40:3, 53:16, 60:25, 61:2

**speculative** [2] - 40:1,

41:7

**spell** [3] - 64:2, 127:15, 154:20

**spelled** [1] - 34:10

**spelling** [4] - 34:2, 53:12, 208:11, 208:17

**spend** [11] - 68:3, 72:9, 73:1, 73:4, 107:6, 163:13, 174:10, 174:14, 174:20, 176:6

**spending** [3] - 72:12, 85:22, 175:3

**spent** [10] - 85:17, 107:3, 115:3, 115:14, 116:12, 164:14, 164:18, 165:4, 200:3, 200:10

**spit** [2] - 137:8, 137:10

**spoken** [1] - 22:12

**spreadsheet** [4] - 31:14, 110:20, 110:24, 111:3

**Spreadsheets** [2] - 174:4, 174:21

**spreadsheets** [4] - 75:23, 111:17, 174:7, 174:23

**St** [1] - 53:22

**staff** [1] - 17:18

**stage** [1] - 207:2

**stand** [2] - 127:11, 154:18

**standard** [1] - 101:10

**standpoint** [3] - 12:11, 88:13, 110:2

**staple** [1] - 26:2

**Star** [3] - 24:4, 24:16, 24:20

**Star-Telegram** [1] - 24:16

**Star-Telegram.com** [1] - 24:4

**start** [1] - 148:5

**started** [10] - 40:23, 42:4, 42:17, 57:12, 72:15, 84:15, 135:1, 210:6, 210:7, 212:25

**starts** [3] - 100:2, 153:4, 207:21

**State** [8] - 11:6, 12:15, 63:25, 75:22, 120:4, 127:13, 131:14, 198:6

**state** [3] - 51:24, 53:17, 61:13

**STATE** [1] - 1:11

**Statement** [1] - 182:7

**statement** [1] - 182:16

**statements** [4] - 157:9, 157:18, 170:9

**states** [2] - 194:5, 194:8

**States** [3] - 45:24, 53:4, 208:2

**STATES** [1] - 1:1

**station** [2] - 85:3, 86:3

**stations** [4] - 85:18, 85:21, 95:1, 213:24

**statistics** [1] - 145:10

**status** [1] - 205:11

**statute** [6] - 7:23, 8:1, 208:6, 210:12, 210:15, 212:25

**step** [13] - 63:3, 75:13, 77:17, 96:24, 97:1, 124:17, 131:22, 132:13, 137:11, 154:10, 169:25, 170:1, 206:12

**sticker** [1] - 217:24

**stickers** [1] - 217:25

**still** [21] - 15:5, 18:8, 27:5, 32:18, 58:17, 71:7, 73:15, 73:17, 92:20, 94:8, 94:9, 113:21, 145:21, 145:24, 146:1, 148:1, 149:1, 150:4, 151:1, 151:2, 169:15

**stop** [5] - 44:8, 131:23, 132:6, 132:9, 144:22

**stopped** [8] - 40:25, 70:25, 73:14, 138:3, 144:18, 144:25, 145:2, 210:2

**stopping** [1] - 137:25

**stored** [2] - 150:11, 150:12

**story** [1] - 210:9

**STREET** [1] - 1:11

**strict** [1] - 136:25

**strike** [4] - 51:17, 79:24, 89:21, 204:4

**strong** [3] - 120:25, 121:3, 178:2

**student** [1] - 54:10

**students** [6] - 25:24, 54:4, 54:5

**study** [3] - 121:13, 121:14, 162:6

**stuff** [2] - 91:3, 212:11

**subject** [10] - 68:20, 121:11, 156:11, 158:3, 161:5, 161:9, 161:11, 161:19

**submit** [4] - 45:15, 137:24, 150:23,

216:18

**submitted** [1] - 91:1

**subpart** [1] - 171:9

**subscribers** [1] - 212:12

**subsidiary** [1] - 93:11

**substance** [1] - 64:22

**substantial** [1] - 205:12

**substantially** [2] - 115:20, 116:4

**substitute** [1] - 8:10

**subtracted** [1] - 164:24

**succeed** [1] - 123:17

**succinctly** [1] - 69:24

**sudden** [2] - 125:13, 208:9

**sued** [1] - 53:17

**suffered** [1] - 208:23

**sufficient** [3] - 110:3, 110:12, 110:16

**suggesting** [2] - 81:5, 88:2

**suggests** [2] - 202:13, 208:3

**suing** [1] - 201:4

**suit** [2] - 207:5, 209:21

**summaries** [1] - 174:9

**summarize** [2] - 179:24, 182:8

**summarized** [2] - 173:4, 180:14

**summarizes** [3] - 67:10, 167:14, 182:9

**summarizing** [2] - 110:21, 111:17

**summary** [17] - 67:1, 76:4, 100:1, 103:23, 114:17, 157:9, 169:19, 169:21, 173:8, 176:19, 178:10, 178:18, 180:1, 181:22, 182:21, 183:2, 184:9

**summer** [1] - 112:5

**sums** [1] - 71:19

**support** [7] - 69:12, 105:4, 163:7, 171:5, 175:8, 179:4, 180:18

**supported** [2] - 126:22, 179:9

**supporting** [4] - 76:2, 109:24, 111:10, 207:22

**supports** [3] - 163:12, 169:18, 207:7

**suppose** [2] - 9:11, 22:17

**supposed** [1] - 95:13

**surplus** [5] - 115:17, 116:6, 123:1, 123:7, 123:19

**surprise** [1] - 50:1

**surrounding** [1] - 24:17

**survey** [9] - 82:15, 86:18, 105:25, 121:10, 192:24, 193:2, 193:4, 193:5, 193:11

**suspect** [1] - 55:15

**sustain** [3] - 61:5, 95:21, 104:3

**sustained** [7] - 7:25, 8:3, 9:22, 20:13, 25:12, 41:8, 159:16

**SUTCLIFFE** [1] - 2:5

**swear** [1] - 11:4

**switch** [1] - 150:17

**sworn** [4] - 11:3, 11:5, 63:24, 154:19

**system** [20] - 66:18, 132:18, 134:20, 134:24, 134:25, 135:1, 137:12, 138:22, 139:2, 143:6

**system's** [1] - 137:8

---

**T**

**table** [4] - 160:2, 167:11, 173:2, 176:17

**tabs** [1] - 108:10

**talks** [1] - 215:1

**tardy** [1] - 54:4

**tarnish** [1] - 26:5

**tarnishes** [1] - 26:5

**tarnishing** [2] - 50:14, 53:15

**Tax** [1] - 162:23

**tax** [8] - 48:14, 59:6, 105:7, 158:2, 162:6, 162:9, 163:14, 180:4

**taxation** [1] - 158:3

**teaching** [1] - 94:11

**team** [2] - 15:6, 17:7

**Tech** [1] - 214:16

**Technically** [1] - 136:7

**Telegram** [2] - 24:16, 24:20

**Telegram.com** [1] - 24:4

**telephone** [3] - 21:13, 21:16, 158:14

**television** [1] - 67:18

**term** [3] - 189:7, 202:2, 217:12

**termed** [1] - 170:17

**terms** [24] - 18:6, 25:13, 29:25, 33:23, 40:25, 48:17, 59:1, 59:5, 59:10, 59:12, 60:6, 60:18, 60:23, 61:4, 61:9, 68:4, 74:19, 77:10, 84:1, 187:21, 188:11, 188:15, 189:8

**territory** [3] - 93:5, 93:11, 93:19

**test** [2] - 170:15, 170:17

**testified** [43] - 33:2, 39:21, 42:4, 46:14, 49:4, 49:19, 50:13, 50:17, 68:2, 68:17, 81:24, 84:13, 101:22, 103:22, 106:6, 107:14, 107:16, 111:24, 115:8, 116:6, 117:18, 120:8, 139:14, 142:23, 144:17, 145:14, 147:6, 152:4, 187:14, 187:19, 192:2, 193:16, 193:18, 196:16, 199:15, 199:20, 199:24, 210:19, 211:8, 211:12, 212:6, 212:21, 213:21

**testify** [18] - 5:24, 5:25, 6:9, 6:17, 11:24, 15:7, 20:9, 22:19, 30:17, 30:21, 62:16, 95:17, 132:21, 138:8, 170:12, 171:20, 186:23, 194:25

**testifying** [4] - 51:11, 130:2, 141:20, 178:11

**testimony** [39] - 5:7, 5:15, 6:1, 9:14, 11:3, 12:1, 12:21, 40:8, 48:7, 48:10, 48:11, 51:20, 59:24, 62:18, 64:22, 65:2, 66:6, 68:10, 86:7, 86:11, 117:17, 117:24, 118:4, 121:9, 124:14, 127:1, 129:25, 135:12, 150:1, 159:17, 169:19, 171:23, 183:24, 193:19,

200:20, 206:23,
207:22, 215:14
**Texans** [1] - 59:17
**Texas** [304] - 8:6,
12:15, 13:5, 13:19,
17:25, 18:4, 18:5,
19:23, 25:22, 26:2,
27:14, 27:16, 27:24,
28:13, 28:15, 28:18,
28:19, 28:22, 28:25,
29:3, 29:4, 29:5,
29:7, 29:11, 30:25,
38:3, 38:13, 38:14,
38:18, 40:17, 40:20,
41:1, 41:3, 41:12,
41:20, 44:8, 48:25,
49:8, 49:16, 50:25,
51:12, 51:18, 52:6,
54:10, 58:12, 58:13,
58:17, 61:10, 61:17,
62:4, 62:5, 62:18,
67:15, 70:11, 75:8,
75:16, 75:22, 75:25,
76:13, 78:20, 79:2,
79:16, 80:19, 80:20,
84:14, 84:19, 84:22,
84:24, 85:1, 85:2,
85:7, 85:16, 85:17,
85:21, 86:2, 86:9,
87:9, 87:10, 91:20,
92:18, 92:22, 94:6,
94:7, 94:14, 94:25,
95:6, 95:9, 96:22,
100:21, 106:3,
106:10, 109:22,
110:21, 113:13,
113:22, 114:2,
114:13, 114:25,
115:4, 116:13,
116:14, 116:17,
116:21, 116:25,
117:4, 117:10,
118:8, 119:7,
119:23, 120:4,
120:8, 120:13,
121:5, 128:16,
129:2, 129:5,
129:17, 129:19,
129:21, 129:22,
130:6, 130:10,
130:18, 131:6,
131:14, 131:16,
131:20, 131:24,
132:1, 132:2, 132:3,
132:7, 132:18,
132:19, 132:22,
133:7, 133:9, 134:4,
134:5, 134:7, 134:8,
134:11, 134:15,
134:17, 134:23,
135:2, 135:6, 135:8,

136:3, 136:10,
136:13, 136:16,
136:20, 137:1,
137:18, 137:19,
137:20, 137:25,
139:5, 139:22,
139:24, 140:18,
140:21, 141:3,
141:14, 141:15,
141:16, 141:18,
142:11, 142:13,
142:17, 143:11,
143:19, 143:24,
144:4, 144:19,
144:24, 145:2,
145:3, 145:6, 145:7,
145:9, 145:15,
145:18, 145:20,
145:21, 145:24,
146:2, 146:5, 146:7,
146:19, 147:10,
148:8, 148:10,
148:15, 148:17,
149:1, 149:8,
149:15, 150:4,
150:22, 150:23,
152:4, 153:9, 154:2,
159:7, 160:4, 161:8,
162:2, 163:21,
163:25, 165:3,
168:7, 169:24,
171:21, 172:3,
172:6, 172:7, 172:9,
172:24, 173:5,
173:16, 173:18,
173:24, 174:16,
174:20, 175:12,
175:17, 176:8,
177:15, 177:17,
178:12, 178:13,
178:15, 179:1,
179:8, 179:11,
179:13, 179:18,
180:24, 180:25,
186:7, 186:11,
186:15, 186:16,
186:17, 186:20,
186:21, 187:2,
187:4, 187:5, 187:8,
188:25, 189:14,
195:25, 196:18,
197:13, 198:6,
198:21, 198:24,
199:2, 199:3,
199:13, 199:16,
199:18, 199:22,
201:8, 203:7,
203:13, 203:14,
204:11, 204:14,
207:10, 207:20,
208:2, 208:13,

209:25, 210:25,
211:3, 211:7,
211:13, 211:14,
211:15, 212:6,
212:18, 213:24,
213:25, 214:2
**text** [2] - 135:18, 136:7
**textbook** [1] - 209:7
**texts** [1] - 91:5
**theirs** [1] - 27:4
**themselves** [1] - 21:21
**therefore** [2] - 82:5,
83:12
**Therefore** [1] - 93:14
**they've** [10] - 71:14,
74:2, 98:13, 208:7,
208:23, 209:15,
209:18, 209:19,
211:5, 212:9
**thinks** [1] - 56:14
**Third** [5] - 6:12,
202:22, 202:25,
207:3, 214:20
**third** [20] - 28:4, 77:8,
77:16, 77:24, 78:3,
78:12, 78:20, 78:22,
79:17, 80:18, 89:16,
97:18, 113:6,
128:20, 157:3,
158:6, 162:24,
162:25, 175:6,
180:12
**third-parties** [1] -
175:6
**third-party** [11] - 77:8,
77:16, 77:24, 78:3,
78:12, 78:20, 78:22,
79:17, 128:20,
157:3, 158:6
**thirds** [2] - 167:18,
180:4
**thousand** [1] - 64:20
**thousands** [1] - 61:4
**three** [18] - 34:5, 34:8,
69:22, 70:2, 70:3,
80:21, 92:19, 97:15,
112:20, 152:9,
152:11, 152:12,
162:21, 162:23,
163:3, 182:13,
192:3, 192:11
**Three** [1] - 152:10
**throughout** [7] -
12:15, 26:2, 29:24,
56:3, 184:10,
207:15, 208:2
**tie** [5] - 74:17, 110:24,
111:2, 111:3, 124:3
**tied** [2] - 109:23,
111:10

**timeframe** [7] - 42:13,
42:16, 42:21, 43:4,
43:9, 61:17, 62:5
**title** [2] - 78:2, 127:20
**today** [23] - 6:11, 9:14,
11:24, 12:7, 48:8,
51:11, 59:6, 101:5,
124:13, 126:18,
126:22, 126:25,
127:4, 127:5,
135:12, 156:7,
158:19, 164:13,
172:20, 173:23,
207:7, 207:16, 217:7
**today's** [2] - 5:21,
206:23
**together** [3] - 70:18,
128:5, 191:19
**took** [10] - 14:20, 23:4,
37:15, 67:11, 70:12,
70:14, 92:4, 130:7,
154:2, 169:25
**tool** [1] - 165:2
**top** [12] - 28:6, 28:7,
37:7, 66:17, 76:12,
160:6, 164:13,
167:16, 167:20,
182:6, 184:18, 204:7
**topics** [1] - 155:25
**Torres** [2] - 55:21,
55:25
**total** [17] - 35:7, 77:2,
79:16, 88:10, 88:15,
92:20, 94:7, 100:2,
120:12, 122:8,
126:6, 176:7,
182:13, 182:15,
188:17, 188:20
**totally** [1] - 97:13
**totals** [1] - 114:20
**towing** [6] - 77:25,
78:6, 78:15, 78:23,
79:13, 79:17
**trace** [1] - 138:21
**track** [8] - 31:15,
125:3, 125:7, 142:6,
142:8, 143:5,
154:12, 205:12
**trademark** [28] - 9:25,
36:20, 44:1, 53:4,
74:18, 83:16, 90:19,
90:20, 90:21, 91:10,
101:11, 107:17,
161:9, 161:11,
163:11, 164:3,
164:18, 165:13,
165:22, 166:2,
166:12, 166:20,
167:19, 194:13,
194:17, 201:19,

206:1
**Trademark** [5] - 45:24,
50:2, 50:11, 53:5,
62:22
**trademarks** [4] - 57:1,
161:19, 163:22,
164:1
**Trademarks** [2] - 10:3,
10:9
**traffic** [1] - 139:21
**training** [1] - 200:4
**transaction** [2] -
157:2, 157:10
**transactions** [2] -
110:8, 157:8
**transcribe** [1] - 150:19
**transcript** [2] - 108:8,
218:13
**Transfer** [1] - 33:22
**transfer** [4] - 34:15,
56:25, 57:7, 58:2
**transferred** [3] -
36:14, 57:10, 57:21
**transition** [1] - 54:25
**treasurer** [1] - 182:11
**treat** [1] - 115:12
**treated** [1] - 171:22
**treatise** [3] - 165:19,
193:3, 203:18
**treatises** [8] - 91:12,
161:4, 190:16,
191:6, 195:10,
195:12, 196:13
**TRENTON** [1] - 1:11
**trial** [28] - 10:21,
12:18, 12:24, 13:10,
13:12, 13:13, 14:21,
29:19, 34:24, 41:2,
45:16, 66:11, 68:22,
70:22, 98:17,
103:24, 117:22,
119:20, 120:6,
121:11, 155:8,
200:21, 205:5,
207:8, 207:22,
211:6, 216:1, 216:13
**tried** [8] - 110:24,
111:2, 111:3,
123:24, 124:3,
146:7, 146:13,
149:15
**Tried** [1] - 146:8
**tries** [1] - 146:3
**trouble** [1] - 54:5
**truck** [1] - 144:24
**true** [11] - 28:14,
89:22, 93:12,
116:14, 163:3,
163:6, 192:9, 193:9,
193:10, 194:10,

202:4

**trust** [2] - 144:13, 188:19

**trustees** [1] - 57:6

**truth** [1] - 20:8

**try** [8] - 49:15, 75:10, 139:12, 148:10, 148:16, 149:6, 165:3, 193:19

**trying** [15] - 8:21, 10:18, 41:18, 60:4, 65:1, 87:5, 93:9, 137:18, 141:17, 141:18, 164:17, 191:9, 193:23, 204:22, 205:17

**turn** [4] - 27:21, 34:11, 133:12, 188:3

**TV** [5] - 32:23, 62:5, 147:11, 147:13, 147:14

**Two** [3] - 62:11, 175:16, 206:25

**two** [36] - 8:16, 10:17, 14:21, 33:11, 56:10, 56:16, 56:17, 65:21, 65:23, 67:9, 70:7, 72:19, 104:4, 105:23, 118:4, 123:11, 123:12, 125:20, 126:7, 163:2, 167:14, 167:18, 176:3, 178:15, 180:4, 180:11, 184:9, 197:12, 201:7, 204:7, 206:23, 208:3, 212:12, 213:19, 217:4, 217:6

**two-thirds** [2] - 167:18, 180:4

**TX** [1] - 27:16

**type** [7] - 9:4, 86:13, 175:24, 197:9, 208:25, 214:13, 215:3

**types** [9] - 6:4, 6:13, 13:2, 66:2, 75:23, 81:21, 112:13, 173:15, 207:12

**typical** [1] - 90:7

**typically** [6] - 66:4, 74:10, 75:3, 110:10, 159:15, 161:20

**Typically** [1] - 161:22

## U

**U.S** [5] - 1:15, 1:24,

50:2, 50:11, 62:22

**U.S.C** [1] - 7:23

**ultimately** [3] - 29:1, 103:22, 157:17

**Um-hmm** [1] - 153:3

**unable** [5] - 111:2, 124:4, 211:3, 211:13, 212:17

**unaware** [1] - 51:14

**uncertainties** [1] - 8:22

**unclean** [1] - 214:6

**unclear** [1] - 61:20

**uncommon** [1] - 109:21

**under** [17] - 57:13, 71:13, 73:17, 77:3, 81:16, 97:8, 99:12, 99:16, 104:2, 111:25, 168:17, 170:15, 170:20, 176:9, 177:1, 183:4, 207:3

**underlying** [4] - 80:12, 81:19, 105:23, 158:4

**Understood** [2] - 216:12, 216:14

**understood** [4] - 161:5, 166:24, 196:14, 206:20

**Unfair** [1] - 10:4

**unique** [1] - 165:22

**United** [3] - 45:24, 53:4, 208:2

**UNITED** [1] - 1:1

**units** [2] - 70:9, 70:13

**universally** [1] - 101:9

**University** [1] - 214:16

**unjustly** [1] - 9:21

**unless** [5] - 82:11, 105:24, 109:7, 126:19, 156:25

**Unlike** [1] - 90:6

**unlike** [1] - 171:5

**up** [103] - 6:21, 20:17, 24:22, 25:3, 25:4, 27:18, 27:24, 28:15, 28:18, 28:22, 28:25, 29:4, 29:10, 29:11, 30:11, 33:19, 46:13, 46:18, 46:20, 47:3, 47:4, 47:5, 47:15, 47:17, 47:21, 47:25, 48:5, 48:9, 48:20, 51:15, 52:10, 52:11, 52:19, 58:7, 58:23, 58:25, 59:23, 59:24, 60:10, 60:19, 60:23, 67:17, 69:22, 71:19, 72:4, 72:25, 73:17,

73:19, 74:1, 78:1, 78:20, 83:12, 88:4, 92:19, 94:7, 114:14, 116:14, 118:15, 120:8, 120:11, 126:10, 127:1, 128:24, 129:1, 129:5, 132:17, 133:12, 134:20, 134:21, 134:23, 134:24, 135:19, 136:5, 137:12, 139:1, 140:11, 142:19, 144:23, 144:25, 148:22, 149:7, 151:8, 151:18, 152:21, 155:6, 158:23, 159:21, 164:6, 167:7, 172:22, 176:13, 177:17, 178:5, 181:18, 182:15, 184:3, 184:7, 185:23, 191:14, 191:16

**ups** [2] - 72:21, 150:22

**URL** [8] - 30:4, 31:4, 32:15, 33:3, 33:4, 33:21, 34:2, 211:24

**users** [1] - 150:22

**uses** [6] - 33:5, 77:9, 81:5, 106:9, 143:22, 202:19

**USPTO** [1] - 52:24

## V

**VALERIE** [1] - 2:14

**validate** [1] - 33:1

**various** [3] - 14:7, 14:11, 156:19

**vary** [1] - 110:14

**varying** [1] - 123:17

**vehicle** [30] - 20:17, 76:12, 78:1, 105:10, 115:21, 115:25, 116:3, 116:9, 144:19, 160:3, 161:8, 161:13, 161:16, 162:6, 162:8, 162:14, 163:4, 163:6, 163:21, 165:3, 166:11, 166:14, 171:1, 179:5, 183:18, 191:12, 192:20, 198:13, 205:7, 205:12

**vehicles** [11] - 27:19, 67:16, 70:1, 128:25,

129:1, 162:24, 165:15, 180:23, 181:14, 181:15, 192:10

**vendor** [4] - 141:4, 141:6, 174:25, 176:12

**vendors** [3] - 128:21, 141:7, 199:3

**verdict** [14] - 13:4, 14:7, 15:21, 19:21, 25:15, 29:22, 119:23, 120:1, 130:7, 131:21, 132:12, 138:5, 145:16, 156:8

**Verify** [1] - 143:13

**verify** [2] - 75:10, 109:14

**versus** [12] - 31:7, 34:9, 71:6, 80:10, 82:21, 88:12, 91:25, 101:3, 118:7, 164:3, 183:13, 193:10

**vexatious** [1] - 215:3

**view** [3] - 171:19, 179:10, 183:21

**viewable** [1] - 145:21

**viewers** [4] - 142:10, 142:17, 143:9, 143:13

**visit** [8] - 34:25, 66:16, 101:25, 102:15, 102:18, 103:7, 135:11, 158:11

**visited** [8] - 46:22, 46:25, 48:21, 101:22, 102:17, 118:13, 118:16, 118:19

**visitors** [2] - 141:23, 141:25

**visits** [2] - 135:22, 143:14

**visualize** [1] - 135:20

**VOGL** [98] - 2:5, 3:4, 3:6, 3:10, 3:11, 5:5, 5:14, 5:18, 6:23, 7:3, 7:8, 7:10, 7:12, 7:15, 9:17, 13:23, 14:2, 15:4, 15:16, 16:10, 17:5, 17:15, 19:16, 20:2, 20:18, 20:25, 21:3, 21:22, 22:3, 22:8, 23:13, 23:24, 24:11, 25:10, 30:15, 32:7, 35:23, 36:24, 39:23, 39:25, 40:4, 41:4, 46:2, 46:10, 46:13, 48:3, 49:3,

49:18, 52:1, 56:20, 60:9, 60:25, 61:18, 62:11, 62:12, 62:25, 63:11, 63:15, 125:17, 125:21, 126:17, 126:21, 127:6, 127:8, 127:10, 127:17, 127:18, 133:20, 134:2, 137:17, 139:6, 152:15, 152:21, 152:24, 153:13, 153:15, 153:25, 154:8, 206:20, 206:25, 207:2, 207:19, 209:10, 213:19, 213:21, 214:9, 214:12, 215:9, 215:22, 216:7, 216:12, 216:14, 216:16, 216:20, 216:24, 217:2, 217:9, 217:18

**Vogl** [25] - 16:9, 22:7, 23:12, 46:1, 46:9, 51:24, 59:23, 60:1, 60:2, 60:5, 60:7, 60:17, 61:11, 124:13, 124:25, 127:7, 154:13, 209:16, 210:10, 210:21, 211:6, 211:11, 211:12, 211:22, 212:22

**Vogl's** [2] - 201:9, 201:19

**voiceover** [1] - 136:17

**volume** [1] - 199:25

**voluminous** [3] - 66:4, 75:7, 75:20

**voracity** [1] - 109:14

**voucher"** [1] - 59:7

**VOX** [1] - 213:6

**Vs** [1] - 1:5

## W

**wages** [4] - 112:3, 113:17, 164:23, 180:2

**wait** [1] - 46:3

**Wait** [9] - 20:19, 33:24, 51:24, 59:22, 73:9, 79:8, 84:2, 179:20, 191:15

**waited** [4] - 208:8, 208:20, 209:2, 209:22

**waiting** [1] - 147:7

**waived** [1] - 209:18
**walk** [1] - 164:11
**WALSH** [1] - 2:2
**wants** [3] - 123:5, 125:3, 147:19
**ways** [3] - 89:25, 135:16, 161:23
**weak** [1] - 97:11
**wear** [1] - 26:19
**wears** [1] - 139:13
**Weather.com** [2] - 16:19, 16:20
**web** [1] - 135:22
**webpage** [7] - 19:5, 24:24, 27:23, 30:5, 49:9, 133:15, 133:17
**website** [54] - 24:5, 29:9, 29:23, 29:25, 30:3, 30:6, 32:18, 32:20, 33:9, 33:10, 33:16, 33:19, 34:7, 48:12, 48:15, 66:24, 73:16, 73:23, 83:21, 95:9, 117:22, 118:2, 118:7, 118:12, 118:13, 118:15, 118:17, 118:19, 118:24, 119:4, 130:5, 130:8, 130:10, 130:20, 130:22, 131:5, 133:16, 134:9, 135:11, 135:22, 135:25, 137:3, 139:18, 139:21, 141:21, 143:14, 145:10, 145:24, 146:15, 150:6, 150:7, 151:12, 151:20, 212:24
**websites** [1] - 136:10
**week** [1] - 17:1
**weeks** [3] - 56:9, 217:4, 217:6
**weigh** [1] - 117:12
**welcome** [2] - 154:24, 181:17
**WENTWORTH** [10] - 3:2, 3:3, 3:4, 3:5, 3:6, 11:5, 11:15, 46:10, 56:23, 62:12
**Wentworth** [48] - 5:22, 5:23, 6:17, 11:1, 11:2, 11:7, 11:9, 11:18, 14:6, 14:19, 15:5, 15:7, 17:9, 17:18, 17:24, 20:20, 22:5, 22:15, 22:19, 22:24, 34:14, 37:22, 39:8, 46:11, 46:14,

48:24, 49:4, 49:19, 50:13, 51:25, 52:2, 56:5, 62:13, 63:3, 66:15, 66:20, 66:21, 84:13, 130:25, 138:8, 138:12, 150:2, 211:8, 211:11, 211:15, 212:6, 212:21, 213:21
**Wentworth's** [2] - 22:10, 129:25
**Western** [1] - 214:17
**whacks** [1] - 88:1
**whatsoever** [2] - 60:11, 211:7
**whereas** [1] - 122:25
**whoever's** [1] - 58:25
**whole** [3] - 40:5, 102:21, 216:13
**Wilde** [2] - 55:21, 55:25
**WILDE** [1] - 2:14
**willful** [9] - 211:18, 211:19, 211:25, 212:16, 214:8, 214:12, 214:20, 214:22
**willfully** [4] - 211:21, 211:23, 211:24, 212:4
**willing** [1] - 67:17
**wish** [5] - 20:5, 127:3, 206:19, 209:11, 213:18
**withdrawal** [1] - 117:24
**withdrawn** [1] - 107:15
**withdrew** [1] - 55:24
**WITNESS** [67] - 3:1, 11:7, 11:10, 14:20, 17:19, 22:4, 22:6, 34:16, 34:18, 39:10, 39:14, 39:17, 40:23, 43:3, 63:4, 64:1, 64:4, 73:11, 73:14, 73:25, 77:14, 78:11, 79:12, 83:3, 83:5, 83:15, 84:5, 84:17, 84:23, 85:10, 87:17, 87:24, 88:25, 89:4, 89:6, 89:11, 93:9, 93:24, 94:3, 94:16, 96:13, 96:24, 97:10, 97:13, 124:18, 127:14, 127:16, 137:13, 140:14, 149:23, 153:3, 154:22, 154:24,

162:25, 166:16, 166:18, 167:4, 179:23, 180:13, 180:19, 181:3, 181:8, 181:17, 191:17, 191:20, 191:24, 206:13
**witness** [36] - 5:20, 5:21, 5:22, 6:8, 11:4, 11:11, 11:14, 17:6, 20:9, 23:25, 26:23, 26:25, 30:17, 40:2, 46:8, 57:4, 61:19, 62:8, 63:6, 63:14, 101:13, 101:17, 121:22, 124:8, 125:18, 125:21, 125:22, 125:24, 153:22, 154:15, 169:4, 185:5, 185:15, 185:16, 185:19, 206:8
**Witness** [4] - 63:5, 124:19, 154:11, 206:15
**witnesses** [4] - 5:9, 81:25, 125:20, 126:7
**WL** [1] - 214:16
**word** [5] - 89:23, 123:23, 132:14, 169:21, 208:17
**words** [8] - 48:19, 81:15, 92:18, 142:7, 142:8, 142:11, 142:14, 149:12
**works** [6] - 27:14, 27:15, 66:19, 150:10, 182:12
**world** [1] - 64:20
**Worth** [3] - 24:16, 24:17, 24:20
**wrap** [2] - 126:10, 126:12
**wrap-up** [1] - 126:10
**WRIGHT** [2] - 2:6, 101:15
**writing** [2] - 32:24, 45:15
**wrote** [2] - 50:25, 207:24
**www** [1] - 33:8
**Www** [1] - 34:4

---

## Y

**y'all** [8] - 12:8, 14:14, 34:6, 34:10, 59:4, 59:15, 59:20, 60:3
**Yahoo** [5] - 85:4, 95:4,

95:11, 141:9, 146:23
**Yahoo's** [1] - 147:1
**YANAROS** [2] - 2:14, 2:14
**Year** [1] - 26:3
**year** [26] - 26:4, 26:20, 50:3, 50:6, 70:16, 71:13, 71:14, 71:15, 72:24, 85:2, 85:5, 85:6, 85:24, 114:25, 130:13, 164:15, 166:16, 166:22, 166:23, 174:10, 181:22, 182:18, 183:4, 205:8
**years** [24] - 12:4, 25:22, 31:15, 40:22, 70:2, 70:3, 70:7, 85:3, 85:16, 96:3, 96:5, 131:8, 166:18, 179:3, 205:23, 205:24, 208:6, 208:7, 210:4, 210:8, 210:13, 210:14, 210:16
**Yellow** [2] - 95:1, 213:24
**yesterday** [2] - 23:23, 27:4
**yielding** [1] - 167:19
**yields** [1] - 184:22
**York** [2] - 213:7, 213:9
**yourself** [6] - 11:16, 11:24, 64:9, 64:10, 155:2, 195:8
**Youth** [1] - 43:18

---

## Z

**zero** [2] - 209:24, 210:25
**Zero** [1] - 210:2
**zip** [3] - 137:20, 148:9, 150:23