**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| KARS 4 KIDS INC., | |
| *Plaintiff*, | **MEMORANDUM** |
| v. | |
| AMERICA CAN!, | Civil Action No. |
| *Defendant*. | 3:14-cv-7770 (PGS) (DEA) |
| | |
| AMERICA CAN! Cars for Kids, | |
| *Plaintiff*, | Civil Action No. |
| v. | 3:16-cv-4232 (PGS) (DEA) |
| KARS 4 KIDS INC., | |
| *Defendant*. | |

**SHERIDAN, U.S.D.J.**

This matter was tried before a jury last May wherein the jury rendered a verdict on findings of fact regarding the liability of the parties. Due to the equitable principles involved, the Court now decides the remedies based upon the jury's findings. This memorandum discusses the application of (1) laches; (2) compensatory damages; (3) attorneys' fees and costs; (4) injunctive relief; and (5) cancellation of the registered trademark.

At the liability trial, the parties objected to the use of abbreviations of their names and thus requested to be identified by their names as reflected in the case captions. (*See* Final Pretrial Order, p. 2, ECF No. 187). Often at trial Kars 4 Kids was referred to as Kars for Kids with a K; and

America Can! Cars for Kids was referred to as Cars for Kids with a "C".  In this memorandum, the designations are "Kars for Kids," and America Can!.

I.

Not all of the facts educed at trial are set forth herein; but some of the relevant facts are detailed in order to explain the Court's rationale for imposing certain remedies. More importantly, the record of the Remedies Hearing (held on November 19, 2019), as well as the Jury Instructions, and the Verdict Form are summarized herein.  The Jury Instructions explained that there were two lawsuits being tried, and that the jury would be making findings of fact in each suit. The Jury Instructions explained the two lawsuits as follows:

> This is a trademark infringement case.  During the trial you have heard the term unfair competition.  This term is included within the elements of trademark infringement that I will present to you; so, there is no reason to consider unfair competition separately.  The parties have asserted claims in two actions against one another relating to their alleged trademarks.  That is, each party is a plaintiff in their own case against the other and each party is a defendant in the other's case. These two respective lawsuits have been combined into this trial, and you will be deciding each party's claims and defenses against the other.

> As I noted earlier, I often refer to the Kars 4 Kids (with a "K") first, and then America Can! Cars for Kids (with a "C") second.  This order is for convenience, and you must consider both lawsuits on an equal basis.

> In the verdict sheet, which I will discuss later, I request that you answer certain questions. So long as extenuating circumstances do not arise, your answers will be the basis from which I may enter an order to enjoin either party, award damages to America Can! Cars for Kids (with a "C")[1], or enter other appropriate relief.

(Jury Instructions, pp. 16 – 17).

---

[1]  While America Can! Cars for Kids sought monetary damages and injunctive relief, Kars 4 Kids only sought injunctive relief.  (Liability Trial T. 52, 8-9; 8-19 (Mr. Vogl: "America Can! simply needs to stop using Cars for Kids with a C . . . All my client wants is that America Can! stop using Cars for Kids with a C."), ECF No. 298).

In this case there are three alleged trademarks at issue.

Kars 4 Kids, Inc. (with a "K") in its lawsuit claims two trademarks. They are:

\*      1-877-KARS-4-KIDS (with a "K") and a number 4. It is registered in the U.S. Patent and Trademark Office.

\*      "Kars 4 Kids" (with a "K"). It is not registered in the U.S. Patent and Trademark Office.

\*      America Can! Cars for Kids (spelled with a "C") in its lawsuit claims one trademark. It is: Cars for Kids (with a "C"). It is not registered in the U.S. Patent and Trademark Office.

In addition to the above, other Jury Instructions defined "trademark," "infringement of trademark," and "federal registration of a trademark." Thereafter, the Jury Instructions set forth the elements of infringement, its required use in commerce, distinctiveness[2], secondary meaning, geographic scope, and confusion of the infringing mark. (Jury Instructions, pp. 33-37). More pertinently, since some of the remedies under consideration required a finding of willful conduct, it was explained in two sections: intentional infringement and cancellation of a trademark registration of 1-877-KARS-4-KIDS. Intentional infringement was instructed as follows:

Intentional Infringement

If you find that a party has infringed the other party's trademark, you must also determine whether the infringer acted with culpable conduct, meaning willfully, with bad faith, fraud, malice, or knowing infringement. The infringer acted willfully if it knew that it was infringing the trademark owner's trademark or if it acted with reckless indifference to those trademark rights.

(Jury Instructions, p. 40). In addition, the Jury Instructions recognized that a trademark registration may be cancelled if it were procured by fraud:

That [is], to prove fraud, America Can! Cars for Kids (with a "C") must establish, by clear and convincing evidence, that Kars 4 Kids (with a "K") knowingly procured by a false or fraudulent declaration or representation, oral or in writing, or by any false means, its

---

[2]  Distinctiveness has four elements: arbitrary, suggestive, description, and generic marks.

> registration of the mark . . . and intended the [USPTO] to rely on that misrepresentation . . .

(Jury Instructions, p. 41). With those instructions, ten questions were submitted to the jury. (Verdict Form, ECF No. 245). These ten questions were subdivided. Section I dealt with the Kars 4 Kids case, Section II concerns America Can!'s suit, and Sections III and IV addressed other issues, such as dilution and cancellation. The jury found as follows:

A.      Kars 4 Kids did <u>not</u> establish, in any of the states of the United States, that it owns exclusive rights to use either of its alleged trademarks, 1-877-KARS-4-KIDS or Kars 4 Kids, and that either of those trademarks were infringed by America Can! (Section I, Questions 1, 3);

B.      Kars for Kids has <u>not</u> demonstrated that America Can! willfully used marks confusingly similar to its mark (Section II, Question 2);

C.      America Can! established in the State of Texas, that it owns the exclusive right to use its trademarks (Cars for Kids), and that the trademark was infringed by Kars 4 Kids (Section II, Questions 4, 6);

D.      America Can! demonstrated that Kars 4 Kids willfully used marks confusingly similar to its mark (Section II, Question 5);

E.      Neither party established that its alleged trademark(s) became famous before the other party commenced use of its alleged trademark(s) (Section III, Question 7); and

F.      America Can! has <u>not</u> shown (by clear and convincing evidence) that Kars 4 Kids knowingly procured its registration of its trademark 1-877-KARS-4-KIDS, by false or fraudulent declarations or representations, orally or in writing, or by any false means (Section IV, Question 10).

## II. Laches

Kars 4 Kids argues that it is entitled to a presumption that America Can!'s claims for injunctive and monetary relief are barred by laches because America Can! learned of the infringing activity in 2003, but took no action until 2014 (when the Complaint was filed).

"Laches consists of two elements: (1) inexcusable delay in bringing suit, and (2) prejudice to the defendant as a result of the delay." *Santana Prods. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 138 (3d Cir. 2005). To determine whether delay is inexcusable for the purpose of laches, courts look to the most analogous state statute of limitations. *D'Agostino v. Appliances Buy Phone, Inc.*, 633 F. App'x 88, 90 n.3 (3d Cir. 2015). "Claims under the Lanham Act are properly analogized to New Jersey's six-year fraud statute." *Kaufhold v. Caiafa*, 872 F. Supp. 2d 374, 379 (D.N.J. 2012) (first citing *Zinn v. Seruga*, No. 05-372, 2009 U.S. Dist. LEX1S 89915, at *24 (D.N.J. Sept. 28, 2009), then citing N.J. Stat. Ann. § 2A:14-1). Moreover, "[o]nce the statute of limitations has expired, the defendant 'enjoys the benefit of a presumption of inexcusable delay and prejudice.'" *Santana Prods.*, 401 F.3d at 138 (citation omitted). "When this presumption applies, the burden shifts to the plaintiff to prove that its delay in bringing the claim was excusable, and that the delay did not prejudice the defendant." *Kaufhold*, 872 F. Supp. 2d at 379. The "aggrieved parties must . . . bring their claim within [the applicable statute of limitations] when they learned or should have learned, through the exercise of due diligence, that they have a cause of action." *Beauty Time, Inc. v. VU Skin Sys.*, 118 F.3d 140, 144 (3d Cir. 1997).

Here, Kars 4 Kids argues the statute of limitations has tolled and that America Can! has done nothing to protect its claims in a timely manner. American Can!, however, has several arguments that overcome Kars 4 Kids' contention:

(1)     laches does not apply because America Can! did not recognize the infringement of its mark until 2011, when it first became aware that Kars 4 Kids was using the domain name www.carsforkids.com; and

(2)     Kars 4 Kids waived its laches defense by failing to present any evidence of laches immediately before or during the jury trial.

Factually, America Can!'s 2003 cease and desist letter to Kars 4 Kids (the "2003 letter") (Exhibit 18) clearly evidences America Can!'s knowledge of a violation of trademark law.  The 2003 letter states, in part:

> Although we assume at this point that your adoption and use of a mark confusingly similar with Texans CAN!'s Mark was inadvertent, we must insist that you immediately cease and desist from all use in Texas of the Mark or anything confusingly similar thereto, including without limitation, the name "Kars 4 Kids" referred to above.

Despite this clear indication of America Can!'s knowledge of Kars 4 Kids' claims in 2003, circumstances changed after Kars 4 Kids sent the 2003 letter; and, as a result, America Can! did not sue.  Malcolm Wentworth, America Can!'s Chief Operating Officer, testified about the changed circumstances.  By checking the record, Wentworth testified that America Can! believed Kars 4 Kids "pulled back [its] advertising," and that there was no advertising by Kars 4 Kids in Texas between 2004 through 2011.  (T. 38, 75 – T. 39, 3).  Referring to business records from that time, Wentworth testified as to the following:

> Q.     Did you come to find out -- or what did you come to find out about the 2003 letter as it relates to someone being aware of K4K in Texas?
>
> A.     The 2003 letter, we don't know what documentation that they saw, but we assumed that because we no longer saw any Kars 4 Kids with a K advertising that they had acknowledged it; didn't respond to it, but acknowledged it, and pulled back their advertising.

(T. 38, 1-8). Wentworth noted that he did not find any Kars 4 Kids advertisements in Texas specifically for many years after the 2003 letter. (T. 38, 1-8; T. 41, 20 – T. 42, 3; T. 61, 24 – T. 62, 7). These years included 2003-2011. (T. 62, 5)[3].

Second, management changed at America Can!, so management became more aware of the Kars 4 Kids donation program starting in 2011. (T. 37, 15; T. 39, 5). Wentworth was placed in charge of the car donation program, but he did not personally become aware of the trademark violation until "we heard them, we saw them on the Internet using Kars 4 Kids with a K," and America Can! was receiving calls in that 2011 timeframe. (T. 42, 9-14). Most importantly, America Can! learned that Kars 4 Kids had acquired the domain name "carsforkids.com," and when accessed the domain directed users to the Kars 4 Kids website. (*See* T. 29-31, 130).

Wentworth's testimony is credible, and the Court adopts it as a key factor in showing that there were changes in circumstances which lulled America Can! into a passive position until 2011. Accordingly, the Court finds that these factual changes preclude a finding of inexcusable delay, and therefore the imposition of laches is denied.

Next, America Can! argues that Kars 4 Kids' laches defense is untimely because it did not meaningfully address laches during the trial. Although Kars 4 Kids provided timely notice of its laches defense in its answer to America Can!'s counterclaim (ECF No. 26, at 15), as well as in the Final Pretrial Order (ECF No. 187, at 53), it seems illogical to apply laches herein because Kars 4 Kids learned of the trademark claim upon receipt of the 2003 letter – around the same time as America Can!, and like America Can!, Kars 4 Kids did nothing to protect its alleged mark. Since Kars 4 Kids claims arose at the same time as America! Can's claims, the merits of the claims

---

[3] To the contrary, Kars 4 Kids presented testimony that it had a direct mail program and some Google advertising. This program seemed relatively small scale (*see* T. 366 – 378) and was not like a direct mail fulfillment center, so it could have been easily missed by America Can!.

would also be subject to the laches defense. By waiting to tee-up its laches defense until the remedy stage after litigating for four years, Kars 4 Kids attempts to unscrupulously apply this equitable principle and Kars 4 Kids cannot show any prejudice to warrant imposition of laches. Consequently, Kars 4 Kids raised it too late, and the Court thus denies the imposition of laches against America Can!. *See Bradford-White Corp. v. Ernst & Whinney*, 872 F.2d 1153, 1160 (3d Cir. 1989).

## III. <u>Damages</u>

America Can! seeks to recover compensatory damages on three theories: disgorgement of net profits, cost of corrective advertising, and royalties. This issue has been decided previously, and the prior rulings are adopted and incorporated herein. As noted, the Court ruled that the remedy of disgorgement of net profits was found to be the adequate measure of damages. *See Kars 4 Kids Inc. v. Am. Can!*, No. 3:14-cv-7770, 2019 U.S. Dist. LEXIS 79317, at *7-8 (D.N.J. May 9, 2019). This remedy does not permit a double recovery through imposition of damages measured by the amount of a reasonable royalty or the cost of corrective advertising. *See id.* at *2-8; (T. 5, 19 – T. 10, 23). As such, compensatory damages will be based upon disgorgement of Kars 4 Kids' net profits in Texas.

## IV. <u>Disgorgement of net profits</u>

At the Remedy Hearing, testimony regarding the appropriate accounting methodology to determine the disgorgement of net profits was proffered by two expert witnesses—Bryce Cook, on behalf of America Can!, and David Hall, on behalf of Kars 4 Kids— both of whom testified at the Remedy Hearing  (T. 64, 1 – T. 155, 1). The Court accepts the qualifications and areas of expertise of each expert witness as set forth in their curricula vitae. As such, Bryce Cook is qualified as an expert in the fields of forensic accounting and analysis, market entry dynamics, and

performance.  (T. 68, 22-25 – T. 69, 6-8); (Cook – Exhibit 446 (T. 65, 11)).  David Hall is qualified as an expert in forensic accounting and market analysis, damages, and calculations.  (T. 155, 23- T. 156, 3); (Hall – Exhibit K4K – 111 (T. 155, 20-22)).

At the outset, both experts recognized that the accounting principles that apply to a not-for-profit corporation are not consistent with the accounting principles applied to a for-profit corporation.  For example, a not-for-profit corporation does not generate a profit, and is usually exempt from paying certain state and federal taxes.  The key point here is that disgorgement of net profits ordinarily applies to a for-profit corporation.  This case, however, concerns two not-for-profit corporations, and as such, the accounting is different.  The experts used the amounts set forth in the accounting methodology of Kars 4 Kids for the years in controversy, and then converted those amounts in a manner to determine net profits as if Kars 4 Kids were a for-profit corporation[4].

Both experts acknowledge that to calculate net profits for the State of Texas, the first step is to determine Kars 4 Kids' gross and net revenues from the donations generated by the sale of vehicles originating from Texas.  More specifically, Cook explained that "gross revenue is what the auction price would be that [the auctioneer] . . . receives upon auction. Net revenue is what is actually remitted to . . . Kars 4 Kids, it's what they receive.  That is, the net of what Copart [auctioneer] retains, towing and providing that service."  (T. 78, 11-16).  The Court adopts the gross and net revenue amounts upon which the experts agreed:

| Year | Vehicle Count | Gross Revenue | Net Revenue |
|------|---------------|---------------|-------------|
| 2008-2019 (6/30 YTD) | 33,718 | $18,454,452 | $16,067,943 |

---

[4] Notably, America Can! did not object to the financial discovery provided by Kars 4 Kids post trial pursuant to Court Order.

After the net revenues were found, the experts disagreed on other expenses or adjustments which may be deducted from net revenue to find net profits. (T. 79, 20-22); (T. 160, 6-10); (K4K DX 505). America Can! (Cook) objected to three of Kars 4 Kids' (Hall) expenses or adjustments. Cook's objections are (1) the adjustment for purported apportionment of infringing versus non-infringing factors (called "advertising for fundraising ratio") (T. 80, 8-13), (2) deductions for grant money (T. 80, 14-17), and (3) deductions for common expenses (T. 80, 18-20). Each is analyzed below.

### Apportionment of Revenue of Infringing Factors

Hall espoused that an apportionment of net revenues of infringing factors is necessary because he acknowledged the concept that "there's other factors involved," other than the trademark, that a donor considers when donating a car. (T. 161, 17-19). For instance, a donor may base his decision on factors such as the not-for-profit's charitable mission (T. 161, 22-23), tax deductibility implications (T. 162, 6), and convenience, i.e., ease of making the donation (T. 156, 11-13). Thus, Hall concluded that "I don't think it's reasonable to conclude that a hundred percent of the Texas vehicle donation revenue is attributable to the trademarks at issue . . ." (T. 163, 20-22). In order to calculate the amount of these "other" factors, Hall contends that the amount related to the "other" factors must be deducted from the net revenue.

Since there was no information or data about donor decision-making, Hall employed the so-called "advertising for fundraising ratio" to estimate the portion of Kars 4 Kids' revenue that was attributable to the trademarks at issue. (T. 164, 6). There is no generally accepted accounting principle the employs the "advertising for fundraising ratio[5]," but Hall believes it provides an adequate estimate of Kars 4 Kids' Texas revenue as a result of its advertising efforts. According

---

[5] Indeed, Hall testified that he has never previously used the "advertising for fundraising ratio." (T. 194, 17).

to Hall, the numerator is the dollars spent on advertising for fundraising (T. 164, 13-15), and the denominator is all expenses less grants (T. 164, 20). This ratio apportioned 63% of the revenues to infringing profits and 37% to other factors. (T. 167, 1-6). Hall then multiplied the net revenue ($16,067,943) by 63%, which equals the infringing revenue ($10,115,299). (T. 167, 19).

Obviously, Cook disagreed with Hall. Cook opined that the advertising for fundraising ratio is not applicable for several reasons. First, Cook noted that all of Kars 4 Kids' advertising used the mark, and therefore all Texas donation revenue is based on use of the infringing mark. (T. 84, 5-12). Cook stated:

> So, if you understand the donors donate after they hear advertising and all that advertising used the infringing mark, then the assumption is that all advertising was using the infringing mark, and therefore all donations are based – all donation revenue is based on use of the infringing mark. And so there would be no reason to apportion anything to non-infringing use of the mark.

(T. 82, 2-8). Secondly, Cook objected to Hall's ratio because it has no relationship to donor intent. That is:

> A.    . . . His assumption is based on, as he [Hall] explains it, a proxy. He's saying that advertising as a percentage of total organizational operating expense, is a proxy for customers who donated because of advertising versus other factors. And I will just say from an accounting and finance standpoint, there's no way to ascertain or assign revenue based on the percentage of advertising as a percentage of total company costs. I've never heard of anything like that.
> Q.    And he called it advertising-to-fund ratio?
> A.    That's correct.
> Q.    Have you as an expert ever heard of such a ratio?
> A.    No, I haven't.
> Q.    Have you ever seen it in any expert materials?
> A.    No.

(T. 88, 9-22). There does not appear to be any logical reason to correlate all advertising expenses over all expenses as a methodology. As Cook opined, "apportionment is not a cost; apportionment

is a methodology to segregate the revenue between infringing and non-infringing revenue." (T. 83, 5-7). *See generally,* J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 30:64 (5th ed. 2019). Here, there is no independent data regarding a donor's motivation to donate a car. As Cook suggested, some type of survey of donors to assess donor motivation may have been an appropriate measure to segregate the infringing from the non-infringing revenues, but neither a survey nor any other reliable method to evaluate donor motivation was provided. The advertising for fundraising ratio does not derive a valid benchmark. (T. 82, 14). As such, the Court declines to accept an apportionment based upon the advertising for fundraising ratio espoused by Hall.

<u>Methodology of Deductions</u>

Next, one must determine whether the deductibility of certain expenses, if any, from the net revenue is appropriate to determine net profits. Cook and Hall rely on different accounting methodologies. Hall adopts the "full absorption method," under which overhead costs are apportioned to production of the infringing item, and Cook adopts the "incremental cost method," under which only direct costs of production are deducted. *See* McCarthy, § 30:68.

Hall explained that he used the full absorption method because he "thought it was reasonable [to deduct expenses] because of the single source of revenue [car donation program] and its central mission that the revenue funds . . . I included and allocated as well given at how it operates nationally as opposed to a region or division." (T. 180, 6-10). Hall "established a cost estimating relationship percent of revenue calculation that was then able to allocate to Texas based revenue, a portion of common expenses that . . . should be deducted to measure profits for Texas." (T. 179, 1-11). Hall's percentage is:

Expense     x     $\underline{\text{Texas Net Revenue}}$  = Deductible Amount
                              Net Revenue

On the other hand, Cook employed the incremental approach. Under his methodology, one looks "at only those expenses that would have been avoided or saved if the infringing revenue hadn't been provided." (T. 92, 14-17). Cook explained,

> So, in other words, if K4K didn't have a Texas operation which makes up approximately three or four percent of its total revenue, would it still have continued to incur certain expenses, or would some expenses have gone away. The only expenses that would have gone away are these Texas specific advertising expenses. So those are what we call incremental expenses.

(T. 92, 18-24). There are several expenses which were discussed at the remedies hearing and are analyzed below.

<u>Deductibility of Texas-Specific Advertising</u>

There is one expense, Texas-specific advertising, that both parties agree should be deducted from net revenues, with one caveat. That is, Hall and Cook agreed that the Texas-specific advertising in the amount of $3,447,191 should be deducted. This is an expense that does not include any amount related to the national advertising program. (T. 85, 10-12 (Cook)); (T. 173, 21-23 (Hall)). Regarding the agreed-upon amount for Texas-specific advertising, Hall recognizes that the exact expenditures are known from the accounting records, so it is best to use a precise number rather than relying on the full absorption method (K4K DX 508); and Cook agrees that this amount is an incremental cost. As such, the methodology is not an issue. Accordingly, the Court adopts the conclusion that the Texas-specific advertising in the amount of $3,447,191 should be deducted as an expense from net revenues.

The caveat, however, concerns a deduction of the Texas portion of Kars 4 Kids' national advertising campaign in the amount of $362,210. (K4K DX 509). These expenses were primarily for radio and online advertising. Hall argues that these advertisements most likely appeared in

Texas and should be allocated. To the contrary, Cook argues that the expenses would have occurred even if the advertising did not appear in Texas, so it is not an incremental cost. (T. 92, 18-24). Cook also calculated this expense to be $280,187 (ACCFK 447, 448), or about $80,000 less than Hall's amount (T. 177, 8-17).

The Court adopts Hall's full absorption method because it is reasonable that the national advertising program had some impact on Texas as it did in other states, and should be a deduction against net profits. Therefore, the Court adopts Hall's deduction of $362,210.

Deduction of Common Expenses

Hall estimates that Kars for Kids' major common expenses are management compensation, labor, and office expenses, which equal $1,011,000 (T. 179, 17 - T. 180, 4).

Cook does not believe such expenses should be deducted because none of these expenses would have been eliminated if Kars 4 Kids did not operate in Texas. As such, it is not an incremental cost. Nevertheless, Hall's full absorption method better reflects Kars 4 Kids' revenues and expenses in Texas because the revenues and expenses derive from one source—the car donation program; and the expense should be absorbed against revenue generated from Texas. The common expenses were likely a major factor in generating Kars 4 Kids' revenue, which contributed to the infringing revenue here. Therefore, Hall's estimate of $1,011,000 as common expenses is adopted as a deduction.

Deduction of Grants

The last area of dispute is the deductibility of grants (approximately $5 million). This is a critical issue because it queries whether grants should be considered as net profits or whether it is another expense. This issue does not directly concern full absorption or incremental cost methodology; rather, it addresses whether grants are part of net profits or an expense.

Hall opined that "the [grant] costs incurred for programs is part of what the expenditures Kars 4 Kids does to execute its programs in addition to grants." (T. 181, 3-5). He added "the grants [are] a cost, they're part of fulfilling their mission. Most of the way Kars 4 Kids fulfills its mission is through grants to its sister organization . . . ." (T. 181, 8-11).

Cook disagrees. He indicated that a grant is "not a business expense because the for-profit and not-for-profit operate in different ways, and this [grant deductibility] is clearly not an expense used to generate revenues. It is not a business expense." (T. 89, 21 – T. 90, 2).

The Court accepts Cook's reasoning. It seems clear that grants are not similar to a business expense. In a broad sense, grants of a not-for-profit are more akin to dividends paid to shareholders after all expenses are paid. As such, the Court declines to adopt Hall's rationale that grants are a business expense.

Summary of Net Profits

Overall, the Court rejects Hall's opinion on advertising for fundraising ratio and grant deductibility. The Court accepts Cook's rationale that Hall's theories generally lead to ludicrous results. As Cook noted:

> . . . I can tell you all combined he's [Hall] basically deducting 99 percent of that net revenue number, 99 percent goes away under his calculation, and he only leaves one percent, or $209,000 left.
>
> Which demonstrates really what would be called a perverse incentive for being able to deduct grants. Because it would make the damage remedy under the Lanham Act have no effect for a nonprofit organization that can simply claim oh well, you know, all of our grant money which is everything left over, you know, after expenses, that's an expense.
>
> And so they basically can infringe without impunity on these kind of cases, where defendant's profits are a monetary remedy, because they would never have to pay any profit other than a, you know, immaterial amount.

(T. 99, 10-23).

In conclusion, net profits equals:

| | | |
|---|---|---|
| Net Revenues: | | 16,067,943 |
| Expenses | | |
| 1. Texas specific ad | (3,447,191) | |
| 2. National Campaign | (362,210) | |
| 3. Office Expenses | (1,011,000) | |
| | | (4,820,401) |
| Net Profit: | | 11,247,542 |

A judgment in the amount of $11,247,542 shall be entered. Kars 4 Kids may apply to pay this amount over a period of time in order to maintain its charitable programs, if practicable.

## V.  Enhanced Damages

America Can! requests that the final judgment include enhanced, or treble, damages. The Court disagrees. When assessing damages under the Lanham Act, a district court "may . . . according to the circumstances of the case," award treble damages to the prevailing party "for any sum above the amount found as actual damages, not exceeding three times such amount."  15 U.S.C. § 1117(a). A court may award treble damages "if the infringement is willful or intentional." *Bethanie L. Mattek, LLC v. Donnay USA Ltd*, Civil Action No.: 13-6188 (ES) (JAD), 2016 U.S. Dist. LEXIS 151633, at *4 (D.N.J. Nov. 1, 2016) (citation and quotation marks omitted). The Third Circuit has explained that "willful infringement consists of more than the accidental encroachment of another's right. It involves an intent to infringe or a deliberate disregard of a mark holder's rights." *SecuraComm Consulting Inc. v. Securacom Inc.*, 166 F.3d 182, 187 (3d Cir. 1999), *superseded by statute on other grounds as recognized by Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168 (3d Cir. 2005). It is within the sound discretion of the court to award treble damages. *Zinn*, 2009 U.S. Dist. LEXIS 89915, at *116.

Here, the facts and the outcome of the trial do not warrant an upward adjustment of damages.  The jury found that Kars 4 Kids willfully infringed upon America Can!'s mark in Texas only; but not in any other state.  (Section II, Question 5).  In addition, the jury found no fraud in procuring Kars 4 Kids trademark.  (Section IV, Question 10).  As such, the Court exercises its discretion and declines to impose enhanced damages when the jury's findings were limited to one out of fifty states.

## VI.  Attorneys' fees and costs

America Can! seeks attorneys' fees and costs related to this litigation under both federal and state law.  (*See* ECF No. 258).

Section 35(a) of the Lanham Act provides that "the court may in its discretion" award attorneys' fees to the prevailing party in "*exceptional cases*."  15 U.S.C. § 1117(a) (emphasis added); *see Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 314 (3d Cir. 2014); *Renna v. Cnty. of Union,* Civ. No. 2:11-3328 (KM)(MAH), 2015 U.S. Dist. LEXIS 52381, at *6 (D.N.J. Apr. 21, 2015).  "[A] district court may find a case 'exceptional' when (a) there is an unusual discrepancy in the merits of the positions taken by the parties or (b) the losing party has litigated the case in an 'unreasonable manner.'"  *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d at 315 (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)); *see Pet Gifts USA, LLC v. Imagine This Co., LLC*, Civil No. 14-cv-3884 (PGS)(DEA), 2019 U.S. Dist. LEXIS 117744, at *2 (D.N.J. July 15, 2019).

Whether litigation positions or litigation tactics are "exceptional" rests within the sound discretion of the court and must be determined on a "case-by-case" basis considering the totality of the circumstances.  *Octane Fitness*, 572 U.S. at 554; *Fair Wind Sailing*, 764 F.3d at 315.  "Importantly, that discretion is not cabined by a threshold requirement that the losing party acted

culpably.  The losing party's blameworthiness may well play a role in a district court's analysis of the 'exceptionality' of a case," but it is not a necessary finding that a district court must make. *Fair Wind Sailing*, 764 F.3d at 315; *see Kern v. Med. Protective Co.*, Civil Action No. 13-02286-BRM-TJB, 2019 U.S. Dist. LEXIS 88479, at \*5 (D.N.J. May 28, 2019).

Moreover, "[p]revailing parties may be awarded reasonable attorneys' fees under New Jersey law even where they are denied under statute by the Lanham Act." *Sabinsa Corp. v. Creative Compounds, LLC*, Civil Action No: 04-4239 (DMC), 2011 U.S. Dist. LEXIS 82001, at \*32 (D.N.J. July 25, 2011).  *Id.* at \*38.  "New Jersey's state law is not read to award attorneys' fees in every successful infringement action," and thus requires "an analysis of the equities."  *Id.*

In this case, an award of attorneys' fees is not appropriate under the Lanham Act or New Jersey state law since the Court does not find this case to be exceptional.  There was no unusual discrepancy in the merits of Kars 4 Kids' and America Can!'s litigation positions, as both parties asserted trademark claims against each other; and the jury found that Kars 4 Kids willfully infringed in only one out of 50 states.  Moreover, neither party succeed on its claim for dilution, nor did America Can! prove its claim for cancellation of the 1-877-KARS-4-KIDS mark.  As such, both parties made substantive claims molded from the facts and law, and counsel for both parties litigated this matter zealously on behalf of their respective clients[6].  Thus, the parties must bear their own attorneys' fees and costs.

## VII.  Injunctive Relief

Finally, America Can! seeks injunctive relief against Kars 4 Kids in three ways.  First, to prohibit Kars 4 Kids from advertising in Texas; second, to bar Kars 4 Kids from conducting

---

[6]  Moreover, it is unreasonable to assess significant legal fees against Kars-4-Kids, that is providing summer vacations for underprivileged children, while America Can! is providing educational opportunities to underprivileged children.  There is no reason to undermine the charitable work of either party.   As such, each party shall bear its own legal fees and expenses.

business in Texas; and lastly, to require Kars 4 Kids to transfer the domain name "carsforkids.com" to America Can!.

To obtain an injunction, a party must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

The Third Circuit Court of Appeals held that the *eBay* factors apply in Lanham Act cases. *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 214-15 (3d Cir. 2014). "Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill." *Pappan Enters., Inc. v. Hardee 's Food Sys., Inc*., 143 F.3d 800, 805 (3d Cir. 1998). Lack of control over one's mark "creates the potential for damage to . . . reputation [which] constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 196 (3d Cir. 1990). Thus, "trademark infringement amounts to irreparable injury as a matter of law." *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 378 (3d Cir. 1992). Additionally, "potential damage to . . . reputation or goodwill or likely confusion between parties' marks" is irreparable injury." *Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F. 3d 157, 169 (3d Cir. 2000), *cert. denied*, 531 U.S. 1071 (2001)

During his testimony at the Remedy Hearing, Wentworth testified that the use of Kars 4 Kids' mark in Texas causes confusion between America Can!'s and Kars 4 Kids' advertising programs. Wentworth declared that

> We would always have to continue to separate ourselves from Kars 4 Kids with a K. Issues that, you know, somebody possibly laugh

about it, the Jimmy Fallon issue, the Bill O'Reilly, when they make fun of the jingle, and then we go places and people, oh yeah, I know you; and to have us continually have to say no, we're not them[7].

(T. 26, 11-16).

Further, Wentworth testified that the confusion tarnishes America Can!'s name and hurts it financially. (T. 26, 5-6). He noted that Kars 4 Kids advertisements were ongoing in Texas during the period between the jury verdict (May 29, 2019) and the Remedy Hearing (November 21, 2019). Mr. Wentworth and his staff conducted searches on engines such as Google during the above-mentioned timeframe in which he monitored Kars 4 Kids advertisements in Texas. Wentworth copied screenshots that appeared on Google and FoxNews.com (T. 14, 6-13) (*see* Exhibits 438-442). Specifically, Wentworth described Exhibit 439 as a "screen shot of banner ads of Kars 4 Kids with a K" found while using a cell phone; and another appeared on weather.com in the Dallas/Fort Worth area. (T. 15, 23 – T. 16, 25) (*see* Exhibit 440). Wentworth also described a Kars 4 Kids "pop-up banner ad" that appeared in Fort Worth Star-Telegram, Fort Worth's and the surrounding areas' digital newspaper. (T. 24, 16-18 – T. 25, 1-4).

In addition to the marketplace confusion, there is another issue concerning the "parked" domain of carsforkids.com. At the jury trial, there was evidence that Kars 4 Kids acquired the domain carsforkids.com, and upon access it redirected users to Kars 4 Kids' website. At the remedy hearing, it was disclosed that Kars 4 Kids abandoned the use of carsforkids.com and "parked" the domain. Based on the testimony, a domain name is considered "parked" when owned by a company or individual, but not associated with any web services, such as email or an active website. (*See* T. 30, 5-6). A domain that is parked does not automatically reroute to any active website, but is simply held inactive by the owner for later development and use. (*See id.*). Cook,

---

[7] There was testimony at trial that the notoriety of the Kars 4 Kids' jingle was commented on by Messrs. Fallon and O'Reilly. (Liability Trial, T. 327, 442).

America Can!'s expert[8], testified regarding the parked website: "So that just means they [Kars 4 Kids] stopped using it.  It's still registered to K4K, but they no longer use it.  So, if you go to the carsforkids.com website . . . [it] says not in use or under construction or something like that."  (T. 73, 14-18).  Thus, if a prospective donor attempts to access "carsforkids.com," nothing happens.

Moreover, Wentworth testified that approximately 40% of America Can!'s revenue is generated through their online website (carsforkids.org).  (T. 32, 17-21).  Wentworth concluded that a prospective donor who accessed the parked domain carsforkids.com but who intended to access America Can's ".org" website may consider America Can! as "incompetent" (T. 33, 17), because a prospective donor may question America Can!'s ability to maintain its website if the website is "consistently down" (T. 33, 16-17).  Consequently, America Can! argues that Kars 4 Kids' acquisition of the "carsforkids.com" domain name, and parking it, constitutes willful trickery that damages America Can!'s reputation.

Due to the consumers' confusion, as Wentworth testified, and the parked domain issues, the Court finds that compensatory damages are insufficient, and thus some injunctive relief is necessary to distinguish these charitable corporations.  *See A&H Sportswear Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 207 (1999); *Travelodge Hotels, Inc. v. S.S.B. & Assocs., LLC*, Civ. No. 14-cv-883 (KM), 2015 U.S. Dist. LEXIS 97465, at *23-24 (D.N.J. July 24, 2015).

Still, the Court finds that the parties' proposed parameters for injunctive relief are inadequate.  America Can! submitted an overbroad proposal for injunctive relief, while Kars 4 Kids presented a more reasonable proposal, but it was not tailored specifically to the facts of the case.  Generally, an injunction should be narrowly tailored to address the injury to America Can!. *See* McCarthy, § 30:3.  "The law requires that courts closely tailor injunctions to the harm that

---

[8]  Cook was not qualified as an expert in this area.

they address." *Id.* (citation omitted). "It is well-settled that the essence of equity jurisdiction has been the power to grant relief no broader than necessary to cure the effects of the harm caused by the violation." *Id.* (citation omitted).

In this case, the jury found that America Can! Cars for Kids owned exclusive rights to "Cars for Kids" in Texas only. (Section II, Question 6). Therefore, the injunction must balance the rights of America Can!, as found by the jury, against the right of Kars 4 Kids to advertise in all other geographic regions and states outside of Texas.

Kars 4 Kids' proposal indicates that it will not accept donations from Texas donors (FOF ¶ 22). Esti Landau, Kars 4 Kids' Chief Operating Officer, testified that, since the jury verdict, beginning in June 2019, Kars 4 Kids has established a "protocol where [its] system will not allow any donation in Texas to be saved, to go through the process." (T. 132, 11-20). Landau further stated that prospective donors who visit Kars 4 Kids' website and who wish to donate in Texas are redirected to a webpage that indicates that Kars 4 Kids is "currently not accepting donations in Texas" (T. 134, 4-7). Similarly, Kars 4 Kids' call center representatives inform potential donors that it is not currently accepting donations in Texas (T. 134, 16-17). Beyond this testimony, however, Kars 4 Kids has not disclosed to the Court the exact contours regarding how Kars 4 Kids will implement, manage and maintain such a protocol.

In addition, Kars 4 Kids agrees to eliminate advertising of the KARS 4 KIDS marks in the State of Texas; but it has not provided a mechanism or protocol to do so. Kars 4 Kids had also indicated that its national advertising program cannot eliminate Texas because it is controlled by third parties. As the Court understands it, the national advertising program, banner ads, or radio advertising on Sirius XM overlap state boundaries. As such, Kars 4 Kids, does not wish to abandon its national advertising program. One solution Kars for Kids offered was to include language in

those advertisements that it does not accept donations from Texas donors. (T. 136, 17-18). Although the Court finds that an injunction is appropriate, it notes that Kars 4 Kids has not sufficiently outlined a protocol or internal control to eliminate or minimize its Texas-related operations.

As such, the Court cannot decide the scope of the injunction without additional briefing by the parties. In my judgment, the parties may consider the following items to be included in the protocol, if appropriate:

(a) an internal control of Kars 4 Kids, or a comparable document to be part of the injunctive relief;

(b) the internal control must be approved by the Board of Trustees of Kars 4 Kids and managed under the direction of a specifically named officer or position of Kars 4 Kids;

(c) the internal control should specifically set forth the scope of the terms regarding elimination of advertising and business operations in Texas;

(d) the internal control should provide for ongoing monitoring and training of management and employees;

(e) the internal control should provide for safeguards if a breach occurs;

(f) the internal control should clearly identify the individual(s) responsible and subject to the Court's order, if the injunctive order is violated;

(g) the internal control may provide for an exception for national advertising if it is reasonable; and, finally

(h) the internal control should be drafted by an accountant or corporate compliance expert, if practicable.

A briefing schedule is set forth in a separate order.

VIII.  Cancellation of Kars 4 Kids' Federal Mark

America Can! seeks an order cancelling Kars for Kids' federally registered mark, 1-877-KARS-4-KIDS.  Under the Lanham Act, a trademark registration may be cancelled at any time if the registration was obtained by fraud; such a showing must be made by clear and convincing evidence that the registrant knowingly made a false, material misrepresentation.  Jury Instructions, p. 41; *see Covertech Fabricating, Inc. v. TVM Bldg. Prods.*, 855 F.3d 163, 174-75 (3d Cir. 2017).

In this case, cancellation of Kars 4 Kids' 1-877-KARS-4-KIDS mark is not warranted because, as indicated above, the jury determined that Kars 4 Kids did not knowingly procure its registration of the 1-877-Kars-4-Kids trademark by false or fraudulent means, which suggests that the jury found that the mark should not be cancelled.  (Question 10).  Therefore, the Court is not inclined to cancel the 1-877-KARS-4-KIDS mark.  The Court may consider other relief consistent with the jury's findings.

IX.  Conclusion

For the reasons explained above, the Court finds the remedies just and proper.  A judgment and order accompanying this memorandum will follow.


*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

April 1, 2020