## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| KARS 4 KIDS INC.,<br><br>                    Plaintiff,<br><br>        v.<br><br>AMERICA CAN!,<br><br>                    Defendant. | **MEMORANDUM**<br><br>Civil Action No.<br>3:14-cv-7770-PGS-LHG |
| AMERICA CAN! Cars for Kids,<br><br>                    Plaintiff,<br><br>        v.<br><br> KARS 4 KIDS INC.,<br><br>                    Defendant. | Civil Action No.<br>3:16-cv-4232-PGS-LHG |

This matter is before the Court on a remand from the Third Circuit directing me to "reexamine" the issues of laches and disgorgement wherein a judgment in the amount of $10,637,135.00 was awarded in this trademark dispute. *Kars 4 Kids Inc. v. America Can!*, 8 F.4th 209, 215 (3d Cir. 2021) (referred to hereinafter respectively as "K4K" and "America Can").

The Third Circuit upheld two of the basic issues within the litigation. First, equitable remedies are to be decided by the Court; and as such, the trial was bifurcated – liability by the jury and equitable remedy, if any, by the Court.

1

Secondly, and luckily, the Third Circuit did not disrupt the jury's verdict. The Third Circuit, however, was critical of my application of the law on laches and disgorgement.  Therefore, the purpose of this memorandum is to follow the instructions of the Third Circuit, and to review my prior decision on laches and disgorgement.  A synopsis of the Third Circuit's remand follows.

Firstly, the Third Circuit reviewed the law of laches as it applies to a trademark case. It noted that "the Lanham Act does not contain a statute of limitations, and instead subjects all claims to 'the principles of equity,' such as laches." *Kars 4 Kids*, 8 F.4th at 220 (internal citation omitted). Laches consists of two elements: (1) a party's inexcusable delay in bringing suit, and (2) prejudice to the defendant as a result of the delay. *See id*.

When reviewing the first factor, a party's inexcusable delay in bringing suit, one examines the length of delay against the most analogous state statute of limitation. Here, it is against New Jersey's six-year fraud statute. *See id*. at 221. The Third Circuit acknowledged that a mark owner "is not obligated to sue until it knows or should know that the defendant's conduct constitutes trademark infringement." *Id*.

The Third Circuit emphasized that since America Can first discovered wrongdoing by K4K in 2003, but did not sue until 2015, the statute had tolled. *Id.* Once the analogous statute of limitations expires, the burden of disproving delay

shifts from the alleged infringer to the rights holder. *See id.* "Accordingly, America Can bears the burden of disproving delay and prejudice." *Id.*

The Third Circuit indicated that the inexcusable delay analysis should begin in 2003 when America Can became aware of K4K's infringing acts in Texas, regardless of any subsequent "pull back." *See id.* at 221-22. The Third Circuit also noted that my original laches analysis focused exclusively on K4K's activity in Texas, but did not take into "account [K4K's] national advertising." *See id.* The Third Circuit directed me to review K4K's "national advertising and whether those advertisements reached Texas." *See id.* (citing *University of Pittsburgh v. Champion Products Inc.*, 686 F.2d 1040, 1044 n.14 (3d Cir. 1982). More specifically, the Third Circuit instructed that I must consider K4K's national advertising program and whether it "reached" Texas in a manner wherein "*a reasonable entity in America Can's shoes* would have filed suit sooner." *See id.* (emphasis added).

Within the Third Circuit's remand, it focused on the issue of whether the national advertising "reached" Texas, but in *University of Pittsburgh*, the concept is more refined as whether "open and notorious use by the defendant is relevant to the plaintiff's knowledge and, thus, whether its delay is excusable." *See University of Pittsburgh*, 686 F.2d 1044 n.14. The exact bounds of "open and notorious" in this context were not addressed in either the Third Circuit's opinion nor in *University of Pittsburgh*, but "open and notorious" is generally understood to mean

3

"[g]enerally known and spoken of," and in the context of property, "so conspicuous as to impute notice to the true owner." *See Black's Law Dictionary,* 1168, 1199 (9th ed. 2009); *see also* 6 McCarthy on Trademarks and Unfair Competition § 31:17 (5th ed. 2021) ("McCarthy").[1] Against this context, each portion of K4K's advertising program was reviewed. As America Can bears the burden to rebut the presumption of unreasonable delay, I considered each portion of K4K's advertising as presented by America Can (America Can Brief at 5-6, 9-12, ECF No. 420) and by K4K. (K4K Opp. at 9-15, ECF No. 425). To determine same requires findings of fact and conclusions of law.

In addition to the above, the Third Circuit directed that I also undertake a full analysis on prejudice, and suggested that I review several equitable arguments that may nonetheless bar laches. *Kars 4 Kids*, 8 F.4th at 222 n.12-13.  This also required findings of fact and conclusions of law.

Secondly, the Third Circuit noted that Section 35(a) of the Lanham Act provides for the disgorgement of an infringer's profits, "subject to the principles of equity." *See id.* at 223 (citing 15 U.S.C. § 1117(a)). Disgorgement "does not follow

---

[1]Within trademark law, the concept of "open and notorious" has been articulated in the related analogous use doctrine to encompass use "of such a nature and extent that the mark has become popularized in the public mind so that the relevant segment of the public identifies the marked goods with the mark's adopter." *See Underwood v. Bank of Am., Corp.*, 996 F.3d 1038, 1054 (10th Cir. 2021) (internal quotation omitted); *FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071, 1081 (11th Cir. 2016). This elaboration aligns with the "lack of notice" defense to laches wherein a lack of evidence "that the trademark owner knew or should have known of the *infringing* use [can mean that] decades can pass without a laches defense being created." *See* 6 McCarthy § 31:17; *see also* 6 McCarthy § 31:38.

as a matter of course upon the mere showing of an infringement," and, for example [damages] "will be denied where an injunction satisfies the equities of a case." *See id.* (internal citation and quotations omitted). To "evaluat[e] whether equity supports disgorging the infringer's profits," courts must consider "(1) whether the [infringer] had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off." *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 175 (3d Cir. 2005) (quoting *Quick Techs. v. Sage Grp. PLC*, 313 F.3d 338, 349 (5th Cir. 2002)).

The Third Circuit found that I had previously considered the second factor, diversion of sales, but that I had failed to consider the other five *Banjo Buddies* factors.  The Third Circuit thus vacated the prior disgorgement order and remanded the matter "for [this] Court to apply the remaining factors."  The applicability of the *Banjo Buddies* factors also requires one to apply the facts of the case against each factor. To do so also requires findings of facts from the evidence and testimony at trial.

Because the remand required additional factual findings to determine these issues, I have organized this memorandum into several sections: the jury's findings, judicial notice, findings of facts, and conclusions of fact and law. *See* Fed. R. Civ. Pro. 52(a)(1).

# I.     <u>The Jury's Findings</u>

Consideration of the laches and disgorgement issues is subject to the jury's verdict. Based on the jury instructions (T. 1236:11-1248:19, 1284:12-1304:2), the jury answered a number of questions about the liability of each party. (Redacted Jury Verdict, ECF No. 245). The verdict is enumerated below:

<u>Question 1</u>

Has Kars 4 Kids established by a preponderance of the evidence that it owns exclusive rights to use either of its alleged trademarks, I -877-KARS-4-KIDS or Kars 4 Kids, and that either of those trademarks were infringed by America Can! Cars for Kids in:

    __✓__   None of the States in the United States

    _____   Some of the States in the United States

    _____   All of the States in the United States

<u>Question 2</u>

Has Kars 4 Kids demonstrated by a preponderance of the evidence that America Can! Cars for Kids <u>willfully</u> used marks confusingly similar to its mark?

    ____   Yes

    __✓__   No

Question 3

[Question 3 was not answered due to jury's answer to Question 1]

Question 4

Has America Can! Cars for Kids established by a preponderance of the evidence that it owns exclusive rights to use its alleged trademark, Cars for Kids, and that trademark was infringed by Kars 4 Kids in:

\_\_\_\_\_   None of the States in the United States

\_\_✓\_\_   Some of the States in the United States

\_\_\_\_\_   All of the States in the United States

Question 5

Has America Can! Cars for Kids demonstrated by a preponderance of the evidence that Kars 4 Kids <u>willfully</u> used marks confusingly similar to its mark?

\_\_✓\_\_   Yes

\_\_\_\_\_   No

Question 6

If you answered "Some of the States in the United States" in Question 4, in which states do you find that America Can! Cars for Kids established by a preponderance of the evidence that it owns the exclusive right to use its trademark and that trademark was infringed by Kars 4 Kids?

[The verdict sheet listed all 50 States and D.C., but the jury only checked off one state – Texas]

<u>Question 7</u>

Has either party established by a preponderance of the evidence that its alleged trademark(s) became famous before the other party commenced use of its alleged trademark(s)? (Select only <u>one</u>.)

    \_\_\_\_    Kars 4 Kids

    \_\_\_\_    America Can! Cars for Kids

     ✓    Neither

[Because the jury answered Question 7 as "neither," the jury was instructed to skip questions 8 and 9 and proceed to Question 10.]

<u>Question 10</u>

Has America Can! Cars for Kids shown by clear and convincing evidence that Kars 4 Kids knowingly procured its registration of its trademark 1-877-KARS-4-KIDS, by false or fraudulent declarations or representations, orally or in writing, or by any false means, to the United States Patent and Trademark Office, and that the United States Patent and Trademark Office relied on those false or fraudulent representations in granting the registration of 1-877-KARS-4-KIDS?

    Yes \_\_\_\_\_

    No   ✓\_\_\_\_

8

## II.   <u>Judicial Notice</u>

Although neither party suggests same, the population and physical size of Texas may impact whether there was an open and notorious use of K4K's mark in Texas.  The Court takes judicial notice that the State of Texas had a population of approximately 20,851,820 people in 2000, 25,145,561 people in 2010, and that Texas has a land area of approximately 261,232 square miles.[2] *See* Fed. R. Evid. 201(c)(1).

## III.   <u>Findings of Fact</u>

I find the following facts:

### a.   <u>America Can – History</u>

1.     When determining the "shoes of America Can," its corporate history is an important factor.  At the outset, the precise chronology of the corporate changes appears to vary slightly between the testimony of the witnesses and the documents introduced.  However, when reviewed as a whole, the corporate history shows an expansion of America Can's goal to promote educational opportunities for less fortunate children, and the minor chronological differences are of little weight.

---

[2]United States Census Bureau, Table 5 - Resident Population of the 50 States, the District of Columbia, and Puerto Rico: April 1, 2000 (Census 2000) and April 1, 1990 (1990 Census), http://www.census.gov/population/cen2000/tab05.txt [https://archive.ph/n5lg]; United States Census Bureau, Guide to 2010 State and Local Census Geography – Texas, https://www.census.gov/geographies/reference-files/2010/geo/state-local-geo-guides-2010/texas.html (last revised Oct. 8, 2021).

2.      In or around 1976, America Can was founded by Grant East as Freedom Ministries, a not-for-profit entity.  Initially, the purpose of Freedom Ministries was to rehabilitate juvenile offenders by preventing them from returning to juvenile detention, and instead "get them back on track" to earning a general equivalence degree (GED). (T. 516:2-10).[3]

3.      Since its inception as Freedom Ministries, the not-for-profit entity operated under a variety of names throughout its existence.  Generally, the word "Can" was part of its name with an exclamation mark. (America Can Responsive Complaint at 3 n.1, ECF No. 1, Case No. 16:cv-4232). As such, witnesses at trial sometimes referred to the entity and its programs collectively as the "Can Academies." (T. 631:12-16).

4.      The non-for-profit entity funded its charitable efforts, at least in part, through proceeds from a car donation program. (T. 519:1-5).

5.      In or around 1985, Freedom Ministries purchased a building in Dallas and opened Dallas Can Academy, an education program run by Freedom Ministries as part of its efforts to serve juvenile offenders. (T. 516:11-13).

6.      In or around 1986, these educational programs were expanded to include all needy children in Texas, regardless of age, race, sex, religion, or other background. (T. 516:23-517:16).

---

[3]The facts are derived from the testimony and exhibits of the trial, as well as statement of facts and exhibits submitted by the parties following the Third Circuit's remand. Except where expressly stated otherwise, all transcript citations are to the trial transcript.

7.     In or around 1988, the not-for-profit was renamed Texans Can Academies ("Texans Can"). (T. 516:14-15).

8.     On or around August 14, 1989, Texans Can filed two assumed name certificates with the Secretary of State of Texas to operate its car donation program as "Cars for Kids" and/or "Kars for Kids." (T. 705:1-706:22; America Can Trial Exhibits 47, 48).

9.     By 1993, Texans Can had begun operating multiple programs and facilities similar to its Dallas Can Academy within Texas, collectively referred to as the Can Academies. (T. 631:12-16, 633:1-6).

10.     In the same year (1993), Texans Can began advertising its car donation program via a local radio station by working with Bonnie Curry, a radio host for 94.9 KLTY out of Dallas. (T. 628:5-10, 631:9-16).

11.     KLTY is a contemporary Christian radio station that reaches approximately 1 million listeners per week in the Dallas-Fort Worth metropolitan area. (T. 629:2-11, 635:2-5).

12.     Ms. Curry testified at trial that she frequently visited many of the Can Academies to grasp their charitable mission. (T. 633:1-9).

13.     Ms. Curry testified that she greatly appreciated the Can Academies' work and began on-air announcements promoting the Can Academies and their operations on average two to five times per week since 1993. (T. 636:20-637:7).

14.     Ms. Curry further noted that the name "Cars for Kids" and its associated car donation program were integral parts of the Can Academies profile. She testified "it's always been part and parcel of that process." (T. 643:1-5).

15.     The Can Academies' principal goal was to teach children to read. America Can's CEO Richard Marquez testified that it was the Can Academies' belief that "if we can teach you to read, and we can teach you to think … you'll no longer be a victim of society." (T. 520:7-16).

16.     The Can Academies became more than an educational institution as it also provided school supplies, lunch, clothing, and safe shelter to children in need. (T. 519:6-23, 633:15-634:4).  For example, Mr. Marquez testified that America Can through its car donation program purchases on average 1,800 to 2,000 pairs of eyeglasses per year for needy children. (T. 519:21-23).

17.     Sometime in or around 1996, Texans Can received a charter that allowed it to formerly operate a charter school and permitted state funding for those schools.  (T. 522:16-24, 523:7-9).

18.     In or around 2003, Mr. East again renamed the not-for-profit as America Can because his goal was to open Can Academies across the country. (T. 517:17-21).

19.      On or around January 19, 2005, the Texas Education Agency approved America Can's request to change the name of the charter holder from Texans Can to America Can. (T. 524:8-12).

20.     In or around 2007, America Can expanded its Can Academies to St. Louis, Missouri and Baton Rouge, Louisiana. (T. 530:18-22, 531:15-19). However, those academies closed within a year due in part to funding problems and issues with the respective states' guidelines on hours of school operation. (T. 531:20-532:23, 538:6-12). America Can then refocused its efforts within Texas. (T. 533:3-7).

21.     Central to America Can's operations around this time was Mr. Marquez. Mr. Marquez served in the Army between 1967-1969 before working in various capacities as a teacher, high school administrator, and assistant high school principal. (T. 509:2, 510:5-18). He later served as principal of Sunset High School between 1985 and 1990. (T. 513:3-6).

22.     During his tenure at Sunset High School, there was an ongoing problem with student attendance and high dropout rates.  As a result, Mr. Marquez began an initiative where he would regularly "roam the streets in [his] pickup truck picking [students] up in the morning, bringing them back to school." (T. 513:9-17).

23.     This initiative garnered him national recognition, and catapulted his career to the U.S. Department of Education as a dropout prevention specialist.  At trial, he humorously characterized himself there as "the first dropout czar." (T. 514:2-8).

24.     Mr. Marquez later worked as an education consultant between 1998 and 2007 (T. 581:4-13) before accepting the role of America Can's president in 2007 (T. 539:12-14) and later its CEO. (T. 508:22-23).

25.     Similarly important to America Can's operation was chief operating officer Malcolm Wentworth, who joined in or around 2005. (T. 686:1-2). Mr. Wentworth, a Marine veteran, bore many administrative duties for America Can, working initially as a facility manager and general contractor before being promoted to COO in 2009. (T. 686:3-22). In or around February of 2011, he became responsible for America Can's car donation program. (T. 686:23-25).

26.     By the time of trial in 2019, America Can was operating fourteen (14) Can Academies in Texas (T. 686:17-18) and employing approximately 860 to 900 staff members. (T. 520:24-521:3). Mr. Marquez testified that the Can Academies serve approximately 8,000 students each year and over 100,000 students have graduated since their inception. (T. 520:17-23).

27.     At trial, the deposition of Cheryl Marie Poldrugach was read into the record. Although her college background was in broadcast journalism (T. 664:24-25), Ms. Poldrugach was hired as a PR manager for America Can in or around 2002 (T. 666:16-19). She became involved with the car donation program in 2007 or 2008 (T. 668:15-21) before leaving in or around 2009 or 2010 to start her own marketing business. (T. 665:7-16).

28.  Ms. Poldrugach testified that in 2007 and 2008, donated cars came in "from everywhere" but that "the bulk was local," and that approximately two-thirds of America Can's contemporary advertising budget, between $2-3 million, was spent in Texas. (T. 673:1-11, 676:20-677:2).

### b.  K4K – Exhibit 119

29.  One important trial exhibit is K4K's Trial Exhibit 119.  It is a master transaction list of K4K's advertising expenditures between September 1998 and June 2015. (AC APP at 362-528)[4] ("the Transaction List").

30.   Esti Landau, K4K's chief operating officer, testified at trial that the Transaction List consisted of "a Quickbooks export of advertising for [K4K]" and that it was kept in the ordinary course of business for K4K. (T. 439:22-440:9).

31.  The Transaction List reads chronologically and categorizes each line item expenditure by payment method, date, targeted market, advertising medium, vendor, and payment amount, although sometimes not every category was completed.

---

[4]In support of its brief, America Can filed an extensive appendix of curated trial transcripts and exhibits. This appendix was filed on ECF as two parts with consecutive pagination, ECF Nos. 420-2 and 420-3, and will be collectively cited to as "AC APP."

32.     More specifically, a partial example of the Transaction List is set forth below to illustrate to the reader how it displays each transaction. (AC APP at 364).

| Type | Date | Number | Market | | Name | Memo | Account | Class | Debi | | |
|------|------|--------|--------|--|------|------|---------|-------|------|--|--|
| Check | 08/31/2000 | 5323 | NJ | Print | BP Graphics | cus#194 inv.#15807 | kars 4 kids | | 76.66 | | |
| Check | 10/24/2000 | 5548 | NJ | Print | BP Graphics | cus#194 inv.#18536, #18688, #18860 | kars 4 kids | | 75.00 | | |
| Check | 11/01/2000 | 5589 | | | Asbury Park Press | Ad | kars 4 kids | | 251.40 | | |
| Check | 11/28/2000 | 5718 | NJ | Print | BP Graphics | invoice # 19126, 19223, 19845 | kars 4 kids | | 70.00 | | |
| Check | 11/29/2000 | 5724 | | | Asbury Park Press | Ad | kars 4 kids | | 502.32 | | |
| Check | 12/15/2000 | 5863 | National | Print | Yated Ne'eman | Invoice numbers: 9219, 9283 | kars 4 kids | | 60.00 | | |
| Check | 12/19/2000 | 5886 | National | Print | Hamodia | invoice # 10061, 9928, 10220 | kars 4 kids | | 50.00 | | |
| Check | 01/10/2001 | 1004 | National | Print | Yated Ne'eman | | kars4kids expenses | | 90.00 | | |

33.     The Transaction List includes over one hundred and fifty pages of K4K advertising details between 1998 and 2015, and shows general trends in K4K's advertising program.

### c.  K4K Car Donation Program

34.     K4K President Asher Moskovits testified at trial how K4K's car donation program operates: (1) K4K purchases advertisements to reach potential donors; (2) said donors contact K4K and commit to donate their vehicle; (3) K4K hires a local tow service to collect the vehicle from the donor; (4) the tow company picks up the vehicle from the donor, and delivers the vehicle for auction or scrap; and (5) K4K collects the proceeds after deducting auction or scrapping costs. (T. 84:16-85:2).

35.     K4K then utilizes the proceeds to advertise its car donation program further, and donates the remaining funds to day camps in New York for Jewish children or providing tuition assistance for Jewish private schools, either by itself or through its sister 501(c)(3) organization, Oorah, Inc. (T. 85:1-2; 254:12-255:23; AC APP at 247).

36.     Often a donor would reside in one state, and the donated car would be elsewhere.  Mr. Moskovits provided several reasons why this event occurs: (1) the donor saw an advertisement in a different state from where he resides; (2) the vehicle broke down while the donor was away from home; (3) the donated vehicle was owned by a relative who had died or lost the capacity to drive; or (4) the donor had moved and left the vehicle behind. (T. 85:20-86:12).  As such, donors may offer a vehicle from a state where the K4K mark did not appear, resulting in "residual donations."

### d.  K4K – Pre-2003 Advertising

37.     K4K CEO Rabbi Eliyohu Mintz testified that in or around 1995, K4K's car donation program advertised primarily in New York, New Jersey, Pennsylvania, and Maryland. (T. 261:18-20).

38.     Rabbi Mintz characterized K4K's advertising efforts around this time as an "unconventional guerilla marketing" approach. (T. 260:15-261:6). Since K4K had a limited marketing budget at this time, the approach included manual distribution of flyers in or around Manhattan and the mailing of postcards. (T. 261:7-262:4).

39.     Rabbi Mintz testified that these post cards were forwarded across the country, but he explained that the actual mailing list was generated by collecting out-of-state newspapers from in or around Manhattan. K4K personnel then "scrap[ed] the telephone numbers from the bylines of newspapers" contained in the

used cars section and fed those phone numbers into a computer program which produced the corresponding addresses. (T. 262:25-263:16).

40.    Rabbi Mintz did not offer a mailing list into evidence, and there was no documented evidence introduced as to whether any address(es) on the mailing list were situated in Texas.

41.    In light of Rabbi Mintz's testimony, there is no documented evidence of precisely where the postcards were sent.  There is little to no support demonstrating that these postcards reached Texas.

42.    In or around 1998, K4K began a print advertising program in periodicals like the *Jewish Press*, *Hamodia*, and *Yated*. (K4K Opp. at 12).

43.    K4K characterizes these periodicals as "national print advertising" and labeled them as national advertising within the Transaction List. (K4K Opp. at 12; AC APP at 363). The description is an exaggeration when considering its actual distribution in Texas.

44.    K4K Trial Exhibit 089, a *Jewish Press* circulation report, showed only 89 subscribers and 0 single copy sales of the *Jewish Press* in Texas between 1997 and 1999. By comparison, New York had 50,766 subscribers and 11,838 single copy sales of the *Jewish Press* in the same time period. (AC App. 358-59).

45.    No similar circulation data was provided for *Hamodia* and *Yated*.

46.     Due to the insignificant number of subscribers and sales of the *Jewish Press* in Texas, only a negligible amount (de minimis) reached Texas when compared to the state's population at the time (approximately 20 million).[5]

### e. 2003 and the First Cease-and-Desist Letter

47.     In or around 1998, K4K expanded its operation from a principally NY/NJ/PA/MD not-for-profit to one that solicited donors in more states. (T. 261:21-24).

48.     In particular, from 2003 onward, K4K began utilizing different marketing techniques to grow its car donation program. K4K phased in magazines, print advertising, newspapers, conventional radio advertising, billboards, internet advertising, radio streaming advertising, television advertisements, and satellite radio advertising. (K4K Opp. at 11-13).

49.     In or around August 2003, America Can noticed K4K advertising in the *Dallas Morning News* (a newspaper).

50.     Mr. Wentworth testified that America Can, through its attorneys, immediately forwarded the following cease-and-desist letter to K4K. (AC APP at 356-57). The letter, dated August 7, 2003, states in pertinent part:

> Texans <u>CAN</u>! recently learned of your use of the phrase "Kars 4 Kids" through an advertisement that appeared in the *Dallas Morning News*.  Your use of this name will infringe Texan [sic] <u>CAN</u>!'s exclusive trademark rights in the phrase "Cars for Kids" for use as the name of an automobile donation program to benefit children in Texas.

---

[5]*See* Section II – Judicial Notice.

Therefore, we must request that you forego your use of the phrase "Kars 4 Kids" in your business dealings in Texas.

Texans <u>CAN</u>! has been exclusively utilizing the name in Texas since 1992, and has achieved widespread regional recognition throughout the state. This recognition was achieved through extensive marketing and advertising efforts, including print and broadcast advertising, billboards, door hangings and other publicity methods. Your use of the mark "Kars 4 Kids" in Texas is likely to cause confusion, mistake and deception with respect to Texans <u>CAN</u>!'s rights in its Mark. It is clear that your services and Texans <u>CAN</u>!'s services are advertised in the same stream of commerce such that the public recognition and goodwill embodied in Texans <u>CAN</u>!'s Mark is threatened and eroded by your unauthorized use. Such usage unfairly trades on my client's goodwill, and is likely to cause confusion, mistake or deception as to the source and quality of your services and authorization, licenses or sponsorship by Texans <u>CAN</u>!, all of which is in violation of Section 43(a) of the federal Lanham Act, Section 16.26 of the Texas Business & Commerce Code, and Texans <u>CAN</u>!'s rights under Texas common law.

Although we assume at this point that your adoption and use of a mark confusingly similar with Texans <u>CAN</u>!'s Mark was inadvertent, we must insist that you immediately cease and desist from all use in Texas of the Mark or anything confusingly similar thereto, including without limitation, the name "Kars 4 Kids" referred to above.

51.    K4K reportedly did not respond to the letter. (April 1, 2020 Memorandum at 6, ECF No. 325; Nov. 21, 2019 Damages Hearing T. 38:1-8, ECF No. 324).

52.    Mr. Moskovits testified at trial that K4K received the August 2003 cease-and-desist letter from America Can, but K4K did not investigate America Can's claims of trademark rights in Texas. (T. 202:21-203:14).

53.     Rabbi Mintz testified that K4K never responded to the letter because "[K4K] just figured [America Can was] trying to piggyback on [K4K] . . . we didn't take it seriously and we just – we ignored it[.]" (T. 274:8-25).

54.     K4K's inaction notwithstanding, Mr. Wentworth nonetheless noted that after the letter was forwarded, K4K seemingly "pulled back [its Texas] advertising" as America Can personnel did not see any infringing K4K advertisements in Texas again for many years. (Nov. 21, 2019 Damages Hearing T. 38:1-8).

55.     In August 2003, there were only two entries on the Transaction List for print advertisements in the *Texas Jewish Post*, dated August 11, 2003 and costing $210 each. (AC APP at 366).

56.     Each entry ran around the same time as the August 2003 cease-and-desist letter, but there were no further listings on the Transaction List immediately after the cease-and-desist letter was forwarded to K4K.

57.     Because the *Texas Jewish Post* advertisements were not mentioned during the trial or in the current briefing, I find that these were isolated advertisements rather than an open and notorious marketing effort in Texas.

58.     In or around 2003 and through 2004, K4K commenced "nationwide email blasts" to grow its online advertising efforts. (K4K Opp. at 13).

59.     Ms. Landau testified that these blasts were sent out nationwide during this time (T. 372:11-373:13), but no mailing list was introduced into evidence, and

there was no testimony expressly confirming that there were any recipients who resided in Texas.

60.    From Ms. Landau's testimony alone, it would be speculative to determine whether any, or how many, emails reached Texas.

61.    In or around 2003, K4K began advertising online through Yahoo. (T. 482:25-483:1).

62.    The record lacks any sufficient detail to determine when, or if, K4K's Yahoo advertising reached Texas in any meaningful way.

63.    Ms. Landau testified about a Yahoo! Advertising Center report for K4K's Yahoo advertising between June 2003 and September 2003. (K4K Trial Exhibit 092; AC APP at 361).

64.    The Yahoo report enumerated the results from K4K's Yahoo advertisements which Ms. Landau characterized as "nationwide." (T. 367:19-368:20).

65.    Overall, the Yahoo report shows minimal advertising engagement, as the one advertisement expressly marked "North kars4kids" generated only 911 impressions and only two clicks during the time period for the entire country.  (AC APP at 361).  There is no specific evidence or details about the number of impressions or clicks from the Yahoo advertising in Texas during that time period (June through September 2003).

66.     At oral argument for the remanded issues, counsel for K4K indicated that a second ad from the Yahoo report, one marked "East kars_east," was in fact a K4K advertisement.  It generated 9,694 impressions and 113 clicks during the same time period. (Nov. 30, 2021 Remand Hearing T. 22:15-23:14, ECF No. 442).

67.     These results are again for a national market, meaning these 113 clicks were spread across all of the states with no specific representation as to how many, if any, actually originated from Texas.

68.     There was no expert evidence on the demographics of said Yahoo advertising campaign to support any method from which one may determine whether such advertisements reached Texas in an appreciable manner. Based on the limited evidence presented, it is speculative to determine when, or if, the Yahoo advertisements reached Texas.

69.     In or around 2003, K4K began advertising online with Google using assorted keyword and search campaigns. (T. 482:23-24).

70.     From 2003 until the time of trial in 2019, Ms. Landau testified that K4K had reportedly generated over 600 million ad impressions through its advertising with Google and drawn over 4 million clicks to K4K's website. (T. 371:4-13).

71.     As explained by Ms. Landau at trial, and K4K's counsel at the remand hearing, an "impression" means that a user searched for a term and, if that term was a "key word" as designated by a Google advertisement campaign (e.g., Kars 4

Kids, car donation, donate car, etc.), the user would be shown an impression consisting of a "banner ad" at the top of the search results list, increasing the likelihood said user would be drawn to the advertiser's website. (T. 370:13-371:3; Nov. 30, 2021 Remand Hearing T. 23:4-8)

72.     Unlike K4K's Yahoo advertising which was substantiated in part by the Trial Exhibit 092 advertising report (¶63),[6] no similar report was submitted for Google.

73.     Critically, Ms. Landau's testimony lacks any detailed analysis of K4K's Google advertising. K4K's briefing overbroadly cites Ms. Landau's testimony in referencing these impression/click numbers without any year-by-year or state-by-state analysis. (K4K Opp. at 13).

74.     K4K's Google advertising as whole, if not the details, is substantiated in part by K4K Trial Exhibit 224, a "summary from all the invoices [K4K] received from Google for advertising on Kars 4 Kids marks," which were kept in the ordinary course of business, but this document lacks important specifics.  (T. 371:14-22).

75.     Trial Exhibit 224 lists invoice numbers and dates, ranging from April 2009 to April 2017. (AC APP at 531-534). The exhibit does not, however, indicate the number of impressions or clicks of the Google ads in any specific timeframe.

---

[6] Unless noted otherwise, all paragraph citations refer to the Court's respective numbered findings of fact.

76.     There is no specific evidence in the record as to when, or if, the
Google advertising reached Texas; and there was no expert evidence introduced
from which one may draw a conclusion about how much, if any, Google
advertising reached Texas at any specific time between 2003 and the time of trial
(2019).

77.     Despite the lack of evidence on year-by-year or state-by-state
engagement, there is some circumstantial evidence found in the Transaction List
that may bear on this issue. Taking Ms. Landau's testimony as true, the
Transaction List identifies K4K's Google advertising transactions over the years.
These transactions gradually increased in costs between 2003 and 2019. From this,
one may infer that the steady increases in Google transaction costs over the years
correspond to increasing levels of reach and engagement, quantified by
impressions and clicks.

78.     For example, K4K's transactions with Google in the early years of
2003-05 were relatively small, usually between a few hundred to a few thousand
dollars. (AC APP at 378) (including a $59.23 charge to Google on March 3, 2005
and a $2,673.73 charge to Google on March 17, 2005).

79.     These transaction amounts skyrocketed in later years, routinely
costing hundreds of thousands of dollars starting around 2011 through 2013. (AC
APP at 505, 522) (including a $652,694.36 paid to Google on December 31, 2013
and a $653,596.72 paid to Google on December 31, 2014).

80.    There was a lack of documented evidence showing any state-by-state or year-by-year analysis resulting from these increasingly costly Google transactions; and there was no expert evidence in the field of advertising demographics to determine such conclusions from the evidence.  However, from the Transaction List (¶¶ 77-79), one may conclude that there was a dramatic change in K4K's Google advertising expenditures around 2011- 2013.

81.    It would be speculative to conclude exactly when K4K's Google advertising began reaching Texas in any appreciable amount.

82.    Sometime in or around 2003, K4K began advertising with different online newspapers. (K4K Opp. at 13).

83.    These online newspapers included *Arutz 7*, *DEBKA*, *Haaretz*, and the *Insider*. According to Ms. Landau, they are all online Israeli newspapers and were considered to be "national" advertisements. (T. 369:14-21).

84.    There was no evidence introduced to show what level of engagement these advertisements had with Texas.  It would be speculative to determine whether these Israeli online newspapers reached Texas in any appreciable amount without further supporting evidence.

85.    In or around 2003 and onward, K4K expanded its print advertising to more newspapers. (K4K Opp. at 12).

86.    Ms. Landau testified that K4K advertisements were placed in the *Daily News*, the *New York Post*, the *Asbury Park Press*, the *Star Ledger*, the

*Chicago Sun Times*, the *Honolulu Times*, and *AAA World Magazine*.[7] (K4K Opp. at 12; T. 363:4-366:13, 378:15-379:11).

87.    Ms. Landau testified these were "regional newspapers." (T. 363:7-12).

88.    For example, Ms. Landau testified that advertisements in *AAA World Magazine* were distributed in New Jersey, Pennsylvania, and Delaware.  (T. 379:9-11).

89.    There was no evidence demonstrating that distribution of these newspapers reached Texas. People most often read their local newspaper, but it would be speculative to find that Texans read the *Asbury Park Press* (New Jersey) or the *Honolulu Times* (Hawaii) in any appreciable number.

90.    There were no facts or expert evidence on the demographics of such print advertising showing these newspapers reached Texas in any appreciable amount.

91.     The Transaction List similarly reflects that these newspapers were internally considered by K4K to be regional publications. For example, the *Chicago Sun Times* is listed as a regional publication in Illinois, and the *New York Post* and the *Daily News* are listed as part of the NJ/NY market. (AC APP at 365, 479).

---

[7] Although K4K's opposition indicates that advertising in each of these publications commenced sometime after 2000, the Transaction List shows transactions for the *Asbury Park Press* arising in 1999. (AC APP at 363).

f.  2004-2010

92.     In or around 2004, K4K began advertising on billboards in New

Jersey, and soon expanded to other cities and states using three vendors: CBS

Outdoors, General Outdoors, and Clear Channel Outdoor. (T. 379:21-385:6).

These cities included New York, Chicago, Los Angeles, San Francisco, Boston,

Seattle, Detroit, Minneapolis, and Washington D.C. (T. 379:18-380:2, 385:3-6).

93.     At one point, Ms. Landau acknowledged that she was "not sure that

[K4K] did Texas billboards." (Nov. 21, 2019 Damages Hearing T. 141:15-16).

94.     Although there was a lack of testimony, there are several entries on

the Transaction List from 2009 onward that list "Clear Channel Outdoor TX" as a

billboard vendor. (AC APP at 439, 442, 445, 447, 450, 487, 504, 519, 522, 528).

However, several of these "TX" entries were marked paid for by "Kars 4 Kids:

MN" and "Kars 4 Kids: IL" (AC APP at 519, 522) rather than "Kars 4 Kids: TX,"

raising doubt as to where the billboards actually were. The "TX" letters were

therefore not explained and there was no evidence from which to conclude these

were billboards in Texas.

95.     It is speculative to find that the letters "TX" for those entries listed as

"Clear Channel Outdoor TX" refers to billboard space in Texas because: (1) Ms.

Landau had no recollection of K4K purchasing billboard space in Texas; (2) the

parties do not discuss same in their briefing; and (3) the Transaction List does not

show or describe the entries as targeting the Texas market.

96.     In or around 2004 or 2005, K4K began its traditional radio advertising with CBS Radio. (K4K Opp. at 11).

97.     Ms. Landau characterized the "reach of CBS radio" as "a national reach" (T. 355:25-356:1); but she explained that the actual reach of advertisements with CBS depended on whether the advertisements were purchased from a local station or a national network. (T. 353:12-18).

98.     Ms. Landau testified that K4K mostly advertises through "local spot[s]." For instance, K4K purchased ads with CBS radio in New York, Chicago, Boston, Los Angeles, San Francisco, St. Louis, Washington D.C., Atlanta, Manassas, and Philadelphia. (T. 353:19-354:5). There was no mention of any Texan locales, nor any cities close to Texas, such as Oklahoma City, Oklahoma or Shreveport, Louisiana, that may have had overlapping radio markets.

99.     K4K's CBS Radio advertisements ran on stations like WFAN and 1010 WINS in New York, WBBM and the Score in Chicago, KNX in Los Angeles, KCBS-AM in San Francisco, WJFK in Washington D.C., WCCO in Manassas, WIP in Philadelphia, and WBZ in Boston. *Id.*  There was no testimony that included any Texan stations nor any stations in neighboring areas.

100.   Without any expert evidence in the demographics of such an advertising program, it is speculative to determine whether any of these CBS Radio advertisements reached Texas.

101.    Ms. Landau testified that K4K also placed advertisements with Bonneville International Radio. Ms. Landau indicated that advertisements with Bonneville aired in the Chicago, San Francisco, Seattle, and Phoenix markets. (T. 356:17-358:24). Nothing in or near Texas.

102.    Without any expert evidence in the demographics of such an advertising program, it is speculative to determine that any of these Bonneville radio advertisements reached Texas.

103.    The Transaction List includes five entries between May 2008 and February 2009 wherein K4K listed relatively small transaction amounts with CBS Radio Houston, but neither the witnesses nor the briefs discuss same. (AC APP at 416-18, 426). These transactions occurred on May 9, 2008 ($787.60), May 31, 2008 ($1,677.40), June 30, 2008 ($1,575.00), July 28, 2008 ($393.80), and February 22, 2009 ($800.00).

104.    Ms. Landau did not testify about these ads in Houston at trial and the transactions were not discussed in the briefing. Because these transactions consisted of only a few comparatively small amounts over a short sporadic period between May 2008 and February 2009, they reached Texas in a de minimis amount, not in an open and notorious manner.

105.    In or around June 2005, K4K purchased an advertisement in *Reader's Digest*, a national publication. (K4K Trial Exhibit 091; AC APP at 529).

106.    The receipts for the *Reader's Digest* advertisements indicate that the ad may have also been published in the July 2005 issue; but the ad itself was not introduced into evidence. (Declaration of Briggs M. Wright, Ex. 8 at 5-6, ECF No. 425-1).

107.    Ms. Landau testified that *Reader's Digest* ad was circulated "in the millions across the country," (T. 378:12-14), but she did not quantify the circulation of *Reader's Digest* in Texas.

108.    There was no evidence nor testimony by any witness or expert about whether one or two isolated advertisements in *Reader's Digest* in June 2005 would have reached Texas in any appreciable or open and notorious manner.

109.    As noted above, Ms. Poldrugach's deposition was read into the record at trial. She testified that in or around 2006 or 2007 when she was working as a public relations manager for America Can, several donors contacted her and mentioned being confused about the distinction between America Can and K4K. (T. 681:5-21).

110.    The above statements of Ms. Poldrugach are ambiguous for several reasons: (1) she did not identify the donors, so it is unknown if the donors resided in Texas; (2) she did not indicate whether the donors were calling based on an advertisement in Texas or outside of Texas; and (3) she did not specify the number or frequency of confused donors who contacted America Can. As such, the level of confusion that existed in Texas and other states at this time (2006-2007) was not

clearly substantiated. Moreover, it is not clear whether the confusion was from donors from states other than Texas, or whether the donors were calling based on ads seen while traveling outside of Texas as explained by Mr. Moskovits (¶36).

111.   From Ms. Poldrugach's testimony and the present record, it is speculative to conclude that the donor confusion was so substantial that it would prompt action from America Can at this time (2006-2007).

112.   Although K4K attempts to highlight this early instance of confusion in its briefing (K4K Opp. at 9), the record shows minimal substantiated confusion in the years prior to litigation. To contrast the timing of substantiated instances of confusion, *compare* AC APP at 222 (June 2009) *with* the following exhibits showing confusion in later years: AC APP at 223 (March 2015), 224 (February 2015), 239-41 (August 2015), 242 (October 2015), 244-45 (June 2016), 316-17 (April 2016), and 332 (January 2016).

113.   Mr. Marquez testified that he had knowledge of K4K advertisements in or around 1998 through 2007. Specifically, when he was working as a consultant, he encountered K4K's advertisements in Florida and a few other eastern states in his business travels. (T. 579:21-24, 581:1-17).

114.   At an earlier deposition, Mr. Marquez testified that he heard and saw the K4K advertisements "everywhere," but his remark was clarified at trial as "Yeah. That's where I traveled," and "it was everywhere. It was different parts of the country." (T. 578:21-580:8).

115.   As a whole, I understand Mr. Marquez's testimony to mean he heard K4K's advertisements while traveling outside of Texas to many different states, but not in Texas. (America Can Reply at 7, ECF No. 431).

### g.   2011

116.   In or around 2011, K4K had registered and was operating www.carsforkids.com, describing it as "a division of Kars4Kids.org" on the home page without any disclaimer or acknowledgment of America Can. (T. 480:20-24, 918:18-919:25; AC APP 354-55).

117.   It was around this time that America Can noticed the website and K4K's growing internet presence, prompting America Can to contact its lawyers in 2011 to "evaluate what the issue would be, moving on to 2012." (Nov. 21, 2019 Damages Hearing T. 42:7-20).

### h.   2012-2019

118.   In or around 2012, K4K began advertising through online streaming radio with Pandora streaming service. (AC APP 477).

119.   Ms. Landau testified that Pandora advertisements were purchased based on a geographic region. That is, Ms. Landau indicated that one advertisement only "ran in California" and while another only ran in "Miami, St. Louis, Denver, Phoenix, and Tampa." (T. 362:1-363:3).

120.   In or around October of 2012, Mr. Moskovits emailed Ms. Landau about America Can and K4K's potential entry into the Texas market. He wrote that

"[f]rom a marketing standpoint — if [T]exas cars for kids is very branded there may always be confusion - even though ion [sic] the beginning that may be to our advantage in the long run it can hurt us too[.]" (AC APP at 330).

121.   Further down in the same email, Mr. Moskovits suggests that K4K enter Texas under a new, similar name like Donate Cars such that "[f]rom a legal angle — we can bait [America Can] and see what happens[.] *Id.*

122.   In March 2013, K4K began openly advertising as K4K in Texas when it purchased radio advertisements with KTRH AM of Houston and Radio One of Texas II. (AC APP at 492). One may infer from the Moskovits/Landau email (¶¶ 120-121) that K4K knew about America Can's presence in Texas at this time; and as such, K4K deliberately infringed on America Can's mark upon its entry into Texas.

123.   On March 28, 2013, America Can's attorneys sent a second cease-and-desist letter to K4K regarding "[K4K's] use of KARS FOR KIDS in Houston." (AC APP at 335-36).

124.   The letter reads in pertinent part (emphasis original):

> Your use of a trademark essentially identical to our client's trademark for identical services is not only likely to confuse current and potential consumers and vendors into believing that you and your services are associated with, sponsored by, or endorsed by Cars for Kids – but has caused **actual confusion**. In fact, your misappropriation of our client's CARS FOR KIDS, TEXANS CAN ACADEMIES, CAN ACADEMIES and related trademarks as keywords for preferential treatment on Google and other search engines makes it clear that you are intending to create this exact type

of confusion.   See **Exhibit A** for examples of your infringing keyword program.

Your activities constitute several actionable wrongs under state and federal law, including without limitation, trademark infringement and unfair competition under the Lanham Act, entitling our client not only to injunctive relief against your future use of its KARS FOR KIDS mark but also to a monetary award against JOY. In order to resolve this matter without the need for further legal action, we demand that you take the following actions:

1. **Immediately and permanently** cease all use of KARSFOR KIDS or any confusingly similar variations thereof, including, without limitation, in Texas;
2. **Immediately and permanently** cease all use of CARS FOR KIDS, TEXANS CAN ACADEMIES, CAN ACADEMIES or any confusingly similar variations thereof as keywords; and
3. Advise us in writing by no later than **April 5, 2013** of your intent to comply with the foregoing demands by executing and returning Page 2 of this letter.

Our client takes this matter very seriously and enforces its rights vigorously.  If we do not receive timely written assurances from you, we will have no choice but to escalate this matter.  In the meantime, please do not destroy any copies of any materials or correspondence related to these issues, as such actions would constitute spoliation of evidence. Any materials on hard drives of computers, such as e-mails and accounting information, should also be preserved.  This evidence may be relevant in the event that we are unable to resolve this issue amicably.

125.   K4K never responded to the cease-and-desist letter. (T. 747:4-20).

126.   Between March 2013 and January 2015, K4K continued to purchase numerous additional advertisements specifically in Texas as indicated on the Transaction List. (AC APP at 493, 495-96, 498-500, 502-03, 505-513, 515-520, 522). A representative sample of these transactions is as follows:

- $18,422 on April 28, 2013 to KBME AM (Radio)

- $14,816 on June 16, 2013 to Radio One of Texas (Radio)

- $6,693.75 on September 29, 2013 to KROI FM (Radio)

- $14,000 on December 29, 2013 to KTRH AM (Radio)

127.    In or around November 2014, K4K began advertising through SiriusXM satellite radio, an advertising medium without geographic boundary. (AC APP 520; T. 359:16-360:4). These SiriusXM advertising ran on numerous national stations such as CNN, ESPN, Fox News, Mad Dog Sports Radio, NFL Radio, Patriot Plus, Sirius Patriot, and XM ESPN Extra. (K4K Opp. at 12; T. 360:5-18).

128.    In or around November 2014, K4K also began advertising through television, starting in New York. (T. 391:17-23).

129.    Ms. Landau indicated that these advertisements were particularly effective because the commencement of television ads drove large numbers of visitors to K4K's website as determined via Google Analytics. (T. 391:24-392:7).

130.    Ms. Landau testified that one of K4K's 2014 TV advertisements was posted on Youtube and accumulated "almost 2 million views" by the time of trial in May of 2019. (T. 391:17-392:9).

131.    On December 12, 2014, K4K filed its original complaint seeking in part to restrain America Can from utilizing its Cars for Kids mark, the transfer of

www.carsforkids.org to K4K, and an award of America Can's profits. (Original Complaint at ¶¶A-D, ECF No. 1).

132. Mr. Wentworth testified that America Can had been attempting to reach an amicable resolution with K4K since the March 2013 cease-and-desist letter. (Nov. 21, 2019 Damages Hearing T. 44:11-17).

133. Mr. Marquez testified such discussions were ongoing at least through November 2014 when he "thought [the parties] would continue to talk, but [K4K] hit us with a lawsuit about a month later." (T. 588:3-8).

134. On February 5, 2015, America Can replied to K4K's complaint and raised its own counterclaims against K4K. (America Can Answer, ECF No. 16).

135. In or around July of 2015, the parties had reportedly reached settlement terms and so the Court had entered an order dismissing the case with prejudice as settled. (ECF No. 42). Subsequent problems arose with the terms, however, and the case was reopened on July 8, 2016. (ECF No. 64).

### IV. Conclusions of Fact and Law

Based on the above, I now find the following conclusions of fact and law:

a. Laches

136. Adopting the jury's findings, America Can is primarily a Texan not-for-profit organization, largely conducting its car donation program in Texas since its inception, including the time frame between 2003 and 2013.

Rationale: This finding aligns with the jury's determination. *See* Section I – the Jury's Findings. Although America Can solicited donations from across the nation (¶28) and at times began branching out to other states with its donation solicitations and charitable endeavors (¶20), it nonetheless operated primarily in Texas.  Its establishment by Grant East to educate juvenile delinquents and dropouts in Texas (¶¶2, 6), as well as its business and assumed name certificates filed with Texas governmental entities (¶8) all establish America Can as a Texas-centric entity. Further, the majority of its advertising and the "bulk" of its car donations occurred in Texas (¶28).

137.   America Can had knowledge and awareness that the protections of its

unregistered mark were likely limited geographically to Texas and its actions

reflect such awareness.

Rationale: The cease-and-desist letters of 2003 and 2013 plainly illustrate this point. In the original 2003 cease-and-desist letter to K4K, America Can referenced Texas as its market. Specifically, America Can "request[ed] that [K4K] forgo [its] use of the phrase 'Kars 4 Kids' in [its] business dealings *in Texas,*" and that K4K should "immediately cease and desist from all use *in Texas* of the Mark or anything confusingly similar thereto[.]" (¶50; AC APP at 356-57) (emphasis added).

Even ten years later in 2013, America Can's second cease-and-desist letter to K4K similarly focused on its Texas operation when it discovered that K4K had advertised in Houston (¶¶123-124). America Can demanded, through its attorneys, that K4K "[i]mmediately and permanently cease all use of KARS FOR KIDS or any confusingly similar variations … *in Texas*," as well as a demand that K4K cease use of "CARS FOR KIDS, TEXANS CAN ACADEMIES, [and] CAN ACADEMIES[.]" (AC APP at 335-336) (emphasis added, caps original).

138.   Between 2003 – 2011, America Can was a small, educational not-for-

profit entity in Texas that was slowly expanding its charitable efforts outside

Texas.

Rationale: Freedom Ministries incrementally grew between its inception (circa 1976) to America Can. (¶¶2, 18).  Its purpose was always to educate needy children with funds raised through the car donation program.  America Can failed

in its attempt to expand its charitable efforts into other states in 2007. (¶20). The Can Academies in Missouri and Louisiana failed due in part to a lack of state funding because of a dispute over school operating hours. (¶20). Thereafter, America Can concentrated its efforts in Texas. (¶20).

139.   Between 2003 – 2013, America Can was a not-for-profit entity familiar with trademark law to recognize and respond to K4K's infringements; but otherwise its educational programs were given priority by management. Moreover, its goal was to fund education goals rather than funding litigation against incidents of infringement outside of Texas at the expense of its charitable endeavors.

Rationale:  During this time, America Can acted promptly when presented with open and notorious infringement by K4K within Texas in 2003 (via print advertisements in the Dallas Daily News (¶¶49-50)) and in 2013 (via radio advertisements (¶¶122-124)). It did not, however, initiate litigation when it encountered similar marks in states other than Texas. (¶¶113-115). Because of its Texas-limited rights (¶¶136-137) and the fact most of its educational endeavors depended on the proceeds of its car donation program (¶¶4, 16), America Can understandably did not pursue costly litigation in venues where its rights were questionable.

140.   Accordingly, during the relevant period, America Can was a not-for-profit entity whose expertise and charitable efforts were directed toward educating youths in need. America Can at this time was protective of its trademark in Texas where its operation was largely located, but was primarily focused on its mission to educate children. Between 2003 and the onset of litigation, I find that America Can's "shoes" were that of a not-for-profit charity rather than a savvy business entity aggressively protecting its mark.  America Can nonetheless was sufficiently

alert to quickly spot clear infringements in 2003 and 2013, and assertive enough to involve lawyers when clearly necessary.

Rationale:  *See* ¶¶138-139.

141.   K4K's early advertising prior to 2003 only reached Texas in a negligible manner, if at all.

Rationale:  K4K distributed fliers by hand within the tri-state area (NY, NJ, and PA) (¶38).  Postcards were sent out via an undisclosed mailing list (¶¶39-41) and ads were placed in a few publications, but these were predominately for the Jewish community and had limited reach (¶¶42-46).

The 2003 *Dallas Daily News* advertisement was the first time K4K reached Texas in manner that was noticed by America Can and it was promptly met with the August 2003 cease-and-desist letter. (¶¶49-50).

142.   K4K's advertising grew in size and types of advertising outlets between 2003 and 2013, but most of it failed to reach Texas in an open and notorious manner.

Rationale:

•   Advertising email blasts were sent out between 2004 and 2005; but no mailing list was introduced into evidence to determine how many, if any, of these emails actually reached Texas. (¶¶58-60).

•   K4K also utilized extensive print advertisements placed in numerous newspapers and magazines across the country (¶¶85-86), but a careful review of Ms. Landau's testimony and K4K's internal records show that these print publications were in fact regional publications distributed in areas outside of Texas. (¶¶87-91).

•   Billboard advertisements were erected in many cities and states outside of Texas (¶92), but there was little evidence that these billboard ads ever reached Texas. (¶¶93-95).

- K4K's conventional radio advertisements covered regional markets in numerous cities and states, but there were no exhibits or testimony showing the radio advertising reached into Texas on a consistent basis prior to 2013. (¶¶96-104).

- K4K advertised in one (possibly two) issues of *Reader's Digest*, a national magazine, in June 2005 (¶105), but there was no testimony or expert evidence explaining the level of circulation or market penetration this isolated advertisement had in Texas.  (¶¶106-108).

- K4K also utilized different forms of online advertising from 2003 onward. Although the evidence and testimony show that online advertising occurred; the evidence lacked any specific findings as to whether it reached Texas in an open and notorious manner before 2013. There was no fact or expert testimony, nor any supporting documentation, to deduce the campaign's level of the market penetration in Texas. For example, there was no evidence showing how many clicks originated in Texas in any specific year.  As such, these online campaigns are minimally persuasive.

As McCarthy has written, the "internet is not a 'territory': it is a communication medium." *See* 5 McCarthy § 26:1.50. McCarthy has concluded that just because "a Web site featuring a trademark can theoretically be accessed on computers from Florida to Alaska and from Beijing to Paris does not mean that the trademark is known and established in all those locations." *Id.* § 26:30.50. "Market penetration by internet use of a mark should be determined, primarily by evidence as to the place where buyers actually purchased the goods and services advertised on the internet site." *Id.* In this case, neither party has undertaken any such analysis in their submissions or in their proofs at trial. Consequently, there is no way to calculate market penetration in this case.  There is no way to distinguish donations prompted by internet advertising from "residual donations," donations by donors familiar with K4K but while in a state where the K4K mark did not appear. (¶36).

143.   K4K's advertised on several online Israeli newspapers but there is no evidence whether these newspapers had any Texas readers. (¶¶82-84).

144.   K4K advertised online with Yahoo, but the record is unclear as to when these advertisements began to reach Texas in any appreciable amount.

Rationale:   There was one analytical report introduced which showed minimal engagement over a three-month period in 2003 across the entire nation. (¶¶63-67). However, no other evidence was submitted for subsequent years showing what level of engagement was reached in Texas.

145.   K4K advertised online with Google from 2003 onward. Ms. Landau testified that between 2003 and the time of trial in 2019, K4K generated over 600 million ad impressions and 4 million clicks with Google, but the evidence indicates that this substantial level of engagement began around 2011 or later.

Rationale:  General invoice summaries were introduced showing that K4K indeed utilized Google from 2009 onward (¶¶74-75), but these invoices do not show any year-by-year details. However, one can infer from the record that a large portion the user engagement Ms. Landau testified about occurred in or around 2011 and later. (¶¶77, 80).

Specifically, K4K's early transactions with Google around 2003-2005 were comparatively small, between a few hundred to few thousand dollars. (¶78). However, in or around 2011-2013, K4K's payments to Google more routinely rose to six-figure amounts. (¶79). One can infer that K4K's substantially larger advertising expenditures corresponded to greater comparative reach with Google advertising. Simply put, one may infer that a September 2013 expenditure of $304,034.79 in advertisements (ACP APP at 501) is far more likely to have reached Texas and engaged a larger number of users compared to a September 2005 expenditure of only $2,402.18 (AC APP at 389). As such, K4K may indeed have generated over 600 million ads and 4 million clicks between 2003 and 2019, but absent any fact or expert evidence, the reasonable inference is that it began reaching Texas in an open and notorious manner around 2011 - 2013.

146.   In 2011, America Can became aware of K4K operating www.carsforkids.com and K4K's increased online presence. At that time, America Can contacted their lawyers. Because of their geographically limited rights, it decided not to initiate litigation and proceeded to stay on high alert, monitoring the situation into 2012. (¶¶116-117).

147.   In 2012, K4K's advertisements via Pandora streaming radio commenced, but none of these would have prompted America Can to act sooner as they were targeted at markets outside of Texas. (¶¶118-119).

148.   In March 2013, K4K began openly advertising via radio in Texas, a clearly open and notorious infringement that a reasonable entity in America Can's shoes would be expected to act upon. (¶122). America Can promptly issued a second cease-and-desist letter. (¶123).

149.   Between 2003 – 2013, America Can was a not-for-profit entity in Texas principally focused on the education and care of needy youths. It was generally aware of its geographically limited rights and avoided costly litigation over questionable infringements in other states. It was also generally alert to clear infringements, as evidenced by its prompt cease-and-desist letters in 2003 and 2013.

Rationale:  Based on the fact that only a negligible number of advertisements, if any, reached Texas between 2003 and 2011, an entity in America Can's shoes would not conclude that it had a valid claim of infringement against K4K any earlier than 2011. The reasonable entity might initiate litigation over the www.carsforkids.com revelation immediately, but it may seek legal advice initially. Since the law on infringement via internet advertising is less certain than that of traditional advertising (¶142), a reasonable entity in America Can's shoes with geographically limited rights may sensibly await more concrete evidence of infringement in Texas before concluding they had a viable claim. *See Kars 4 Kids*, 8 F.4th at 221. ("A plaintiff is not obligated to sue until it knows or should know that defendant's conduct constitutes trademark infringement.")

In addition, a not-for-profit like America Can may be concerned about the cost of the litigation; and such a cost may enter into its decision-making about filing a suit based only on potential internet infringement.  As McCarthy states:

"Lawyers and lawsuits come high and a financial decision must be made in every case as to whether the gain of prosecution is worth the candle." See 6 McCarthy § 31:19 (quoting *Cullman Ventures, Inc. v. Columbian Art Works, Inc.*, 717 F. Supp. 96, 126-27 (S.D.N.Y. 1989)).

The reasonable entity would thus be expected to act immediately upon a clear infringement in Texas, much like America Can did in 2013 upon recognizing K4K's radio advertisements. (¶¶122-123).

150.   America Can understandably delayed filing suit because the character of K4K's advertising changed substantially over the years.  K4K's advertising appeared in Texas in 2003 (¶49), more or less disappeared from Texas until 2011 when it appeared in a limited way on the internet (¶116), and then openly reappeared in 2013 in Texas with a burst of radio advertisements (¶¶122, 126).

Rationale:   Another reason for delay in filing is that the "character and scope of the alleged infringement changed substantially over the years."  *See University of Pittsburgh*, 686 F.2d at 1046. This progression of K4K's advertising methods illustrates a slow, steady change in the use of a mark in a new territory that can excuse prior delay in commencing action. See 6 McCarthy § 31:19; *see also Analytic Recruiting, Inc. v. Analytic Resources, Inc.*, 156 F. Supp. 2d 499 (E.D. Pa. 2001) (recognizing that "[c]hanges in the quality and quantity of the alleged infringement use can excuse delay in suing"). "[I]t is only when 'the accused use moves closer or increases in quantity that the doctrine of progressive encroachment requires the trademark [owner] to remain alert and to promptly challenge the new and significant acts of infringement.'" *Urban Outfitters, Inc. v. BCBG Max Azria Group, Inc.*, 511 F. Supp. 2d 482, 509 (E.D. Pa. 2007) (citing McCarthy § 31-20 (4th ed. 2006)).

151.   There was a delay between the reappearance of clear infringements in 2013 (¶122) and America Can's responsive claims in 2015 (¶134), but this is excusable because America Can sought to resolve or settle same prior to litigation. (¶¶132-133, 135)

Rationale: "Delay in filing suit for infringement will not count toward laches if during that time the parties were engaged in good faith settlement negotiations." 6 McCarthy §31:15. Although time spent in settlement discussions can be discounted when those efforts have no "fair chance of success," *id.* at n.2 (citing *Eat Right Foods Ltd. v. Whole Foods Mkt., Inc.,* 779 F. App'x 471, 473 (9th Cir. 2019)), the parties nearly reached a settlement following the initiation of litigation (¶135) and thus the discussions referenced by Mr. Marquez and Mr. Wentworth between 2013 and 2014 (¶¶132-133) had a fair chance of success. As such, America Can's delay in filing suit between 2013 and 2015 was reasonable and thus excusable.

152.   Finally, K4K engaged in other open and notorious means of national advertising like television, satellite radio, and YouTube which unquestionably permeated into Texas due to the mechanics behind each, but the evidence indicates that each of these commenced in or around November 2014. (¶¶127-130). As such, it does not relate back to the 2003 cease-and-desist letter.  Further, K4K commenced advertising through these mediums on the eve of litigation while the parties were reportedly in settlement discussions. (¶¶132-133). Accordingly, these advertisements would have prompted a reasonable entity to take action, but not earlier than America Can already did.

153.   Although K4K engaged in other forms of advertising during the pertinent times (2003-2015), none of such were discussed at length in the briefing and entail similar problems to the advertising mediums discussed above. Accordingly, I assign them little weight. This includes in representative part:

- Indoor posters at malls and shopping centers in states like Florida, Illinois, California, and Virginia, but which would inherently suffer from limited reach (T. 388:1-390:5);

- Assorted web mediums like Superpages.com or Microsoft Adcenter (AC APP at 390, 440) for which no explanatory evidence was introduced; and
- Many, many mediums for which little more than a date, name, and cost was available, such as "Car Buyer's Market", E & M Media Group, and RNS Communications, Inc. (AC APP at 368, 373, 446).

154.    Ultimately, "laches focuses on the excusability of the delay . . . not the length of the delay per se." *Gruca v. United States Steel Corp.,* 495 F.2d 1252 (3d Cir. 1974). After careful consideration of the record, I find no inexcusable delay by America Can between 2003 and 2013 for the reasons set forth above.

155.    K4K was not prejudiced by America Can's delay because it assumed the risk of its advertising campaigns.  Moreover, K4K's advertising in Texas in the years after 2013 skyrocketed commensurate with the course of this litigation, which to me infers K4K's clear assumption of the risk.

Rationale:  When assessing prejudice in a laches analysis, one most often looks at economic or evidentiary prejudice. *Gloster v. Relios, Inc.*, 2006 U.S. Dist. LEXIS 42740, at *6 (E.D. Pa. June 23, 2006). Here, the Court reviews potential economic prejudice. (America Can Brief at 14-15; K4K Opp. at 15-20).[8]

On appeal, America Can argued that K4K suffered no prejudice because it assumed the risk that its financial investments might be disrupted when it ignored the 2003 and 2013 cease-and-desist letters. *Kars 4 Kids*, 8 F.4th at 222 n.13. The Third Circuit agreed that other circuits had accepted this line of reasoning but stopped short of expressing its own opinion and invited me to consider several cases when deciding whether K4K had been prejudiced. *Id.* I do so now:

In *Elvis Presley Enters., Inc, v. Capece*, 141 F.3d 188 (5th Cir. 1998), the assignee of all trademarks related to Elvis Presley's estate sent a cease-and-desist

---

[8] Although K4K's counsel briefly alluded to evidentiary prejudice at the remand oral argument when discussing the availability of documents (Nov. 30, 2021 Remand Hearing T. 24:10-15), the briefing focuses entirely on economic prejudice.

letter to a prospective club owner looking to operate a new club called the Velvet Elvis, eventually filing suit less than one year after the letter. *Elvis*, 141 F.3d at 191-92. The Fifth Circuit indicated that any "acts after receiving a cease and desist letter are at the defendant's own risk because it is on notice of the plaintiff's objection to such acts." *Id.* at 205.

In *Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145 (5th Cir. 1985), the owners of the registered CONAN THE BARBARIAN trademark became aware of an Austin, Texas chain of restaurants called Conans Pizza and made no effort to enforce their trademark until five years later when a letter of objection was forwarded. *Conan*, 752 F.2d at 147-49. Although the Fifth Circuit found that the owners waived their right to protect their mark after five years of acquiescence, they found that imposition of laches was improper with regard to a new store in San Antonio that opened after receiving the letter of objection as the defendants had "opened that restaurant at its own peril[.]" *Id.* at 152-53.

In *Citibank, N.A. v. Citibanc Grp., Inc.*, 724 F.2d 1540 (11th Cir. 1984), the titular financial institution that owned the registered trademark "CITIBANK" wrote numerous letters to a holding company between 1972 and 1977, respectively when the defendant adopted the name Citibanc and when its subsidiary banks changed their names to include Citibanc, whereupon Citibank filed suit two years later. *Citibank*, 724 F.2d at 1542, 1546. The 11th Circuit found that where the defendant had received the letters and nonetheless enlarged their use of the mark "with the complete realization that the [mark owner] disputed their use and did not intend to acquiesce," laches was not appropriate. *Id.* at 1546-47.

After consideration, I find that the assumption-of-the-risk reasoning underlying each of the above cases to be persuasive. K4K opposes this result, arguing the cited cases are distinguishable because none of them entailed a delay as long as America Can's alleged delay in the present case. (K4K Opp. at 17-19). K4K's argument lacks merit.

In this case, unlike those above, America Can's mark was unregistered and could thus sustain a claim of infringement only in Texas.[9] The filing of an action was thus not immediately appropriate after the 2003 cease and desist letter was sent because K4K's advertising program was scaled back in Texas until 2013.

---

[9] Each of the discussed cases, by contrast, entailed a registered trademark where any infringing use nationwide would likely be actionable due to the national protections offered by registration. *See* 15 U.S.C. § 1057; *see also* 3 McCarthy § 20:17 ("The owner of a territorially unrestricted federal registration has a presumptive exclusive right to use which extends throughout the United States.")

(¶¶54, 122). Moreover, the bulk of K4K's substantiated Texas advertising emanated after America Can's 2013 cease and desist letter.  As such, K4K was informed of the risk in 2013, but chose to accelerate its advertising expenditures in Texas despite the warnings.  Accordingly, the assumption-of-the-risk reasoning is adopted here. K4K ramped up its advertisements in 2013 despite two warnings from America Can in 2003 and 2013; and K4K in 2013-14 unilaterally initiated and raised the stakes in this dispute.  Due to K4K's assumption of the risk, there is no prejudice to K4K.

### b.  Equitable Considerations

After carefully considering the record, I also find that K4K's conduct over the years constitutes unclean hands that precludes the invocation of laches. In reaching this conclusion, I make the following findings:

156.   First, Mr. Moskovits admitted that K4K, having received the 2003 cease-and-desist letter from America Can, did not undertake any investigation of America Can's claims of trademark rights in Texas. (¶52).

157.   Second, Rabbi Mintz admitted that K4K treated the matter with a dismissive attitude, testifying that K4K never responded to the aforementioned letter and instead chose to ignore it because "[K4K] just figured [America Can was] trying to piggyback on [K4K] … we didn't take them seriously[.]" (¶53).

158.   Third, in 2011, K4K had knowledge of America Can's identity. Despite same, K4K registered and operated www.carsforkids.com, noting on the landing page that carsforkids.com was "a division of Kars4Kids.org," and that visitors could communicate with K4K by contacting "Cars for Kids" by phone,

email, and mail.  K4K undertook same without any disclaimer or

acknowledgement of America Can. (¶116).

159.   Fourth, in October of 2012, Mr. Moskovitz emailed Ms. Landau

regarding America Can, writing that "[f]rom a marketing standpoint – if Texas cars

for kids is very branded there may always be confusion – even though [in] the

beginning that may be to our advantage in the long run it can hurt us too[.]" (¶120).

Further down in the email, Mr. Moskovitz continues on to suggest K4K enter

Texas under a new, similar name like Donate Cars such that "[f]rom a legal angle –

we can bait them and see what happens[.]" (¶121). K4K nonetheless blatantly

marketed infringing advertisements via Houston radio just five months later.

(¶122).

160.   I find that the above conduct shows unclean hands.  The imposition of

laches would therefore be inappropriate given K4K's unclean hands by its willful

infringement. *Kars 4 Kids*, 8 F.4th at 221 n.12 (citing *A.C. Aukerman Co. v. R.L.*

*Chaides Constr. Co.*, 960 F.2d 1020, 1033 (Fed. Cir. 1992) ("Where there is

evidence of other factors which would make it inequitable to recognize the defense

despite undue delay or prejudice, the defense may be denied")).

Rationale: The Third Circuit acknowledged America Can's alternative
arguments that K4K had unclean hands and that as an "intentional infringer" it
could not take advantage of equitable doctrines such as laches. *Kars 4 Kids*, 8 F.
4th at 221 n.12. It subsequently left consideration of these concerns to me on
remand, to determine if "the equities of the case outweigh any finding of delay or
prejudice." *Id.* (citing *Aukerman*, 960 F.2d at 1033).

"Pervading the administration of equity in all its branches are certain broad principles, so generally accepted and of such fundamental characters that they have become known as maxims." *Fullman v. Steel City Electric Co.*, 2 F.2d 4, 6 (3d Cir. 1924). One such maxim is that "he who comes into equity must come with clean hands." *See Monsanto Co. v. Rohm & Haas Co.*, 456 F.2d 592, 598 (3d Cir. 1972) (quoting *Precision Instrument Mfg. Co. v. Automotive Maint. Machinery Co.*, 324 U.S. 806, 816 (1945)); 6 McCarthy § 31:44.

The Supreme Court noted that "[a]ny willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim[.]" *Precision Instrument*, 324 U.S. at 815. Unclean hands has been found where a litigant's conduct has been determined to simply run afoul of justice, good faith, uprightness, fairness, conscientiousness, or public policy. 6 McCarthy § 31:46 (citing cases).[10] Further, the alleged misconduct must "in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication." *Highmark, Inc. v. Upmc Health Plan*, 276 F.3d 160, 174 (3d Cir. 2001). "The nexus between the misconduct and the claim must [therefore] be close." *Id.* (internal quotation omitted). Here, the above points clearly bear on the equitable relations between America Can and K4K with respect to the unauthorized use of trademarks.

### c. Disgorgement

Finally, I address disgorgement. As noted above, I must here "apply the remaining" *Banjo Buddies* factors aside from the second, diversion of sales. *Kars 4 Kids*, 8 F.4th at 223.

---

[10] This is not to say there is no minimum bar; some courts have restricted the use of unclean hands to cases involving "wrongfulness, willfulness, bad faith, or gross negligence, prove[n] by clear and convincing evidence." *See* 6 McCarthy § 31-46 (citing *Pinkette Clothing, Inc. v. Cosmetic Warriors Limited*, 894 F.3d 1015, 1029 (9th Cir. 2018)); *see also Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 129 (3d Cir. 2004) ("Because a central concern in an unfair competition case is protection of the public from confusion, courts require clear, convincing evidence of 'egregious' misconduct before invoking the doctrine of unclean hands.") (citation omitted).

i.   Intent to Confuse or Deceive

The first factor is whether K4K had the intent to confuse or deceive. I find that the same facts discussed in the above assumption of the risk and equitable considerations section apply here as well. Specifically, K4K personnel internally recognized America Can was well branded in Texas and that entry could cause confusion which would likely benefit K4K for a time. (¶¶121-122). They nonetheless entered the Texas market in or about 2013 and caused increased confusion by use of its mark while capitalizing on America Can's mark. (¶112). Further, I find that K4K's registration and operation of www.carsforkids.com without any acknowledgment or disclaimer of America Can, whom K4K was aware of, constitutes a culpable intent to confuse. (¶116). I therefore find that K4K's planning and conduct prior to entry into Texas in 2013 are sufficiently culpable to weigh in favor of disgorgement.

ii.   Adequacy of Other Remedies

The next factor, adequacy of other remedies, favors disgorgement. K4K argues that the implemented injunctive relief is an adequate remedy for America Can because there was no fraud, palming off, damage to America Can, or profit to K4K since its imposition. (K4K Opp. at 28-29) (citing *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 131-32 (1947)).  To the contrary, there are several important facts that show the inadequacies of an injunction:

- The jury determined that K4K only infringed in one state; and that America Can did not show by clear and convincing evidence that K4K knowingly procured its registration of its trademark by false or fraudulent declarations.  Any imposition of an injunction must be fashioned to preserve the jury's findings.
- Since Texans relocate and travel on vacation, America Can and K4K's marks may overlap.  As such, there will always be some interaction between K4K and America Can's respective marks in Texas that results in "residual donations." (¶36). An injunction in this situation only minimizes the incidences of confusion in Texas.
- Internet and satellite services are part of K4K's advertising program. They cannot be enjoined from entering Texas, so K4K's use of those services will enter or reach into Texas, even with a disclaimer. As a result, an injunction of some activity may minimize confusion, but will not prevent internet or satellite services from communicating into Texas.

These residual interactions with Texas show that there will always be some interactions with the respective marks in Texas; and an injunction alone is insufficient to fully remedy the adverse effects of K4K's infringement. As such, this factor favors disgorgement as a means of damages.

### iii.  Unreasonable Delay by Mark Owner in Asserting Rights

For the reasons outlined above in the laches discussion, I find that America Can did not unreasonably delay in asserting its rights and so the factor favors disgorgement.

### iv.  Public Interest in Making Misconduct Unprofitable

The next factor, the public interest in making the misconduct unprofitable, weighs heavily in favor of disgorgement. In opposition, K4K argues that the public interest would "plainly not be served by taking revenues intended to serve K4K's

charitable mission and conferring a windfall on America Can." (K4K Opp. at 29). Although the Court is hesitant to impose the so-called "windfall" upon K4K, it is directed to another charity, so the sting of the remedy is lessened.

"As a general matter, the public has a great interest in making trademark infringement unprofitable." *CPC Props. v. Dominic, Inc.*, 2013 U.S. Dist. LEXIS 145907, at *10 (E.D. Pa. Oct. 9, 2013). The public interest would be better served if two charities like America Can and K4K would pause and consider their adversary's not-for-profit purpose in resolving their disputes in an equitable manner rather than ignoring warnings and ramping up the controversy.

Further, K4K argues disgorgement is inappropriate here, but in its original complaint, it requested an order "that America Can! account to Kars 4 Kids for its profits (disgorgement) and damages sustained by Kars 4 Kids . . ." (Original Complaint at ¶C). Even though K4K only asked the jury for injunctive relief at trial, it is a bit disingenuous to argue against damages here.

## v.  Palming Off

The final factor is whether K4K's conduct constituted palming off.  "Passing off (or palming off, as it is sometimes called) occurs when a producer misrepresents his own goods or services as someone else's." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 27 n.1 (2003) (citations omitted). "Stated differently, 'A' sells 'A's' products under 'B's' name." *Kitchen & Bath*

*Concepts of Pittsburgh, LLC v. Eddy Homes*, 2016 U.S. Dist. LEXIS 177016, at

*17 (W.D. Pa. Dec. 22, 2016) (internal citations omitted).

Although America Can argues that K4K's use of "www.carsforkids.com"

resulted in a diversion of sales and should be construed as a case of palming off

(AC Br. at 29), I find that this is not a case of palming off as the record does not

show any instances where K4K held themselves out as America Can. K4K

unscrupulously utilized www.carsforkids.com but the webpage itself made clear it

was operated by K4K. As such, I find it to be less a case of K4K pretending to be

America Can to solicit donations and more a matter of K4K improperly using

America Can's name to draw in additional consumers to its own service.

Taken in the aggregate, I find that the equities as explained above favor

disgorgement. Since the jury found K4K willfully infringed in Texas, the

injunction has some imperfections in enforcement, and this Court previously found

disgorgement more suitable than compensatory damages, disgorgement is

appropriate to remedy the infringement.[11] *Banjo Buddies*, 399 F.3d at 178.

However, in light of the Court's revisit of laches and review of K4K's past

conduct, namely how infringement re-commenced between 2011-2013, the parties

should each submit a letter indicating if and how the Court should adjust the total

amount to be disgorged given that its original calculation relied on K4K's gross

---

[11] Although the Third Circuit did not require a revisit of the original disgorgement calculation (*Kars 4 Kids*, 8 F4th at 218 n.5), the findings of fact here suggest other damages may be revised. See. Fed. R. Civ. P. 60.

and net revenue amounts between 2008 through 2019. (April 1, 2020

Memorandum at 9).

## V.    Conclusions

For the all the above reasons, I find that laches remains inappropriate in this

case and that *Banjo Buddies* factors weigh in favor of disgorgement. A

corresponding judgment will follow.


s/*Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

June 10, 2022